### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS
### KANSAS CITY, KANSAS DIVISION

D.M. a minor, by and through his next friend and
natural guardian, KELLI MORGAN,

                         Plaintiff,

vs.
                                                                    Case No._____

WESLEY MEDICAL CENTER LLC d/b/a
WESLEY MEDICAL CENTER-WOODLAWN;
WESLEY-WOODLAWN CAMPUS,
BRIDGET GROVER, PA-C;
DR. GREGORY  FAIMON,
LISA JUDD, RN;
VIA CHRISTI HEALTH SYSTEMS d/b/a
VIA CHRISTI-ST FRANCIS;
JENNIFER CHAMBERS-DANEY, ARNP;
DR. BALA BHASKAR REDDY BHIMAVARAPU;
DR. CONNOR HARTPENCE;
DR. STEFANIE WHITE
DR. JAMIE BORICK,
and AARON KENT, RN.

                         Defendants.

### COMPLAINT

        COMES NOW D.M., by and through his attorney Daniel B. Giroux of the DUGAN &

GIROUX LAW, INC. and Stephen J. Torline, Michael J. Kuckelman and Benjamin T. Friesen of

the law firm KUCKELMAN TORLINE KIRKLAND, and alleges the following for his causes of

action against Defendants:

### PARTIES

        1.        Plaintiff D.M. is a citizen of the State of Colorado and currently resides at 11992

Ridge Parkway, Apt. 206, Broomfield, Colorado, 80021.

        2.        Defendant Wesley Medical Center, LLC ("Wesley Medical Center"), is a Delaware

LLC with its principal place of business in Kansas and a Kansas healthcare provider as defined by K.S.A. § 40-3401.  It may be served with process by mailing a copy of the summons and this Complaint via certified mail, return receipt requested, to its registered agent.

3.    At all relevant times, Defendant Bridget Grover, PA-C was a Kansas licensed and practicing physician's assistant and a citizen of the State of Kansas.  Ms. Grover may be served with process by mailing a copy of the summons and this Complaint by certified mail, return receipt requested, to her residence of 3021 E. 101st St. North, Valley Center, KS  67147.

4.    At all relevant times, Defendant Dr. Gregory Faimon was a Kansas licensed and practicing physician and a citizen of the State of Kansas. Dr. Faimon may be served with process by mailing a copy of the summons and this Complaint by certified mail, return receipt requested, to his residence of 3800 E 93rd St North, Valley Center KS, 67147.

5.    At all relevant times, Defendant Lisa Judd, RN was a Kansas licensed and practicing registered nurse and a citizen of the State of Kansas.  Ms. Judd may be served with process by mailing a copy of the summons and this Complaint by certified mail, return receipt requested, to her residence at 226 S. Holyoke, Wichita, KS  67218.

6.    Defendant Via Christi Hospitals Wichita, Inc. is a Kansas corporation with its principal place of business in Kansas and a Kansas healthcare provider as defined by K.S.A. § 40-3401. It may be served with process by mailing a copy of the summons and this Complaint via certified U.S. mail, return receipt requested, to its registered agent, Corporation Service Company, 2900 SW Wanamaker Drive, Suite 204, Topeka, KS 66614.

7.    At all relevant times, Defendant Aaron Kent, RN was a Kansas licensed and practicing registered nurse and a citizen of the State of Kansas.  Mr. Kent may be served with process by mailing a copy of the summons and this Complaint by certified mail, return receipt requested, to his residence at 1824 N. Turquoise St., Wichita, KS  67212.

8.      At all relevant times, Defendant Bala Bhaskar Reddy Bhimavarapu, M.D. was a Kansas licensed and practicing physician and a citizen of the State of Kansas.  Dr. Bhimavarapu may be served with process by mailing a copy of the summons and this Complaint by certified mail, return receipt requested, to his residence at 9911 E. 21st St. N., Apt. 1102, Wichita, KS  67206.

9.      At all relevant times, Defendant Jennifer Chambers-Daney, ARNP, was a Kansas licensed and practicing advanced registered nurse practitioner and a citizen of the State of Kansas.  Ms. Daney may be served with process by mailing a copy of the summons and this Complaint by certified mail, return receipt requested, to her residence of 8114 E Boston St, Wichita, KS 67207-3301.

10.     At all relevant times, Defendant Connor Hartpence, M.D. was a Kansas licensed and practicing physician and a citizen of the State of Kansas.  Dr. Hartpence may be served with process by mailing a copy of the summons and this Complaint by certified mail, return receipt requested, to his residence of 233 N. Edgemoore St., Wichita, KS  67208.

11.     At all relevant times, Defendant Stefanie White M.D. was a Kansas licensed and practicing physician.  Dr. White is now a citizen of the State of Missouri.  Dr. White may be served with process by mailing a copy of the summons and this Complaint by certified mail, return receipt requested, to her residence of 5933 Kingsbury Ave., Apt 3w, Saint Louis, MO  63112.

12.     At all relevant times, Defendant Jamie Borick, M.D. was a Kansas licensed and practicing physician and a citizen of the State of Kansas.  Dr. Borick may be served by mailing a copy of this Complaint by certified mail, return receipt requested at her residence of 758 South Broadview St, Wichita, KS 67218-2106.

13.     At all relevant times, a physician/patient relationship existed between D.M. and Defendant physicians.

14.     At all relevant times, a nurse/patient relationship existed between D.M. and

Defendant nurses.

15.     At all relevant times, a mid-level practitioner/patient relationship existed between D.M. and Defendant mid-level providers.

16.     At all relevant times, a hospital/patient relationship existed between D.M. and Defendant hospitals.

17.     At all relevant times, the individual Defendants were providing healthcare within their specialties and chosen practices and provided care and treatment to D.M. while holding themselves out as specialists in their chosen fields using that degree of care, skill, diligence and attention as used by other medical providers in the practice of those specialties.

