IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY, KANSAS DIVISION

| | |
|---|---|
| D.M., a minor, by and through his next friend and natural guardian, KELLI MORGAN,<br><br>        Plaintiff,<br><br>v.<br><br>WESLEY MEDICAL CENTER LLC d/b/a WESLEY MEDICAL CENTER-WOODLAWN, et al.,<br><br>        Defendants | Case No. 2:18-CV-02158 |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT WESLEY MEDICAL CENTER, LLC'S MOTION FOR PROTECTIVE ORDER**

Plaintiff's deposition topics for Defendant Wesley Medical Center, LLC's ("Wesley") corporate witness are proper because they are described with reasonable particularity and relate to claims and defenses in this lawsuit.

Five-year old D.M. presented to Wesley with clear indicators for a neurological exam and head CT scan. He presented to Wesley with vomiting, headache, nausea, imbalance, lethargy, slurred speech, photophobia, weakness, dizziness, disorientation, but no fever. D.M. would have failed a neurological exam and a CT scan would have revealed elevated intracranial pressure to inform providers to drain the pressure thereby preventing stroke. Instead, Wesley failed to provide D.M. a neurological exam or CT scan and failed to relieve the intracranial pressure. As a result, D.M. suffered a medically-preventable stroke. The stroke left him with permanent right-side paralysis, neurological damage and other debilitating physical injuries that forever changed his and his parents' lives. D.M. is permanently paralyzed on his right side, has significant neurological deficits, has permanent impaired eye movement, permanent difficulty swallowing

and slowed speech, permanent truncal ataxia known as "drunken sailor" gait characterized by uncertain starts and stops and unequal steps, difficulty speaking, and is wheelchair dependent along with many other health related problems attributable to the stroke.

In this lawsuit, D.M. claims Wesley acted negligently in failing to follow its own established policies and procedures, in failing to have appropriate policies and procedures to provide D.M. the appropriate standard of care, and in failing to provide adequate staff to treat D.M. within the appropriate standards of care.  D.M. also claims Wesley violated EMTALA in failing to immediately provide appropriate care and seeks punitive damages against Wesley.

Wesley objects that certain of D.M.'s designated 30(b)(6) deposition topics are not sufficiently described or are not relevant to these claims or any defenses to the claims.

## ARGUMENT

Corporate witness deposition topics must be described with "reasonable particularity." Fed. R. Civ. P. 30(b)(6).  Though Defendant Wesley suggests Plaintiff must describe the topics with "painstaking specificity," that is not the correct standard and this District rejects it.  *See id.*; *Espy v. Mformation Technologies*, 2010 WL 1488555 (D. Kan. 2010) (rejecting defendant's argument that 30(b)(6) deposition topics must be described with "painstaking specificity," the court held it "will measure the topics in Plaintiff's notice by the standard stated in the rule – reasonable particularity.")

A defendant "objecting to a deposition topic must set forth a specific, particularized showing as to how the requested deposition testimony is objectionable." *Cohen–Esrey Real Estate Servs. v. Twin City Fire Ins. Co.*, No 08–2527, 2009 WL 4571845, at *1 (D. Kan. Dec. 3, 2009).

{00555917}                                    2

### I.   Topics 1-8, 14, 15, 18, 19 and 21 are described with reasonable particularity.

Each of these topics request Wesley to identify and describe an official Wesley policy related to D.M.'s claims. Wesley does not argue these topics are irrelevant to claims or defenses. It produced these official policies to Plaintiff in response to document requests. Instead, Wesley complains that its corporate witness is asked to "identify and describe" Wesley's own policies and procedures that Wesley produced to Plaintiff. Wesley claims such prior production sufficiently "identifies" each policy and the policy language itself sufficiently "describes" each policy.

However, Judge Gale rejected that approach in *White v. Union Pac. R. Co.*, No. 09-1407-EFM-KGG, 2011 WL 721550, at *1–2 (D. Kan. Feb. 22, 2011), calling it "improper":

> In several instances, Defendant has offered to provide documents, refers to documents previously produced, or contends that no such documents exist—arguing that requiring a deposition on these topics would be wasteful. [citation omitted]. In the Court's view, Defendant seems to be arguing that Plaintiff's available discovery methods should be limited to document requests rather than depositions. This is improper.

