1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
CASE NO.: 2:18-CV-02158


D.M., A MINOR, BY AND THROUGH HIS NEXT FRIEND
AND NATURAL GUARDIAN, KELLI MORGAN,

     PLAINTIFFS,

     VS.

WESLEY MEDICAL CENTER LLC D/B/A
WESLEY MEDICAL CENTER -WOODLAWN;
WESLEY-WOODLAWN CAMPUS; BRIDGET
GROVER, PA-C; DR. GREGORY FAIMON;
LISA JUDD, RN; VIA CHRISTI HEALTH SYSTEMS
D/B/A VIA CHRISTI-ST FRANCIS; JENNIFER
CHAMBERS-DANEY, ARNP; DR. BALA BHASKAR
REDDY BHIMAVARAPU; CEP AMERICA-KS LLC;
DR. CONNOR HARTPENCE; DR. STEFANIE
WHITE; DR. JAMIE BORICK; AND
AARON KENT, RN,

     DEFENDANTS.



     ORAL DEPOSITION OF ROBERT DABROW, M.D.,

TAKEN AT MILESTONE REPORTING COMPANY, LOCATED AT

315 EAST ROBINSON STREET, SUITE 510, ORLANDO,

FLORIDA 32801, ON NOVEMBER 14, 2019, AT 9:08 A.M.,

BEFORE KIMBERLY FLORES, COURT REPORTER AND NOTARY

REPUBLIC.


advanced depositions
Nationwide Court Reporting & Trial Support
855·204·8184 • www.advanceddepositions.com

EXHIBIT

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

2

```
 1              APPEARANCES
 2
 3 ON BEHALF OF THE DEPONENT, ROBERT DABROW, M.D.:
   DANIEL GIROUX, ESQUIRE
 4 DUGAN & GIROUX LAW, INC.
   940 NORTH TYLER ROAD, SUITE 206
 5 WICHITA, KANSAS 67212
   (316) 721-5500
 6 DAN@DGWICHITALAW.COM
 7
 8 ON BEHALF OF THE PLAINTIFFS, D.M., A MINOR, BY AND
   THROUGH HIS NEXT FRIEND AND NATURAL GUARDIAN, KELLI
 9 MORGAN:
   MICHAEL KUCKELMAN, ESQUIRE
10 KUCKELMAN TORLINE KIRKLAND
   10740 NALL AVENUE, SUITE 250
11 OVERLAND PARK, KANSAS 66211
   (913) 948-8610
12 MKUCKELMAN@KTK-LAW.COM
13
14 ON BEHALF OF THE DEFENDANTS, VIA CHRISTI HEALTH SYSTEMS
   D/B/A VIA CHRISTI-ST FRANCIS AND AARON KENT, RN:
15 SAMANTHA WOODS, ESQUIRE
   MARTIN, PRINGLE, OLIVER, WALLACE, & BAUER, LLP
16 645 EAST DOUGLAS, SUITE 100
   WICHITA, KANSAS 67202
17 (316) 265-9311
   SMWOODS@MARTINPRINGLE.COM
18 (APPEARED TELEPHONICALLY)
19
20 ON BEHALF OF THE DEFENDANTS, BRIDGET GROVER, PA-C AND
   DR. GREGORY FAIMON:
21 TRACY COLE, ESQUIRE
   GILLILAND GREEN, LLC
22 20 WEST 2ND AVENUE, SECOND FLOOR
   P.O. BOX 2977
23 HUTCHINSON, KANSAS 67504
   (620) 662-0537
24 TCOLE@GGLAWKS.COM
25 APPEARANCES CONTINUED:
```

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

3

1 APPEARANCES CONTINUE:

2

3 ON BEHALF OF THE DEFENDANTS, WESLEY MEDICAL CENTER LLC
  D/B/A WESLEY MEDICAL CENTER -WOODLAWN; WESLEY-WOODLAWN
4 CAMPUS AND LISA JUDD, RN:
  ANDREW MARINO, ESQUIRE
5 GIBSON WATSON MARINO
  301 NORTH MAIN STREET, SUITE 1300
6 WICHITA, KANSAS 67202
  (316) 264-7321
7 ANDREW@GWMKS.COM

8

9 ON BEHALF OF THE DEFENDANT, CEP AMERICA-KS, LLC:
  DUSTIN DENNING, ESQUIRE
10 CLARK, MIZE, & LINVILLE, CHTD
  129 SOUTH 8TH STREET
11 SALINA, KANSAS 67401
  (785) 823-6325
12 DJDENNING@CML-LAW.COM

13

14 ON BEHALF OF THE DEFENDANT, JENNIFER CHAMBERS-DANEY,
  ARNP:
15 GREGORY YOUNG, ESQUIRE
  HINKLE LAW OFFICE
16 1617 NORTH WATERFRONT PARKWAY, SUITE 400
  WICHITA, KANSAS 67206
17 (316) 267-2000
  GYOUNG@HINKLAW.COM

18

19
  ON BEHALF OF THE DEFENDANT, DR. BALA BHASKAR REDDY
20 BHIMAVARAPU:
  DON D. GRIBBLE, ESQUIRE
21 HITE, FANNING, & HONEYMAN, LLP
  100 NORTH BROADWAY STREET, SUITE 950
22 WICHITA, KANSAS 67202
  (316) 265-7741
23 GRIBBLE@HITEFANNING.COM

24

25 APPEARANCES CONTINUED:

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

4

1 APPEARANCES CONTINUE:
2
3 ON BEHALF OF THE DEFENDANTS, DR. CONNOR HARTPENCE, DR
   STEFANIE WHITE, AND DR. JAMIE BORICK:
4 STEVEN C. DAY, ESQUIRE
   WOODARD, HERNANDEZ, ROTH & DAY. LLC
5 245 NORTH WACO AVENUE, SUITE 260
   WICHITA, KANSAS 67201
6 (316) 263-4958
   SCDAY@WOODARD-LAW.COM
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

1          STIPULATION
2
3 THE DEPOSITION OF ROBERT DABROW, M.D. TAKEN AT MILESTONE
4 REPORTING COMPANY, 315 EAST ROBINSON STREET, SUITE 510,
5 ORLANDO, FLORIDA 32801 ON THURSDAY THE 14TH DAY OF
6 NOVEMBER 2019 AT APPROXIMATELY 9:08 A.M.; SAID
7 DEPOSITION WAS TAKEN PURSUANT TO THE FLORIDA RULES OF
8 CIVIL PROCEDURE.
9
10 IT IS AGREED THAT KIMBERLY FLORES, BEING A NOTARY PUBLIC
11 AND COURT REPORTER FOR THE STATE OF FLORIDA, MAY SWEAR
12 THE WITNESS AND THAT THE READING AND SIGNING OF THE
13 COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.
14
15
16
17
18
19
20
21
22
23
24
25

5

1          EXAMINATION INDEX
2                        Page
3 DIRECT EXAMINATION BY MR. GRIBBLE        7
4 EXAMINATION BY MR. DAY            74
5 EXAMINATION BY MS. COLE           130
6 EXAMINATION BY MR. DENNING        154
7 EXAMINATION BY MR. YOUNG          167
8 EXAMINATION BY MR. MARINO         181
9 EXAMINATION BY MS. WOODS          182
10
11          EXHIBIT INDEX
12 Exhibit                  Marked
13  1 MORGAN CASE NARRATIVE REVIEW REPORT 11
14  2 HANDWRITTEN AND TYPED NOTES       11
15  3 GLASGOW COMA SCALE          11
16  4 ACUTELY ELEVATED ICP SYMPTOM LIST   12
17  5 INVOICES               12
18  6 EXPERTS OF MEDICAL RECORDS FROM
       FLASHDRIVE             16
19
     7 MORGAN CASE REVIEW            161
20
     8 FLASHDRIVE WITH MEDICAL RECORDS   167
21
22
23
24
25

7

1          PROCEEDINGS
2      COURT REPORTER:  Can you please raise your
3 right hand?  Do you swear and affirm the testimony
4 you're about to give is the truth, the whole truth,
5 and nothing but the truth?
6      THE WITNESS:  Yes.
7          DIRECT EXAMINATION
8      BY MR. GRIBBLE:
9  Q   State your name, please.
10  A   Robert Dabrow.
11  Q   Dr. Dabrow, my name is Don Gribble.  I'm the
12 attorney for Dr. Bala in this case, and I'll take the
13 lead in taking your deposition.  These other folks will
14 follow me.  Do you understand that?
15  A   Yes.
16  Q   Have you been deposed before?
17  A   Never like this.
18  Q   And when you say "like this," have you been
19 deposed in any kind of fashion?
20  A   Once or twice.
21  Q   And what were the --
22  A   One was a --
23  Q   -- general context?
24  A   One was a child abuse case, and one was a case
25 of a large group practice that I was part of that was

8

1  asked to make some commentary.
2      Q   So that -- the second was, kind of, a business
3  matter?
4      A   Yeah, it was probably -- no.  It was a medical
5  malpractice case, but it was probably 20 years ago.
6      Q   What did it have to do with?
7      A   It had to do with a teenager who died of a
8  cancer who claimed to have not had a diagnosis properly
9  made.
10     Q   And the previous matter was a -- you said, a
11  child abuse matter?
12     A   Yes, child abuse.
13     Q   Okay.
14     A   Yes.
15     Q   So this would be your first deposition, at
16  least in the last 20 years or so, in a medical
17  malpractice context?
18     A   I'm not sure if you would qualify it as a
19  deposition.  On the last page of the chart I just gave
20  you, I was asked in 2015 to review a case of a missed
21  appendicitis, which was subsequently settled before I
22  was ever asked to be deposed.  But I did provide written
23  commentary to the attorneys prior to that.  I don't know
24  if that counts.
25     Q   Have you ever testified in court?

9

1      A   Only in a child abuse case.
2      Q   Okay.  You have been kind enough to bring your
3  file related to this matter; is that correct?
4      A   Yes.
5      Q   And I think that's composed of, essentially,
6  three things, two folders and a flash drive; is that
7  correct?
8      A   Yes.
9      Q   I'll go through these things so we can
10  identify them for the record.  But in front of you, I
11  think, is one of our two folders.  What is in that
12  folder --
13     A   These are --
14     Q   -- in front of you, sir?
15     A   These are just Xerox copies of, essentially,
16  what's on the flash drive, which are the medical records
17  that were provided to me.
18     Q   Okay.  And then you have a few notes here and
19  there on those medical records?
20     A   Yeah.
21     Q   Could I see those for a moment, please?
22     A   Sure.
23     Q   Doctor, I'll hand these around, just so the
24  others can get a look at them.  And whenever you need
25  them, although I don't think we'll get into the

10

1  substance before they make their way back around to you,
2  let me know, and I'll make sure they're in your hand.
3      A   Okay.
4      Q   The second folder is the one that I have in
5  front of me, and that contains a copy of your CV,
6  correct?
7      A   Yes.
8      Q   Your report regarding this case?
9      A   Yes.
10     Q   And some typewritten notes, some handwritten
11  notes, a template concerning the Glascow Coma Scale, a
12  note that says, "Acutely elevated ICP," and then your
13  deposition notice, your expert retention contract, and
14  your invoices.
15     A   Yeah.  That's the contract from the case in
16  2015.
17     Q   Oh, I see.  Okay.
18     A   Or maybe it was '14.  I don't know.
19     Q   Okay.  The notes that I'm going to hand you
20  right now, would this be the totality of your notes,
21  either typewritten or handwritten in the case?
22     A   Yes.
23     Q   And why are some typed and some handwritten?
24     A   As I was reviewing and preparing for giving a
25  final statement, I realized that it's sometimes hard to

11

1  read even your own writing after a period of time.  So
2  initially, I typed up my comments as I go along, just to
3  be neat and tidy.
4          MR. GRIBBLE:  I get it.  Okay.  Kim, let's mark
5  this as Exhibit --
6          COURT REPORTER:  1?
7          MR. GRIBBLE:  We'll mark the report as 1.  We'll
8  mark this as 2.  2, I believe.  And let's do -- I
9  believe this is 3, 4, and then those two is 5.
10  Okay.  Right.  I think that's it.
11          (EXHIBIT 1, 2, 3, 4, AND 5 MARKED FOR
12          IDENTIFICATION)
13          BY MR. GRIBBLE:
14     Q   Doctor, I'm going to hand you what's been
15  marked as deposition Exhibit number 1.  Is that your
16  report?
17     A   Yes.  This is the copy that I submitted
18  including the original signature.
19     Q   Exhibit 2 would be the typewritten and
20  handwritten notes that we've talked about --
21     A   Yes.
22     Q   -- correct?
23     A   Correct.
24     Q   Exhibit 3 is the Glascow Coma Scale template
25  with some of your notes on it?



## 12

```
 1    A   Yes.
 2    Q   Exhibit 4 is this document that doesn't really
 3  bear a title, but it talks about acute increased
 4  intracranial pressure?
 5    A   Yes.
 6    Q   And then Exhibit 5 would be your invoices; is
 7  that correct?
 8    A   Yes.
 9    Q   The only other thing that's in your folder
10  here, the others may want to identify them later by
11  terms of exhibits, but is the retention contract in that
12  prior case, your CV, and the deposition notice --
13    A   Yes.
14    Q   -- right?  And then -- thank you.  The flash
15  drive here, it basically has what on it, sir?
16    A   So the flash drive is all of the documents
17  that were provided to me by Mr. Giroux regarding the
18  copies of the hospital records, and some but not all, of
19  the depositions that are involved in this case.
20    Q   Would everything that's on the flash drive be
21  identified in your report?
22    A   There's some things on the -- I'm not --
23  I'm -- there's some things on the flash drive that aren't
24  relevant to the report, but they're are copies of the
25  record that was provided to me, if that's what you're
```

## 13

```
 1  asking.
 2    Q   Well, I'm just trying to -- there's other
 3  folks here that can put this into a computer and see
 4  what's on here.  But I'm just trying to get an
 5  understanding for my own mind, what's in your report.
 6  You've identified various things that you looked at.
 7    A   Yes.
 8    Q   Everything that you looked at, that's
 9  identified in your report, would be on that flash drive?
10    A   Oh, yes.  Absolutely.
11    Q   And are there are a few things in addition
12  that aren't in your report that are on the flash drive?
13    A   Yes.  There's probably some depositions in
14  there that came late to me, that aren't in my report.
15    Q   Okay.  Do you have a memory of what those
16  depositions would be?
17    A   I believe there may have been -- I'd actually
18  have to look at the flash drive to see what's on there
19  now.
20    Q   Did you review the depositions of any of the
21  plaintiff's experts that have been taken so far?
22    A   The -- the only -- the depositions I reviewed
23  was a Dr. -- was it Haile (phonetic), I believe?  A
24  family physician.  Haile or Haine (phonetic)?  Lane?
25  There was a family physician gentleman.
```

## 14

```
 1    Q   Okay.
 2    A   There was a Dr. Greenfield (phonetic), I
 3  believe.
 4    Q   Okay.  I think you're talking about reports.
 5  And there is a report from a Dr. Haine.
 6    A   Yeah.  So those aren't -- I -- then I'm using
 7  the wrong term.
 8    Q   That's fine.
 9    A   I read some reports, but they're -- the only
10  depositions I have would be on -- I would have reviewed
11  the depositions on that flash-drive, yes.
12    Q   Okay.  So as far as expert reports then, aside
13  from what's on the flash drive -- and I'm going to pass
14  this down.
15    MR. GRIBBLE:  Dustin or whoever, the computer
16  expert, can you --
17    MR. DENNING:  I'm sorry.
18    MR. GRIBBLE:  -- see what's on there?
19    THE WITNESS:  You'll have -- you'll need a
20  password to unlock it.  It's a secure.
21    MR. DENNING:  What's the password on that?
22    THE WITNESS:  It's a capital W with the word
23  welcome, and then the numbers 1, 2, 3.
24    MR. DENNING:  Hold on a second.
25    THE WITNESS:  You have to use the DTP.
```

## 15

```
 1    MR. DENNING:  Launcher?
 2    THE WITNESS:  Yeah.
 3    MR. DENNING:  Give me a second on the password.
 4  Okay.  What is it?
 5    THE WITNESS:  Capital W with the word welcome,
 6  and then the numbers 1, 2, 3.
 7    MS. COLE:  Did you mark the medical records?
 8    MR. GRIBBLE:  Uh-uh.  You want me to?  Okay.
 9    THE WITNESS:  If I may clarify, I believe I
10  misunderstood your initial comment using the word
11  "deposition."  So I reviewed depositions of the
12  people involved in the case, but I never saw any
13  depositions from any expert witness, as you called
14  "reports," provided by other experts.
15    BY MR. GRIBBLE:
16    Q   Okay.  Thank you for that clarification.  And
17  while we're getting up the flash drive, and for
18  clarification purposes, did you review the deposition of
19  Dr. Paul Grabb?
20    A   No, I don't recognize that name.
21    Q   How about Dr. Le Pichon (phonetic).
22    A   I don't recognize that name.
23    Q   Dr. Charles Murphy?
24    A   No.
25    Q   Okay.
```

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

---

16

1      THE WITNESS: Did you get it, Dustin?
2      MR. DENNING: Yeah.
3      MR. GRIBBLE: Okay. Andrew, when you're done
4  with that, would you hand that back? We're going to
5  mark that -- or I'll tell you -- give it back.
6  We'll mark it and I'll give it back to you.
7      COURT REPORTER: 6?
8      MR. GRIBBLE: What did we have?
9      COURT REPORTER: 5.
10     MR. GRIBBLE: Exhibit 5?
11     COURT REPORTER: So 6 will be this one.
12     (EXHIBIT 6 MARKED FOR IDENTIFICATION)
13     BY MR. GRIBBLE:
14     Q   Yeah. There you go, 6. Exhibit 6, Doctor,
15 would be some excerpts of the medical records that are
16 on the flash drive, and these excerpts have some of your
17 handwritten notes on them.
18     A   Yes.
19     Q   Okay. Doctor, let's get started with some of
20 the more substantive portions of this deposition. What
21 do you define your role as in this case as an expert
22 witness?
23     A   I was a full-time pediatric hospitalist in an
24 academic teaching environment for many years. I was
25 associate medical director of the pediatric residency

---

17

1  program. I have been teaching both interns, medical
2  residents, and medical students, for over ten years. And
3  I also have experience, briefly, in an emergency room
4  setting and in private practice for many years. So my
5  role was to review the case and make comments on various
6  aspects regarding each -- each center of this child's
7  care.
8      Q   And do you consider yourself an expert?
9      A   I'm an expert as an American board-certified
10 pediatrician who's a pediatric hospitalist, yes.
11     Q   Okay. In assessing the care of another
12 healthcare provider, do you believe that it's only fair
13 that you would have expertise in the issues that are at
14 issue?
15     A   Do I believe it would be only fair? It seems
16 reasonable.
17     Q   Okay. Would you agree that strep throat is an
18 issue in the case?
19     A   Without a doubt.
20     Q   Okay. You have expertise in that, correct,
21 sir?
22     A   Yes.
23     Q   And that, in part, in addition to your
24 background that you've talked about, gives you some
25 qualifications that you believe would qualify you as an

---

18

1  expert in the case?
2      A   Yes.
3      Q   Okay. In assessing the care of a physician,
4  do you think it's only fair that the one doing the
5  assessing be board-certified in that particular
6  discipline?
7      A   Yes.
8      Q   You agree that one of the disciplines at issue
9  is pediatrics?
10     A   Yes.
11     Q   And you are board-certified in pediatrics?
12     A   Yes.
13     Q   And have been so for how long, sir?
14     A   Since 1989.
15     Q   And that, again, gives you some qualifications
16 to weigh in on this case as an expert witness, correct?
17     A   Yes.
18     Q   Okay. Do you know who Dr. Le Pichon is?
19     A   No, actually I don't. I heard his name
20 briefly, but I don't know who he is.
21     Q   How have you heard his name --
22     A   You just mentioned it.
23     Q   -- other than me mentioning it?
24     A   I have not. You just mentioned it.
25     Q   Okay. Would it surprise you if one of the

---

19

1  plaintiff's expert witnesses in this case has admitted
2  he does not have expertise in diagnosing strep throat,
3  nor is board-certified in pediatrics?
4      A   I'm -- I'm not sure what you're asking me.
5      Q   Would that surprise you that there would be an
6  expert for the plaintiffs that would not be board-
7  certified in one of the disciplines at issue, nor have
8  expertise, self-admitted, in strep throat diagnosis?
9      MR. GIROUX: Object to form. Misstates the
10 testimony. You can answer.
11     A   It would -- it would surprise me that an
12 expert would be chosen that doesn't have expertise
13 relevant to the case, but no one can have expertise in
14 all areas.
15     Q   Sure. But -- and there are others, I agree,
16 but one area in this case, obviously, is strep throat?
17     A   Yes.
18     Q   One of the areas of medicine that's at issue
19 is pediatrics?
20     A   Yes.
21     Q   Okay. With respect to your report -- if you
22 would get that out in front of you, Doctor, and I think
23 that's Exhibit number 1. Do you agree that it's
24 incumbent upon an expert witness, who's holding him or
25 herself out as an expert in the case, to get the facts

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

20

1  right?
2    A   Yes.
3    Q   Why do you agree with that?
4    A   The facts are the heart of the case.
5    Q   Okay.  Or stated otherwise, they would be the
6  foundation upon which an expert's opinions would be
7  based, correct?
8    A   Yes.
9    Q   With respect to your review of all of the
10  materials on the flash drive, did anyone limit you at
11  all with respect to how much time you were allowed to
12  spend reviewing those records?
13    A   No.
14    Q   Did anyone limit the amount of time that you
15  were allowed to spend reviewing the deposition
16  testimony?
17    A   No.
18    Q   Okay.  Did anyone limit the amount of time it
19  took for you to prepare your report, which is Exhibit
20  number 1?
21    A   No.
22    Q   When is the last time that you reviewed your
23  report?
24    A   I reviewed it this morning in preparation for
25  this.

21

1    Q   Okay.  Your report has a date right above your
2  signature of July 22, '19.  Is that when you prepared
3  it, sir?
4    A   That's when I presented it.  That was the
5  final version -- final copy.
6    Q   Okay.  It was a bit of a work in progress, I
7  suppose, that over the course of days or weeks that
8  you've had all your thoughts and --
9    A   Yeah.  Exactly why you have typed notes and
10  handwritten notes.
11    Q   Right.  And as of July 22, 2019, you felt your
12  report was accurate?
13    A   My report is accurate.
14    Q   Okay.  I mean, you felt it was then?
15    A   Yes.
16    Q   You reviewed it within the last 24 hours, and
17  you feel it is still?
18    A   There's one error.
19    Q   Okay.  What is that error?
20    A   There was a -- there were some comments on
21  that.  I remarked about something called Cushing's
22  triad.
23    Q   Uh-huh.
24    A   And that seems to have come up.  And my mis --
25  I misread the document that -- I don't have it in front

22

1  of me, the page of vital signs from when the child was
2  measured in the emergency room.  And then I guess it
3  made it to the floor.  There was -- two different times,
4  a low blood pressure reading, but one did not have a
5  blood pressure.  So I made a comment about Cushing's
6  triad, which may or may not still apply.  However, the
7  comment I made in the report saying he definitely had
8  Cushing's triad cannot be supported by that data.
9    Q   Okay.  So would you concede he did not at any
10  time, he being D.M, have a set of vitals that met the
11  Cushing's triad?
12    A   Only partly, because he didn't have blood
13  pressures taken with all his other measurements, so
14  we'll never know.  But of the document that is measured,
15  I can state and agree to that -- with that statement.
16    Q   Other than that one error or clarification,
17  however you want to put it, is there anything else that
18  you found back in July of '19, or within the last 24
19  hours of reviewing your report, you felt was inaccurate?
20    A   No.
21    Q   And would you agree that it's only fair to the
22  defense counsel, to the attorneys that you're working
23  with, to D.M, to his family, to the jury, frankly, that
24  you'd be right relative to the facts that are contained
25  in your report?

