## Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF KANSAS
 2             KANSAS CITY, KANSAS DIVISION
 3
 4   D.M., a minor, by and through  )
     his next friend and natural    )
 5   guardian, KELLI MORGAN,        )
                                    )
 6          Plaintiff,  )
                                    )
 7                                  )
       vs.            )Case No. 2:18-CV-02158
 8                                  )
                                    )
 9   WESLEY MEDICAL CENTER LLC d/b/a )
     WESLEY MEDICAL CENTER-WOODLAWN; )
10   WESLEY WOODLAWN CAMPUS; BRIDGET )
     GROVER, PA-C; DR. GREGORY      )
11   FAIMON; LISA JUDD, RN; VIA     )
     CHRISTI HOSPITALS WICHITA,     )
12   INC.; JENNIFER CHAMBERS-DANEY, )
     ARNP; DR. BALA BHASKAR REDDY   )
13   BHIMAVARAPU; CEP AMERICA-KS    )
     LLC; DR. CONNOR HARTPENCE; DR. )
14   STEFANIE WHITE; DR. JAMIE      )
     BORICK; and AARON KENT, RN,    )
15                                  )
             Defendants.  )
16
17
18           D E P O S I T I O N
19        The videotape deposition of CONNOR HARTPENCE, M.D.
20   taken on behalf of the Plaintiff pursuant to the Federal
21   Rules of Civil Procedure before:
22        RICK J. FLORES, CSR
             KELLEY REPORTING ASSOCIATES, LTD.
23        515 South Main, Suite 108
             Wichita, Kansas 67202
24
25   a Certified Shorthand Reporter of Kansas, at 245 North
26   Waco, Suite 260, Wichita, Sedgwick County, Kansas, on the
27   4th day of January, 2019, at 9:08 a.m.
```

## Page 2

```
 1           A P P E A R A N C E S
 2
 3   PLAINTIFF:
        DUGAN & GIROUX LAW, INC.
 4      Mr. Daniel B. Giroux
        940 N. Tyler, Suite 206
 5      Wichita, KS  67212
        (316) 721-5500
 6      Fax:  (316) 722-7510
        dan@dgwichitalaw.com
 7
        KUCKELMAN TORLINE KIRKLAND
 8      Mr. Michael J. Kuckelman
        10740 Nall Avenue, Suite 250
 9      Overland Park, KS  66211
        (913) 948-8612
10      Fax:  (913) 948-8611
        mkuckelman@ktk-law.com
11
     DEFENDANTS WESLEY MEDICAL CENTER, LLC and
12   LISA JUDD, RN:
        GIBSON WATSON MARINO LLC
13      Ms. Michelle M. Watson
        301 North Main, Suite 1300
14      Wichita, KS  67202-4813
        (316) 264-7321
15      Fax:  (316) 264-8614
        michelle@gwmks.com
16
     DEFENDANTS BRIDGET GROVER, PA-C and
17   DR. GREGORY FAIMON:
        GILLILAND & GREEN LLC
18      Ms. Tracy A. Cole
        20 W. 2nd Avenue, 2nd Floor
19      P.O. Box 2977
        Hutchinson, KS  67504
20      (620) 662-0537
        Fax:  (620) 669-9426
21      tcole@gglawks.com
22   DEFENDANTS VIA CHRISTI HOSPITALS, INC. and
     AARON KENT, RN:
23      MARTIN PRINGLE
        Ms. Samantha Woods
24      100 N. Broadway, Suite 500
        Wichita, KS  67202
25      (316) 265-9311
        Fax:  (316) 265-2955
26      smwoods@martinpringle.com
27
```

## Page 3

```
 1           A P P E A R A N C E S  Cont'd
 2
     DEFENDANT JENNIFER CHAMBERS DANEY, APRN:
 3      HINKLE LAW FIRM, LLC
        Mr. Gregory Young
 4      1617 N. Waterfront Parkway, Suite 400
        Wichita, KS  67206-6639
 5      (316) 267-2000
        Fax:  (316) 630-8466
 6      Gyoung@hinklaw.com
 7   DEFENDANT DR. BALA BHASKAR REDDY BHIMAVARAPU:
        HITE, FANNING & HONEYMAN, LLP
 8      Mr. Don D. Gribble, II
        100 North Broadway, Suite 950
 9      Wichita, KS  67202
        (316) 265-7741
10      Fax:  (316) 267-7803
        Gribble@hitefanning.com
11
     DEFENDANT CEP AMERICA-KS, LLC:
12      CLARK, MIZE & LINVILLE, Chartered
        Mr. Dustin J. Denning
13      129 South Eighth Street
        Salina, KS  67402-0380
14      (785) 823-6325
        Fax:  (785) 823-1868
15      DJdenning@cml-law.com
16   DEFENDANTS DR. STEFANIE WHITE, DR. CONNOR HARTPENCE
     and DR. JAMIE BORICK:
17      WOODARD, HERNANDEZ, ROTH & DAY, LLC
        Mr. Steven C. Day
18      245 North Waco, Suite 260
        Wichita, KS  67202-0127
19      (316) 263-4958
        Fax:  (316) 263-0125
20      Scday@woodard-law.com
     VIDEOGRAPHER:
21      Advanced Document Imaging
        Mr. Michael Miles
22      515 S. Main, Suite 105
        Wichita, KS  67202
23      (316) 267-9380
        Fax:  (316) 267-9382
24      video@kelleyreporting.com
25
     Also present:  Dr. Bala Bhimavarapu and Ms. Joey
26   Dean, Risk Manager, Wesley Medical Center.
27
```

## Page 4

```
 1                    I N D E X
 2
 3
     CONNOR HARTPENCE, M.D.
 4   Direct Examination by Mr. Giroux:        5
     Cross-Examination by Mr. Denning:      119
 5   Cross-Examination by Mr. Day:          123
     Redirect Examination by Mr. Giroux:    124
 6
 7
 8
 9
10
11   No Exhibits Marked.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26   SIGNATURE OF WITNESS                   128
27   CERTIFICATE                            129
```

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105
316.267.8200

WICHITA, KANSAS



EXHIBIT

A

Page 5

1      VIDEOGRAPHER:  This begins the
2    videotape deposition of Dr. Connor Hartpence.
3    Today is January 4th, 2019, and the time is
4    9:08 a.m.
5      Will the court reporter please swear
6    in the witness.
7      CONNOR HARTPENCE, M.D.
8    having been first duly sworn on his oath to
9    state the truth, the whole truth, and nothing
10   but the truth, testifies as follows:
11      DIRECT EXAMINATION
12   BY MR. GIROUX:
13   Q.  Please state your name for the record.
14   A.  Connor Hartpence.
15   Q.  And your home address?
16   A.  233 North Edgemoor, Wichita, Kansas, 67208.
17   Q.  Doctor, I -- my name's Dan Giroux. I
18      introduced myself to you before the
19      deposition.
20   A.  Uh-huh.
21   Q.  I represent D███ M████ in this action.
22      You understand that?
23   A.  Yes.
24   Q.  And essentially what I'm going to try to
25      accomplish today, if I ask my questions

Page 6

1      correctly, is I'm going to ask you questions
2      concerning the care and treatment that you
3      provided to D███ M████ on March 6 of 2017.
4      You understand that?
5   A.  Yes.
6   Q.  And have you ever been through a deposition
7      before?
8   A.  I have not.
9   Q.  I know that Mr. Day's probably gone through
10     some of the rules with you, but just so that
11     we have a clear understanding and we make a
12     good record and we can get through the
13     morning quickly, if I ask a question you
14     don't understand, can you have me rephrase,
15     please.
16  A.  Yes.
17  Q.  If at anytime you need to take a break, can
18     you let me know, and I'll accommodate you
19     with a break.
20  A.  Yes.
21  Q.  Also, it's important, since there is a
22     written record being made, that any answer
23     that you give, please give an audible answer,
24     a yes or a no or a narrative if the question
25     calls for it.

Page 7

1      Can you do that?
2   A.  Yes.
3   Q.  And, you know, I know it's been almost two
4      years since this incident occurred, and if I
5      ask you a question you don't know the answer
6      to or you don't remember, that's a perfectly
7      acceptable answer.
8      You understand that?
9   A.  Yes.
10  Q.  Can we assume that if you do answer my
11     question that you've understood my question?
12  A.  Yes.
13  Q.  You'll have an opportunity, after this
14     deposition, to look at the transcript and
15     make any changes to it.
16     So if there are any things that you
17     don't understand or didn't understand, you
18     answered incorrectly, you will have the right
19     to make those changes.
20     You understand that?
21  A.  Yes.
22  Q.  Tell me what, if anything, you've done to
23     prepare for your deposition today other than
24     any discussions with your lawyer.
25  A.  Discussions with my lawyer and then just

Page 8

1      reading through the record, reviewing the
2      record.
3   Q.  What portions of the record did you review?
4   A.  I tried to look at all of it, but it's a lot.
5      So I focused on my history and physical and
6      the initial emergency room documentation.
7   Q.  Okay. Is there a reason why you looked at
8      the emergency room documentation?
9   A.  I would have reviewed that prior to seeing
10     D███
11  Q.  And then in terms -- it looks like in review
12     of the records myself that the emergency room
13     documentation isn't too lengthy; is that --
14  A.  Correct.
15  Q.  And at the time that you were providing care
16     to D███ and you were summoned down into the
17     ER, would all the records that you reviewed
18     in preparation for your deposition, would
19     those have already been generated at the time
20     that you delivered care?
21  A.  I believe so.
22  Q.  Okay.
23  A.  Yes.
24  Q.  Is there anything in the records now in your
25     review that look different than they were in

2 (Pages 5 to 8)

**Page 9**

```
 1      March of 2017 when you were delivering care
 2      to D_____?
 3   A. No.
 4   Q. Other than, obviously, you reviewed all the
 5      records that you created; correct?
 6   A. Yes.
 7   Q. And then tell me specifically what other
 8      records that you looked at to the best of
 9      your recollection.
10   A. I reviewed Dr. Borick's progress note the
11      next morning, and then I kind of skimmed
12      through the intensive care notes.
13   Q. Did you look at Dr. White's note?
14   A. Her addendum?
15   Q. Yes.
16   A. Yes.
17   Q. Okay. Did you look at any of the
18      consultation notes, say Dr. El-Nabbout or
19      Dr. Grundmeyer?
20   A. Yes.
21   Q. Did you look through the intensivist's note?
22   A. There were a lot of them. I glanced through
23      them, yes. I don't know that I read them
24      thoroughly.
25   Q. Okay. And then beyond the medical records,
```

**Page 10**

```
 1      have you reviewed any depositions?
 2   A. Dr. White's deposition.
 3   Q. Okay. And when did you last review that
 4      deposition?
 5   A. I read through it again yesterday.
 6   Q. And how many times have you read through it?
 7   A. Fully one time. One and a half, I would say.
 8   Q. Yeah. Anything in that deposition that you
 9      remembered differently in terms of delivering
10      care to D____ M____?
11   A. No.
12   Q. Her recollection or her testimony's
13      consistent with what you recall?
14   A. Yes.
15   Q. Beyond -- anyone else's deposition?
16   A. I have not read any other depositions.
17   Q. We talked about medical records. We talk
18      about depositions.
19          Any other documentation that you've
20      reviewed in anticipation of your deposition
21      today?
22   A. No.
23   Q. Have you -- tell me what -- you're in
24      residency right now?
25   A. Correct.
```

**Page 11**

```
 1   Q. Okay. And what year of residency are you in?
 2   A. I'm now in my third year.
 3   Q. And what's your specialty?
 4   A. Family medicine.
 5   Q. In March of 2017, you would have been in your
 6      first year?
 7   A. That's correct.
 8   Q. When did your first year of residency begin?
 9   A. It would have been July of 2016.
10   Q. And then from July 2016 up to March 2017, I
11      take it, that you would have rotated through
12      various specialties?
13   A. That's correct.
14   Q. Tell me to the best of your recollection what
15      specialties, up until March of 2017, that
16      you -- that you had experience in.
17   A. I would have had a lot of family medicine
18      clinic. We do that longitudinally. And then
19      I would have had at least one, I believe I
20      had two, adult medicine inpatient blocks,
21      which is a 4-week block. And I would have
22      had one, at least one, obstetrics block on
23      labor and delivery. I'd also had a
24      dermatology rotation, an ENT rotation. And
25      those are the -- those are the only ones I
```

**Page 12**

```
 1      remember for sure.
 2   Q. What was your level experience in dealing
 3      with pediatric patients, let's say, by March
 4      6th of 2017?
 5   A. Sure. I had seen multiple pediatric patients
 6      in the clinic, and that would have been my
 7      first inpatient pediatric rotation in
 8      residency.
 9   Q. And then I take it in March of 2017, you were
10      doing a pediatric rotation?
11   A. Correct.
12   Q. And when would that have started in relation
13      to March 6th?
14   A. It's tough to say because they're four week
15      blocks. It doesn't go by month.
16   Q. Yes.
17   A. So I couldn't say for certain when it
18      started.
19   Q. Do you know whether you were on the front end
20      or the back end or in the middle or do you
21      just not remember?
22   A. I can't say for certain. I think I was on
23      the back end, but I don't know for sure.
24   Q. Patients -- pediatric patients, let's say, by
25      March 6th of 2017 that presented to the
```

3 (Pages 9 to 12)

## Page 13

1  emergency room that were going to be admitted
2  to the general floor, can you give me an
3  estimate of how many patients' care you were
4  involved in?
5  A.  Yes.  So each day I would have been rounding
6  on anywhere between 4 to 6 pediatric patients
7  on the floor.  And I would have had several
8  call days, as we call them, where we're the
9  resident on call to take admissions from the
10  emergency room.  Typically, that ranges from
11  anywhere from 1 to 5 admissions per day.  I
12  couldn't tell you how many I did up to that
13  point.
14  Q.  So let's say on March 6 of 2017, were you
15  working on the pediatric floor or were you
16  working in the ER?
17  A.  I was assigned to the pediatric floor and I
18  would have been accepting -- I would not be
19  accepting admissions, but I would be helping
20  admit patients from the ER to the pediatric
21  floor.
22  Q.  So that would be one thing that you would be
23  doing?
24  A.  Correct.
25  Q.  Okay.  What other responsibilities as a first

## Page 14

1  year family practice resident would you have
2  during a pediatric rotation at that time?
3  A.  It would depend on if I was assigned to a
4  day -- to the days or the nights.
5  Q.  And this time you would have been assigned
6  during what -- was it the nights?
7  A.  I was on nights, yes.
8  Q.  What would be your duties at night?
9  A.  My sole duty -- well, I guess there's a
10  couple duties.  One would be to admit
11  patients, and then two would be to respond to
12  any needs of patients on the floor or in the
13  PICU overnight.
14      Our residents take pages and calls on
15  the patients that they're assigned to
16  overnight.  So the residents who are on
17  during the day, the patients that they are
18  seeing and following, they will take calls on
19  those patients overnight from the nurses.
20      However, if there is something that
21  needs evaluated in-house, they will call the
22  residents who are there, the night residents,
23  so that would be one of the rules.
24  Q.  The scenario with D████ where he was
25  admitted from the ER, that was a scenario

## Page 15

1  that you were familiar with --
2  A.  Yes.
3  Q.  -- I think, by March 6 of 2017?
4  A.  Yes.
5  Q.  Tell me, when you are charged with the task
6  of admitting a pediatric patient from the ER,
7  essentially, the admit, what do you do during
8  the admit?
