**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**KANSAS CITY, KANSAS DIVISION**

|  |  |  |
|---|---|---|
| D.M., a minor, by and through | ) | |
| his next friend and natural guardian, | ) | |
| KELLI MORGAN, | ) | |
| | ) | Case No. 2:18-CV-02158 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| WESLEY MEDICAL CENTER LLC d/b/a | ) | |
| WESLEY MEDICAL CENTER -WOODLAWN; | ) | |
| WESLEY-WOODLAWN CAMPUS; | ) | |
| BRIDGET GROVER, PA-C; | ) | |
| DR. GREGORY FAIMON | ) | |
| LISA JUDD, RN; | ) | |
| VIA CHRISTI HOSPITALS WICHITA, INC.; | ) | |
| JENNIFER CHAMBERS-DANEY, ARNP; | ) | |
| DR. BALA BHASKAR REDDY BHIMAVARAPU; | ) | |
| CEP AMERICA-KS LLC; DR. CONNOR HARTPENCE; | ) | |
| DR. STEFANIE WHITE; | ) | |
| DR. JAMIE BORICK; | ) | |
| and AARON KENT, RN. | ) | |
| | ) | |
| Defendants. | | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT**
**CONNOR HARPENCE'S MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** the Plaintiff, and respectfully submits his Memorandum in Response to

Defendant Connor Hartpence's Motion for Summary Judgment (Docket No. 430) pursuant to

Fed. R. Civ. P. 56.

**RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS**

1. Uncontroverted.

2. Uncontroverted.

1

3.  Uncontroverted.

4.  Uncontroverted.

5.  Controverted.  Dr. Dabrow testified that a complete physical examination was

    required and Dr. Hartpence had a duty to performed a full head to toe examination.

    Dr. Dabrow testified as follows:

    Q       And a sleepy five-year-old who is especially
    tired can be hard to wake up, can't they?
    A       Yeah. They can be hard to wake up.
    Q       Okay. So the fact that a healthcare provider
    would prod him and do some things with him, and would
    get a response, but he wouldn't completely wake up is
    not surprising, is it?
    A       No.
    Q       And that by itself is not an indication that
    there is something seriously wrong with him?
    A       That you need -- no, of course not.
    Q       All right. Now, there are times when certain
    portions of, well -- and let me strike that and lay a
    little foundation. When a resident sees a patient in
    the hospital, they do a history and physical that
    includes, at least, briefly touching on some issues that
    do not seem to be related to the reason that the
    patient's at the hospital, correct?
    A       *A resident's required to do a complete history
    and physical, yes.*
    Q       Okay. So they may do physical examinations
    that are, kind of, on the list, but wouldn't necessarily
    seem to have a lot to do with a particular complaint
    that brought the patient to the hospital?
    A       At times, sure.
    Q       And when that is true and when you have a
    child who is unusually sleepy and -- for a reason, and
    mom is concerned and thinking that he's asleep, at times
    it is appropriate and is done to defer portions of that
    exam, if they do not appear to be pertinent to the issue
    at hand?
    A       *Well, the way we train our residents and the
    way it's always been taught to me is, when a patient is*

*admitted in the middle of the night, the intern, the*
*resident -- it's the duty between one or both of them to*
*get a complete history, and to do a complete physical*
*exam from head to toe, regardless of the complaint.*
*That's why the child's in the hospital. It's not a*
*babysitting service.*

Q        Okay. So your experience is that the entire
exam will be done with nothing being deferred under all
circumstances?

A        Rarely and occasionally people are going to
defer for their own unique reasons, but the team
should --

Q        So are you saying, for example, that the
standard of care -- let me strike that. Let me set this
as a hypothetical. Assume hypothetically that Dr.
Hartpence was completely reasonable in believing that
there was a clear established diagnosis of strep throat.
This is a child like D. who has been vomiting. With the
medication, has stopped vomiting, and is now for the
first time -- it's now early -- it's now somewhat mid-
morning, or mid-early-morning, we're talking, your 5:00,
6:00 in the morning, and as of this time, the child is
finally asleep. Is it your testimony that it would be a
violation of the standard of care for that resident
physician to say, "I don't want to wake the child up.
That seems unnecessary. We will pick up this exam and
fill out the rest of the exam that's required later"?

A        No.

A        *So the way you phrased the question, if the*
*diagnosis was certain, if a complete history had been*
*obtained, and an appropriate differential had been*
*thought about, and if the patient had been at least*
*examined in a limited way for the pertinent findings,*
*you could defer part of the exam.*

Q        Okay. And, okay. So going back to my
original question. The deferring part of the exam is
not per se a violation of the standard of care --

A        I --

Q        -- it depends on the circumstances?

A        I believe that is a better way of saying it.

Q        And whether or not that circumstance is
present, is often a judgment call?

A        It's -- it's always a judgment.

Q        Okay. And when we talked about judgments, we
already discussed that different physicians may reach
differing judgments, correct?
A        Correct.
(Exhibit A, Deposition of Dr. Dabrow, p. 88, ln. 2 – p. 91, ln. 9)(emphasis added).

