IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY, KANSAS DIVISION

D.M., a minor, by and through     )
his next friend and natural       )
guardian, KELLI MORGAN,           )
                                  )
          Plaintiff,     )
                                  )
                                  )
     vs.              )Case No. 2:18-CV-02158
                                  )
                                  )
WESLEY MEDICAL CENTER LLC d/b/a   )
WESLEY MEDICAL CENTER-WOODLAWN;   )
WESLEY WOODLAWN CAMPUS; BRIDGET   )
GROVER, PA-C; DR. GREGORY         )
FAIMON; LISA JUDD, RN; VIA        )
CHRISTI HOSPITALS WICHITA,        )
INC.; JENNIFER CHAMBERS-DANEY,    )
ARNP; DR. BALA BHASKAR REDDY      )
BHIMAVARAPU; CEP AMERICA-KS       )
LLC; DR. CONNOR HARTPENCE; DR.    )
STEFANIE WHITE; DR. JAMIE         )
BORICK; and AARON KENT, RN,       )
                                  )
          Defendants.    )
                                  )

D E P O S I T I O N

The videotape deposition of CONNOR HARTPENCE, M.D.

taken on behalf of the Plaintiff pursuant to the Federal

Rules of Civil Procedure before:

          RICK J. FLORES, CSR
          KELLEY REPORTING ASSOCIATES, LTD.
          515 South Main, Suite 108
          Wichita, Kansas  67202

a Certified Shorthand Reporter of Kansas, at 245 North

Waco, Suite 260, Wichita, Sedgwick County, Kansas, on the

4th day of January, 2019, at 9:08 a.m.



EXHIBIT

B

## Page 2

```
 1        A P P E A R A N C E S
 2
 3   PLAINTIFF:
 4      DUGAN & GIROUX LAW, INC.
        Mr. Daniel B. Giroux
        940 N. Tyler, Suite 206
 5      Wichita, KS  67212
        (316) 721-5500
 6      Fax: (316) 722-7510
        dan@dgwichitalaw.com
 7
 8   KUCKELMAN TORLINE KIRKLAND
        Mr. Michael J. Kuckelman
        10740 Nall Avenue, Suite 250
 9      Overland Park, KS  66211
        (913) 948-8612
10      Fax: (913) 948-8611
        mkuckelman@ktk-law.com
11
12   DEFENDANTS WESLEY MEDICAL CENTER, LLC and
     LISA JUDD, RN:
13      GIBSON WATSON MARINO LLC
        Ms. Michelle M. Watson
        301 North Main, Suite 1300
14      Wichita, KS  67202-4813
        (316) 264-7321
15      Fax: (316) 264-8614
        michelle@gwmks.com
16
17   DEFENDANTS BRIDGET GROVER, PA-C and
     DR. GREGORY FAIMON:
18      GILLILAND & GREEN LLC
        Ms. Tracy A. Cole
        20 W. 2nd Avenue, 2nd Floor
19      P.O. Box 2977
        Hutchinson, KS  67504
20      (620) 662-0537
        Fax: (620) 669-9426
21      tcole@gglawks.com
22   DEFENDANTS VIA CHRISTI HOSPITALS, INC. and
     AARON KENT, RN:
23      MARTIN PRINGLE
        Ms. Samantha Woods
24      100 N. Broadway, Suite 500
        Wichita, KS  67202
25      (316) 265-9311
        Fax: (316) 265-2955
26      smwoods@martinpringle.com
27
```

## Page 3

```
 1        A P P E A R A N C E S  Cont'd
 2
     DEFENDANT JENNIFER CHAMBERS DANEY, APRN:
 3      HINKLE LAW FIRM, LLC
        Mr. Gregory Young
 4      1617 N. Waterfront Parkway, Suite 400
        Wichita, KS  67206-6639
 5      (316) 267-2000
        Fax: (316) 630-8466
 6      Gyoung@hinklaw.com
 7   DEFENDANT DR. BALA BHASKAR REDDY BHIMAVARAPU:
 8      HITE, FANNING & HONEYMAN, LLP
        Mr. Don D. Gribble, II
        100 North Broadway, Suite 950
 9      Wichita, KS  67202
        (316) 265-7741
10      Fax: (316) 267-7803
        Gribble@hitefanning.com
11
12   DEFENDANT CEP AMERICA-KS, LLC:
        CLARK, MIZE & LINVILLE, Chartered
13      Mr. Dustin J. Denning
        129 South Eighth Street
        Salina, KS  67402-0380
14      (785) 823-6325
        Fax: (785) 823-1868
15      Djdenning@cml-law.com
16   DEFENDANTS DR. STEFANIE WHITE, DR. CONNOR HARTPENCE
     and DR. JAMIE BORICK:
17      WOODARD, HERNANDEZ, ROTH & DAY, LLC
        Mr. Steven C. Day
18      245 North Waco, Suite 260
        Wichita, KS  67202-0127
19      (316) 263-4958
        Fax: (316) 263-0125
20      Scday@woodard-law.com
21   VIDEOGRAPHER:
        Advanced Document Imaging
22      Mr. Michael Miles
        515 S. Main, Suite 105
23      Wichita, KS  67202
        (316) 267-9380
24      Fax: (316) 267-9382
        video@kelleyreporting.com
25
     Also present:  Dr. Bala Bhimavarapu and Ms. Joey
26   Dean, Risk Manager, Wesley Medical Center.
27
```

## Page 4

```
 1              I N D E X
 2
 3
     CONNOR HARTPENCE, M.D.
 4   Direct Examination by Mr. Giroux:       5
 5   Cross-Examination by Mr. Denning:     119
 6   Cross-Examination by Mr. Day:         123
 7   Redirect Examination by Mr. Giroux:   124
 8
 9
10
11   No Exhibits Marked.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26   SIGNATURE OF WITNESS               128
27   CERTIFICATE              129
```

## Page 5

```
 1           VIDEOGRAPHER:  This begins the
 2   videotape deposition of Dr. Connor Hartpence.
 3   Today is January 4th, 2019, and the time is
 4   9:08 a.m.
 5           Will the court reporter please swear
 6   in the witness.
 7           CONNOR HARTPENCE, M.D.
 8   having been first duly sworn on his oath to
 9   state the truth, the whole truth, and nothing
10   but the truth, testifies as follows:
11           DIRECT EXAMINATION
12   BY MR. GIROUX:
13   Q.   Please state your name for the record.
14   A.   Connor Hartpence.
15   Q.   And your home address?
16   A.   ███████████████████████████.
17   Q.   Doctor, I -- my name's Dan Giroux.  I
18   introduced myself to you before the
19   deposition.
20   A.   Uh-huh.
21   Q.   I represent D███ M████ in this action.
22   You understand that?
23   A.   Yes.
24   Q.   And essentially what I'm going to try to
25   accomplish today, if I ask my questions
```

Page 6

1    correctly, is I'm going to ask you questions
2    concerning the care and treatment that you
3    provided to D███ M███ on March 6 of 2017.
4        You understand that?
5    **A.  Yes.**
6    Q.   And have you ever been through a deposition
7    before?
8    **A.  I have not.**
9    Q.   I know that Mr. Day's probably gone through
10   some of the rules with you, but just so that
11   we have a clear understanding and we make a
12   good record and we can get through the
13   morning quickly, if I ask a question you
14   don't understand, can you have me rephrase,
15   please.
16   **A.  Yes.**
17   Q.   If at anytime you need to take a break, can
18   you let me know, and I'll accommodate you
19   with a break.
20   **A.  Yes.**
21   Q.   Also, it's important, since there is a
22   written record being made, that any answer
23   that you give, please give an audible answer,
24   a yes or a no or a narrative if the question
25   calls for it.

Page 7

1        Can you do that?
2    **A.  Yes.**
3    Q.   And, you know, I know it's been almost two
4    years since this incident occurred, and if I
5    ask you a question you don't know the answer
6    to or you don't remember, that's a perfectly
7    acceptable answer.
8        You understand that?
9    **A.  Yes.**
10   Q.   Can we assume that if you do answer my
11   question that you've understood my question?
12   **A.  Yes.**
13   Q.   You'll have an opportunity, after this
14   deposition, to look at the transcript and
15   make any changes to it.
16       So if there are any things that you
17   don't understand or didn't understand, you
18   answered incorrectly, you will have the right
19   to make those changes.
20       You understand that?
21   **A.  Yes.**
22   Q.   Tell me what, if anything, you've done to
23   prepare for your deposition today other than
24   any discussions with your lawyer.
25   **A.  Discussions with my lawyer and then just**

Page 8

1    **reading through the record, reviewing the**
2    **record.**
3    Q.   What portions of the record did you review?
4    **A.  I tried to look at all of it, but it's a lot.**
5        **So I focused on my history and physical and**
6        **the initial emergency room documentation.**
7    Q.   Okay.  Is there a reason why you looked at
8    the emergency room documentation?
9    **A.  I would have reviewed that prior to seeing**
10       **D███.**
11   Q.   And then in terms -- it looks like in review
12   of the records myself that the emergency room
13   documentation isn't too lengthy; is that --
14   **A.  Correct.**
15   Q.   And at the time that you were providing care
16   to D███ and you were summoned down into the
17   ER, would all the records that you reviewed
18   in preparation for your deposition, would
19   those have already been generated at the time
20   that you delivered care?
21   **A.  I believe so.**
22   Q.   Okay.
23   **A.  Yes.**
24   Q.   Is there anything in the records now in your
25   review that look different than they were in

Page 9

1    March of 2017 when you were delivering care
2    to D███?
3    **A.  No.**
4    Q.   Other than, obviously, you reviewed all the
5    records that you created; correct?
6    **A.  Yes.**
7    Q.   And then tell me specifically what other
8    records that you looked at to the best of
9    your recollection.
10   **A.  I reviewed Dr. Borick's progress note the**
11       **next morning, and then I kind of skimmed**
12       **through the intensive care notes.**
13   Q.   Did you look at Dr. White's note?
14   **A.  Her addendum?**
15   Q.   Yes.
16   **A.  Yes.**
17   Q.   Okay.  Did you look at any of the
18   consultation notes, say Dr. El-Nabbout or
19   Dr. Grundmeyer?
20   **A.  Yes.**
21   Q.   Did you look through the intensivist's note?
22   **A.  There were a lot of them.  I glanced through**
23       **them, yes.  I don't know that I read them**
24       **thoroughly.**
25   Q.   Okay.  And then beyond the medical records,

3 (Pages 6 to 9)

## Page 10

1    have you reviewed any depositions?
2    A.  Dr. White's deposition.
3    Q.  Okay.  And when did you last review that
4    deposition?
5    A.  I read through it again yesterday.
6    Q.  And how many times have you read through it?
7    A.  Fully one time.  One and a half, I would say.
8    Q.  Yeah.  Anything in that deposition that you
9    remembered differently in terms of delivering
10    care to D███ M█████?
11    A.  No.
12    Q.  Her recollection or her testimony's
13    consistent with what you recall?
14    A.  Yes.
15    Q.  Beyond -- anyone else's deposition?
16    A.  I have not read any other depositions.
17    Q.  We talked about medical records.  We talk
18    about depositions.
19        Any other documentation that you've
20    reviewed in anticipation of your deposition
21    today?
22    A.  No.
23    Q.  Have you -- tell me what -- you're in
24    residency right now?
25    A.  Correct.

## Page 11

1    Q.  Okay.  And what year of residency are you in?
2    A.  I'm now in my third year.
3    Q.  And what's your specialty?
4    A.  Family medicine.
5    Q.  In March of 2017, you would have been in your
6    first year?
7    A.  That's correct.
8    Q.  When did your first year of residency begin?
9    A.  It would have been July of 2016.
10    Q.  And then from July 2016 up to March 2017, I
11    take it, that you would have rotated through
12    various specialties?
13    A.  That's correct.
14    Q.  Tell me to the best of your recollection what
15    specialties, up until March of 2017, that
16    you -- that you had experience in.
17    A.  I would have had a lot of family medicine
18    clinic.  We do that longitudinally.  And then
19    I would have had at least one, I believe I
20    had two, adult medicine inpatient blocks,
21    which is a 4-week block.  And I would have
22    had one, at least one, obstetrics block or
23    labor and delivery.  I'd also had a
24    dermatology rotation, an ENT rotation.  And
25    those are the -- those are the only ones I

## Page 12

1    remember for sure.
2    Q.  What was your level experience in dealing
3    with pediatric patients, let's say, by March
4    6th of 2017?
5    A.  Sure.  I had seen multiple pediatric patients
6    in the clinic, and that would have been my
7    first inpatient pediatric rotation in
8    residency.
9    Q.  And then I take it in March of 2017, you were
10    doing a pediatric rotation?
11    A.  Correct.
12    Q.  And when would that have started in relation
13    to March 6th?
14    A.  It's tough to say because they're four week
15    blocks.  It doesn't go by month.
16    Q.  Yes.
17    A.  So I couldn't say for certain when it
18    started.
19    Q.  Do you know whether you were on the front end
20    or the back end or in the middle or do you
21    just not remember?
22    A.  I can't say for certain.  I think I was on
23    the back end, but I don't know for sure.
24    Q.  Patients -- pediatric patients, let's say, by
25    March 6th of 2017 that presented to the

## Page 13

1    emergency room that were going to be admitted
2    to the general floor, can you give me an
3    estimate of how many patients' care you were
4    involved in?
5    A.  Yes.  So each day I would have been rounding
6    on anywhere between 4 to 6 pediatric patients
7    on the floor.  And I would have had several
8    call days, as we call them, where we're the
9    resident on call to take admissions from the
10    emergency room.  Typically, that ranges from
11    anywhere from 1 to 5 admissions per day.  I
12    couldn't tell you how many I did up to that
13    point.
14    Q.  So let's say on March 6 of 2017, were you
15    working on the pediatric floor or were you
16    working in the ER?
17    A.  I was assigned to the pediatric floor and I
18    would have been accepting -- I would not be
19    accepting admissions, but I would be helping
20    admit patients from the ER to the pediatric
21    floor.
22    Q.  So that would be one thing that you would be
23    doing?
24    A.  Correct.
25    Q.  Okay.  What other responsibilities as a first

## Page 14

1      year family practice resident would you have
2      during a pediatric rotation at that time?
3 A.   It would depend on if I was assigned to a
4      day -- to the days or the nights.
5 Q.   And this time you would have been assigned
6      during what -- was it the nights?
7 A.   I was on nights, yes.
8 Q.   What would be your duties at night?
9 A.   My sole duty -- well, I guess there's a
10      couple duties.  One would be to admit
11      patients, and then two would be to respond to
12      any patients of patients on the floor or in the
13      PICU overnight.
14         Our residents take pages and calls on
15      the patients that they're assigned to
16      overnight.  So the residents who are on
17      during the day, the patients that they are
18      seeing and following, they will take calls on
19      those patients overnight from the nurses.
20         However, if there is something that
21      needs evaluated in-house, they will call the
22      residents who are there, the night residents,
23      so that would be one of the rules.  **Roles**
24 Q.   The scenario with D█████ where he was
25      admitted from the ER, that was a scenario

## Page 15

1      that you were familiar with --
2 A.   Yes.
3 Q.   -- I think, by March 6 of 2017?
4 A.   Yes.
5 Q.   Tell me, when you are charged with the task
6      of admitting a pediatric patient from the ER,
7      essentially, the admit, what do you do during
8      the admit?
9 A.   Sure.  Do you want that from a intern
10      resident perspective or a senior resident
11      perspective?
12 Q.   From an intern 'cause you were an intern at
13      the time; right?
14 A.   Correct.
15 Q.   Yeah.
16 A.   So usually the way it works is the senior
17      resident would have received a call from the
18      attending doctor saying, hey, this is a
19      patient that needs to be admitted to the
20      floor and this is why.
21         The senior resident would then tell
22      the intern resident, hey, we have a patient
23      down in the ER.  This is the room they're in.
24      This is the chief complaint or the reason
25      they need to be admitted.