18.     The acts performed by each individual Defendant alleged herein were at all times performed during the course and scope of their employment with either Via Christi or Wesley Medical Center.  At the time each individual Defendant rendered care to D.M., they were employees of either Via Christi or Wesley Medical Center.  The individual Defendants' care and treatment of D.M. was in the course and scope of their employment with Via Christi or Wesley Medical Center.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) in that Plaintiff is a Colorado citizen, the Defendants are either Kansas, Missouri, or Delaware citizens, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omission giving rise to these claims occurred in Kansas.

21.     This Court has personal jurisdiction over all Defendants because they transacted the business alleged herein and committed the tortious acts alleged herein in Kansas.

## D.M.

22.     Prior to March 5, 2017, D.M. was a healthy, active five-year old.

23.     D.M. loved being a big brother to two younger foster sisters whom his parents took in and raised.

24.     D.M. was full of life and precocious. He liked to rock climb, bike ride and help his parents garden.



25.     D.M., his parents, and his foster siblings lived in Haysville, Kansas.

26.     D.M. enjoyed kindergarten and was excited to begin first grade.

27.     D.M. is his parents' only biological child.

28.     On March 6, 2017, D.M. suffered a catastrophic and medically-preventable stroke that left him with right-side paralysis, neurological damage and other debilitating physical injuries that permanently changed his and his parents' lives.

29.     As a result of the medically-preventable stroke, D.M. is permanently paralyzed on his right side, has significant neurological deficits, has permanent impaired eye movement, permanent difficulty swallowing and slowed speech, permanent truncal ataxia known as "drunken sailor" gait characterized by uncertain starts and stops and unequal steps, difficulty speaking, and is wheelchair dependent as well as many other health related problems attributable to the stroke.

30.     D.M. now describes his right side as "not awake yet."



31.     Where D.M. once enjoyed helping his parents garden and riding his bike, he now requires his parents' help to perform simple tasks like picking up a Lego.

32.     D.M. misses his beloved foster siblings who had to be moved in order for his parents to be able to provide the intensive care D.M. now requires and will require for the rest of his life.

### D.M.'s Symptoms

33.     On March 4 and 5, 2017, D.M. began suffering headache, dizziness, nausea, unbalance, vomiting and lethargy.

34.     On the evening of March 5, 2017, D.M. suffered a headache and head pressure so painful that he began screaming uncontrollably and clutching the back of his head during church service.   In addition, D.M. also displayed slurred speech, photophobia, weakness, and extreme lethargy.

35.     His parents rushed him to the emergency room at Wesley Medical Center-Woodlawn.

### EMERGENCY VISIT TO WESLEY MEDICAL CENTER-WOODLAWN

36.     On March 5, 2017, D.M. presented to Wesley Medical Center-Woodlawn in Wichita, Kansas at approximately 6:19 p.m.

37.     At the time of D.M.'s arrival at Wesley, D.M.'s Mother had to carry him into the emergency room. Once there, D.M.'s Mother spoke with Wesley emergency room personnel and informed them about D.M.'s sudden onset of headache, lethargy, weakness, nausea, slurred speech, photophobia, dizziness, unbalance, vomiting, and disorientation.

38.     At about 6:29 p.m., D.M. was triaged and Defendant Lisa Judd noted headache, dizziness, nausea, and unbalance with no fever.

39.     Pursuant to Defendant Wesley's internal policies and procedures, Defendant Judd triaged D.M. as non-urgent general care, which triggered the involvement of Defendant Bridget Grover.

40.     Defendant Grover is not a physician board certified in emergency medicine.  In fact, Defendant Grover has never attended medical school.

41.     Instead, Defendant Grover is a physician's assistant, which is a mid-level practitioner.

42.     Defendant Wesley utilizes mid-level practitioners like Defendant Grover to staff its emergency room in order to reduce its costs.  While the use of mid-level practitioners reduces

Defendant Wesley's operating costs, it comes at the price of patient care.

43.     Defendant Judd's triage note confirming complaints of headache, dizziness, nausea, and unbalance with no fever was provided to Defendant Grover for her review and Defendant Grover reviewed it.

44.     At 6:32 p.m., Defendant Grover saw D.M. and obtained her own history.

45.     In addition to the triage complaints of headache, dizziness, nausea, lethargy and unbalance with no fever, Grover noted that D.M. also suffered "one bout of vomiting today."

46.     D.M.'s Mother also reported to Defendant Grover that D.M. recently developed slurred speech, photophobia, weakness and his extremities were limp.

47.     Grover then performed a cursory physical examination and failed to perform a neurological assessment or refer D.M. for a neurological assessment.

48.     D.M. vomited again in the emergency room.

49.     A proper neurological assessment at that time would have revealed elevated intracranial pressure and severe neurologic abnormalities.     Instead of performing or referring a neurological assessment, Grover ordered a strep test that came back positive after completing the history and physical examination.

50.     D.M. was prescribed amoxicillin and discharged at 7:06 p.m.

51.     D.M. was discharged with no explanation for his symptoms, no discharge vital signs were taken and his symptoms increased in severity at the time of discharge compared to initial presentation.  For example, his headache worsened and the lethargy, nausea, unbalance, weakness, and dizziness increased.

52.     While at Wesley Medical Center, D.M. was never seen by a physician, never given a neurological assessment, and no imaging of the head was ever considered, ordered or performed.

53.     Despite symptoms unexplained by strep throat, Grover negligently failed to

consider other diagnoses and failed to consult with a physician about D.M.'s complaints of headache, dizziness, nausea, unbalance, lethargy, slurred speech, photophobia, weakness, and vomiting.

54.     Grover also negligently failed to order imaging as well as establish a differential diagnosis that could medically explain D.M.'s condition.

55.     In total, Grover spent only 9 minutes in actual bedside care of D.M.

### DEFENDANT GROVER COMMITTED FRAUD IN RENEWING HER MEDICAL LICENSE AND CRITICIZED PATIENTS WHO USE THE EMERGENCY ROOM UNNECESSARILY

56.     While in the emergency room, D.M.'s Mother questioned Grover's diagnosis of strep in the face of D.M.'s clinical presentation of sudden debilitating headache, nausea, vomiting, lack of balance, lethargy, slurred speech, weakness, and photophobia.