Instead, "parties may choose the manner and method in which they conduct discovery. The Federal Rules provide several vehicles for discovery. Parties may choose their preferred methodology. Courts generally will not interfere in such choices." *Id.* (citing *McCloud v. Board of Geary County Com'rs*, No. 06–1002–MLB, 2008 WL 3502436, at *2 (D. Kan. Aug. 11, 2008, citing *Audiotext Communications Network, Inc. v. U.S. Telecom, Inc.*, No. 9402395–GTV, 1995 WL 625962, at *5 (D. Kan. Oct. 5, 1995)).

While Wesley may view its own policies as straightforward needing no explanation of how they were or were not applied to D.M.'s purported treatment, Plaintiff does not. Plaintiff is entitled to discover that information from Wesley's deposition testimony. *See Id.*

Further, Plaintiff's First Amended Complaint alleges Wesley failed to follow its own policies and procedures and lacked adequate policies and procedures to provide D.M. with acceptable care. (First Amended Complaint, Doc. 121, ¶ 42, 184, 204, 212). As such, Plaintiff is entitled to an explanation from Wesley as to how its official policies work, how they were implemented to the purported treatment of D.M., how they applied to the purported treatment of D.M., and an identification and description of which policies were and were not applicable to D.M.'s purported treatment. That is what Plaintiff seeks in these topics and it is exactly what the topics request. Plaintiffs previously agreed to limit the topics to Wesley policies in place during D.M.'s treatment at Wesley. Topics 1-8, 14, 15, 18 and 21 are described with reasonable particularity.

**II.    Topics 9, 10, 12, 19, 20, and 21 are relevant to Plaintiff's claims.**

Wesley complains each of these topics ask it to explain information not relevant to whether it provided substandard care to D.M. However, each of the topics request information directly related to allegations in D.M.'s First Amended Complaint. The allegations specifically relate to D.M.'s negligence claim, EMTALA violation claim, and punitive damages claim against Wesley.

Fed. R. Civ. P. 26(b) states that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

In *White v. Union Pac. R. Co.*, Judge Gale explained that "[d]iscovery relevance is minimal relevance, which means it is possible and reasonably calculated that the request will lead to the discovery of admissible evidence." *Teichgraeber v. Memorial Union Corp. of*

*Emporia State University*, 932 F.Supp. 1263, 1265 (D . Kan. 1996) (internal quotation omitted). "Relevance is broadly construed at the discovery stage of the litigation and a request for discovery should be considered relevant if there is any possibility the information sought may be relevant to the subject matter of the action." *Smith v. MCI Telecommunications Corp.*, 137 F.R.D. 25, 27 (D. Kan. 1991). Thus, "discovery should ordinarily be allowed unless it is clear that the information sought can have no possible bearing on the subject matter of the action." *Snowden By and Through Victor v. Connaught Lab.*, 137 F.R.D. 325, 341 (D. Kan. 1991).

Here, the designated topics are relevant to D.M.'s claims because they have a possible bearing on the subject matter of this action. In fact, the topics seek information about that exact subject matter.

**Topic 9** requests Wesley identify and describe the factual basis for statements maintained on Wesley's website that Wesley has "specialists in emergency medicine, neurological and stroke care as alleged in paragraphs 164-165 of the First Amended Complaint." In these paragraphs, Plaintiff claims Wesley holds itself out as "emergency room, neuro and stroke care specialists." This is relevant for a number of reasons. First, specialists are burdened with a more stringent standard of care than generalists. "[T]he particular decisions and acts required to satisfy that duty of care vary, i.e., the required skill depends on the patient's situation and the physician's medical specialty, if applicable." *Foster ex rel. Foster v. Klaumann*, 296 Kan. 295, 302, 294 P.3d 223, 229 (2013).