23

1    A   Yes.
2    Q   What if you're wrong?
3    A   What if I'm wrong?
4    Q   On those facts?
5    A   I would have to be shown where I'm wrong.
6    Q   Okay.  You understand that -- you've obviously
7  been held out as an expert.  I'm here to cross-examine
8  you.  So your report should withstand scrutiny, correct?
9    A   Yes.
10    Q   And you would not hold it against me at all
11  if, in fact, I tried to show that it didn't withstand
12  scrutiny?
13    A   I believe that's your job.
14    Q   Okay.  And in fact, if you were a defendant in
15  a lawsuit and there was an expert held out against you,
16  and I was representing you, you would want me to do the
17  very same thing relative to that expert.  Challenge the
18  validity of his or her opinions, correct?
19    A   Yes.
20    Q   And as we get ready to get into this, do you
21  believe that your report will withstand scrutiny?
22    A   Yes.
23    MR. GRIBBLE:  Okay.  Let me take just a break.
24    (OFF THE RECORD)
25    BY MR. GRIBBLE:



24

1    Q   Doctor, what do you believe would have
2  happened if D.M. would've been at his home March 6,
3  2017, when he coded?
4    A   I have no idea.  They probably would have
5  called 911.
6    Q   Don't you think, in all practical purposes, he
7  would've died?
8    A   It's possible.
9    Q   Is it probable that he literally codes at
10 home, there's no medical provider there?
11     MR. GIROUX:  Object to form.  Foundation, it's
12 an incomplete hypothetical.
13   A   It's really unknown.  He could have.  He might
14 have -- 911 may have arrived and resuscitated him.
15 There's just no way to know.
16   Q   Do you agree that it's very possible that the
17 actions of Nurse Chambers-Daney and Dr. Bala, by
18 facilitating the admission of D.M. to the hospital,
19 literally saved his life?
20   A   That's a hard question to answer.  Because by
21 admitting him to the hospital, yes, he was in a location
22 where aid could be provided in an emergency situation.
23 But aid could have been provided sooner.
24   Q   And that's why I said -- I toned the question
25 down to, do you agree that it's possible that the

25

1  actions of Chambers-Daney and Bala in facilitating the
2  admission of D.M. to the hospital, may well have saved
3  his life?
4    A   I can't disagree with the way you're phrasing
5  the question.
6    Q   I have for you, Doctor, if you want -- in fact
7  let me just do this.  I'm going to give you a couple of
8  sets of records of things that I'm going to refer to.  If
9  you want to look at your own, you can do that.  But
10 you'll see down at the bottom corner of these records
11 there are some numbers, like WMC is Wesley Medical
12 Center.
13   A   Okay.
14   Q   And then VC is Via Christi, and WMC is the
15 first hospitalization, VC is the second.  Do you
16 understand that?
17   A   Yes, sir.
18   Q   Okay.  If you would turn to page 11 of WMC.
19 And do you see at the top where we're talking about a
20 focused physical examination.  And for ears, nose, and
21 throat, it states that there's mild pharyngeal erythema.
22 Do you see that?
23   A   Yes.
24   Q   What do you think caused that?
25   A   What do I think caused mild pharyngeal

26

1  erythema?  I'm not sure there's something to say had
2  caused it.  It could be a normal finding.
3    Q   It could be that that's just the way D.M's
4  throat looks?
5    A   Many throats are erythematous.
6    Q   Okay.  Let's go to the next line down.  It
7  says, mild bilateral submandibular adenopathy.  What do
8  you think caused that?
9    A   That can be a normal finding.
10   Q   If, in fact, a provider sees mild pharyngeal
11 erythema, would it be important for them to note that in
12 the record?
13   A   If they think it's important.
14   Q   Okay.  And if a provider felt the sides of the
15 child's neck, and noted mild bilateral submandibular
16 adenopathy, should that be noted?
17   A   Well, I have to correct your statement.  It
18 wouldn't be the sides of the neck.  They'd be talking
19 about under the chin, for submandibular adenopathy.  It
20 would down here --
21   Q   Okay.
22   A   -- as opposed to neck.
23   Q   Isn't this your neck?
24   A   Under the chin would be more precise.
25   Q   Okay.  So if a provider, under the chin, noted

27

1  mild bilateral submandibular adenopathy upon palpations,
2  should that be noted in the record?
3    A   If they feel it's important.  It can be a
4  normal finding.
5    Q   If you would, let's go over to Via Christi,
6  page 8.  And under the section where it states "general
7  skin, head, neck," et cetera, and "ears over to the
8  right, oral mucosa, moist, erythema."  What do you think
9  caused that?
10   A   Again, it could be a normal finding.
11   Q   It could be normal.  What else could it be
12 that's causing the mild pharyngeal erythema, both at Via
13 Christi and at Wesley Medical Center?
14   A   You can have a common cold.
15   Q   Could strep cause that?
16   A   Possibly.  It's more important to me the lack
17 of findings, than the finding of erythema.
18   Q   Okay.  Well, I can't ask every question at one
19 time, so we'll have to just kind of go -- these one at a
20 time.  But with respect to mild bilateral submandibular
21 -- submandibular adenopathy, you said it could be a
22 normal finding.  It also can be an abnormal finding?
23   A   Sure.
24   Q   What could cause it if it's an abnormal
25 finding?



28

1    A   Common cold, viral pharyngitis.
2    Q   How about strep?
3    A   Strep, possibly.
4    Q   Page 16 of the Via Christi record.  This is
5  Dr. Hartpence's, H&P, toward the bottom under physical
6  exam, under -- or next to HEENT.  It says that the
7  posterior oral pharynx is mildly erythematous, correct?
8    A   Yes.
9    Q   What do you think caused that?
10   A   Very likely all the vomiting that he'd had.
11 That will surely cause an erythematous throat.
12   Q   Could a common cold cause that?
13   A   Possibly.
14   Q   Could strep throat cause that?
15   A   Possibly.
16   Q   If we go over to page 18, Dr. White's note, it
17 states that there's enlarged tonsils.  Do you see that
18 at the end?
19   A   Hang on.
20   Q   First paragraph?
21   A   Yes.
22   Q   What do you think caused that?
23   A   It could be, again, recurrent vomiting, could
24 be infection, could be an interpretation that's
25 incorrect.

29

1    Q   And could it also be strep?
2    A   Could be strep or viral.
3    Q   If you go to page 9 of the Via Christi
4  records, we have lab reports.  And we have an elevated
5  white blood count, correct?
6    A   Yes.
7    Q   What do you think caused that?
8    A   That's unexplained.  Some sort of inflammatory
9  process.
10   Q   Can an infection cause that?
11   A   Of course.
12   Q   Could strep throat cause that?
13   A   Not usually.
14   Q   Could it?
15   A   When I say "could," in medicine, almost any
16 aspect would be "could," but certainly, it could.
17   Q   Okay.  So you would concede at least that
18 pharyngeal erythema, bilateral submandibular adenopathy,
19 enlarged tonsils, and an elevated white blood count
20 could all be caused by strep throat?
21   A   If we take those specific findings in
22 isolation, sure.  In the big picture, less likely.
23   Q   If we add to the things that I just went over,
24 going back to page 11 at Wesley's records, toward the
25 bottom there under procedures, you see that we have a

30

1  positive strep test, correct?
2    A   Yes.
3    Q   Can strep throat cause a positive strep test?
4    A   Strep throat or a carrier state can cause a
5  positive strep test.
6    Q   So if we look at these things that we've now
7  gone over, erythematous airway, enlarged tonsils,
8  adenopathy, elevated white blood count, and a positive
9  strep test, you would agree that those would all be
10 things that could be caused by a viral or bacterial --
11 or viral strep throat, correct?
12   A   Viral infection, or a strep throat, or
13 vomiting, or some other stress.
14   Q   In your report on page 7 --
15      MR. KUCKELMAN:  We should mark these.
16      MR. GIROUX:  Yeah, got to number them.
17      MR. GRIBBLE:  Yeah, I'm sorry.
18      BY MR. GRIBBLE:
19   Q   You state in the -- about the middle of the
20 first full paragraph.  "It is troubling that no repeat
21 strep test was requested."  Do you see that?
22   A   Yes.
23   Q   And why do you say that?
24   A   Because perhaps the original test was
25 incorrect.

31

1    Q   Okay.  And so it troubled you that there was
2  not a repeat done at Via Christi?
3    A   Correct.
4    Q   Okay.  If you would then go back one page.  You
5  state in the middle there, of that page, "It is likely
6  that she assumed these complaints existed, and that D.'s
7  symptoms could be explained by a poorly chosen lab
8  test."  Do you see that?
9    A   Yes.
10   Q   And that poorly chosen lab test is the strep
11 test?
12   A   Yes.
13   Q   And so the poorly chosen lab test that you
14 believe that Ms. Grover did should've been repeated at
15 Via Christi.
16   A   At that point yes, to verify if it was a --
17 yes.
18   Q   Do you see a little incongruity there that
19 you're calling this a poorly chosen lab test to begin
20 with, but yet at hospital number one -- but yet you're
21 saying it should have been repeated at hospital number
22 two?
23   A   The reason I'm commenting like that is to
24 verify if a test was done rightly or wrongly, the
25 accuracy of the test is the result.  It doesn't change.

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

32

1     Q   So basically it would be that the wrongly
2  chosen lab test that was done at Wesley should've been
3  also repeated at Via Christi?
4     A   So the nurses ordering the test -- the nurse
5  who didn't order the tests Nurse Daney-Chambers [sic],
6  assumed the child had strep throat, I guess based on
7  what she was told.
8     Q   But I understand your position on that, or
9  your comment there, but stay with my question.
10    A   Okay.
11    Q   Your position is that the poorly chosen lab
12 test, in other words, shouldn't have been done to begin
13 with, correct?
14    A   Correct.
15    Q   Should have been done a second time at the
16 second hospital?
17    A   It could've been done again --
18    Q   But --
19    A   -- should have been done.
20    Q   -- you're saying it should have been done?
21    A   Should have been.
22    Q   Okay.  Do you agree that at -- I'll focus on
23 Via Christi because that's really where my client gets
24 involved.  And my client again, is Dr. Bala.
25    A   Okay.

33

1     Q   He is the pediatric hospitalist, and he's at
2  home.  Do you understand that generally?
3     A   Yes.
4     Q   Okay.  You agree that as to the providers at
5  Via Christi whether it's in the ER, or on the floor
6  before D. coded that strep absolutely should've been on
7  the differential?
8     A   The strep should've been on the differential?
9     Q   Yes.
10    A   Strep could've been on the differential, yes.
11    Q   Should it have been?
12    A   Be very low.
13    Q   Whether it's the top one, or the bottom one,
14 if it's on the differential it's on the differential.
15 Should it have been there?
16    A   Whoever had the case I wouldn't have included
17 strep in the differential.
18    Q   Okay.  Would you be critical if strep was on
19 the differential?
20    A   Strep could've been on differential.  And I
21 think that's the answer you were looking for.
22    Q   Okay.  Do you agree that it was appropriate to
23 administer antibiotics to D.M., both based upon his
24 presentation at Wesley, and in the ER at Via Christi.
25    A   I would only administer antibiotics to a

34

1  patient who had a clear cut case of strep throat.
2     Q   So the things that we've gone through wouldn't
3  justify in your mind, and make sure we're clear on these
4  things, an erythematous throat, enlarged tonsils,
5  adenopathy, elevated white blood count, and a positive
6  strep test would not justify the administration of
7  antibiotics?
8     A   The erythematous red throat could be explained
9  by many things including vomiting, a viral illness.  The
10 adenopathy you described is not consistent with strep
11 throat, as it's usually anterior and posterior cervical
12 adenopathy.  What were the other things you had
13 mentioned?  The white count, strep throat in general is
14 not a systemic illness and you rarely have an elevated
15 white count.  Although, I concede any infectious process
16 could have an elevated white count.  So I would not have
17 included the differential of strep throat.  But if a
18 diagnosis of strep throat is made correctly, antibiotics
19 are the treatment of choice.
20    Q   What antibiotics would those be?
21    MR. YOUNG: Hold it.  I object.  Move to strike
22 as non-responsive.  Go ahead.
23    BY MR. GRIBBLE:
24    Q   What would those antibiotics be?
25    A   For strep throat is some form of penicillin is

35

1  the drug of choice.
2     Q   Amoxicillin, for instance?
3     A   Sure.
4     Q   Do you agree that Zofran should have been
5  administered to D.M.?
6     A   Zofran certainly could be administered to any
7  patient who's vomiting.
8     Q   Should it have been administered to D.?
9     A   I don't -- I don't see any reason why not.
10    Q   Well, I mean, that's kind of a laissez-faire,
11 just throw it at him or not.  I mean, should it have
12 been or not?  I mean, this is a child that has
13 apparently vomiting repeatedly, that's put him at one or
14 more hospitals.  Should he been given Zofran?
15    A   If someone's vomiting, and you think they have
16 gastroenteritis giving Zofran is a good thing.
17    Q   Do you think D. should've been given Zofran?
18    A   At the moment he was given it, it seemed a
19 reasonable thing to do.
20    Q   You understand that D.M. was given fluids in
21 the ER and Via Christi?
22    A   Yes.
23    Q   Do you think that was appropriate to do?
24    A   Yes.
25    Q   Going to your report on page 4.  At the very

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

36

1  bottom you give elements relative to the diagnosis of
2  strep throat, correct?
3      A  Yes.
4      Q  You say for a school-aged child it almost
5  always requires a history of sore throat with findings
6  of pharyngitis, correct?
7      A  Correct.
8      Q  There was a history of a sore throat, wasn't
9  there?
10     A  Not provided by the mother.
11     Q  Let's go to Wesley, page 3. You see here on
12 the first page of the Wesley record it says in the
13 middle, "Throat red the other day." Do you see that?
14     A  Yes.
15     Q  Then let's go to page 5. Under the assessment
16 by Nurse Judd about halfway, or in the middle of that,
17 it says, she states that she thinks his throat might be
18 red. Do you see that?
19     A  Yes.
20     Q  Let's go to page 9.
21     A  Is that -- that -- okay, the -- yes. Okay.
22     Q  Under "Presentation," what is listed as the
23 second chief complaint?
24     A  Sore throat.
25     Q  Let's go to page 11. And you can see again,

37

1  we've already talked about this, the mild pharyngeal
2  erythema, correct?
3      A  Yes.
4      Q  Let's go to Via Christi, page 6.
5      A  Uh-huh.
6      Q  Under "History of Present Illness," "The
7  patient presents with sore throat, and patient has had a
8  sore throat for unknown time," correct?
9      A  Okay.
10     Q  Let's go to page 8. We've already discussed
11 in the middle of the assessment section, the erythema,
12 correct?
13     A  Yes.
14     Q  Let's go to page 16. Here again, we've
15 already discussed this by Dr. Hartpence, the mildly
16 erythematous throat, correct?
17     A  Yes.
18     Q  And then page 18, where Dr. White found some
19 erythema, correct?
20     A  It's recorded, yes.
21     Q  So do you think your report is accurate? Well,
22 let me ask you this. Are you saying that there's no
23 history of sore throat, and findings of pharyngitis?
24     A  The history of sore throat, according to the
25 record, was not provided the triage to two different

38

1  people. Nurse Grover wrote in her report, as I recall,
2  and I don't want to be misquoting because I don't have
3  them in front of me. I think the parent of the child
4  stated that she wasn't worried about strep throat or
5  sore throat. I'm sorry, I lost -- I lost my train of
6  thought there. Could you repeat the question?
7      Q  Sure. Let's just use two documents. Get in
8  your hand Wesley Medical Center, page 9.
9      A  Okay.
10     Q  And Via Christi, page 6.
11     A  Okay. Via Christi, page 6.
12     Q  Via Christi -- I'm sorry, Wesley, page 9,
13 "Presentation, chief complaint." First is headache. The
14 second is sore throat, correct?
15     A  I'm sorry we -- we're at Wesley or Via
16 Christi?
17     Q  We're going to get to Via Christi. We're at
18 Wesley.
19     A  Wesley, okay. "Chief complaint is headache
20 and sore throat." Yes, I see that.
21     Q  And then at Via Christi, page 6, "The patient
22 presents with sore throat, and patient has had sore
23 throat for an unknown time," correct?
24     A  That's what it says, yes.
25     Q  So I guess what I want to know, before I leave

39

1  here, are you going to tell the jury there was no
2  history of D.M. having a sore throat?
3      A  I believe I could not say that based on your
4  comment.
5      Q  And similarly, based upon the findings both at
6  Wesley and at Via Christi, whether it's a normal finding
7  or not, there is evidence of pharyngitis, isn't there?
8      A  There's no cervical adenopathy. There's no
9  exudates. There's no fever.
10     Q  What is pharyngitis?
11     A  Inflammation in the throat.
12     Q  Can inflammation of the throat be seen as
13 erythema?
14     A  That can be one small component of it, yes.
15     Q  And what type of adenopathy would pharyngitis
16 present with?
17     A  Pharyngitis could have adenopathy. I'm
18 specifically referring to strep. Primarily as the
19 cervical chain --
20     Q  But --
21     A  -- not so much submandibular or submental.
22     Q  Just pharyngitis, what would be the elements
23 of pharyngitis?
24     A  Red throat, pus on your tonsils.
25     Q  Okay.



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

40

1    A    Inflammation, swelling.
2    Q    And would you agree that there is evidence in
3  two hospitalizations of D.M. having a red throat?
4    A    That's what's reported, yes.
5    Q    There's evidence at the first hospitalization
6  of him having submandibular adenopathy.
7    A    That's what's reported, yes.
8    Q    There's an indication in the second
9  hospitalization at Via Christi of him having enlarged
10  tonsils.
11    A    That's what's reported, yes.
12    Q    Isn't all of that consistent with pharyngitis?
13    A    It could be.
14    Q    You go on to say in your report, and I'm at
15  page 4. "Besides history of sore throat, there might be
16  history of fever," correct?
17    A    Correct.
18    Q    Go to Wesley Medical Center, page 9.
19    A    Uh-huh.
20    Q    At the bottom, "Focused Review of Symptoms,"
21  you see where it says "reports fever"?
22    A    I see that.
23    Q    Your report goes on to say, "swollen lymph
24  glands." We know from the Wesley Medical Center ER
25  visit, there was submandibular adenopathy, correct?

41

1    A    Okay.
2    Q    Is that the same as swollen lymph glands?
3    A    Those -- those are some of the lymph glands,
4  yes.
5    Q    You note "rash" in your report -- not noted,
6  you list rash. I know there was no evidence of that.
7  Exudates, I understand there's no evidence of that. "And
8  is frequently associated with vomiting." There's no
9  question, but that D. had vomiting?
10    A    Yes.
11    Q    "Abdominal pain." Did you see evidence of D.
12      having abdominal pain?
13    A    It's not clear.
14    Q    Go to page 9 of Wesley's record. Under the
15  "Free Text HPI Notes," it says, about the third
16  sentence. "He has complained of some generalized
17  abdominal pain."
18    A    Okay.
19    Q    Do you find that unclear?
20    A    No. I see that now.
21    Q    And then back to your report "or headache,"
22  correct?
23    A    I'm sorry?
24    Q    Your report then goes on after abdominal pain
25  "or headache" --

42

1    A    Yes.
2    Q    -- correct? So would you agree that there's
3  evidence in the record that D. in fact had sore throat,
4  evidence of pharyngitis, history of a fever, swollen
5  lymph glands, vomiting, abdominal pain, and headache?
6    A    Well, I'd have to challenge that statement,
7  because some of the nursing triage notes say just the
8  opposite. They deny fever and they deny sore throat. So
9  I'm not sure who's providing the information that ended
10  up in this report.
11    Q    So one might be right. One might be wrong?
12    A    It's -- it's hard to know.
13    Q    Let's assume that what I'm telling you is
14  right.
15    A    Okay.
16    Q    Let's take that path.
17    A    No problem.
18    Q    If in fact my path from the providers I've
19  talked about is evident in the record, would you agree
20  there's evidence of D. having sore throat, evidence of
21  pharyngitis, fever, swollen lymph glands, vomiting,
22  abdominal pain, and headache?
23    A    I cannot disagree with that.
24    Q    And additive to that, a positive strep test
25  result at Wesley Medical Center?

43

1    A    As reported, yes.
2    Q    Doesn't that sound a lot like strep throat?
3    A    As presented the way you're -- the way you're
4  presenting it, it could be.
5    Q    And in fact I'm using your diagnosis elements
6  of strep throat in your report, aren't I?
7    A    You are?
8    Q    In your report, go over to page 5 if you
9  would, please. In the first full paragraph about this
10  last sentence says, "Slightly red throat as the only
11  clinical finding in vomiting child." Do you see where
12  I'm reading from?
13    A    Yes.
14    Q    You say "slightly red throat," and you're
15  referring to -- this would be at which hospital, or is
16  it both, or does it matter?
17    A    Initially you would think it's the Wesley
18  primarily, but both.
19    Q    Okay. You say slightly red throat is the only
20  clinical finding, and yet didn't he also have submandibular
21  adenopathy and enlarged tonsils?
22    A    We're -- we're -- I guess we're picking from
23  different points of the record, at different points in
24  the process --
25    Q    Well --

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

44

1  A  -- so --
2  Q  -- let's go slowly then, because I -- you had
3  said at one hospital, the other, or both, so that's why
4  I did it that way, but let's take it one hospital a
5  time. Slightly red throat as the only clinical finding
6  at Wesley is not true, is it?
7  A  Shortly after --
8  Q  Because at Wesley there's submandibular
9  adenopathy, isn't there?
10  A  That's reported, yes.
11  Q  And that would be a clinical finding, wouldn't
12  it?
13  A  Could be a normal or abnormal clinical
14  finding.
15  Q  But so could the slightly red throat, correct?
16  A  Correct.
17  Q  And so it's incorrect to state slightly red
18  throat is the only clinical finding at Wesley, isn't it?
19  A  I'm not sure how to answer the question,
20  because as I said, there's discrepancies in the record.
21  So based on the reports red throat was reported,
22  submandibular adenopathy he would not be abnormal.
23  The provider may have thought so.
24  Q  And in fact a slightly red throat may have
25  been normal, correct?

45

1  A  May have been.
2  Q  But would you think that adenopathy is a
3  clinical finding?
4  A  Yes. I wouldn't quarrel with that.
5  Q  Now, let's move to Via Christi. We have
6  different providers seeing a red throat, correct?
7  A  Yes.
8  Q  And we have Dr. White stating that he has
9  enlarged tonsils, correct?
10  A  She reported -- I believe that's correct.
11  Q  Isn't that a clinical finding?
12  A  Sure, that would be reportable.
13  Q  So how do you square what we've just talked
14  about with your sentence saying, "Slightly red throat is
15  the only clinical finding"?
16  A  As I review the record, when the patient
17  presented, red throat was the primary reason it seems
18  that PA Grover ordered a strep screen based on the
19  nursing report, but there was no sore throat and no
20  fever. I don't have any strong reason to believe that
21  he in fact had those symptoms.
22  Q  Will you stand in front of the jury in this
23  case, or sit on the witness stand and say that, "I, Dr.
24  Dabrow, believe that the only clinical finding D. had at
25  Wesley Medical Center was a slightly red throat"?