9  A.  Sure.  Do you want that from a intern
10  resident perspective or a senior resident
11  perspective?
12  Q.  From an intern 'cause you were an intern at
13  the time; right?
14  A.  Correct.
15  Q.  Yeah.
16  A.  So usually the way it works is the senior
17  resident would have received a call from the
18  attending doctor saying, hey, this is a
19  patient that needs to be admitted to the
20  floor and this is why.
21      The senior resident would then tell
22  the intern resident, hey, we have a patient
23  down in the ER.  This is the room they're in.
24  This is the chief complaint or the reason
25  they need to be admitted.

## Page 16

1      At that point, it was my role to do
2  the history and physical exam.  And then
3  after doing the full history, the physical, I
4  would then formulate an assessment and plan
5  and talk to the senior resident.
6      After doing that, the senior resident
7  will then do their own evaluation of the
8  patient.  They will talk to the junior
9  resident about any discrepancies in the
10  history or the exam, any changes they think
11  that need to be made to the plan, and then it
12  would be my role to call the attending
13  physician and check out the patient to the
14  attending.
15  Q.  And then when you -- when you get assigned to
16  admit a pediatric patient from the ER, is it
17  your custom, habit and routine to review the
18  ER chart?
19  A.  It is my routine, yes.
20  Q.  Okay.  And then do you know whether, in this
21  particular case, whether you would have
22  reviewed the emergency room charting?
23  A.  I don't remember specifically, but I don't
24  see any reason why I wouldn't have because it
25  is my regular routine.

4 (Pages 13 to 16)

## Page 17

1  Q.  Why is that your regular routine?
2  A.  It's -- it's something that was passed down
3      to me from senior residents when I was an
4      intern.  It's just a way of being thorough
5      and trying to make sure that we're not
6      missing things.
7          Sometimes, you know, they may have
8      pieces of history that we aren't able to
9      obtain from the patient for whatever reason.
10 Q.  What would be the various reasons why you
11     would be unable to obtain certain histories
12     that others are able to?
13 A.  I think it varies.  Sometimes, you know,
14     patients just may not provide the same
15     information to different people that they
16     talk to.
17 Q.  Is that common?
18 A.  I would say it's fairly common.
19 Q.  How about in the pediatric population where
20     you have a pediatric patient that is ill, who
21     presents with a parent, in a situation like
22     that, is it common?
23 A.  I would say it's no less or more common than
24     it is in an adult patient.
25 Q.  So in the pediatric population, when you are

## Page 18

1      gathering history, do you sometimes have to
2      gather the history from the parent?
3  A.  A lot of the time, most of the history comes
4      from the parent, yes.
5  Q.  Is it sometime difficult to gather history
6      from a parent?
7  A.  It can be.  It definitely varies.  It depends
8      on very many factors.
9  Q.  In your training and experience at least up
10     to that time as a first year resident, did
11     you learn techniques, wherein, you would
12     gather history from other parents or patients
13     who are difficult to gather history from?
14 A.  I would say that I received a lot of training
15     on that in medical school and then in
16     residency.  I don't think there was any
17     formal training for that.  It was more of a
18     learn on the job type of training.
19 Q.  Can you tell me a little bit of the training
20     that you would have received in medical
21     school regarding that, eliciting history?
22 A.  Sure.  I went to med school at Case Western
23     in Cleveland, Ohio.  And there's a large
24     portion of the curriculum in the -- actually
25     at first through fourth year where we work

## Page 19

1      with standardized patients on obtaining
2      history, doing physical exams.  And there is
3      a portion of that curriculum that is
4      dedicated to difficult patients.  And
5      difficult could mean difficult to obtain
6      history, difficult to get an exam, many
7      different things, but yes, there is a
8      standardized curriculum for that.
9  Q.  You made a reference in one of your previous
10     responses that one of the reasons why you
11     look through the ER charting before you --
12     while you're doing the admit is to be
13     thorough.
14 A.  Uh-huh.
15 Q.  Correct?
16 A.  Correct.
17 Q.  How about in situations where you have a
18     patient who is re-presenting to the ER for --
19     or a hospital for pretty much the same
20     reason, do you try to elicit history
21     regarding the previous admission?
22 A.  Yes, I would say -- I would say that I would
23     want to elicit that history, yes.
24 Q.  Why would that be important?
25 A.  It's part of the history of -- the history of

## Page 20

1      present illness, the HPI.  It's all part of
2      the recent history of the current illness,
3      which is part of the history and physical.
4  Q.  So the history and -- would your history and
5      physical examination, to your knowledge, be
6      any different than the history and physical
7      examination that was done in the ER?
8          MR. YOUNG:  Object to form;
9      foundation.
10 A.  Sorry.  Can you repeat that.
11 BY MR. GIROUX:
12 Q.  In a general sense, the history and physical
13     examination that you perform, would it be any
14     different than the history and physical
15     examination that's being done by the -- by
16     the physician or the midlevel provider in the
17     emergency room?
18         MR. YOUNG:  Same objections.
19 A.  I don't see why it would be any different.  I
20     do think sometimes we ask a little bit more
21     as far as family history, social history,
22     those types of things, than they do in the
23     emergency room, but I can't say for certain.
24     It would depend on -- depend on the provider
25     and the scenario, I guess.

5 (Pages 17 to 20)

## Page 21

1  Q.  The -- you talk about doing a history and
2  physical examination.
3       What's the importance of doing a --
4  first of all, what is a physical examination?
5  A.  It's exactly what it sounds like:  An exam of
6  the patient to basically evaluate their
7  wellbeing and see if you can help guide your
8  decisionmaking to figure out what's wrong
9  with the patient.
10  Q.  Is your -- is your -- is your physical
11  examination of patient, is it more focused
12  based upon their presenting symptoms?
13  A.  Yes.  In general, yes.
14  Q.  And then how does -- if they present, let's
15  say, with, like in D███'s case, with just
16  nausea and vomiting, but they have a history
17  of dizziness and balance issues and headache,
18  how does that factor into your physical
19  examination of the patient?
20  A.  I'd -- you know, with this case, I don't
21  recall getting a history of balance issues,
22  but, typically, you -- we would do an exam
23  that we found appropriate for that specific
24  scenario.
25       For D███ mom's main complaint was

## Page 22

1  that he couldn't keep his antibiotics down
2  and she was worried that he was dehydrated.
3  So we do an assessment for dehydration.
4  There's various things you can look for with
5  that and just a general exam for him.
6  Q.  So during the history and physical
7  examination in D███'s case, let's just say,
8  how long would that have taken?
9  A.  The entire process of getting the history and
10  doing the physical?
11  Q.  Let's just -- yeah, let's break it down.
12       First of all, how long would it take
13  to get the history?
14       MR. DAY:  How long did it take,
15  he thinks?
16  BY MR. GIROUX:
17  Q.  Yes.  How long do you think --
18  A.  How long did it take?
19  Q.  Yes.
20  A.  I believe -- it was somewhere around 15 to
21  20 minutes, I believe, getting the history
22  from mom.
23  Q.  And then doing a physical examination?
24  A.  Five minutes.  Five minutes or less.
25  Q.  And you said the history took about 15 to 20

## Page 23

1  minutes; is that correct?
2  A.  That would be my estimate.  I don't know for,
3  you know, hundred percent certainty.
4  Q.  Do you think you wrote down everything that
5  she told you?
6  A.  I actually had my computer with me, so I
7  think I did, yes.
8  Q.  So when you say you have your computer with
9  you, you were taking notes directly into the
10  medical chart?
11  A.  Correct.
12  Q.  Okay.  So this would have been something that
13  you would have done -- while you're talking
14  to and interviewing her and gathering
15  history, you would be contemporaneously
16  inserting into the medical chart?
17  A.  That's correct.  I take my laptop with me to
18  see patients.
19  Q.  Can you tell me, to the best of your
20  recollection and review of the records, at
21  what point in time did you actually go in and
22  see D███?
23       When's the first time that you saw
24  him?
25  A.  What time of day?

## Page 24

1  Q.  Yes, sir.
2       MR. DAY:  Do you want him to look
3  at the record?
4  Q.  You can refer to the records if you need.  I
5  got an extra copy if you need one.
6       MR. DAY:  This is -- I don't know
7  whether this is going to be the part of the
8  record you need or not.  You can look at it
9  if you want and see if it's in there.
10  A.  I believe it's --
11  BY MR. GIROUX:
12  Q.  I think your note begins on 14,
13  Dr. Hartpence.
14  A.  Okay.
15  Q.  I apologize.  It's 15.
16  A.  So looks like the note was started at 5:18.
17  Usually, I start the note right before I go
18  into the room.  So I would estimate that it
19  was somewhere between 5:20 and 5:30.  I don't
20  know for sure, though.
21  Q.  Do you know, at least, in D███'s case, did
22  you have any discussions with any of the ER
23  providers?
24  A.  I don't recall if I did or did not.  I know
25  that I walked by the desk, but I don't recall

6 (Pages 21 to 24)

## Page 25

1  if I did or did not.
2  Q.  Do you know who the ER provider was?
3  A.  I know from the chart.  I don't -- I don't
4  have any specific recollection of that,
5  though.
6  Q.  And then before seeing D█████ who would you
7  have spoken to in terms of -- would you have
8  spoken to the second year resident at the
9  time?
10  A.  Yes, and I believe Dr. White was a third year
11  resident at the time.
12  Q.  That's fine.  And she would have been the
13  senior resident?
14  A.  Uh-huh.
15  Q.  And tell me what, if anything, you recall
16  about that conversation with her.
17        MR. DAY:  Doctor, you're doing a
18  great job, but try to avoid uh-huhs and
19  huh-uhs 'cause it doesn't make for a clear
20  record.
21  A.  Okay.
22        MR. DAY:  You did that --
23  A.  Okay.  Okay.  Okay.  Sorry.  Can you repeat
24  that.
25  Q.  No problem at all.

## Page 26

1        Tell me what you recall about your
2  conversation with Dr. White.
3  A.  Okay.
4  Q.  And this is before you see D████
5  A.  Before I saw D████
6  Q.  Yes, sir.
7  A.  Unfortunately, I don't remember any
8  specifics.  It's -- you know, we do so many
9  admissions, I don't recall specifics.
10  Q.  Is it typically a quick process where she'll
11  say, hey, we're going to admit a patient and
12  the patient has got nausea and vomiting and
13  you need to go see the patient; is it
14  something as quick and as fast as that?
15  A.  It's usually brief, but the senior resident
16  will include necessary details.  So I would
17  say it's as in-depth as it needs to be, but
18  usually less than a few minutes.
19  Q.  Do you know -- then how does a senior
20  resident, at least, to your knowledge, how
21  does she receive information about the
22  patient?
23  A.  So it depends.  With our inpatient
24  pediatrics, it depends on who the patient's
25  being admitted to.  In this scenario, the

## Page 27

1  patient was being admitted to our private
2  hospitalist group, and Dr. Bala was the
3  attending physician.  So she would have got a
4  call from Dr. Bala for the admission, and
5  then she would have relayed that information
6  to me.
7  Q.  Then with Dr. Bala, what's his role in the
8  hospital?
9  A.  Dr. Bala is an attending pediatric
10  hospitalist.
11  Q.  And then have you -- prior to March 6th, have
12  you worked with him regarding pediatric
13  patients?
14  A.  I would have worked with him on that
15  rotation, yes.
16  Q.  Would you have personal interaction with him
17  during rotations and seeing patients?
18  A.  Yes.
19  Q.  Without looking at the medical records, do
20  you have an independent recollection of
21  D███ M███?
22  A.  Yes.
23  Q.  Tell me what you recall about D███
24  A.  Sure.  I remember -- actually, I remember
25  what room he was in in the emergency room.

## Page 28

1  Q.  What room is that?
2  A.  I don't remember the number, but I --
3  location, I could tell you exactly where it
4  was.  The way the emergency room is set up,
5  there's kind of a square desk and he was just
6  to the -- if you're facing the doors to exit
7  where the ambulances come in, he was in the
8  room right there on the right-hand side of
9  those.
10        I remember walking in with my
11  computer.  Mom was sitting on the left in a
12  chair, and D████ was in the hospital bed,
13  which is right in the middle of the room, and
14  he was sleeping when I went into the room.
15  And that's when I started talking to mom.
16  And he slept throughout most of the
17  encounter.
18  Q.  At any point in time did he wake?
19  A.  He never woke up fully.  He aroused, but
20  never woke up and opened his eyes.
21  Q.  Were you aware, at least, prior to seeing
22  D████ based on your review of the ER
23  records, whether he was awake at any point?
24  A.  I know -- after looking through documentation
25  I can answer that, but I didn't have

7 (Pages 25 to 28)

## Page 29

1  independent recollection of remembering that.
2  Q.  What is your -- based on your review of the
3  documentation, what is your impression?
4  A.  Sure.  My impression was that he was awake
5  when he came into the emergency room.
6  Q.  Okay.  Tell me what, based on your review of
7  the documentation, more details about his
8  wakefulness and what he was able to do.
9  A.  In the triage documentation for the ER -- I
10  think it's the triage documentation, they
11  always do a general evaluation of the patient
12  and will assign a number to them based on the
13  severity, their -- what they deem the
14  severity of the illness.  And in that
15  documentation, they document a Glasgow Coma
16  Score, which part of that is spontaneous eye
17  opening and wakefulness, and D███ had a GCS
18  of 15.
19  Q.  Explain that scale to me, please.
20  A.  Sure.
21  Q.  It's the Glasgow Coma Scale; correct?
22  A.  Correct.
23  Q.  And what are the multiple components to that
24  in order to calculate a score?
25  A.  Sure.  So they assess eye opening, speech --

## Page 30

1  verbal response, and motor response.
2  Q.  So in order to do the Glasgow Coma Scale, he
3  would have to open his eyes?
4  A.  Spontaneously.
5  Q.  Spontaneously, meaning, hey, D███ open
6  your eyes, and he opens his eyes?
7  A.  Even without verbal stimulation, he would
8  open his eyes spontaneously.
9  Q.  And then speech?
10  A.  Speech would be verbalizing without -- and
11  having speech that is recognizable.  You
12  know, he's not mumbling, not
13  incomprehensible.
14  Q.  And then the verbal response?
15  A.  The motor -- yeah, that's the verbal
16  response.
17  Q.  Okay.
18  A.  The motor response would be spontaneous
19  movements of his extremities.
20  Q.  Okay.  And then that would be -- the Glasgow
21  Coma Scale would be different than like a
22  neurological examination?
23  A.  Correct, it would be a -- an adjunct or a
24  piece of the neurological exam.
25  Q.  Okay.  How is -- how would be -- a Glasgow

## Page 31

1  Coma Scale be different than a neurological
2  examination?
3  A.  It depends on -- you know, there's varying
4  degrees of a neurological exam, but the GCS
5  itself is just a piece of that.  So a
6  neurological exam on top of that would
7  assess, I guess, for more focal deficits.
8  Q.  So, I mean, if you were looking for focal
9  deficit or any type of neurologic deficit,
10  would the Glasgow Coma Scale be the test that
11  you would use to determine that?
12  MR. DAY:  Object to form;
13  overbroad.
14  A.  No.  The Glasgow Coma Score is more of a
15  general assessment.
16  Q.  If you wanted to check for a focal neurologic
17  deficit, you would do a neurological
18  examination; is that fair?
19  A.  That's correct.
20  Q.  Do you know at what point in time, and if you
21  need to refer to the records, please do so,
22  at what point in time he scored a 15 on the
23  Glasgow Coma Scale within the emergency room?
24  A.  I don't know what time.  I'll have to look
25  and it might take a while 'cause I don't

## Page 32

1  know -- here it is, 0429.