6. Uncontroverted.

7. Uncontroverted.

8. Uncontroverted.

8. Controverted[1].  Dr. Dabrow testified throughout his deposition that Dr. Hartpence

   had a duty to perform a full physical examination and establish a broad-based

   differential.  Dr. Dabrow provided the following testimony:

   Q        You believed that a CT scan should have been
   done at both hospitals, correct?
   A        *I phrased it that I believe a wider broad-
   based differential should've been created to include
   symptoms of intracranial pressure being increased. And
   the easiest way to determine if there's a problem there
   is to do a CT. So I do believe a CT should have been
   thought about --*
   *Q        Well --*
   *A        -- and then performed.*
   *Q        At both hospitals?*
   *A        Well, at one or the other.*
   *Q        Okay.*
   A        You're not going to do two CTs. If that's
   what you're asking.
   (Exhibit A, Deposition of Dr. Dabrow, p. 64, ln. 17 – p. 65, ln. 2)(emphasis
   added).

   Staying on the topic of standard of care, Dr. Dabrow testified:

   Q        Okay. Now, Dr. Hartpence -- from everything
   available, would you agree appears to have communicated

---

[1] In his Memorandum in Support for Summary Judgment, Defendant Connor Hartpence M.D. had two paragraphs enumerated as "8".  Plaintiff has addressed each in the order presented in Defendant Hartpence's Motion.

with Dr. Bala concerning what he found and what his
thinking was?

A Yes. Well, I don't know what he actually
said, but --

Q But it makes sense that that occurred?

A It makes sense, yes.

Q Now, at that point -- and he gave his
recommendation, his thoughts as to what should occur --
now, at that point, hasn't Dr. Hartpence done what was
expected of him as a first-year resident?

A *If he did a complete history and a _complete_
_exam_, we would say yes. And if he thought about a
differential diagnosis and presented all that
information to the attending.*

(Exhibit A, Deposition of Dr. Dabrow, p. 116, ln. 23 – p. 117, ln. 13) (emphasis
added).

Lastly, in the questions leading up to the question Defendant Hartpence cites as the
basis for its motion as follows, Dr. Dabrow testifies as follows:

Q Okay. And that being true, that in his level
of training -- and accepting that without question,
having what he did, more or less, communicated to the
attending, and the attending being aware of everything,
the decision to defer doing the neurological exam -- *if*
*he has accepted without question, to use your terms, the*
*strep throat diagnosis*, for a physician at his level of
training and experience, would you agree would be within
the standard of care?

A It's reasonable.

Q Okay. And you would agree that, in general,
under all of these circumstances, given his level of
experience, Dr. Hartpence did, in fact, act within the
standard of care in this case?

A I'm only hesitating a little bit because he's
never acting in a vacuum. Presumably everything he saw
or did or observed, information he transmitted, he
would've talked with the senior resident about, who also
examined the patient, and presumably there was some
feedback loop before they spoke to the attending. So
perhaps they didn't get a full history. *Perhaps they*
*didn't do a full exam.* But if he's in isolation -- and
then again, *part of the resident's responsibility is to*

*think independently*, in graded responsibility, so it is
*possible* that he was within the standard of care at that
level.
(Exhibit A, Deposition of Dr. Dabrow, p. 118, ln. 1 – p. 119, ln. 1) (emphasis
added).

9.  Controverted.  Dr. Dabrow testified that a broad-based differential should have

   been established after performing a full head to toe physical examination of D.M.

   He testified as follows:

   Q        You believed that a CT scan should have been
   done at both hospitals, correct?
   A        *I phrased it that I believe a wider broad-*
   *based differential should've been created to include*
   *symptoms of intracranial pressure being increased. And*
   *the easiest way to determine if there's a problem there*
   *is to do a CT. So I do believe a CT should have been*
   *thought about --*
   *Q        Well --*
   *A        -- and then performed.*
   *Q        At both hospitals?*
   *A        Well, at one or the other.*
   *Q        Okay.*
   A        You're not going to do two CTs. If that's
   what you're asking.
   (Exhibit A, Deposition of Dr. Dabrow, p. 64, ln. 17 – p. 65, ln. 2)(emphasis
   added).

   Staying on the topic of standard of care, Dr. Dabrow testified:

   Q        Okay. Now, Dr. Hartpence -- from everything
   available, would you agree appears to have communicated
   with Dr. Bala concerning what he found and what his
   thinking was?
   A        Yes. Well, I don't know what he actually
   said, but --
   Q        But it makes sense that that occurred?
   A        It makes sense, yes.
   Q        Now, at that point -- and he gave his
   recommendation, his thoughts as to what should occur --
   now, at that point, hasn't Dr. Hartpence done what was

expected of him as a first-year resident?

A       *If he did a complete history and a <u>complete</u>*
*<u>exam</u>, we would say yes. And if he thought about a*
*differential diagnosis and presented all that*
*information to the attending.*

(Exhibit A, Deposition of Dr. Dabrow, p. 116, ln. 23 – p. 117, ln. 13) (emphasis
added).