## Page 16

1         At that point, it was my role to do
2      the history and physical exam.  And then
3      after doing the full history, the physical, I
4      would then formulate an assessment and plan
5      and talk to the senior resident.
6         After doing that, the senior resident
7      will then do their own evaluation of the
8      patient.  They will talk to the junior
9      resident about any discrepancies in the
10      history or the exam, any changes they think
11      that need to be made to the plan, and then it
12      would be my role to call the attending
13      physician and check out the patient to the
14      attending.
15 Q.   And then when you -- when you get assigned to
16      admit a pediatric patient from the ER, is it
17      your custom, habit and routine to review the
18      ER chart?
19 A.   It is my routine, yes.
20 Q.   Okay.  And then do you know whether, in this
21      particular case, whether you would have
22      reviewed the emergency room charting?
23 A.   I don't remember specifically, but I don't
24      see any reason why I wouldn't have because it
25      is my regular routine.

## Page 17

1 Q.   Why is that your regular routine?
2 A.   It's -- it's something that was passed down
3      to me from senior residents when I was an
4      intern.  It's just a way of being thorough
5      and trying to make sure that we're not
6      missing things.
7         Sometimes, you know, they may have
8      pieces of history that we aren't able to
9      obtain from the patient for whatever reason.
10 Q.   What would be the various reasons why you
11      would be unable to obtain certain histories
12      that others are able to?
13 A.   I think it varies.  Sometimes, you know,
14      patients just may not provide the same
15      information to different people that they
16      talk to.
17 Q.   Is that common?
18 A.   I would say it's fairly common.
19 Q.   How about in the pediatric population where
20      you have a pediatric patient that is ill, who
21      presents with a parent, in a situation like
22      that, is it common?
23 A.   I would say it's no less or more common than
24      it is in an adult patient.
25 Q.   So in the pediatric population, when you are

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105       WICHITA, KANSAS
316.267.8200                           67202

**Page 18**

1  gathering history, do you sometimes have to
2  gather the history from the parent?
3  A.  A lot of the time, most of the history comes
4     from the parent, yes.
5  Q.  Is it sometime difficult to gather history
6     from a parent?
7  A.  It can be.  It definitely varies.  It depends
8     on very many factors.
9  Q.  In your training and experience at least up
10    to that time as a first year resident, did
11    you learn techniques, wherein, you would
12    gather history from other parents or patients
13    who are difficult to gather history from?
14 A.  I would say that I received a lot of training
15    on that in medical school and then in
16    residency.  I don't think there was any
17    formal training for that.  It was more of a
18    learn on the job type of training.
19 Q.  Can you tell me a little bit of the training
20    that you would have received in medical
21    school regarding that, eliciting history?
22 A.  Sure.  I went to med school at Case Western
23    in Cleveland, Ohio.  And there's a large
24    portion of the curriculum in the -- actually
25    at first through fourth year where we work

**Page 19**

1  with standardized patients on obtaining
2  history, doing physical exams.  And there is
3  a portion of that curriculum that is
4  dedicated to difficult patients.  And
5  difficult could mean difficult to obtain
6  history, difficult to get an exam, many
7  different things, but yes, there is a
8  standardized curriculum for that.
9  Q.  You made a reference in one of your previous
10    responses that one of the reasons why you
11    look through the ER charting before you --
12    while you're doing the admit is to be
13    thorough.
14 A.  Uh-huh.
15 Q.  Correct?
16 A.  Correct.
17 Q.  How about in situations where you have a
18    patient who is re-presenting to the ER for --
19    or a hospital for pretty much the same
20    reason, do you try to elicit history
21    regarding the previous admission?
22 A.  Yes, I would say -- I would say that I would
23    want to elicit that history, yes.
24 Q.  Why would that be important?
25 A.  It's part of the history of -- the history of

**Page 20**

1  present illness, the HPI.  It's all part of
2  the recent history of the current illness,
3  which is part of the history and physical.
4  Q.  So the history and -- would your history and
5     physical examination, to your knowledge, be
6     any different than the history and physical
7     examination that was done in the ER?
8        MR. YOUNG:  Object to form;
9  foundation.
10 A.  Sorry.  Can you repeat that.
11 BY MR. GIROUX:
12 Q.  In a general sense, the history and physical
13    examination that you perform, would it be any
14    different than the history and physical
15    examination that's being done by the -- by
16    the physician or the midlevel provider in the
17    emergency room?
18       MR. YOUNG:  Same objections.
19 A.  I don't see why it would be any different.  I
20    do think sometimes we ask a little bit more
21    as far as family history, social history,
22    those types of things, than they do in the
23    emergency room, but I can't say for certain.
24    It would depend on -- depend on the provider
25    and the scenario, I guess.

**Page 21**

1  Q.  The -- you talk about doing a history and
2     physical examination.
3        What's the importance of doing a --
4     first of all, what is a physical examination?
5  A.  It's exactly what it sounds like:  An exam of
6     the patient to basically evaluate their
7     wellbeing and see if you can help guide your
8     decisionmaking to figure out what's wrong
9     with the patient.
10 Q.  Is your -- is your -- is your physical
11    examination of patient, is it more focused
12    based upon their presenting symptoms?
13 A.  Yes.  In general, yes.
14 Q.  And then how does -- if they present, let's
15    say, with, like in D████ case, with just
16    nausea and vomiting, but they have a history
17    of dizziness and balance issues and headache,
18    how does that factor into your physical
19    examination of the patient?
20 A.  I'd -- you know, with this case, I don't
21    recall getting a history of balance issues,
22    but, typically, you -- we would do an exam
23    that we found appropriate for that specific
24    scenario.
25       For D████, mom's main complaint was

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105                    WICHITA, KANSAS
                                    316.267.8200                                      67202

Page 22

1    **that he couldn't keep his antibiotics down**
2    **and she was worried that he was dehydrated.**
3    **So we do an assessment for dehydration.**
4    **There's various things you can look for with**
5    **that and just a general exam for him.**
6    Q.  So during the history and physical
7    examination in D⬛ case, let's just say,
8    how long would that have taken?
9    A.  **The entire process of getting the history and**
10   **doing the physical?**
11   Q.  Let's just -- yeah, let's break it down.
12        First of all, how long would it take
13   to get the history?
14        MR. DAY:  How long did it take,
15   he thinks?
16   BY MR. GIROUX:
17   Q.  Yes.  How long do you think --
18   A.  **How long did it take?**
19   Q.  Yes.
20   A.  **I believe -- it was somewhere around 15 to**
21   **20 minutes, I believe, getting the history**
22   **from mom.**
23   Q.  And then doing a physical examination?
24   A.  **Five minutes.  Five minutes or less.**
25   Q.  And you said the history took about 15 to 20

Page 23

1    minutes; is that correct?
2    A.  **That would be my estimate.  I don't know for,**
3    **you know, hundred percent certainty.**
4    Q.  Do you think you wrote down everything that
5    she told you?
6    A.  **I actually had my computer with me, so I**
7    **think I did, yes.**
8    Q.  So when you say you have your computer with
9    you, you were taking notes directly into the
10   medical chart?
11   A.  **Correct.**
12   Q.  Okay.  So this would have been something that
13   you would have done -- while you're talking
14   to and interviewing her and gathering
15   history, you would be contemporaneously
16   inserting into the medical chart?
17   A.  **That's correct.  I take my laptop with me to**
18   **see patients.**
19   Q.  Can you tell me, to the best of your
20   recollection and review of the records, at
21   what point in time did you actually go in and
22   see D⬛
23        When's the first time that you saw
24   him?
25   A.  **What time of day?**

Page 24

1    Q.  Yes, sir.
2        MR. DAY:  Do you want him to look
3    at the record?
4    Q.  You can refer to the records if you need.  I
5    got an extra copy if you need one.
6        MR. DAY:  This is -- I don't know
7    whether this is going to be the part of the
8    record you need or not.  You can look at it
9    if you want and see if it's in there.
10   A.  **I believe it's --**
11   BY MR. GIROUX:
12   Q.  I think your note begins on 14,
13   Dr. Hartpence.
14   A.  **Okay.**
15   Q.  I apologize.  It's 15.
16   A.  **So looks like the note was started at 5:18.**
17   **Usually, I start the note right before I go**
18   **into the room.  So I would estimate that it**
19   **was somewhere between 5:20 and 5:30.  I don't**
20   **know for sure, though.**
21   Q.  Do you know, at least, in D⬛ case, did
22   you have any discussions with any of the ER
23   providers?
24   A.  **I don't recall if I did or did not.  I know**
25   **that I walked by the desk, but I don't recall**

Page 25

1    **if I did or did not.**
2    Q.  Do you know who the ER provider was?
3    A.  **I know from the chart.  I don't -- I don't**
4    **have any specific recollection of that,**
5    **though.**
6    Q.  And then before seeing D⬛, who would you
7    have spoken to in terms of -- would you have
8    spoken to the second year resident at the
9    time?
10   A.  **Yes, and I believe Dr. White was a third year**
11   **resident at the time.**
12   Q.  That's fine.  And she would have been the
13   senior resident?
14   A.  **Uh-huh.**
15   Q.  And tell me what, if anything, you recall
16   about that conversation with her.
17        MR. DAY:  Doctor, you're doing a
18   great job, but try to avoid uh-huhs and
19   huh-uhs 'cause it doesn't make for a clear
20   record.
21   A.  **Okay.**
22        MR. DAY:  You did that --
23   A.  **Okay.  Okay.  Okay.  Sorry.  Can you repeat**
24   **that.**
25   Q.  No problem at all.

7 (Pages 22 to 25)

Page 26

```
1        Tell me what you recall about your
2    conversation with Dr. White.
3    A.  Okay.
4    Q.  And this is before you see D█████?
5    A.  Before I saw D█████.
6    Q.  Yes, sir.
7    A.  Unfortunately, I don't remember any
8        specifics.  It's -- you know, we do so many
9        admissions, I don't recall specifics.
10   Q.  Is it typically a quick process where she'll
11       say, hey, we're going to admit a patient and
12       the patient has got nausea and vomiting and
13       you need to go see the patient; is it
14       something as quick and as fast as that?
15   A.  It's usually brief, but the senior resident
16       will include necessary details.  So I would
17       say it's as in-depth as it needs to be, but
18       usually less than a few minutes.
19   Q.  Do you know -- then how does a senior
20       resident, at least, to your knowledge, how
21       does she receive information about the
22       patient?
23   A.  So it depends.  With our inpatient
24       pediatrics, it depends on who the patient's
25       being admitted to.  In this scenario, the
```

Page 27

```
1        patient was being admitted to our private
2        hospitalist group, and Dr. Bala was the
3        attending physician.  So she would have got a
4        call from Dr. Bala for the admission, and
5        then she would have relayed that information
6        to me.
7    Q.  Then with Dr. Bala, what's his role in the
8        hospital?
9    A.  Dr. Bala is an attending pediatric
10       hospitalist.
11   Q.  And then have you -- prior to March 6th, have
12       you worked with him regarding pediatric
13       patients?
14   A.  I would have worked with him on that
15       rotation, yes.
16   Q.  Would you have personal interaction with him
17       during rotations and seeing patients?
18   A.  Yes.
19   Q.  Without looking at the medical records, do
20       you have an independent recollection of
21       D████ M████?
22   A.  Yes.
23   Q.  Tell me what you recall about D█████.
24   A.  Sure.  I remember -- actually, I remember
25       what room he was in in the emergency room.
```

Page 28

```
1    Q.  What room is that?
2    A.  I don't remember the number, but I --
3        location, I could tell you exactly where it
4        was.  The way the emergency room is set up,
5        there's kind of a square desk and he was just
6        to the -- if you're facing the doors to exit
7        where the ambulances come in, he was in the
8        room right there on the right-hand side of
9        those.
10           I remember walking in with my
11       computer.  Mom was sitting on the left in a
12       chair, and D████ was in the hospital bed,
13       which is right in the middle of the room, and
14       he was sleeping when I went into the room.
15       And that's when I started talking to mom.
16       And he slept throughout most of the
17       encounter.
18   Q.  At any point in time did he wake?
19   A.  He never woke up fully.  He aroused, but
20       never woke up and opened his eyes.
21   Q.  Were you aware, at least, prior to seeing
22       D████, based on your review of the ER
23       records, whether he was awake at any point?
24   A.  I know -- after looking through documentation
25       I can answer that, but I didn't have
```

Page 29

```
1        independent recollection of remembering that.
2    Q.  What is your -- based on your review of the
3        documentation, what is your impression?
4    A.  Sure.  My impression was that he was awake
5        when he came into the emergency room.
6    Q.  Okay.  Tell me what, based on your review of
7        the documentation, more details about his
8        wakefulness and what he was able to do.
9    A.  In the triage documentation for the ER -- I
10       think it's the triage documentation, they
11       always do a general evaluation of the patient
12       and will assign a number to them based on the
13       severity, their -- what they deem the
14       severity of the illness.  And in that
15       documentation, they document a Glasgow Coma
16       Score, which part of that is spontaneous eye
17       opening and wakefulness, and D████ had a GCS
18       of 15.
19   Q.  Explain that scale to me, please.
20   A.  Sure.
21   Q.  It's the Glasgow Coma Scale; correct?
22   A.  Correct.
23   Q.  And what are the multiple components to that
24       in order to calculate a score?
25   A.  Sure.  So they assess eye opening, speech --
```

8 (Pages 26 to 29)

Page 30

```
1      verbal response, and motor response.
2      Q.   So in order to do the Glasgow Coma Scale, he
3           would have to open his eyes?
4      A.   Spontaneously.
5      Q.   Spontaneously, meaning, hey, D____, open
6           your eyes, and he opens his eyes?
7      A.   Even without verbal stimulation, he would
8           open his eyes spontaneously.
9      Q.   And then speech?
10     A.   Speech would be verbalizing without -- and
11          having speech that is recognizable.  You
12          know, he's not mumbling, not
13          incomprehensible.
14     Q.   And then the verbal response?
15     A.   The motor -- yeah, that's the verbal
16          response.
17     Q.   Okay.
18     A.   The motor response would be spontaneous
19          movements of his extremities.
20     Q.   Okay.  And then that would be -- the Glasgow
21          Coma Scale would be different than like a
22          neurological examination?
23     A.   Correct, it would be a -- an adjunct or a
24          piece of the neurological exam.
25     Q.   Okay.  How is -- how would be -- a Glasgow
```

Page 31

```
1           Coma Scale be different than a neurological
2           examination?
3      A.   It depends on -- you know, there's varying
4           degrees of a neurological exam, but the GCS
5           itself is just a piece of that.  So a
6           neurological exam on top of that would
7           assess, I guess, for more focal deficits.
8      Q.   So, I mean, if you were looking for focal
9           deficit or any type of neurologic deficit,
10          would the Glasgow Coma Scale be the test that
11          you would use to determine that?
12               MR. DAY:  Object to form;
13          overbroad.
14     A.   No.  The Glasgow Coma Score is more of a
15          general assessment.
16     Q.   If you wanted to check for a focal neurologic
17          deficit, you would do a neurological
18          examination; is that fair?
19     A.   That's correct.
20     Q.   Do you know at what point in time, and if you
21          need to refer to the records, please do so,
22          at what point in time he scored a 15 on the
23          Glasgow Coma Scale within the emergency room?
24     A.   I don't know what time.  I'll have to look
25          and it might take a while 'cause I don't
```