57.     Defendant Grover became rude and dismissive of D.M.'s Mother's concerns. Defendant Grover cut D.M.'s Mother off and abruptly left the room.  Grover never returned.  Instead, a Wesley nurse subsequently apologized to D.M.'s Mother for Grover's behavior.

58.     Grover's rude and dismissive behavior to D.M. and his Mother is consistent with Grover's attitude towards patients who she believes "bog down" the emergency room for treatment of "chronic" illnesses, "pain control" issues or those patients who use the emergency room as a substitute for a visit to a doctor's office. On her Facebook page, Defendant Grover posted: "Reading this sounds like a typical day" and agreed with the following criticism of those who she believes abuse emergency room care:

> Emergency, as per the all-knowing Webster, is defined as an unforeseen combination of circumstances or the resulting state that calls for immediate action. Furthermore, an emergency is also defined as an urgent need for assistance or relief.
>
> These definitions sound pretty spot-on, right? When thinking about emergency room settings, even, one can easily correlate the words of Webster to what one would necessitate to be a situation requiring emergency medical treatment. A trauma. Broken bones. A heart attack. A stroke. A seizure. Respiratory distress. A cardiac arrest. The list goes on and on and on. When a critical illness or injury occurs, then, we should all

be thankful that we live within a society where emergent, life-saving medical care is available.

Lately, though, it seems the system meant to provide this care is being bogged down by questionable decision-making. Instead of providing emergent care, it seems I spend at least half of my emergency room time now playing doctor to chronic illnesses. To pain control issues. To mildly elevated blood pressure readings. To months of nonspecific weaknesses and fatigue. To office appointments sent to the ER because "we are overbooked today." And our ER is not alone. I hear the frustration of my colleagues and see first-hand how overworked most of us who provide health care in the ER setting have become…

59.     In addition to her troubling attitude towards patient care and unbeknownst to D.M. and his parents, the Kansas Board of Healing Arts had previously determined and adjudicated that Grover committed fraud in connection with her attempt to renew her medical license.

60.     Although D.M. and his parents had no way of knowing this at the time, Wesley Medical Center knew or should have known that Grover had previously committed fraud by falsely certifying that she had obtained the requisite Continuing Medical Hours ("CME") hours necessary to renew her medical license when, in fact, Grover had not obtained the requisite CME hours.

61.     The Board of Healing Arts of the State of Kansas entered a Final Order finding that Grover committed fraud or misrepresentation by lying to the Board.  The Order concluded:

11.     By certifying that the licensee had met the requirement for renewal, Licensee violated K.S.A. 65-2836 (q), "committed fraud or misrepresentation in applying for or securing an original, renewal or reinstatement."

62.     At the time of D.M.'s presentation to Wesley, Defendant Dr. Gregory Faimon claimed he was available for consultation.  Defendant Faimon was responsible for supervising Defendant Grover because she was only a mid-level practitioner.

63.     While Dr. Faimon was responsible for supervising Defendant Grover, Dr. Faimon never saw D.M. nor did he review D.M.'s chart until after D.M. was discharged.

64.     Despite no differential diagnoses, without observing D.M. or performing his own independent history and physical exam, and without discussing D.M.'s troubling and worsening

symptoms unexplained by strep throat, Dr. Faimon approved of Grover's care and treatment. As he noted in the chart, "Midlv (Mid-Level) Saw Pt Alone …. I was available for consultation as needed at all times during the patient's visit in the emergency department.  I agree with the clinical impression, plan and disposition."

65.     Dr. Faimon failed to consider other diagnoses, failed to consult a specialist, and failed to order imaging.

66.     Defendants Faimon and Grover both deviated from the accepted standard of care for their care and treatment of D.M.

67.     D.M. spent a total of approximately 61 minutes at Wesley Medical Center and most of that time was spent alone with his Mother while his condition deteriorated.

68.     A simple neurological assessment, which was mandated by D.M.'s presentation, would have led to discovery of D.M.'s elevated intracranial pressure and allowed doctors to relieve the pressure and prevent stroke.

69.     Likewise, a simple CT scan, which was mandated by D.M.'s presentation, would have led to discovery of D.M.'s tumor and obstructive hydrocephalus and allowed doctors to relieve the pressure and prevent stroke.

70.     Instead, Defendants sent D.M. home and his intracranial pressure continued to build.

## POST DISCHARGE FROM WESLEY MEDICAL CENTER-WOODLAWN

71.     After being discharged, D.M.'s condition continued to deteriorate.

72.     D.M. was given his first oral dose of antibiotics to treat strep.

73.     However, D.M. could not tolerate the medicine and developed intractable vomiting, worsening headache and increased lethargy and weakness with difficulty moving himself.

74.     D.M.'s parents became increasingly concerned as D.M.'s condition deteriorated.

75.    At approximately 1:30 a.m. on March 6, D.M.'s symptoms became even more pronounced.  At that time, he was difficult to arouse, his severe headache was worse, he vomited uncontrollably, and failed to respond to basic questions.

76.    Deeply concerned about D.M.'s worsening condition, D.M.'s parents immediately made phone calls to two different hospitals for assistance and at the same time departed to Via Christi -St. Francis in Wichita, Kansas.  While in route, D.M.'s Mother received a return call from one hospital and was instructed to take D.M. to the emergency room.

## EMERGENCY VISIT TO VIA CHRISTI HOSPITAL

77.    D.M. arrived at the Via Christi Hospital-St. Francis (Via Christi) emergency room at approximately 2:22 a.m. on March 6, 2017.

78.    Because of D.M.'s condition, his Mother had to carry him into the Via Christi emergency room.

79.    D.M.'s Mother notified Via Christi emergency personnel of D.M.'s sudden onset of headache, nausea, intractable vomiting, lethargy, weakness, unbalance, dizziness, slurred speech, photophobia, inability to respond to basic questions, inability to walk, knee joint pain, and D.M.'s previous presentation to the Wesley emergency room.