Second, the allegations in paragraphs 164-165 of Plaintiff's First Amended Complaint consist of quotes from Wesley relating directly to the applicable standard of care owed to D.M. These paragraphs allege:

> 164. Wesley Medical Center represents that it provides skilled and competent emergency room medical care:

a. "Our emergency room staff is dedicated to providing patients with high quality care and comfort in a timely manner."

b. "Our staff provides expert, compassionate inpatient care and is prepared for all types of children's emergencies, ranging from sudden illness to a life-threatening injury."

c. "When it comes to ER care, children are not just small adults, they need the expert, respectful care found only at the Wesley Children's Hospital ER."

d. "Upon check-in at the reception desk, the triage nurse will ask the patient about symptoms and medical history to determine the seriousness of the medical condition. Triage is a process that helps determine which patients need to be seen sooner because of the severity of their condition. Patients are treated according to the seriousness of their condition."

165. Wesley Medical Center represents and advertises that it is skilled in detecting and preventing signs of impending stroke:

a. "At Wesley Medical Center, our experienced and compassionate doctors know the signs and treatment options for all types of stroke. Wesley Medical Center is recognized as a Primary Care Stroke Center by the Joint Commission, meaning we meet and surpass the national standards for stroke patient outcomes."

b. "Tissue loss in the brain can cause many sudden and scary symptoms, including a sudden loss of bodily function, such as speech, movement or vision. The longer a stroke goes untreated, the more brain cells die and the chances of a patient making full recovery are significantly decreased."

c. "Headache is a very common symptom of a brain tumor, though very few headaches are from a tumor. The headache happens because of increased pressure in the skull caused by growth of the tumor itself, swelling from tissue around the tumor, or a blockage of fluid that surrounds the brain and spine."

d. "Increased intracranial pressure may cause other symptoms, such as: Nausea and/or vomiting; Blurred, double, or loss of vision; Increased fatigue and/or sleepiness; Difficulty maintaining balance."

e. "Many small or rural hospitals do not have a neurologist available to diagnose and treat stroke patients. WesleyCare Virtual Network helps connect physicians and patients in these hospitals with a neurologist any time of the day or night."

(First Amended Complaint, Doc. 121, ¶¶ 164-165).

Plaintiff is entitled to Wesley's explanation of these statements taken directly from Wesley's website.  Plaintiff is entitled to Wesley's description of how these statements were applied to D.M.'s purported care and treatment.   That information has a possible relation to the standard of care applicable to D.M.'s presentation to Wesley's emergency room.  Topic 9 is directly relevant to Plaintiff's claims as it involves the very subject matter of Plaintiff's claims against Wesley.  Plaintiff previously agreed to limit this topic to Wesley's website content accessible in March 2017.

**Topic 10** likewise seeks a witness to testify about the Wesley advertisement alleged within Plaintiff's First Amended Complaint.  In the advertisement Wesley describes a patient with a similar presentation to D.M.'s presentation, except that in the advertisement Wesley immediately provided a neurological exam and imaging to the patient.  The advertisement explains how early detection of stroke can be lifesaving.  For the patient in the advertisement Wesley's decision to provide an immediate neurological exam and imaging apparently revealed an impending stroke that Wesley was able to stop before it caused life-limiting damage.

Here, D.M. alleges that despite his similar presentation, Wesley failed to provide D.M. a proper neurological exam or imaging to detect and prevent impending stroke.  Topic 10 seeks a witness to testify to the decision to produce the advertisement, why the subject patient was chosen by Wesley, and the policies and procedures Wesley and its health care providers followed to diagnose the patient's presentation as depicted in Wesley's public advertisement.  There are no HIPAA concerns there because Wesley already put that information in the public eye.  This information has a possible relation to the standard of care and to Wesley's defense as to why it

failed to immediately test D.M. for impending stroke in light of his emergency room presentation.

**Topic 12** seeks a witness to testify to the contractual relationship between Wesley and CarePoint to provide Wesley with adequately trained nursing staff, including compensation and incentives.  Wesley produced these contracts in discovery because they are relevant to Plaintiff's claims.  They are relevant to determine 1) whether Wesley or CarePoint trained these Defendants provided to Wesley by CarePoint; 2) whether these Defendants must follow Wesley's or CarePoint's policies and procedures; 3) whether these staff members are trained in Wesley's or CarePoint's policies and procedures or both; and 4) to determine Wesley's potential bias in selecting substandard staff members as a result of favorable incentives or compensation arrangements between CarePoint and Wesley.  This information bears a possible relation to Plaintiff's inadequate policies, failure to adhere to policies, and inadequate staffing claims against Wesley.