46

1  A  Of course not.
2  Q  Will you say to the jury at Via Christi, "The
3  only clinical finding D.M. had was a slightly red
4  throat"?
5  A  No. He had multiple clinical findings at
6  those institutions. I'm not disagreeing with that. I'm
7  just trying to look at the whole picture, the package,
8  not a specific individual finding.
9  Q  Dr. Murphy is one of the plaintiff's experts
10  in this case. He's an emergency medicine physician that
11  focuses on pediatrics. And at his deposition he
12  produced an article titled Group A Streptococci Amongst
13  School Aged Children, Clinical Characteristics in the
14  Carrier State. My first question to you is:
15  Are you even familiar with that article?
16  A  No.
17  Q  That article states in the discussion section,
18  second sentence, a child is considered to have
19  streptococcal pharyngitis if he or she has a sore throat
20  and a positive rapid diagnostic test or culture for GAS.
21  Do you agree or disagree with that?
22  A  Those are commonly accepted criteria.
23  Q  And then wouldn't it be a fact that D. should
24  be regarded as having strep throat inasmuch he had a red
25  throat and a positive strep test?

47

1  A  He may have had strep carrier state. He may
2  have had strep throat.
3  Q  You can't rule out that he had strep throat?
4  A  I don't think anybody can.
5  Q  Okay. And do you agree with this sentence
6  that a child is considered to have streptococcal
7  pharyngitis if he or she has a sore throat and a
8  positive rapid diagnostic test or culture for GAS?
9  A  I haven't read the article so I'm not sure in
10  the context that it came from. And I certainly don't
11  probably have the time to read the entire thing now. But
12  the criteria of strep throat -- of strep throat again is
13  typically a constellation of findings, not just a test
14  result and one symptom. So I -- I really don't have an
15  opinion on this article other than you're presenting it
16  to me now.
17  Q  For the constellation of symptoms for instance
18  in addition to a red throat and a positive strep test
19  you might have headache, abdominal pain, vomiting,
20  swollen lymph glands, correct?
21  A  There's -- there's -- that's very typical.
22  That's why I wrote in my report that way.
23  Q  All of which D. had?
24  A  I -- I guess I can't disagree the way you've
25  phrased the question.

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

48

1    Q   Let's switch gears and talk about Glasgow Coma
2  Scales.  And I know you have a document here, Exhibit 3
3  and you have a note.  And I'll let you read it.  I
4  think -- I can't read it, but read it for the record, please.
5    A   Okay.  I just -- I say, "This is not designed
6  for the use for acute pediatric care.  It's a coma
7  scale -- levels of consciousness."  I had to refresh my
8  brain on the Glasgow Coma Scale.  It's not something we
9  normally use at our hospital.
10   Q   Is there kind of a substitute that you use.
11   A   It's called a PEW scale.
12   Q   Like what?  I'm sorry.
13   A   PEW scale.  I'm not in the hospital currently
14 so I don't know if they still use it.
15   Q   When you were what is that?
16   A   It's a pediatric early warning system.
17 Combination of vital signs and neurologic status
18 combined together not just some neurologic findings.
19   Q   So PEW is an acronym for pediatric --
20   A   Early warning.
21   Q   -- early warning, okay got it.  What is the
22 Glasgow Coma Scale or score?
23   A   It's a measure of level of consciousness
24 primarily used for trauma victims or people with a brain
25 injury.

49

1    Q   You saw that it was done in a triage fashion
2  both at Wesley Medical Center and Via Christi relating
3  to D.M.?
4    A   Yes, I saw that.
5    Q   Would you have been critical if it would not
6  have been done at both facilities?
7    A   I'm not sure I would have had a comment if it
8  was or wasn't done.
9    Q   Just not something that you would typically
10 do?
11   A   No.  Not in a -- not in an acute care setting.
12   Q   What is its purpose when it is done?
13   A   Well, that's why I had to review this little
14 document from the up-to-date, to the level of
15 consciousness to -- to verify if someone's in a coma not
16 for brain injury on neurologic impairment.
17   Q   Well, I mean the reality is you can probably
18 look at somebody and see if they're in a coma or not,
19 can't you?  If they're truly in a coma?
20   A   Yeah, of course.
21   Q   Okay.  So there's something between total
22 alertness and a coma, isn't there?
23   A   Of course.
24   Q   Which is why we have these various numerical
25 ratings depending upon how the person responds to the

50

1  examiner, right?
2    A   Sure.
3    Q   And what are the three categories that are
4  being assessed in the Glasgow Coma Scale?
5    A   As it shows here eye opening, verbal response,
6  and motor response.
7    Q   And the numerical values that the patient can
8  get go from 1 to 5; is that right?
9    A   It looks like there's -- one is a 6, one is a
10 5, one is a 4.
11   Q   Okay.  The top score collectively would be a
12 15, correct?
13   A   Yes.
14   Q   And are you -- of the mind do you agree that
15 D.M. had a 15 at both hospitals?
16   A   That's what's reported.
17   Q   Do you believe that the Glasgow Coma Scale
18 score has good predictability in detecting increasing
19 intracranial pressure?
20   A   That I wouldn't know.  It's beyond my area of
21 expertise.
22   Q   If Dr. Le Pichon testified on page 37 of his
23 deposition that it provides good predictability of how
24 sick a child is, would you agree or disagree or have no
25 comment?

51

1    A   I don't know Dr. Le Pichon.  I -- I don't know
2  of him.  Is he a neurologist or a pediatrician?
3    Q   He is a neurologist.
4    A   Okay.
5    Q   He was D.M's neurologist and he's one of the
6  plaintiff's expert.
7    A   Okay.  He should have expertise then.
8    Q   Okay.  If he said that, "When you see a
9  Glasgow Coma Scale score between 9 and 13, that's when
10 you're starting to have a sick child."  That's page 37
11 of his deposition.  Would u agree, disagree or have no
12 comment on that?
13   A   It seems reasonable but I really don't have
14 any expertise to comment on that.
15   MS. WOODS:  Don?
16   MR. GRIBBLE:  Yes.
17   MS. WOODS:  I'm sorry to interrupt.  Doctor,
18 can you keep your voice up a little bit more?
19   THE WITNESS:  Sure.  I'm going to take some
20 water, that'll probably help.
21   BY MR. GRIBBLE:
22   Q   If Dr. Le Pichon testified on page 36 of his
23 deposition that the Glasgow Coma Scale score would be
24 part of the overall evaluation, and as critical as the
25 history, would you agree, disagree or have no comment on

52

1    that?
2        A    I'm going to -- could you ask the question
3    again, I'm sorry.
4        Q    If Dr. Le Pichon testified the Glasgow Coma
5    Scale score would be part of the overall evalu --
6    evaluation and be as critical as D.'s history, would you
7    agree, disagree or have no comment?
8        A    I -- I really don't have a comment.
9        Q    Okay. Let's talk about the Cushing's triad.
10   What is the Cushing's triad?
11       A    The Cushing's triad is described long time ago
12   in medical history as hypertension, low heart rate, and
13   an abnormal breathing pattern usually a low respiratory
14   rate although sometimes it's fast and irregular. It's
15   typically associated with elevated increased
16   intracranial pressure.
17       Q    In your report, Exhibit 1 on page 5, you
18   reference the Cushing's triad, correct?
19       A    Yes.
20       Q    And this is in the big paragraph in the
21   middle. That paragraph starts off with the diagnosis of
22   increased intracranial pressure. Do you see that?
23       A    Yes.
24       Q    About halfway down, you say, "The complaint of
25   the worst headache a child ever had in a patient who

53

1    never previously complained of headache and had a few
2    days of vomiting with balance abnormalities would raise
3    strong suspicion for increased ICP, and possible brain
4    tumor or stroke, correct?
5        A    Yes.
6        Q    Where in the record does it say that D.M. had
7    the worst headache of his life?
8        A    I believe that came from one of the
9    depositions of his mother.
10       Q    And the reality is it's not in either the
11   Wesley or Via Christi medical record, agreed?
12       A    Well, I believe the first page of the Wesley
13   triage note shows balance, unbalanced vomiting. We'd
14   have to refer back to them I don't want to misquote it.
15       Q    No, we can, and you're right. But I'm talking
16   about your reference to the worst headache.
17       A    Yes, I do not believe that anywhere in the
18   medical records from the physicians or for -- for other
19   providers that they described the worst headache that he
20   ever had.
21       Q    Okay.
22       A    I probably took that from his mother's
23   statement.
24       Q    Now, looking down here at the last sentence,
25   "In addition fundamental medical school teaching to all

54

1    physicians of so-called Cushing's triad, per in the
2    findings of elevated BP, bradycardia, and rapid or slow
3    irregular breathing is considered a classic finding for
4    elevated ICP," correct?
5        A    Yes, I do see that.
6        Q    And so this is teaching that's fundamental in
7    medical school, right?
8        A    Yes.
9        Q    And in fact, in your note here you say that
10   you need the findings of elevated BP, bradycardia, and
11   in other words conjunctive, rapid or slow irregular
12   breathing, correct?
13       A    Yes.
14       Q    You're just defining the point of the triad.
15   You need these three things, correct?
16       A    Correct, yes.
17       Q    And those three things not only are they
18   taught in medical school but it's fundamental you have
19   to have those three things?
20       A    Yes.
21       Q    You go over to page -- please go over to Page
22   8 in your report.
23       A    Okay.
24       Q    Just to orient you, you're talking about the
25   Via Christi hospitalization because at the top there you

55

1    referenced Dr. Hartpence?
2        A    Yeah.
3        Q    And if you go down about four sentences it
4    says, "The vital signs again are highlighted in bold
5    type in the hospital chart as abnormal."
6        A    Yes.
7        Q    And you say in parentheses, "The classic
8    Cushing Triad," correct?
9        A    Yes.
10       Q    But the candid reality is you were wrong on
11   the fundamentals being present of the Cushing triad and
12   D. M's case?
13       A    I misread the times of vital signs, correct.
14   I've already freely admitted to that.
15       Q    And so there is no way in the world you can
16   now stand and say that D.M. had a classic situation of
17   the Cushing's triad, true?
18       A    Well, that is true.
19       Q    Are you aware, maybe you didn't read it, but
20   are you aware that two other of the experts of the
21   plaintiff both Dr. Le Pichon and Dr. Murphy initially
22   said D.M. had Cushing's triad and then backed off of
23   that at their depositions?
24       A    I'm not aware of that. Am I allowed to
25   clarify it?



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

---

56

1    Q   Sure.
2    A   Okay. So I -- I would just refer to the page
3  in the Via Christi documents. I'm going to find it. And
4  I believe it's in your -- on your page 7. Simply --
5  simply reading off a PDF perhaps I misread that there
6  were two different times of vital signs. One included a
7  blood pressure which is abnormal, one included an
8  abnormal respiratory and pulse rate, but no blood
9  pressure. So that's the problem. The vitals are
10 incomplete. So I misread the times though I did not see
11 that there were two different times. I took it all as
12 one set of vitals. And that's the -- that's the error.
13    Q   The triage in fact is fully complete on these
14 vitals that would be necessary for the Cushing's triad,
15 right?
16    A   Yes, on arrival they took a full set of
17 vitals. He did not meet the criteria.
18    Q   And that's at 2:31 and the heart rate is 93,
19 respiratory rate is 20, and the systolic blood pressure
20 at 124, correct?
21    A   Yes, elevated blood pressure. Yes, I agree
22 100 percent.
23    Q   And in fact not only does he not have the
24 Cushing's triad, he doesn't even have the Cushing's biad
25 [sic]. He doesn't even have two of the three, does he?

---

57

1    A   I'm not sure that there's such a thing as a
2  Cushing's biad.
3    Q   I know it's kind of a stupid point but I guess
4  of a three-legged stool, he's only got one leg, doesn't
5  he?
6    A   He has low pulse and heart rate and sitting
7  right there in bold face.
8    Q   Where is it that he has a low heart rate?
9    A   At the 4:01 CST right on the same page we're
10 looking at 67.
11    Q   No. We're at 2:31. We're not yet at 4:01.
12    A   Yeah, I agree. Yes. I'm sorry, I think I
13 misunderstood you. I'm sorry
14    Q   The full set of vitals that's done is done at
15 2:31 a.m., correct?
16    A   Correct.
17    Q   93 is the heart rate, 20 is the respiratory
18 rate, 124 is the elevated systolic, correct?
19    A   For sure.
20    Q   The only bolded vital is the systolic,
21 correct?
22    A   Absolutely.
23    Q   So these are the three components that one
24 would look at to assess whether or not someone has that
25 Cushing's triad, correct?

---

58

1    A   Yes.
2    Q   If that's a three legged stool, D. only has
3  one leg of that triad, doesn't he?
4    A   Yes. It's -- it's a funny way you're phrasing
5  it, but as I said, I withdraw the comment about
6  Cushing's triad because I cannot state with any
7  certainty that he had it. He didn't have the vital
8  signs to go along with the blood pressure when it was
9  measured.
10    Q   Okay.
11    MR. GIROUX:  Don, when you get to a point.
12  We've been going about an hour, take a break?
13    MR. GRIBBLE:  Do it right now?
14    MR. GIROUX:  That's fine.
15    COURT REPORTER:  We're off the record.
16    (OFF THE RECORD)
17    BY MR. GRIBBLE:
18    Q   Doctor, what do you believe would be the
19 normal range of a heart rate for a child the age of D.
20 M.?
21    A   Normal heart rate?
22    Q   Yes, sir.
23    A   Usually I look at a textbook to answer a
24 question like that precisely. But let's say in the
25 range of the high 70s up to about 100, 90 to 100.

---

59

1    Q   High 70s to what? I'm sorry?
2    A   Let's say from 70 to 100. I'll just give you
3  a range.
4    Q   Okay.
5    A   With questions like that, I always refer to
6  the textbook because there are normals published.
7    Q   Okay. Do you agree, sir, that there was no
8  history given at Via Christi of D.M. having a present
9  problem with dizziness or unstableness or instability.
10    A   I believe there was no history given.
11    Q   I'm not sure the question was ever asked.
12    A   You only get the history if the questions are
13 asked of the parents.
14    Q   Do you feel like you closely reviewed the
15 medical records?
16    A   I closely reviewed the medical records prior
17 to putting up my report and now I cannot recall every
18 single page. I don't have a photographic memory.
19    Q   Go to page 15 of the Via Christi records that
20 I gave you.
21    A   (No verbal response.)
22    Q   And specifically under the "History of Present
23 Illness" about three-quarters of the way down, "Nausea
24 and vomiting started on Friday, intermittent throughout
25 the weekend. On Sunday the patient complained of

---



advanced
depositions
Nationwide Court Reporting & Trial Support
855·204·8184 • www.advanceddepositions.com

60

1  headache, dizziness, and worsening nausea and several
2  episodes of emesis."
3      A   Yes.
4      Q   So it appeared that it was asked.
5      A   Okay.
6      Q   Okay.  And you understand that that's
7  historical because we're now at Monday.
8      A   I don't understand what you mean.
9      Q   Well, it said that, "On Sunday patient
10  complained of headache, dizziness, and worsening nausea
11  several episodes of emesis."  And you understand this
12  history and physical is being taken on Monday.
13      A   Yes, that's correct.
14      Q   Okay.  So back to my point, that there was no
15  statement of present problems with dizziness, unbalance
16  or instability of D.M. at Via Christi?
17      A   I'm -- I'm misunderstanding something here.
18  You just read where the patient's complaining of
19  headache, dizziness and you're asking me to say there's
20  no mention of it?  Maybe I'm missing some point.
21      Q   You are, but I'm probably asking it poorly.
22  This HPI is done on Monday.
23      A   This is Dr. Hartpence's HPI I'm looking at?
24      Q   Right.
25      A   Okay.

61

1      Q   You understand Sunday comes before Monday,
2  obviously.
3      A   Yes.  Of course.  Of course.
4      Q   It says, "On Sunday, patient complained of
5  headache, dizziness, and worsening nausea and several
6  episodes of emesis," correct?
7      A   Yes.
8      Q   This being on Monday, in other words you could
9  say, yesterday he complained of these problems.  Are you
10  with me so far?
11      A   Sure.  Sure.
12      Q   The point being there was no statement of D.M.
13      having unbalance, instability or dizziness on
14  Monday.  Would you agree with that?
15      A   Sorry, maybe I'm being ignorant here, I'm
16  just -- the physician's writing it in his HPI?
17      Q   Right.
18      A   That on Sunday the patient complained of these
19  things, so are we saying they don't have them now or are
20  we saying they're continuing?
21      Q   Right.
22      A   I don't know that you can understand that from
23  the way he wrote it.  This is the history of present
24  illness.  This is what's going on now.  So he's getting
25  a whole sort of chronologic sequence --

62

1      Q   Well, we --
2      A   -- over two or three days.
3      Q   Right.
4      A   So does he still have dizziness, nausea,
5  vomiting?  I mean, he certainly still has nausea and
6  several episodes of emesis.  So does he deny dizziness?
7  It's there, we don't know if it's there at that moment.
8      Q   So the way you interpret this sentence, "On
9  Sunday patient complained of headache, dizziness, and
10  worsening nausea and several episodes of emesis."  You
11  interpret that to be he had that present on Monday?
12      A   Well, he could.  He could.  We'd have to ask
13  the physician himself what he referred to there.  This
14  is an HPI.  He's describing over a constellation of
15  symptoms of a patient.  He's trying to get a lot of
16  information and he did a very good job putting a lot of
17  symptoms in a simple paragraph.  The question is, are
18  the symptoms all current or past?  I don't know that.  He
19  certainly doesn't put it under his "review of systems."
20      Q   In fact, under "review of symptoms" you're
21  correct.  There is no mention of unbalance --
22      A   Yes.
23      Q   -- dizziness or instability, correct?
24      A   Correct.  Just headache.  Under the neurologic
25  at least.

63

1      Q   Would you agree that as of 5:00 in the morning
2  on March the 7th of '17 that -- I'm sorry, March the 6th
3  of '17, that D.M. would've been sleep deprived?
4      A   That's what's reported.  It says he'd been up
5  all night.  That's what everybody said.
6      Q   Is sleep important to a five-year-old child?
7      A   Sleep's important to everybody.
8      Q   Is it restorative?
9      A   Is it restorative?  That's an interesting
10  word.  But I suppose sleep is restorative.
11      Q   Is it helpful in keeping down medications?
12      A   I'm not sure what it would have anything to do
13  with keeping down medications.  We have lots of sleep-
14  deprived kids, they get medications throughout the
15  evening.  You wake them up, they take it, they go back
16  to sleep.
17      Q   Would a sleep-deprived child potentially give
18  unreliable results on a neuro exam?
19      A   Part of the neuro exam wouldn't have anything
20  to do sleep deprivation.  Reflexes, certain responses,
21  cranial nerve exam, coherent things, sure.  A sleep-
22  deprived child may not speak to you coherently or
23  rationally and may be scared to death and screaming the
24  whole time.  With this child, he just pretty much laid
25  around and did nothing.



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

64

1    Q   Would you agree that the most common complaint
2  of children in the emergency department is headache?
3    A   No. I would not agree.
4    Q   Do you know what the incidence of strep throat
5  is in the emergency department among children?
6    A   I do not know that.
7    Q   Do you know what the incidence of brain tumor
8  is in the emergency department among children?
9    A   Would be low. Based on all children who go to
10 all emergency rooms.
11   Q   Less than one percent?
12   A   I -- I don't have a number. I don't want to
13 be misquoted. I do know that brain tumor is most common
14 tumor -- solid tumors in children.
15   Q   You believed that a CT scan should have been
16 done at both hospitals, correct?
17   A   I phrased it that I believe a wider broad-
18 based differential should've been created to include
19 symptoms of intracranial pressure being increased. And
20 the easiest way to determine if there's a problem there
21 is to do a CT. So I do believe a CT should have been
22 thought about --
23   Q   Well --
24   A   -- and then performed.
25   Q   At both hospitals?

65

1    A   Well, at one or the other.
2    Q   Okay.
3    A   You're not going to do two CTs. If that's
4  what you're asking.
5    Q   Why wouldn't you do two CTs?
6    A   There's no point.
7    Q   And obviously by definition, the providers at
8  both hospitals thought differently than you do?
9    A   Yes. By -- based on why we're here.
10   Q   Have you ordered CTs before children in the
11 emergency room?
12   A   Yes.
13   Q   As such it's incumbent upon you to know the
14 risks associated with CT scanning?
15   A   Yes.
16   Q   Are there risks for CT scanning?
17   A   Theoretical concerns with a CT of the brain
18 would be potential injury to the lens of the eye. It's
19 unknown at what those levels. Potential injury to the
20 thyroid, those are the main ones. There's a whole list
21 of abdominal CT issues which I'm not part of that
22 discussion.
23   Q   But what you're aware of would be the
24 theoretical concerns of eye lens injuries and thyroid
25 injuries relative to CTs of the brain?

66

1    A   Theoretically, yes. In practice, nobody is
2  worried about that in general.
3
4    Q   In practice nobody is worried about that in
5  what?
6    A   In general physician. In general pediatric
7  practice, the need for a CT would far outweigh any
8  theoretical risk if you thought a CT was important
9  enough to do.
10   Q   If a CT scan was done inappropriately,
11 wouldn't that by definition violate the Hippocratic
12 Oath.
13   A   No, because you're doing it to try to
14 determine if there was a serious medical problem that
15 could be life-threatening.
16   Q   If a CT scan was done without the appropriate
17 indications, would that be a violation of the standard
18 of care?
19   A   If the CT scan was done without the
20 appropriate -- but you wouldn't do a CT scan without
21 appropriate indications or suspicions.
22   Q   But some people deviate from the standard of
23 care, right?
24   A   Well, yes.
25   Q   And so if, in fact, a CT scan was done without

67

1  appropriate indications, wouldn't that be a violation of
2  the standard of care?
3    A   I think violation is a strong word. I would
4  just say a variation.
5    Q   A variation from the standard of care?
6    A   Perhaps yeah. It's -- the semantics are
7  fooling me a bit.
8    Q   Do you agree that CT scanners use radiation?
9    A   Of course.
10   Q   And am I correct that radiation is energy
11 traveling as an electromagnetic wave?
12   A   Are you asking me a question? Sure. It seems
13 reasonable. I'm not an expert on CT scan technology. I
14 certainly use it all the time.
15   Q   There's low frequency electromagnetic waves
16 such as radios or microwaves, correct?
17   A   Yes.
18   Q   There's high frequency, high energy waves such
19 as x-rays and CT scanners.
20   A   Yes.
21   Q   What is ionizing radiation?
22   A   Like, an x-ray for example.
23   Q   What does ionizing mean?
24   A   I don't know. Off the top of my head I'm not
25 going to be able to give you a definition.


advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

68

1    Q   Doesn't it mean that the radiation disrupts
2  atoms, displaces electrons, and therefore the atoms can
3  mutate?  Isn't that the point of it?
4    A   I -- I don't know.  I mean, I'm not sure what
5  you're asking me.
6    Q   Well, isn't it a fact that ionizing radiation
7  can cause cells to mutate and therefore cause cancer?
8    A   Ionizing radiation can be dangerous if it's
9  inappropriately used.  That's why when people do CTs of
10  the brain, they're low dose protocols, and there are
11  specific protocols for children at almost every
12  children's hospital that the hospital should follow.
13    Q   Do you dispute that in 2012, the International
14  Agency for Research on Cancer classified ionizing
15  radiation as a carcinogen?
16    A   I don't know anything about that statement,
17  but it sounds reasonable.
18    Q   Do you dispute that children are more
19  vulnerable than adults to ionizing radiation because of
20  the fact as they're growing, there's more cell division
21  and they live a longer life?
22    A   Exactly the point of why we use and pick and
23  choose our choice of -- of methodology carefully and why
24  we use low dose protocols.
25    Q   You mentioned that the theoretical concerns of

70

1  mandatory CT dose reporting?
2    A   I'm not aware of that.
3    Q   Are you familiar with JAMA Pediatrics?
4    A   Well, it's a journal.
5    Q   Do you read it?
6    A   I don't subscribe to it.  I don't read it
7  cover-to-cover every issue.
8    Q   Are you aware that in the August 1, 2013
9  article, "Pediatric Computed Tomography and Associated
10  Radiation Exposure and Estimated Cancer Risk," that it
11  stated nationally, 4 million pediatric CTs of the head,
12  abdomen, pelvis, chest, or spine performed each year are
13  projected to cause 4,870 future cancers?
14    A   That was a highly quoted statistical report.
15  And as a result a lot of protocols were shifted.
16    Q   Are you aware that the same article states
17  that ionizing radiation doses delivered by CT are 100 to
18  500 times stronger than a conventional x-ray?
19    A   They can be 100 times stronger, but pediatric
20  doses is not 500.
21    Q   Are you aware that it's been found that the
22  excess relative risk of a single head CT results in a
23  2.4 fold increase in having a brain tumor?
24    A   I'm not sure.  Are you're talking about
25  pediatric specifically?