2  Q.  So that would have been -- how long would
3  that have been before you actually saw the
4  patient?
5  A.  I would estimate about an hour.
6  Q.  So that -- I guess was he a Glasgow Coma
7  Scale of 15 when you saw him?
8  A.  I did not assess a GCS for him.
9  Q.  Do you know whether it was reassessed?
10  A.  I do not.
11  Q.  Essentially, at 4:30, at least, based on the
12  Glasgow Coma Scale, he was alert enough to
13  open his eyes, give a verbal response and had
14  a score of 15; correct?
15  A.  Correct.
16  Q.  And then when you saw him about an hour
17  later, he was asleep?
18  A.  Correct.
19  Q.  What role, if any, in your physical
20  examination does the fact that he had a prior
21  admission within hours of the Via Christi
22  admission for the same -- for the same
23  problem?
24  MR. DAY:  Object; that misstates
25  the evidence.

8 (Pages 29 to 32)

Page 33

1   A. Can you rephrase that, please.
2   Q. Absolutely.  The fact that he was at Wesley?
3   A. Yes.
4   Q. The day before?
5   A. Yes.
6   Q. At 6:00 in the evening?
7   A. Uh-huh.
8   Q. For nausea and vomiting and the diagnosis of
9       strep, what impact at all does that have on
10      your care of [ ]
11  A. I would say I don't know that it impacts the
12      care.  I would have -- I would have done the
13      same history and evaluation of the patient no
14      matter what prior care they had, I would say.
15      I mean, it would be taken into account, but I
16      don't think it changed my exam.
17  Q. Is there ever attempt, at least, from your
18      perspective that when a patient presents to a
19      different hospital that there's an attempt to
20      gather the records from the previous
21      admission?
22  A. I would say it depends on the specific
23      scenario.
24  Q. Okay.
25  A. Yeah.

Page 34

1   Q. It wasn't done in this case?
2   A. Correct.  We did not obtain records that
3       evening, and I don't know if it was done at a
4       later date.
5   Q. Do you think it was necessary, at least, from
6       your perspective to do a history and physical
7       examination to gather the records from Wesley
8       Medical Center?
9   A. In this specific scenario, I did not think it
10      was necessary.
11  Q. Have you been involved in a scenario where it
12      was necessary to gather records from a
13      different hospital?
14  A. Yes.
15  Q. And then how quickly are you able to obtain
16      those records?
17  A. Usually within a couple of hours, depending
18      on how busy things are on both ends.
19  Q. Is there anything that -- have you ever had a
20      situation where a patient presents to a
21      different hospital within a 24-hour period of
22      time where you guys could just pick up the
23      phone and talk to the treating provider at
24      the previous hospital?
25  A. I have done that with an obstetric patient,

Page 35

1       yes.
2   Q. Have you done that with a pediatric patient?
3   A. Not that I recall.
4   Q. We talked about your independent recollection
5       of D[ ]
6       When you walked in, you remember him
7       asleep; correct?
8   A. Correct.
9   Q. Was he -- was he moving at all?
10  A. He -- I don't -- I don't recall either way.
11      I do know that when I did my exam, he reacted
12      to the exam.  He never fully opened his eyes,
13      though.
14  Q. How did he react to your exam?
15  A. Moved his extremities to where I was touching
16      or wiggled around a little bit, you know,
17      just rustled around.
18  Q. And then how was he laying?
19  A. Just on his back.  Was laying in bed with his
20      head on the pillow from what I recall.
21  Q. And at that time -- and then you were in the
22      room for -- you did 15, 20 minutes of a
23      history and then you did about a 5-minute
24      exam, so you would have been in the room at
25      least 25 minutes; is that fair?

Page 36

1   A. That's my estimate, yes.
2   Q. And then who else was in the room -- did
3       anyone else come in the room during that 25
4       minutes?
5   A. Not that I recall either way.  I mean, I
6       don't know if somebody did or didn't.
7   Q. That's fine.  And during that 25 minutes, do
8       you recall having any conversations with any
9       other healthcare providers regarding D[ ]?
10  A. I do not recall either way.
11  Q. After -- and the purpose of your history and
12      physical examination is what?
13  A. The purpose of any history and physical is to
14      try to identify, you know, what illness or
15      what ailment the patient has and then develop
16      an assessment and plan to help treat that
17      patient.
18  Q. Then I take it your history and physical
19      examination is going to be independent of any
20      other history and physical examination that
21      he has had prior to that?
22  A. Correct.
23  Q. You're going to do your own independent
24      assessment?
25  A. Correct.

9 (Pages 33 to 36)

## Page 37

1  Q.  Even though he had a diagnosis of strep, you
2      were going to see whether there was any other
3      diagnoses that may come into -- may be into
4      play; is that correct?
5  A.  I think that, you know, with each specific
6      scenario you take into account the prior
7      diagnostics that have been done, and in this
8      scenario, I went into it with a diagnosis of
9      strep throat and -- and then built upon that.
10     Had there been red flags or things that came
11     up, you know, with any history and physical,
12     you're kind of developing a plan and a
13     differential as you're talking to the patient
14     or the parent and doing the physical exam.
15     With this case I didn't -- I didn't find
16     anything that would have led me to another
17     diagnosis.
18 Q.  But that's something certainly you would have
19     done, though.
20          If something -- if something was a red
21     flag, that's something that you would have
22     pursued?
23 A.  Yes.
24 Q.  Not only pursued, but you would have
25     discussed it with the senior resident?

## Page 38

1  A.  Yes.
2  Q.  And ultimately, you or the senior resident
3      would have discussed it with the attending
4      physician in this case, Dr. Bala; is that
5      correct?
6  A.  That's correct.
7  Q.  As far as you know, did Dr. -- did you ever
8      have a conversation yourself with Dr. Bala?
9  A.  I would have been the resident who called
10     Dr. Bala to talk about the patient.
11 Q.  Okay. And you would have talked to him, and
12     I think at the end of your note, it says that
13     you discussed it with Dr. Bala?
14 A.  Yes.
15 Q.  Do you have a specific recollection of that
16     conversation with Dr. Bala?
17 A.  Unfortunately, I do not.
18 Q.  Okay. Typically, in a situation like that
19     where you're admitting a patient from the
20     emergency room, how long would that
21     conversation last?
22 A.  It definitely depends on the specific case.
23 Q.  How about D███s case?
24 A.  So we have a -- basically a regimented way
25     of -- that we -- that we present to

## Page 39

1      attendings. And usually that takes awhile
2      'cause we have to go through the whole
3      history and everything. My guess would be
4      around five minutes on the phone or less.
5  Q.  When you say a regimented way --
6  A.  Yes.
7  Q.  Is that regimented way, is that reduced to
8      writing in terms -- is that reduced to
9      writing in any way?
10 A.  Can you rephrase that.
11 Q.  Yeah, that's a bad question.
12          Is there a document that you follow
13     that says, hey, these are the things that we
14     go through and we talk to the attending
15     physician about our history and physical
16     examination.
17 A.  No, not that I'm aware of. It's more of a
18     built-in culture in medicine, and it's a
19     formal presentation to the attending.
20 Q.  Excellent. So just walk me through the
21     regimented way or the formal presentation.
22 A.  Sure. You can actually follow a H & P, and
23     that pretty much guides you through the
24     presentation to the attending.
25          So typically you'll start out with the

## Page 40

1      patient's name and age and presenting
2      complaint. And then you give the HPI. You
3      tell the attending basically what's been
4      going on with the patient.
5          You then go through past medical
6      history, past surgical history, any
7      allergies, medications that they're on.
8          And then I would have discussed my
9      physical exam and findings, any diagnostics
10     or labs that had been done. And then at that
11     point, I would have gone into my assessment
12     and plan.
13 Q.  Did you order any diagnostics?
14 A.  I don't recall. I don't believe I did.
15 Q.  Do you order any labs?
16 A.  No, the labs were ordered by the emergency
17     room.
18 Q.  Was there concerns, at least, from your
19     standpoint when you saw D███ that he was
20     dehydrated?
21 A.  He had received a full fluid bolus, 20
22     milliliters per kilogram, before I saw him.
23     And so when I saw him, he was mildly
24     dehydrated at best -- or at worst, I guess.
25 Q.  And how would you make the determination that

10 (Pages 37 to 40)

## Page 41

1       he was mildly dehydrated at that time?

2  A.  Sure.  With dehydration, there's varying

3     degrees, anywhere from not dehydrated to

4     severe dehydration.  And there are exam

5     findings that you would look for that could

6     guide you towards a diagnosis.  For mild

7     dehydration, oftentimes, it's just history

8     alone of nausea, vomiting, decreased PO

9     intake.

10       When you get to moderate or severe

11    dehydration, you start seeing physical exam

12    findings.

13  Q.  So beyond physical exam findings, can you --

14    are there laboratory values that play a role

15    in making a determination of whether a

16    patient is dehydrated or not?

17  A.  Yes.

18  Q.  What --

19  A.  They can play a role, yes.

20  Q.  Sorry to talk over you.

21       What lab -- what specific lab values

22    assist you in making a determination whether

23    a patient is dehydrated?

24  A.  Lab values?

25  Q.  Yes, sir.

## Page 42

1  A.  Okay.  Lab values:  It would depend.  So with

2     a history of nausea and vomiting, sometimes

3     you can get electrolyte disturbances, but

4     that doesn't necessarily tell you a degree of

5     dehydration.

6       You could also -- for dehydration,

7     sometimes you can look at the urine and look

8     at the specific gravity of the urine, the

9     concentration of the urine.

10  Q.  Do you -- in D█████s case, do you know

11    whether anybody observed his urine?

12  A.  Not that I'm aware of.

13  Q.  Okay.  Back to your independent recollection.

14    You talked about D████

15       Did D████ pretty much remain asleep

16    at -- on an exam table in the ER the whole

17    time you were there?

18  A.  From my recollection, yes, he was -- he was

19     asleep during my encounter.

20  Q.  And then tell me, I mean, just your

21    observations of him.

22       I mean, what did he look like?

23       Did he look like he was ill?

24       I mean, tell me your thoughts on that.

25  A.  Sure.  And, you know, to me he looked like a

## Page 43

1     well -- so we define degrees of illness.

2     Especially in the pediatric population, we

3     like to determine if they are ill-appearing

4     or toxic-appearing.  For me, he was -- he was

5     well appearing.  He appeared well hydrated,

6     actually, when I saw him and just looked like

7     a kiddo that was exhausted after being awake

8     all night.

9  Q.  Do you know if he had been -- do you know

10    whether he had been awake all night?

11  A.  Do you mind if I look in my --

12  Q.  Absolutely.  If you need to refer to those

13    medical records at anytime, please do so.

14  A.  Yeah.  In Dr. White's addendum, she mentioned

15     that he's very sleepy, didn't get sleep at

16     all until getting meds in the ED around 3:00

17     a.m.

18  Q.  Okay.

19  A.  So that's where I had that in my mind.

20  Q.  Do you -- do you remember -- we talked

21    about -- back to your independent

22    recollection discussion with mom.

23       Can you -- I mean, do you have a

24    picture in your mind like right now where

25    you're talking to her?

## Page 44

1       I mean, do you remember that?

2  A.  Yes.

3  Q.  And how would you describe her demeanor at

4    the time?

5  A.  Mom was tired, but she was -- she was calm.

6     She was sitting in a chair, and I sat down to

7     chat with her, and I remember it was a very

8     calm conversation.

9  Q.  And then in your history and present illness,

10    do you think it encompasses everything that

11    you guys discussed?

12  A.  I believe it does.  I try to include

13     everything when I'm talking to a patient.

14  Q.  Do you recall any other facts or history that

15    she told you that are not in your history of

16    present illness in your charting?

17  A.  I do not.  I do not recall any other

18     information.

19  Q.  You knew that she went to Wesley; correct?

20  A.  Correct.

21  Q.  And you knew that they diagnosed D███ with

22    strep throat?

23  A.  Correct.

24  Q.  And that they tried to give D████ oral

25    antibiotics?

11 (Pages 41 to 44)

## Page 45

1    A. Correct.

2    Q. And that he threw up multiple times?

3    A. Correct.

4    Q. Were you aware that they called other

5    facilities about D███s condition?

6    A. I did not get that history.

7    Q. Were you aware that they were concerned that

8    his strep may have converted over to

9    meningitis?

10         MR. DAY: I'm going to object to

11    form to the extent there's an assumption.

12    You can ask him if he was told that. Well,

13    you can ask whatever you want, but I

14    object --

15         MR. GIROUX: I understand your

16    objection.

17         MR. DAY: Yeah.

18         MR. GIROUX: Yeah.

19    A. Can you repeat the question, please.

20    BY MR. GIROUX:

21    Q. Yeah. Did you know that mom was concerned

22    about meningitis?

23         MR. DAY: Same objection.

24    A. I did not know that.

25    Q. Did the word meningitis, was that ever

## Page 46

1    mentioned to you?

2    A. No.

3    Q. Have you ever -- at least by that time, have

4    you ever provided care to a patient -- a

5    pediatric patient who had meningitis?

6    A. I don't know for sure if I had treated a

7    patient with meningitis, but I know that I

8    had evaluated a patient for meningitis.

9    Q. Let me change it up with you.

10    Have you -- let's say prior to March

11    6th of 2017, what would have been your

12    experience with pediatric patients who

13    presented with elevated intracranial

14    pressure?

15    A. That's tough to say. I would guess that I --

16    or I would say that I probably had not seen

17    any cases of elevated intracranial pressure

18    in a pediatric case, but I'd -- I would have

19    received lectures and things on that.

20    Q. How about adult cases of elevated

21    intracranial pressure?

22    A. I don't think I had encountered that.

23    Q. Okay. And I just want to make my question

24    more broad.

25    Had you ever, let's say, prior to

## Page 47

1    March 6, 2017, to the best of your

2    recollection, ever been involved with a

3    diagnosis of a patient with elevated

4    intracranial pressures?

5    A. I don't think so.

6    Q. By the time that you saw D██ at 5:18 or

7    5:30, whatever the time is, do you know

8    whether D███was tested for any type of

9    neurologic deficit?

10         MR. YOUNG: Object to form;

11    overbroad.

12         MR. DAY: Join.

13    A. I don't know.

14    Q. Okay. Based on your review of the ER records

15    in preparation for this deposition, can you

16    see anywhere within the ER record, which you

17    would have reviewed before you saw D██

18    whether any testing was done to see whether

19    he was neurologically intact?

20    A. Sure.

21         MR. YOUNG: Object to form.

22         MR. DENNING: Other than the

23    Glasgow Coma Scale?

24         MR. GIROUX: Other than the

25    Glasgow Coma Scale.

## Page 48

1         MR. DAY: Take the time to look

2    through it if he's going to ask you about it,

3    about the record.

4    A. Okay. Can you repeat the question, please.

5    BY MR. GIROUX:

6    Q. Yeah. Based on your review of the emergency

7    room charting, which you would have reviewed

8    prior to seeing D██?