Lastly, in the questions leading up to the question Defendant Hartpence cites as the
basis for its motion as follows, Dr. Dabrow testifies as follows:

Q       Okay. And that being true, that in his level
of training -- and accepting that without question,
having what he did, more or less, communicated to the
attending, and the attending being aware of everything,
the decision to defer doing the neurological exam -- *<u>if</u>*
*<u>he has accepted without question, to use your terms, the</u>*
*<u>strep throat diagnosis</u>*, for a physician at his level of
training and experience, would you agree would be within
the standard of care?

A       It's reasonable.

Q       Okay. And you would agree that, in general,
under all of these circumstances, given his level of
experience, Dr. Hartpence did, in fact, act within the
standard of care in this case?

A       I'm only hesitating a little bit because he's
never acting in a vacuum. Presumably everything he saw
or did or observed, information he transmitted, he
would've talked with the senior resident about, who also
examined the patient, and presumably there was some
feedback loop before they spoke to the attending. So
perhaps they didn't get a full history. *Perhaps they*
*didn't do a full exam.* But if he's in isolation -- and
then again, *part of the resident's responsibility is to*
*think independently,* in graded responsibility, so it is
*possible* that he was within the standard of care at that
level.

(Exhibit A, Deposition of Dr. Dabrow, p. 118, ln. 1 – p. 119, ln. 1) (emphasis
added).

10. Controverted.  The testimony Defendant Hartpence cites is taken out of context

and was asked in the form of a hypothetical.  In the questioning leading up to the

testimony cited by Defendant Hartpence, Dr. Dabrow was asked to assume that

strep throat was the accepted diagnosis.  Dr. Dabrow's answer was in the context

of a hypothetical and not the actual facts of D.M.'s care and treatment.  Here is

how Dr. Dabrow testified:

Q      You believed that a CT scan should have been
done at both hospitals, correct?
A      *I phrased it that I believe a wider broad-
based differential should've been created to include
symptoms of intracranial pressure being increased. And
the easiest way to determine if there's a problem there
is to do a CT. So I do believe a CT should have been
thought about --*
*Q      Well --*
*A      -- and then performed.*
*Q      At both hospitals?*
*A      Well, at one or the other.*
*Q      Okay.*
A      You're not going to do two CTs. If that's
what you're asking.
(Exhibit A, Deposition of Dr. Dabrow, p. 64, ln. 17 – p. 65, ln. 2)(emphasis
added).

Staying on the topic of standard of care, Dr. Dabrow testified:

Q      Okay. Now, Dr. Hartpence -- from everything
available, would you agree appears to have communicated
with Dr. Bala concerning what he found and what his
thinking was?
A      Yes. Well, I don't know what he actually
said, but --
Q      But it makes sense that that occurred?
A      It makes sense, yes.
Q      Now, at that point -- and he gave his
recommendation, his thoughts as to what should occur --
now, at that point, hasn't Dr. Hartpence done what was
expected of him as a first-year resident?
A      *If he did a complete history and a <u>complete
exam</u>, we would say yes. And if he thought about a
differential diagnosis and presented all that*

8

*information to the attending.*
(Exhibit A, Deposition of Dr. Dabrow, p. 116, ln. 23 – p. 117, ln. 13) (emphasis added).

Lastly, in the questions leading up to the question Defendant Hartpence cites as the basis for its motion as follows, Dr. Dabrow testifies as follows:

Q        Okay. And that being true, that in his level
of training -- and accepting that without question,
having what he did, more or less, communicated to the
attending, and the attending being aware of everything,
the decision to defer doing the neurological exam -- *if*
*he has accepted without question, to use your terms, the*
*strep throat diagnosis*, for a physician at his level of
training and experience, would you agree would be within
the standard of care?
A        It's reasonable.
Q        Okay. And you would agree that, in general,
under all of these circumstances, given his level of
experience, Dr. Hartpence did, in fact, act within the
standard of care in this case?
A        I'm only hesitating a little bit because he's
never acting in a vacuum. Presumably everything he saw
or did or observed, information he transmitted, he
would've talked with the senior resident about, who also
examined the patient, and presumably there was some
feedback loop before they spoke to the attending. So
perhaps they didn't get a full history. *Perhaps they*
*didn't do a full exam.* But if he's in isolation -- and
then again, *part of the resident's responsibility is to*
*think independently*, in graded responsibility, so it is
*possible* that he was within the standard of care at that
level.
(Exhibit A, Deposition of Dr. Dabrow, p. 118, ln. 1 – p. 119, ln. 1) (emphasis added).


## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS


1.   Dr. Hartpence did not know whether a full neurologic examination was performed.

     (Exhibit B, Deposition of Dr. Hartpence, p. 48, lns. 10-21).

2. According to the Via Christi medical chart, Dr. Hartpence deferred the neurologic exam and noted the following regarding neurologic exam, "deferred, pt sleeping, will re-evaluate on the floor.".