Page 32

```
1           know -- here it is, 0429.
2      Q.   So that would have been -- how long would
3           that have been before you actually saw the
4           patient?
5      A.   I would estimate about an hour.
6      Q.   So that -- I guess was he a Glasgow Coma
7           Scale of 15 when you saw him?
8      A.   I did not assess a GCS for him.
9      Q.   Do you know whether it was reassessed?
10     A.   I do not.
11     Q.   Essentially, at 4:30, at least, based on the
12          Glasgow Coma Scale, he was alert enough to
13          open his eyes, give a verbal response and had
14          a score of 15; correct?
15     A.   Correct.
16     Q.   And then when you saw him about an hour
17          later, he was asleep?
18     A.   Correct.
19     Q.   What role, if any, in your physical
20          examination does the fact that he had a prior
21          admission within hours of the Via Christi
22          admission for the same -- for the same
23          problem?
24               MR. DAY:  Object; that misstates
25          the evidence.
```

Page 33

```
1      A.   Can you rephrase that, please.
2      Q.   Absolutely.  The fact that he was at Wesley?
3      A.   Yes.
4      Q.   The day before?
5      A.   Yes.
6      Q.   At 6:00 in the evening?
7      A.   Uh-huh.
8      Q.   For nausea and vomiting and the diagnosis of
9           strep, what impact at all does that have on
10          your care of D____?
11     A.   I would say I don't know that it impacts the
12          care.  I would have -- I would have done the
13          same history and evaluation of the patient no
14          matter what prior care they had, I would say.
15          I mean, it would be taken into account, but I
16          don't think it changed my exam.
17     Q.   Is there ever attempt, at least, from your
18          perspective that when a patient presents to a
19          different hospital that there's an attempt to
20          gather the records from the previous
21          admission?
22     A.   I would say it depends on the specific
23          scenario.
24     Q.   Okay.
25     A.   Yeah.
```

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105    WICHITA, KANSAS
316.267.8200    67202

Page 34

1   Q.  It wasn't done in this case?
2   A.  **Correct.  We did not obtain records that**
3       **evening, and I don't know if it was done at a**
4       **later date.**
5   Q.  Do you think it was necessary, at least, from
6       your perspective to do a history and physical
7       examination to gather the records from Wesley
8       Medical Center?
9   A.  **In this specific scenario, I did not think it**
10      **was necessary.**
11  Q.  Have you been involved in a scenario where it
12      was necessary to gather records from a
13      different hospital?
14  A.  **Yes.**
15  Q.  And then how quickly are you able to obtain
16      those records?
17  A.  **Usually within a couple of hours, depending**
18      **on how busy things are on both ends.**
19  Q.  Is there anything that -- have you ever had a
20      situation where a patient presents to a
21      different hospital within a 24-hour period of
22      time where you guys could just pick up the
23      phone and talk to the treating provider at
24      the previous hospital?
25  A.  **I have done that with an obstetric patient,**

Page 35

1       yes.
2   Q.  Have you done that with a pediatric patient?
3   A.  **Not that I recall.**
4   Q.  We talked about your independent recollection
5       of D███.
6           When you walked in, you remember him
7       asleep; correct?
8   A.  **Correct.**
9   Q.  Was he -- was he moving at all?
10  A.  **He -- I don't -- I don't recall either way.**
11      **I do know that when I did my exam, he reacted**
12      **to the exam.  He never fully opened his eyes,**
13      **though.**
14  Q.  How did he react to your exam?
15  A.  **Moved his extremities to where I was touching**
16      **or wiggled around a little bit, you know,**
17      **just rustled around.**
18  Q.  And then how was he laying?
19  A.  **Just on his back.  Was laying in bed with his**
20      **head on the pillow from what I recall.**
21  Q.  And at that time -- and then you were in the
22      room for -- you did 15, 20 minutes of a
23      history and then you did about a 5-minute
24      exam, so you would have been in the room at
25      least 25 minutes; is that fair?

Page 36

1   A.  **That's my estimate, yes.**
2   Q.  And then who else was in the room -- did
3       anyone else come in the room during that 25
4       minutes?
5   A.  **Not that I recall either way.  I mean, I**
6       **don't know if somebody did or didn't.**
7   Q.  That's fine.  And during that 25 minutes, do
8       you recall having any conversations with any
9       other healthcare providers regarding D███?
10  A.  **I do not recall either way.**
11  Q.  After -- and the purpose of your history and
12      physical examination is what?
13  A.  **The purpose of any history and physical is to**
14      **try to identify, you know, what illness or**
15      **what ailment the patient has and then develop**
16      **an assessment and plan to help treat that**
17      **patient.**
18  Q.  Then I take it your history and physical
19      examination is going to be independent of any
20      other history and physical examination that
21      he has had prior to that?
22  A.  **Correct.**
23  Q.  You're going to do your own independent
24      assessment?
25  A.  **Correct.**

Page 37

1   Q.  Even though he had a diagnosis of strep, you
2       were going to see whether there was any other
3       diagnoses that may come into -- may be into
4       play; is that correct?
5   A.  **I think that, you know, with each specific**
6       **scenario you take into account the prior**
7       **diagnostics that have been done, and in this**
8       **scenario, I went into it with a diagnosis of**
9       **strep throat and -- and then built upon that.**
10      **Had there been red flags or things that came**
11      **up, you know, with any history and physical,**
12      **you're kind of developing a plan and a**
13      **differential as you're talking to the patient**
14      **or the parent and doing the physical exam.**
15      **With this case I didn't -- I didn't find**
16      **anything that would have led me to another**
17      **diagnosis.**
18  Q.  But that's something certainly you would have
19      done, though.
20          If something -- if something was a red
21      flag, that's something that you would have
22      pursued?
23  A.  **Yes.**
24  Q.  Not only pursued, but you would have
25      discussed it with the senior resident?

10 (Pages 34 to 37)

## Page 38

1  A.  Yes.
2  Q.  And ultimately, you or the senior resident
3      would have discussed it with the attending
4      physician in this case, Dr. Bala; is that
5      correct?
6  A.  That's correct.
7  Q.  As far as you know, did Dr. -- did you ever
8      have a conversation yourself with Dr. Bala?
9  A.  I would have been the resident who called
10     Dr. Bala to talk about the patient.
11 Q.  Okay.  And you would have talked to him, and
12     I think at the end of your note, it says that
13     you discussed it with Dr. Bala?
14 A.  Yes.
15 Q.  Do you have a specific recollection of that
16     conversation with Dr. Bala?
17 A.  Unfortunately, I do not.
18 Q.  Okay.  Typically, in a situation like that
19     where you're admitting a patient from the
20     emergency room, how long would that
21     conversation last?
22 A.  It definitely depends on the specific case.
23 Q.  How about D███ case?
24 A.  So we have a -- basically a regimented way
25     of -- that we -- that we present to

## Page 39

1      attendings.  And usually that takes awhile
2      'cause we have to go through the whole
3      history and everything.  My guess would be
4      around five minutes on the phone or less.
5  Q.  When you say a regimented way --
6  A.  Yes.
7  Q.  Is that regimented way, is that reduced to
8      writing in terms -- is that reduced to
9      writing in any way?
10 A.  Can you rephrase that.
11 Q.  Yeah, that's a bad question.
12     Is there a document that you follow
13     that says, hey, these are the things that we
14     go through or we talk to the attending
15     physician about our history and physical
16     examination.
17 A.  No, not that I'm aware of.  It's more of a
18     built-in culture in medicine, and it's a
19     formal presentation to the attending.
20 Q.  Excellent.  So just walk me through the
21     regimented way or the formal presentation.
22 A.  Sure.  You can actually follow a H & P, and
23     that pretty much guides you through the
24     presentation to the attending.
25     So typically you'll start out with the

## Page 40

1      patient's name and age and presenting
2      complaint.  And then you give the HPI.  You
3      tell the attending basically what's been
4      going on with the patient.
5      You then go through past medical
6      history, past surgical history, any
7      allergies, medications that they're on.
8      And then I would have discussed my
9      physical exam and findings, any diagnostics
10     or labs that had been done.  And then at that
11     point, I would have gone into my assessment
12     and plan.
13 Q.  Did you order any diagnostics?
14 A.  I don't recall.  I don't believe I did.
15 Q.  Do you order any labs?
16 A.  No, the labs were ordered by the emergency
17     room.
18 Q.  Was there concerns, at least, from your
19     standpoint when you saw D███ that he was
20     dehydrated?
21 A.  He had received a full fluid bolus, 20
22     milliliters per kilogram, before I saw him.
23     And so when I saw him, he was mildly
24     dehydrated at best -- or at worst, I guess.
25 Q.  And how would you make the determination that

## Page 41

1      he was mildly dehydrated at that time?
2  A.  Sure.  With dehydration, there's varying
3      degrees, anywhere from not dehydrated to
4      severe dehydration.  And there are exam
5      findings that you would look for that could
6      guide you towards a diagnosis.  For mild
7      dehydration, oftentimes, it's just history
8      alone of nausea, vomiting, decreased PO
9      intake.
10     When you get to moderate or severe
11     dehydration, you start seeing physical exam
12     findings.
13 Q.  So beyond physical exam findings, can you --
14     are there laboratory values that play a role
15     in making a determination of whether a
16     patient is dehydrated or not?
17 A.  Yes.
18 Q.  What --
19 A.  They can play a role, yes.
20 Q.  Sorry to talk over you.
21     What lab -- what specific lab values
22     assist you in making a determination whether
23     a patient is dehydrated?
24 A.  Lab values?
25 Q.  Yes, sir.

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105                    WICHITA, KANSAS
                                         316.267.8200                                67202

Page 42

1    A.   Okay.  Lab values:  It would depend.  So with
2         a history of nausea and vomiting, sometimes
3         you can get electrolyte disturbances, but
4         that doesn't necessarily tell you a degree of
5         dehydration.
6              You could also -- for dehydration,
7         sometimes you can look at the urine and look
8         at the specific gravity of the urine, the
9         concentration of the urine.
10   Q.   Do you -- in D‎████ case, do you know
11        whether anybody observed his urine?
12   A.   Not that I'm aware of.
13   Q.   Okay.  Back to your independent recollection.
14        You talked about D████.
15             Did D████ pretty much remain asleep
16        at -- on an exam table in the ER the whole
17        time you were there?
18   A.   From my recollection, yes, he was -- he was
19        asleep during my encounter.
20   Q.   And then tell me, I mean, just your
21        observations of him.
22             I mean, what did he look like?
23             Did he look like he was ill?
24             I mean, tell me your thoughts on that.
25   A.   Sure.  And, you know, to me he looked like a

Page 43

1         well -- so we define degrees of illness.
2         Especially in the pediatric population, we
3         like to determine if they are ill-appearing
4         or toxic-appearing.  For me, he was -- he was
5         well appearing.  He appeared well hydrated,
6         actually, when I saw him and just looked like
7         a kiddo that was exhausted after being awake
8         all night.
9    Q.   Do you know if he had been -- do you know
10        whether he had been awake all night?
11   A.   Do you mind if I look in my --
12   Q.   Absolutely.  If you need to refer to those
13        medical records at anytime, please do so.
14   A.   Yeah.  In Dr. White's addendum, she mentioned
15        that he's very sleepy, didn't get sleep at
16        all until getting meds in the ED around 3:00
17        a.m.
18   Q.   Okay.
19   A.   So that's where I had that in my mind.
20   Q.   Do you -- do you remember -- we talked
21        about -- back to your independent
22        recollection discussion with mom.
23             Can you -- I mean, do you have a
24        picture in your mind like right now where
25        you're talking to her?

Page 44

1              I mean, do you remember that?
2    A.   Yes.
3    Q.   And how would you describe her demeanor at
4         the time?
5    A.   Mom was tired, but she was -- she was calm.
6         She was sitting in a chair, and I sat down to
7         chat with her, and I remember it was a very
8         calm conversation.
9    Q.   And then in your history and present illness,
10        do you think it encompasses everything that
11        you guys discussed?
12   A.   I believe it does.  I try to include
13        everything when I'm talking to a patient.
14   Q.   Do you recall any other facts or history that
15        she told you that are not in your history of
16        present illness in your charting?
17   A.   I do not.  I do not recall any other
18        information.
19   Q.   You knew that she went to Wesley; correct?
20   A.   Correct.
21   Q.   And you knew that they diagnosed D████ with
22        strep throat?
23   A.   Correct.
24   Q.   And that they tried to give D████ oral
25        antibiotics?

Page 45

1    A.   Correct.
2    Q.   And that he threw up multiple times?
3    A.   Correct.
4    Q.   Were you aware that they called other
5         facilities about D████ condition?
6    A.   I did not get that history.
7    Q.   Were you aware that they were concerned that
8         his strep may have converted over to
9         meningitis?
10             MR. DAY:  I'm going to object to
11        form to the extent there's an assumption.
12        You can ask him if he was told that.  Well,
13        you can ask whatever you want, but I
14        object --
15             MR. GIROUX:  I understand your
16        objection.
17             MR. DAY:  Yeah.
18             MR. GIROUX:  Yeah.
19   A.   Can you repeat the question, please.
20   BY MR. GIROUX:
21   Q.   Yeah.  Did you know that mom was concerned
22        about meningitis?
23             MR. DAY:  Same objection.
24   A.   I did not know that.
25   Q.   Did the word meningitis, was that ever

12 (Pages 42 to 45)

Page 46

1    mentioned to you?
2    **A. No.**
3    Q.  Have you ever -- at least by that time, have
4       you ever provided care to a patient -- a
5       pediatric patient who had meningitis?
6    **A. I don't know for sure if I had treated a**
7       **patient with meningitis, but I know that I**
8       **had evaluated a patient for meningitis.**
9    Q.  Let me change it up with you.
10      Have you -- let's say prior to March
11      6th of 2017, what would have been your
12      experience with pediatric patients who
13      presented with elevated intracranial
14      pressure?
15   **A. That's tough to say.  I would guess that I --**
16      **or I would say that I probably had not seen**
17      **any cases of elevated intracranial pressure**
18      **in a pediatric case, but I'd -- I would have**
19      **received lectures and things on that.**
20   Q.  How about adult cases of elevated
21      intracranial pressure?
22   **A. I don't think I had encountered that.**
23   Q.  Okay.  And I just want to make my question
24      more broad.
25      Had you ever, let's say, prior to

Page 47

1    March 6, 2017, to the best of your
2       recollection, ever been involved with a
3       diagnosis of a patient with elevated
4       intracranial pressures?
5    **A. I don't think so.**
6    Q.  By the time that you saw D███ at 5:18 or
7       5:30, whatever the time is, do you know
8       whether D███ was tested for any type of
9       neurologic deficit?
10         MR. YOUNG:  Object to form;
11      overbroad.
12         MR. DAY:  Join.
13   **A. I don't know.**
14   Q.  Okay.  Based on your review of the ER records
15      in preparation for this deposition, can you
16      see anywhere within the ER record, which you
17      would have reviewed before you saw D███,
18      whether any testing was done to see whether
19      he was neurologically intact?
20   **A. Sure.**
21         MR. YOUNG:  Object to form.
22         MR. DENNING:  Other than the
23      Glasgow Coma Scale?
24         MR. GIROUX:  Other than the
25      Glasgow Coma Scale.

Page 48

1         MR. DAY:  Take the time to look
2       through it if he's going to ask you about it,
3       about the record.
4    **A. Okay.  Can you repeat the question, please.**
5    BY MR. GIROUX:
6    Q.  Yeah.  Based on your review of the emergency
7       room charting, which you would have reviewed
8       prior to seeing D███?
9    **A. Yes.**
10   Q.  Other than the Glasgow Coma Scale, was D███
11      evaluated for any type of neurologic deficit?
12         MR. DAY:  I'm going to object.
13      The question really keeps changing.  Object
14      to form.
15         MR. YOUNG:  And foundation.
16   **A. Other than a general assessment of the child,**
17      **I don't know that a full neurological exam**
18      **was done.**
19   Q.  And then what would be a full neurologic
20      examination?
21   **A. Sure.**
22         MR. YOUNG:  Object to form.
23   **A. I would say that also kind of depends on**
24      **which provider that's coming from.**
25   Q.  How about from you on March 6 of 2017.