80.    At approximately 2:31 a.m., D.M. was triaged by Defendant Aaron Kent who noted the following chief complaint, "nausea and vomiting, was just diagnosed with strep tonight at Wesley, mom concerned unable to keep meds down to treat it."

81.    Defendant Kent failed to note D.M.'s other concerning symptoms of dizziness, debilitating headache, inability to respond to basic questions, slurred speech, photophobia, difficulty ambulating, weakness, lethargy and unbalance.

82.    Those symptoms are clear indicators for an immediate neurological assessment and CT scan of the head.

83.     At the time of initial triage, D.M. also had abnormal vital signs.

84.     Pursuant to Defendant Via Christi's internal policies and procedures, Defendant Kent triaged D.M. as non-urgent general care, which triggered the involvement of Defendant Jennifer Chambers-Daney.

85.     After waiting alone with his Mother for over two hours at Via Christi, D.M. was finally seen by Defendant Daney.

86.     Defendant Daney is not a physician board certified in emergency room medicine.  In fact, Defendant Daney has never attended medical school.

87.     Instead, Defendant Daney is an advanced registered nurse practitioner (ARNP) which is a mid-level practitioner.

88.     Defendant Via Christi utilizes mid-level practitioners like Defendant Daney to staff its emergency room in order to reduce its costs.  While the use of mid-level practitioners reduces Defendant Via Christi's operating costs, it comes at the price of patient care.

89.     Daney first saw D.M. at approximately 4:48 a.m.

90.     During this time period, D.M.'s intracranial pressure continued to build.

91.     In addition to the multiple clinical signs of increased intracranial pressure that D.M. reported to Defendants, including debilitating headache, weakness, dizziness, nausea, slurred speech, photophobia, vomiting, lethargy, lack of responsiveness, inability to walk by himself, knee joint pain and inability to answer basic questions, D.M.'s vital signs also revealed that his systolic blood pressure was elevated, he was hyperglycemic, his breathing rate was reduced and his heartrate was low.  Hypertension, hyperglycemia, bradypnea and bradycardia are all signs of increased intracranial pressure.

92.     Daney performed a history and charted that D.M. "presents with sore throat and PT (patient) has had a sore throat for unknown time …. was seen at Wesley this eve (evening) 6 pm DX

13

(diagnosed) strep.  PT sent home and then mom states he has been vomiting every hour and not able to keep meds down pain meds.  The onset was unknown.  The course/duration is constant.  Location: pharynx/throat…"

93.     Daney admitted D.M. for observation with the following differential diagnoses: viral pharyngitis, strep throat, viral syndrome, upper respiratory infection and she noted that D.M. was a "failed out patient."

94.     Daney failed to chart that D.M. suffered from debilitating headache, inability to walk, severe lethargy, weakness, dizziness, slurred speech, photophobia, inability to answer basic questions, and severe unbalance.

95.     D.M.'s presentation to Daney was a clear indicator for an immediate neurological assessment and CT scan of the head.

96.     Despite D.M.'s Mother informing Daney about these additional, severe complications and concern for elevated intra-cranial pressure, Daney failed to perform a neurologic examination to rule out head pathologies.

97.     Daney did not consider other more lethal pathologies in D.M., never consulted with a physician or a specialist, and failed to order imaging.

98.     D.M.'s intracranial pressure continued to build.

99.     At approximately 5:18 a.m., D.M. was finally seen by a doctor, albeit junior resident physicians who were subject to supervision by a senior attending physician.

100.     At that time, D.M. was seen by Defendants Dr. Stefanie White, a third-year family practice resident, and Dr. Connor Hartpence, a first-year family practice resident.  They performed a history of D.M.'s symptoms and charted nausea, vomiting, headache and dizziness.

101.     Dr. Hartpence and Dr. White's care and treatment of D.M. was supervised in part by Defendant Dr. Bala Bhaskar Reddy Bhimavarapu who signed off on their treatment notes.

102.    Despite D.M.'s deteriorating condition and symptoms, these Defendant doctors failed to perform a neurological assessment and order a CT scan of the head.

103.    Instead, these junior doctors ordered D.M.'s vital signs to be checked hourly and they specifically "deferred" a neurological assessment to a later time noting: "deferred, pt sleeping, will re-evaluate on the floor."

104.    D.M.'s intracranial pressure continued to build.

105.    Thereafter, for over 3 hours, D.M. was left alone in a room with his Mother while his condition continued to deteriorate.  None of the Defendant health care professionals evaluated D.M. after 7:00 a.m. until he coded at approximately 10:00 a.m.

106.    Shortly before or around 10:00 a.m. on March 6, 2017, D.M. suffered a medically-preventable stroke as a result of unsustainable intracranial pressures.

107.    D.M. became unresponsive in his Mother's arms and stopped breathing with no health care professionals present.

108.    At approximately 10:02 a.m., a Code Blue was initiated because D.M.'s Mother began screaming for someone to help because D.M. stopped breathing.

109.    Upon examination, D.M. had a Glascow Coma Scale score of 3, was hypertonic, had decreased air movement with reduced respiratory rate, and corticate posturing thereby requiring intubation.

110.    As a result of the Code Blue, D.M. received, for the first time, an evaluation by a board-certified physician.

111.    And finally, a CT scan was ordered.

### D.M.'S BRAIN TUMOR AND MEDICALLY-PREVENTABLE STROKE

112.    The CT scan revealed a brainstem tumor and significant obstructive hydrocephalus.

113.    Because of the persistent intracranial pressures caused by the hydrocephalus, D.M.

15

underwent surgery to relieve the pressure and his tumor was resected.

114.    The resected tumor was sent to pathology for analysis, which later revealed that D.M. had a very treatable form of medulloblastoma with a high probability of survival with requisite care and treatment.

115.    However, prior to the surgery to relieve D.M.'s elevated intracranial pressure and tumor resection, and because of the unsustainable intracranial pressures caused by the obstructive hydrocephalus, D.M. sustained a significant brainstem stroke to his left pons.