**Topic 19** requests a witness to testify to Wesley's social media policies for its health care providers.  Plaintiff has alleged, and this Court has refused to strike, allegations that Defendant Grover posted on social media a disturbing comment about her attitude towards patients who she thinks use the emergency department as their primary medical care for routine health issues.  The topic is relevant to Plaintiff's claim that Defendant Grover's attitude and predisposition, as displayed in her social media post, to patients who she perceives as using the emergency room for routine health issues caused her to dismiss D.M.'s presentation as a routine health issue rather than stroke.

Wesley's applicable social media policies will govern whether it condoned or encouraged Defendant Grover's disturbing post and whether it shares the same disturbing predisposition to

dismissing emergency patients as mere routine medical issues. These issues are relevant to standard of care and witness bias. Plaintiff previously agreed to limit this request to social media policies applicable to Defendant Grover in place in March 2017.

**Topic 20** seeks a knowledgeable witness to testify about Wesley's decision to outsource its emergency department responsibilities to a third party. It is established fact that D.M. was seen by Defendant Grover, a physician's assistant employed by a third party, CarePoint, and her treatment was approved by another CarePoint employee, Dr. Faimon. The decision to outsource emergency room care is particularly relevant to Plaintiff's claim given Wesley Medical Center's emergency department's former medical director stating that providing emergency services "is not something you can fly in from out of town and buy… It's created from years of teamwork…When you take that away, you potentially put patient care at risk." (*Physicians in Wesley emergency rooms told to become EMCare employees or leave*, The Wichita Eagle, June 10, 2014 10:26 am, updated August 08, 2014 09:24am, available at https://www.kansas.com/news/business/health-care/article1145848.html). Plaintiff seeks a witness knowledgeable on the analysis performed by Wesley concerning this risk to its emergency department patients who receive treatment from such third-party contractors before it outsourced its emergency room obligations. This information is relevant to Plaintiff's claims that Wesley provided him substandard care.

**Topic 21** seeks information concerning the process and procedure by which patients' complaints are handled at Wesley and specifically the complaint made by Kevin Morgan in March, 2017. What was the procedure in place for Wesley to identify, investigate and resolve Mr. Morgan's complaint? Why did the complaint result in the involvement of the Wesley Woodlawn CEO? Are there varying levels of complaint responses based on whether Wesley believes it acted negligently or based on certain levels of damages to a patient? Such information is relevant because it would

constitute admissions that Wesley provided substandard care. Plaintiff is entitled to discover that information.

### III. Topics 22 and 24-25 are moot.

Prior to Wesley filing this motion, Plaintiff's counsel informed Wesley's counsel that topics 22 and 24-25 will be deferred. Plaintiff does not intend to question Wesley over those topics at this deposition. As such, Wesley's objections to topics 22 and 24-25 is moot.

Respectfully submitted,

/s/: Daniel B. Giroux
DUGAN & GIROUX LAW, INC.
Daniel Giroux, SCID 19375
940 N. Tyler Rd., Suite 206
Wichita, Kansas 67212
P. 316-721-5500 F. 316-722-7510
dan@dgwichitalaw.com

and

KUCKELMAN TORLINE KIRKLAND

/s/ Stephen J. Torline
Stephen J. Torline         KS #18292
Michael J. Kuckelman       KS #14587
Benjamin T. Friesen        KS #26655
10740 Nall, Suite 250
Overland Park, Kansas 66211
Direct dial: 913-948-8615
Fax: 913-948-8611
storline@ktk-law.com
mkuckelman@ktk-law.com
bfriesen@ktk-law.com
*Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2019, the foregoing was served by operation of the Court's electronic filing system upon all parties whose attorneys have entered their appearance in the above-captioned case.

/s/ Stephen J. Torline
Attorney for Plaintiff