69

1  brain CT scanning would be eye lens injury and thyroid
2  problems potentially.  But isn't it true that ionizing
3  radiation can cause both leukemia and solid cancers?
4    A   CT of the head I'm not aware that that's been
5  associated with that.  Since those are tumors of blood
6  and other parts of the body.  I'm just not aware of
7  that.
8    Q   Have you ever read the article, "Pediatric CT
9  radiation exposure: where we were, and where we are
10  now" --
11    A   No, sir.
12    Q   -- by Pediatric Radiology?
13    A   No, sir.
14    Q   If it said that ionizing radiation can cause
15  leukemia and solid cancers, would you disagree with
16  that?
17    A   If it's been studied and it's stated, I'm sure
18  it's true.
19    Q   Would you agree that medical science hasn't
20  yet quantified the level of a single or cumulative
21  exposure level of ionizing radiation that won't cause
22  cancer?
23    A   I don't know anything about that statement.
24    Q   Are you aware that Connecticut, California,
25  Texas and New York have passed legislation regarding

71

1    Q   Yes.
2    A   I'm not aware of that fact and I'm not sure
3  that's a proven fact.  I just don't know enough about it
4  to comment.
5    Q   I'm looking at the article brain tumor, or
6  from the brain tumor article, "Risk of Brain Tumor
7        Induction from Pediatric Head CT Procedures: A
8  Systematic Literature Review."  Have you ever read that?
9    A   No.  Where is it from?
10    Q   I'll let you look at it.
11    A   So it's a research article from the web.  Open
12  access from the Korean Brain Tumor Society.  No, I
13  certainly wouldn't be reading something from the
14  Brain -- Brain Tumor Society.  I'm sorry, I'm not familiar
15  with it.
16    Q   Can you dispute that a single head CT results
17  in a 2.4 fold access relative risk of brain cancer?
18    A   Again, I don't know that that statistic is
19  correct or not correct.
20    Q   Can you dispute that the hazard ratio for
21  brain tumor increases 4.58 times after two CTs of the
22  head?
23    A   You're pointing statistics at me that I can't
24  respond to.  I know that the risk of dying from
25  intracranial problem far outweighs the potential risk.



advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

72

1    Q   Are you aware that the National Cancer
2  Institute has recognized pediatric CT scanning as a
3  public health concern?
4    A   Primarily for abdominal, but yes.
5    Q   And that it has stated CT scanning is the
6  largest contributor to medical radiation exposure among
7  the US population?
8    A   That seems reasonable.
9    Q   And that it has stated that the first study to
10  address the risk of cancer after CT scans in childhood
11  found a clear dose response relationship for both
12  leukemia and brain tumors?
13    A   That seems reasonable. I'm not familiar with
14  it, but it seems reasonable. That's what we taught.
15    Q   And lastly that the medical community should
16  work together to minimize the radiation dose to
17  children?
18    A   Absolutely. And that's being done. Still
19  being done.
20    Q   Are you aware of the Image Gently campaign?
21    A   I was part of that a few years ago. Primarily,
22  again, for abdominal CTs.
23    Q   Do you think that your statement that nobody
24  is worried about the effects of CT scanning squares with
25  the literature?

73

1    A   Say again.
2    Q   You earlier mentioned because I wrote it down,
3  "Nobody is worried about that." CT scanning of the
4  head. Do you think that squares with the literature?
5    A   I would probably rephrase the statement since
6  you're asking it that way. And state that in practice,
7  in general pediatric practice, in emergency room
8  practice, and inpatient hospital practice, the concern
9  that any intracranial problem, whether it'd be a tumor,
10  a bleed, a trauma. If you miss that, that far outweighs
11  a theoretical risk, whatever the percentage is.
12    Q   Why do you say these risks are theoretical?
13    A   Because just what you're describing. They're
14  theoretical. It's a low percentage.
15    Q   Well, isn't it a fact that ionizing radiation
16  is a carcinogen?
17    A   Potentially. Sure. Many things that can be
18  carcinogens. That's why you try to minimize the
19  exposure and minimize the inappropriate use.
20    Q   Before I'd mentioned these articles to you,
21  did you know that there was a risk of both leukemia and
22  solid brain tumors and brain cancer from CT radiation of
23  the head?
24    A   Well, that's been reported. Of course.
25    Q   Do you consider yourself current with the

74

1  medical literature?
2    A   In what respect?
3    Q   Any respect.
4    A   I'm current with the practice of general
5  pediatrics, pediatric hospital medicine, and not
6  pediatric emergency care in a current status. I don't
7  read every journal cover-to-cover that comes my way. I
8  go to meetings and I keep up.
9    Q   I'm about ready to turn over the questioning
10  to other folks. But having listened to my questions, do
11  you believe that your report has withstood scrutiny?
12    A   Yes.
13    Q   Do you stand by your earlier statement that
14  your report, in fact, is accurate?
15    A   With the exception of the comments about
16  Cushing's triad.
17    Q   And despite all of the questions I asked you
18  about sore throat and that type of thing, you still
19  stand by that?
20    A   Yes.
21      MR. GRIBBLE: All right. That's all the
22  questions I have at this time. Thank you, sir.
23      (OFF THE RECORD)
24        EXAMINATION
25      BY MR. DAY:

75

1    Q   Doctor, my name is Steve Day. I represent the
2  three resident physicians: Dr. Hartpence, Dr. White and
3  Dr. Borick. Do you understand that?
4    A   Okay.
5    Q   I'm going to start off with just a few general
6  questions. I'm going to be bouncing around a bit
7  because of Mr. Gribble's very thorough examination. As
8  a general rule, do you agree, that medicine is a field
9  that involves the use of judgment?
10    A   Sure.
11    Q   And that as with any area of life involving
12  judgment, there are times when equally qualified people
13  will come to different judgments in a particular
14  situation?
15    A   All the time.
16    Q   And the fact that you reach a different
17  judgment from another healthcare provider in and of
18  itself doesn't indicate that either one of you are
19  necessarily doing anything wrong, correct?
20    A   As you phrased it, sure.
21    Q   Similarly, there are often multiple schools of
22  thought as to how to proceed in a particular situation
23  in medicine?
24    A   Absolutely.
25    Q   And where a physician follows one of the

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

---

76

1  generally accepted approaches, that won't be below the
2  standard of care merely because you follow a different
3  approach, fair?
4      A   Could you state that again? I'll listen
5  carefully.
6      Q   I'm basically saying that people -- there are
7  different ways of doing things. And if a doctor follows
8  one of the reasonably well-recognized approaches, the
9  fact that you don't personally choose to follow that
10 approach doesn't mean that that's below the standard of
11 care?
12     A   That's correct.
13     Q   Okay. Finally, Doctor, you are aware that in
14 offering opinions, you've had the opportunity of
15 hindsight?
16     A   I've had the opportunity to review the
17 records, sure.
18     Q   Right. And you know looking back that this
19 child had a brain tumor?
20     A   Of course.
21     Q   Obviously, the people who were providing care
22 to this child looking forward didn't have access to that
23 information of what would be determined in the future,
24 obviously?
25     A   Yes.

---

77

1      Q   And you would agree that in judging whether a
2  healthcare provider met the standard of care we have, to
3  look at it from the standpoint of the information that
4  was available to that provider at the time the services
5  were provided?
6      A   Yes.
7      Q   Which, would you agree, can sometimes be a
8  little difficult to look at it from the standpoint of
9  someone who doesn't know what you know in terms of
10 events, that can be a little difficult?
11     A   Okay.
12     Q   You agree?
13     A   It seems reasonable.
14     Q   Okay. Finally, have you heard of the term
15 "hindsight bias"?
16     A   Hindsight bias? No. I've not heard that
17 term.
18     Q   All right. Well, there is a term that is used
19 that refers to the fact that when people are looking
20 back it can bias how they view a particular situation as
21 opposed to what was going on at the time. Does that
22 sound reasonable to you?
23     A   Yeah. Almost sounds like a phrase we use all
24 the time called observer bias, where going forward the
25 same thing occurs.

---

78

1      Q   Okay. Now, my clients are family practice
2  residents, or were at the time, anyways. And you don't
3  hold a resident physician to the same standard of care
4  as you would hold a board certified pediatric physician,
5  do you?
6      A   No. You can't.
7      Q   You have to judge them based upon their level
8  of training at the time?
9      A   Correct.
10     Q   Okay. And the reason for that is that
11 residency is, at least in part, an educational process,
12 correct?
13     A   Yes.
14     Q   And people go into a residency program in
15 order to gain knowledge and skills?
16     A   Correct.
17     Q   And in that process of doing this, they will
18 provide services to patients?
19     A   Correct.
20     Q   But when they do so, they do so under the
21 supervision of an attending physician?
22     A   Yes.
23     Q   And under the basic standards a resident is
24 always, either directly or indirectly, being supervised
25 by an attending physician in providing care to a

---

79

1  patient, correct?
2      A   That's what -- yes. Yes.
3      Q   And one of the reasons why that is done is
4  because the attending physician can help with the
5  education of the resident in providing guidance and
6  information during the process of providing care, fair?
7      A   Yes.
8      Q   Another reason is to make sure that the
9  patient is properly taken care of. So that the more
10 senior person, the attending, can step in if necessary
11 or give advice to change course if appropriate?
12     A   Of course.
13     Q   And that is to protect both the patient and
14 the resident, do you agree with that?
15     A   Yes.
16     Q   Okay. Now, have you worked with, I mean,
17 taught family practice for residents?
18     A   Yes.
19     Q   Okay. And in what context, if you don't mind?
20     A   I was an inpatient hospital attending at an
21 academic hospital for ten years, two different
22 institutions, and in which I had family practice
23 interns and residents on our inpatient service.
24     Q   Okay.
25     A   Similar to what I believe occurred at this

---



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

80

1  hospital.
2    Q   Right. And were you, during your time of
3  association with universities, always volunteer faculty?
4    A   No. When I was at Florida Hospital, I was the
5  associate residency director.
6    Q   Okay.
7    A   And the other institution I know the fact that
8  I was a hospitalist employed by the hospital in an
9  academic position as well.
10    Q   Okay. Now, wouldn't you also agree that as an
11  expert witness, which I know is fairly new to you, but
12  does it sound right that you're supposed to be
13  impartial?
14    A   Yes.
15    Q   In other words, you shouldn't come in here
16  looking to achieve one result or the other or in any way
17  push one way or the other, simply follow the facts, you
18  agree?
19    A   Yes.
20    Q   And that if, in fact, an expert witness
21  becomes an advocate and acts as an advocate rather than
22  an independent unbiased witness, you would tend to
23  question the reliability of their opinions, fair?
24    A   Okay.
25    Q   Do you agree?

81

1    A   Yeah.
2    Q   Okay. Again, let's -- I'm going to stop
3  because I don't want to repeat the things that Mr.
4  Gribble went through. Doctor, when the child was taken
5  to Wesley, he went with complaints as demonstrated in
6  the record including headache; is that correct?
7    A   Yeah.
8    Q   And at that point there was no established
9  diagnosis?
10    A   Of course not.
11    Q   And in fact, though, he received an
12  established diagnosis at the hospital; is that right?
13    A   Yes.
14    Q   He was diagnosed with having strep throat?
15    A   Correct.
16    Q   And was given medication for that?
17    A   Correct.
18    Q   Okay. Then the parents take D. home and he's
19  throwing up the medication, correct?
20    A   It sounds like he threw up multiple times.
21    Q   Right. And we can go to the records, but, you
22  know, the records indicate that in coming back to Via
23  Christi, the mother or the parents were expressing the
24  concern that he wasn't getting treated for the strep
25  because he was vomiting?

82

1    A   Yes. I saw that.
2    Q   And in fact that was in essence the purpose of
3  going to the hospital, wasn't it, as described in the
4  records?
5    A   In the medical record, yes. In the deposition
6  by the parent I think there was a different point of
7  view.
8    Q   Okay. But I mean, we can go through it. But
9  you agree that if there were signs or symptoms or
10  experiences that are referenced in the Wesley records
11  that aren't necessarily referenced in the Via Christi
12  records, in terms of history?
13    A   Yes. That's possible.
14    Q   And that's despite the fact that Dr. Hartpence
15  took a very thorough history, as you'd mentioned?
16    A   I'm -- ask the question again, I'm sorry.
17    Q   And that's despite the fact that Dr. Hartpence
18  took a fairly thorough history?
19    A   And what -- what am I being asked. That he
20  did take a -- it seemed that he took a thorough history.
21    Q   Right. And yet there were some things that
22  had been -- that are shown in the records in Wesley that
23  do not appear to be present?
24    A   Correct. Yeah. There's discrepancies, yes.
25    Q   Doesn't it appear from an overall review of

83

1  the records that the parent -- that basically at Via
2  Christi the parents presented this if you accept the
3  records as an issue of, "I'm afraid my son may be
4  becoming dehydrated. I'm afraid that he's not getting
5  his medication," as opposed to them coming in seeking a
6  diagnosis?
7    A   Parents come in with an opinion and seeking
8  treatment. There's no question about that.
9    Q   All right. Now from reviewing the
10  depositions, you're aware that Dr. Hartpence took that
11  he did his history and physical and then he at some
12  point, you know, would have had contact with Dr. White
13  who also saw the patient. And then they contacted -- or
14  at least Dr. Hartpence contacted the attending
15  physician?
16    A   Yes. That's what's reported.
17    Q   Right. And neither -- you noted in your
18  report that neither Dr. Bala or Dr. Hartpence remember
19  the details of that conversation?
20    A   Correct.
21    Q   However, Dr. Hartpence did testify that his
22  routine and habit as a first-year resident would've been
23  to pretty much go through his entire history and
24  physical, do you recall that testimony?
25    A   Yeah. I believe it was repeated on the



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

84

1  document somewhere.
2  Q   Okay.
3  A   The entire thing was, like, repeated.
4  Q   So you agree -- so is -- that sounds like
5  something you'd expect a first year resident to do?
6  A   Actually I wouldn't expect the first year
7  resident to repeat the entire history and physical in
8  the middle of the night to the attending.  To repeat the
9  highlights is typically what they do.
10  Q   Okay.  And at least you would expect them to
11  provide what appears to be pertinent information?
12  A   Correct.
13  Q   And would your expectation be at that point
14  there would be discussion in terms of the plan as to how
15  to move forward?
16  A   There will be discussion between the intern
17  and the senior resident and the intern and the
18  attending, if that's who they spoke with.
19  Q   Right.  And ultimately the attending is the
20  one who has the final say so?
21  A   Let's put it, the attending has the final say.
22  But part of residency training is that you're supposed
23  to develop clinical skills and make decision-making
24  processes independently and autonomously --
25  autonomously.

85

1  Q   So you come up with a recommendation and then
2  the attending can either approve or disapprove that
3  recommendation?
4  A   Or you can act on your own in order to test a
5  procedure that you feel is necessary, if you feel it's
6  necessary.
7  Q   Okay.  But if we're talking, and let me be
8  specific about an admission.  And if it is the policy or
9  practice of the program to always contact the attending
10  when a patient's being admitted, you would expect that
11  the resident would make a proposal as to what appears
12  the appropriate thing to do.  And then the attending has
13  the power to either approve or disapprove of that, or
14  change it?
15  A   Yes.  The way you phrased it, yes. Absolutely.
16  Q   Doctor, if in fact vomiting is associated with
17  a brain tumor, you normally expect the vomiting to be
18  difficult to control?
19  A   That I don't know.  Because I've seen many
20  kids who have VP shunts and brain tumors and other sorts
21  of things, and sometimes they respond and sometimes they
22  don't.
23  Q   As a general rule would you expect that a baby
24  or an infant such as we have here, a young infant who
25  has a brain tumor, and if there's vomiting in

86

1  association with that, would you generally expect them
2  to be resistant to medications designed to prevent or to
3  treat that condition?
4  A   It's a hard question to answer, honestly.
5  Q   You don't know?
6  A   That's right, yeah.  I don't -- I don't know
7  the precisely -- no.  I don't know how to answer that
8  question because when I see kids that might have a tumor
9  or -- well, let me rephrase my answer as well.  We
10  always are going to give Zofran to a vomiting patient as
11  an attempt to ameliorate the symptoms so they feel
12  better.  It -- it is the custom.  Whether it's more or
13  less effective, I'm not sure.
14  Q   Okay.  Now, you state in your report that
15  multiple examining staff have reported him to be
16  excessively sleepy and poorly arousable.  Where in the
17  records did you find a statement that he was excessively
18  sleepy?
19  A   Non-arousable would be excessively sleepy. The
20  nurses respond that the patient is lethargic on one of
21  the vitals reports.  Things like that.  They did not use
22  the word "excessive," I used the word "excessive."
23  Q   Right.  And in fact there are a number of
24  entries in the record that discuss the child's response
25  to healthcare providers; is that right?

87

1  A   Yes.
2  Q   And some of them would indicate that the child
3  was responsive?
4  A   Oh, yes.
5  Q   Are you making a judgment as to which of these
6  entries is correct?
7  A   No.  I just found it confounding that some of
8  the entries describe a non-arousable sleepy patient who
9  has a Glasgow Coma Scale of 15 within a few minutes of
10  that description.  So there were discordant entries that
11  didn't agree in the way the things should have flowed.
12  That's what bothered me.
13  Q   You do agree that a five-year-old who hasn't
14  slept all night, and who has been vomiting, is likely to
15  be pretty tired?
16  A   Oh, certainly.  Of course.
17  Q   Exhausted?
18  A   Of course.
19  Q   And under those circumstances -- well, strike
20  that.  And actually, the medication he was given to
21  control the vomiting can cause additional sleepiness,
22  can't it?
23  A   No.  Without a doubt.
24  Q   So it is not surprising that he was very
25  sleepy, very tired?

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

88

1  A  Yes. Of course.
2  Q  And a sleepy five-year-old who is especially
3  tired can be hard to wake up, can't they?
4  A  Yeah. They can be hard to wake up.
5  Q  Okay. So the fact that a healthcare provider
6  would prod him and do some things with him, and would
7  get a response, but he wouldn't completely wake up is
8  not surprising, is it?
9  A  No.
10  Q  And that by itself is not an indication that
11  there is something seriously wrong with him?
12  A  That you need -- no, of course not.
13  Q  All right. Now, there are times when certain
14  portions of, well -- and let me strike that and lay a
15  little foundation. When a resident sees a patient in
16  the hospital, they do a history and physical that
17  includes, at least, briefly touching on some issues that
18  do not seem to be related to the reason that the
19  patient's at the hospital, correct?
20  A  A resident's required to do a complete history
21  and physical, yes.
22  Q  Okay. So they may do physical examinations
23  that are, kind of, on the list, but wouldn't necessarily
24  seem to have a lot to do with a particular complaint
25  that brought the patient to the hospital?