9    A. Yes.

10    Q. Other than the Glasgow Coma Scale, was D██

11    evaluated for any type of neurologic deficit?

12         MR. DAY: I'm going to object.

13    The question really keeps changing. Object

14    to form.

15         MR. YOUNG: And foundation.

16    A. Other than a general assessment of the child,

17    I don't know that a full neurological exam

18    was done.

19    Q. And then what would be a full neurologic

20    examination?

21    A. Sure.

22         MR. YOUNG: Object to form.

23    A. I would say that also kind of depends on

24    which provider that's coming from.

25    Q. How about from you on March 6 of 2017.

12 (Pages 45 to 48)

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105           WICHITA, KANSAS

316.267.8200          67202

## Page 49

1     A.  If I were to do a -- as a family medicine
2     resident do a full neurological exam.
3     Q.  Yes, sir.
4     A.  Okay.  That would include the GCS.  It would
5     include testing the cranial nerves, testing
6     the patient's motor and sensory function and
7     cerebellar function.
8     Q.  And -- and if a person has elevated -- If a
9     patient has elevated intracranial pressures
10    and you suspect that, you would do a full
11    neurological examination?
12    A.  Yes, in that scenario I would.
13    Q.  Why?
14    A.  Well, an elevated intracranial pressure is
15    very dangerous.  The skull is a rigid
16    structure and the brain doesn't have anywhere
17    to go other than herniating down so it's --
18    it can be a emergent thing.
19    Q.  And what would be -- let me put it this way:
20    Did you do a -- prior to March 6 of 2017, had
21    you done a full neurological examination of a
22    patient?
23    A.  Yes.
24    Q.  Have you done a full neurological examination
25    of a patient for purposes of ruling out

## Page 50

1     intracranial pressure?
2     A.  Not specifically.
3     Q.  How about for stroke?
4     A.  Yes.
5     Q.  Okay.  And as it relates to intracranial
6     pressures, what would be some of the common
7     signs that you would see in doing a full
8     neurological assessment of a patient?
9          MR. DAY:  Object to form;
10    overbroad.
11    A.  One of the findings you could see is
12    papilledema if you look in the eyes.
13    However, I will say that I think general
14    practitioners are not the best at assessing
15    that.  Usually a neurologist or a
16    neurointensivist would be better at
17    evaluating that.
18    Q.  Why would they be better -- better at
19    evaluating that?
20    A.  Sure.  With that being a specialty, they do
21    that a lot more often than, say, a family
22    practice resident.
23    Q.  You would do -- in a situation like that
24    where you suspect it, you would do a full
25    neurological assessment, and then if there

## Page 51

1     were some signs that were alarming to you,
2     you would consult with neurology?
3     A.  Depending on the scenario, yes.  If there was
4     a focal neurological deficit or something
5     concerning, I would typically talk to the
6     attending doctor and discuss it with them and
7     if the decision was made to consult, then we
8     would.
9     Q.  Okay.  So I want to shift back over to your
10    independent recollection.  We talked about
11    the time period that you were in with mom and
12    saw D█████  We talked about what you recall
13    about the conversation with Dr. Bala.
14          Do you remember any conversations that
15    you had with Dr. White after your history and
16    physical examination?
17    A.  Unfortunately, I don't have any independent
18    recollection of my conversation with
19    Dr. White.
20    Q.  Is there anything in the record that would --
21    that would -- was anything written in the
22    record regarding your conversation?
23          Not saying that there's supposed to be
24    but --
25    A.  I don't -- no, I don't believe there's

## Page 52

1     anything in the record about me discussing it
2     with Dr. White, other than her addendum
3     saying that she saw the patient, as well.
4     Q.  When you saw -- when you saw D███ at 5:18
5     or 5:15, whenever the time was, was that the
6     only time that you saw him?
7     A.  Yes.
8     Q.  Okay.  And so would have been that 25-minute
9     plus time period would have been the only
10    time that you saw him?
11    A.  That's correct.
12    Q.  And is my understanding that Dr. White saw
13    D███ subsequent to your history and
14    physical examination?
15    A.  Yes, from what I recall.
16    Q.  Okay.  And is that common that the first year
17    resident would do the admit and then the
18    second year or the third year, whatever she
19    was, would come in and do her own or his own
20    history and physical examination?
21    A.  Yes, that's very common.
22    Q.  Okay.  You weren't in the room when she did
23    her history and physical examination?
24    A.  No, I was not.
25    Q.  Would you have discussed with her D███

13 (Pages 49 to 52)

## Page 53

1  before her examination or after or both?
2  A. Usually both.
3  Q. Okay. And in this case, we talked about
4  after your history and physical examination
5  not having a recollection of discussions with
6  her.
7  How about after her history and
8  physical examination?
9  A. I have no recollection of our conversation.
10  Q. What's your understanding of her -- what's
11  your understanding of D███'s condition when
12  she did her history and physical examination?
13  A. My understanding is that it was -- his
14  condition was unchanged from when I saw him.
15  Q. Unchanged meaning what, specifically?
16  A. Meaning that he was still sleeping.
17  Q. Do you know whether she did a physical
18  examination of D███?
19  A. She did do a physical exam, yes.
20  Q. And do you know whether she would have
21  discussed those physical exam findings with
22  you?
23  A. She would have discussed -- she definitely
24  would have discussed discrepancies if there
25  were any; or, she would have just said yes, I

## Page 54

1  agree with your exam.
2  Q. Did she agree with your exam?
3  A. Yes, she would have documented any
4  discrepancies.
5  Q. And then the way the notes are written, it
6  looks like you kind of have a -- what I would
7  consider a true SOAP note, and her note is
8  just an addendum.
9  It looks like she's not repeating a
10  whole lot of what you've done; is that fair?
11  A. That's correct.
12  Q. Tell me -- and you've served as -- you
13  probably are serving in that role as a senior
14  resident right now; correct?
15  A. Correct.
16  MR. DAY: I want to be clear on
17  your question before, I didn't have a chance
18  to jump in yet. Were you asking whether the
19  note doesn't repeat or whether he -- whether
20  the exams weren't repeated? I think the
21  question was unclear as to --
22  MR. GIROUX: Okay. Yeah.
23  BY MR. GIROUX:
24  Q. Let me just retract. Just clear that up.
25  A. Okay.

## Page 55

1  Q. Her note looks a lot different than yours;
2  okay? Correct?
3  A. Yes.
4  Q. You look like you have a traditional SOAP
5  note where you do the history and physical
6  examination, the review of systems, you do
7  the physical examination, and you do your
8  assessment and plan.
9  Her note doesn't follow that
10  structure; is that correct?
11  A. Yes, that's correct.
12  Q. Tell me why that is.
13  A. So it's the senior resident's role to
14  basically confirm the findings of the intern
15  resident. And usually what the senior
16  resident will do is exactly what Dr. White
17  did where she'll summarize the case and in
18  the plan of care.
19  Q. So when you're seeing a patient and if
20  something were -- if red flags were -- if you
21  spotted red flags that this patient needed a
22  consult from a specialist, is that something
23  that you could do?
24  A. Yes.
25  Q. Okay. You can order a consultation?

## Page 56

1  A. Yes, I would typically discuss it with senior
2  resident and the attending, but yes.
3  Q. Very well. And then if you felt that the
4  patient needed, let's say, some imaging,
5  whether it's an MRI or a CT, is that
6  something that you could order?
7  A. Yes.
8  Q. And is that with the same caveat that you
9  would typically discuss it with the senior
10  resident or the attending?
11  A. Definitely, especially in a pediatric case.
12  Q. And then in terms of if you thought the
13  patient was more sick based on your history
14  and physical examination, if you felt that
15  the patient didn't need to go to the
16  pediatric floor, but needed to go to the
17  PICU, you as the first year resident, are you
18  able to order that?
19  A. Yes, and again, with the caveat that I would
20  discuss that with the senior resident and the
21  attending.
22  Q. Let's say after Dr. White's examination, I
23  think, according to her record, she saw
24  D███ maybe around 6:15.
25  Do you -- do you have an independent

14 (Pages 53 to 56)

## Page 57

1  recollection of anything that occurred
2  thereafter?
3       Kind of a broad question, but -- and
4  I'm just going to open it up to the whole
5  hospitalization to the 15th.
6  A.  Can you repeat the question, please.
7  Q.  Yeah.  Do you have independent recollection
8  of D____'s care while at Via Christi after
9  Stefanie White did her examination of him?
10  A.  No.  After I saw him, I was not involved in
11  his care.
12  Q.  Okay.  Did you learn about his condition
13  subsequently?
14  A.  Yes.
15  Q.  Tell me how you learned about his condition
16  subsequently.
17  A.  I don't remember specifically how I learned
18  it, but I know that next night when I came in
19  for my shift, it was relayed to me what
20  happened.
21  Q.  Okay.  What was relayed?
22  A.  That D____ had to be moved to the pediatric
23  intensive care unit because he had a
24  respiratory arrest on the floor and that the
25  imaging found a brain mass.

## Page 58

1  Q.  And do you remember who you spoke to about
2  that?
3  A.  I don't recall.  It would have been whoever
4  was the resident on call that day.
5  Q.  So you learned about the mass in his head?
6  A.  Yes.
7  Q.  Did you eventually learn about a stroke that
8  he may have had?
9  A.  I don't recall if I learned that at that
10  point or when reviewing the records for this.
11  Q.  Okay.  And then I take it, and we'll take a
12  break here in a second, but as it relates to
13  opinions regarding the stroke, when the
14  stroke occurred and what caused the stroke,
15  are you going to have any opinions regarding
16  that?
17  A.  No.
18       MR. YOUNG:  Object to form.
19       MS. WOODS:  Join.
20       MR. DAY:  And again, I'm going to
21  note for the record that it's -- that's
22  actually my decision, but he has correctly
23  answered.  He is not going to act as a
24  causation expert in this case.
25       MR. GIROUX:  Okay.

## Page 59

1  BY MR. GIROUX:
2  Q.  Other than that discussion where you learned
3  that he was in the pediatric intensive care
4  unit and that imaging revealed a mass, did
5  you -- do you have an independent
6  recollection of any other conversations
7  regarding D____ M____ during that
8  hospitalization that we haven't discussed?
9  A.  I do not.
10  Q.  And once your care was provided to D____ on
11  the morning of the 6th for that 25 minutes
12  and you discussed it with Stefanie White
13  after her exam, your care of D____ ceased?
14  A.  Correct.
15  Q.  Why don't we take about a 5-minute break.
16  We've been going at it about an hour; okay?
17  A.  Okay.
18       VIDEOGRAPHER:  Off the record at
19  10:00 o'clock.
20       (A recess was taken from 10:00 a.m. to
21  10:11 a.m.)
22       VIDEOGRAPHER:  Back on the record
23  at 10:11.
24  BY MR. GIROUX:
25  Q.  Doctor, just a few followup questions from

## Page 60

1  some previous testimony.
2       You indicated that when you talked to
3  Kelli Morgan that you were using your laptop?
4  A.  Yes.
5  Q.  Was that your own personal laptop?
6  A.  No.
7  Q.  That's a laptop that was assigned to you
8  through the residency program?
9  A.  Yes.
10  Q.  Okay.  And then that laptop, you can access
11  records from your laptop?
12  A.  Yes.  It's the Cerner, yeah, medical record.
13  Q.  So for example, when Dr. White called you and
14  said that there is a patient that's going to
15  be admitted to the pediatric floor, you would
16  have been able to utilize that laptop to look
17  at the emergency room records?
18  A.  Yes.
19  Q.  And then we talked a little bit about
20  elevated intracranial pressure and you
21  indicated that your experience, at least, by
22  that time on March 6 of 2017 was really
23  through lectures through medical school; is
24  that correct?
25  A.  Correct.

15 (Pages 57 to 60)

Page 61

1  Q.  What is your understanding of some of the
2  common signs and symptoms of elevated
3  intracranial pressure in a pediatric patient?
4       MR. DAY:  Object to form;
5  overbroad.
6  A.  Sure.  I don't know that I had lectures
7  specifically for the pediatric population,
8  but for elevated intracranial pressure you
9  could see variations in vital signs, and then
10  papilledema and neurological deficits.
11  Q.  So let's talk about abnormalities in vital
12  signs.
13       What type of abnormalities would there
14  be?
15  A.  If I recall correctly, you can see increased
16  blood pressure with bradycardia.
17  Q.  How about respiratory rate?
18  A.  It can be depressed.
19  Q.  How about temperature?
20  A.  I'm sure it can be affected.  I don't know --
21  I couldn't say for certain.
22  Q.  And then neurologic deficits, what type of
23  neurologic deficits would you see?
24  A.  I think that can vary, as well.
25  Q.  What would be some kind of common signs and

Page 62

1  symptoms?
2       MR. DAY:  Object to form.
3  BY MR. GIROUX:
4  Q.  What would be some common neurologic deficits
5  that you would expect to see?
6  A.  Decreased mental status, may have weakness in
7  an extremity, but it definitely could vary.
8  Q.  And what would be the, I guess, spectrum of
9  some general common symptoms that you would
10  expect a person to manifest who has elevated
11  intracranial pressure?
12       MR. DAY:  Object to form;
13  overbroad.
14  A.  Can you repeat that, please.
15  Q.  What would be some symptoms of an individual
16  who had -- what would be signs and symptoms
17  that the body would manifest in a patient
18  with elevated intracranial pressure?
19       MR. DAY:  Same objection.  Go
20  ahead.
21  A.  Yes.  You can see multiple things and it can
22  vary, but definitely a altered mental status,
23  decreased mental status.  You could have
24  headache, vision changes, nausea, vomiting,
25  and any -- any number of neurological

Page 63

1  problems.
2  Q.  How about dizziness?
3  A.  Sure.  Yeah.
4  Q.  How about balance issues?
5  A.  Yes.
6  Q.  Is elevated intracranial pressures, is that a
7  medical emergency?
8       MR. DAY:  Object to form.
9       MR. YOUNG:  Object to form.
10  A.  Yes, it would be something you would want to
11  address very quickly.
12  Q.  Why is that?
13  A.  Kind of mentioned it earlier.  The skull is a
14  rigid structure.  It does not allow the brain
15  to -- when it's swelling or if there's
16  elevated pressures, there's nowhere for the
17  brain to go other than herniating down
18  through the spinal column, which can be
19  catastrophic.
20  Q.  In looking at your note, that's something
21  that you didn't suspect, elevated
22  intracranial pressures; is that right?
23  A.  Correct, I did not.  I did not suspect that.
24  Q.  You didn't actually -- in review of your
25  note, and you can correct me if I'm wrong,

Page 64

1  you didn't suspect any abnormalities within
2  the -- within the head?
3  A.  Can you rephrase that, please.
4  Q.  Yeah.  There was no head pathologies or --
5  that you were -- that was on your
6  differential that you considered?
7  A.  The phrasing of that kind of confuses me a
8  little bit.
9  Q.  Let me -- I want to make sure that we make a
10  good record.
11  A.  Okay.
12  Q.  Did you establish a differential diagnosis?
13  A.  Whenever I'm seeing a patient, a differential
14  is kind of developing as I'm seeing the
15  patient.
16  Q.  Is it kind of a fluid task?
17  A.  Yeah, a fluid task, yeah.
18  Q.  So let's say at the end of your physical
19  examination, did you have a -- did you
20  develop your own differential diagnosis at
21  that time?