(Exhibit C, VCSF Medical Chart at p. VC000016)

3. Dr. Hartpence recorded that D.M. had two emergency room admissions, headache, vomiting, nausea, dizziness, decreased appetite, abnormal labs and that he was sleeping.

(Exhibit C, VCSF Medical Chart at p. VC000015-17)

4. Dr. Hartpence did not establish a differential diagnosis.

(Exhibit C, VCSF Medical Chart at p. VC000015-17)

5. Dr. Hartpence did not perform a physical examination of D.M.

(Exhibit E, Deposition of Kelli Morgan, p. 343, ln. 17 – p. 344, ln. 9).

6. Dr. Hartpence did not look down D.M.'s throat.

(Exhibit E, Deposition of Kelli Morgan, p. 367, lns. 1-12).

7. Kelli Morgan reported to Dr. Hartpence when he came into the emergency room to assess D.M. the following history which included a prior admission to the Wesley emergency room because of a "really severe" headache causing him to scream, nausea, vomiting, dizziness, protruding eyes and her belief D.M. might have meningitis.  Her testimony is as follows:

Q.      Okay. What happened next after they got
the IV fluids?
A.      We just sat and waited. There were a
couple of people that came in and out, but it wasn't
to observe him or check him or anything. They came

10

and they were like -- it almost seemed like a storage
room to me because there were those, like, big
cabinets with a bunch of stuff in it, and people were
coming in and getting supplies out and taking them to
other rooms but not saying anything to us.

Q.      Okay. What's the next thing you recall?

A.      Dr. -- it was a resident from the
pediatric floor that came in.

Q.      Male or female?

A.      Male.

Q.      What was the conversation with him?

A.      He said that we were going to be
admitted for monitoring. And I was shocked, because
I hadn't spoken to anyone. It was like, oh, finally
there's a doctor here to, you know, come and check
him out. I thought that's what we were waiting for
the whole time was for a doctor to come into the room
to check him out. Because I didn't know that the
nurse practitioner was a nurse practitioner. I
thought she was just a nurse.
I thought that the nurse came in and
started the IV fluids and that he was still waiting
to see a doctor, because nobody else had been in
there. And so when the resident came in, he
introduced himself, and I was relieved. I was like,
finally somebody is going to see him.
And he just said, "You're going to be
admitted." And I -- I said, "Why" -- oh, they took
blood when they were doing the IV. They did lab
work. And so I asked him was there something on the
lab work. Like, I was -- you know, mom freak-out
moment. Like, oh, my goodness. There's something
horrible in his lab work and they are having to admit
him because of it.
And he said, "No. No. No. No. There
was nothing wrong with his lab work." That's what he
told me. He said that the white count was a little
elevated, but it's probably from the strep. And they
were just going to admit him because they wanted to
make sure that he was able to keep antibiotics down
in the morning.
And so I went over -- he kind of asked
me what was going on with him. And we were -- we

11

were sitting at the edge, like, at the doorway. I
had scooted my chair down to the edge of the doorway,
and we were having the conversation there, like kind
of away from the bed. And I told him that -- you
know, the full history again.

*I told him that we had been in the ER
earlier at Wesley because he had developed a headache
during church where he was screaming, and it was
really severe, and that he had been nauseous a couple
of days before and that he then did end up vomiting
several times in the ER and since then, and that on
the way to the ER we had noticed that he was rolling
his eyes into the back of his head and really weak
and lethargic at that point.*

*And then I told him about how the time
between the two ERs we had noticed that his symptoms
had gotten worse, closer to the time when we came
back into the Via Christi ER, and I had noticed that
his eyes weren't closing. And I showed him. I
pointed it out because D.M.[2] was still doing that,
to where his eyes weren't shut. They were like half
shut while he was asleep there on the bed.*

*And I said, you know, "His eyes aren't
closing. I think that's really odd. It's like
they're protruding." And his -- his neck, when he
was turning it, he was saying "Ow," so we were really
concerned that he had had strep for longer and that
maybe it was going into meningitis.*

Q.      And what was the response?
A.      "Okay."
Q.      Did he do any sort of examination?
A.      *No. He did not approach his bed.*
Q.      About how long was this conversation?
A.      You know, actually, it was -- it was a
good, like, ten -- ten minutes. Like I really felt
like he sat down and had the longest conversation
with me. Like I felt relieved at that point that he
was actually sitting and listening. I was -- I was
just feeling relief that there was a doctor there

---

[2] Actual deposition testimony referenced Plaintiff's name and was changed to D.M. for purposes of this Response to protect his identity in this line of questioning as well as other testimony cited in this Response.  Furthermore, the attached Exhibits containing deposition testimony have been redacted to protect the identity of the Plaintiff and have either been redacted or changed to D.M.

that I could talk to.
Q.      And once he said "Okay," was there any
more discussion?
A.      He said, "Well, we are getting a room
prepped right now, and we'll be back down when it's
ready."
(Exhibit E, Deposition of Kelli Morgan, p. 178, ln. 5 – p. 181, ln. 22). (Emphasis
added.).