Page 49

1    **A. If I were to do a -- as a family medicine**
2       **resident do a full neurological exam.**
3    Q.  Yes, sir.
4    **A. Okay.  That would include the GCS.  It would**
5       **include testing the cranial nerves, testing**
6       **the patient's motor and sensory function and**
7       **cerebellar function.**
8    Q.  And -- and if a person has elevated -- if a
9       patient has elevated intracranial pressures
10      and you suspect that, you would do a full
11      neurological examination?
12   **A. Yes, in that scenario I would.**
13   Q.  Why?
14   **A. Well, an elevated intracranial pressure is**
15      **very dangerous.  The skull is a rigid**
16      **structure and the brain doesn't have anywhere**
17      **to go other than herniating down so it's --**
18      **it can be a emergent thing.**
19   Q.  And what would be -- let me put it this way:
20      Did you do a -- prior to March 6 of 2017, had
21      you done a full neurological examination of a
22      patient?
23   **A. Yes.**
24   Q.  Have you done a full neurological examination
25      of a patient for purposes of ruling out

13 (Pages 46 to 49)

Page 50

1    intracranial pressure?
2    **A.  Not specifically.**
3    Q.  How about for stroke?
4    **A.  Yes.**
5    Q.  Okay.  And as it relates to intracranial
6    pressures, what would be some of the common
7    signs that you would see in doing a full
8    neurological assessment of a patient?
9        MR. DAY:  Object to form;
10    overbroad.
11    **A.  One of the findings you could see is**
12    **papilledema if you look in the eyes.**
13    **However, I will say that I think general**
14    **practitioners are not the best at assessing**
15    **that.  Usually a neurologist or a**
16    **neurointensivist would be better at**
17    **evaluating that.**
18    Q.  Why would they be better -- better at
19    evaluating that?
20    **A.  Sure.  With that being a specialty, they do**
21    **that a lot more often than, say, a family**
22    **practice resident.**
23    Q.  You would do -- in a situation like that
24    where you suspect it, you would do a full
25    neurological assessment, and then if there

Page 51

1    were some signs that were alarming to you,
2    you would consult with neurology?
3    **A.  Depending on the scenario, yes.  If there was**
4    **a focal neurological deficit or something**
5    **concerning, I would typically talk to the**
6    **attending doctor and discuss it with them and**
7    **if the decision was made to consult, then we**
8    **would.**
9    Q.  Okay.  So I want to shift back over to your
10    independent recollection.  We talked about
11    the time period that you were in with mom and
12    saw D████.  We talked about what you recall
13    about the conversation with Dr. Bala.
14        Do you remember any conversations that
15    you had with Dr. White after your history and
16    physical examination?
17    **A.  Unfortunately, I don't have any independent**
18    **recollection of my conversation with**
19    **Dr. White.**
20    Q.  Is there anything in the record that would --
21    that would -- was anything written in the
22    record regarding your conversation?
23        Not saying that there's supposed to be
24    but --
25    **A.  I don't -- no, I don't believe there's**

Page 52

1    **anything in the record about me discussing it**
2    **with Dr. White, other than her addendum**
3    **saying that she saw the patient, as well.**
4    Q.  When you saw -- when you saw D████ at 5:18
5    or 5:15, whenever the time was, was that the
6    only time that you saw him?
7    **A.  Yes.**
8    Q.  Okay.  And so would have been that 25-minute
9    plus time period would have been the only
10    time that you saw him?
11    **A.  That's correct.**
12    Q.  And is my understanding that Dr. White saw
13    D████ subsequent to your history and
14    physical examination?
15    **A.  Yes, from what I recall.**
16    Q.  Okay.  And is that common that the first year
17    resident would do the admit and then the
18    second year or the third year, whatever she
19    was, would come in and do her own or his own
20    history and physical examination?
21    **A.  Yes, that's very common.**
22    Q.  Okay.  You weren't in the room when she did
23    her history and physical examination?
24    **A.  No, I was not.**
25    Q.  Would you have discussed with her D████

Page 53

1    before her examination or after or both?
2    **A.  Usually both.**
3    Q.  Okay.  And in this case, we talked about
4    after your history and physical examination
5    not having a recollection of discussions with
6    her.
7        How about after her history and
8    physical examination?
9    **A.  I have no recollection of our conversation.**
10    Q.  What's your understanding of her -- what's
11    your understanding of D████ condition when
12    she did her history and physical examination?
13    **A.  My understanding is that it was -- his**
14    **condition was unchanged from when I saw him.**
15    Q.  Unchanged meaning what, specifically?
16    **A.  Meaning that he was still sleeping.**
17    Q.  Do you know whether she did a physical
18    examination of D████?
19    **A.  She did do a physical exam, yes.**
20    Q.  And do you know whether she would have
21    discussed those physical exam findings with
22    you?
23    **A.  She would have discussed -- she definitely**
24    **would have discussed discrepancies if there**
25    **were any; or, she would have just said yes, I**

Page 54

```
1        agree with your exam.
2     Q.  Did she agree with your exam?
3     A.  Yes, she would have documented any
4        discrepancies.
5     Q.  And then the way the notes are written, it
6        looks like you kind of have a -- what I would
7        consider a true SOAP note, and her note is
8        just an addendum.
9           It looks like she's not repeating a
10        whole lot of what you've done; is that fair?
11    A.  That's correct.
12    Q.  Tell me -- and you've served as -- you
13        probably are serving in that role as a senior
14        resident right now; correct?
15    A.  Correct.
16           MR. DAY:  I want to be clear on
17        your question before, I didn't have a chance
18        to jump in yet.  Were you asking whether the
19        note doesn't repeat or whether he -- whether
20        the exams weren't repeated?  I think the
21        question was unclear as to --
22           MR. GIROUX:  Okay.  Yeah.
23    BY MR. GIROUX:
24    Q.  Let me just retract.  Just clear that up.
25    A.  Okay.
```

Page 55

```
1     Q.  Her note looks a lot different than yours;
2        okay?  Correct?
3     A.  Yes.
4     Q.  You look like you have a traditional SOAP
5        note where you do the history and physical
6        examination, the review of systems, you do
7        the physical examination, and you do your
8        assessment and plan.
9           Her note doesn't follow that
10        structure; is that correct?
11    A.  Yes, that's correct.
12    Q.  Tell me why that is.
13    A.  So it's the senior resident's role to
14        basically confirm the findings of the intern
15        resident.  And usually what the senior
16        resident will do is exactly what Dr. White
17        did where she'll summarize the case and in
18        the plan of care.
19    Q.  So when you're seeing a patient and if
20        something were -- if red flags were -- if you
21        spotted red flags that this patient needed a
22        consult from a specialist, is that something
23        that you could do?
24    A.  Yes.
25    Q.  Okay.  You can order a consultation?
```

Page 56

```
1     A.  Yes, I would typically discuss it with senior
2        resident and the attending, but yes.
3     Q.  Very well.  And then if you felt that the
4        patient needed, let's say, some imaging,
5        whether it's an MRI or a CT, is that
6        something that you could order?
7     A.  Yes.
8     Q.  And is that with the same caveat that you
9        would typically discuss it with the senior
10        resident or the attending?
11    A.  Definitely, especially in a pediatric case.
12    Q.  And then in terms of if you thought the
13        patient was more sick based on your history
14        and physical examination, if you felt that
15        the patient didn't need to go to the
16        pediatric floor, but needed to go to the
17        PICU, you as the first year resident, are you
18        able to order that?
19    A.  Yes, and again, with the caveat that I would
20        discuss that with the senior resident and the
21        attending.
22    Q.  Let's say after Dr. White's examination, I
23        think, according to her record, she saw
24        D█████ maybe around 6:15.
25           Do you -- do you have an independent
```

Page 57

```
1        recollection of anything that occurred
2        thereafter?
3           Kind of a broad question, but -- and
4        I'm just going to open it up to the whole
5        hospitalization to the 15th.
6     A.  Can you repeat the question, please.
7     Q.  Yeah.  Do you have independent recollection
8        of D█████ care while at Via Christi after
9        Stefanie White did her examination of him?
10    A.  No.  After I saw him, I was not involved in
11        his care.
12    Q.  Okay.  Did you learn about his condition
13        subsequently?
14    A.  Yes.
15    Q.  Tell me how you learned about his condition
16        subsequently.
17    A.  I don't remember specifically how I learned
18        it, but I know that next night when I came in
19        for my shift, it was relayed to me what
20        happened.
21    Q.  Okay.  What was relayed?
22    A.  That D█████ had to be moved to the pediatric
23        intensive care unit because he had a
24        respiratory arrest on the floor and that the
25        imaging found a brain mass.
```

15 (Pages 54 to 57)

Page 58

1   Q.  And do you remember who you spoke to about
2       that?
3   A.  **I don't recall.  It would have been whoever**
4       **was the resident on call that day.**
5   Q.  So you learned about the mass in his head?
6   A.  **Yes.**
7   Q.  Did you eventually learn about a stroke that
8       he may have had?
9   A.  **I don't recall if I learned that at that**
10      **point or when reviewing the records for this.**
11  Q.  Okay.  And then I take it, and we'll take a
12      break here in a second, but as it relates to
13      opinions regarding the stroke, when the
14      stroke occurred and what caused the stroke,
15      are you going to have any opinions regarding
16      that?
17  A.  **No.**
18          MR. YOUNG:  Object to form.
19          MS. WOODS:  Join.
20          MR. DAY:  And again, I'm going to
21      note for the record that it's -- that's
22      actually my decision, but he has correctly
23      answered.  He is not going to act as a
24      causation expert in this case.
25          MR. GIROUX:  Okay.

Page 59

1   BY MR. GIROUX:
2   Q.  Other than that discussion where you learned
3       that he was in the pediatric intensive care
4       unit and that imaging revealed a mass, did
5       you -- do you have an independent
6       recollection of any other conversations
7       regarding D███ M███ during that
8       hospitalization that we haven't discussed?
9   A.  **I do not.**
10  Q.  And once your care was provided to D███ on
11      the morning of the 6th for that 25 minutes
12      and you discussed it with Stefanie White
13      after her exam, your care of D███ ceased?
14  A.  **Correct.**
15  Q.  Why don't we take about a 5-minute break.
16      We've been going at it about an hour; okay?
17  A.  **Okay.**
18          VIDEOGRAPHER:  Off the record at
19      10:00 o'clock.
20          (A recess was taken from 10:00 a.m. to
21      10:11 a.m.)
22          VIDEOGRAPHER:  Back on the record
23      at 10:11.
24  BY MR. GIROUX:
25  Q.  Doctor, just a few followup questions from

Page 60

1       some previous testimony.
2           You indicated that when you talked to
3       Kelli Morgan that you were using your laptop?
4   A.  **Yes.**
5   Q.  Was that your own personal laptop?
6   A.  **No.**
7   Q.  That's a laptop that was assigned to you
8       through the residency program?
9   A.  **Yes.**
10  Q.  Okay.  And then that laptop, you can access
11      records from your laptop?
12  A.  **Yes.  It's the Cerner, yeah, medical record.**
13  Q.  So for example, when Dr. White called you and
14      said that there is a patient that's going to
15      be admitted to the pediatric floor, you would
16      have been able to utilize that laptop to look
17      at the emergency room records?
18  A.  **Yes.**
19  Q.  And then we talked a little bit about
20      elevated intracranial pressure and you
21      indicated that your experience, at least, by
22      that time on March 6 of 2017 was really
23      through lectures through medical school; is
24      that correct?
25  A.  **Correct.**

Page 61

1   Q.  What is your understanding of some of the
2       common signs and symptoms of elevated
3       intracranial pressure in a pediatric patient?
4           MR. DAY:  Object to form;
5       overbroad.
6   A.  **Sure.  I don't know that I had lectures**
7       **specifically for the pediatric population,**
8       **but for elevated intracranial pressure you**
9       **could see variations in vital signs, and then**
10      **papilledema and neurological deficits.**
11  Q.  So let's talk about abnormalities in vital
12      signs.
13          What type of abnormalities would there
14      be?
15  A.  **If I recall correctly, you can see increased**
16      **blood pressure with bradycardia.**
17  Q.  How about respiratory rate?
18  A.  **It can be depressed.**
19  Q.  How about temperature?
20  A.  **I'm sure it can be affected.  I don't know --**
21      **I couldn't say for certain.**
22  Q.  And then neurologic deficits, what type of
23      neurologic deficits would you see?
24  A.  **I think that can vary, as well.**
25  Q.  What would be some kind of common signs and

16 (Pages 58 to 61)

Page 62

```
 1        symptoms?
 2               MR. DAY:  Object to form.
 3    BY MR. GIROUX:
 4    Q.  What would be some common neurologic deficits
 5        that you would expect to see?
 6    A.  Decreased mental status, may have weakness in
 7        an extremity, but it definitely could vary.
 8    Q.  And what would be the, I guess, spectrum of
 9        some general common symptoms that you would
10        expect a person to manifest who has elevated
11        intracranial pressure?
12               MR. DAY:  Object to form;
13        overbroad.
14    A.  Can you repeat that, please.
15    Q.  What would be some symptoms of an individual
16        who had -- what would be signs and symptoms
17        that the body would manifest in a patient
18        with elevated intracranial pressure?
19               MR. DAY:  Same objection.  Go
20        ahead.
21    A.  Yes.  You can see multiple things and it can
22        vary, but definitely a altered mental status,
23        decreased mental status.  You could have
24        headache, vision changes, nausea, vomiting,
25        and any -- any number of neurological
```

Page 63

```
 1        problems.
 2    Q.  How about dizziness?
 3    A.  Sure.  Yeah.
 4    Q.  How about balance issues?
 5    A.  Yes.
 6    Q.  Is elevated intracranial pressures, is that a
 7        medical emergency?
 8               MR. DAY:  Object to form.
 9               MR. YOUNG:  Object to form.
10    A.  Yes, it would be something you would want to
11        address very quickly.
12    Q.  Why is that?
13    A.  Kind of mentioned it earlier.  The skull is a
14        rigid structure.  It does not allow the brain
15        to -- when it's swelling or if there's
16        elevated pressures, there's nowhere for the
17        brain to go other than herniating down
18        through the spinal column, which can be
19        catastrophic.
20    Q.  In looking at your note, that's something
21        that you didn't suspect, elevated
22        intracranial pressures; is that right?
23    A.  Correct, I did not.  I did not suspect that.
24    Q.  You didn't actually -- in review of your
25        note, and you can correct me if I'm wrong,
```

Page 64

```
 1        you didn't suspect any abnormalities within
 2        the -- within the head?
 3    A.  Can you rephrase that, please.
 4    Q.  Yeah.  There was no head pathologies or --
 5        that you were -- that was on your
 6        differential that you considered?
 7    A.  The phrasing of that kind of confuses me a
 8        little bit.
 9    Q.  Let me -- I want to make sure that we make a
10        good record.
11    A.  Okay.
12    Q.  Did you establish a differential diagnosis?
13    A.  Whenever I'm seeing a patient, a differential
14        is kind of developing as I'm seeing the
15        patient.
16    Q.  Is it kind of a fluid task?
17    A.  Yeah, a fluid task, yeah.
18    Q.  So let's say at the end of your physical
19        examination, did you have a -- did you
20        develop your own differential diagnosis at
21        that time?
22    A.  I would have.  I do for every patient, yes.
23    Q.  What would it have been in D▉▉▉▉ case?
24    A.  It's tough to say what I was thinking at that
25        exact time.  I don't have any independent
```