116.    Had Defendants performed a timely neurological assessment on D.M., he would have failed the assessment and a CT scan would have been ordered prior to D.M.'s stroke.

117.    The CT scan would have revealed the need for immediate treatment to relieve the intracranial pressure.

118.    There was ample time for Defendants to make this discovery and relieve D.M.'s intracranial pressure to prevent D.M.'s stroke.

119.    The stroke rendered D.M. permanently disabled.  He now suffers from, among other physical problems, permanent right-side paralysis, significant neurological deficits, permanent impaired eye movement, permanent difficulty swallowing and slowed speech, permanent truncal ataxia known as "drunken sailor" gait characterized by uncertain starts and stops and unequal steps, difficulty speaking and is now wheelchair dependent.

## D.M.'S DEBILITATING STROKE WAS EASILY PREVENTABLE BY DEFENDANTS

120.    D.M.'s debilitating stroke was easily preventable and should have been prevented by Wesley Medical Center, Via Christi and the individual Defendants.

121.    When a five-year old patient presents to the emergency room with D.M.'s symptoms and vital signs, qualified medical providers should perform a neurological assessment and differential diagnoses.

122.     Despite ample opportunity to do so and clear indicators for a neurological assessment and differential diagnoses, Defendants failed to perform a neurological assessment until after D.M.'s stroke and failed to perform proper differential diagnoses to explain D.M.'s condition.

123.     Despite clear signs that D.M. needed a neurological assessment and would have failed a neurological assessment, Defendants never ordered a CT scan until after D.M.'s stroke and after he became unresponsive.

124.     Defendants had sufficient time and opportunity to do so before D.M.'s stroke and had numerous and clear indicators that D.M. required a neurological assessment and head CT scan.

125.     The stroke-causing intracranial pressure was easily discoverable by Defendants with ample time to relieve the pressure and prevent D.M. from suffering the stroke.

126.     A qualified provider can perform a neurological assessment in less than five minutes.

127.     A CT head scan can be completed in approximately 20 minutes.

128.     Over 15 hours passed from the time D.M. first presented to Wesley Medical Center-Woodlawn to the time of his stroke at Via Christi.

129.     Had Defendants performed a five-minute test and administered a CT scan, D.M. would not be catastrophically injured.

130.     At no point prior to the Code Blue at 10:02 a.m. on March 6, 2017 was a neurologic assessment performed on D.M. and no imaging was considered, ordered, or performed.

131.     Furthermore, there was no consultation with a specialist or an attending physician.

132.     Despite orders to perform routine vital signs on the hour, the assigned nursing staff at Via Christi failed to timely and accurately obtain vital signs on D.M. that would have revealed symptoms of elevated intra-cranial pressures.

133.     The Via Christi nursing staff failed to initiate the chain of command so that D.M.'s condition could be properly addressed by attending physicians and specialists, not residents.

134.     The Via Christi nursing staff further failed to properly monitor, assess, care, treat, document and report D.M.'s deteriorating condition and further neglected D.M. thereby allowing his medical condition to worsen.

135.     D.M. suffered a debilitating stroke that was easily preventable and for which the indicators were plainly present well before the stroke occurred.

136.     As a result, D.M. now requires help from his parents picking up a single Lego instead of rock climbing, biking, helping his parents in the garden, or completing his school lessons.

137.     After D.M.'s stroke, he received significant subsequent care at Children's Mercy Hospital in Kansas City, Missouri and at Denver Mercy in Denver, Colorado.

## DEFENDANT WESLEY ATTEMPTED TO COVER UP THE WESLEY DEFENDANTS' NEGLIGLENCE BY FAILING TO TURN OVER KEY PORTIONS OF D.M.'S MEDICAL CHART TO D.M.'S FAMILY

138.     After D.M.'s stroke, D.M.'s family requested a copy of D.M.'s medical records from Defendant Wesley.

139.     After receiving D.M.'s request for his medical records, Defendant Wesley produced some of D.M.'s records but failed to produce the initial triage note in which Wesley personnel noted that D.M.'s clinical presentation to Wesley included: headache, nausea, dizziness, and unbalance.

140.     Defendant Wesley subsequently and repeatedly failed to produce this record in response to several more requests by the family for over 8 months.

141.     Finally, in November 2017, after receiving a formal notice to preserve all records, Defendant Wesley produced a copy of the triage note to D.M.'s family.

## DEFENDANT DANEY'S FACEBOOK POSTS

142.     In numerous social media posts by Defendant Daney on her public Facebook page, Daney has revealed her unprofessional attitude, lack of training and disturbing approach to the practice of nursing, caring for patients and treating patients like five-year old D.M.

### DEFENDANT DANEY CANNOT PROPERLY OBTAIN A MEDICAL HISTORY AND COMPLETE HER PATIENT'S MEDICAL CHART

143.    Defendant Daney posted about her inability to obtain a medical history and properly complete her patient's medical chart.  Among other things, Defendant Daney stated: "So… Fill out the whole chart?  I'm confused" and "Does [Daney] chart anything!??"





Emily and Beth did it! They completed Jen's charts! Yeah!



Beth just doesn't get Jennifer sometimes.

**DEFENDANT DANEY HAS NO CONCERN FOR PATIENT SAFETY OR PATIENT SATISFACTION**

144.      In her Facebook posts, Defendant Daney has repeatedly expressed her disdain for her patients, her job and those who question her decisions.  For example, Defendant Daney stated: "The only patient satisfaction that matters… DID YOU DIE??"





 **Jennifer Chambers Daney** shared Nurses Daily's photo.
June 22, 2016 · 🌐



**Nurses Daily**
June 21, 2016 · 🌐

👍 Like Page

Me during sign outs...Thanks to Healthcare NOT FAIR

⤷ Share

👍😆 7

### DEFENDANT DANEY HATES HER JOB AS A HEALTH CARE PROVIDER AT VIA CHRISTI

145.    Defendant Daney has also repeatedly posted that she hates her job as a health care professional providing emergency services to patients like D.M.