89

1  A  At times, sure.
2  Q  And when that is true and when you have a
3  child who is unusually sleepy and -- for a reason, and
4  mom is concerned and thinking that he's asleep, at times
5  it is appropriate and is done to defer portions of that
6  exam, if they do not appear to be pertinent to the issue
7  at hand?
8  A  Well, the way we train our residents and the
9  way it's always been taught to me is, when a patient is
10  admitted in the middle of the night, the intern, the
11  resident -- it's the duty between one or both of them to
12  get a complete history, and to do a complete physical
13  exam from head to toe, regardless of the complaint.
14  That's why the child's in the hospital. It's not a
15  babysitting service.
16  Q  Okay. So your experience is that the entire
17  exam will be done with nothing being deferred under all
18  circumstances?
19  A  Rarely and occasionally people are going to
20  defer for their own unique reasons, but the team
21  should --
22  Q  So are you saying, for example, that the
23  standard of care -- let me strike that. Let me set this
24  as a hypothetical. Assume hypothetically that Dr.
25  Hartpence was completely reasonable in believing that

90

1  there was a clear established diagnosis of strep throat.
2  This is a child like D. who has been vomiting. With the
3  medication, has stopped vomiting, and is now for the
4  first time -- it's now early -- it's now somewhat mid-
5  morning, or mid-early-morning, we're talking, your 5:00,
6  6:00 in the morning, and as of this time, the child is
7  finally asleep. Is it your testimony that it would be a
8  violation of the standard of care for that resident
9  physician to say, "I don't want to wake the child up.
10  That seems unnecessary. We will pick up this exam and
11  fill out the rest of the exam that's required later"?
12  A  No.
13  MR. GIROUX: Object to the form. Foundation
14  and improper hypothetical. Hypothetical, but go
15  ahead.
16  A  So the way you phrased the question, if the
17  diagnosis was certain, if a complete history had been
18  obtained, and an appropriate differential had been
19  thought about, and if the patient had been at least
20  examined in a limited way for the pertinent findings,
21  you could defer part of the exam.
22  Q  Okay. And, okay. So going back to my
23  original question. The deferring part of the exam is
24  not per se a violation of the standard of care --
25  A  I --

91

1  Q  -- it depends on the circumstances?
2  A  I believe that is a better way of saying it.
3  Q  And whether or not that circumstance is
4  present, is often a judgment call?
5  A  It's -- it's always a judgment.
6  Q  Okay. And when we talked about judgments, we
7  already discussed that different physicians may reach
8  differing judgments, correct?
9  A  Correct.
10  Q  And a first year resident may reach a somewhat
11  different judgment than you would reach?
12  A  Oh, it happens all the time.
13  Q  Okay. And that by itself, again, is not an
14  indication that the first year resident is departed from
15  the standard of care?
16  A  Agreed.
17  Q  Okay. You mentioned in your report that there
18  is some relevance to the fact that this was at Via
19  Christi, was a return to the hospital for a second time,
20  or at least to a hospital for a second time having
21  previously been to Wesley; is that correct?
22  A  Yes.
23  Q  And in fact it is that within emergency
24  medicine it is sometimes thought that if a patient comes
25  in for a condition, goes home, and then comes back for

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

92

1  that condition again, that that may be an indication to
2  take a little closer look?
3      A   Yes.  Or make sure you have the right
4  diagnosis.
5      Q   All right.  On the other hand, Doctor, in this
6  situation, the patient had been seen at Wesley for what
7  the records disclose a headache, nausea, and sore
8  throat.  And he has now come -- been taken -- brought
9  back to -- brought to Via Christi specifically because
10  the parents are afraid that he's not getting his
11  medication because he's throwing up, and that he might
12  be dehydrated because he's throwing up, correct?
13      A   That's what medical record does reflect.
14      Q   All right.  And so they're not really going to
15  the doctor because of the -- or going to the hospital,
16  to the emergency department, for the same reason that
17  they went the first time?
18      A   From the medical record your statement is
19  correct.
20      Q   Yeah.
21      A   From I believe the parent's deposition, that's
22  not what she stated, but I'd have to refer to her
23  testimony.
24      Q   Would we assume that the records are correct,
25  under those circumstances where it is basically parents

93

1  come in and saying, "He's vomiting and I don't think
2  he's getting his medicine," that the basis, the
3  rationale for that idea you need to take a closer look
4  the second time doesn't really apply, does it?
5      A   Well, this is where your bias comment comes
6  in, and I would just flip it the other way.  Your
7  objective should be to look at the situation and get a
8  comprehensive history, and determine if the diagnosis is
9  correct.  Is that why they're coming back or could there
10  be a different problem?
11      Q   Okay.  But they didn't come back because what
12  was done the first time was unsuccessful.  They came
13  back for a specific reason having to do with the
14  medication.
15      A   That's -- according to the records, yes.
16      Q   And Doctor, you have discussed with Mr.
17  Gribble, and put in your report, your belief that the
18  labs aren't what you would expect in some respect,
19  aren't -- and don't establish in your mind strep throat?
20      A   Which labs are you referring to?
21      Q   The laboratory exams that were done.  The
22  bloodwork.
23      A   The bloodwork, yeah.  You would never diagnose
24  strep throat from bloodwork.
25      Q   Yeah.  You also do not diagnose a brain tumor

94

1  or increased intracranial pressure from a blood test, do
2  you?
3      A   Of course not.
4      Q   So when you say that there are things -- well,
5  when you talk about the blood test results in this case,
6  you are not saying that there's something about those
7  results that would make someone think, brain tumor?
8      A   No.  They should make you think of other
9  alternatives than strep throat.
10      Q   And Doctor, have you heard of the term, which,
11  I think it's often discussed in -- I'm going to strike
12  that, I didn't say that very well.  Have you heard it
13  said in medicine that when you hear hoofbeats, look for
14  horses and not zebras?
15      A   Commonly used phrase.
16      Q   And in fact, I'll tell you Kansas it's not
17  unusual to have a doctor say -- talk about "looking for
18  zebras."  Do they say in Kansas, "looking for zebras" in
19  Kansas?  Do they say "looking for zebras" in Florida --
20      A   Sure.
21      Q   -- in Florida?
22      A   Everywhere.
23      Q   And the point of that statement is generally
24  that while you have to keep a look out for unusual
25  things, more often if signs or symptoms are associated

95

1  with a common versus a very uncommon condition, it's
2  probably the common condition that's going on?
3      A   The way you phrased it, I won't disagree.
4      Q   And it has a little bit to do with the fact
5  that when you have general signs and symptoms, such as
6  nausea, vomiting, that we have in this case, a headache.
7  Those types of things would have a very long potential
8  differential attached to them; would they not?  Looking
9  at --
10      A   Yeah.
11      Q   Correct?
12      A   Yes.  That's why you need more information.
13      Q   Right.  And if you look at it in an academic
14  sense, the differential -- if you were asked, what's the
15  differential for a child who has vomiting, nausea,
16  headache, some dizziness.  There might be 100 items that
17  could be found that would be consistent with those signs
18  or symptoms?
19      A   Maybe a hundred, maybe more.
20      Q   Right.
21      A   The computer, I think, in one of the medical
22  records generated subarachnoid hemorrhage as a
23  possibility.
24      Q   Right.
25      A   It was, like -- okay.



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

96

1    Q   So when they talk in medicine about "not
2   looking for zebras" in Kansas or in Florida, it's partly
3   saying that if you find an explanation that's reasonable
4   that is relatively common and expected, you shouldn't go
5   running tests on every obscure thing that would be on
6   that differential list?
7    A   After you do a complete history and do a
8   complete exam, you'll create a differential diagnosis,
9   and we teach our residents this all the time. Look at
10  the probability of each item and what do you think the
11  most likely diagnosis is, and support it. However, if
12  there's a diagnosis that could be potentially life-
13  threatening you need to strongly consider it.
14   Q   Right. But that also means it is a diagnosis
15  that is potentially fatal, that's within the range of
16  things that seem reasonably likely or reasonably
17  possible, correct?
18   A   I'm not sure I understand your question.
19   Q   Well, you're not saying that because every
20  time a kid comes in with a headache, and the
21  differential includes brain tumor, subarachnoid
22  hemorrhage, a whole bunch of other things, the tests
23  have to be run for all those things?
24   A   Of course not.
25   Q   All right. So when we talk about if there's

97

1   something life-threatening, you know, you need to try to
2   exclude that -- that means something that's life-
3   threatening among the handful or collection of things
4   that seem reasonably likely to be explanations to what
5   you've seen, true?
6    A   Correct.
7    Q   Okay. As opposed to everything?
8    A   Correct.
9    Q   Okay. And the reality is in medicine, if
10  physicians were to try to test to exclude every
11  conceivable possibility for particular symptoms, much
12  more harm would be done than good?
13   A   Oh, we teach that all the time. That's the
14  purpose of a differential diagnosis.
15   Q   And when we talk about a differential
16  diagnosis, and we talk about you try to rule things out
17  and rule things in, right?
18   A   Yes.
19   Q   But ruling things out doesn't necessarily mean
20  that you've done the definitive test, does it?
21   A   No.
22   Q   It means that under the whole totality of
23  circumstances and the judgment of the practitioner, that
24  doesn't appear to be a likely explanation. Is that a
25  fair way to put it?

98

1    A   That's an excellent way to phrase it.
2    Q   Are you aware of the incident rate of
3   medulloblastomas?
4    A   Not specifically for medulloblastoma.
5    Q   If literature indicates that it's about 1.2 to
6   two cases out of 100,000 per year, would you agree, or
7   disagree with that?
8    A   If you're telling me it's probably true, I
9   don't know personally.
10   Q   All right.
11   A   I don't keep up with the literature --
12   Q   I will tell you --
13   A   -- in this case.
14   Q   -- I looked at a Medscape article and it says
15  there 300 cases in the United States a year. I looked
16  up at the date and it says that there are 500 cases a
17  year in the United States. Either way it's a very, very
18  unusual condition, true?
19   A   True. I -- makes sense.
20   Q   And yet it is the most common brain tumor
21  among the pediatric population, correct?
22   A   That I'm not sure.
23   Q   In any case, any kind of brain tumor is a very
24  unusual diagnosis in a pediatric patient?
25   A   I believe it's the most common solid tumor in

99

1   children.
2    Q   It's still a very unusual thing to find in
3   a --
4    A   Correct.
5    Q   -- pediatric patient; is that true?
6    A   As -- if it's a low percentage, sure.
7    Q   Now, strep throat is a very common diagnosis
8   for a physician to make who deals with children?
9    A   Correct.
10   Q   There have been -- there -- I don't know that
11  anybody has a good count, but there are several million
12  cases a year in the United States?
13   A   Probably. I mean, it's going to be a huge
14  number, whatever it is.
15   Q   Right. So if we go back to our analogy, and
16  not suggesting that you're saying that it shouldn't have
17  necessarily less have been -- something should
18  nevertheless have been explored, but if we look at our
19  analogy, you would agree that basically a
20  medulloblastoma is the zebra, and strep throat would be
21  a horse?
22   A   Seems reasonable the way you phrase it.
23   Q   Would it be accurate to say that a family
24  practice physician might well go through an entire
25  career and never run into one of these tumors?

advanced
depositions
Nationwide Court Reporting & Trial Support
855·204·8184 ▪ www.advanceddepositions.com

100

1    A    Most likely.
2    Q    In fact, they may go through a entire career
3    and see -- if they don't -- and see no pediatric brain
4    tumors, true?
5    A    Probably, it's possible.
6    Q    And not unlikely, is what you're saying?
7    A    Yeah.  It would mean with community family
8    practice residents, it's probably not very common.
9    Q    Yeah.
10    A    On the other hand, head injury or other causes
11    of increasing intracranial pressure, they're going to
12    see.
13    Q    And when there is a car crash, or when there
14    is a trauma, there's frequently a report of that, isn't
15    there?
16    A    Yes.
17    Q    In other words, when you're a physician and
18    you're looking for increased intracranial pressure when
19    there has been an accident or a head trauma, because you
20    know, you have a reason to associate that as a
21    possibility?
22    A    That, and if you have symptoms consistent with
23    signs of intracranial pressure.
24    Q    Yeah.  But if you have a small child that's
25    been closely followed and there's no evidence of any

101

1    injury on the outside of the head, and the parents bring
2    him in with headache and vomiting, it's pretty unlikely
3    that he has suffered a collision of some sort?
4    A    Oh, yeah.  I mean, it's a hypothetical,
5    correct.
6    Q    Right.  Okay.  So at the same time that a
7    family practice doctor may, through the course of the
8    career, have none -- had no, or certainly little,
9    occasion to diagnose or treat a brain tumor, that
10    physician will likely have diagnosed and/or treated
11    thousands or even tens of thousands of cases of strep
12    throat?
13    A    I doubt thousands, if it's a resident in
14    training.  Is that what you're asking me?
15    Q    No, I'm just asking you -- right now, we're
16    talking about it in the career of a --
17    A    Oh, in somebody's career?
18    Q    Yeah.
19    A    So you are asking me about family physician or
20    pediatricians?
21    Q    Yes, family physician.
22    A    Family physicians probably treat almost no
23    brain tumors or make no diagnoses of brain tumors.
24    Q    Right.  But they would treat probably
25    thousands of --

102

1    A    Yeah, probably, thousands.
2    Q    -- of strep throat.
3    A    Most likely, sure.
4    Q    Yeah.  Now, in fairness, would you agree that
5    when a diagnosis is unusual, it can make that diagnosis
6    much harder to reach?
7    A    If the diagnosis is unusual.  As your
8    statement, sure, that would -- that would seem
9    reasonable.
10    Q    And that would be especially true if you're
11    dealing with a resident physician?
12    A    That question, I don't understand.
13    Q    Okay.  I was saying if you're talking about
14    someone who is early in their career, still in
15    residency, it is likely going to be especially difficult
16    for that physician to make a diagnosis of a very unusual
17    condition?
18    A    Oh, typically no.  Without question.  I'm with
19    you there.
20    Q    And those are factors, how usual or unusual
21    the condition is, the level of experience to the
22    provider that someone needs to take into account in
23    making a judgment whether that physician acted in
24    accordance with the standard of care; do you agree?
25    A    Yes.

103

1    Q    Now, I'm going to talk a little bit about each
2    of my three clients, and then I probably will be close
3    to passing or reserving the right to ask a few questions
4    later, if it becomes appropriate.  What is your
5    understanding of where Dr. Borick was in her training?
6    A    She was an intern, I believe.
7    Q    Right.  Intern and first year resident mean
8    the same thing?
9    A    Intern and first year resident in the -- near
10    the -- I guess the final quarter of her year.
11    Q    Okay.
12    A    March.
13    Q    Now.  Dr. Borick was not involved with the
14    actual admission process of D.; is that right?
15    A    Yes.
16    Q    At the time that she became involved, he had
17    already been diagnosed as having strep throat, true?
18    A    Yes.
19    Q    In fact, he had been diagnosed by having strep
20    throat by two separate emergency departments?
21    A    Yes.
22    Q    Now, Dr. Borick was also not involved in
23    establishing the plan of treatment, true?
24    A    I -- I believe that's correct, yes.
25    Q    And do you recall testimony that Dr. White,



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

---

**104**

1  when she spoke to Dr. Borick, at least according to Dr.
2  Borick's memory, told Dr. Borick what the plan was?
3      A  I actually don't remember it, but I -- I'll
4  accept that you're saying it if it's in the record.
5      Q  You will accept Borick was involved?
6      A  Yeah -- yeah.
7      Q  It's what you'd expect?
8      A  Yeah.
9      Q  Okay.  And you would agree that the plan that
10  was put into place was to let D. sleep.  And then when
11  he woke up, to see if he could keep his oral medication
12  down.  And therefore, and if so, probably could move
13  towards discharge.  If not, then IV medication might be
14  required.  Do you recall that being the plan?
15      A  Yes, oh, I saw that.  It's in black and white.
16      Q  All right.  Now, Dr. Borick, at that time,
17  would have known that the attending head approved this
18  diagnosis and plan, true?
19      A  Yes.
20      Q  And that would likely have known that the
21  diagnosis has been made by others, true?
22      A  Sure.
23      Q  Now, you would agree that in Dr. Borick's
24  situation, she would be entitled to place some faith
25  upon what had been done before she became involved?

---

**105**

1      A  Yes.
2      Q  And she would have had no reason, coming on
3  duty and being assigned this case, to have been thinking
4  that she would do anything other than follow the plan
5  that been put in place; isn't that fair?
6      A  Yes, until she examines the patient.
7      Q  And in terms of examining the patient,
8  basically, as of that point, rightly or wrongly, D. had
9  been diagnosed as having a non-life threatening
10  condition, true?
11      A  Yes.
12      Q  And Dr. Borick would be operating under that
13  assumption in terms of when to examine the patient?
14      A  Correct.
15      Q  And actually, there would've been nothing in
16  the standard of care which would have required Dr.
17  Borick to see this patient before, say, 6:00 a.m., when
18  he was found to be non-responsive?
19      A  I believe you mean 10:00 a.m.
20      Q  10:00 a.m. I'm sorry -- correct, 10:00 a.m. Do
21  you agree with that statement?
22      A  I don't know what the hospital policy is in
23  their residency program.  We have our residency see
24  patients on arrival before we do rounds --
25      Q  Would that --

---

**106**

1      A  -- so she would have -- in most programs the
2  resident -- the intern is required to see the patient on
3  arrival.
4      Q  And even in that situation, when she would see
5  the patient would depend on where the patient was in the
6  rotation, what else was going on, those sorts of things?
7      A  Correct, the -- Q&A the patient and the newest
8  patient first.  So you have to balance those two.
9      Q  And it's a fairly common experience for, in
10  pediatrics, for example, to have something like what
11  they thought was going on here occur, where a parent
12  brings in a patient -- a child who has strep throat.
13  He's been vomiting, they're concerned they won't keep
14  the medication down, they're concerned that the child
15  may be dehydrated, and the child will be admitted on an
16  observation basis.  That's something that occurs quite a
17  bit, isn't it?
18      A  Yes.
19      Q  And when that occurs, the patient is examined
20  by a resident or an attending at admission.  And then
21  wouldn't you agree, Doctor, that frequently that child
22  is not actually seen by a doctor again, unless a nurse
23  calls, until whenever that doctor does rounds in the
24  morning?
25      A  Yeah, that is -- that is the custom in most

---

**107**

1  places.
2      Q  Which would frequently occur, depending on the
3  physician's personal practices, at 6:00, 7:00, 8:00 in
4  the morning even, correct?
5      A  Yes.
6      Q  And that would be perfectly okay within the
7  standard of care?
8      A  As far as the time you've seen the patient?
9      Q  Right.
10      A  Yeah, it varies.
11      Q  So from this point, I'm not worrying about
12  what the residency requirements were.  We're talking
13  about the standard of care.  Would you agree that Dr.
14  Borick would not have been required, under the standard
15  of care, to have seen D., having never been contacted by
16  a nurse, until after he was found to be non-responsive
17  at 6:00 a.m.?
18      A  I'm -- I'm confused by your question.  Again,
19  it was 10:00 a.m., not 6:00 a.m.
20      Q  10:00 a.m., I'm sorry --
21      A  But --
22      Q  I've got the 6:00 a.m. on my mind.
23      A  -- there is -- there is a note signed by her -
24  - I believe it's like 7:20 or around there --
25      Q  I'm asking you --

advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

108

```
 1      A   -- she saw the patient.
 2      Q   -- I know.  In the end I'm not --
 3      A   -- so let's not confuse --
 4      Q   -- contesting that she saw the patient.  I am
 5   simply -- to the extent that if -- well, I just first
 6   want to establish the standard of care wouldn't actually
 7   have required that, would it?
 8      A   In our institution and all the institutions
 9   I've been associated with, the intern coming onto the
10   day, the standard of care is that they would see the
11   patient promptly.  Even if the patient had been examined
12   at 4:00 or 5:00 a.m., they would then go in and repeat
13   the exam.  Even if it requires waking the patient up,
14   and the family, and annoying them because you ask all
15   the same questions.
16      Q   What's the definition of "standard of care"
17   that you were using in expressing your opinions?
18      A   The definition of "standard of care"?
19      Q   Yes.
20      A   That would be -- that's a good question.  That
21   would be the quality level of, I guess, a procedure or
22   how you approach a problem.  I've never actually been
23   asked to define "standard of care," like a linguist.
24      Q   Well, and for example, "standard of care"
25   doesn't necessarily mean the same thing as, for example,
```

109

```
 1   a residency program requirement, does it?
 2      A   Correct.
 3      Q   "Standard of care" means what a reasonably
 4   prudent physician would do under the same or similar
 5   circumstances.
 6      A   Okay.
 7      Q   Which is a range of conduct usually, correct?
 8      A   Okay.  Yeah.  I'm not just quarreling with
 9   that statement.
10      Q   So that's the question I wanted to ask, is
11   whether, just in terms of a physician doing what a
12   reasonable prudent physician would do within the range
13   of the judgments open -- whether that standard of care
14   would have required Dr. Borick to have seen this child
15   any earlier than she was found non-responsive -- he was
16   non-responsive at 6 -- at 10:00 a.m. -- I got it that
17   time.
18      MR. GIROUX:  Objection.  Asked and answered.
19   You may answer it again.
20      MR. DAY:  Yes, asked.
21      A   So as I understand the question.  Would it be
22   okay for a physician to wait until 10:00 to see a
23   patient who's newly admitted, who is otherwise felt to
24   be stable, rightly or wrongly?  I cannot disagree with
25   that statement.
```

110

```
 1      BY MR. DAY:
 2      Q   That it would -- that's the system?
 3      A   That might have been okay.
 4      Q   Yeah.
 5      A   Especially if they knew the attending was
 6   coming.
 7      Q   Okay.  You make a point in your report to
 8   suggest that Dr. Borick maybe didn't really see the
 9   patient when it's referenced in the record, correct?  Can
10   you say that?
11      A   Yes, I'm not sure if she actually saw the
12   patient or did an exam.
13      Q   All right.  Dr. Borick did testify under oath
14   regarding what, at least, she says occurred, true?
15      A   Okay.  Yes.
16      Q   Did you read her deposition?
17      A   Yes.
18      Q   What did she say occurred?
19      A   I'd have to look and see.  I don't know what
20   she exactly said.
21      Q   You don't remember?
22      A   I don't remember.
23      Q   All right.  Well, Dr. Borick's testimony, I
24   think can fairly be summarized, that she had been told
25   and understood that the plan was to see D. -- to let D.
```

111

```
 1      sleep at least a reasonable amount of time
 2   because he was exhausted.  And then what I said before,
 3   in the morning they would, you know, finish up anything
 4   that needed to be done -- the exam.  And they would try
 5   to test whether or not he could tolerate keeping his
 6   medication down?
 7      A   Yeah, okay.
 8      Q   All right.
 9      A   I think read that.
10      Q   That was the plan.  And then she testified she
11   went into the room, and Mrs. Morgan -- she spoke briefly
12   to Mrs. Morgan.  She did a very limited exam of the
13   child.  She was not told that there was any problem or
14   anything going on.  She did not wake up D.  She told the
15   mother that, you know, "We're going to let him sleep,
16   and we'll talk later."  If you accept that as being
17   correct, all those factors as being hypothetically true,
18   wouldn't you agree that Dr. Borick acted within the
19   standard of care?
20      A   If all of that happened as stated, it doesn't
21   seem unreasonable --
22      Q   Yeah.
23      A   -- challenged by her note.
24      Q   And she explained the note in her deposition.
25   Do you recall that?
```

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

112

1    A   I don't recall her explanation.  I'm sorry.
2    Q   Okay.  Well, she testified that she hadn't
3  done her charting on this case as of the time that D.'s
4  emergency condition developed which we can tell is true
5  just by when things were entered on the report, correct?
6    A   Yes.
7    Q   And that, actually, within the residency
8  program is not surprising.  They may take notes or
9  whatever along the line --
10   A   Oh, of course.
11   Q   -- and then do their charting later, correct?
12   A   All the time.
13   Q   And D. was going to be a very, you know, high
14 maintenance, to use an inappropriate term in medicine,
15 but would require a lot of attention once his
16 neurological situation was discovered?
17   A   Oh, yeah.  Yeah.
18   Q   He was a critically ill child?
19   A   Yeah.
20   Q   And she was going to be involved in the
21 capacity of a resident, you know.  Were you aware of
22 that, during her shift?
23   A   I don't know what actually took place after
24 that.  I paid very little attention to the notes --
25   Q   Okay.

113

1    A   -- after the arrest.
2    Q   Well, she testified that, basically, as of
3  that time orders were being entered.  Things were
4  happening on an emergency basis that needed to be
5  documented in the chart.  She felt that something should
6  be documented from the morning on the chart.  And just
7  to get something on the chart, she went and copied the
8  medical student's note and pasted it in.  Now, number
9  one, it's pretty obvious that, in fact, physically,
10 that's what she did?
11   A   Yep.
12   Q   And I assume, you not being there, you don't
13 know one way or the other whether her explanation of why
14 she did it was accurate?
15   A   Yes.
16   Q   But it sounds like something that might
17 happen?
18   A   Oh, yes.
19   Q   So there is a statement in the student's note
20 that was pasted in that D. was "not arousable," correct?
21   A   Yeah.  It generated a lot of discussion, as it
22 did at the depositions.
23   Q   Right.  And are you aware that the medical
24 student was deposed?
25   A   Yes.  I saw his deposition.

114

1    Q   And you know that he testified that with the
2  greater knowledge that he's developed since he's been no
3  longer a medical student and had been through residency,
4  he would not have used the term "not arousable"?
5    A   Yeah.  I did see that statement.
6    Q   And, in fact, that he described that D. was --
7  you know, he would respond to him touching, he would
8  reach out and he would do those things, but he didn't
9  ever completely wake up, correct?
10   A   Yes.
11   Q   In other words, not that different a
12 description of what occurred than some other healthcare
13 providers have made?
14   A   Yes.  Can I get a five-minute break?
15   Q   Yeah.  Can I ask you just two questions --
16   A   Sure.  Sure.
17   Q   -- to get this and then -- okay?  Not yet.  So
18 setting that aside -- again, you don't know whether
19 that's true or not?
20   A   Well, nobody does.
21   Q   Right.  Well --
22   A   Except the people involved.
23   Q   Involved, yes.  Are you also aware that Mrs.
24 Morgan does recall a woman coming into the room at some
25 point in that morning and there being at least some

115

1  discussion regarding what the plan was?  Do you recall
2  that?
3    A   I think -- is this the part where she
4  mentioned she wasn't sure if it was a nurse or doctor.
5  There was some female she referred to.
6    Q   Right.  Okay.  So the bottom line is, you
7  don't know one way or the other whether or not Dr.
8  Borick did, in fact, go in and do the very limited
9  examination that she described?
10   A   Yeah.  Correct.
11   Q   Okay.  But if, in fact, she did what she
12 described, given what the plan was, given there was no
13 indication at that time at least that something had
14 changed, wouldn't you agree that that would have been
15 consistent with the standard of care?
16   A   Standard of care?  It would have been,
17 probably, consistent with her training at the time.
18       MR. DAY:  Okay.  You can go ahead and take your
19 break now.
20       THE WITNESS:  Thank you.
21       (OFF THE RECORD)
22       BY MR. DAY:
23   Q   Doctor, I want to move and talk for a little
24 while about Dr. Hartpence and Dr. White.  Dr. Hartpence
25 was also an intern.  Are you aware of that?