22  A.  I would have.  I do for every patient, yes.
23  Q.  What would it have been in D███'s case?
24  A.  It's tough to say what I was thinking at that
25  exact time.  I don't have any independent

16 (Pages 61 to 64)

## Page 65

1    recollection of what I was thinking at the
2    time that I saw him, but based on my note,
3    whatever differential was going through my
4    mind, everything -- taking into consideration
5    everything that we knew about D███ at the
6    time, my differential led me to yes, this is
7    a kiddo with strep throat, who can't keep his
8    medications down, who's been awake for a long
9    time and is sleepy and needs some rest and
10   some -- got some IV fluids in the ER.
11   Q.  So in a situation like D███ where you're
12       called to do the admit onto the pediatric
13       floor and you're tasked with gathering your
14       own history and physical examination, is it
15       common for you, as a matter of habit, routine
16       and custom for you to see whether there's any
17       neurologic deficit?
18   A.  I wouldn't say that you do a full
19       neurological exam on every patient, if that's
20       what you're asking.
21   Q.  Okay.  What type of neurologic assessment
22       would you do?
23   A.  Sure.  With any history and physical, we like
24       to have at least a general physical exam.
25       And we always do the exam that we deem

## Page 66

1    appropriate for that specific scenario.
2        For D███ he was sleeping.  And, you
3    know, given the scenario and everything that
4    had led up to the point from when I was
5    seeing him, he, to me, was a sick kiddo, who
6    was finally asleep after being awake most of
7    the night.  And so for completeness sake, we
8    would have done a brief neurological exam.
9    And usually in a general physical exam,
10   that's just saying yes, the patient is moving
11   their extremities in a normal manner and
12   there's nothing grossly abnormal.
13       For him, he was sleeping, and so I
14   wasn't really able to evaluate that, and I
15   didn't think it was appropriate to wake him
16   up for that at that time.
17   Q.  Okay.  So if he was awake, you would have
18       done a general physical exam of D███ which
19       would include a brief neurological
20       examination; is that right?
21   A.  Yes.
22   Q.  And then that brief neurological examination
23       would consist of what?
24           What, actually, would you do?
25   A.  Typically, it is -- like I said, we're

## Page 67

1    looking for gross deficits, meaning looking
2    from kind of like a bird's eye view:  Is
3    there anything grossly abnormal.  So I would
4    make sure that he could move all of his
5    extremities.  And typically, if they're awake
6    and alert, they can stand up and you can --
7    usually I assess gait for patients just as
8    they're walking around the exam room.  But I
9    would not -- for a general exam, I would not
10   go into very specific testing.
11   Q.  That's fine.  But for the brief neurological
12       exam, you would have him stand up?
13   A.  Generally.
14   Q.  Okay.  And then you would also assess their
15       gait while they're -- have them walk?
16   A.  Typically.
17   Q.  And then what would be the importance -- what
18       would you see -- why do you ask him to stand
19       up or why would you want to access their
20       gait?
21   A.  Sure.  Gait can be affected for various
22       reasons.  It could be in the extremities,
23       pathology in the extremities, but it could be
24       central, as well.  So it can -- you can
25       assess for possible CNS problems.

## Page 68

1    Q.  And that's something that you wanted to do
2        with D███ correct?
3    A.  No.
4            MR. DAY:  Object to form.
5    A.  I don't believe so.
6    Q.  You wanted to do a brief neurologic exam of
7        him; right?
8    A.  For completeness sake of the history and
9        physical, yes.
10   Q.  But you weren't able to do that because he
11       was sleeping?
12   A.  Correct.
13   Q.  And then is it your understanding that --
14       what is your understanding as to the type of
15       neurologic exam that Dr. White wanted to do?
16   A.  I actually don't know what kind of
17       neurological exam she wanted to do.
18   Q.  Do you know whether she did any type of
19       neurological examination based on your review
20       of the records?
21   A.  So she did kind of a brief exam where asleep,
22       but will wake to stimuli, rub his eyes and
23       push examiner's hand away.  So that would be
24       a very, like, again, kind of a brief -- a
25       brief exam.

17 (Pages 65 to 68)

Page 69

1  Q.  Do you know whether a brief exam was done
2      other than the Glasgow Coma Scale in the
3      emergency room?
4  A.  I don't know what all they did in the
5      emergency room.  What's documented is that
6      the provider notes that the patient is
7      sleepy.
8  Q.  Did you know whether D███ -- is it your
9      understanding -- let me ask:  Do you know
10     what time the rapid response or the code was
11     called?
12 A.  I don't.  I would have to look in the record
13     to tell you exactly when that was.
14 Q.  I'm going to represent to you it was
15     approximately 10:00 a.m. in the morning.
16 A.  Okay.
17 Q.  As far as you know, based on your review of
18     the records, do you know whether D███ stood
19     at anytime or asked to stand at anytime from
20     the time he was admitted to Via Christi up
21     and to the time of the code?
22 A.  I don't know.
23 Q.  Do you know whether he was asked to ambulate
24     during that time period?
25 A.  I don't know.

Page 70

1  Q.  Now if we can go to your note on Page 15.
2  A.  Sure.
3  Q.  And I just want to start off with the history
4      of present illness.
5  A.  Yes.
6  Q.  The first line that D███M███ is a
7      previously healthy 5-year-old male who
8      presented to the ED with nausea and vomiting,
9      I take it, is that information that you would
10     have received from your review of the medical
11     chart or from mom?
12 A.  Both.
13 Q.  Okay.  And then the patient was diagnosed
14     with group A strep pharyngitis at Wesley at
15     6:00 p.m. on Sunday and sent home with
16     amoxicillin 480 milligrams -- was that as
17     needed every --
18 A.  BID, twice a day.
19 Q.  Twice a day for 10 days.
20         Is that information that you would
21     have received from mom or from the record?
22 A.  It would have -- I don't know for sure.  It
23     probably was from mom.
24 Q.  And I take it by March 6th of 2017 that you
25     provided care to many pediatric patients who

Page 71

1      had strep?
2  A.  Yes.
3  Q.  Did you provide care to patients who had
4      multiple admissions to hospitals who had a
5      diagnosis of strep?
6  A.  Not that I recall either way.
7  Q.  In terms of characterizing D███'s strep,
8      would you consider it more on the severe side
9      or more of a mild case of strep?
10         MR. DAY:  Object to form.
11         MR. YOUNG:  Object to form.
12         MR. DAY:  Foundation.
13 A.  I would say that any kiddo with dehydration
14     and inability to keep medications down is --
15     you would consider worse than a kiddo that
16     can.  So a kid that needed to come in because
17     they're dehydrated or can't keep medications
18     down is probably more severe than one who
19     can.
20 Q.  Did it worry you at all that he did have a
21     prior hospitalization for strep and now he's
22     not getting better and he's back at a
23     different hospital?
24         MS. COLE:  Object to form.
25         MR. DAY:  Object to form.

Page 72

1  A.  I don't think it specifically worried me,
2      only because we -- it's not uncommon to see
3      that in the pediatric population where we
4      have kids who have either showed up to clinic
5      or to an urgent care and then present to the
6      emergency room because they're still not
7      better and just need IV fluids or just a
8      little bit more support.
9  Q.  Do you remember talking to mom at all, you
10     know, once -- now that you reviewed your
11     note, about, you know, when you were at
12     Wesley, why didn't you go back to Wesley, why
13     are you coming -- why are you coming to Via
14     Christi?
15 A.  I don't recall if I asked her that question.
16 Q.  Is that something that you would have asked?
17 A.  I typically would ask that, yes.  I usually
18     say, okay, what made you come in this time?
19     What brought you in this time?
20 Q.  And then you understand that the Wesley
21     admission, that was at 6:00 p.m. on a Sunday
22     evening?
23 A.  Yes.
24 Q.  Did you ask her what led to the Wesley
25     admission?

18 (Pages 69 to 72)

## Page 73

1   A.  I don't recall what I specifically asked.

2   Q.  Do you know whether they were in a rush to

3   get to Wesley, whether they considered it

4   emergency?

5   A.  I did not get that history from the mother.

6   Q.  And then the note says:  Patient took one

7   dose, but was unable to keep it down.  Mother

8   states he vomited three or four times after

9   leaving Wesley.  She was worried about

10   getting treatment for his strep and thought

11   that he might be dehydrated so they brought

12   him to St. Francis ED.

13        I take it that that's information you

14   would have gathered completely from mom?

15   A.  Yes.

16   Q.  And then the next sentence:  Patient's mother

17   states that she is unsure when the symptoms

18   started.  She talks about patient's sister

19   who had tonsillectomy, and that line is

20   something that you would have received

21   completely from mom, as well?

22   A.  Yes, I believe so.

23   Q.  And then it says:  Nausea and vomiting

24   started on Friday, intermittent throughout

25   the weekend; is that correct?

## Page 74

1   A.  Yes, that's what it says.

2   Q.  Did you get any more detailed information

3   from mom about, well, how often was he

4   nauseated, how often was he vomiting

5   throughout the weekend?

6   A.  If I would have obtained that information, I

7   would have written it in the HPI.

8   Q.  Do you think based, I mean, on your normal

9   custom, habit and routine that when mom is

10   telling you that, well, he's been nauseated

11   and vomiting over the weekend that you would

12   have followed up with questions about that?

13   A.  Yes.

14   Q.  And then -- and then, at least, from your

15   perspective in providing care to D████, did

16   you attribute the nausea and vomiting that

17   started on Friday and that was intermittent

18   throughout the weekend to strep?

19   A.  I did.

20   Q.  Did you ever ask mom whether D████ had a

21   fever?

22   A.  I believe I did, yes.  Mom denied fever.

23   Q.  Did that cause you any concern about the

24   diagnosis of strep that he was a patient that

25   had nausea and vomiting but no fever?

## Page 75

1   A.  No, I don't believe I was worried about that.

2   Q.  And then -- and then in terms of your

3   evaluation of -- how is strep diagnosed?

4   A.  It's a clinical diagnosis and typically

5   you'll do a throat swab to obtain a culture

6   and make sure.  So they have rapid strep

7   swabs that can tell you negative or positive.

8   Q.  And then, typically, what type of physical

9   findings would you -- would you expect?

10   A.  You can see enlarged erythematous tonsils

11   with exudate.  And you can --

12   Q.  I'm sorry.  Go ahead.

13   A.  And also, typically, you can have

14   lymphadenopathy and fever can be associated,

15   as well.

16   Q.  In terms of physical findings that were

17   consistent with a diagnosis of strep, what

18   physical findings did you make that were

19   consistent with the diagnosis?

20   A.  Sure.  I noted that the posterior oropharynx

21   was mildly erythematous.

22        REPORTER:  I'm sorry.  Start

23   over.  Start over.

24   Q.  Those are big words for him.

25   A.  Okay.  I noted that the posterior oropharynx

## Page 76

1   was mildly erythematous and that was the

2   extent of the findings.

3   Q.  In layman's terms, what does that mean?

4   A.  That the back of the throat was red.

5   Q.  Okay.  And then if we continue on with your

6   history and physical, it says:  On Sunday,

7   patient complained of headache, dizziness and

8   worsening nausea and several episodes of

9   emesis.

10   A.  Uh-huh.

11   Q.  Okay.  What information did you learn from

12   mom regarding the headache?

13   A.  So in this -- in this case, the headache, the

14   dizziness, those were basically part of my

15   review of systems that went into the HPI.  It

16   wasn't something that mom focused on.  And

17   she was more concerned about him getting

18   treatment for the strep and making sure he

19   wasn't dehydrated.  And so that was more of a

20   review of systems where you typically -- you

21   don't always dive into each thing fully, if

22   that makes sense.

23   Q.  So mom was focused more on the nausea and

24   vomiting?

25   A.  She was concerned about him getting treatment

19 (Pages 73 to 76)

## Page 77

1     for the strep, yeah.

2   Q. Mom wasn't as focused about the headache and

3     the dizziness?

4   A. Not during my encounter with her.

5   Q. Were you at all concerned about the headache

6     and dizziness?

7   A. For me, it was consistent with what we knew

8     already, and so it didn't make me anymore

9     concerned.

10   Q. Did you ask questions about the headache, the

11     nature and extent, the location, the duration

12     of the headache?

13   A. I don't believe I did.

14   Q. You don't think you did?

15   A. I don't know if I did or didn't. It's not

16     documented in my HPI.

17   Q. Okay. I would -- and you just correct me if

18     I'm wrong: If you got a mom there that

19     you're talking to for 15 or 20 minutes and

20     she mentions that this is her second

21     hospitalization, that he's been diagnosed

22     with strep, but he also had headache and

23     dizziness, to me, that is -- you know, as a

24     father, that's something that I would expect

25     somebody to follow up on.

## Page 78

1     Do you think you would have followed

2     up on those symptoms?

3     MR. DAY: Object to the form of

4     the question. What you would think as a

5     father is irrelevant. The question's

6     inappropriate.

7   A. Can you repeat that, please.

8   Q. Did you followup on the complaint of

9     headache?

10     MR. DAY: Object as asked and

11     answered. He said he doesn't remember.

12   A. Right. I don't recall specific questions

13     that I asked the mom.

14   Q. How about dizziness?

15   A. I don't recall specific questions that I

16     asked about the dizziness.

17   Q. Okay. Would it be your normal habit, custom

18     and routine that if somebody presents with a

19     complaint of headache and dizziness that you

20     would followup with questions regarding those

21     complaints?

22   A. If that was their chief complaint, yes.

23   Q. Okay. And if it wasn't their chief

24     complaint?

25   A. So it depends on the scenario. If -- as

## Page 79

1     you're interviewing a patient or a patient's

2     parent, if the review of systems is

3     consistent with the information that you're

4     already gathering, and it all fits into a

5     diagnosis, you don't always ask a whole tree

6     of questions for every review of systems,

7     positive finding, because that can lead to

8     tons of rabbit holes.

9   Q. Do you know why she presented to Wesley?

10   A. I don't recall asking or not asking that

11     question. I don't know.

12   Q. And then how about the worsening nausea, did

13     you get more details about the worsening --

14     worsening nausea?

15   A. I don't recall specifics of the conversation.

16     Reading through the chart, it looks like, you

17     know, he vomited three or four times after

18     leaving Wesley that night.

19   Q. And then the next paragraph: Per mother,

20     patient did complain of bilateral knee pain

21     prior to arrival.

22     I mean, did you do assessment of the

23     knees?

24   A. I did. "Bilateral knees: Nonerythematous

25     with no effusions" is what I wrote in my

## Page 80

1     physical exam, so I did -- I did do a

2     evaluation of the knees.

3   Q. And then if we go down to -- by that time

4     when you saw ▇▇▇▇ he had received fluids;

5     is that correct?

6   A. That's correct.

7   Q. Okay. Had he received any antibiotics?

8   A. I don't believe so.

9   Q. Was the IV still in when you saw him or did

10     they remove the IV?

11   A. Based on my documentation, I wrote that he

12     still had a peripheral IV at that time.

13   Q. Is there a reason why you didn't order a

14     additional bolus of fluids?