8.  Dr. Dabrow testified that all of his expert opinions were in his expert report which

was attached to his deposition as Exhibit Number 1.  In his report, Dr. Dabrow

criticized Dr. Hartpence for failing to consider other diagnoses including elevated

intracranial pressure, failing to perform a neurological examination, and failing to

order imaging among other deviation.

(Exhibit A, Deposition of Dr. Dabrow, p. 163, ln. 19 – p. 164, ln. 6.; Exhibit F,
Dabrow Expert Report attached as Exhibit Number 1 to Dabrow deposition.)

9.  Dr. Dabrow testified that Dr. Hartpence as well as the other residents should have

developed alternative diagnoses.  He testified as follows:

Q       Okay. And my question, so back to my original
question, do you still agree today that you would not
expect the APRN or the residents to put this diagnosis
together so quickly?
A       *I believe they should have come up with
alternate diagnoses*. I don't know that they would have
come up with a final diagnosis.
(Exhibit A, Deposition of Dr. Dabrow, p. 162, lns. 19-25) (emphasis added).

10. Dr. Stephanie DeLeon is the expert witness designated by Dr. Hartpence.

(Exhibit G, Defendants Connor Hartpence, M.D., Stefanie White, M.D. and Jamie
Borick, M.D.'s Designation of Expert Witnesses, Filing No. 396).

11. Dr. DeLeon confirmed the fact that a neurological examination was not performed.

Dr. DeLeon testified:

13

Q.      Okay. I think we can agree in this case,
you wouldn't have the requisite neurologic findings
because they failed to do a neurological assessment;
correct?
A.      In this case, there was no neurological
exam done.
Q.      I'm sorry, say that again.
A.      In this case, there was no full
neurological exam done.
Q.      *Right, they failed to do a neurological*
*exam, correct?*
A.      *There was not one completed.*
(Exhibit D, Deposition of Dr. DeLeon, p. 50, lns 14-25).

12. Dr. DeLeon further testified that it takes minutes to perform a full neurological

examination, that D.M. needed a neurological examination and that it should be

done sooner rather than later.  DeLeon testified as follows:

Well, I take it for your opinion to hold
true, that there was not a deviation from standard
of care from Dr. Hartpence, Dr. White and Dr.
Borick, you've had to assume that their recitation
of the facts is accurate, that is that Mrs. Morgan
didn't share all of these other symptoms, and to
ignore Mrs. Morgan's statement that she did share
those symptoms, correct?
THE WITNESS: Yes.
Q.      And I take it, in your opinion, that if
Mrs. Morgan did in fact share those concerns as
stated in this short telephone call while driving to
the emergency room, if she shared that information
with Dr. Hartpence, Dr. White and Dr. Borick, they
would have deviated from the standard of care in
this case, correct?
THE WITNESS: If she had shared all of
those comments and the information that she shared
that she shared in her deposition, that should have
prompted more testing and more questioning, but
again, there's nothing that said it would need to be

14

done first thing in the morning when he was admitted
to the hospital, initially.
Q.      It would be better to do it as soon as
possible, wouldn't it, when you have this many
concerning symptoms being recited, it would be
important to do the testing as soon as possible,
wouldn't it?
THE WITNESS: *As soon as is reasonable,*
*yes. Yes.*
*Q.      How long does it take to do a neurological*
*exam?*
*A.      Probably three to four, five minutes,*
*perhaps.*
*Q.      So, a neurological exam would take three,*
*four, maybe five minutes during the time period*
*between D.M. being admitted to the hospital and*
*the time that he coded, correct?*
*A.      Correct.*
*Q.      It would have only taken three, four, five*
*minutes to have completed this necessary*
*neurological exam during those hours, correct?*
*THE WITNESS: It would have taken three to*
*five minutes to complete the exam.*
(Exhibit D, Deposition of Dr. DeLeon, p. 60, lns. 21 – p. 62, lns. 19).  (emphasis
added).

13. Lastly, Dr. DeLeon testified that the standard of care requires a full neurological

examination of D.M. and had one been done sooner it potentially would have led

to earlier intervention and CT imaging.  Dr. DeLeon testified:

Q.      In this case, if we assume that
Mrs. Morgan gave at least the same history at the
hospital that she gave to a nurse on the telephone
while driving, the standard of care would have
required neurological testing, correct?

THE WITNESS: If you assume that she gave
that exact same history to the care providers at the
hospital, it should have prompted a neurological

assessment sometime during his evaluation.

Q.      Did Dr. Borick ever do a neurological exam?

A.      I don't believe she did.

Q.      Did Dr. White ever do a neurological exam?

A.      Not a full neurologic exam, no.

*Q.      Did Dr. Hartpence ever do a full neurologic exam?*

*A.      Not a full neurologic exam.*

Q.      If they failed to give the full neurological exam, and assuming that she gave at least the history she gave on the telephone, that they would have deviated from the standard of care?