Page 65

```
 1        recollection of what I was thinking at the
 2        time that I saw him, but based on my note,
 3        whatever differential was going through my
 4        mind, everything -- taking into consideration
 5        everything that we knew about D▉▉▉ at the
 6        time, my differential led me to yes, this is
 7        a kiddo with strep throat, who can't keep his
 8        medications down, who's been awake for a long
 9        time and is sleepy and needs some rest and
10        some -- got some IV fluids in the ER.
11    Q.  So in a situation like D▉▉▉▉ where you're
12        called to do the admit onto the pediatric
13        floor and you're tasked with gathering your
14        own history and physical examination, is it
15        common for you, as a matter of habit, routine
16        and custom for you to see whether there's any
17        neurologic deficit?
18    A.  I wouldn't say that you do a full
19        neurological exam on every patient, if that's
20        what you're asking.
21    Q.  Okay.  What type of neurologic assessment
22        would you do?
23    A.  Sure.  With any history and physical, we like
24        to have at least a general physical exam.
25        And we always do the exam that we deem
```

Page 66

```
 1    appropriate for that specific scenario.
 2         For D█████, he was sleeping.  And, you
 3    know, given the scenario and everything that
 4    had led up to the point from when I was
 5    seeing him, he, to me, was a sick kiddo, who
 6    was finally asleep after being awake most of
 7    the night.  And so for completeness sake, we
 8    would have done a brief neurological exam.
 9    And usually in a general physical exam,
10    that's just saying yes, the patient is moving
11    their extremities in a normal manner and
12    there's nothing grossly abnormal.
13         For him, he was sleeping, and so I
14    wasn't really able to evaluate that, and I
15    didn't think it was appropriate to wake him
16    up for that at that time.
17    Q.  Okay.  So if he was awake, you would have
18        done a general physical exam of D█████, which
19        would include a brief neurological
20        examination; is that right?
21    A.  Yes.
22    Q.  And then that brief neurological examination
23        would consist of what?
24           What, actually, would you do?
25    A.  Typically, it is -- like I said, we're
```

Page 67

```
 1    looking for gross deficits, meaning looking
 2    from kind of like a bird's eye view:  Is
 3    there anything grossly abnormal.  So I would
 4    make sure that he could move all of his
 5    extremities.  And typically, if they're awake
 6    and alert, they can stand up and you can --
 7    usually I assess gait for patients just as
 8    they're walking around the exam room.  But I
 9    would not -- for a general exam, I would not
10    go into very specific testing.
11    Q.  That's fine.  But for the brief neurological
12        exam, you would have him stand up?
13    A.  Generally.
14    Q.  Okay.  And then you would also assess their
15        gait while they're -- have them walk?
16    A.  Typically.
17    Q.  And then what would be the importance -- what
18        would you see -- why do you ask him to stand
19        up or why would you want to access their
20        gait?
21    A.  Sure.  Gait can be affected for various
22        reasons.  It could be in the extremities,
23        pathology in the extremities, but it could be
24        central, as well.  So it can -- you can
25        assess for possible CNS problems.
```

Page 68

```
 1    Q.  And that's something that you wanted to do
 2        with D█████; correct?
 3    A.  No.
 4           MR. DAY:  Object to form.
 5    A.  I don't believe so.
 6    Q.  You wanted to do a brief neurologic exam of
 7        him; right?
 8    A.  For completeness sake of the history and
 9        physical, yes.
10    Q.  But you weren't able to do that because he
11        was sleeping?
12    A.  Correct.
13    Q.  And then is it your understanding that --
14        what is your understanding as to the type of
15        neurologic exam that Dr. White wanted to do?
16    A.  I actually don't know what kind of
17        neurological exam she wanted to do.
18    Q.  Do you know whether she did any type of
19        neurological examination based on your review
20        of the records?
21    A.  So she did kind of a brief exam where asleep,
22        but will wake to stimuli, rub his eyes and
23        push examiner's hand away.  So that would be
24        a very, like, again, kind of a brief -- a
25        brief exam.
```

Page 69

```
 1    Q.  Do you know whether a brief exam was done
 2        other than the Glasgow Coma Scale in the
 3        emergency room?
 4    A.  I don't know what all they did in the
 5        emergency room.  What's documented is that
 6        the provider notes that the patient is
 7        sleepy.
 8    Q.  Did you know whether D█████ -- is it your
 9        understanding -- let me ask:  Do you know
10        what time the rapid response or the code was
11        called?
12    A.  I don't.  I would have to look in the record
13        to tell you exactly when that was.
14    Q.  I'm going to represent to you it was
15        approximately 10:00 a.m. in the morning.
16    A.  Okay.
17    Q.  As far as you know, based on your review of
18        the records, do you know whether D█████ stood
19        at anytime or asked to stand at anytime from
20        the time he was admitted to Via Christi up
21        and to the time of the code?
22    A.  I don't know.
23    Q.  Do you know whether he was asked to ambulate
24        during that time period?
25    A.  I don't know.
```

18 (Pages 66 to 69)

Page 70

```
 1    Q.  Now if we can go to your note on Page 15.
 2    A.  Sure.
 3    Q.  And I just want to start off with the history
 4        of present illness.
 5    A.  Yes.
 6    Q.  The first line that D███ M███ is a
 7        previously healthy 5-year-old male who
 8        presented to the ED with nausea and vomiting,
 9        I take it, is that information that you would
10        have received from your review of the medical
11        chart or from mom?
12    A.  Both.
13    Q.  Okay.  And then the patient was diagnosed
14        with group A strep pharyngitis at Wesley at
15        6:00 p.m. on Sunday and sent home with
16        amoxicillin 480 milligrams -- was that as
17        needed every --
18    A.  BID, twice a day.
19    Q.  Twice a day for 10 days.
20            Is that information that you would
21        have received from mom or from the record?
22    A.  It would have -- I don't know for sure.  It
23        probably was from mom.
24    Q.  And I take it by March 6th of 2017 that you
25        provided care to many pediatric patients who
```

Page 71

```
 1        had strep?
 2    A.  Yes.
 3    Q.  Did you provide care to patients who had
 4        multiple admissions to hospitals who had a
 5        diagnosis of strep?
 6    A.  Not that I recall either way.
 7    Q.  In terms of characterizing D███ strep,
 8        would you consider it more on the severe side
 9        or more of a mild case of strep?
10            MR. DAY:  Object to form.
11            MR. YOUNG:  Object to form.
12            MR. DAY:  Foundation.
13    A.  I would say that any kiddo with dehydration
14        and inability to keep medications down is --
15        you would consider worse than a kiddo that
16        can.  So a kid that needed to come in because
17        they're dehydrated or can't keep medications
18        down is probably more severe than one who
19        can.
20    Q.  Did it worry you at all that he did have a
21        prior hospitalization for strep and now he's
22        not getting better and he's back at a
23        different hospital?
24            MS. COLE:  Object to form.
25            MR. DAY:  Object to form.
```

Page 72

```
 1    A.  I don't think it specifically worried me,
 2        only because we -- it's not uncommon to see
 3        that in the pediatric population where we
 4        have kids who have either showed up to clinic
 5        or to an urgent care and then present to the
 6        emergency room because they're still not
 7        better and just need IV fluids or just a
 8        little bit more support.
 9    Q.  Do you remember talking to mom at all, you
10        know, once -- now that you reviewed your
11        note, about, you know, when you were at
12        Wesley, why didn't you go back to Wesley, why
13        are you coming -- why are you coming to Via
14        Christi?
15    A.  I don't recall if I asked her that question.
16    Q.  Is that something that you would have asked?
17    A.  I typically would ask that, yes.  I usually
18        say, okay, what made you come in this time?
19        What brought you in this time?
20    Q.  And then you understand that the Wesley
21        admission, that was at 6:00 p.m. on a Sunday
22        evening?
23    A.  Yes.
24    Q.  Did you ask her what led to the Wesley
25        admission?
```

Page 73

```
 1    A.  I don't recall what I specifically asked.
 2    Q.  Do you know whether they were in a rush to
 3        get to Wesley, whether they considered it
 4        emergency?
 5    A.  I did not get that history from the mother.
 6    Q.  And then the note says:  Patient took one
 7        dose, but was unable to keep it down.  Mother
 8        states he vomited three or four times after
 9        leaving Wesley.  She was worried about
10        getting treatment for his strep and thought
11        that he might be dehydrated so they brought
12        him to St. Francis ED.
13            I take it that that's information you
14        would have gathered completely from mom?
15    A.  Yes.
16    Q.  And then the next sentence:  Patient's mother
17        states that she is unsure when the symptoms
18        started.  She talks about patient's sister
19        who had tonsillectomy, and that line is
20        something that you would have received
21        completely from mom, as well?
22    A.  Yes, I believe so.
23    Q.  And then it says:  Nausea and vomiting
24        started on Friday, intermittent throughout
25        the weekend; is that correct?
```

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105
316.267.8200

WICHITA, KANSAS
67202

Page 74

1    A.   Yes, that's what it says.
2    Q.   Did you get any more detailed information
3         from mom about, well, how often was he
4         nauseated, how often was he vomiting
5         throughout the weekend?
6    A.   If I would have obtained that information, I
7         would have written it in the HPI.
8    Q.   Do you think based, I mean, on your normal
9         custom, habit and routine that when mom is
10        telling you that, well, he's been nauseated
11        and vomiting over the weekend that you would
12        have followed up with questions about that?
13   A.   Yes.
14   Q.   And then -- and then, at least, from your
15        perspective in providing care to D___, did
16        you attribute the nausea and vomiting that
17        started on Friday and that was intermittent
18        throughout the weekend to strep?
19   A.   I did.
20   Q.   Did you ever ask mom whether D___ had a
21        fever?
22   A.   I believe I did, yes.  Mom denied fever.
23   Q.   Did that cause you any concern about the
24        diagnosis of strep that he was a patient that
25        had nausea and vomiting but no fever?

Page 75

1    A.   No, I don't believe I was worried about that.
2    Q.   And then -- and then in terms of your
3         evaluation of -- how is strep diagnosed?
4    A.   It's a clinical diagnosis and typically
5         you'll do a throat swab to obtain a culture
6         and make sure.  So they have rapid strep
7         swabs that can tell you negative or positive.
8    Q.   And then, typically, what type of physical
9         findings would you -- would you expect?
10   A.   You can see enlarged erythematous tonsils
11        with exudate.  And you can --
12   Q.   I'm sorry.  Go ahead.
13   A.   And also, typically, you can have
14        lymphadenopathy and fever can be associated,
15        as well.
16   Q.   In terms of physical findings that were
17        consistent with a diagnosis of strep, what
18        physical findings did you make that were
19        consistent with the diagnosis?
20   A.   Sure.  I noted that the posterior oropharynx
21        was mildly erythematous.
22        REPORTER:  I'm sorry.  Start
23        over.  Start over.
24   Q.   Those are big words for him.
25   A.   Okay.  I noted that the posterior oropharynx

Page 76

1         was mildly erythematous and that was the
2         extent of the findings.
3    Q.   In layman's terms, what does that mean?
4    A.   That the back of the throat was red.
5    Q.   Okay.  And then if we continue on with your
6         history and physical, it says:  On Sunday,
7         patient complained of headache, dizziness and
8         worsening nausea and several episodes of
9         emesis.
10   A.   Uh-huh.
11   Q.   Okay.  What information did you learn from
12        mom regarding the headache?
13   A.   So in this -- in this case, the headache, the
14        dizziness, those were basically part of my
15        review of systems that went into the HPI.  It
16        wasn't something that mom focused on.  And
17        she was more concerned about him getting
18        treatment for the strep and making sure he
19        wasn't dehydrated.  And so that was more of a
20        review of systems where you typically -- you
21        don't always dive into each thing fully, if
22        that makes sense.
23   Q.   So mom was focused more on the nausea and
24        vomiting?
25   A.   She was concerned about him getting treatment

Page 77

1         for the strep, yeah.
2    Q.   Mom wasn't as focused about the headache and
3         the dizziness?
4    A.   Not during my encounter with her.
5    Q.   Were you at all concerned about the headache
6         and dizziness?
7    A.   For me, it was consistent with what we knew
8         already, and so it didn't make me anymore
9         concerned.
10   Q.   Did you ask questions about the headache, the
11        nature and extent, the location, the duration
12        of the headache?
13   A.   I don't believe I did.
14   Q.   You don't think you did?
15   A.   I don't know if I did or didn't.  It's not
16        documented in my HPI.
17   Q.   Okay.  I would -- and you just correct me if
18        I'm wrong:  If you got a mom there that
19        you're talking to for 15 or 20 minutes and
20        she mentions that this is her second
21        hospitalization, that he's been diagnosed
22        with strep, but he also had headache and
23        dizziness, to me, that is -- you know, as a
24        father, that's something that I would expect
25        somebody to follow up on.

20 (Pages 74 to 77)

Page 78

```
 1              Do you think you would have followed
 2       up on those symptoms?
 3              MR. DAY:  Object to the form of
 4       the question.  What you would think as a
 5       father is irrelevant.  The question's
 6       inappropriate.
 7       A.  Can you repeat that, please.
 8       Q.  Did you followup on the complaint of
 9       headache?
10              MR. DAY:  Object as asked and
11       answered.  He said he doesn't remember.
12       A.  Right.  I don't recall specific questions
13       that I asked the mom.
14       Q.  How about dizziness?
15       A.  I don't recall specific questions that I
16       asked about the dizziness.
17       Q.  Okay.  Would it be your normal habit, custom
18       and routine that if somebody presents with a
19       complaint of headache and dizziness that you
20       would followup with questions regarding those
21       complaints?
22       A.  If that was their chief complaint, yes.
23       Q.  Okay.  And if it wasn't their chief
24       complaint?
25       A.  So it depends on the scenario.  If -- as
```

Page 79

```
 1       you're interviewing a patient or a patient's
 2       parent, if the review of systems is
 3       consistent with the information that you're
 4       already gathering, and it all fits into a
 5       diagnosis, you don't always ask a whole tree
 6       of questions for every review of system,
 7       positive finding, because that can lead to
 8       tons of rabbit holes.
 9       Q.  Do you know why she presented to Wesley?
10       A.  I don't recall asking or not asking that
11       question.  I don't know.
12       Q.  And then how about the worsening nausea, did
13       you get more details about the worsening --
14       worsening nausea?
15       A.  I don't recall specifics of the conversation.
16       Reading through the chart, it looks like, you
17       know, he vomited three or four times after
18       leaving Wesley that night.
19       Q.  And then the next paragraph:  Per mother,
20       patient did complain of bilateral knee pain
21       prior to arrival.
22              I mean, did you do assessment of the
23       knees?
24       A.  I did.  "Bilateral knees:  Nonerythematous
25       with no effusions" is what I wrote in my
```

Page 80

```
 1       physical exam, so I did -- I did do a
 2       evaluation of the knees.
 3       Q.  And then if we go down to -- by that time
 4       when you saw D███, he had received fluids;
 5       is that correct?
 6       A.  That's correct.
 7       Q.  Okay.  Had he received any antibiotics?
 8       A.  I don't believe so.
 9       Q.  Was the IV still in when you saw him or did
10       they remove the IV?
11       A.  Based on my documentation, I wrote that he
12       still had a peripheral IV at that time.
13       Q.  Is there a reason why you didn't order a
14       additional bolus of fluids?
15       A.  Yes.  So typically with mild dehydration,
16       kids don't usually even need IV fluids at
17       all.  The standard of care actually is to do
18       oral rehydration therapy.  And we're trained
19       that nausea and vomiting is not a sign of
20       failure and you can just keep trying oral
21       rehydration.  And so that's why I did not
22       order further IV fluids.
23       Q.  How about IV antibiotics?
24       A.  Sure.  Kind of along the same lines.  I think
25       Dr. White mentioned in her addendum -- yep,
```