**Jennifer Chambers Daney** shared Fuck Sensitivity.'s photo.
July 29, 2016 · 🌐   · · ·



Some days you feel like you're surrounded by fucking morons. On other days you realize it's not just some days.

**Fuck Sensitivity.**
July 29, 2016 · ⚙                              👍 **Like Page**

↪ **Share**

👍😆 15



**Jennifer Chambers Daney** shared Fuck Sensitivity.'s photo.
July 23, 2016 · 🌐                                                   • • •



**Fuck Sensitivity.**                              👍 **Like Page**
July 17, 2016 · ⚙

↪ **Share**

👍😆 21

**Kelly Arrowsmith** Everyday!  👍 1
1y

**DEFENDANT DANEY THINKS CHILDREN ARE "JERKS" AND "ASSHOLES"**

146.     Defendant Daney thinks that children, like D.M., are "jerks" and "assholes."





**DEFENDANT DANEY DOESN'T "GIVE A FUCK"**

147.    Defendant Daney doesn't "Give a Fuck" about her job or her patients like D.M.









**Jennifer Chambers Daney**
August 2, 2016 · 🌐



Inspirational Quote Of The Day

Don't be a stupid motherfuckin dumbass whiny bitchfaced piece of shit.

 Share

😮😆❤️ 31

 **Kevin Wren** amen
1y



**Jennifer Chambers Daney** shared Fuck Sensitivity.'s photo.
August 2, 2016 · 🌐



**Fuck Sensitivity.**
August 1, 2016 · ⚙

👍 Like Page

**DEFENDANT DANEY REPEATEDLY BRAGS ABOUT GETTING DRUNK**

148.    Defendant Daney has also repeatedly posted of her desire to get and remain drunk.



 **Jennifer Chambers Daney** shared Fuck it, lets have a beer's photo.

August 3, 2016 · 🌐

···

## Pouring myself a drink after work like:



**Fuck it, lets have a beer**
August 3, 2016 · ⚙

👍 Like Page

 **Jennifer Chambers Daney** shared Fuck it, lets have a beer's photo.
August 4, 2016 · 🌐



 **Jennifer Chambers Daney** shared 94.3 Rev-FM, The Rock of Texas's photo.
July 8, 2016 · 🌐



**94.3 Rev-FM, The Rock of Texas** is with Ashley Speakman and 41 others.
June 27, 2016 · Facebook Creator · 🌐                    👍 Like Page

↪ Share

👍😆 4

 **Jennifer Chambers Daney** shared Fuck Sensitivity.'s photo.
July 31, 2016 · 🌐



**Fuck Sensitivity.**
July 30, 2016 · ☀

👍 Like Page

 Share

 9

 **Jennifer Chambers Daney** shared Fuck it, lets have a beer's photo.

August 3, 2016 · 🌐



**Fuck it, lets have a beer**
August 3, 2016 · ⚙

| 👍 Like Page |

Best salad dressing EVER.

 Share

 7

**Jennifer Chambers Daney** shared Dark Medics's photo.
August 3, 2016 ·



**Dark Medics**
August 2, 2016 ·

👍 Like Page

Lol ~DM

#darkmedics #doublevision #emslife

↪ Share

👍😂 6



149.     Defendant Daney's posts are a direct reflection of her unprofessional attitude, complete lack of training and qualifications, and her inability to be a patient advocate.

150.     Defendant Daney's posts also reflect a complete lack of supervision and training by Defendant Via Christi of its health care professionals.

151.     Defendant Daney's posts also reflect the standard of care and conduct acceptable by Defendant Via Christi of its health care professionals.   More than 50 Via Christi employees are Facebook "Friends" with Defendant Daney, including Defendant Aaron Kent.

152.     Defendant Kent and other Via Christi employees often "liked" or "loved" Daney's posts where she tells the world that she doesn't know how to complete a medical chart, doesn't "Give a Fuck," criticizes her patients and their families, complains of her job and expresses her desire to get drunk.

### WESLEY MEDICAL CENTER-WOODLAWN'S STROKE CARE COMMERCIAL

153.     At all relevant times, Wesley Medical Center-Woodlawn advertised competent and qualified stroke care at its facility.

154.     In a commercial that Wesley aired only months after D.M.'s presentation to Wesley, the story of a pediatric patient suffering from a headache and nausea who presented to Wesley was highlighted.   See   https://www.youtube.com/watch?v=dlEq7zhWDjk;   and https://wesleymc.com/service/stroke.

155.     In the commercial, Wesley Medical Center-Woodlawn touted its care and treatment and diagnosis of pediatric strokes and established the standard of care in the treatment and prevention of pediatric strokes.

156.     The patient in the commercial presents to Wesley Medical Center-Woodlawn with "a weird feeling on the left side of my head. It was kind of like a headache, sort of a nauseous feeling," and left side weakness.

157.     Unlike D.M., the patient in the commercial is seen by "nurses within seconds and a physician "within a minute" after arriving and a MRI was ordered immediately.  The MRI revealed the presence of a stroke. In the commercial, the patient's father initially questioned the ordering of the MRI saying "it feels premature for me that the doctor would order an MRI, after all it's like he's got the flu."  But the nurse reassured the father, "I trust this doctor, you can trust him too."

158.     In the commercial, the pediatric patient was promptly diagnosed and received a level of care and treatment not offered to D.M.

159.     Although Wesley Medical Center-Woodlawn holds itself out to the public as a stroke facility, in reality it provides substandard care to patients, including D.M., who presented similarly with headache, nausea, weakness, and unbalance.

### WESLEY MEDICAL CENTER-WOODLAWN AND VIA CHRISTI HOLD THEMSELVES OUT AS EMERGENCY ROOM, NEURO AND STROKE CARE SPECIALISTS

160.     Wesley Medical Center represents that it provides skilled and competent emergency room medical care:

a.     "Our emergency room staff is dedicated to providing patients with high quality care and comfort in a timely manner."

b.     "Our staff provides expert, compassionate inpatient care and is prepared for all types of children's emergencies, ranging from sudden illness to a life-threatening injury.

c.     "When it comes to ER care, children are not just small adults, they need the expert, respectful care found only at the Wesley Children's Hospital ER."

d.     "Upon check-in at the reception desk, the triage nurse will ask the patient about symptoms and medical history to determine the seriousness of the medical condition. Triage is a process that helps determine which patients need to be seen sooner because of the severity of their condition. Patients are treated according to the seriousness of their condition."