116

1    A   Oh, yes.
2    Q   And under the program, he was assigned the
3  responsibility of doing the history and physical. Are
4  you aware of that?
5    A   Yes.
6    Q   And he did that, and then he, as we've
7  discussed previously, placed a call to the attending and
8  there was a discussion with an attending. And at that
9  point, the plan of action was basically finalized. Is
10  that approximately --
11    A   Yeah.
12    Q   -- what you understand?
13    A   Yeah.
14    Q   Now, there is a considerable difference in the
15  level of experience between a first-year resident or an
16  intern and a, well, let's say a faculty member in a
17  program, who is a board-certified experienced physician,
18  true?
19    A   Oh, yes.
20    Q   You would expect Dr. Hartpence would be
21  inclined to defer to his attending?
22    A   Yes.
23    Q   Okay. Now, Dr. Hartpence -- from everything
24  available, would you agree appears to have communicated
25  with Dr. Bala concerning what he found and what his

117

1  thinking was?
2    A   Yes. Well, I don't know what he actually
3  said, but --
4    Q   But it makes sense that that occurred?
5    A   It makes sense, yes.
6    Q   Now, at that point -- and he gave his
7  recommendation, his thoughts as to what should occur --
8  now, at that point, hasn't Dr. Hartpence done what was
9  expected of him as a first-year resident?
10    A   If he did a complete history and a complete
11  exam, we would say yes. And if he thought about a
12  differential diagnosis and presented all that
13  information to the attending.
14    Q   Okay. I guess you don't know specifically
15  what he said to the attending when his description in
16  his deposition?
17    A   Yes, that's correct. I can -- and the same
18  for the history. I can only know what he wrote in the
19  history of present illness.
20    Q   Okay. And as a first-year resident, it
21  would've been significant to him that the provider at
22  two separate emergency departments had diagnosed strep
23  throat?
24    A   He probably would have accepted it without
25  question.

118

1    Q   Okay. And that being true, that in his level
2  of training -- and accepting that without question,
3  having what he did, more or less, communicated to the
4  attending, and the attending being aware of everything,
5  the decision to defer doing the neurological exam -- if
6  he has accepted without question, to use your terms, the
7  strep throat diagnosis, for a physician at his level of
8  training and experience, would you agree would be within
9  the standard of care?
10    A   It's reasonable.
11    Q   Okay. And you would agree that, in general,
12  under all of these circumstances, given his level of
13  experience, Dr. Hartpence did, in fact, act within the
14  standard of care in this case?
15    A   I'm only hesitating a little bit because he's
16  never acting in a vacuum. Presumably everything he saw
17  or did or observed, information he transmitted, he
18  would've talked with the senior resident about, who also
19  examined the patient, and presumably there was some
20  feedback loop before they spoke to the attending. So
21  perhaps they didn't get a full history. Perhaps they
22  didn't do a full exam. But if he's in isolation -- and
23  then again, part of the resident's responsibility is to
24  think independently, in graded responsibility, so it is
25  possible that he was within the standard of care at that

119

1  level.
2    Q   Let me approach it from a different angle.
3  Will you agree, based upon all the information and
4  knowledge that you have, based upon what was available
5  for your review, you cannot offer an opinion, to a
6  reasonable degree of medical probability, that Dr.
7  Hartpence violated the standard of care?
8    A   I would agree with that statement, yes.
9    Q   Okay. Now, moving to Dr. White -- Dr. White
10  was a senior resident, correct?
11    A   Yes.
12    Q   And I suspect that you believe that as a
13  senior resident she would have had more knowledge and
14  more experience and might be held to a somewhat higher
15  standard?
16    A   Without question. She would've been
17  graduating in two months after this.
18    Q   Right. She was, nevertheless, still in a
19  residency program?
20    A   Yes.
21    Q   Which meant she was still subject to
22  supervision by the attending?
23    A   Yes.
24    Q   And ultimately the final decision would still
25  be made by the attending?



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

120

1   A   Final decision regarding?
2   Q   Well, what would be happening in this case
3   when the attending was contacted.  Now, maybe there are
4   circumstances where she wouldn't contact the attending,
5   but since the attending was contacted, as to whether the
6   plan that was put into effect was appropriate, was
7   ultimately the attending's decision, correct?
8   A   It's ultimately the attending physician's, but
9   it's also the resident's responsibility to advocate for
10  the patient if there's a discrepancy or if there's other
11  concerns.
12  Q   Right.  And in terms of -- I'm trying to think
13  of what has and hasn't been covered.  It's all --
14  actually, at the same time, if I think, permitted as
15  opposed to just shooting off.  Dr. White would also have
16  been reasonable in giving some fairly significant
17  consideration to the fact that the diagnosis of strep
18  throat had been reached in two separate emergency
19  departments?
20  A   She would've been aware of it, sure.
21  Q   And that would have been something that it
22  would have been reasonable for her to put a fair amount
23  of reliance on?
24  A   Yeah, until she did her own history and
25  physical.

121

1   Q   And if, in fact, the various entries in the
2   record that Mr. Gribble discussed with you are correct,
3   you can't deny, can you, that there were a number of
4   features in this case that were consistent with strep
5   throat?
6   A   There were a few.  There were also a few that
7   were not.
8   Q   Then there were also -- I think -- what is
9   your understanding of the signs and symptoms of
10  increased intracranial pressure?
11  A   Vomiting, headache, altered mental status,
12  gait disturbance, cranial nerve abnormalities, pupillary
13  abnormalities.
14  Q   Okay.  In this case there was vomiting?
15  A   Uh-huh.
16  Q   Is that a "yes"?
17  A   Yes.  I'm sorry.  Yes.
18  Q   Yes.  Although the vomiting had been
19  controlled for at least some time before Dr. White
20  would've seen the patient?
21  A   Controlled with medication, yes.
22  Q   Yes.  There was, at least, a history of a
23  headache?
24  A   Yes.  It's in her history as well.
25  Q   Yep.  At this point, vomiting and headache,

122

1   stated in the abstract, would be consistent with
2   increased intracranial pressure; that's your testimony?
3   A   I'm not sure of your question.
4   Q   Is it your testimony that the headache --
5   having a headache, generically stated, and having heavy
6   vomiting, generically stated, can be consistent with
7   increased intracranial pressure?
8   A   Well, not each symptom in isolation.  You're
9   always looking at the whole picture.
10  Q   Right.  And those --
11  A   Those would be consistent.
12  Q   And they are also consistent with many, many
13  other diagnoses?
14  A   Absolutely.
15  Q   Right.  There is no report that would have
16  been available to Dr. White that you can point to
17  anywhere in the records that would have supported that
18  this child was having problems with balance, was there?
19  A   She was not aware of any reports.  I don't
20  know if she ever asked the question.
21  Q   Are you aware of what Mom was talking about
22  when she made some reference to thinking there might be
23  balance issues?
24  A   I don't recall.  No, honestly.
25  Q   Do you recall that basically involved a couple

123

1   of episodes that were, more or less, one for example,
2   was he used a banister and she had never seen him use a
3   banister before.  But he, nevertheless, was running
4   around playing.  That's not ataxia, is it?
5   A   That wouldn't be defined as ataxia.
6   Q   Huh?
7   A   That would not be defined as ataxia.
8   Q   Right.  And if that's what she was describing,
9   there is no indication that D. had ataxia?
10  A   Not that I'm aware of, no.
11  Q   The headache with increased intracranial
12  pressure, especially in association with the
13  medulloblastoma. is expected to be in the morning or at
14  night; is it not?
15  A   I'm not sure.  I did read something in the
16  deposition about that, but I don't claim to be an expert
17  on headaches with medulloblastoma.
18  Q   The issue of whether the headache in this case
19  is the kind of headache that one would associate with
20  increased intracranial pressure, would be relevant to
21  how reasonable the actions of the physicians in this
22  case were, wouldn't it?
23  A   Sure.
24  Q   But you can't answer that question?
25  A   Well, which question are you referring to?

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

124

1    Q   You can't answer the question as to what the
2  specific aspects of the headache are that would be
3  expected?
4    A   I can't answer it because it's not in the
5  record. It doesn't prove anybody has.
6    Q   No, but you can answer whether -- well, strike
7  that, it is in the record. He was at a, or at least
8  we -- it's in the general record of this litigation that he
9  was at church. There was some thought that it was maybe
10  because he was prevented from cutting something he
11  wanted to. But in any case, he started screaming. This
12  would have been in the late afternoon or early evening,
13  I believe, and then they -- they took him to the -- to
14  the hospital.
15   A   Yeah, exactly.
16   Q   Right.
17   A   And we all read that.
18   Q   Okay. So we know that the description of the
19  least significant headache was not something that he
20  woke up with, or something that occurred shortly after
21  he woke up, or late when he was in bed?
22   A   Oh, okay. I see what you're getting at. No.
23  That's -- that's true.
24   Q   Okay. So we know that, but you're telling us
25  that you can't really say what would be the expected

125

1  pattern in the face of increased intracranial pressure?
2    A   Pattern? No. There's general symptoms in
3  context of lack of another explanation.
4    Q   But the -- in the lack of the -- it's
5  interesting that you say "lack of another explanation"
6  for -- another explanation, for example, would be strep
7  throat?
8    A   It's hard to -- it's hard to justify that. Are
9  we even talking about Dr. White now, or just the generic
10  case?
11   Q   Just so -- we'll talk about a generic case
12  first.
13   A   Okay. So it's hard to know because my
14  contention all along is there's really many findings not
15  associated strep throat, and many there are.
16   Q   And there was a positive rapid strep test?
17   A   As can be found in 15 percent of healthy
18  children.
19   Q   Yeah. But that also means it's found in 85
20  percent of children who had strep throat, true?
21   A   It's what?
22   Q   Found in 85 percent of children with strep
23  throat.
24   A   For sure.
25   Q   So if, in fact, you have a positive strep, it

126

1  doesn't rule out the possibility that the child does not
2  have strep throat, but it makes it probable that the
3  child does have strep throat, true?
4    A   I'm a little confused, but I think I'm
5  agreeing with you.
6    Q   Yeah. Well, the -- 85 percent is a
7  probability?
8    A   Yeah.
9    Q   Okay. So you've got the 85 percent
10  probability of strep throat just from the test. You
11  have a history -- and I'm not going to repeat everything
12  that Mr. Gribble went through for you, but a lot of the
13  signs and symptoms of strep throat are checked off here,
14  aren't they?
15   A   A few.
16   Q   And, in fact, you can look at any reference
17  about strep throat, and it will say there's no one key
18  sign or symptom that you can look for in strep throat,
19  true?
20   A   Everybody will agree with that statement.
21   Q   Right. So in other words, you're looking for
22  a collection of signs and symptoms of -- and they can be
23  various different signs and symptoms in association with
24  a positive test. That's what you're looking for, right?
25   A   Yes.

127

1    Q   And your basic thesis is there just weren't
2  enough of those signs and symptoms to justify the
3  diagnosis? Is that what you're saying?
4    A   It wasn't a collection. There wasn't
5  collectively -- right. Yes, you can say that.
6    Q   Which is ultimately a judgment call?
7    Q   Which is ultimately a judgment call?
8    Q   A judgment call. Whether or not the
9  circumstances presented with a child who has some
10  indications of strep throat and a positive assay, but,
11  in your opinion, lacked some others as to what point it
12  becomes probable that there is strep throat, and
13  probable enough to act on that assumption, is a judgment
14  call, true?
15   A   Yeah. That's seems a reasonable statement.
16   Q   Which means that, as with all forms of
17  judgment, differing qualified capable physicians will at
18  times reach somewhat different judgments?
19   A   Yes. I'm with you there.
20   Q   What are the key signs or symptoms of strep
21  throat that you believe were absent in this case?
22   A   Fever, exudative tonsil, repetitive -- you
23  know, repetitive complains of sore throat multiple
24  times.
25   Q   There were complaints of --



128

1    A   Certainly, I am not --
2    Q   -- for sore throat put in the record, correct?
3    A   Yes.
4    Q   And there's also an explanation given by the
5  mother as to why the child might have not emphasized
6  that soreness as much as he might otherwise have, true?
7    A   Yes. We all read that.
8    Q   Now in terms of the throat findings, there
9  were -- not -- not every --
10    A   I think --
11    Q   Is there a problem?
12    A   I thought you lost your contact for a second.
13    Q   Okay. Not every child who has strep throat
14  will have -- well, I've lost my words, but what are the
15  throat findings that you say were missing?
16    A   Again, it's the whole picture, but
17  specifically in the pharynx --
18    Q   No. I'm talking about specifically from the
19  view of the --
20    A   Frequently it's hyperemia beyond the -- beyond
21  the pale. I'm saying someone who has a slightly red
22  throat doesn't usually do it. Fire engine red, palatal
23  petechiae, little red spots on the back of the throat,
24  tonsils that are huge and swollen with exudates. Those
25  are fairly classic.

129

1    Q   None of those are required to be present?
2    A   None of them are required. Nothing is
3  required.
4    Q   So you're basically saying that the
5  description here of the throat seems borderline to you?
6    A   I would agree, yes.
7    Q   But a borderline throat, combined with a
8  positive assay and enough other signs and symptoms, may
9  well be enough to justify a diagnosis of strep throat,
10  true?
11    A   It's possible.
12    Q   Would you agree that, in general, there are
13  advantages to being the person who was on the scene
14  actually looking at a patient?
15    A   Yes.
16    Q   There's something called gestalt that doctors
17  use the term, right?
18    A   Gestalt.
19    Q   Gestalt. I've --
20    A   Yes. I've heard that word. I've heard that
21  word.
22    Q   Yeah. And, basically, the idea is that a lot
23  of medicine involves just kind of observing the patient
24  and getting a sense of what's going on, and that that
25  can be very valuable?

130

1    A   It can be.
2    Q   And that's something that Dr. White, Dr.
3  Hartpence, other providers in this case, they got to do,
4  that you can't do, just because of the nature of being a
5  reviewer, true?
6    A   Of course.
7    Q   And that information may well have been of
8  relevance to them in reaching their diagnosis?
9    A   Yes.
10    MR. DAY: Okay. I'm going to go ahead now and
11  let some other people ask questions. I reserve the
12  right to ask a few more later, if appropriate.
13    MR. GIROUX: Are we going to go straight
14  through?
15    COURT REPORTER: Yeah.
16    MS. COLE: Yeah, I'm working.
17    MR. GIROUX: Okay.
18    MS. COLE: Is that okay?
19    MR. GIROUX: Yeah. But can we do a five-
20  minute break right now?
21    (OFF THE RECORD)
22    EXAMINATION
23    BY MS. COLE:
24    Q   Doctor, earlier this morning, you said --
25    A   I'm sorry. I'm sorry. Who are you?

131

1    Q   I'm sorry. I'm Tracy Cole. I represent the
2  physician assistant, Bridget Grover, and Dr. Faimon at
3  Wesley Medical Center.
4    A   Okay. Thank you for explaining.
5    Q   And just to clarify, as I read your opinions,
6  you have no criticisms of the nursing care at Wesley
7  Medical Center, correct?
8    A   Criticisms of the nursing care? What's
9  this -- I don't think I made any comments about the
10  nursing care --
11    Q   Right.
12    A   -- other than Bridget Grover.
13    Q   I just wanted to clarify that you have no
14  criticism of the nursing care at Wesley Medical Center,
15  correct?
16    A   Not in my note, correct.
17    Q   Okay. Earlier this morning when you were
18  talking about your experience, you said you have a brief
19  history in an ED setting. Can you tell me what your
20  experience has been working in the emergency room
21  setting as the primary emergency room physician?
22    A   Sure. From 2008 until about 2000 -- no. From
23  2009 till roughly 2011, I worked part-time, which was 40
24  hours a month, at Baltimore Washington Medical Center in
25  Anne Arundel County, Maryland, which is a suburb of

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

132

1  Baltimore.
2      Q   And what was your role there?  Were you the
3  first provider that would see the patient as they
4  arrived, or was your involvement as a consultant?
5      A   No, I was the physician -- the primary
6  physician.  We saw all but trauma.  Trauma went to the
7  rest of the ER.  They saw the pediatric patients,
8  whatever the problem was, if it wasn't trauma.
9      Q   Okay.  How many patients did they see,
10  typically in a year, at that facility?
11      A   I don't know in a year.  I know when I did a
12  shift, which was generally 12 or 24 hours, it could be
13  anywhere from 20 to 40 patients on a shift.
14      Q   Okay.  And how many times during that work did
15  you initiate a diagnosis of medulloblastoma?
16      A   Never.
17      Q   Have you ever diagnosed medulloblastoma?
18      A   Never diagnosed medullo -- I've never
19  diagnosed medullo -- medulloblastoma.  I have diagnosed
20  brain tumors and/or other intracranial emergencies.
21      Q   How often have you done that?
22      A   Total?  Probably ten or 12 times.
23      Q   And that would be over a patient population of
24  how many?
25      A   Could be thousands.

133

1      Q   How many thousands?
2      A   I wouldn't really have any idea to compare.
3  I'd have to do some heavy math.
4      Q   Would that be over your career?  Over your
5  total -- the time of your total career?
6      A   Yeah.  That's a reasonable statement.
7      Q   So you were including within that, patients
8  you would've seen in your clinical practice as a
9  pediatrician, correct?
10      A   Yes.
11      Q   Okay.  How many do you think you diagnosed as
12  having a brain tumor when you were working as an
13  emergency room physician?
14      A   I don't think I saw anybody that has a brain
15  tumor.  I haven't even had a brain tumor as an emergency
16  room physician.  Sorry, losing my voice.  I don't think
17  I made any diagnosis of a primary brain tumor when I was
18  moonlighting as an emergency room physician.
19      Q   Have you ever been a board-certified emergency
20  room physician?
21      A   No.
22      Q   Was the last time you worked in the emergency
23  room 2009?
24      A   It was probably 2011.
25      Q   And how often did you work shifts in the

134

1  emergency room?
2      A   I worked 40 hours a month.
3      Q   And how many shifts would that be?
4      A   Two or three, 12, 20 hours, yeah.  Two or
5  three shifts.
6      Q   And why did you do that?
7      A   It was extra money.  It was called
8  moonlighting.
9      Q   In that role as moonlighting as an emergency
10  room physician, did you ever use the Glasgow Coma Scale?
11      A   No.  We weren't the trauma team.
12          MR. YOUNG:  I'm sorry, I couldn't hear.  I
13  heard "no" and then I couldn't hear.
14      A   I said we weren't the trauma team.  So we
15  wouldn't have needed the Glasgow Coma Scale.
16      Q   So it's your understanding that that scale
17  applies only in trauma situations?
18      A   No.  I didn't say that.  I said we didn't use
19  it.
20      Q   Okay.
21      A   So I'm not that familiar with it in a
22  practical way since everywhere I've ever worked it's
23  never been a primary use tool.
24      Q   The facility where you moonlighted as an
25  emergency room physician, you said they didn't do

135

1  traumas at that facility.  What kind of patients did you
2  see in the emergency room at that facility?
3      A   General medical patients.  Kids with fevers,
4  headaches, abdominal pain, vomiting, diarrhea, the whole
5  gamut of primary pediatric and emergency room care.  Kids
6  with asthma.
7      Q   Was there a level assigned to that facility?
8      A   I think the hospital was a Level 2 but I
9  wouldn't swear to it.  There was no pediatric ICU.  There
10  was an inpatient pediatrics unit.
11      Q   Sorry.  I didn't hear.  There was an --
12      A   There was no pediatric ICU at that facility.
13  We were part of University of Maryland system, but we
14  did have a pediatrics inpatient unit.  I think it was
15  about 12 or 15-bed pediatrics inpatient unit.  I was a
16  full-time pediatric hospitalist during those years.
17      Q   In your role as a moonlighting emergency room
18  physician, how many times did you diagnose increased
19  intracranial pressure?
20      A   I can't give you a number, but it was at least
21  once or twice.
22      Q   Okay.  How many times over your career as a
23  physician have you diagnosed increased intracranial
24  pressure?
25      A   To be the primary diagnosis, probably no more

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

136

1  than ten or 12.
2      Q   Okay.  What are the primary signs and symptoms
3  of increased intracranial pressure?
4      A   I think I answered that earlier, but I'll
5  repeat it again.
6      Q   I think you may have, but I --
7      A   I'll repeat it again.
8      Q   I want to hear it again.
9      A   So --
10     Q   Sorry.
11     A   -- headache, usually quite extreme, but
12  unknown.  Vomiting, without another alternative
13  explanation to be made.  Abnormal vital signs can be
14  part of the symptoms. Papilloedema, if you can examine
15  for that, that's quite difficult.  Pupil or other
16  cranial nerve anomalies, state of consciousness.
17  Basically an abnormal neurologic exam associated with
18  the others, the headache, the vomiting.
19     Q   Okay.  What is your understanding of the
20  nature of the headache when D. was at Wesley Woodlawn?
21     A   The nature of the headache at Wesley?
22     Q   Yes.
23     A   As described?  Don't know.  Wasn't well-
24  described by any of the providers.
25     Q   Did you see a pain level report in the Wesley

137

1  Woodlawn record?
2      A   There was a -- was it a FLACC score?  I think
3  there was.  I don't recall the number, but I believe
4  they did have the pain levels scored somewhere.
5      Q   Do you know what that scale is that they used
6  for children when they're trying to -- and -- are you
7  looking at Mr. Giroux's computer there to get some
8  information?
9      A   I'm sorry.
10     Q   You're pointing at Ms. Giroux's computer --
11     A   Yeah, no, no.  I'm sorry.  Yeah, no --
12     Q   -- are you looking at something there?
13     A   -- no, he's -- he's perusing something.
14     Q   Okay.
15     A   All right.  So the FLACC scale is basically
16  they use indicators for kids who are non-verbal to try
17  to assess their pain level.  Are they happy, are they
18  sad, and they seeming to be uncomfortable?
19     Q   And do you know what the rating was at Wesley
20  Woodlawn?
21     A   I don't recall.  The only thing I recall was
22  in the notes that -- it's in the comments, in the
23  verbal.  I remember noticing the written comments by the
24  triage nursing.
25     Q   What do you recall about that?