15   A. Yes. So typically with mild dehydration,

16     kids don't usually even need IV fluids at

17     all. The standard of care actually is to do

18     oral rehydration therapy. And we're trained

19     that nausea and vomiting is not a sign of

20     failure and you can just keep trying oral

21     rehydration. And so that's why I did not

22     order further IV fluids.

23   Q. How about IV antibiotics?

24   A. Sure. Kind of along the same lines. I think

25     Dr. White mentioned in her addendum -- yep,

20 (Pages 77 to 80)

## Page 81

1    she mentioned that if he's not tolerating PO

2    or by oral, when he wakes up, then we'll

3    consider additional IV fluids and switching

4    to IV antibiotics at that time.

5    Q.  At any point during your encounter with

6    █████ and the mom -- and Kelli Morgan, did

7    you think that a specialist needed to be

8    consulted?

9    A.  I did not.

10   Q.  Did you at any point think that you needed to

11   have Dr. Bala come and actually see the

12   patient?

13   A.  I did not.

14   Q.  Do you know where Dr. Bala was when you

15   called him?

16   A.  I do not.

17   Q.  Do you know at what point in time that he saw

18   █████

19   A.  I do not know.

20   Q.  Do you know how many patients he would have

21   had that -- that morning?

22   A.  I don't know.

23   Q.  How many patients would you have been

24   assigned to that morning?

25   A.  Zero.

## Page 82

1    Q.  Zero?

2    A.  (Witness nods.)

3    Q.  Okay.

4    A.  'Cause I was on nights so I wouldn't be

5    rounding on any patients.

6    Q.  Was D████ the last person or, at least, as

7    far as you can recall, the last patient that

8    you would have provided care to that morning?

9    A.  I don't know.  I would -- I would be guessing

10   if I answered that question.

11   Q.  That's fine.  Do you know whether, at least,

12   up until the time -- do you know in the ER

13   whether anybody asked any questions about

14   D████s headache and whether more

15   information was gathered about his headache?

16   A.  I don't know.

17   Q.  How about his dizziness?

18   A.  I don't know.

19   Q.  And then on your neurologic, if we go to your

20   area of review of symptoms.

21   A.  Yep.

22   Q.  In terms of hands on evaluations of D████

23   and his review of symptoms, tell me what

24   exactly you did.  Just walk me through it.

25   A.  Sorry.  Can you rephrase that.

## Page 83

1    Q.  Yeah.  In terms of actually hands on

2    evaluation for the review of symptoms, tell

3    me exactly what you did.

4        Walk me through each --

5    A.  So the review of systems is --

6        MR. DENNING:  Hold on, are you

7    saying symptoms or systems?

8        MR. GIROUX:  Systems.  I'm sorry.

9    Thank you, Dustin.

10   A.  The review of systems is questioning.  It's

11   not a physical exam.

12   BY MR. GIROUX:

13   Q.  Okay.

14   A.  So I don't understand the question.

15   Q.  Okay.  Well, let me just -- how about let's

16   go to the physical exam.

17       Tell me about your hands on physical

18   exam.

19   A.  Okay.  I'll refer to the record for this.  So

20   as far as -- so you want what I did

21   neurologically, is that what you're asking?

22   Q.  No, just general, so explain general.

23       What does general mean under the

24   physical exam?

25       MR. DAY:  In other words, what

## Page 84

1    did you do when you -- your physical exam.

2    A.  So observe the patient, where I mentioned he

3    was sleeping in the bed, arousable,

4    appropriately responds to stimuli.  And so I

5    did an evaluation of his mucous membranes,

6    the posterior oropharynx, the mouth.  I did

7    not evaluate his heart.  Listened to his heart

8    and lungs, pressed on his belly, looked at

9    his extremities, his skin.

10   Q.  On the general exam where you say he's

11   arousable, what do you mean by that?

12   A.  Meaning that he stirs, kind of moves his

13   extremities around when -- when I'm touching

14   him.  And even just during the encounter just

15   kind of -- I'm stirring in bed, but doesn't

16   fully like wake up.  You know, seemed like a

17   sleepy kid.

18   Q.  So at least at that time, when you were doing

19   the general exam, that he was able to move

20   all of his extremities?

21   A.  I did not document that in the record, and I

22   don't have any independent recollection of

23   that.  I do know that he was moving, at

24   least, some extremities in bed.

25   Q.  At least from your observation, did it look

21 (Pages 81 to 84)

## Page 85

1　as if D████ had any problems moving either
2　his left or his right side?
3　A.　I don't recall noticing any deficits.
4　Q.　Okay.  And you wouldn't have tested for any
5　deficits, as well?
6　A.　I did not -- I did not formally test for any
7　deficits.
8　Q.　Okay.  If we do go up to review of symptoms,
9　actually, there's a couple of questions
10　that I had over there.
11　　Under neurologic, is this information
12　that you would have received from mom?
13　A.　This is information that I would have
14　received from the mother.
15　Q.　And then in terms of ambulating, you have
16　that first, after neurologic.
17　　Tell me what you can recall about mom
18　telling you that he's been able to ambulate.
19　I would imagine she didn't use the word
20　ambulate.
21　A.　No.  I don't recall what the specific answer
22　or question was, but usually I would -- the
23　review of systems is usually a very brief
24　overview of has he had any of this, any of
25　this.  And so I would have said, has he been

## Page 86

1　walking, has he had any complaint of any
2　numbness, weakness, those types of things.
3　And so she would have responded yes, he's
4　been walking.
5　Q.　So under your history and physical exam, the
6　last sentence is mother states patient has
7　seemed weak and he looked pale until getting
8　fluids in the ED.
9　　And then under neurologic, you
10　indicate no weakness.
11　A.　Sure.
12　Q.　Explain the discrepancy to me.
13　A.　Sure.  So with weakness in the review of
14　systems, it typically would be more of like a
15　focal, like right-sided weakness or left foot
16　weakness.  The way I interpreted her saying
17　he seemed weak was more of like a fatigue,
18　tired, worn down, sick kid.
19　Q.　Okay.  Then we'll go back down to physical
20　exam.  The review of the abdomen:  Plus bowel
21　sounds, soft, nondistended.  Patient did not
22　wake to palpation.
23　A.　Uh-huh.
24　Q.　So tell me about that.
25　A.　Sure.  So that one basically just means that

## Page 87

1　while I was pressing on his belly, he didn't
2　open his eyes and say "ow" or it didn't seem
3　like he was in pain when I was palpating the
4　abdomen.
5　Q.　I mean, is it unusual, at least, based on
6　your training and experience up to that time
7　that he didn't wake or respond at all to you
8　palpating his belly?
9　　MR. YOUNG:  Object to form.
10　A.　I would say that's not uncommon with a
11　pediatric patient that's sleeping.
12　Q.　And then we go to neurologic:  Deferred,
13　patient sleeping, will reevaluate on the
14　floor.
15　　Explain to me what you mean by that.
16　A.　Sure.  Again, so with a history and physical,
17　there's -- obviously, there's a lot of
18　components to it.  And we usually like to try
19　to document, at least, something for each
20　portion of the exam.  And so we, ideally, for
21　completeness sake would have wanted to do, at
22　least, just a general overview neurologic
23　exam.  And since he was sleeping, I didn't --
24　I thought it would be cruel to wake up a
25　sleeping kid who had been awake all night --

## Page 88

1　to wake him up just for the sake of
2　completeness.
3　　So essentially, deferred to the floor
4　is just saying we'll wait 'til he's awake
5　and then we'll do it.  'Cause there was -- there
6　was nothing about the presenting history and
7　everything that made me concerned enough to
8　have to wake him up to do it at that time.
9　Q.　So he was asleep while you were there;
10　correct?
11　A.　Correct.
12　Q.　He wasn't asleep during parts in the ER;
13　correct?
14　A.　Correct.
15　Q.　And then there wasn't, at least, as you would
16　characterize it, a brief neurologic exam, at
17　least, noted based on your review in the ER
18　chart?
19　A.　Correct, not that I was able to find in the
20　document, in the record.
21　Q.　So from your -- from your assessment that
22　we're going to wait until D████'s awake
23　before we do the brief neurological
24　examination?
25　A.　From our standpoint, yes, that was the plan.

22 (Pages 85 to 88)

Page 89

1   Q.  And you would agree with me that the sooner
2      that you're able to do a brief neurological
3      exam, the better for the patient?
4         MR. DAY:  Object to form.
5         MR. YOUNG:  Object to form.
6   A.  I would say it definitely depends on the
7      scenario.  Again, in this scenario, it was
8      more for completeness sake and it would not
9      have affected -- based on what we believed to
10     be the problem, it would not have affected
11     his care.
12  Q.  Certainly.  I understand that.
13         But indeed, if D███was awake, you
14     would have done the brief neurological exam?
15  A.  That's correct.
16  Q.  Okay.  Do you know at what point in time
17     D███was transferred from the emergency
18     room to the pediatric floor?
19  A.  I don't know what specific time, no.
20  Q.  And then what orders you put in the record
21     for D██ or the transfer?
22         And if you need to refer to the
23     records, go ahead.
24  A.  Sorry.  Can you repeat that.
25  Q.  What orders did you place in the chart

Page 90

1      regarding D██ s care?
2   A.  So I would have placed the -- well, let me
3      pull up -- let me pull up the record here.
4   Q.  You're fine.  I think it's in the 500s, the
5      540s.  Like 546, 547, 548.
6   A.  It's going to be in volume 2.  Let me see --
7         MR. DAY:  I have it here,
8      actually, down here.
9   Q.  Okay.  So you want me to list all of the
10     orders that I put in?
11  Q.  Let's just say as it relates -- one, did you
12     place an order for vital signs?
13  A.  Yes, that's routine.
14  Q.  Okay.  And then the orders that you placed
15     were what?
16  A.  It's difficult to tell.
17  Q.  Okay.  What would have been the orders based
18     on your review of the records?
19  A.  Again, it's difficult to tell based on the
20     record.
21  Q.  I know there's an issue of whether it was
22     every one hour or every four hours, but let
23     me just ask you a general statement:  What's
24     the importance of vital signs?
25         Why do you order vital signs to be

Page 91

1      taken?
2   A.  Vital signs are one of the most important
3      parts of a patient's exam and so it can clue
4      you in to any impending problems.
5   Q.  Okay.  And then I saw that there was an
6      order -- a separate order -- my understanding
7      is that blood pressures are a vital sign;
8      correct?
9   A.  That's correct.
10  Q.  But there's a separate order for blood
11     pressure.  Why would that be?
12  A.  Typically, in the pediatric population, the
13     blood pressure cuff can be uncomfortable for
14     kids, and so usually we don't need to obtain
15     blood pressures with the other vital signs
16     every time.
17  Q.  And then there was a physician notification
18     order which is on 543.
19  A.  Yes.
20  Q.  And what's the purpose of that order?
21  A.  Yeah, that's a routine order that we put in
22     for every patient, and it has call parameters
23     for the nurses to let the physician know if
24     vital signs are outside of a given range for
25     the patient's age.

Page 92

1   Q.  Do you know what those parameters are?
2   A.  We have a book at Via Christi that has those
3      parameters.  I don't know them off the top of
4      my head.
5   Q.  You don't know any of them as it relates to
6      either heart rate, blood pressure or
7      respiratory rate?
8   A.  I couldn't tell you 100 -- with 100 percent
9      certainty.  We always reference the manual
10     for that.
11  Q.  So when you would admit a patient onto the
12     pediatric floor, generally, based on your
13     experience, what are, typically, the orders
14     that you place for vital signs?
15  A.  For vital signs?
16  Q.  Yeah.
17  A.  For the general pediatric floor, vital signs
18     are usually anywhere between q4 to q8 to once
19     a shift, and that's pretty standard.
20  Q.  Okay.  And then -- and then physician
21     notification, is that kind of a standard
22     order that you always put in the chart?
23  A.  That is.  That's a standard order, yes.
24  Q.  So under the labs portion of your note on 17,
25     I guess, you got to go back.

23 (Pages 89 to 92)

Page 93

1    A.  Okay.
2    Q.  The abnormalities in the labs, were those as
3        a result of the strep?
4    A.  That's what I attributed those abnormalities
5        to, yes.
6    Q.  How about the elevated glucose, is that a
7        common finding with somebody who is -- has
8        strep and who is ill?
9    A.  It can be, yes.
10   Q.  Okay.  Can there be other -- do you know
11       whether -- what abnormalities there would be
12       in a lab with an individual with elevated
13       intracranial pressures?
14   A.  I don't know.
15   Q.  And the radiology diagnostics -- let me ask
16       you this:  After you've performed your
17       history and your physical examination, was
18       your opinion that no radiology or diagnostics
19       needed to be performed or did you consult
20       with Dr. White and Dr. Bala before making
21       that decision?
22   A.  That was my determination that yes, nothing
23       more was needed as far as radiology and
24       diagnostics, and then I confirmed that with
25       Dr. White and Dr. Bala.

Page 94

1    Q.  And that was their opinion, as well?
2    A.  They -- yes.  If they had wanted something
3        done, it would have changed the plan.
4    Q.  Got it.  And then what was done to address
5        the hypoglycemia, the high glucose?
6    A.  Sorry.  Can you -- can you repeat the
7        question.
8    Q.  Was anything done to address the high
9        glucose?
10   A.  No, the glucose of 189 is actually not that
11       concerning.  It's -- it's, you know, nothing
12       that needed to be done acutely for that.
13   Q.  Does -- when you administer fluids, does that
14       help stabilize the glucose?
15   A.  Usually, if you administer fluids, the
16       glucose can decrease.
17   Q.  Did you order labs yourself?
18   A.  I did not order labs.
19   Q.  Okay.  Did you put an order in for labs
20       during his time on the floor?
21   A.  No.
22   Q.  And then we go down there and it says:
23       Patient discussed with Dr. Bala.
24           And again, you don't recall exactly
25       what was said to Dr. Bala?

Page 95

1    A.  Correct.  I don't recall.
2    Q.  Based on your note and your custom, habit and
3        routine, give me what you think you probably
4        would have said to him.
5            MR. DAY:  I'm going to object.  I
6        think we've already gone through that, but go
7        ahead.
8    A.  Do you want a summary or do you want --
9    Q.  Tell me exactly what you think you would have
10       said to him.
11   A.  Okay.  Dr. Bala, we have a 5-year-old male
12       here presenting to the ED.  Essentially, I
13       would have read through the H & P.
14       Presenting with nausea and vomiting.  He was
15       actually diagnosed with strep at Wesley last
16       night at 6:00 p.m.  Went home with
17       amoxicillin and mom's concerned that he can't
18       keep his antibiotics down.  He's thrown up
19       four times since -- three or four times since
20       leaving Wesley and she's concerned about
21       getting treatment for the -- for the strep,
22       and she's concerned about dehydration.  She's
23       really unsure about when symptoms started.
24       The patient's sister actually recently had a
25       tonsillectomy and she thought that maybe the

Page 96

1        patient was afraid that if he told her about
2        his symptoms that he would have to have
3        surgery, as well.  She reports that the
4        nausea and vomiting started on Friday and has
5        been intermittent throughout the weekend.