THE WITNESS: D.M. needed a full neurological exam sometime during his observation, there is nothing that required that to be done initially and immediately at admission.

Q.      Right. It could have been done anytime between admission and the stroke, couldn't it?

Q.      In fact, a full neurological exam should have occurred sometime between admission and his code at 10:00, correct?

THE WITNESS: Ideally, it would have. But it did not deviate from standard of care for it not to have been done first thing that morning.

Q.      But we can agree that standard of care would dictate that there should have been a full neurologic exam sometime between admission and prior to the code, correct?

A.      Sometime --

*THE WITNESS: -- during his admission, he should have had a full neurologic exam.*

*Q.      And that's standard of care, correct?*

*A.      Correct.*

Q.      And it's a deviation from the standard of care to have failed to do a full neurologic exam at some point between admission and his code at 10:00, correct?

THE WITNESS: No, I don't agree that standard of care said it has to be done in those four hours.

Q.      When does standard of care dictate that it has to be done?

A.      I don't think that standard of care would
dictate that, necessarily.
Q.      So it didn't ever have to be done?
A.      It should have been done at some point
during his admission, but there's nothing that would
say it should have been done at four hours or eight
hours or 24 hours.
Q.      *Can we agree that had a full neurologic*
*exam been conducted, that it could have prevented*
*D.M. from suffering the squall that he now suffers*
*as a result of that code and that stroke?*
*THE WITNESS: If a full neurologic exam*
*had been done that earlier in that morning, and he*
*had findings consistent with increased intracranial*
*pressure on those exams, it potentially could have*
*prompted an earlier CT scan and intervention*
*earlier.*
(Exhibit D, Deposition of Dr. DeLeon, p. 45, ln 14 – P. 48, ln. 18).

14. Dr. Dabrow did not believe D.M. had strep throat and strep throat should have

either been low on the differential or not on the differential at all.  He testified as

follows:

Q   Okay. You agree that as to the providers at
Via Christi whether it's in the ER, or on the floor
before D. coded that strep absolutely should've been on
the differential?
A.  The strep should've been on the differential?
Q   Yes.
A   Strep could've been on the differential, yes.
Q   Should it have been?
A   Be very low.
Q   Whether it's the top one, or the bottom one,
if it's on the differential it's on the differential.
Should it have been there?
A   Whoever had the case I wouldn't have included
strep in the differential.
Q   Okay. Would you be critical if strep was on
the differential?
A   Strep could've been on differential. And I
I think that's the answer you were looking for.

Q   Okay. Do you agree that it was appropriate to
administer antibiotics to D.M., both based upon his
presentation at Wesley, and in the ER at Via Christi.
A   I would only administer antibiotics to a
patient who had a clear cut case of strep throat.
Q   So the things that we've gone through wouldn't
justify in your mind, and make sure we're clear on these
things, an erythematous throat, enlarged tonsils,
adenopathy, elevated white blood count, and a positive
strep test would not justify the administration of
antibiotics?
A   The erythematous red throat could be explained
by many things including vomiting, a viral illness. The
adenopathy you described is not consistent with strep
throat, as it's usually anterior and posterior cervical
adenopathy. What were the other things you had
mentioned? The white count, strep throat in general is
not a systemic illness and you rarely have an elevated
white count. Although, I concede any infectious process
could have an elevated white count. So I would not have
included the differential of strep throat. But if a
diagnosis of strep throat is made correctly, antibiotics
are the treatment of choice.
(Exhibit A, Deposition of Dr. Dabrow, p. 33, ln. 4 – p. 34, ln. 19).

## **INTRODUCTION**

This is a medical case involving D.M. who suffered an avoidable debilitating stroke.

Although the facts and medicine are complex, the present Motion for Summary Judgment is simple

and straightforward.  In his motion, Defendant Hartpence fails to properly inform the Court of all

the opinions expressed by Dr. Dabrow in his deposition.  Furthermore, Defendant Hartpence fails

to cite his own expert's (Dr. Stephanie DeLeon) criticisms of him as well as the other residents.

When the entirety of Dr. Dabrow's and Dr. DeLeon's testimony is reviewed as well as the pertinent

facts, there is no doubt Plaintiff has produced the required expert testimony.

## AUTHORITIES AND ARGUMENTS

The only issue before the Court is whether D.M. submitted sufficient expert testimony regarding standard of care to avoid summary judgment as to Defendant Hartpence. Even though the question of whether the defendant's actions were substandard is typically a fact question for the jury, where the facts of a case are susceptible to only one conclusion, the question is one of law and may be properly subject to summary judgment. *Baker v. City of Garden City*, 240 Kan. 554, 557, 731 P.2d 278 (1987). Summary judgment is governed by F.R.C.P. Rule 56 which provides in pertinent part:

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> The burden on the party seeking summary judgment is a strict one.