Page 81

```
 1       she mentioned that if he's not tolerating PO
 2       or by oral, when he wakes up, then we'll
 3       consider additional IV fluids and switching
 4       to IV antibiotics at that time.
 5       Q.  At any point during your encounter with
 6       D███ and the mom -- and Kelli Morgan, did
 7       you think that a specialist needed to be
 8       consulted?
 9       A.  I did not.
10       Q.  Did you at any point think that you needed to
11       have Dr. Bala come and actually see the
12       patient?
13       A.  I did not.
14       Q.  Do you know where Dr. Bala was when you
15       called him?
16       A.  I do not.
17       Q.  Do you know at what point in time that he saw
18       D███?
19       A.  I do not know.
20       Q.  Do you know how many patients he would have
21       had that -- that morning?
22       A.  I don't know.
23       Q.  How many patients would you have been
24       assigned to that morning?
25       A.  Zero.
```

21 (Pages 78 to 81)

Page 82

```
 1   Q.  Zero?
 2   A.  (Witness nods.)
 3   Q.  Okay.
 4   A.  'Cause I was on nights so I wouldn't be
 5       rounding on any patients.
 6   Q.  Was D█████ the last person or, at least, as
 7       far as you can recall, the last patient that
 8       you would have provided care to that morning?
 9   A.  I don't know.  I would -- I would be guessing
10       if I answered that question.
11   Q.  That's fine.  Do you know whether, at least,
12       up until the time -- do you know in the ER
13       whether anybody asked any questions about
14       D█████ headache and whether more
15       information was gathered about his headache?
16   A.  I don't know.
17   Q.  How about his dizziness?
18   A.  I don't know.
19   Q.  And then on your neurologic, if we go to your
20       area of review of symptoms.
21   A.  Yep.
22   Q.  In terms of hands on evaluations of D█████
23       and his review of symptoms, tell me what
24       exactly you did.  Just walk me through it.
25   A.  Sorry.  Can you rephrase that.
```

Page 83

```
 1   Q.  Yeah.  In terms of actually hands on
 2       evaluation for the review of symptoms, tell
 3       me exactly what you did.
 4           Walk me through each --
 5   A.  So the review of systems is --
 6           MR. DENNING:  Hold on, are you
 7       saying symptoms or systems?
 8           MR. GIROUX:  Systems.  I'm sorry.
 9       Thank you, Dustin.
10   A.  The review of systems is questioning.  It's
11       not a physical exam.
12   BY MR. GIROUX:
13   Q.  Okay.
14   A.  So I don't understand the question.
15   Q.  Okay.  Well, let me just -- how about let's
16       go to the physical exam.
17           Tell me about your hands on physical
18       exam.
19   A.  Okay.  I'll refer to the record for this.  So
20       as far as -- so you want what I did
21       neurologically, is that what you're asking?
22   Q.  No, just general, so explain general.
23           What does general mean under the
24       physical exam?
25           MR. DAY:  In other words, what
```

Page 84

```
 1       did you do when you -- your physical exam.
 2   A.  So observe the patient, where I mentioned he
 3       was sleeping in the bed, arousable,
 4       appropriately responds to stimuli.  And so I
 5       did an evaluation of his mucous membranes,
 6       the posterior oropharynx, the mouth.  I did
 7       not evaluate his ears.  Listened to his heart
 8       and lungs, pressed on his belly, looked at
 9       his extremities, his skin.
10   Q.  On the general exam where you say he's
11       arousable, what do you mean by that?
12   A.  Meaning that he stirs, kind of moves his
13       extremities around when -- when I'm touching
14       him.  And even just during the encounter just
15       kind of -- I'm stirring in bed, but doesn't
16       fully like wake up.  You know, seemed like a
17       sleepy kid.
18   Q.  So at least at that time, when you were doing
19       the general exam, that he was able to move
20       all of his extremities?
21   A.  I did not document that in the record, and I
22       don't have any independent recollection of
23       that.  I do know that he was moving, at
24       least, some extremities in bed.
25   Q.  At least from your observation, did it look
```

Page 85

```
 1       as if D█████ had any problems moving either
 2       his left or his right side?
 3   A.  I don't recall noticing any deficits.
 4   Q.  Okay.  And you wouldn't have tested for any
 5       deficits, as well?
 6   A.  I did not -- I did not formally test for any
 7       deficits.
 8   Q.  Okay.  If we do go up to review of symptoms,
 9       actually, there was a couple of questions
10       that I had over there.
11           Under neurologic, is this information
12       that you would have received from mom?
13   A.  This is information that I would have
14       received from the mother.
15   Q.  And then in terms of ambulating, you have
16       that first, after neurologic.
17           Tell me what you can recall about mom
18       telling you that he's been able to ambulate.
19       I would imagine she didn't use the word
20       ambulate.
21   A.  No.  I don't recall what the specific answer
22       or question was, but usually I would -- the
23       review of systems is usually a very brief
24       overview of has he had any of this, any of
25       this.  And so I would have said, has he been
```

22 (Pages 82 to 85)

Page 86

1  walking, has he had any complaint of any
2  numbness, weakness, those types of things.
3  And so she would have responded yes, he's
4  been walking.
5  Q.  So under your history and physical exam, the
6  last sentence is mother states patient has
7  seemed weak and he looked pale until getting
8  fluids in the ED.
9  And then under neurologic, you
10  indicate no weakness.
11  A.  Sure.
12  Q.  Explain the discrepancy to me.
13  A.  Sure.  So with weakness in the review of
14  systems, it typically would be more of like a
15  focal, like right-sided weakness or left foot
16  weakness.  The way I interpreted her saying
17  he seemed weak was more of like a fatigue,
18  tired, worn down, sick kid.
19  Q.  Okay.  Then we'll go back down to physical
20  exam.  The review of the abdomen:  Plus bowel
21  sounds, soft, nondistended.  Patient did not
22  wake to palpation.
23  A.  Uh-huh.
24  Q.  So tell me about that.
25  A.  Sure.  So that one basically just means that

Page 87

1  while I was pressing on his belly, he didn't
2  open his eyes and say "ow" or it didn't seem
3  like he was in pain when I was palpating the
4  abdomen.
5  Q.  I mean, is it unusual, at least, based on
6  your training and experience up to that time
7  that he didn't wake or respond at all to you
8  palpating his belly?
9  MR. YOUNG:  Object to form.
10  A.  I would say that's not uncommon with a
11  pediatric patient that's sleeping.
12  Q.  And then we go to neurologic:  Deferred,
13  patient sleeping, will reevaluate on the
14  floor.
15  Explain to me what you mean by that.
16  A.  Sure.  Again, so with a history and physical,
17  there's -- obviously, there's a lot of
18  components to it.  And we usually like to try
19  to document, at least, something for each
20  portion of the exam.  And so we, ideally, for
21  completeness sake would have wanted to do, at
22  least, just a general overview neurologic
23  exam.  And since he was sleeping, I didn't --
24  I thought it would be cruel to wake up a
25  sleeping kid who had been awake all night --

Page 88

1  to wake him up just for the sake of
2  completeness.
3  So essentially, deferred to the floor
4  is just saying we'll wait 'til he's awake and
5  then we'll do it.  'Cause there was -- there
6  was nothing about the presenting history and
7  everything that made me concerned enough to
8  have to wake him up to do it at that time.
9  Q.  So he was asleep while you were there;
10  correct?
11  A.  Correct.
12  Q.  He wasn't asleep during parts in the ER;
13  correct?
14  A.  Correct.
15  Q.  And then there wasn't, at least, as you would
16  characterize it, a brief neurologic exam, at
17  least, noted based on your review in the ER
18  chart?
19  A.  Correct, not that I was able to find in the
20  document, in the record.
21  Q.  So from your -- from your assessment that
22  we're going to wait until D█████ is awake
23  before we do the brief neurological
24  examination?
25  A.  From our standpoint, yes, that was the plan.

Page 89

1  Q.  And you would agree with me that the sooner
2  that you're able to do a brief neurological
3  exam, the better for the patient?
4  MR. DAY:  Object to form.
5  MR. YOUNG:  Object to form.
6  A.  I would say it definitely depends on the
7  scenario.  Again, in this scenario, it was
8  more for completeness sake and it would not
9  have affected -- based on what we believed to
10  be the problem, it would not have affected
11  his care.
12  Q.  Certainly.  I understand that.
13  But indeed, if D█████ was awake, you
14  would have done the brief neurological exam?
15  A.  That's correct.
16  Q.  Okay.  Do you know at what point in time
17  D█████ was transferred from the emergency
18  room to the pediatric floor?
19  A.  I don't know what specific time, no.
20  Q.  And then what orders you put in the record
21  for D█████ for the transfer?
22  And if you need to refer to the
23  records, go ahead.
24  A.  Sorry.  Can you repeat that.
25  Q.  What orders did you place in the chart

23 (Pages 86 to 89)

## Page 90

1      regarding D████ care?

2    **A. So I would have placed the -- well, let me**

3      **pull up -- let me pull up the record here.**

4    Q. You're fine. I think it's in the 500s, the

5      540s. Like 546, 547, 548.

6    **A. It's going to be in volume 2. Let me see --**

7         MR. DAY: I have it here,

8      actually, down here.

9    **A. Okay. So you want me to list all of the**

10      **orders that I put in?**

11    Q. Let's just say as it relates -- one, did you

12      place an order for vital signs?

13    **A. Yes, that's routine.**

14    Q. Okay. And then the orders that you placed

15      were what?

16    **A. It's difficult to tell.**

17    Q. Okay. What would have been the orders based

18      on your review of the records?

19    **A. Again, it's difficult to tell based on the**

20      **record.**

21    Q. I know there's an issue of whether it was

22      every one hour or every four hours, but let

23      me just ask you a general statement: What's

24      the importance of vital signs?

25         Why do you order vital signs to be

## Page 91

1      taken?

2    **A. Vital signs are one of the most important**

3      **parts of a patient's exam and so it can clue**

4      **you in to any impending problems.**

5    Q. Okay. And then I saw that there was an

6      order -- a separate order -- my understanding

7      is that blood pressures are a vital sign;

8      correct?

9    **A. That's correct.**

10    Q. But there's a separate order for blood

11      pressure. Why would that be?

12    **A. Typically, in the pediatric population, the**

13      **blood pressure cuff can be uncomfortable for**

14      **kids, and so usually we don't need to obtain**

15      **blood pressures with the other vital signs**

16      **every time.**

17    Q. And then there was a physician notification

18      order which is on 543.

19    **A. Yes.**

20    Q. And what's the purpose of that order?

21    **A. Yeah, that's a routine order that we put in**

22      **for every patient, and it has call parameters**

23      **for the nurses to let the physician know if**

24      **vital signs are outside of a given range for**

25      **the patient's age.**

## Page 92

1    Q. Do you know what those parameters are?

2    **A. We have a book at Via Christi that has those**

3      **parameters. I don't know them off the top of**

4      **my head.**

5    Q. You don't know any of them as it relates to

6      either heart rate, blood pressure or

7      respiratory rate?

8    **A. I couldn't tell you 100 -- with 100 percent**

9      **certainty. We always reference the manual**

10      **for that.**

11    Q. So when you would admit a patient onto the

12      pediatric floor, generally, based on your

13      experience, what are, typically, the orders

14      that you place for vital signs?

15    **A. For vital signs?**

16    Q. Yeah.

17    **A. For the general pediatric floor, vital signs**

18      **are usually anywhere between q4 to q8 to once**

19      **a shift, and that's pretty standard.**

20    Q. Okay. And then -- and then physician

21      notification, is that kind of a standard

22      order that you always put in the chart?

23    **A. That is. That's a standard order, yes.**

24    Q. So under the labs portion of your note on 17,

25      I guess, you got to go back.

## Page 93

1    **A. Okay.**

2    Q. The abnormalities in the labs, were those as

3      a result of the strep?

4    **A. That's what I attributed those abnormalities**

5      **to, yes.**

6    Q. How about the elevated glucose, is that a

7      common finding with somebody who is -- has

8      strep and who is ill?

9    **A. It can be, yes.**

10    Q. Okay. Can there be other -- do you know

11      whether -- what abnormalities there would be

12      in a lab with an individual with elevated

13      intracranial pressures?

14    **A. I don't know.**

15    Q. And the radiology diagnostics -- let me ask

16      you this: After you've performed your

17      history and your physical examination, was

18      your opinion that no radiology or diagnostics

19      needed to be performed or did you consult

20      with Dr. White and Dr. Bala before making

21      that decision?

22    **A. That was my determination that yes, nothing**

23      **more was needed as far as radiology and**

24      **diagnostics, and then I confirmed that with**

25      **Dr. White and Dr. Bala.**

24 (Pages 90 to 93)

Page 94

```
1    Q.  And that was their opinion, as well?
2    A.  They -- yes.  If they had wanted something
3        done, it would have changed the plan.
4    Q.  Got it.  And then what was done to address
5        the hypoglycemia, the high glucose?
6    A.  Sorry.  Can you -- can you repeat the
7        question.
8    Q.  Was anything done to address the high
9        glucose?
10   A.  No, the glucose of 189 is actually not that
11       concerning.  It's -- it's, you know, nothing
12       that needed to be done acutely for that.
13   Q.  Does -- when you administer fluids, does that
14       help stabilize the glucose?
15   A.  Usually, if you administer fluids, the
16       glucose can decrease.
17   Q.  Did you order labs yourself?
18   A.  I did not order labs.
19   Q.  Okay.  Did you put an order in for labs
20       during his time on the floor?
21   A.  No.
22   Q.  And then we go down there and it says:
23       Patient discussed with Dr. Bala.
24          And again, you don't recall exactly
25       what was said to Dr. Bala?
```

Page 95

```
1    A.  Correct.  I don't recall.
2    Q.  Based on your note and your custom, habit and
3        routine, give me what you think you probably
4        would have said to him.
5          MR. DAY:  I'm going to object.  I
6        think we've already gone through that, but go
7        ahead.
8    A.  Do you want a summary or do you want --
9    Q.  Tell me exactly what you think you would have
10       said to him.
11   A.  Okay.  Dr. Bala, we have a 5-year-old male
12       here presenting to the ED.  Essentially, I
13       would have read through the H & P.
14       Presenting with nausea and vomiting.  He was
15       actually diagnosed with strep at Wesley last
16       night at 6:00 p.m.  Went home with
17       amoxicillin and mom's concerned that he can't
18       keep his antibiotics down.  He's thrown up
19       four times since -- three or four times since
20       leaving Wesley and she's concerned about
21       getting treatment for the -- for the strep,
22       and she's concerned about dehydration.  She's
23       really unsure about when symptoms started.
24       The patient's sister actually recently had a
25       tonsillectomy and she thought that maybe the
```

Page 96

```
1        patient was afraid that if he told her about
2        his symptoms that he would have to have
3        surgery, as well.  She reports that the
4        nausea and vomiting started on Friday and has
5        been intermittent throughout the weekend.
6        And then on Sunday he had headache, dizziness
7        and worsening nausea with several episodes of
8        emesis.  She denies any fevers, chills,
9        weight loss or abdominal pain or rash in
10       D████, but she did say that he complained of
11       bilateral knee pain prior to arrival.  But
12       she didn't notice any joint swelling or
13       redness.  She said that he has seemed weak
14       and looked pale until he got fluids in the
15       ER.  In the ER, they gave 20 cc per kg bolus
16       of IV fluids and they checked labs, including
17       a CMP and a CBC and gave Zofran --
18          MR. DENNING:  Slow down.
19   A.  Sorry.  This is the checkout.  This is
20       like -- this is the --
21   Q.  And if I can cut you off, too --
22          MR. DAY:  Let's see if he can do
23       it.  No, go ahead.
24   A.  I'm sorry.
25   BY MR. GIROUX:
```