161.     Wesley Medical Center represents and advertises that it is skilled in detecting and preventing signs of impending stroke:

a. "At Wesley Medical Center, our experienced and compassionate doctors know the signs and treatment options for all types of stroke. Wesley Medical Center is recognized as a Primary Care Stroke Center by the Joint Commission, meaning we meet and surpass the national standards for stroke patient outcomes."

b. "Tissue loss in the brain can cause many sudden and scary symptoms, including a sudden loss of bodily function, such as speech, movement or vision. The longer a stroke goes untreated, the more brain cells die and the chances of a patient making full recovery are significantly decreased."

c. "Headache is a very common symptom of a brain tumor, though very few headaches are from a tumor. The headache happens because of increased pressure in the skull caused by growth of the tumor itself, swelling from tissue around the tumor, or a blockage of fluid that surrounds the brain and spine."

d. "Increased intracranial pressure may cause other symptoms, such as: Nausea and/or vomiting; Blurred, double, or loss of vision; Increased fatigue and/or sleepiness; Difficulty maintaining balance."

e. "Many small or rural hospitals do not have a neurologist available to diagnose and treat stroke patients. WesleyCare Virtual Network helps connect physicians and patients in these hospitals with a neurologist any time of the day or night."

162.     Similarly, at all relevant times, Via Christi advertises its stroke-care specialty on its website:

a. "Advanced neurology and stroke treatment in Wichita, Kansas - Sedgwick County's first Comprehensive Stroke Center - When a patient needs stroke treatment, their long-term

47

health depends on timely, specialized care. Via Christi Comprehensive Stroke Center is a life-saving resource for patients and hospitals throughout Kansas. We are certified by the Joint Commission — an independent accrediting organization — as a Comprehensive Stroke Center, a recognition that reflects our expert care, advanced capabilities and positive stroke recovery outcomes."

b. "Expert neuroscience team - The Via Christi Comprehensive Stroke Center team, which started in the early 2000s, shares a single goal: Provide high quality, coordinated stroke care from the moment the patient enters the emergency room through recovery and rehabilitation. Our team includes emergency physicians and nurses, neurointensivists, interventional radiologists, neurologists, hospitalists, neuroscience nurses and nurse practitioners, physician assistants, neurosurgeons and vascular surgeons, rehabilitation therapists, laboratory and pharmacy staff, and radiologists. Each member is specially trained and has a specific responsibility to respond quickly and completely to the needs of a stroke patient."

c. "Our 20-bed Neurocritical Care unit is the only one in the region, staffed 24/7 with specially trained neuroscience nurse practitioners, physician assistants and bedside nurses. We offer in-house evaluation and treatment for acute stroke, as well as advanced neuro imaging and interventional acute stroke treatment options."

d. "Neurology - Via Christi Hospital St. Francis provides highly specialized care for patients from across the region with conditions of the brain, spinal cord, peripheral nerves and muscles, including stroke, cerebral aneurysms, blood vessel malformations, multiple seizures and infections, such as meningitis or encephalitis."

e. "Some patients receive care before and after neurosurgery including highly specialized procedures such as surgery for epilepsy, aneurysms, brain tumors or

endovascular procedures (using catheters to access the brain through the arterial system)."

f. "Care teams include specially trained physicians, neuroscience nurse practitioners and bedside nurses, physical therapists, occupational therapists, speech pathologists, respiratory therapists and dietitians."

g. "Stroke Center - As the region's only 24/7 neuro-interventional center, Via Christi Stroke Center is a life-saving resource for patients and hospitals throughout Kansas."

h. "Neurosurgery - Via Christi Hospital St. Francis was recently named one of Becker's Hospital Review's 100 Hospitals & Health Systems with Great Neurosurgery and Spine programs. It also has earned the Cranial Neurosurgery Excellence Award and the Neurosciences Excellence Award."

163.    Despite these advertisements and representations, D.M. did not receive adequate care from Defendants.

## COUNT I – NEGLIGENCE

164.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

165.    As Defendants' patient, Defendants owed D.M. a duty to provide medical care within the accepted standard of medical care.

166.    Defendants failed to provide medical care within the accepted standard of medical care.

167.    As a direct and proximate result of Defendants' breach, D.M. has suffered and will ever suffer in the future significant economic, non-economic, and medical damages.

168.    A five-year old patient presenting with D.M.'s symptoms should receive a proper neurological assessment.

169.    When D.M. presented to Wesley Medical Center-Woodlawn and to Via Christi, a

proper neurological assessment would have revealed elevated intracranial pressure and neurologic abnormalities.

170.    A patient with elevated intracranial pressure and neurologic abnormalities should be referred for immediate head imaging.

171.    Head imaging performed prior to D.M.'s would have confirmed elevated intracranial pressure and revealed a hyperdense heterogenous midline posterior fossa mass.

172.    A patient with elevated intracranial pressure, D.M.'s symptoms, and D.M.'s posterior fossa mass should be treated immediately to relieve the intracranial pressure in order to prevent stroke.

173.    There was ample time and opportunity for Defendants to detect the need and provide treatment to relieve D.M.'s intracranial pressure and prevent the stroke.

174.    Had D.M. received treatment prior to the stroke to relieve his intracranial pressure, he would not have suffered a debilitating stroke.

175.    Physicians and mid-level practitioners should perform differential diagnoses prior to discharging a patient.

176.    Mid-level practitioners should consult with the supervising physician when there are indicators for a differential diagnosis.

177.    A supervising physician should not approve a mid-level practitioner's care, treatment, diagnosis, and plan for patients presenting with symptoms like D.M.'s until the physician is satisfied that a proper differential diagnosis has been performed and that a proper neurological assessment reveals no abnormalities.