138

1      A   That he did not have sore throat and that he
2  did not have -- that he did have headache, but they
3  didn't describe any of it beyond that.
4      Q   Okay.  Would it be important to know what the
5  pain rating was?
6      A   I'm not sure.  It depends where the pain is
7  coming from.
8      Q   Okay.  Well, I think I just heard you say that
9  with increased intracranial pressure, one of the
10  symptoms is headache and what you're concerned about is
11  severe headache or intense headache.  Was there severe
12  or intense headache pain reported at Wesley Woodlawn?
13     A   No, I -- I did not see that in the chart.
14     Q   Okay.  Did you see any record or note that
15  D.M. was crying out in pain while he was at Wesley
16  Woodlawn?
17     A   I believe not in the hospital -- no, not in
18  the hospital record.
19     Q   The vomiting.  What is your understanding of
20  any reports of vomiting at Wesley Woodlawn?
21     A   Actually, I have to refresh my memory now.
22  That's going to be a bit confusing with all the notes.
23  But I believe he presented, because of headache and
24  vomiting. Can't remember, the mother said he started
25  vomiting one or two days earlier, I'm trying to remember

139

1  that triage paper.  Can I look at it?
2      Q   Yeah, well, it's not -- yeah.  Here you go.
3  Here's the Exhibit 6 which was your notes.
4      A   Yeah.  Headache today, nausea two mornings,
5  dizzy, unbalanced for two days.  But I don't think
6  there's any actual description of the vomiting in any of
7  the notes.  Just this Nurse Judd's comments there.
8      Q   And what are you pointing to at Nurse Judd's
9  comments?
10     A   Nurse Judd just said he was nausea and
11  vomiting.  Something to eat.  Nausea was gone on
12  Saturday, the same thing.  So it sounds like he had two
13  days of vomiting.
14     Q   That's how you interpret that?
15     A   That's what it says.  On Friday, he was nausea
16  and vomiting some -- wanted something to eat.  After he
17  ate, nausea was gone.  On Saturday, same.  Today he said
18  he wouldn't -- wanted to eat again, so he wouldn't get
19  nauseated.  She denies vomiting.  She states he's
20  afebrile.
21     Q   So is there any history upon presentation --
22  of vomiting upon presentation to Wesley Woodlawn?
23     A   Not at Wesley Woodlawn.
24     Q   Okay.  Abnormal neuro signs.  Is there any
25  evidence of abnormal neuro signs at Wesley Woodlawn?



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

---

140

1  A  So there is a neuro exam that's described. And
2  it says normal. I'm not sure that's a justifiable exam
3  the way it's written, but that's what it says. So I
4  have to accept what's written there, if in fact all that
5  was done. Would take a while to do that exam, though.
6  Q  Do you think it's your place to determine
7  whether a witness is being truthful or not?
8  A  No, that's not my job.
9  Q  Okay. Do you have any reason to disagree with
10  Ms. Grover's charting there?
11  A  Well, some of it's a little inconsistent.
12  Q  Is that fairly common for charting to be
13  inconsistent among different providers?
14  A  That's a reasonable statement.
15  Q  So back to my question. You indicate you
16  don't believe the neuro exam recorded by --
17  A  I didn't say I don't believe it.
18  Q  -- Ms. Grover?
19  A  I just said it would take a while to do a
20  comprehensive exam the way it's described.
21  Q  How long?
22  A  Probably ten or 12 minutes at minimum.
23  Q  How long was he there?
24  A  It looks like it was in the ER -- he was in
25  the ER about an hour-and-a-half. Looks like he was

---

141

1  examined for about ten or 12 minutes.
2  Q  Sufficient amount of time to do that kind of
3  exam?
4  A  Well, it would -- that would -- that amount of
5  time would you do -- just the neuro exam would take that
6  amount of time plus everything else would take more.
7  Q  When was the last time you did that kind of
8  neuro exam?
9  A  I do neuro exam on kids pretty frequently
10  because kids have headaches all the time and you have to
11  determine, is it a legitimate headache that might
12  actually matter for something, or is it just a headache
13  for whatever reason? So it takes about ten, 12 minutes
14  to do a comprehensive exam. Check cranial nerves. Check
15  balance. Have them walk around. Talk to him a little
16  bit. Determine how they're doing.
17  Q  But you don't have any evidence that that was
18  not performed my Ms. Grover as she recorded --
19  A  I wouldn't suggest that. I wouldn't suggest
20  especially under oath. That's not my place.
21  Q  So back to my question. Is there any evidence
22  of an abnormal neuro exam at Wesley Woodlawn?
23  A  Correct. There is no evidence in this
24  charting as it exists.
25  Q  Okay. Is there any evidence of papilloedema?

---

142

1  A  Papilloedema? No.
2  Q  And the -- those are the ones I jotted down
3  from you talking, but there were other signs you gave of
4  increased intracranial pressure. What were the other
5  signs that I haven't?
6  A  I think we talked about abnormal vital signs.
7  Q  Was there any evidence --
8  A  Of the cranial nerves -- well, they only --
9  they didn't do a complete set of vital signs, but of the
10  vital signs they did, they were normal.
11  Q  Okay. No evidence of Cushing's triad at
12  Wesley --
13  A  No.
14  Q  -- even if we assume the blood pressure was
15  abnormal, correct?
16  A  Yes, correct.
17  Q  And you would agree children have headaches
18  quite frequently?
19  A  They do.
20  Q  Okay. And that can be something serious or it
21  can be something not so serious, correct?
22  A  As with anybody, yes.
23  Q  And headache can be present with strep throat,
24  correct?
25  A  Yes.

---

143

1  Q  Are you aware of the Centor scale?
2  A  I'm aware of it. It's not used in pediatrics
3  because it's not validated.
4  Q  And why do you say it's not used in
5  pediatrics?
6  A  It's -- if you look up under general
7  pediatrics criteria, it's not an agreed upon scale for
8  children. It's only validated for adults. However,
9  having said that, people do sometimes use those criteria
10  in determining who to do a strep test on. I actually
11  studied under Bob Centor back in the '80s. He was one
12  of our faculty.
13  Q  Okay. Are you saying it's a deviation from
14  the standard of care to use the Centor criteria?
15  A  No, I'm simply saying it's not a parameter
16  that we've -- in my teaching experience, in my world of
17  pediatrics, and all the worlds I've lived in, I would
18  never seen a pediatric notes Centor criteria written.
19  Nobody would write that comment.
20  Q  But you could use the criteria that's set
21  forth in the Centor scale to decide whether to test
22  somebody for strep?
23  A  Yes. People do that all the time.
24  Q  Okay. Do you agree that D. met the Centor
25  scale for testing for --

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

144

```
 1    A   Again --
 2    Q   -- strep?
 3    A   -- I don't use the Centor scale in pediatrics.
 4  So I really don't have an expert opinion about that.
 5    Q   Okay.  Would you agree with me, without any
 6  history of vomiting prior to the review of systems by
 7  Bridget Grover, that the finding of a red throat would
 8  not be due to vomiting?
 9    A   If he hadn't been vomiting, that wouldn't
10  explain his red throat.  You can't say it's from
11  vomiting if he's not vomiting.  That's a logical
12  statement.
13    Q   And would you agree on the record that you've
14  referred to a few minutes ago with a handwritten -- keep
15  flipping back.
16    A   Yeah.
17    Q   I think it's page 3 of --
18    A   This one?
19    Q   Page 4, yes.  Page 4 of your exhibit.  Is it
20  in fact noted that the mom had reported that D. had a
21  red throat the other day?
22    MR. GIROUX:  I think she's on -- you're on the
23  triage one, right?
24    MS. COLE:  Yes.  Thank you.  Thank you.
25    A   Throat red the other day.  Yes.
```

145

```
 1    BY MS. COLE:
 2    Q   Where'd that information come from?
 3    A   That was always confusing until I read some of
 4  the depositions, but it sounds like this is supposed to
 5  be what the parent has told the provider or perhaps they
 6  filled it in.  I don't know.
 7    Q   Okay.
 8    A   But that's supposed to be parent history.
 9    Q   And is there any report on there that mom was
10  reporting vomiting?
11    A   It says right here "vomited Friday" right
12  under the -- the fever.
13    Q   Do you see the line going through that, the
14  word "vomited"?
15    A   That's a line right there.  So no, I didn't
16  notice that before.
17    Q   Okay.  If you want to confirm that, look at
18  Nurse Judd's nurse's note that you had referred to and
19  you just read it earlier in your testimony with me that
20  denied vomiting.
21    A   Denies vomiting.  Okay.  I see that.
22    Q   So would you agree with me there was no
23  history of vomiting upon presentation to Wesley
24  Woodlawn?
25    A   Yes.
```

146

```
 1    Q   Would you agree with me that the mother
 2  reported that D.M. had a red throat when she presented
 3  to Wesley Woodlawn, a red throat the other day?
 4    A   It's -- it's in the record.  Not sure what
 5  that means for the parent, but it's in the record.
 6    Q   Tell me what your understanding is of the
 7  dizziness and the unbalance?
 8    A   My understanding isn't as important as the
 9  person on the scene trying to get information about
10  that.  Because my understanding would be I'd want to ask
11  questions of the parents.  Tell me about your dizziness.
12  Tell me about what you mean by unbalance.  Tell me about
13  nausea.  Tell me all the, you know, try to get more
14  information.  So it wasn't asked, so I don't have a
15  great understanding of it.
16    Q   Why do you say it wasn't asked?
17    A   Well, I don't see any commentary on it.  Just
18  the nausea was discussed.
19    Q   Would you agree that not everything that is
20  discussed is recorded in the chart?
21    A   Yes, that's a fact of life.
22    Q   Have you assumed that the imbalance has gone
23  on for a period of two days?  Have you assumed that in
24  your opinion?
25    A   The way it's written here.  It says two days.
```

147

```
 1    Q   And is that what you have assumed in your
 2  reaching your opinions?
 3    A   I would have to go back and see what the
 4  mother said as well.
 5    Q   What's your understanding of what the mother
 6  said?
 7    A   I don't.  I actually -- this second, I don't
 8  recall what she said.  But on the record here it says
 9  two days.
10    Q   Would it surprise you that in fact the two
11  episodes of imbalance that she described had been, the
12  latest one was two days before presentation to the ED?
13  Was that your understanding of her testimony?
14    A   There was something.  There's something that
15  you had mentioned earlier as well about the banister and
16  something that went on at school that seemed to be
17  relatively recent.  I don't -- I just don't recall.
18    Q   Mrs. Morgan testified about two incidents, one
19  in which D took the handrail as he was going up some
20  stairs.  And the second, when he was approaching the top
21  of the stairs, getting ready to run down and he stopped
22  and threw his arms out and then ran on down the stairs.
23  Those are the two episodes that she describes.  Do you
24  know when those episodes occurred in relationship to her
25  presentation at the ED with D.M.?
```



advanced
depositions

Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

148

1    A   Not off the top of my head.
2    Q   Okay. On your report, you state, "The
3 diagnosis of increased intracranial pressure can be
4 difficult in the early stages." What do you mean by
5 that?
6    A   Let me refer back. Well, again, diagnosis of
7 increased intracranial pressure, it's a process that
8 develops over time, so the symptoms are going to worsen
9 if it's untreated. From the beginning, it may just have
10 vomiting and some subtle neurological findings. Some
11 subtle -- some subtle pupillary abnormalities that may
12 or may not be obvious to an examiner and as things
13 progress, symptoms progress, and it gets worse. That's
14 what I mean. I think, if that's what you're asking me.
15    Q   Would you agree that if in hindsight we
16 consider D.'s presentation to be all related to
17 increased intracranial pressure, that those signs would
18 be settled when he was at Wesley Woodlawn?
19    A   Again, I have to use the word "gestalt"
20 earlier. I have to look at the big picture. Trying to
21 decide what's wrong with the child. Get a constellation
22 of the symptoms and then come up with a differential. So
23 the symptoms we just mentioned, that you just mentioned,
24 would be subtle.
25    Q   Also in your report you state that both

149

1 physician assistant Grover and Dr. Faimon should've had
2 acute elevated intracranial pressure at the top of any
3 differential diagnosis list. Why are you saying it
4 should be at the top of the list?
5        MR. GIROUX: What page are we on?
6        THE WITNESS: Can you refer to where you are?
7        MS. COLE: 6, bottom of the page.
8    A   History of dizzy, unbalanced, nausea plus
9 minus vomiting, headache. In retrospect we know it was
10 the worst headache he had ever had perhaps.
11        BY MS. COLE:
12    Q   And I want to stop you right there. Why do
13 you say it was the worst headache he ever had?
14    A   Based on the description by the mother. And
15 that report of what went on in preschool.
16    Q   What was the headache when he presented to the
17 ED?
18    A   No, it's not reported.
19    Q   And again, you don't recall what the pain
20 rating is --
21    A   No.
22    Q   -- at the ED, right?
23    A   No.
24    Q   And again, there's no evidence that D. was in
25 acute distress? Nothing documented as far as that,

150

1 correct?
2    A   There were some comments that he was just
3 laying around his mom's arms. I can't recall if that's
4 from the medical records or from the deposition.
5    Q   Is there anything in that record that reveals
6 to you that D. was suffering from a severe worst
7 headache of his life when --
8    A   Not --
9    Q   -- he was at the emergency room --
10    A   No. Not --
11    Q   -- at Wesley Woodlawn?
12    A   Sorry to interrupt. No. Not at that time.
13 Not at that moment.
14    Q   And we've already established there was no
15 history vomiting when he presented to Wesley Woodlawn,
16 correct?
17    A   Yes.
18    Q   And there were no abnormal neuro signs when he
19 was at Wesley Woodlawn, correct?
20    A   None reported.
21    Q   So why would acute elevated intracranial
22 pressure be at the top of the differential list.
23    A   Again, a child without a fever, who's got
24 significant complaints.
25    Q   What are the significant complaints?

151

1    A   Dizzy, the unbalanced -- I know you're going
2 back-and-forth on that. Headache. Not with this
3 obvious infectious problem. He doesn't have fever, he
4 doesn't have a sore throat. He doesn't appear to have
5 the common symptoms of strep throat in a way that would
6 explain it. So I would've considered an alternate
7 diagnosis.
8    Q   Can fever come and go?
9    A   Fever can come and go.
10    Q   Is there any evidence that he was unbalanced
11 or dizzy at the time he was actually in the ED at Wesley
12 Woodlawn?
13    A   Not in the medical record.
14    Q   And in fact, if you use the mother's
15 testimony, the only two episodes she described occurred
16 days before the presentation to the emergency room,
17 correct?
18    A   I believe so.
19    Q   Do you make diagnoses based on symptoms that
20 you were not seeing when the patient is there in the
21 emergency room before you?
22    A   We make diagnosis of a differential. You
23 don't come into an instant conclusion of one problem.
24 You look at the possibilities of A, B, C, or D, or
25 however many you need to do. You get the history and

advanced
depositions
Nationwide Court Reporting & Trial Support
855-204-8184 • www.advanceddepositions.com

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

152

1   you do the physical exam. And you say, "Okay. I think
2   it can be this, this, or this." But you do need some
3   symptoms and you do need some history. You need to get
4   a thorough history. Then you do a thorough exam. And
5   then you form your conclusions.
6       Q   Is there any history that you think the
7   providers did not obtain?
8       A   We're talking about Wesley?
9       Q   Yes.
10      A   History. History of the headache itself.
11      Q   Did you look at Nurse Judd's notes about the
12  circumstances of the headache?
13      A   Let me look at this. This is -- the civil
14  line here on page -- what list is this? Five? These
15  comments.
16      Q   Yeah. What's it say?
17      A   It says that he had a -- they wasn't able at
18  church. He wasn't able to staple something because they
19  wouldn't let him. He got a headache. She also said he
20  had been dizzy. No other complaints.
21      Q   And then on that same record, do you see the
22  pain scale?
23      A   What is the pain scale? Pain scale utilized
24  non-verbal. See next page. You're going to have to
25  help me with this. I don't actually see it.

153

1       Q   On page 7.
2       A   Pain level number 1, intensity 2.
3       Q   What would an intensity 2 pain be?
4       A   I don't know.
5       Q   Do you know what the scale is from?
6       A   I don't know what the scale they are using,
7   no.
8       Q   Do you know if it's 0 to 10?
9       A   Okay. Is that --
10      Q   Do you know that?
11      A   This -- I'm not sure what the scale is here.
12      Q   Okay.
13      A   But you're telling me it's a low score.
14      Q   Well, I would think that that would be important to
15  you to know if you're talking about a severe intense
16  headache. Was it --
17      A   There's other kinds of pain. It could be
18  throat pain, it could be abdominal pain.
19      Q   Okay. Did you attempt to put forth all your
20  opinions that you have in this case in the report that's
21  been marked as an Exhibit 1.
22      A   I don't -- I think I understand the question.
23  All of my opinions, these are my opinions. I don't know
24  what you mean by all my opinions.
25      Q   Did you try to put everything that you were

154

1   critical of and you believed was done inappropriately in
2   this case. Did you try to set forth everything within
3   the document that's been marked as Exhibit 1?
4       A   I tried to include all the things that seemed
5   important.
6       Q   Okay. Deposition Exhibit 5 are some invoices.
7   Does that include all the time you've spent related to
8   this case in both your review and forming your opinions
9   that are set forth in Exhibit 1?
10      A   In prior -- yes. Prior to this document, yes.
11      Q   Okay. Did you do any other research or check
12  on anything like the Baker Wong [sic] scale or the
13  Centor scale in reviewing and assessing the care
14  provided in this case?
15      A   No.
16          MS. COLE: Okay. I don't think I have anything
17  further --
18          THE WITNESS: Okay.
19          MS. COLE: -- for you today, Doctor. Thank
20  you.
21      (OFF THE RECORD)
22          EXAMINATION
23  BY MR. DENNING:
24      Q   Is it Doctor -- is it Dabrow?
25      A   Dabrow.

155

1       Q   Dabrow. My name is Dustin Denning. I
2   represent one of the defendants in this case called CEP
3   America Kansas, LLC which employs a nurse practitioner
4   by the name of Jennifer Chambers-Daney.
5       A   Okay.
6       Q   You understand that?
7       A   Yes.
8       Q   I just have a few questions for you. Where
9   are the handwritten notes -- I'm sorry, the typed up
10  notes? Are they in this pile?
11      A   Everything is there.
12      Q   Somehow I got handed the thumb drive. And so
13  I'm going to ask you a few questions about the thumb
14  drive.
15      A   Sure.
16      Q   Is that something that you put together, the
17  thumb drive? Or did that come to you from Plaintiff's
18  counsel?
19      A   No. Well, the documents came from Mr. Giroux,
20  the PDFs of the depositions, the PDF of the hospital
21  record. The only thing that would be mine would be
22  where it says Morgan case notes review. And the report
23  also just came to me prior to this meeting.
24  Everything -- every PDF came from the legal system from
25  you guys well, from Dr. -- Mr. Giroux's office.



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

156

1    Q   Okay. So we're going to mark the thumb drive
2   as an exhibit, and so that the court reporting firm can
3   make copies of it. Remind me what the password is?
4    A   Welcome with a capital W.
5    Q   And then 123?
6    A   123. Yeah.
7    Q   Okay.
8    A   That's fine.
9    Q   And the expert witness contract that is on the
10  thumb drive, is that your contract that you prepared or
11  is that -- was that prepared by Plaintiff's counsel?
12   A   No. I presented that to them when I reviewed
13  the case.
14   Q   And you have a document called the ABP Cert
15  Outline. What is that?
16   A   That's the American Board of Pediatrics
17  certifications just from the website of the American
18  Board of Pediatrics. Any Board certified pediatrician
19  would be able to meet those criteria.
20   Q   And it's criteria that was developed for
21  certification examinations for general pediatricians?
22   A   Yes. For pediatrics, yes.
23   Q   Were you provided a copy of that or did you
24  print that out?
25   A   I just pulled it offline.

157

1    Q   For what reason?
2    A   For what reason? Well, I was curious to know
3   if Dr. Bala who I saw after the fact was board-
4   certified. I believe he was board certified. He was
5   going to meet those criteria for his diagnosis of strep
6   throat and neurologic emergencies.
7    Q   Did you not know the criteria without pulling
8   it off this website?
9    A   I like to confirm things if I can.
10   Q   Okay. And then Dabrow Morgan Case Narrative
11  Review. That is your report; is that right?
12   A   That should be the PDF. Is that the -- it's
13  probably the Word document before I scanned it.
14   Q   It's in PDF on the thumb drive.
15   A   Okay. So then that would be.
16   Q   You have a Word document on here called
17  Infectious Diseases, what is that?
18   A   That is -- just a from the American Board of
19  Pediatric content specification PDF that you have, a
20  simple document specifically noting infectious diseases
21  including strep throat. It's just part of the same
22  document in a Word format.
23   Q   You pulled it out of the --
24   A   I just copied it from the PDF and made a
25  separate file. It was just easier to view it that way.

158

1    Q   Okay. And what was the reason for creating
2   that separate file called infectious diseases?
3    A   Again, I wanted to see what the contents and
4   specifications were specifically for strep throat.
5    Q   Got a Word document called Neurologic
6   Disorders?
7    A   Same exact principle. This is the neurologic
8   component -- subcomponent of the American Board of
9   Pediatric content specifications.
10   Q   Okay. And then finally you've got a document
11  called Morgan Case Notes Review which I believe is --
12   A   That should be the case narrative. That
13  should be -- one of them is -- yeah, one of them is that
14  form.
15   Q   And that's what we've marked as Exhibit 2; is
16  that correct?
17   A   It should be. You might want to open it to
18  double-check. Only two Word documents is this one and
19  that one.
20   Q   Well --
21   A   Of things that I wrote personally.
22   Q   Let me have you confirm that the hard copy
23  that we've marked as Exhibit 2.
24   A   Morgan Case Review, yes.
25   Q   It's the same thing?

159

1    A   Yes.
2    Q   Okay. What is the purpose in preparing what
3   we've marked as Exhibit 2?
4    A   Those notes are for myself.
5    Q   Okay. Do you prepare those as you go through
6   the records?
7    A   I've never gone through records before like
8   this, but I prepared them so I wouldn't go back and have
9   sloppily written -- handwritten notes to try to refer to
10  as I am formulating a final opinion.
11   Q   Okay. Are you typing up these notes as you're
12  reviewing the records?
13   A   Yeah. As I go through things I'm typing. My
14  typing is much better than my handwriting.
15   Q   And do you record your thoughts and
16  impressions about the case as you typed up what we've
17  marked as Exhibit 2?
18   A   Yeah, you can see it just for the format that
19  there's some of them are comments. Some of them are
20  just opinions.
21   Q   Okay. And these are your comments and
22  impressions and opinions that you typed into this
23  document? Then what do you do with the information in
24  this document? Is that when you prepared your final
25  report?



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

---

160

1    A   It's just an aid, not the final summary. It's
2   just an aid for me to organize my thoughts. It's just
3   an outline. It's just flight of ideas sometimes, just
4   points of information that caught my attention that
5   might be important.
6    Q   Okay. Do you still agree today that you would
7   not expect that the APRN Daney or the family practice
8   residents would put this diagnosis together in the time
9   frame that we've been talking about?
10   A   I'm -- I'm sorry. The question -- I don't
11  understand.
12   Q   Okay. Do you still agree today that you would
13  not expect the APRN Jennifer Chambers-Daney or the
14  family practice residents to put together this diagnosis
15  in the time frame that we've been talking about this
16  morning at this deposition?
17   A   Put together diagnosis --
18      MR. GIROUX: Object to form.
19   A   I'm -- I'm sorry I just -- I -- I'm confused
20  what you're asking me.
21   Q   Okay.
22   A   I'm not trying to be stupid, but I --
23   Q   Well, here -- so here's what I'm troubled by.
24  You -- you provided these three pages that we've marked
25  as Exhibit 2.