6        And then on Sunday he had headache, dizziness
7        and worsening nausea with several episodes of
8        emesis.  She denies any fevers, chills,
9        weight loss or abdominal pain or rash in
10       D██████ but she did say that he complained of
11       bilateral knee pain prior to arrival.  But
12       she didn't notice any joint swelling or
13       redness.  She said that he has seemed weak
14       and looked pale until he got fluids in the
15       ER.  In the ER, they gave 20 cc per kg bolus
16       of IV fluids and they checked labs, including
17       a CMP and a CBC and gave Zofran --
18           MR. DENNING:  Slow down.
19   A.  Sorry.  This is the checkout.  This is
20   .   like -- this is the --
21   Q.  And if I can cut you off, too --
22           MR. DAY:  Let's see if he can do
23       it.  No, go ahead.
24   A.  I'm sorry.
25   BY MR. GIROUX:

24 (Pages 93 to 96)

## Page 97

1  Q.  I mean, would you have literally read your
2      note to him?
3  A.  Essentially. I mean, that's how a
4      checkout -- I mean, it's the exact -- yeah.
5  Q.  So everything in your history -- history of
6      present illness and I don't -- I know that
7      you don't specifically recall the
8      conversation with Dr. Bala, but your -- you
9      know, your, I guess, your normal custom,
10     habit and routine is to read the complete
11     history and present illness as you wrote it?
12 A.  I usually wouldn't read it straight off the
13     page, but -- because at the time it's fresher
14     in my mind, but me trying to reinvent that
15     now, I have to read it 'cause I -- you know,
16     it's -- I would worry that I would misstate
17     things now if I didn't read it from the page.
18 Q.  And then you would have gone through the
19     review of symptoms as noted and then, of
20     course, your physical findings, as well?
21 A.  Yep, and I would have mentioned past medical,
22     he was previously healthy. We even talk
23     about birth history and development and all
24     that stuff so --
25 Q.  Do you recall at all Dr. Bala having any

## Page 98

1      questions?
2  A.  I don't recall whether he did or did not.
3  Q.  Okay.
4  A.  Usually, attendings will ask questions at the
5      end of a presentation, but I don't recall.
6  Q.  And then when in relation to your history and
7      physical examination, when would you have
8      called Dr. Bala?
9  A.  I would have called Dr. Bala after I saw the
10     patient and discussed the patient with
11     Dr. White.
12 Q.  And then -- so you would have talked to
13     Dr. White first?
14 A.  Yes.
15 Q.  And then would your, I guess, report to her
16     would have been similar to Dr. Bala?
17 A.  It would have been nearly identical.
18 Q.  And then I take it, at that time, that you
19     had experience with Dr. White?
20 A.  Yes.
21 Q.  Was she the type of person that would ask
22     questions and followup with questions?
23 A.  Yes.
24 Q.  But in terms of what questions that she asked
25     and what followup, you don't recall what

## Page 99

1      those would be?
2  A.  I don't recall specifically.
3  Q.  But essentially, I guess, the import of all
4      this talking to Dr. White and Dr. Bala is
5      that everybody was pretty much on the same
6      page regarding what the plan was for D█████?
7          MR. DAY:  Again, based on the
8      assumptions of normal practice as opposed to
9      memory. I just want to be clear on this.
10         MR. GIROUX:  Yes.
11 A.  Yes.
12 BY MR. GIROUX:
13 Q.  Okay. And the plan was to -- what was the
14     plan?
15 A.  The plan was to admit D███ for observation.
16     So observation is different from inpatient.
17     We expect a shorter stay with observation.
18     And to essentially let him sleep. When he
19     wakes up, try to see if he can tolerate PO,
20     because it seemed that his nausea and
21     vomiting improved with the Zofran given in
22     the ER. So the plan was to -- a PO challenge
23     in the morning, and if he did well with it
24     and tolerated antibiotics, then he could
25     likely go home later that day.

## Page 100

1  Q.  How long was he going to -- how long -- what
2      was the plan in terms of how long you were
3      going to let him sleep?
4  A.  I don't recall a specific timeframe.
5  Q.  If he slept to 12:00 or 1:00, was the plan
6      just to let him sleep to 12:00 or 1:00?
7          MR. DAY:  Object to form.
8  A.  We did not -- I don't -- I don't know that we
9      discussed a specific plan of how long we
10     would let him sleep.
11 Q.  Do you have a -- I guess based on your review
12     of the records and your own history and
13     physical examination, how long you wanted to
14     let him sleep --
15         MR. DAY:  Object to form.
16 BY MR. GIROUX:
17 Q.  -- before doing any further evaluation of
18     him?
19         MR. DAY:  Same objection.
20 A.  I don't have any independent recollection of
21     what I thought would be an appropriate amount
22     of time for sleep.
23 Q.  Do you know whether Dr. Bala or Dr. White
24     commented on how long they wanted him to
25     sleep?

25 (Pages 97 to 100)

## Page 101

1    A. I don't recall whether they did or did not
2       comment on that.
3    Q. What time would you have left the hospital?
4    A. Our -- the nightshift ends at 7:00 a.m. and
5       checkout occurs usually anywhere between 6:45
6       and 7:15 so it would have been not too long
7       after 7:00 a.m.
8    Q. And then do you -- I mean, and you take your
9       laptop with you?
10   A. I do, yes.
11   Q. Are you able to do charting from home from
12      the laptop?
13   A. You can, yes.
14   Q. Did you do that?
15   A. No.
16   Q. Okay. Have you ever done that?
17   A. I have done that, yes.
18   Q. Do you know whether you were doing that at
19      this time, in this -- during this time
20      period?
21   A. I can tell you for a fact that I did not. I
22      never -- I never do work at home when I'm on
23      nights because the hours are so long that I'm
24      usually just sleeping when I get home.
25   Q. Was there ever a discussion -- do you recall

## Page 102

1       any discussion with any provider whether it's
2       Dr. White or Dr. Bala, at least, in the time
3       that you were providing care that D█████
4       needed any type of imaging?
5    A. No, we did not determine that he needed
6       imaging.
7    Q. Okay. And the same question as it relates to
8      a consult?
9    A. No, he did -- we did not deem a consult
10      necessary.
11   Q. Then in looking at -- was it -- do you recall
12      whether the plan was observation --
13      typically, when a patient's admitted for
14      observation, are they typically going to be
15      discharged that same day?
16   A. Not always the same day. It's usually less
17      than two midnight stay in the hospital. So
18      it would -- usually that same day or the next
19      day.
20   Q. Did you know about Dr. Borick's -- did you
21      read Dr. Borick's notes?
22   A. I did.
23   Q. Okay.
24   A. Yep.
25   Q. In her note, which is on Page 132, she has,

## Page 103

1       under provider signature, disposition was
2       plan to discharge later today.
3       Were you aware of that?
4    A. That was our plan if D███ was able to
5       tolerate PO.
6    Q. And if he wasn't able to tolerate PO, then he
7       would be admitted for another day, at least,
8       until he was able to tolerate --
9    A. Yes.
10   Q. -- PO?
11   A. Yes.
12   Q. And then if he wasn't able to tolerate, was
13      the plan to do IV?
14   A. We would have reevaluated and then made that
15      determination, but that was -- the thought
16      process was, yes, we'll reevaluate for IV
17      fluids if he can't tolerate PO.
18   Q. When you began your residency, would you do
19      rounds with other physicians who weren't in
20      residency?
21      MR. DAY: I'm not --
22   Q. I'm sorry. It was a bad question.
23      Actually, when you began your
24      pediatric rotation?
25   A. Uh-huh.

## Page 104

1    Q. Were you doing rounds on your own?
2    A. What do you mean? Can you --
3    Q. When you were -- when you were on your
4      pediatric rotation in your first year of
5      residency and you were assigned to go down
6      and evaluate a patient that's going to be
7      admitted into the pediatric floor, was there
8      ever at the front end of that where you would
9      actually see the patient in conjunction with
10      like Dr. Bala or another pediatrician or a
11      hospitalist?
12   A. I guess that it kind of varies. So the
13      answer is yes, I would see patients with an
14      upper level resident or the attending during
15      the day when we did admissions. Usually I
16      would check out face to face with the
17      attending during the day and occasionally
18      we'd even go in after I'd seen the patient
19      and then see the patient together, after they
20      got up to the floor.
21   Q. Let's say up to March 6th of 2017, had you
22      done rounds with Dr. Bala?
23   A. I don't know for sure if I had done rounds
24      during the day with him. They have three
25      physicians who work in their group and they

26 (Pages 101 to 104)

## Page 105

1   rotate their roles, and so I don't know for
2   sure if I had done rounds during the day with
3   him.
4   Q.   Does he have a level of experience that you
5      don't have?
6   A.   Yes.
7   Q.   How would you characterize that or describe
8      that?
9   A.   Dr. Bala is an attending pediatrician, so he
10     did a pediatrics residency and then is
11     board -- he took his boards and got board
12     certified in pediatrics.
13  Q.   In terms of -- do you know whether -- if you
14     don't, you don't, but would he -- would his
15     history and physical examination of a
16     pediatric patient who's being admitted from
17     the ER to the pediatric floor be any
18     different than yours?
19        MR. DAY:  Object to form; calls
20     for speculation, lack of foundation.
21  A.   I don't know.
22  Q.   Would you expect it to be different?
23        MR. DAY:  Same objection.
24  A.   I -- I would expect him to gather the same
25     information that I gathered.

## Page 106

1   Q.   For example, you know what the standard of
2      care is?
3   A.   Yes.
4   Q.   What is the standard of care in your mind?
5      What's the definition of it?
6   A.   It's basically if you look at any presenting
7      patient, it's what's expected -- it's hard
8      not to use the word standard of care when
9      you're talking about standard of care, but
10     what's expected for treatment for a patient
11     given a specific scenario.  Usually it's like
12     consensus among the medical population.
13  Q.   Does -- and then as a -- your training as a
14     family practice resident in your first year
15     and what you learn in the family practice
16     residency is much different than what
17     somebody would learn in a pediatric
18     residency; is that fair?
19        MR. DAY:  Object; lack of
20     foundation.
21  A.   No, I don't think it's -- I don't think it's
22     significantly different.
23  Q.   Okay.  Why have specialties then if it's not
24     significantly different?
25  A.   So family medicine is basically we treat all

## Page 107

1   ages and we do obstetrics.  We do a little
2   bit of everything.  Dr. Bala would --
3   pediatricians would have received more
4   training specifically to pediatrics 'cause
5   that's all they do.  But we would have had
6   similar training in pediatrics when we were
7   on pediatrics if that makes sense.  We cover
8   the same topics and take care of the same
9   patients.
10  Q.   So at the beginning of your deposition, we
11     talked about, in general terms, your
12     experience with the pediatric population up
13     until March 6th of 2017; correct?
14  A.   Yep.
15  Q.   Would you say by that time, from July 1st,
16     when you began your residency, to March 6th
17     of 2017, that you would have seen and
18     evaluated hundreds of pediatric patients?
19  A.   No.
20  Q.   How would you characterize the number of
21     patients that you would have evaluated during
22     that time period?
23  A.   Pediatric patients or total patients?
24  Q.   Pediatric patients.
25  A.   Tough to put a number on it.  Less than a

## Page 108

1   hundred for sure in the clinic.  In a
2   hospital, I would be guessing if I told you a
3   number.
4   Q.   And then in a scenario like this where you
5      are the first year resident assigned to do
6      the admit of a patient -- pediatric patient
7      coming from the ER to the general pediatric
8      floor, how many times had you done that prior
9      to March 6th of 2017?
10  A.   Again, it would be a guess if I put an exact
11     number on it, but admissions, between 20 and
12     40.
13  Q.   And then I guess that would be -- in the 20
14     or 40, I know that's a guess, that would be a
15     spectrum of different illnesses that you are
16     encountering?
17  A.   Correct.
18  Q.   Do you recall approximately how many of those
19     20 to 40 were strep?
20  A.   I don't recall.
21  Q.   Do you know if any were strep admissions?
22  A.   I don't recall.
23  Q.   Were you able to do, if you go to Page 16,
24     your own -- were you able to do an evaluation
25     of D█████s eyes?

27 (Pages 105 to 108)

Page 109

1    A. No.
2    Q. Is that because he was sleeping?
3    A. That's correct.
4    Q. Was that -- is that something that would have
5       been deferred, as well?
6    A. Yes.
7    Q. To the floor?
8    A. Yes. So --
9    Q. Go ahead. I apologize.
10   A. I'm done.
11   Q. Do you know whether there was an evaluation
12      done of his eyes in the ER?
13   A. They documented his eye opening
14      spontaneously. And they documented that his
15      extraocular movements were intact.
16   Q. Is that a full eye examination that you would
17      typically do?
18   A. It's a general eye examination.
19   Q. Okay. And would you do a general eye
20      examination if he was awake?
21   A. Yes.
22   Q. And that would consist of what?
23   A. Usually testing the extraocular movements and
24      typically check pupillary response, as well.
25   Q. And then what would the pupillary response

Page 110

1       tell you about the patient?
2    A. That cranial nerves are intact that supply
3       the pupil, allowing the pupil to constrict
4       with light on both sides.
5    Q. How about the extraocular examination?
6    A. Same thing: Cranial nerve testing telling
7       you that the cranial nerves are intact.
8    Q. Okay. And then what deficits, if any, would
9       eye -- elevated intracranial pressure cause
10      on a general eye exam if one was done?
11          MR. DAY: Object to foundation.
12   A. So kind of mentioned it earlier, you can see
13      papilledema when you -- you actually have to
14      look to the -- to the back of the eye.
15   Q. And then that's done with some type of
16      instrument?
17   A. Yes.
18   Q. Okay. Do you know whether Dr. White did
19      that?
20   A. She did not document that she did that, so I
21      don't know if she did.
22   Q. And then she saw D▇▇▇ at least, when you
23      look at the time -- and I'm not going to hold
24      you to the time. If you saw D▇▇ at 5:18
25      or 5:30, she says 6:15.

Page 111

1          Did she do, at least, the general
2       neurologic exam that you were wanting to do?
3          MR. DAY: Object to form. I
4       don't understand.
5    A. She -- the neurological exam that she did was
6       a general exam where she documents that he
7       rubbed his eyes, pushed examiner's hand away.
8    Q. Okay.
9    A. Otherwise, nothing else is documented.
10   Q. Okay. But the brief neuro exam that you
11      discussed earlier about standing up,
12      accessing gait and see whether there's any
13      gross abnormalities, she didn't do that?
14   A. Correct, and actually she also documents the
15      uvula is midline, which is important for
16      cranial nerves, as well.
17          MR. DENNING: Sorry, Doctor?
18   A. The uvula is midline.
19   Q. Explain that to me.
20   A. So you can see a uvula deviation if there is
21      some sort of like abscess or, you know, you
22      may expect some changes if there's cranial
23      nerve problems.
24   Q. How about with elevated intracranial
25      pressure, I mean, can you expect the uvula

Page 112

1       not to be midline?
2    A. Not that --
3    Q. Or is that beyond your scope?
4    A. Yeah, probably beyond my scope. I don't know
5       for sure.
6    Q. And then if we go to Dr. Borick, her note on
7       Page 131-132, do you know whether she did a
8       general neurologic exam?
9          MR. DAY: Object to form.
10   A. I don't know whether she did or didn't, but
11      it's not -- it's not documented.
12   Q. And then, at least, based on her note, you
13      would agree with me that D▇▇s condition
14      was probably about the same as it was when
15      you saw D▇ and when Dr. White saw D▇?
16          MR. YOUNG: Object to form.
17          MR. DAY: Object to form.
18   A. Tough -- it's tough for me to comment on that
19      just based on the note.