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), cert. denied, 506 U.S. 1013, 113 S. Ct. 635, 121 L. Ed. 2d 566 (1992) *The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought*. *Id.* (Emphasis added)*.* The party opposing summary judgment, however, has the affirmative duty to come forward with facts to support its claim, *although it is not required to prove its case*. See *Willard v. City of Kansas City*, 235 Kan. 655, Syl. ¶ 2, 681 P.2d 1067 (1984); *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, Syl. ¶ 5, 661 P.2d 348 (1983). (Emphasis added).

Rarely is summary judgment proper in negligence cases. *Phillips v. Carson*, 240 Kan. 462, 472, 731 P.2d 820 (1987).  In *Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), the United States Supreme Court analyzed Rule 56(c) of the Federal Rules of Civil Procedure. In *Celotex*, the United States Supreme Court held there can be no genuine issue as to any material fact when the plaintiffs offer no proof concerning an essential element of their case. The Court stated:

> "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses and we think it should be interpreted in a way that allows it to accomplish this purpose." 477 U.S. at 323-24.

Negligence is never presumed in a medical malpractice action.  *Tatro v. Lueken*, 212 Kan. 606, 611, 512 P.2d 529 (1973). The plaintiff in a medical malpractice case bears the burden of showing the doctor's negligence. See *Funke v. Fieldman*, 212 Kan. 524, 535, 512 P.2d 539 (1973). Except where the lack of reasonable care is apparent to the average layman, expert testimony is required in medical malpractice cases to establish the accepted standard of care. *Webb v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22 (1978); *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 48-51, 510 P.2d 190 (1973). Expert witnesses must confine their opinions to matters in issue which are certain or *probable* and not testify as to mere *possibilities*. *Nunez v. Wilson*, 211 Kan. 443, Syl. ¶ 1, 507 P.2d 329 (1973).  (Emphasis added).

It is important to note that there are no "magic words" required when an expert is conveying his/her opinions and courts generally do not indulge in "semantic refinements."  *Id*.  It is important to review the expert's testimony as a whole, not in isolation.  The fact the expert's opinion may be lacking during a line of questioning does not negate the opinions found in other areas of the expert's testimony.  *Id*.

In this case, there is sufficient expert testimony that Defendant Hartpence deviated from the standard of care.  When the testimony of Dr. Dabrow and Dr. DeLeon is viewed in the light most favorable to D.M., Defendant Hartpence's motion must be denied.

I.   **D.M. HAS PRODUCED EXPERT OPINIONS ESTABLSIHING A BREACH OF THE STANDARD OF CARE BY DEFENDANT HARTPENCE.**

D.M. has provided the requisite expert opinions to defeat Defendant Hartpence's summary judgment motion.  A review of that testimony demonstrates that both Dr. DeLeon and Dr. Dabrow were critical of Dr. Hartpence for not performing a neurological examination, establishing a differential diagnosis, and ordering a CT scan.

Defendant Hartpence's arguments really comes down to just one question and one answer in Dr. Dabrow's testimony.  Frankly, Defendant Hartpence took Dr. Dabrow's answer out of context resulting in "sematic refinements" which courts have frowned upon as noted in *Nunez*. Defendant Hartpence ignored the majority of Dabrow's deposition testimony critical of Defendant Hartpence's conduct as well as the other resident physicians.  Let us examine the totality of Dr. Dabrow's relevant testimony regarding the standard of care.

First, Dr Dabrow testified that "*a resident is required to do a complete history and physical*" in response to a question about a resident's <u>duty</u> when he/she sees a patient in the hospital. See Plaintiff's Response to Defendant's Statement of Uncontroverted Controverted Fact Number 5. (Emphasis added).  This is one of the many criticisms that Dr. Dabrow outlined in his deposition. In this case, Dr. Hartpence did a history but he did not perform a neurological examination which was required.  Dr. Hartpence provided support to this fact by testifying that he did not perform a full neurological examination.  Furthermore, he did not record a neurological examination in the

21

medical record and "deferred" the examination altogether even though D.M. presented with headache, dizziness, nausea, vomiting, slurred speech, bulging eyes among other complaints consistent with an intra-cranial process.

Dr. Dabrow testified that "it's the *duty* between one or both of them (referencing defendant residents Hartpence and Smith) to get a complete history, *and to do a complete physical exam from head to toe,* regardless of the complaint. *That's why the child is in the hospital. It's not a babysitting service*. See Plaintiff's Response to Defendant's Statement of Uncontroverted Controverted Fact Number 5, 8, 9 & 10. (Emphasis added). In the series of questions that followed, Dr. Dabrow was given hypotheticals where the diagnosis was assumed to be "certain," i.e. strep throat. Those hypotheticals produced the very testimony Defendant Hartpence now relies upon to support his motion. If indeed the diagnosis was "certain" then, of course, there could be exceptions to performing a neurological examination. However, that does not apply to the present case as the diagnosis was never certain and in Dr. Dabrow's opinion a more robust differential was required. See Plaintiff's Response to Defendant's Statement of Uncontroverted Controverted Fact Number 10. As a matter of fact, Dr. Dabrow questioned the diagnosis of strep throat. PSAMF Number 14.