Page 97

```
1    Q.  I mean, would you have literally read your
2        note to him?
3    A.  Essentially.  I mean, that's how a
4        checkout -- I mean, it's the exact -- yeah.
5    Q.  So everything in your history -- history of
6        present illness and I don't -- I know that
7        you don't specifically recall the
8        conversation with Dr. Bala, but your -- you
9        know, your, I guess, your normal custom,
10       habit and routine is to read the complete
11       history and present illness as you wrote it?
12   A.  I usually wouldn't read it straight off the
13       page, but -- because at the time it's fresher
14       in my mind, but me trying to reinvent that
15       now, I have to read it 'cause I -- you know,
16       it's -- I would worry that I would misstate
17       things now if I didn't read it from the page.
18   Q.  And then you would have gone through the
19       review of symptoms as noted and then, of
20       course, your physical findings, as well?
21   A.  Yep, and I would have mentioned past medical,
22       he was previously healthy.  We even talk
23       about birth history and development and all
24       that stuff so --
25   Q.  Do you recall at all Dr. Bala having any
```

25 (Pages 94 to 97)

Page 98

```
 1        questions?
 2     A.  I don't recall whether he did or did not.
 3     Q.  Okay.
 4     A.  Usually, attendings will ask questions at the
 5        end of a presentation, but I don't recall.
 6     Q.  And then when in relation to your history and
 7        physical examination, when would you have
 8        called Dr. Bala?
 9     A.  I would have called Dr. Bala after I saw the
10        patient and discussed the patient with
11        Dr. White.
12     Q.  And then -- so you would have talked to
13        Dr. White first?
14     A.  Yes.
15     Q.  And then would your, I guess, report to her
16        would have been similar to Dr. Bala?
17     A.  It would have been nearly identical.
18     Q.  And then I take it, at that time, that you
19        had experience with Dr. White?
20     A.  Yes.
21     Q.  Was she the type of person that would ask
22        questions and followup with questions?
23     A.  Yes.
24     Q.  But in terms of what questions that she asked
25        and what followup, you don't recall what
```

Page 99

```
 1        those would be?
 2     A.  I don't recall specifically.
 3     Q.  But essentially, I guess, the import of all
 4        this talking to Dr. White and Dr. Bala is
 5        that everybody was pretty much on the same
 6        page regarding what the plan was for D███?
 7           MR. DAY:  Again, based on the
 8        assumptions of normal practice as opposed to
 9        memory.  I just want to be clear on this.
10           MR. GIROUX:  Yes.
11     A.  Yes.
12     BY MR. GIROUX:
13     Q.  Okay.  And the plan was to -- what was the
14        plan?
15     A.  The plan was to admit D███ for observation.
16        So observation is different from inpatient.
17        We expect a shorter stay with observation.
18        And to essentially let him sleep.  When he
19        wakes up, try to see if he can tolerate PO,
20        because it seemed that his nausea and
21        vomiting improved with the Zofran given in
22        the ER.  So the plan was to -- a PO challenge
23        in the morning, and if he did well with it
24        and tolerated antibiotics, then he could
25        likely go home later that day.
```

Page 100

```
 1     Q.  How long was he going to -- how long -- what
 2        was the plan in terms of how long you were
 3        going to let him sleep?
 4     A.  I don't recall a specific timeframe.
 5     Q.  If he slept to 12:00 or 1:00, was the plan
 6        just to let him sleep to 12:00 or 1:00?
 7           MR. DAY:  Object to form.
 8     A.  We did not -- I don't -- I don't know that we
 9        discussed a specific plan of how long we
10        would let him sleep.
11     Q.  Do you have a -- I guess based on your review
12        of the records and your own history and
13        physical examination, how long you wanted to
14        let him sleep --
15           MR. DAY:  Object to form.
16     BY MR. GIROUX:
17     Q.  -- before doing any further evaluation of
18        him?
19           MR. DAY:  Same objection.
20     A.  I don't have any independent recollection of
21        what I thought would be an appropriate amount
22        of time for sleep.
23     Q.  Do you know whether Dr. Bala or Dr. White
24        commented on how long they wanted him to
25        sleep?
```

Page 101

```
 1     A.  I don't recall whether they did or did not
 2        comment on that.
 3     Q.  What time would you have left the hospital?
 4     A.  Our -- the nightshift ends at 7:00 a.m. and
 5        checkout occurs usually anywhere between 6:45
 6        and 7:15 so it would have been not too long
 7        after 7:00 a.m.
 8     Q.  And then do you -- I mean, and you take your
 9        laptop with you?
10     A.  I do, yes.
11     Q.  Are you able to do charting from home from
12        the laptop?
13     A.  You can, yes.
14     Q.  Did you do that?
15     A.  No.
16     Q.  Okay.  Have you ever done that?
17     A.  I have done that, yes.
18     Q.  Do you know whether you were doing that at
19        this time, in this -- during this time
20        period?
21     A.  I can tell you for a fact that I did not.  I
22        never -- I never do work at home when I'm on
23        nights because the hours are so long that I'm
24        usually just sleeping when I get home.
25     Q.  Was there ever a discussion -- do you recall
```

26 (Pages 98 to 101)

Page 102

```
 1        any discussion with any provider whether it's
 2        Dr. White or Dr. Bala, at least, in the time
 3        that you were providing care that D███
 4        needed any type of imaging?
 5    A.  No, we did not determine that he needed
 6        imaging.
 7    Q.  Okay.  And the same question as it relates to
 8        a consult?
 9    A.  No, he did -- we did not deem a consult
10        necessary.
11    Q.  Then in looking at -- was it -- do you recall
12        whether the plan was observation --
13        typically, when a patient's admitted for
14        observation, are they typically going to be
15        discharged that same day?
16    A.  Not always the same day.  It's usually less
17        than two midnight stay in the hospital.  So
18        it would -- usually that same day or the next
19        day.
20    Q.  Did you know about Dr. Borick's -- did you
21        read Dr. Borick's notes?
22    A.  I did.
23    Q.  Okay.
24    A.  Yep.
25    Q.  In her note, which is on Page 132, she has,
```

Page 103

```
 1        under provider signature, disposition was
 2        plan to discharge later today.
 3        Were you aware of that?
 4    A.  That was our plan if D███ was able to
 5        tolerate PO.
 6    Q.  And if he wasn't able to tolerate PO, then he
 7        would be admitted for another day, at least,
 8        until he was able to tolerate --
 9    A.  Yes.
10    Q.  -- PO?
11    A.  Yes.
12    Q.  And then if he wasn't able to tolerate, was
13        the plan to do IV?
14    A.  We would have reevaluated and then made that
15        determination, but that was -- the thought
16        process was, yes, we'll reevaluate IV
17        fluids if he can't tolerate PO.
18    Q.  When you began your residency, would you do
19        rounds with other physicians who weren't in
20        residency?
21            MR. DAY:  I'm not --
22    Q.  I'm sorry.  It was a bad question.
23        Actually, when you began your
24        pediatric rotation?
25    A.  Uh-huh.
```

Page 104

```
 1    Q.  Were you doing rounds on your own?
 2    A.  What do you mean?  Can you --
 3    Q.  When you were -- when you were on your
 4        pediatric rotation in your first year of
 5        residency and you were assigned to go down
 6        and evaluate a patient that's going to be
 7        admitted into the pediatric floor, was there
 8        ever at the front end of that where you would
 9        actually see the patient in conjunction with
10        like Dr. Bala or another pediatrician or a
11        hospitalist?
12    A.  I guess that it kind of varies.  So the
13        answer is yes, I would see patients with an
14        upper level resident or the attending during
15        the day when we did admissions.  Usually I
16        would check out face to face with the
17        attending during the day and occasionally
18        we'd even go in after I'd seen the patient
19        and then see the patient together, after they
20        got up to the floor.
21    Q.  Let's say up to March 6th of 2017, had you
22        done rounds with Dr. Bala?
23    A.  I don't know for sure if I had done rounds
24        during the day with him.  They have three
25        physicians who work in their group and they
```

Page 105

```
 1        rotate their roles, and so I don't know for
 2        sure if I had done rounds during the day with
 3        him.
 4    Q.  Does he have a level of experience that you
 5        don't have?
 6    A.  Yes.
 7    Q.  How would you characterize that or describe
 8        that?
 9    A.  Dr. Bala is a attending pediatrician, so he
10        did a pediatrics residency and then is
11        board -- he took his boards and got board
12        certified in pediatrics.
13    Q.  In terms of -- do you know whether -- if you
14        don't, you don't, but would he -- would his
15        history and physical examination of a
16        pediatric patient who's being admitted from
17        the ER to the pediatric floor be any
18        different than yours?
19            MR. DAY:  Object to form; calls
20        for speculation, lack of foundation.
21    A.  I don't know.
22    Q.  Would you expect it to be different?
23            MR. DAY:  Same objection.
24    A.  I -- I would expect him to gather the same
25        information that I gathered.
```

27 (Pages 102 to 105)

## Page 106

1  Q.  For example, you know what the standard of
2  care is?
3  A.  Yes.
4  Q.  What is the standard of care in your mind?
5      What's the definition of it?
6  A.  **It's basically if you look at any presenting**
7  **patient, it's what's expected -- it's hard**
8  **not to use the word standard of care when**
9  **you're talking about standard of care, but**
10 **what's expected for treatment for a patient**
11 **given a specific scenario.  Usually it's like**
12 **consensus among the medical population.**
13 Q.  Does -- and then as a -- your training as a
14     family practice resident in your first year
15     and what you learn in the family practice
16     residency is much different than what
17     somebody would learn in a pediatric
18     residency; is that fair?
19         MR. DAY:  Object; lack of
20     foundation.
21 A.  **No, I don't think it's -- I don't think it's**
22 **significantly different.**
23 Q.  Okay.  Why have specialties then if it's not
24     significantly different?
25 A.  **So family medicine is basically we treat all**

## Page 107

1  **ages and we do obstetrics.  We do a little**
2  **bit of everything.  Dr. Bala would --**
3  **pediatricians would have received more**
4  **training specifically to pediatrics 'cause**
5  **that's all they do.  But we would have had**
6  **similar training in pediatrics when we were**
7  **on pediatrics if that makes sense.  We cover**
8  **the same topics and take care of the same**
9  **patients.**
10 Q.  So at the beginning of your deposition, we
11     talked about, in general terms, your
12     experience with the pediatric population up
13     until March 6th of 2017; correct?
14 A.  **Yep.**
15 Q.  Would you say by that time, from July 1st,
16     when you began your residency, to March 6th
17     of 2017, that you would have seen and
18     evaluated hundreds of pediatric patients?
19 A.  **No.**
20 Q.  How would you characterize the number of
21     patients that you would have evaluated during
22     that time period?
23 A.  **Pediatric patients or total patients?**
24 Q.  Pediatric patients.
25 A.  **Tough to put a number on it.  Less than a**

## Page 108

1  hundred for sure in the clinic.  In a
2  hospital, I would be guessing if I told you a
3  number.
4  Q.  And then in a scenario like this where you
5      are the first year resident assigned to do
6      the admit of a patient -- pediatric patient
7      coming from the ER to the general pediatric
8      floor, how many times had you done that prior
9      to March 6th of 2017?
10 A.  **Again, it would be a guess if I put an exact**
11 **number on it, but admissions, between 20 and**
12 **40.**
13 Q.  And then I guess that would be -- in the 20
14     or 40, I know that's a guess, that would be a
15     spectrum of different illnesses that you are
16     encountering?
17 A.  **Correct.**
18 Q.  Do you recall approximately how many of those
19     20 to 40 were strep?
20 A.  **I don't recall.**
21 Q.  Do you know if any were strep admissions?
22 A.  **I don't recall.**
23 Q.  Were you able to do, if you go to Page 16,
24     your own -- were you able to do an evaluation
25     of D████ eyes?

## Page 109

1  A.  **No.**
2  Q.  Is that because he was sleeping?
3  A.  **That's correct.**
4  Q.  Was that -- is that something that would have
5      been deferred, as well?
6  A.  **Yes.**
7  Q.  To the floor?
8  A.  **Yes.  So --**
9  Q.  Go ahead.  I apologize.
10 A.  **I'm done.**
11 Q.  Do you know whether there was an evaluation
12     done of his eyes in the ER?
13 A.  **They documented his eye opening**
14 **spontaneously.  And they documented that his**
15 **extraocular movements were intact.**
16 Q.  Is that a full eye examination that you would
17     typically do?
18 A.  **It's a general eye examination.**
19 Q.  Okay.  And would you do a general eye
20     examination if he was awake?
21 A.  **Yes.**
22 Q.  And that would consist of what?
23 A.  **Usually testing the extraocular movements and**
24 **typically check pupillary response, as well.**
25 Q.  And then what would the pupillary response

28 (Pages 106 to 109)

## Page 110

1      tell you about the patient?

2    **A.  That cranial nerves are intact that supply**

3    **the pupil, allowing the pupil to constrict**

4    **with light on both sides.**

5    Q.  How about the extracular examination?

6    **A.  Same thing:  Cranial nerve testing telling**

7    **you that the cranial nerves are intact.**

8    Q.  Okay.  And then what deficits, if any, would

9    eye -- elevated intracranial pressure cause

10    on a general eye exam if one was done?

11          MR. DAY:  Object to foundation.

12    **A.  So kind of mentioned it earlier, you can see**

13    **papilledema when you -- you actually have to**

14    **look to the -- to the back of the eye.**

15    Q.  And then that's done with some type of

16    instrument?

17    **A.  Yes.**

18    Q.  Okay.  Do you know whether Dr. White did

19    that?

20    **A.  She did not document that she did that, so I**

21    **don't know if she did.**

22    Q.  And then she saw D████, at least, when you

23    look at the time -- and I'm not going to hold

24    you to the time.  If you saw D████ at 5:18

25    or 5:30, she says 6:15.

## Page 111

1      Did she do, at least, the general

2    neurologic exam that you were wanting to do?

3          MR. DAY:  Object to form.  I

4    don't understand.

5    **A.  She -- the neurological exam that she did was**

6    **a general exam where she documents that he**

7    **rubbed his eyes, pushed examiner's hand away.**

8    Q.  Okay.

9    **A.  Otherwise, nothing else is documented.**

10    Q.  Okay.  But the brief neuro exam that you

11    discussed earlier about standing up,

12    accessing gait and see whether there's any

13    gross abnormalities, she didn't do that?

14    **A.  Correct, and actually she also documents the**

15    **uvula is midline, which is important for**

16    **cranial nerves, as well.**

17          MR. DENNING:  Sorry, Doctor?

18    **A.  The uvula is midline.**

19    Q.  Explain that to me.

20    **A.  So you can see a uvula deviation if there is**

21    **some sort of like abscess or, you know, you**

22    **may expect some changes if there's cranial**

23    **nerve problems.**

24    Q.  How about with elevated intracranial

25    pressure, I mean, can you expect the uvula

## Page 112

1    not to be midline?

2    **A.  Not that --**

3    Q.  Or is that beyond your scope?

4    **A.  Yeah, probably beyond my scope.  I don't know**

5    **for sure.**

6    Q.  And then if we go to Dr. Borick, her note on

7    Page 131-132, do you know whether she did a

8    general neurologic exam?

9          MR. DAY:  Object to form.

10    **A.  I don't know whether she did or didn't, but**

11    **it's not -- it's not documented.**

12    Q.  And then, at least, based on her note, you

13    would agree with me that D████ condition

14    was probably about the same as it was when

15    you saw D████ and when Dr. White saw D████?