178.    Defendants negligently failed to perform each of these.

179.    The Via Christi nursing staff further failed to properly monitor, assess, care, treat, document and report D.M.'s deteriorating condition and further neglected D.M. thereby allowing

his medical condition to worsen.

180.    Wesley Medical Center-Woodlawn and Via Christi have established policies, procedures and guidelines that are insufficient and failed to properly address D.M.'s clinical presentation.

181.    Likewise, the individual Defendants employed by Wesley Medical Center and Via Christi failed to advocate on behalf of D.M. and failed to timely check D.M.'s vital signs, failed to activate the chain of command so that a more established and experienced clinician could care and treat D.M. and provide the requisite level of care.

182.    Defendants' medical care was not within acceptable standards of care.

183.    Had the Defendants' medical care and treatment met acceptable standards of care, D.M. would not have been forced to endure the pain, suffering, emotional distress, and disfigurement caused by their care and treatment.

184.    As a result of Defendants' deviations from the standard of care in failing to properly care and treat D.M., D. M. endured pain, suffering, emotional distress and other injuries and has incurred significant economic and medical expense and will continue to do so in the future.  His harms and losses are permanent and progressive.

185.    Had D.M. been promptly diagnosed and had appropriate care and treatment been provided by Defendants, D.M. would not have endured significant avoidable pain and suffering. Accordingly, Defendants breached their duty to D.M. which breach caused the injuries to D.M.

186.    As a direct result of the deviations from the standard of care by Defendants, D.M. suffered permanent injury, pain, suffering, mental anguish, significant past and future medical expenses, loss of future earnings and other economic and non-economic losses.

WHEREFORE, Plaintiff prays that this Court enter judgment against the Defendants for an amount to be determined at trial, together with all relief allowed by law including pre- and post-

judgment interest.

## COUNT II – PUNITIVE DAMAGES

187. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth and realleged herein.

188. At the time of the misconduct alleged in this Complaint, it was certain that catastrophic harm would result to D.M. if Defendants did not follow the required standard of care.

189. Although Defendants were acutely aware of the catastrophic consequences of their failures and certainty that the failures would result in permanent harm to D.M, Defendants still failed to conduct a neurological examination, failed to establish a differential diagnoses, failed to administer a CT scan of D.M.'s head, failed to monitor D.M., failed to timely assess and treat D.M., and failed to provide health care within the accepted standard of care.

190. Defendant Wesley authorized the use of mid-level practitioners to treat and evaluate patients who present to its emergency room.

191. By failing to chart or note D.M.'s full presentation and history, Defendants intentionally attempted to conceal the misconduct alleged in this Complaint.

192. By refusing to promptly release D.M.'s full medical files to D.M.'s representatives upon HIPAA compliant requests, Defendants intentionally attempted to conceal the misconduct alleged in this Complaint.

193. Defendants' intentional concealments and wanton failures were financially motivated.

194. Defendants put their own interests ahead of D.M.'s physical, cognitive and emotional health.

195. Defendant Grover's attitude toward her profession, her job, her patients, and her previous adjudication of fraud in connection with her attempt to renew her medical license is an open display of and explanation for her wanton and willful failures in harming D.M.

196.     Defendant Wesley and Defendant Grover's co-workers acted with wanton and willful disregard for D.M.'s health by ratifying Defendant Grover's treatment of D.M. despite their awareness of her inadequate approach to patient care.

197.     Defendant Via Christi authorized the use of mid-level practitioners to treat and evaluate patients who present to its emergency room.

198.     Defendant Daney's attitude toward her profession, her job, her patients, and children are an open display of and explanation for her wanton and willful failures in harming D.M.

199.     Defendant Via Christi and Defendant Daney's co-workers acted with wanton and willful disregard for D.M.'s health by ratifying Defendant Daney's treatment of D.M. despite their awareness of her inadequate approach to patient care.

200.     Defendant Wesley authorized and ratified the conduct of the Wesley health care providers who caused catastrophic injury to D.M.

201.     Defendant Via Christi authorized and ratified the conduct of the Via Christi health care providers who caused catastrophic injury to D.M.

202.     Upon information and belief, Defendants' financial condition is such that they can withstand substantial punitive damages.

203.     Defendants' acts and failures were wanton, willful, outrageous or in reckless disregard for the consequences such that D.M. is entitled to punitive damages in an amount that will punish Defendants, protect similar patients from like conduct, and deter Defendants and others from like conduct.

204.     That in accordance with the Seventh Amendment, a jury be allowed to determine the amount of punitive damages against Defendants.

WHEREFORE, Plaintiff prays that this Court enter judgment against the Defendants for an amount to be determined at trial, including punitive damages in an amount to be determined by a jury,

together with all relief allowed by law including pre- and post-judgment interest.

## NOTICE TO HEALTH CARE STABILIZATION FUND

205. Plaintiff D.M. incorporates all prior allegations as if fully restated herein.

206. Pursuant to K.S.A. § 40-3409 a copy of this Complaint is being served by registered mail within ten days from filing the same upon the Board of Governors of the Health Care Stabilization Fund for the State of Kansas.

## DEMAND FOR JURY TRIAL

Plaintiff D.M. demands trial by jury on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff D.M. designates Kansas City, Kansas as the place of trial.

Respectfully submitted,

/s/: *Daniel B. Giroux*
DUGAN & GIROUX LAW, INC.
Daniel Giroux              KS # 19375
940 N. Tyler Rd., Suite 206
Wichita, Kansas 67212
P. 316-721-5500 F. 316-722-7510
dan@dgwichitalaw.com

and

KUCKELMAN TORLINE KIRKLAND

/s/ *Stephen J. Torline*
Stephen Torline            KS #18292
Michael J. Kuckelman       KS #14587
Benjamin T. Friesen        KS#26655
10740 Nall, Suite 250
Overland Park, Kansas 66211
Direct dial: 913-948-8615
Fax: 913-948-8611
storline@ktk-law.com
mkuckelman@ktk-law.com
bfriesen@ktk-law.com

*Attorneys for Plaintiff*