---

161

1    A   Okay.
2    Q   And on the --
3    A   And there's also some handwritten pages as
4   well.
5    Q   Right. On the thumb drive, you've got the
6   same document but there's a fourth page to it.
7    A   Is it --
8    Q   Yeah. Do you know why that did not get
9   printed off?
10   A   No, I don't know.
11   Q   Okay.
12   A   Can we see it? Make sure we have the right
13  copy?
14      MR. DENNING: Let's put a sticker on this. Are
15  we ready for 19?
16      (OFF THE RECORD)
17      BY MR. DENNING:
18   Q   Okay. All right. I'm going to hand you what
19  we've marked as Exhibit 7. And my question about that
20  is the first three pages of Exhibit 7, are those
21  identical to --
22   A   I hope so --
23   Q   -- the three pages that we marked as Exhibit
24  2?
25      (EXHIBIT 7 MARKED FOR IDENTIFICATION)

---

162

1    A   The same, same. This is a supplement. These
2   are other thoughts.
3    Q   Okay. Those are your thoughts and impressions
4   about the case that you made as you were formulating
5   your opinions?
6    A   Yeah, and I can't answer why it's missing
7   several pages.
8    Q   Okay. Now if you turn to the last page of
9   Exhibit 7, that last paragraph.
10   A   Uh-huh.
11   Q   You state, "I would not have expected the ARNP
12  or the FM" -- do you mean family medicine?
13   A   Yes.
14   Q   -- "family medicine intern to put this
15  together so quick. But the upper level or the attending
16  should have thought of alternate causes of symptoms."
17  Did I read that correctly?
18   A   Yes, that's what it says.
19   Q   Okay. And my question, so back to my original
20  question, do you still agree today that you would not
21  expect the APRN or the residents to put this diagnosis
22  together so quickly?
23   A   I believe they should have come up with
24  alternate diagnoses. I don't know that they would have
25  come up with a final diagnosis.

---

163

1    Q   Okay.
2    A   As opposed to just accepting a diagnosis that
3   was passed on.
4    Q   Okay. But as you state here in Exhibit 7,
5   because they are APRNs, because they are family medicine
6   residents, you wouldn't expect them to come up with a
7   diagnosis of brain tumor in the time frame that we've
8   been talking about this morning from roughly 3:00 or
9   4:00 in the morning until roughly 10:00 a.m. in the
10  morning?
11   A   Come up with a diagnosis of brain tumor, no. I
12  don't think so --
13   Q   Okay.
14   A   Again, these were my work thoughts. This is
15  not my final product.
16   Q   Okay. But these are your thoughts and
17  impressions that you formulated as you've reviewed the
18  records?
19   A   It appears to be, yeah.
20   Q   Okay. And do you still agree today that if
21  the CT scan had been performed in the emergency room or
22  later once D.M. got put on the floor, obviously it would
23  have shown the tumor. You agree with that?
24   A   Yeah.
25   Q   And that controlled intervention may have

---

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

164

1    avoided the subsequent code.
2        A    Yeah. I think that's -- that's a very well --
3    that's -- the main word is "appropriate."
4        Q    Okay.
5        A    Since I'm not an expert in any of those things
6    other than any situation. Controlled intervention is
7    better than a stat emergent procedure.
8        Q    Okay. And you emphasize the word "may" in
9    your answer. So you can't say it's more probable than
10   not that CT imaging and controlled intervention would
11   have indeed avoided the code?
12       A    You would need probably a neurosurgeon or
13   pediatric neurologist to answer that precisely. In
14   general, though, for any patients, a stable situation is
15   much better than an unstable situation if you need to go
16   to the operating room.
17       Q    Okay.
18       A    And you can reduce intracranial pressure by
19   interaction.
20       Q    Okay. And at the time you reviewed the
21   records in this case and you prepared what we marked as
22   Exhibit 7, you felt like that the outcome may very well
23   have been the same even if an earlier diagnosis had been
24   made.
25       A    I don't think I said that. You said that. I

165

1    don't think -- where'd I say it?
2        Q    Okay. If you look to the last sentence of
3    that paragraph.
4        A    Yeah. It says, "May have avoided subsequent
5    ultimate prognosis is unknown," because I'm not an
6    expert in that area. I can't comment.
7        Q    Okay. So the sentence reads, "However, the
8    ultimate prognosis is unknown if earlier diagnosis truly
9    would alter the outcome."
10       A    That sentence was there, yeah. That's not in
11   my final report but that sentence went through my
12   thoughts.
13       Q    Yeah. And what does that mean? What does
14   that sentence mean?
15           MR. GIROUX: I'm going to object to form. This
16   goes beyond the scope of this. We are not offering
17   for causation on this case.
18           THE WITNESS: I should answer?
19           MR. DENNING: Yeah, you should answer.
20       A    Okay. So it's just what it says. To me, you
21   know, it says prognosis is unknown. But the expectation
22   would be that the patient would have done better if they
23   didn't have a code.
24           BY MR. DENNING:
25       Q    Just looking over my other notes. The

166

1    document that we've marked as Exhibit 2, did you print
2    that off today?
3        A    Today, no.
4        Q    When did you print that?
5        A    Probably -- I don't recall. I just brought
6    my -- when I started Sunday looking up the requirements to
7    come here, I started printing documents as requested. So
8    would've been some time since Sunday. Sometime this
9    week.
10       Q    And that would've been printed from the
11   document called Morgan Case Notes Review?
12       A    It should be. Yeah.
13       Q    Okay. Do you have any idea as you sit here
14   today why page four was left off when you printed this?
15       A    No, I have no idea.
16       Q    Okay.
17       A    I'm curious if it's even on there. Like which
18   is this copy from? Could we just print this out or did
19   I provide this --
20       Q    This -- well, I printed it at break.
21       A    Okay.
22       Q    And you're free to look at my --
23       A    Yeah. That's fine.
24       Q    That's your Word document, Morgan -- Case
25   Notes.

167

1        A    Yeah, that was probably -- it was probably in
2    preparation for something, but okay. No specific
3    reason.
4            MR. DENNING: All right. Thank you, Doctor. I
5    don't have anything else. Let's mark -- let me
6    eject the thumb drive here.
7            MR. GIROUX: That goes with the thumb drive.
8            MR. YOUNG: Oh, this goes with the thumb drive,
9    thank you.
10           MR. DENNING: Yeah. Okay. And we're going to
11   mark this as Exhibit 8.
12           COURT REPORTER: 7 --
13           MR. DAY: 7 was the handwritten. The typed
14   notes that he just marked.
15           MR. DENNING: Yeah, it'll be 8. So that would
16   be 8.
17           (EXHIBIT 8 MARKED FOR IDENTIFICATION)
18           THE WITNESS: There must have been an old
19   version. That's the only thing I can figure.
20           MR. DENNING: All right. Thank you.
21           MR. DAY: Anybody need a break?
22           (OFF THE RECORD)
23               EXAMINATION
24           BY MR. YOUNG:
25       Q    Dr. Dabrow, my name is Greg Young. I met you



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

168

1  shortly before the deposition.
2     A   Yes.
3     Q   I represent Jennifer Chambers-Daney in this
4  case. You understand that?
5     A   Yes.
6     Q   Just a second ago we went off the record so
7  that Mr. Denning could mark the flash drive as an
8  exhibit. And I think you stated that your typewritten
9  notes that were previously marked as Exhibit 2 that were
10 missing the fourth page, you said that must have been an
11 old version.
12    A   Well, I don't know. It might have been. It's
13 listed as an initial -- where is the page now -- the top
14 of the page it said initial --
15    Q   Yeah.
16    A   Something review.
17    Q   I think it's two.
18    A   Yeah. I just don't know where it came from.
19    Q   All right.
20    A   It's clearly my notes, though. Those are my
21 words.
22    Q   Right. Well, I just wanted to know you think
23 that Exhibit 2 is an old version and then Exhibit 7's an
24 updated version.
25    A   I can't answer that now.

169

1     Q   Okay. I got a little confused by your
2  testimony about this two-year time frame that you worked
3  in an emergency room in Baltimore. That was at a
4  community hospital?
5     A   That was at a teaching hospital affiliated
6  with University of Maryland system, but it is a
7  community hospital. General medical center with a
8  pediatric ER dedicated.
9     Q   And is that where you worked primarily as a --
10    A   No.
11    Q   -- as a hospitalist or not?
12    A   I was a pediatric hospitalist at Inova Fairfax
13 in Northern Virginia. Full-time, I was the associate
14 residency -- I was associate medical director of the
15 pediatric hospitalist group and I was moonlighting at
16 this hospital which is about 40 miles away.
17    Q   Okay. And were you just a general ER
18 physician at that time?
19    A   PGR. I don't do general.
20    Q   Okay. So it was only PGR?
21    A   Right. I was a dedicated PGR and I was one of
22 many supplemental people working at this institution.
23    Q   Have you ever worked in a general ER?
24    A   Never.
25    Q   You understand that Ms. Chambers-Daney works

170

1  as a general emergency room provider, meaning she sees
2  patients from one day to the time of death?
3     A   I believe so, yes.
4     Q   And the reason you were doing that was to just
5  pick up additional income?
6     A   Yeah, supplemental income.
7     Q   How did you get involved in this case?
8     A   It was very interesting. I was called by a
9  colleague who does professional reviews, a pediatrician
10 from Inova. And she said I was approached about --
11 about a case review and I'm physically unable to do it
12 and I don't have the time. Would you be doing any more
13 reviews because she knew four years prior I had done
14 that one case in the same circumstances to assist in.
15    Q   And who was that?
16    A   Her name is Riva Kamat, K-A-M-A-T.
17    Q   And where does she practice?
18    A   She is in the Inova System in northern
19 Virginia. I don't know where she's currently located.
20 But that's the last I spoke with her.
21    Q   That's where you know her from?
22    A   Yes. She's a pediatric hospitalist and the
23 director of one of the Community Hospital Pediatrician
24 pediatric programs.
25    Q   Did you guys discuss the Morgan case at all?

171

1     A   No. She just said I have the case that you
2  might be interested in if you're still interested in
3  doing reviews. I'm happy to get you in contact with the
4  attorneys.
5     Q   Okay. This case is set for trial in January
6  of 2021. So it's a little over a year from now. Have
7  you -- if you're asked to testify at trial in Kansas,
8  are you willing to do so?
9     A   Yes.
10    Q   Okay. It's a long ways away, but do you know
11 of any reason that you're not available in January of
12 2021?
13    A   God forbid, unless I'm in the hospital. That's
14 the only reason.
15    Q   Have you ever been to Kansas before?
16    A   No, never.
17    Q   Do you know where Kansas is?
18    A   Yes. The center of the country. I actually
19 have some distant cousins, I believe, still in Wichita,
20 but I've never spoken to them. I'll look them up if I
21 have the opportunity.
22    Q   You said that you were provided a couple of
23 expert witness reports in this case, I think. Did you
24 review any expert witness reports from any emergency
25 room physicians?



Oral Deposition of Robert Dabrow, M.D., 11/14/2019

172

1    A   No. Not to my knowledge.
2    Q   And would you agree that your level of
3  training and experience in pediatrics is probably more
4  advanced and superior than a general practitioner in an
5  emergency room?
6    A   My experience in pediatrics is dedicated. Is
7  it superior? It should be superior in the
8  qualifications that any board-certified pediatrician
9  should have --
10   Q   Right.
11   A   -- but emergency room physicians also have
12 superior training in their skills as well.
13   Q   Sure. In emergency medicine, correct?
14   A   Yes.
15   Q   Right. Your focus has been on pediatric
16 medicine, true?
17   A   Yes.
18   Q   All right. And you've never been educated as
19 a nurse practitioner, correct?
20   A   Me personally, no.
21   Q   Right. Never worked as a nurse practitioner,
22 correct?
23   A   I teach nurse practitioners. I don't work
24 with them.
25   Q   Okay. In this case, there have been four

173

1  emergency room expert witnesses who have disclosed
2  reports and/or testified, Dr. Murphy, Dr. Mathews, Dr.
3  Kabrhel, and Dr. Schierling. You haven't reviewed any of
4  those reports?
5    A   No, those names are not familiar to me.
6    Q   Would you defer to them regarding what the
7  standard of care is for an emergency room provider in
8  the emergency room?
9    A   I am not an emergency provider, so I'm not
10 sure what the emergency room requirements of the
11 standard of care. But any pediatrician would be able to
12 qualify what the pediatric requirements are.
13   Q   Okay.
14   A   If that answers the question.
15   Q   But no, I'm asking for the standard of care
16 applicable to a general emergency room provider. Do you
17 think that those board-certified emergency room
18 physicians probably have superior knowledge and training
19 in that respect than you do?
20   A   For emergencies, yes.
21   Q   Yes. Did you know that of those four, none of
22 them have indicated that a repeat strep test was
23 indicated at Via Christi?
24   A   That's fine. I wouldn't know that, you're
25 telling me. That's fine.

174

1    Q   Do you think they're wrong?
2    A   The reason my comment of repeat strep test was
3  made is perhaps the test itself was wrong, or an
4  alternative diagnosis should have been entertained.
5    Q   Yeah. My question is do you think that those
6  other emergency room providers are wrong?
7    A   I'm not sure. I'm not sure.
8    Q   Or would the explanation be that you have
9  different training and different focus, and you may
10 think that a test is indicated that they may not agree
11 with?
12   A   That's a better way to phrase it.
13   Q   In regards to terms, one of the words that's
14 been used today is "lethargic." You're familiar with
15 that term?
16   A   Yes.
17   Q   Is that a term what -- as a lawyer, I've
18 called a term of art. It means something specific to
19 medical providers; is that true?
20   A   It's a -- terms like "lethargy" and
21 "irritability" are terrible terms because everyone has
22 their own point of view.
23   Q   Okay.
24   A   But it implies something abnormal.
25   Q   Right. Do you know in your experience in

175

1  emergency room care, does the word "lethargic" mean the
2  same thing as sleepy?
3    A   I wouldn't know if it does mean the same as
4  sleepy. It wouldn't mean to me the same.
5    Q   Okay. What would be the difference to you if
6  you see the term "sleepy" versus "lethargic"?
7    A   To me, someone who's lethargic would be
8  difficult to arouse.
9    Q   Okay. And on a spectrum or on a scale,
10 "lethargic" would be more concerning than "sleepy,"
11 true?
12   A   As I use the terms?
13   Q   Yes. Based on your definition.
14   A   As I use the terms, yes.
15   Q   Okay. And "unarousable," would that be
16 similar to "lethargic" in the sense of maybe it's even
17 further down the scale because you're unable to arouse
18 the person?
19   A   It may or may not. It's again, the person
20 using the terms would have to know.
21   Q   Okay. What would be the normal range of
22 respiratory rate for a five, almost six-year-old male
23 infant like, or male, not infant, but childlike D.M.?
24   A   Probably 18 to 20 up to about 30. Again, I
25 would defer to a text reference, to be precise, since

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

176

1   these are all norms that can be looked up and I didn't
2   prepare for those questions.
3        Q    And I've deposed other providers before and
4   some of them carry, like, a card with them in the
5   emergency room for example, that might list the normal
6   ranges for vital signs. Have you seen or heard of
7   things like that?
8        A    Yeah. I think they've been replaced in the
9   electronic medical -- medical record by the blips that
10  you see.
11       Q    Right. Those are things that you may not have
12  committed to memory. If you need to know, you'll have
13  an exact reference somewhere, correct?
14       A    Of course.
15       Q    And would you agree that you can probably go
16  to different sources and see some variation as to what
17  is considered normal?
18       A    A slight variation. Yeah.
19       Q    Have you ordered MRI studies on pediatric
20  patients?
21       A    As an inpatient hospitalist, yes.
22       Q    Okay. What about through an emergency room?
23       A    It's very difficult to do an MRI in the
24  emergency room because for the children they need
25  frequently to be sedated, and that's not something you

177

1   would do as a stat procedure. CT can be done in a
2   matter of minutes.
3        Q    All right. Do you know if you're evaluating a
4   six-year-old for a brain tumor if the preferred test
5   would be an MRI or a CT scan?
6        A    Oh, in an academic way, an MRI is always
7   superior if you're evaluating for a brain tumor. If
8   you're evaluating for acute intracranial emergency, a CT
9   scan is very helpful and usually a good choice of test.
10       Q    If a child is nauseous and at risk of
11  vomiting, would you be concerned about putting them on
12  their back in a CT machine?
13       A    The child was again at risk --
14       Q    Nauseous and at risk of vomiting?
15       A    At risk of vomiting, you'd have to determine
16  the circumstances.
17       Q    Well, would one of the things you would think
18  about would be the risk of aspiration?
19       A    It's a reasonable thing to consider.
20       Q    Right. And would it be true that for example,
21  providing Zofran and fluids to stabilize the child
22  before doing a test like that might be indicated?
23       A    "Might" is an appropriate word.
24       Q    Right. Depending on the circumstances?
25       A    Sure.

178

1        Q    But that's an appropriate consideration, true?
2        A    Yes.
3        Q    All right. If you do an MRI on a child,
4   oftentimes they need to be sedated, true?
5        A    Oh, yes. Absolutely.
6        Q    That's a -- that's an event that takes time
7   and takes specialists to be involved of monitoring and
8   initiating sedation, things like that, correct?
9        A    Correct.
10       Q    Do you agree that in the emergency room when
11  you have a pediatric patient like in the age of five to
12  ten years old, that general observation of the behavior
13  of the child is important?
14       A    Of course.
15       Q    As to how they're interacting with their --
16  the person with them, for example?
17       A    Yes.
18       Q    How they interact with the nurses?
19       A    Yes.
20       Q    How they interact with you as the provider?
21       A    Always, we make comments like that all the
22  time.
23       Q    Eye contact?
24       A    Yes.
25       Q    Following commands?

179

1        A    Yes.
2        Q    Appropriate responses?
3        A    Yes.
4        Q    And those are all general things that you
5   would put into your gestalt as you're evaluating the
6   child to see how they're neurologically functioning,
7   true?
8        A    Of course.
9        Q    Okay. In the emergency room, a provider
10  basically has three final disposition options, correct?
11  Discharge, admit, or continue to monitor in the ER for
12  some period of time, correct?
13       A    I believe that's it. Well, that's the
14  standard.
15       Q    And in this case, while you believe that a CT
16  scan or some other test should have been done, you
17  certainly would agree that admitting this patient was
18  the proper thing to do?
19       A    Of course.
20       Q    Okay. Is it unusual for a pediatric patient
21  to be admitted through the ER, and then the ultimate
22  diagnosis of the condition not made until after they've
23  been admitted?
24       A    The ultimate -- the ultimate diagnosis is
25  often made, whether children or adults, until after a

180

1  time. You need data.
2      Q  After admission?
3      A  Yes. I think that's true.
4      Q  I take it of all the names you've read in this
5  case, you are not familiar with anybody other than
6  reading the stuff in this case?
7      A  No, not a soul.
8      Q  And have you talked about this case with
9  anybody other than any of the attorneys for the
10 plaintiff?
11     A  No. It's the legal requirement, I believe.
12     Q  If you testify at trial in Kansas, how do you
13 charge for that?
14     A  I would have to look back at my contract.
15     Q  Oh. So it'd be in the contract?
16     A  Yeah. It'll be in the contract.
17     Q  Okay. I'll look at that.
18     A  There's something about travel expenses and --
19     Q  All right.
20     A  It's basically the same rate, it works out to
21 be. I've never had to use that service before.
22     MR. YOUNG: I think that's all the questions I
23 have. Thank you, sir.
24     THE WITNESS: Okay.
25         EXAMINATION

181

1      BY MR. MARINO:
2      Q  Doctor, my name is Andrew Marino. I represent
3  Nurse Judd and Wesley Medical Center in this case.
4      A  Okay.
5      Q  I just had a question basically about a
6  sentence you put in your report at the top of the sixth
7  page.
8      A  Okay.
9      Q  That sentence says, "The fact that there is no
10 blood pressure measured in a child who was hypertensive
11 at every subsequent measurement prior to his code
12 suggest that the child would likely have been
13 hypertensive on arrival at Wesley." Can we agree that
14 the only basis in your report --
15     (OFF THE RECORD)
16     Q  Okay. Doctor, the sentence, the first full
17 sentence at the top of the sixth page there?
18     A  Yes.
19     Q  Can we agree that the only basis for that
20 opinion in your report is that the child was
21 hypertensive at subsequent measurements?
22     A  Yes.
23     Q  And the first of those subsequent measurements
24 would've been about eight hours after he presented at
25 Wesley Woodlawn, true?

182

1      A  I think it was more like six hours, but within
2  six or eight hours whichever the time is.
3      MR. MARINO: Okay. All right. I think that's
4  the only questions I have at this time.
5      MR. GRIBBLE: Sam, do you have any questions?
6         EXAMINATION
7      BY MS. WOODS:
8      Q  I have probably just one. Doctor, my name is
9  Samantha Woods and I represent Via Christi Hospital. Can
10 you hear me okay?
11     A  Absolutely.
12     Q  Good. Other than the criticisms that I've
13 heard you express today with regard to Nurse Chambers-
14 Daney, is it correct that you are not offering any
15 opinion or criticism with regard to violations of
16 standard of care of any of the other nurses at Via
17 Christi, correct?
18     A  Standard of care of nurses was not my
19 observation for this case.
20     MR. GIROUX: Sam, that is correct. He's not
21 going to offer any opinions against any of the
22 nursing care.
23     MS. WOODS: Thank you. That's all I needed.
24     MR. GRIBBLE: Anybody else, follow-up?
25     MR. YOUNG: I don't have any.

183

1      MR. GIROUX: Okay. He'll read and sign. She
2  will put it in the transcribed form.
3      THE WITNESS: Okay.
4      MR. GIROUX: She'll send it to you. And then
5  under Kansas law you have 30 days to make any types
6  of corrections.
7      THE WITNESS: Okay.
8      MR. GIROUX: If you make anything of substance,
9  like a substantive correction, these folks have the
10 opportunity to come back and depose you just on
11 those types of changes, okay?
12     THE WITNESS: Okay. So I'll just get something
13 to initial as an e-mail?
14     MR. GIROUX: Yeah, you'll get a sheet, an
15 errata -- correction sheet. Where do you want it
16 sent?
17     THE WITNESS: Just my work e-mail.
18     COURT REPORTER: Work e-mail?
19     THE WITNESS: I think it's on the CV, but D-R-
20 B-O-B, Dr. Bob, @celebrationpediatrics.com.
21     COURT REPORTER: Before we break, is anybody
22 ready to order yet?
23     MR. YOUNG: Well, all I can say is --
24     MS. COLE: Yes. E-tran with scanned exhibits.
25     MR. DENNING: Yeah, we're going to want it.

Oral Deposition of Robert Dabrow, M.D., 11/14/2019

184

1    MR. GRIBBLE:  Everyone's going to want it.
2    MR. DENNING:  Same for everyone.
3    COURT REPORTER:  So e-tran, scanned exhibits.
4    MR. YOUNG:  And condensed format.
5    (DEPOSITION CONCLUDED AT 1:27 P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

185

1         WITNESS CERTIFICATION
2
3         I hereby certify that I have read the
4    foregoing transcript of my deposition testimony,
5    and that my answers to the questions propounded,
6    with the attached corrections or changes, if
7    any, are true and correct.
8
9
10
11
12    _____
13    DATE        ROBERT DABROW, M.D.
14
15
16
17    _____
18    PRINTED NAME
19
20    JOB #90251
21    D.M., KELLI MORGAN
22    vs.
23    WESLEY MEDICAL CENTER
24
25