20   Q. You indicated that he was arousable; correct?
21   A. Correct.
22   Q. Then if we go to -- do you know Sam
23      Dumontier?
24   A. The name sounds familiar.
25   Q. He was a medical student at the time, and

28 (Pages 109 to 112)

## Page 113

1 he's got a note at, let's say, I think, 291.
2 Hold on, let me make sure I got it right.
3 Yes, it's 291.
4 A. Okay.
5 Q. He says: General: Non-arousable.
6 That's different than -- than what you
7 put; correct?
8 MR. DAY: Object to form.
9 A. That is different than what I wrote.
10 Q. Had you reviewed his note prior to your
11 deposition?
12 A. I had reviewed Dr. Borick's note and I don't
13 think I looked at this note specifically.
14 Q. And I think she had non-arousable, but she
15 testified yesterday that her note was pretty
16 much a mirror of Dr. Dumontier's because she
17 did it after the code.
18 A. Okay.
19 Q. Can you tell based on your review of Dr. --
20 or Sam Dumontier's note and Dr. Borick's note
21 whether there was a change in D████'s
22 condition from the time that you saw him to
23 the time they saw him?
24 A. Again, it's tough to say without actually
25 doing an exam myself. You know, it can vary

## Page 114

1 by provider.
2 Q. Was it your impression that he was sleeping
3 during that whole time?
4 A. During what whole time?
5 Q. During the whole time between the time you
6 saw him and the time that Dr. Borick saw him
7 at 7:00 o'clock in the morning.
8 MR. DAY: Object to form;
9 foundation.
10 A. I don't know.
11 Q. Would you expect him to have a Glasgow Coma
12 Scale at 6:30 of 15?
13 MR. DAY: Object to form;
14 foundation.
15 A. I'm not sure. If he was sleeping, you
16 wouldn't assess a GCS.
17 Q. Okay. If there is one in the record that
18 says that his Glasgow Coma Scale at 6:30 was
19 15, would that indicate to you, at least,
20 that he was tested?
21 A. Yes, if there's one documented, then it would
22 have had to have been tested.
23 Q. And then in order to do a Glasgow Coma Scale,
24 and if I'm asking the same question again, I
25 apologize.

## Page 115

1 A. No, it's okay.
2 Q. When you do a Glasgow Coma Scale, are you
3 asking the patient to stand or sit up?
4 A. No, you're not -- you're not having them
5 stand up and ambulate.
6 Q. But they can -- they can lay in bed and you
7 can do a Glasgow Coma Scale?
8 A. That's correct.
9 Q. But you would have to ask them questions;
10 they would have to be, at least, alert enough
11 to respond?
12 A. You don't always have to ask questions, but
13 yeah. 'Cause if they're awake and moving
14 their extremities and talking normally,
15 that's a GCS of 15.
16 Q. Okay.
17 A. And you don't have to ask questions.
18 MR. GIROUX: Okay. Let's take a
19 break. I think I'm just about done. I might
20 have a few questions before and after, but I
21 think I'm just -- take about five minutes and
22 go back on the record and see if I have
23 anymore.
24 VIDEOGRAPHER: Off the record
25 11:10.

## Page 116

1 (A recess was taken from 11:10 a.m. to
2 11:21 a.m.)
3 VIDEOGRAPHER: Back on the record
4 11:21.
5 BY MR. GIROUX:
6 Q. Doctor, just a few questions. I think I'll
7 be about five minutes and I'll be done and
8 then others will have questions for you.
9 A. Okay.
10 Q. Are you from Wichita?
11 A. I'm not.
12 Q. Where are you from originally?
13 A. Eudora, Kansas.
14 Q. Okay. And that's up in the Kansas City area?
15 A. It's close to Lawrence.
16 Q. Okay. And then where did you go undergrad?
17 A. Kansas State.
18 Q. And then you went to Case Western?
19 A. That's correct.
20 Q. And then what's the plans when you complete
21 your residency in May?
22 A. Looking for a job right now so going to stay
23 in Kansas. I just don't know where yet.
24 Q. Do you want to stay in the Wichita area?
25 A. We're looking in smaller towns near Kansas

29 (Pages 113 to 116)

## Page 117

1    City.

2    Q.  If I asked this, I apologize. I don't ask

3    repeated questions, but at any point in time

4    during D███s hospitalization, did you

5    learn from any source about D███s stroke,

6    the cause of his stroke and when it occurred?

7          MR. DAY: Object to foundation.

8    A.  I don't recall specifically learning about a

9    stroke, but I recall learning about the

10    respiratory arrest on the floor.

11    Q.  And then without getting into any discussions

12    with your attorney, or attorneys, have you

13    learned, since D███s hospitalization,

14    anything about when the stroke occurred and

15    what caused the stroke?

16          MR. YOUNG: Object to form.

17          MR. DAY: Object to form and

18    foundation.

19    A.  I've read the record about the brain mass and

20    the problems ensuing from that.

21    Q.  The record being the Via Christi record?

22    A.  Correct.

23    Q.  You haven't looked at any other medical

24    records of D███?

25    A.  No.

## Page 118

1    Q.  He was transferred from Via Christi to

2    Children's Mercy.

3          Do you understand that?

4    A.  Correct. I read that in the record.

5    Q.  But any subsequent records after he was

6    discharged or transferred from Via Christi,

7    you haven't reviewed any of those?

8    A.  That's correct. I have not reviewed any

9    other records.

10    Q.  There was a -- there was testimony that was

11    provided yesterday by a Nurse Angela Walker

12    that said that it was -- the nurse or nurses

13    were informed that when doing rounds on

14    patients, to round on D███ last.

15          Were you involved in any conversation

16    with the nurses about rounding on D███

17    last?

18    A.  No.

19    Q.  Does that ring any bells, that question?

20    A.  No, it does not.

21          MS. WOODS: Object to form.

22    BY MR. GIROUX:

23    Q.  Have you understood my questions today?

24    A.  Yes, sir.

25          MR. GIROUX: I don't have

## Page 119

1    anything else.

2          MR. GRIBBLE: I have no

3    questions. Thank you, sir.

4          MS. WATSON: I have no questions.

5    Thank you.

6          MR. YOUNG: I do not have any

7    questions at this time. Thank you.

8          MS. WOODS: I have no questions.

9    Thank you.

10          MS. COLE: No questions.

11          CROSS-EXAMINATION

12    BY MR. DENNING:

13    Q.  I do have a few questions for you. My name

14    is Dustin Denning. I represent CEP America

15    Kansas in this lawsuit.

16          Dr. Hartpence, were you rushed at all

17    during your examination and assessment of

18    D███?

19    A.  No, sir.

20    Q.  You made a comment earlier and I wanted to

21    followup on that.

22          Was he your only responsibility or

23    focus at that time that morning?

24    A.  From what I recall, yes. And usually the

25    senior resident will protect the intern from

## Page 120

1    having two admissions at the same time. So

2    we'll focus on one, and then if there was

3    another one, I would have waited till I was

4    done with that.

5    Q.  Okay. Do you think that you are thorough

6    when you take a history from a patient or a

7    patient's family member?

8    A.  Yes.

9    Q.  Do you believe that you were thorough in this

10    case in taking a history?

11    A.  Yes.

12    Q.  You talked about bringing in your laptop into

13    the exam room.

14          You recall that testimony?

15    A.  Yes.

16    Q.  And do you sit down at a -- on a chair at

17    kind of a desk or workstation to type?

18    A.  I always try to sit down and be eye to eye

19    with the parent or the patient. And

20    usually -- sometimes it's on my lap,

21    sometimes there's like a little table you can

22    adjust the height of and I'll use that, but I

23    don't recall what I did in this instance.

24    Q.  Okay. And as I understand your testimony,

25    you've got your laptop open, you've got the

30 (Pages 117 to 120)

## Page 121

1      exam note open, and you start typing into
2      that note when taking a history?
3      A. Correct.
4      Q. Okay. Are you literally typing in as, in
5      this case, Kelli Morgan is conveying to you
6      t████s history?
7      A. Yes.
8      Q. Okay. Are you trying to type stuff in word
9      for word?
10     A. I try to.
11     Q. If Kelli had told you that D███ had a
12     sudden onset of headache the day before at
13     church where he clutched the back of his head
14     and screamed out in pain, if she had told you
15     that, is that something that would have ended
16     up in your HPI?
17     A. Yes, most certainly.
18     Q. All right. If she told you that D███s
19     eyeballs were protruding from his skull and
20     he was not able to close his eyes, is that
21     something that you would have recorded in the
22     history?
23     A. Yes.
24     Q. Because that would be a significant thing to
25     know, wouldn't it?

## Page 122

1      A. That would be very significant, yes.
2      Q. If she told you that D███s eyes had been
3      rolling into the back of his head, is that
4      something that you would have recorded?
5      A. Yes, I would have recorded that.
6      Q. If she told you that D███ had sensitivity
7      to light, is that something that you would
8      have placed in your note?
9      A. Yes.
10     Q. If she told you that D███ was slurring
11     words, is that something you would have
12     recorded?
13     A. Yes.
14     Q. If she told you that D███ was unbalanced,
15     would you have recorded that?
16     A. Yes, I would have.
17     Q. If she told you that D███ had difficulty
18     standing or walking, would you have placed
19     that into your note?
20     A. Yes.
21     Q. Because those are all significant findings;
22     is that right?
23     A. They are, yep.
24     Q. And because none of that appears in your HPI,
25     is it fair to say that Kelli Morgan didn't

## Page 123

1      tell you about any of that stuff?
2      A. That's correct.
3           MR. GIROUX: Object to form;
4      that's contrary to his earlier testimony.
5           MR. DENNING: I think -- he said
6      that's correct.
7      A. That's correct. Sorry.
8           MR. DENNING: Thank you. That's
9      all I have.
10          CROSS-EXAMINATION
11    BY MR. DAY:
12     Q. Doctor, I have just one quick series.
13      You mentioned the subject of a
14     headache and dizziness came up during the
15     review of symptoms -- or systems and -- is
16     that correct?
17     A. That's correct.
18     Q. And I just want to make sure the record's
19     clear on what that means.
20      When Mrs. Morgan came in and described
21     what her concerns were, did she mention
22     either headache or dizziness?
23     A. No, that was not her primary concern.
24     Q. Just so the record's clear: Are you saying
25     that came up when you went through the list

## Page 124

1      of questions that you asked?
2      A. Yes. So when I started asking about
3      associated symptoms, that was when it came
4      up.
5      Q. Within medicine, is there a significant
6      distinction made between what appears in the
7      review of systems versus the chief
8      complaints that bring the patient in?
9      A. Yes, the chief complaint is really where you
10     dive into the details.
11          MR. DAY: That's all I have.
12          REDIRECT EXAMINATION
13    BY MR. GIROUX:
14     Q. Just a couple followup.
15      When you see D███ first, the first
16     thing that you did was gather the history;
17     right?
18     A. From the mother, correct.
19     Q. That's right. And then you do the review of
20     systems?
21     A. The HPI and the review of systems can happen
22     in conjunction.
23     Q. Okay. So the way I read the history of
24     physical -- the history of present illness,
25     she says: On Sunday, patient complained of

31 (Pages 121 to 124)

## Page 125

1  headache, dizziness and worsening nausea and
2  several episodes of emesis.
3  A.  Correct.
4  Q.  To me that would suggest that you're having
5  this conversation, you're gathering the
6  history from mom, and she's providing you
7  that information separate from the review of
8  systems; is that fair?
9  A.  Can you rephrase that.  Let me pull up the
10  note.
11  Q.  That's fine.  I'll let you pull it up first.
12  A.  Okay.  Okay.  Sorry.  Can you say that again.
13  Q.  Yeah.  In review of the history of present
14  illness, it looks like the history that you
15  gathered from mom, which is separate from the
16  review of systems, is that on Sunday, patient
17  complained of headache, dizziness and
18  worsening nausea and episodes of emesis.
19  A.  Correct.
20  Q.  So that would be separate than the review of
21  systems?
22  A.  Not necessarily.  So during the HPI, when I'm
23  obtaining history from a patient, you ask --
24  first, you let them talk.  You get the
25  information.  And then you ask, did he have

## Page 126

1  any of this, did he have any of this.  And
2  typically that's towards the end of my HPI
3  when I'm asking those additional questions
4  'cause I've already gone through what our
5  chief complaint was.  And so when you get
6  down to the headache, dizziness, worsening
7  nausea, several episodes of emesis on Sunday,
8  and then the next line is "he denies these."
9  So it's -- the review of systems and the HPI
10  can be in conjunction.
11  Q.  Okay.  Well, when you first went in, I mean,
12  tell me all the history.
13  Did mom just kind of open up and tell
14  you exactly what happened?
15  A.  I don't recall specifically what the
16  conversation was, but I would have asked
17  broad questions to start.
18  Q.  It seems like if you spent 15 or 20 minutes
19  taking a history, and you have one paragraph
20  that is noted in the history of present
21  illness, there's probably a lot of
22  information that she told you that just
23  didn't make it to the chart.
24  MR. DENNING:  Object to form.
25  A.  I mean, there's a lot of information in the

## Page 127

1  history that's not just the HPI that takes
2  time.
3  MR. GIROUX:  I have nothing
4  further.
5  MR. DAY:  I think we're done.
6  MR. GIROUX:  Thank you, sir.
7  THE WITNESS:  Thanks.
8  VIDEOGRAPHER:  Off the record
9  11:31.
10  (Deposition concluded at 11:31 a.m.)
11  *   *   *

## Page 128

1  I have read or have had read to me the foregoing
2  testimony recorded on pages 5 to 127, inclusive, and the
3  same is true and correct to my knowledge and belief.
4
5
6  CONNOR HARTPENCE, M.D.          (Date)
7
8
9
10  STATE OF          )
          ) ss:
11          COUNTY)
12  Subscribed and sworn to before me, the
13  undersigned authority, this, the      day of
14
15
16
          Notary Public
17
18
19  (Commission Expires)
20
21
22
23
          MORGAN v. WESLEY MEDICAL CENTER, LLC, et al.
24
25
26
27

32 (Pages 125 to 128)

Page 129

```
 1              CERTIFICATE
 2    STATE OF KANSAS)
              ) ss:
 3    SEDGWICK COUNTY)
 4        I, RICK J. FLORES, CSR, a Certified Shorthand
 5    Reporter for the State of Kansas, do hereby certify that
 6    the within-named witness was by me first duly sworn to
 7    testify the truth, that the testimony given in response
 8    to the questions propounded, as herein set forth, was
 9    first taken in machine shorthand and reduced to writing
10    with computer-aided transcription, and is a true and
11    correct record of the testimony given by the witness.  I
12    certify that review of the testimony was requested by the
13    witness or the parties.  If any changes are made by the
14    deponent during the time period allowed, they will be
15    appended to the transcript.
16        I further certify that I am not a relative or
17    employee or attorney or counsel of any of the parties, or
18    a relative or employee of such attorney or counsel, or
19    financially interested in the action.
20        WITNESS my hand and official seal at Wichita,
21    Sedgwick County, Kansas, this    day of
22                 .   .
23
24
             RICK J. FLORES, CSR
25           515 South Main, Suite 108
             Wichita, KS  67202
26           (800) 654-8684
27
```

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105
316.267.8200

WICHITA, KANSAS
67202