In the pages leading up to the testimony Defendant Hartpence cites as the basis for his motion, Dr. Dabrow again makes clear his opinions regarding Dr Hartpence. When ask whether Dr. Hartpence had done what was expected of a first-year resident after discussing with Dr. Bala and making recommendations, Dr. Dabrow testified "*if he (Hartpence) did a complete history and a complete exam, we would say yes.* And if he thought about a *differential* and presented all that information to the attending." See Plaintiff's Response to Defendant's Statement of Uncontroverted Controverted Fact Number 10. (Emphasis added). In reality, Dr. Hartpence did

not establish a differential in the medical record and he did not perform complete exam. Furthermore, Defendant Hartpence does not even remember what was discussed with Dr. Bala. Defendant Hartpence Statement of Uncontroverted Facts Number 6. Therefore, Dr. Hartpence did NOT do what was expected of a first-year resident.

For purposes of his motion, Defendant Hartpence relies upon the question and answer found on page 119, line 2-8 of Dabrow's testimony. But, Defendant Hartpence ignores the testimony leading up this question and answer. As a matter of fact, Dabrow's answer in the prior question was framed as a hypothetical, not the actual facts. For example, in the lead-up question Dr. Dabrow was asked to assume the strep throat diagnosis. However, Dr. Dabrow made clear in his testimony that this was not a "strep throat" case and a full physical examination was required based upon D.M. presentation. If indeed this was a clear "strep throat" case, then Dabrow's answer on page 119, line 8 would stand. However, that clearly is not the case. At best, Defendant Hartpence merely has fodder for cross-examination but not grounds for summary judgment.

In addition to Dr. Dabrow's testimony, D.M. has the testimony of defense expert Dr. DeLeon who is a witnessed designated in the Pretrial Order. Like Dr. Dabrow, she shares in some of the same criticisms of Defendant Hartpence. First, she acknowledges that a neurological examination was not performed. Plaintiff's Statement of Additional Material Facts (PSAMF), Number 10. Second, she acknowledges that a neurological examination should have been done. PSAMF Number 13. Third, she testified that the neurological examination could have been done in minutes. PSAMF Number 12. Lastly, she testified that if Kelli Morgan had shared the details of her telephone call (Kelli Morgan to Children's Mercy) with Dr. Hartpence, it should have prompted "more testing" and that should have been done sooner rather than later. PSAMF Number 13.

Unquestionably, DeLeon testified that D.M. needed a full neurological examination and that is the standard of care.  Defendant Hartpence will argue DeLeon testified such an examination could have been done anytime after D.M. was admitted.  However, DeLeon clearly testified that the sooner the examination was performed the better.  PSAMF Number 12.  Furthermore, she testified that an earlier neurological examination could have prompted earlier intervention.  PSAMF Number 13.

## **CONCLUSION**

As established above, Plaintiff has produced expert testimony that Dr. Hartpence departed from the standard of care and, for this reason, Defendant Hartpence is not entitled to judgment as a matter of law.


Respectfully submitted,


/s/ Daniel B. Giroux
Daniel B. Giroux, #19375
DUGAN & GIROUX LAW, INC.
3636 N. Ridge Rd., Suite 100
Wichita, Kansas 67205
Telephone: (316) 721-5500
Facsimile: (316) 722-7510
Email: dan@dgwichitalaw.com

 and


/s/ Stephen J. Torline
Stephen Torline            KS #18292
Michael J. Kuckelman       KS #14587
Benjamin T. Friesen        KS#26655
KUCKELMAN TORLINE KIRKLAND
10740 Nall, Suite 250
Overland Park, Kansas 66211
Direct dial: 913-948-8615

24

Fax: 913-948-8611
storline@ktk-law.com
mkuckelman@ktk-law.com
bfriesen@ktk-law.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May 2020, a copy of the above and foregoing was

sent via electronic mail to the following:

Gregory S. Young
Brian L. White
Hinkle Law Firm, LLC
gyoung@hinklaw.com
bwhite@hinklaw.com
  *Attorneys for Defendant Jennifer Chambers-Daney, APRN*

Don D. Gribble, II
Hite, Fanning & Honeyman, LLP
gribble@hitefanning.com
  *Attorneys for Defendant Dr. Bala Bhaskar Reddy Bhimavarapu*

Steven C. Day
Christ S. Cole
Woodard, Hernandez, Roth & Day, LLC
scday@woodard-law.com
ccole@woodard-law.com
  *Attorneys for Defendants Stefanie White, MD, Connor Hartpence, MD and Dr. Jamie Borick*

Tracy A. Cole
Gilliland Green, LLC
tcole@gglawks.com
  *Attorneys for Defendants Bridget Grover, PA-C and Dr. Gregory Faimon*

And

Dustin J. Denning
Clark, Mize & Linville, Chtd.
djdenning@cml-law.com
   *Attorneys for CEP America-KS LLC*


By  /s/ Daniel B. Giroux_____
   Daniel B. Giroux, #19375