16          MR. YOUNG:  Object to form.

17          MR. DAY:  Object to form.

18    **A.  Tough -- it's tough for me to comment on that**

19    **just based on the note.**

20    Q.  You indicated that he was arousable; correct?

21    **A.  Correct.**

22    Q.  Then if we go to -- do you know Sam

23    Dumontier?

24    **A.  The name sounds familiar.**

25    Q.  He was a medical student at the time, and

## Page 113

1    he's got a note at, let's say, I think, 291.

2    Hold on, let me make sure I got it right.

3    Yes, it's 291.

4    **A.  Okay.**

5    Q.  He says:  General:  Non-arousable.

6      That's different than -- than what you

7    put; correct?

8          MR. DAY:  Object to form.

9    **A.  That is different than what I wrote.**

10    Q.  Had you reviewed his note prior to your

11    deposition?

12    **A.  I had reviewed Dr. Borick's note and I don't**

13    **think I looked at this note specifically.**

14    Q.  And I think she had non-arousable, but she

15    testified yesterday that her note was pretty

16    much a mirror of Dr. Dumontier's because she

17    did it after the code.

18    **A.  Okay.**

19    Q.  Can you tell based on your review of Dr. --

20    or Sam Dumontier's note and Dr. Borick's note

21    whether there was a change in D████

22    condition from time that you saw him to

23    the time they saw him?

24    **A.  Again, it's tough to say without actually**

25    **doing an exam myself.  You know, it can vary**

## Page 114

1    by provider.
2    Q.  Was it your impression that he was sleeping
3    during that whole time?
4    A.  During what whole time?
5    Q.  During the whole time between the time you
6    saw him and the time that Dr. Borick saw him
7    at 7:00 o'clock in the morning.
8              MR. DAY:  Object to form;
9    foundation.
10   A.  I don't know.
11   Q.  Would you expect him to have a Glasgow Coma
12   Scale of 6:30 of 15?
13             MR. DAY:  Object to form;
14   foundation.
15   A.  I'm not sure.  If he was sleeping, you
16   wouldn't assess a GCS.
17   Q.  Okay.  If there is one in the record that
18   says that his Glasgow Coma Scale at 6:30 was
19   15, would that indicate to you, at least,
20   that he was tested?
21   A.  Yes, if there's one documented, then it would
22   have had to have been tested.
23   Q.  And then in order to do a Glasgow Coma Scale,
24   and if I'm asking the same question again, I
25   apologize.

## Page 115

1    A.  No, it's okay.
2    Q.  When you do a Glasgow Coma Scale, are you
3    asking the patient to stand or sit up?
4    A.  No, you're not -- you're not having them
5    stand up and ambulate.
6    Q.  But they can -- they can lay in bed and you
7    can do a Glasgow Coma Scale?
8    A.  That's correct.
9    Q.  But you would have to ask them questions;
10   they would have to be, at least, alert enough
11   to respond?
12   A.  You don't always have to ask questions, but
13   yeah.  'Cause if they're awake and moving
14   their extremities and talking normally,
15   that's a GCS of 15.
16   Q.  Okay.
17   A.  And you don't have to ask questions.
18             MR. GIROUX:  Okay.  Let's take a
19   break.  I think I'm just about done.  I might
20   have a few questions before and after, but I
21   think I'm just -- take about five minutes and
22   go back on the record and see if I have
23   anymore.
24             VIDEOGRAPHER:  Off the record
25   11:10.

## Page 116

1              (A recess was taken from 11:10 a.m. to
2    11:21 a.m.)
3              VIDEOGRAPHER:  Back on the record
4    11:21.
5    BY MR. GIROUX:
6    Q.  Doctor, just a few questions.  I think I'll
7    be about five minutes and I'll be done and
8    then others will have questions for you.
9    A.  Okay.
10   Q.  Are you from Wichita?
11   A.  I'm not.
12   Q.  Where are you from originally?
13   A.  Eudora, Kansas.
14   Q.  Okay.  And that's up in the Kansas City area?
15   A.  It's close to Lawrence.
16   Q.  Okay.  And then where did you go undergrad?
17   A.  Kansas State.
18   Q.  And then you went to Case Western?
19   A.  That's correct.
20   Q.  And then what's the plans when you complete
21   your residency in May?
22   A.  Looking for a job right now so going to stay
23   in Kansas.  I just don't know where yet.
24   Q.  Do you want to stay in the Wichita area?
25   A.  We're looking in smaller towns near Kansas

## Page 117

1    City.
2    Q.  If I asked this, I apologize.  I don't ask
3    repeated questions, but at any point in time
4    during D████'s hospitalization, did you
5    learn from any source about D████ stroke,
6    the cause of his stroke and when it occurred?
7              MR. DAY:  Object to foundation.
8    A.  I don't recall specifically learning about a
9    stroke, but I recall learning about the
10   respiratory arrest on the floor.
11   Q.  And then without getting into any discussions
12   with your attorney, or attorneys, have you
13   learned, since D████s hospitalization,
14   anything about when the stroke occurred and
15   what caused the stroke?
16             MR. YOUNG:  Object to form.
17             MR. DAY:  Object to form and
18   foundation.
19   A.  I've read the record about the brain mass and
20   the problems ensuing from that.
21   Q.  The record being the Via Christi record?
22   A.  Correct.
23   Q.  You haven't looked at any other medical
24   records of D████?
25   A.  No.

## Page 118

1   Q.  He was transferred from Via Christi to
2       Children's Mercy.
3           Do you understand that?
4   A.  Correct.  I read that in the record.
5   Q.  But any subsequent records after he was
6       discharged or transferred from Via Christi,
7       you haven't reviewed any of those?
8   A.  That's correct.  I have not reviewed any
9       other records.
10  Q.  There was a -- there was testimony that was
11      provided yesterday by a Nurse Angela Walker
12      that said that it was -- the nurse or nurses
13      were informed that when doing rounds on
14      patients, to round on D███ last.
15          Were you involved in any conversation
16      with the nurses about rounding on D███
17      last?
18  A.  No.
19  Q.  Does that ring any bells, that question?
20  A.  No, it does not.
21          MS. WOODS:  Object to form.
22  BY MR. GIROUX:
23  Q.  Have you understood my questions today?
24  A.  Yes, sir.
25          MR. GIROUX:  I don't have

## Page 119

1       anything else.
2           MR. GRIBBLE:  I have no
3       questions.  Thank you, sir.
4           MS. WATSON:  I have no questions.
5       Thank you.
6           MR. YOUNG:  I do not have any
7       questions at this time.  Thank you.
8           MS. WOODS:  I have no questions.
9       Thank you.
10          MS. COLE:  No questions.
11          CROSS-EXAMINATION
12  BY MR. DENNING:
13  Q.  I do have a few questions for you.  My name
14      is Dustin Denning.  I represent CEP America
15      Kansas in this lawsuit.
16          Dr. Hartpence, were you rushed at all
17      during your examination and assessment of
18      D███?
19  A.  No, sir.
20  Q.  You made a comment earlier and I wanted to
21      followup on that.
22          Was he your only responsibility or
23      focus at that time that morning?
24  A.  From what I recall, yes.  And usually the
25      senior resident will protect the intern from

## Page 120

1       having two admissions at the same time.  So
2       we'll focus on one, and then if there was
3       another one, I would have waited till I was
4       done with that.
5   Q.  Okay.  Do you think that you are thorough
6       when you take a history from a patient or a
7       patient's family member?
8   A.  Yes.
9   Q.  Do you believe that you were thorough in this
10      case in taking a history?
11  A.  Yes.
12  Q.  You talked about bringing in your laptop into
13      the exam room.
14          You recall that testimony?
15  A.  Yes.
16  Q.  And do you sit down at a -- on a chair at
17      kind of a desk or workstation to type?
18  A.  I always try to sit down and be eye to eye
19      with the parent or the patient.  And
20      usually -- sometimes it's on my lap,
21      sometimes there's like a little table you can
22      adjust the height of and I'll use that, but I
23      don't recall what I did in this instance.
24  Q.  Okay.  And as I understand your testimony,
25      you've got your laptop open, you've got the

## Page 121

1       exam note open, and you start typing into
2       that note when taking a history?
3   A.  Correct.
4   Q.  Okay.  Are you literally typing in as, in
5       this case, Kelli Morgan is conveying to you
6       D███ history?
7   A.  Yes.
8   Q.  Okay.  Are you trying to type stuff in word
9       for word?
10  A.  I try to.
11  Q.  If Kelli had told you that D███ had a
12      sudden onset of headache the day before at
13      church where he clutched the back of his head
14      and screamed out in pain, if she had told you
15      that, is that something that would have ended
16      up in your HPI?
17  A.  Yes, most certainly.
18  Q.  All right.  If she told you that D███
19      eyeballs were protruding from his skull and
20      he was not able to close his eyes, is that
21      something that you would have recorded in the
22      history?
23  A.  Yes.
24  Q.  Because that would be a significant thing to
25      know, wouldn't it?

KELLEY REPORTING ASSOCIATES, LTD    515 S. MAIN, STE 105          WICHITA, KANSAS
                                    316.267.8200                            67202

Page 122

1    A.  **That would be very significant, yes.**
2    Q.  If she told you that D███ eyes had been
3        rolling into the back of his head, is that
4        something that you would have recorded?
5    A.  **Yes, I would have recorded that.**
6    Q.  If she told you that D███ had sensitivity
7        to light, is that something that you would
8        have placed in your note?
9    A.  **Yes.**
10   Q.  If she told you that D███ was slurring
11       words, is that something you would have
12       recorded?
13   A.  **Yes.**
14   Q.  If she told you that D███ was unbalanced,
15       would you have recorded that?
16   A.  **Yes, I would have.**
17   Q.  If she told you that D███ had difficulty
18       standing or walking, would you have placed
19       that into your note?
20   A.  **Yes.**
21   Q.  Because those are all significant findings;
22       is that right?
23   A.  **They are, yep.**
24   Q.  And because none of that appears in your HPI,
25       is it fair to say that Kelli Morgan didn't

Page 123

1        tell you about any of that stuff?
2    A.  **That's correct.**
3        MR. GIROUX:  Object to form;
4        that's contrary to his earlier testimony.
5        MR. DENNING:  I think -- he said
6        that's correct.
7    A.  **That's correct.  Sorry.**
8        MR. DENNING:  Thank you.  That's
9        all I have.
10       CROSS-EXAMINATION
11   BY MR. DAY:
12   Q.  Doctor, I have just one quick series.
13       You mentioned the subject of a
14       headache and dizziness came up during the
15       review of symptoms -- or systems and -- is
16       that correct?
17   A.  **That's correct.**
18   Q.  And I just want to make sure the record's
19       clear on what that means.
20       When Mrs. Morgan came in and described
21       what her concerns were, did she mention
22       either headache or dizziness?
23   A.  **No, that was not her primary concern.**
24   Q.  Just so the record's clear:  Are you saying
25       that came up when you went through the list

Page 124

1        of questions that you asked?
2    A.  **Yes.  So when I started asking about**
3        **associated symptoms, that was when it came**
4        **up.**
5    Q.  Within medicine, is there a significant
6        distinction made between what appears in the
7        review of systems versus what's the chief
8        complaints that bring the patient in?
9    A.  **Yes, the chief complaint is really where you**
10       **dive into the details.**
11       MR. DAY:  That's all I have.
12       REDIRECT EXAMINATION
13   BY MR. GIROUX:
14   Q.  Just a couple followup.
15       When you see D███ first, the first
16       thing that you did was gather the history;
17       right?
18   A.  **From the mother, correct.**
19   Q.  That's right.  And then you do the review of
20       systems?
21   A.  **The HPI and the review of systems can happen**
22       **in conjunction.**
23   Q.  Okay.  So the way I read the history of
24       physical -- the history of present illness,
25       she says:  On Sunday, patient complained of

Page 125

1        headache, dizziness and worsening nausea and
2        several episodes of emesis.
3    A.  **Correct.**
4    Q.  To me that would suggest that you're having
5        this conversation, you're gathering the
6        history from mom, and she's providing you
7        that information separate from the review of
8        systems; is that fair?
9    A.  **Can you rephrase that.  Let me pull up the**
10       **note.**
11   Q.  That's fine.  I'll let you pull it up first.
12   A.  **Okay.  Okay.  Sorry.  Can you say that again.**
13   Q.  Yeah.  In review of the history of present
14       illness, it looks like the history that you
15       gathered from mom, which is separate from the
16       review of systems, is that on Sunday, patient
17       complained of headache, dizziness and
18       worsening nausea and episodes of emesis.
19   A.  **Correct.**
20   Q.  So that would be separate than the review of
21       systems?
22   A.  **Not necessarily.  So during the HPI, when I'm**
23       **obtaining history from a patient, you ask --**
24       **first, you let them talk.  You get the**
25       **information.  And then you ask, did he have**

## Page 126

1   any of this, did he have any of this.  And
2   typically that's towards the end of my HPI
3   when I'm asking those additional questions
4   'cause I've already gone through what our
5   chief complaint was.  And so when you get
6   down to the headache, dizziness, worsening
7   nausea, several episodes of emesis on Sunday,
8   and then the next line is "he denies these."
9   So it's -- the review of systems and the HPI
10  can be in conjunction.
11  Q.  Okay.  Well, when you first went in, I mean,
12      tell me all the history.
13          Did mom just kind of open up and tell
14      you exactly what happened?
15  A.  I don't recall specifically what the
16      conversation was, but I would have asked
17      broad questions to start.
18  Q.  It seems like if you spent 15 or 20 minutes
19      taking a history, and you have one paragraph
20      that is noted in the history of present
21      illness, there's probably a lot of
22      information that she told you that just
23      didn't make it to the chart.
24          MR. DENNING:  Object to form.
25  A.  I mean, there's a lot of information in the

## Page 127

1   history that's not just the HPI that takes
2   time.
3          MR. GIROUX:  I have nothing
4   further.
5          MR. DAY:  I think we're done.
6          MR. GIROUX:  Thank you, sir.
7          THE WITNESS:  Thanks.
8          VIDEOGRAPHER:  Off the record
9   11:31.
10         (Deposition concluded at 11:31 a.m.)
11               *   *   *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 128

1       I have read or have had read to me the foregoing
2   testimony recorded on pages 5 to 127, inclusive, and the
3   same is true and correct to my knowledge and belief.
4
5
6          CONNOR HARTPENCE, M.D.          (Date)
7
8
9
10  STATE OF          )
                      ) ss:
11             COUNTY)
12  Subscribed and sworn to before me, the
13  undersigned authority, this, the      day of
14           ,   .
15
16
    Notary Public
17
18
19  (Commission Expires)
20
21
22
23
    MORGAN v. WESLEY MEDICAL CENTER, LLC, et al.
24
25
26
27

## Page 129

1                    CERTIFICATE
2   STATE OF KANSAS)
                    ) ss:
3   SEDGWICK COUNTY)
4       I, RICK J. FLORES, CSR, a Certified Shorthand
5   Reporter for the State of Kansas, do hereby certify that
6   the within-named witness was by me first duly sworn to
7   testify the truth, that the testimony given in response
8   to the questions propounded, as herein set forth, was
9   first taken in machine shorthand and reduced to writing
10  with computer-aided transcription, and is a true and
11  correct record of the testimony given by the witness.  I
12  certify that review of the testimony was requested by the
13  witness or the parties.  If any changes are made by the
14  deponent during the time period allowed, they will be
15  appended to the transcript.
16      I further certify that I am not a relative or
17  employee or attorney or counsel of any of the parties, or
18  a relative or employee of such attorney or counsel, or
19  financially interested in the action.
20      WITNESS my hand and official seal at Wichita,
21  Sedgwick County, Kansas, this      day of
22           ,   .
23
24
25          RICK J. FLORES, CSR
            515 South Main, Suite 108
            Wichita, KS  67202
26          (800) 654-8684
27