Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY, KANSAS DIVISION

D.M., a minor, by and through his
next friend and natural guardian,
KELLI MORGAN,

                              Plaintiff,        Case Number
vs.                                             2:18-CV-02158

WESLEY MEDICAL CENTER LLC d/b/a
WESLEY MEDICAL CENTER - WOODLAWN;
WESLEY-WOODLAWN CAMPUS;
BRIDGET GROVER, PA-C;
DR. GREGORY FAIMON;
LISA JUDD, RN;
VIA CHRISTI HOSPITALS WICHITA, INC;
JENNIFER CHAMBERS-DANEY, ARNP;
DR. BALA BHASKAR REDDY BHIMA VARAPU;
CEP AMERICA-KS LLC;
DR. CONNOR HARTPENCE;
DR. STEPHANIE WHITE;
DR. JAMIE BORICK;
and AARON KENT, RN,

                              Defendants.

DEPOSITION OF STEPHANIE DeLEON, M.D.

TAKEN ON BEHALF OF THE PLAINTIFF

ON FEBRUARY 26, 2020

IN OKLAHOMA CITY, OKLAHOMA

REPORTED BY:  BRENDA SCHMITZ, CSR, RPR

Page 2

APPEARANCES:

FOR THE PLAINTIFF:

    MR. MICHAEL J. KUCKELMAN
    Kuckelman, Torline, Kirkland
    10740 Nall Avenue, Suite 250
    Overland Park, Kansas 77211
    Telephone: 913.948.8612
    Email: mkuckelman@ktk-law.com

FOR THE DEFENDANTS DR. STEPHANIE WHITE, DR. CONNOR
HARTPENCE and DR. JAMIE BORICK, (by telephone):

    MR. STEVEN C. DAY
    Woodard, Hernandez, Roth & Day, LLC
    245 North Waco Avenue, #210
    Wichita, Kansas 67202
    Telephone: 316.263.4958
    Email: scday@woodard-law.com

FOR THE DEFENDANT CEP AMERICA-KS LLC:

    MR. DUSTIN J. DENNING
    Clark, Mize & Linville
    129 South Eighth Street
    Salina, Kansas 67402-0380
    Telephone: 785.823.6325
    Email: djdenning@cml-law.com

FOR THE DEFENDANT DR. BALA BHASKAR REDDY BHIMA
VARAPU:

    MR. DON D. GRIBBLE, II
    Hite, Fanning & Honeyman LLP
    Suite 950
    100 North Broadway
    Wichita, Kansas 67402
    Telephone: 316.265.7741
    Email: gribble@hitefanning.com

Page 3

FOR THE DEFENDANT JENNIFER CHAMBERS-DANEY, APRN:

    MR. GREGORY S. YOUNG
    Hinkle Law Firm
    1617 N. Waterfront Parkway, Suite 400
    Wichita, Kansas 67206-6639
    Telephone: 316.267.2000
    Email: gyoung@hinklaw.com

FOR THE DEFENDANTS BRIDGET GROVER, PA-C AND GREGORY
FAIMON:

    MS. TRACY A. COLE
    Gilliland Green
    20 West 2nd, Second Floor
    Hutchinson, Kansas 67502
    Telephone: 620.664.5023
    Email: tcole@gglawks.com

EXAMINATION INDEX

DIRECT EXAMINATION BY MR. KUCKELMAN ..........6

CROSS EXAMINATION BY MR. GRIBBLE ............85

CROSS EXAMINATION BY MR. YOUNG. ............89

CROSS EXAMINATION BY MR. DAY ...............90

REDIRECT EXAMINATION BY MR. KUCKELMAN.......99

REDIRECT EXAMINATION BY MR. DAY ...........105

FURTHER DIRECT EXAMINATION BY MR. KUCKELMAN.107

Page 4

EXHIBIT INDEX

Number 1  Curriculum Vitae of Dr. DeLeon.....70

Number 2  Date, Times and Cost sheet .......71

Number 3  Article, "Group A streptococcal
          Tonsillopharyngitis in children and
          Adolescents" ...............................73

Number 4  Article, "Clinical Practice
          Guideline for the Diagnosis and Management
          Of Group A Streptococcal Pharyngitis ........75

Number 5  "Cancer, Medulloblastoma"..........75

Number 6  Article, "The diagnosis of brain
          Tumours in children" ......................77

Number 7  Notebook, depositions and records..83

Number 8  Notebook, depositions and records..84

(Exhibits 7 and 8 retained by the witness by
agreement of the parties.)

EXHIBIT

D

tabbies

Deposition of Stephanie DeLeon MD                          Morgan V. Wesley Medical Center

Page 5

STIPULATIONS

1     It is hereby stipulated and agreed by and
between the parties hereto, through their respective
attorneys, that the deposition of STEPHANIE DeLEON,
M.D. may be taken on behalf of the Plaintiffs on
FEBRUARY 26, 2020, in the City of Oklahoma City,
Oklahoma by Brenda Schmitz, Certified Shorthand
Reporter within and for the State of Oklahoma, taken
by subpoena duces tecum pursuant to the Federal
Rules of Civil Procedure.

    It is also agreed between the parties than an
objection for one is an objection for all.

Page 6

    And thereupon the following witness was produced
by the Plaintiff:

            STEPHANIE DeLEON, M.D.,
the witness hereinbefore named, being first duly
cautioned and sworn to testify the truth, the whole
truth, and nothing but the truth, testified on her
oath as follows:

            DIRECT EXAMINATION
BY MR. KUCKELMAN:
    Q.    Would you state your full name for the
record, please?
    A.    Yes.  Stephanie Dawn DeLeon.
    Q.    And Dr. DeLeon, what does unarouseable
mean?
    A.    For most physicians, they would describe a
child as unarouseable if they were not responsive to
touch, stimulation, words.
    Q.    Touch, stimulation and words, is that --
    A.    Or words.
    Q.    Or words?
    A.    Uh-huh.
    Q.    So any one of those three, not all three?
    A.    Typically, when we are examining children,
we do a combination of the three, it would be very
rare to just say something without a touch with it.

Page 7

I would say touch is probably the most common that
we're doing with children.
    Q.    Would nonarouseable, in an otherwise
normal, healthy, five-year-old boy, would his being
nonarouseable be of concern to you, as a physician?
    A.    Yes.
    Q.    Why would that be a concern?
    A.    That would likely be a sign that this was
actually not a healthy child, that there was
something else going on.
    Q.    What steps would you take, as a physician,
if you knew that a child was nonarouseable?
    A.    I think nonarouseable is sort of a general
term, and so I would do potentially a more in-depth
physical exam, and obtain history about what perhaps
led the child to that state to be in, to try to get
some more details about what other studies or
testing might need to be done for that child.
    Q.    In your position, do you have medical
students that are under your supervision?
    A.    Yes.
    Q.    If a medical student reported to you that
an otherwise normal, healthy, five-year-old child
was nonarouseable, what steps would you take upon
hearing that information from a medical student?

Page 8

    A.    I would ask what they meant by that,
because I think there is a deep learning curve in
what the word unarouseable means in medical
training, and certainly if that description fit with
what I would consider an unarouseable child, we
would go see that child.
    Q.    You would personally go see the child?
    A.    Yes.
    Q.    Or would you send a resident to see the
child?
    A.    Well, if I am there talking to that
medical student, actually, typically, we would go as
a team to see the child.  If I were at home, per se,
and this was in a phone call, I would send whoever
was in the hospital to see the child.
    Q.    And what would you expect the person that
you send to see the child, what would you expect
them to do?
    A.    An exam on the child.
    Q.    And what would that exam entail?
    A.    You mean what would be involved in that
exam?
    Q.    Yes.
    A.    So, certainly there would be a general
assessment of the child's appearance, their vital

National Court Reporters, Inc.                          Page: 2 (5 - 8)

Deposition of Stephanie DeLeon MD                 Morgan V. Wesley Medical Center

Page 9

1 signs, cardiac exam, lung exam, abdominal exam, skin
2 exam, and then a neurologic exam.
3      Q.   What was the last one, a neurologic exam?
4      A.   A neurologic exam.
5      Q.   What is a neurologic exam?
6      A.   So, that is an examination about the
7 child's neurologic status, again it's just that
8 unarouseable is a general description, but not
9 necessarily a specific finding that would give me an
10 idea of what was going on with that child.
11     Q.   Doctor, why would the neurological status
12 of a child who's nonarouseable matter?
13     A.   There are several things that could lead a
14 child to be unarouseable, and so your exam would be
15 a clue as to what some of those things might be, and
16 give you a direction in which you would need to
17 focus your workup.
18     Q.   What does a neurological exam entail?
19     A.   So, there is a general assessment of, is a
20 patient awake, alert, talking, appropriately
21 interactive, is the child playful, things like that.
22 Can the child stand up, walk, do they reach for
23 things with one hand versus the other, do they move
24 both sides of their body equally, do they have
25 reflexes that are equal on both sides of their body,

Page 10

1 those are some of the basics.
2      Q.   Anything else you would do as part of the
3 neurological exam?
4      A.   You would test cranial nerves as well, so,
5 looking at pupillary response, facial symmetry or
6 asymmetry, tongue deviation, if you could get the
7 child to stick their tongue out.
8      Q.   How is nonarouseable different than
9 sleepy?
10     A.   A sleepy child is one who does respond to
11 stimuli when you go in to examine them or talk with
12 the family or talk with the child.  A sleepy child
13 is what you would expect in perhaps a child who
14 doesn't feel well or who maybe had been awake for a
15 long period of time.  They are responsive to you,
16 but perhaps not running around the room and playful
17 like you would expect a well child to be.
18     Q.   So I take it from a physician's
19 standpoint, there is -- it is quite an important
20 distinction between sleepy and nonarouseable; would
21 that be fair?
22     A.   That's a fair statement.
23     Q.   You can't use sleepy and nonarouseable
24 interchangeably, can you?
25     A.   Correct.

Page 11

1      Q.   Sleepy could be a normal finding for a
2 child, correct?
3      A.   Correct.
4      Q.   Nonarouseable would not ever be a normal
5 finding for an otherwise healthy five-year-old
6 child, would it?
7      A.   Correct.
8      Q.   Would you agree that nonarouseable is a
9 red flag?
10          MR. YOUNG:  Object to form.
11          THE WITNESS:  I would agree if a child is
12 described as nonarouseable, that should be noted.
13     Q.   Would it be a red flag?
14     A.   Yes.
15     Q.   And what do you mean by red flag?
16     A.   So, in medicine, when we say something is
17 a red flag, it's a marker that something more
18 serious may be going on and should be paid attention
19 to.
20     Q.   What do you mean that something more
21 serious might be going on?
22     A.   So, for -- that there may be a severe
23 underlying illness that's there.
24     Q.   So nonarouseable is a red flag for a
25 possibly underlying serious illness?

Page 12

1      A.   Correct.
2      Q.   Are you aware that the term nonarouseable
3 is contained within D▆▆▆ M▆▆▆▆ medical chart?
4      A.   I am.
5      Q.   And it actually appears two times,
6 correct?
7      A.   Yes.  I believe it is in the initial
8 medical student note, and then it is copied into Dr.
9 Borick's note.
10     Q.   So both the medical student and Dr. Borick
11 reported that D▆▆▆ M▆▆▆▆ was nonarouseable; is
12 that correct?
13     A.   They have documentation that states he was
14 nonarouseable.
15     Q.   Do you know what follow-up Dr. Borick
16 engaged in upon learning that D▆▆▆ M▆▆▆▆ was
17 nonarouseable?
18          MR. DAY:  Object to form.
19          THE WITNESS:  I believe, based on her
20 testimony, she stated that she did not believe that
21 D▆▆▆▆ M▆▆▆▆ was nonarouseable, and the medical
22 student's testimony also indicated that he was in
23 that period of a learning curve, and at this time
24 would not indicate that Dorian was unarouseable, as
25 well.

Page 13

1   Q.   You're talking about their testimony after
2 they had been sued, correct?
3   A.   Correct.
4   Q.   All right.  If we go back to the
5 charting --
6   A.   Correct.
7   Q.   -- that was contemporaneous with the care
8 and treatment of D███████ M███████ --
9   A.   Yes.
10   Q.   -- at that point in time, they both
11 charted that he was nonarouseable, correct?
12   A.   Correct.
13   Q.   And both the medical student, in his own
14 note, says he was nonarouseable, and Dr. Borick, in
15 her own note, says that D██████ M███████ is
16 nonarouseable, correct?
17   A.   Correct.
18   Q.   So their contemporaneous notes suggest
19 that they believed at the time he was hospitalized,
20 just before he had a stroke, that he was
21 nonarouseable, correct?
22   A.   That's what the documentation --
23   Q.   Now, after they got sued, they both have
24 backed away from that and attempted to say that it
25 wasn't really nonarouseable, correct?

Page 14

1   A.   Correct.
2   MR. DAY:  Object to the form.  Doctor,
3 please give me a chance to note my objections before
4 you answer, thank you.
5   THE WITNESS:  Okay.
6 BY MR. KUCKELMAN:
7   Q.   What follow-up did Dr. Borick conduct in
8 response to what you've described as a red flag,
9 this nonarouseable finding?
10   A.   There is nothing indicated in the record
11 that there was an immediate follow-up taken.
12   Q.   When you say nothing, do you mean that
13 literally, that there was no follow-up at all in
14 response to the red flag of nonarouseable finding?
15   MR. DAY:  Objection --
16   THE WITNESS:  There was no
17 documentation -- sorry, Steve.
18   There was no documentation provided to me that
19 showed there was any immediate actions taken.
20   Q.   Would you agree, Doctor, that it would be
21 a deviation from the standard of care for a
22 physician to fail to take immediate action to
23 follow-up in response to the red flag of a finding
24 of nonarouseable in an otherwise healthy
25 five-year-old boy?

Page 15

1   MR. YOUNG:  Object to form, overbroad, go
2 ahead.
3   THE WITNESS:  If a patient was truly noted
4 to be unarouseable, it would be a standard from
5 deviation of care to not respond to that.
6   Q.   It would be a deviation of standard of
7 care, correct?
8   A.   Yes.
9   Q.   So, Doctor, would you agree that in this
10 case, Dr. Borick, in her failure to follow-up on
11 this red flag of nonarouseable finding, she, in
12 fact, did deviate from the standard of care?
13   MR. DAY:  I'm going to object to the form
14 of the question, you're being argumentative, you're
15 not making it clear whether you're talking about
16 strictly if she assumed the records are accurate
17 versus the testimony of the witnesses.
18   MR. KUCKELMAN:  Mr. Day, I'll remind you
19 that in federal court, our objections aren't to be
20 speaking objections.
21   MR. DAY:  And I'll remind you that you're
22 not supposed to mislead the witness in the way you
23 express the question, but I will try to be careful.
24   MR. KUCKELMAN:  Thank you.
25   THE WITNESS:  Can you repeat the question,

Page 16

1 please?
2   MR. KUCKELMAN:  Sorry, you'll have to read
3 it back.
4   (Question read.)
5   THE WITNESS:  In reviewing Dr. Borick's
6 testimony, or her deposition, it did not appear that
7 she thought that the patient was actually
8 unarouseable, and so therefore would not have taken
9 the steps that I described previously.
10 BY MR. KUCKELMAN:
11   Q.   So you discount the nonarouseable finding
12 that was in contemporary -- a contemporaneous
13 record, medical record, based on testimony that she
14 gave well after the fact after she had been sued?
15   A.   I think there are --
16   MR. DAY:  Objection.
17   THE WITNESS:  Sorry, Steve, go ahead.
18   MR. DAY:  I made my objection, object to
19 form.  Go ahead, Doctor.
20   THE WITNESS:  I think there is other
21 supporting testimony in depositions that beyond just
22 the documentation around that that I reviewed to
23 come to my decision about that.
24   Q.   Well, ultimately the jury will have to
25 decide the credibility issue, correct?

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 17

1   A.   Correct.

2   Q.   But in helping the jury with the standard

3 of care issue, I think at least we can agree that if

4 the jury were to find that Dr. Borick did note

5 contemporaneously that the patient was

6 nonarouseable, and that that was the finding made

7 contemporaneous with the exam, that it would be a

8 deviation of the standard of care for her to have

9 failed to do any follow-up in that regard, correct?

10   A.   I think as I stated earlier, if she truly

11 believed the patient was unarouseable and did not

12 act, that was a deviation from the standard of care.

13   Q.   And in fact, any physician that became

14 aware of the nonarouseable finding after the medical

15 student charted it, any physician, after that time,

16 would also have deviated from the standard of care

17 if they failed to follow-up on that finding of

18 nonarouseable, correct?

19   A.   Just to clarify, so if someone read that

20 student's record later that morning and didn't act

21 on that?

22   Q.   Correct.

23   A.   Yes, that should have been acted upon.

24   Q.   And failure to act upon it would be a

25 deviation from the standard of care, correct?

Page 18

1   A.   Yes, fair statement.

2   Q.   And likewise, once Dr. Borick put a note

3 in, a finding that D██████ was nonarouseable, it

4 would be a deviation from standard of care for any

5 physician subsequent to that finding to fail to do

6 anything further in evaluating the patient, correct?

7        MR. YOUNG:  Object to form, overbroad.

8        MR. DAY:  Object to form.

9        THE WITNESS:  If someone were to review a

10 note that said a patient was unarouseable, it would

11 be standard of care to follow-up on that.

12   Q.   Doctor, you state in your report, "only

13 once the final diagnosis is known does the real

14 association between symptoms become clearly

15 apparent."  What does that mean?

16   A.   So there are a lot of overlap in the

17 symptoms between a strep infection and not

18 tolerating antibiotics and increased intracranial

19 pressure.  And so once you have a CT scan and a

20 final diagnosis, in retrospect, you can see how the

21 symptoms fit with that diagnosis.

22   Q.   So you agree today that the symptoms were

23 present that were suggestive of increased

24 intracranial pressure, correct?

25   A.   I do.

Page 19

1   Q.   Have you ever diagnosed a patient with

2 increased intracranial pressure?

3   A.   Yes.

4   Q.   Approximately how many times have you

5 diagnosed a patient with increased intracranial

6 pressure?

7   A.   Oh, probably maybe three to five times per

8 year over the last ten years or so.

9   Q.   So you, personally, have diagnosed

10 increased intracranial pressure 30 to 50 times over

11 your ten-year history; is that correct?

12   A.   I would say that's correct.

13   Q.   How many times have you ordered a CT scan

14 to rule out increased intracranial pressure?

15   A.   Probably every single time I've diagnosed

16 it.

17   Q.   I would assume, though, there have been

18 sometimes you've ordered a CT scan and not found

19 increased intracranial pressure, correct?

20   A.   Correct.

21   Q.   How many times do you think you've had a

22 negative finding?

23   A.   Oh, that's a difficult question to answer.

24 Lots.  I am -- probably 300 times in ten years,

25 maybe more than that.

Page 20

1   Q.   So by a factor of at least -- at least ten

2 times as often, you have ordered a CT scan, even

3 when there wasn't increased intracranial pressure?

4   A.   Correct.  There are lots of reasons to

5 order a CT scan that have nothing to do with

6 increased intracranial pressure.

7   Q.   What is a CT scan?

8   A.   It is a diagnostic imaging modality that

9 gives you pictures of the brain, spinal fluid, and

10 sinuses and the anterior facial features as well.

11   Q.   Is that something that's fairly routine in

12 a children's hospital?

13   A.   We try not to do CT scans unless we feel

14 they're indicated, but certainly in an institution

15 where I am, which is a tertiary care referral

16 center, yes, we do a fair number of CT scans.  There

17 are risks with them, so it's not a test that we

18 order without thought.

19   Q.   Right.  You wouldn't just order it without

20 any indication whatsoever for the need for a CT

21 scan, correct?

22   A.   Correct.

23   Q.   That's like any test in a hospital, you

24 don't order tests unless there's some symptom you

25 want to rule out an underlying cause, correct?

Deposition of Stephanie DeLeon MD        Morgan V. Wesley Medical Center

Page 21

1     A.   Correct.

2     Q.   What are the signs and symptoms of

3 increased intracranial pressure in a five year old?

4     A.   There can be headaches, there can be some

5 subtle sort of personality changes, interaction --

6 sort of interactivity changes with the family that

7 they may notice.

8     There can be abnormal eye movements, such as

9 nystagmus.  There can be slurred speech that's

10 there, and then vomiting.  Typically, early morning

11 vomiting.

12     Q.   Any other signs and symptoms that you know

13 of for increased intracranial pressure?

14     A.   And balance issues, I don't think I said

15 that one.  Those are the most common.

16     Q.   Did you listen to the audio recording of

17 D██████ M████'s mother's telephone call to the

18 Children's Mercy Hospital nurse?

19     A.   I did not.

20     Q.   Was that provided to you?

21     A.   It was not.

22     Q.   Do you know why it wasn't provided to you?

23     A.   I do not.

24     Q.   Are you aware that there's an audio

25 recording?

Page 22

1     A.   No, I don't think I was before this.  I

2 recall in her testimony she mentioned calling a

3 nurse line, but that's my only recollection of that

4 call.

5     Q.   Do you agree that in offering expert

6 opinions in a case, it's important for you to have

7 all of the information before you render an opinion?

8     A.   For -- yes.

9     Q.   Doctor, do you agree that before D██████

10 coded, that it was known that he had been nauseous?

11     A.   Yes.

12     Q.   Do you agree that before D█████ coded, it

13 had been made known by his mother that he was

14 disoriented?

15     A.   I don't recall that being documented in

16 the record anywhere.

17     Q.   Do you recall that before D█████ coded, it

18 had been made known that he had a really bad

19 headache?

20     MR. YOUNG:  Object to form.

21     THE WITNESS:  There was documentation that

22 he had had headaches.

23     Q.   Do you agree that prior to D█████ coding,

24 it was known that he had multiple episodes of

25 vomiting?

Page 23

1     A.   Yes.

2     Q.   Do you agree that prior to D████coding,

3 his mother had expressed concerns that she was

4 worried it was something more serious than strep?

5     MR. DAY:  Object to form.

6     THE WITNESS:  I don't recall that being in

7 the medical record at Via Christi.

8     Q.   Do you agree that prior to D█████ coding,

9 it was known that D█████ had returned to the

10 emergency room because his mother was concerned

11 about him?

12     A.   Yes, this was a second visit.

13     Q.   Do you agree that it was known prior to

14 D█████ coding that he, in fact, had what she

15 described as dry heaves?

16     A.   I don't recall that being documented in

17 the medical record at Via Christi.

18     Q.   Do you agree that it was known prior to

19 D█████ coding, that he was unable to stand on his

20 own to be weighed?

21     MR. YOUNG:  Object to form.

22     THE WITNESS:  No, I don't remember that

23 being noted in the medical record.

24     Q.   Do you rely only on the information that's

25 in the medical records in formulating your opinions?

Page 24

1     A.   I've obviously read the depositions as

2 well.

3     Q.   So you -- your opinions take into account

4 facts and information that is outside of the medical

5 records; is that correct?

6     A.   It does.  When I'm looking at the medical

7 decisions that the medical team made overnight, I am

8 aware of what information would have been available

9 to them, though.

10     Q.   And will you agree that there would be

11 information made available to the healthcare

12 providers that might not show up in the chart?

13     A.   Yes.

14     Q.   And sometimes there's a dispute between a

15 patient and healthcare providers as to what the

16 patient reported, correct?

17     A.   Correct.

18     Q.   Now, what is the purpose of a medical

19 record?

20     A.   It is a tool for communication between

21 providers, it serves as a record for referencing

22 what happened with the patient for review as you're

23 making care decisions, and as a place to store

24 information.

25     Q.   And is it important for these residents to

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 25

1 accurately record the concerns of the patient or the
2 patient's parent in the case of a five-year-old
3 child?
4     A.   Yes.  We -- yes.
5     Q.   I take it you train residents on how to
6 create medical records, correct?
7     A.   Yes.
8     Q.   And medical students, I take it you train
9 medical students as well; is that right?
10    A.   I do.
11    Q.   Now, do you train medical students and
12 residents that they simply record what a patient's
13 mother reports, or do they have to do more than
14 that?
15    A.   They record what the family is reporting;
16 in the exam portion, they record their own
17 observations for that.  Maybe I'm not understanding
18 your question.
19    Q.   Well, for example, the history.  How does
20 a history come to be in a medical record?
21    A.   It typically starts with a chief
22 complaint, which is what a family reports when they
23 come in to be seen, and that typically prompts a
24 line of questioning by the students or physicians
25 who are caring for the patient.  And then that

Page 26

1 information is recorded in the medical record.
2     Q.   So, do physicians have an obligation to
3 ask follow-up questions to elicit more information
4 from the person providing history?
5          MR. YOUNG:  Object to form, it's
6 overbroad.
7          THE WITNESS:  Yes, once there is some
8 information initially provided from the family, that
9 takes a physician down a line of questioning to ask
10 clarifying questions or to get more details.
11    Q.   Is that standard of care that a physician
12 would ask follow-up questions and elicit further
13 information from a patient?
14         MR. YOUNG:  Same objection.
15         MS. COLE:  Object to form.
16         THE WITNESS:  It is a routine part of
17 practice to do that.
18    Q.   When you say it's routine, would that mean
19 that that is standard of care that a physician or a
20 resident would ask follow-up questions to elicit
21 additional information?
22         MS. COLE:  Object to form.
23         MR. DAY:  Object to form, overbroad.
24         THE WITNESS:  Yes.
25    Q.   And if a physician complies with standard

Page 27

1 of care and asks follow-up questions in the history
2 taking and elicits additional information, is the
3 physician then expected to put that in the medical
4 record as well, the additional information?
5          MS. COLE:  Object to form.
6          THE WITNESS:  Yes, it is, especially if it
7 seems pertinent to the presentation of the patient.
8     Q.   Doctor, I know that you weren't given the
9 audio recording of D██████ mother calling
10 Children's Mercy Hospital, I'll play that clip for
11 you, it's a short clip, and then I'm going to ask
12 you some questions about that, okay?
13    A.   Okay.
14         (Recording played.)
15 BY MR. KUCKELMAN:
16    Q.   And Doctor, I will also play for you the
17 follow-up call from the nurse.
18         (Second recording played.)
19    Q.   Doctor, are you telling the jury that
20 prior to today, you've not heard those two phone
21 calls?
22    A.   Correct.
23    Q.   Doctor, having heard those two phone
24 calls, if you were a physician -- or you are a
25 physician, if that patient was coming to you, would

Page 28

1 you be concerned about that patient's health?
2          MR. YOUNG:  Object to form.
3          THE WITNESS:  I -- it sounds like an ill
4 child, so anytime a patient presents to the
5 emergency room, there's enough family concern to
6 bring them in, so that would be a concern on the
7 part of myself or the physician seeing them.
8     Q.   Having heard the history that the mother
9 relayed in those two short phone calls, would you
10 have a heightened concern for the health of this
11 child?
12         MR. YOUNG:  Object to form.
13         THE WITNESS:  Yes.
14    Q.   And why would you have a heightened
15 concern for D██████ based upon the information you
16 heard his mother recite in those two short phone
17 calls?
18    A.   You have a child who, based on that
19 description in that phone call, was diagnosed with
20 an illness, is not tolerating the antibiotics that
21 was given for that illness, and is coming back in to
22 be seen again.
23    Q.   Was D██████s mother correct to take him to
24 the emergency room, back to the emergency room a
25 second time?

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 29

1    A.    Yes, she was.
2    Q.    And was she correct to expect the
3  physicians at Via Christi, that saw her son, to
4  treat him and to properly diagnose his condition?
5         MR. YOUNG:   Object to form.
6         MR. DENNING:  Object to form.
7         MR. YOUNG:   And foundation.
8         THE WITNESS:  I think that is a reasonable
9  expectation that families have when they bring their
10 children in for medical care.
11   Q.    Did D▮▮▮▮▮ mother sound concerned, in
12 that phone call, about his health?
13        MR. YOUNG:   Object to form, foundation.
14        THE WITNESS:  That's quite a subjective
15 question, I think she was taking her son back in for
16 a second visit, so there's reason to believe she was
17 concerned.
18   Q.    Based on that phone call, do you think she
19 was being an overreactive mother?
20        MR. YOUNG:   Object to form.
21        MS. COLE:    Foundation.
22        MR. DAY:     Object to form.
23        THE WITNESS:  No.
24   Q.    Would you agree, that based upon D▮▮▮▮
25 symptoms, his mother was correct to be very worried

Page 30

1  about his health?
2         MR. DAY:     Object to form.
3         MR. YOUNG:   Same.
4         THE WITNESS:  She was appropriate to be
5  worried.
6    Q.    And given the symptoms that she listed in
7  that very short call to Children's Mercy Hospital,
8  the appropriate thing to do was to get D▮▮▮▮ into a
9  hospital urgently, correct?
10        MR. DAY:     Object to form.
11        MR. YOUNG:   Same.
12        THE WITNESS:  The appropriate thing was to
13 take him in to be seen again, yes.
14   Q.    Why was D▮▮▮▮ M▮▮▮▮ admitted to the
15 hospital?
16   A.    Based on the documentation and the
17 assessments that I can read, it was because he was
18 not tolerating his oral antibiotics.
19   Q.    But what was the hospital going to do?
20 Why was he going to a floor, what was the plan?
21   A.    So, typically, in a patient who has a
22 prescribed treatment plan such as a diagnosis of
23 strep with antibiotics, if they are not able to
24 tolerate those antibiotics because of vomiting, we
25 would classically admit them for observation to

Page 31

1  ensure that the next morning, they can tolerate
2  those antibiotics.
3    Q.    You said the word "observation", correct?
4    A.    Uh-huh.
5    Q.    I'm sorry, you have to say yes or no.
6    A.    Yes, sorry.
7    Q.    What does observation mean?
8         MR. YOUNG:   Object to form.
9         THE WITNESS:  Observation is essentially a
10 medical term for being placed into the hospital, and
11 different hospitals do this differently, but it's
12 thought to be a short period of admission to the
13 hospital in a patient who you expect is going to get
14 well rather quickly.
15   Q.    But why put in the hospital for
16 observation as opposed to just sending them home?
17   A.    For continued ability for monitoring.
18   Q.    What do you mean by continued ability for
19 monitoring?
20   A.    To be able to have a repeat physician
21 and/or nursing assessment of how the patient is
22 doing.
23   Q.    When you say a repeat physician
24 assessment, what does that mean?
25   A.    A follow-up.

Page 32

1    Q.    So you would expect that when D▮▮▮▮
2  M▮▮▮▮ was admitted to the hospital for observation,
3  that he would have repeat physician assessments; is
4  that fair?
5    A.    During that observation period, yes.
6    Q.    And would that again, that would be the
7  standard of care when a patient is admitted to the
8  hospital for observation, that the patient would
9  have repeat physician assessments?
10        MS. COLE:    Object to form.
11        THE WITNESS:  Either, again, different
12 hospitals have some different protocols for it, but
13 there would be the expectation that some trained
14 medical personnel would be doing assessments on that
15 patient.  It may not necessarily be the physician
16 coming in frequently, though.
17   Q.    Now, does it have to be an admitting
18 physician?
19   A.    Yes.
20   Q.    What is an admitting physician?
21   A.    So I guess kind of the classical way to
22 think about it, the admitting physician is the boss,
23 they are the fully trained, fully licensed
24 physician, ultimately responsible for the patient's
25 care.  And they are fully credentialed by the

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 33

1 hospital with admitting privileges.
2     Q.    All right.  So an admitting physician, I
3 think you used the term, lay term, boss, correct?
4     A.    Uh-huh.
5     Q.    I'm sorry, you have to say yes or no.
6     A.    Yes.
7     Q.    And so the admitting physician becomes the
8 boss, if you will, of the patient care and treatment
9 during that admission, correct?
10    A.    Correct.
11    Q.    And when you say ultimately responsible,
12 what do you mean that an admitting physician is
13 ultimately responsible?
14    A.    At the end of the day, they are the
15 physician who is leading the team, especially in a
16 teaching hospital like this, with it, and they are
17 the most highly trained physician on the team,
18 usually.  Always, actually.
19    Q.    Now, in regard to the two telephone calls
20 you just listened to, again, those haven't been
21 provided to you before today, I think you said,
22 correct?
23    A.    Correct.
24    Q.    So if you need to listen to them again at
25 any time, just let me know, because I know you've

Page 34

1 only been able to hear them on the one occasion.
2     A.    Thank you.
3     Q.    But if we assume that Kelli Morgan was as
4 good of historian at the hospital as she was talking
5 on the telephone on her drive to the hospital, do
6 you agree that it would have been available to the
7 physicians to know that D████ had nausea?
8           MR. YOUNG:  Object to form.
9           MR. GRIBBLE:  And object, which
10 physicians?
11          THE WITNESS:  I think that --
12          MR. GRIBBLE:  Hang on, hang on, which
13 physicians?
14          MR. KUCKELMAN:  What's your objection?
15          MR. GRIBBLE:  I want to know what you mean
16 by that question, which physicians?
17          MR. KUCKELMAN:  You can object, but the
18 question, whatever your objection is, but I'm not --
19 I don't answer the questions today.
20          MR. GRIBBLE:  So you're going to hide that
21 question.
22          MR. KUCKELMAN:  Yes, I am.  If that's how
23 you want to characterize that.
24          MR. GRIBBLE:  You're the --
25          MR. KUCKELMAN:  Again, this is being taken

Page 35

1 pursuant to the Federal Rules of Civil Procedure, I
2 think we all understand clearly what the rules
3 require in terms of objecting during a deposition.
4           MR. GRIBBLE:  And you should be fair.
5 What do you mean by that question, when you say
6 physicians, there's lots of physicians here.  I
7 don't know whether I need to stand up or sit down on
8 this question.
9           MR. KUCKELMAN:  Well, if -- I'll caution,
10 you should state whatever objection you want and
11 then we'll carry on.
12          MR. GRIBBLE:  Okay.  Then I would object
13 to any question relative to Dr. Bala, inasmuch, her
14 report says nothing about Dr. Bala, and I don't
15 think she's offering any opinion about Dr. Bala.
16          MR. YOUNG:  And I join in that objection
17 as to application with my client.
18          MR. KUCKELMAN:  Okay.  And I don't even
19 know what the question was, but it must've been
20 good.  Can you read it back?
21          (Last question read back.)
22          THE WITNESS:  I would need to reference to
23 be sure, but I believe in the admission
24 documentation there was a notation of nausea that
25 was recorded in there.  I do also think it's

Page 36

1 important to note that families will give different
2 histories at different times with it, and so I don't
3 think you can guarantee that she gave the same
4 history to the physicians in the ED and at the
5 hospital as she did on the phone.  And I don't think
6 there's a way for us to know that for sure.
7     Q.    What is the purpose of asking follow-up
8 questions to patients, or parents of five year old
9 patients?
10    A.    Sure.  Just to gather more information.
11    Q.    If we can assume that Kelli Morgan was as
12 good historian at the hospital as she was on the
13 telephone, do you agree that it would have been
14 known that D████ was disoriented?
15          MR. YOUNG:  Same objection.
16          MR. DAY:  Objection.
17          THE WITNESS:  I will say the same thing,
18 there was no documentation that she gave that
19 history to anyone at the hospital there, so if she
20 gave the same history in both places, then yes.
21    Q.    If we assume that Kelli Morgan was as good
22 historian at the hospital as she was on the
23 telephone while driving to the emergency room, would
24 you agree that it would have been known that D████
25 had been complaining about headaches?

1      MR. YOUNG:  Object to form.
2      THE WITNESS:  I believe it's documented in
3  the record that he had a history of headaches, and
4  so I have no reason to think she did not give that
5  history.
6      Q.  And if Kelli Morgan was as good of
7  historian at the hospital as she was while driving
8  to the hospital, it would have been known that, as
9  his mother, she was concerned that this was
10 something more serious than strep, correct?
11     A.  She stated that certainly on the phone
12 call with it.  I have no indication that she said
13 that to anyone at the hospital.
14     And I think you put some pressure on her by
15 saying as good of a historian, she was in a
16 different environment, in a different place, giving
17 a different history.  So if she didn't give that
18 history in both places, that's not on her.  That is
19 a --
20     Q.  Well, in taking the history, you would
21 certainly expect that the physicians would ask her
22 questions about duration and timing and so on,
23 correct?
24     MR. YOUNG:  Object to form.
25     THE WITNESS:  That is often a part of

1  history that we take.
2      Q.  And you would ask other open-ended
3  questions so that hopefully she would be as free
4  with information as she was on that telephone call,
5  correct?
6      A.  That is routinely how histories are
7  gathered.
8      Q.  Doctor, would you agree that the
9  information she gave on that short phone call to
10 Children's Mercy Hospital is a concerning history in
11 regard to this five-year-old child?
12     MR. YOUNG:  Object to form.  Overbroad.
13     THE WITNESS:  Can I listen to the first
14 phone call again?  Not the second one, just the
15 first one.
16     Q.  Just the first one, yes.  Okay.
17     (First recording played again.)
18     THE WITNESS:  And now if you'll repeat
19 your question.
20     MR. KUCKELMAN:  I'm sorry, would you read
21 it back?
22     (Last question read back.)
23     MR. YOUNG:  Object to the form.
24     THE WITNESS:  It is -- it is the history
25 that prompts an evaluation.

1  BY MR. KUCKELMAN:
2      Q.  Do you agree that with a history of really
3  bad headache at church and that he's been
4  complaining about headaches, that he's disoriented,
5  he's nauseous and he's vomiting, his mother was
6  concerned this was something more serious than
7  strep, that requires a neurological examination?
8      MR. YOUNG:  Object to the form.
9      MR. DAY:  Object to form.
10     MR. YOUNG:  Overbroad and nonspecific.
11     THE WITNESS:  If those specific history
12 points were provided, that would be concerning for a
13 need for a full neurologic exam.
14     Q.  And what is a full neurologic exam?
15     A.  All of the things that I mentioned
16 earlier.
17     Q.  And would you agree that while on the
18 floor after being admitted for observation, that
19 with these symptoms, that D████ M█████ should have
20 had a full neurologic examination as well?
21     MR. DAY:  Object to form.
22     THE WITNESS:  Per the medical record, all
23 of those symptoms were not reported to the initial
24 resident physician team that was taking care of him
25 then with it.  In my report, after the diagnosis is

1  known, I think yes, having a full neurologic exam
2  would have been important, knowing the diagnosis on
3  the back end of it.
4      On the front end, with the symptoms that were
5  provided in the medical record, I think it is
6  understandable that a full neurologic exam was not
7  completed initially.
8      Q.  Now, again, you are --
9      MR. YOUNG:  Mike, when you get to a point,
10 can we take a break?
11     MR. KUCKELMAN:  Yeah.
12 BY MR. KUCKELMAN:
13     Q.  You're basing that again strictly on the
14 medical chart, correct?
15     A.  I am probably pulling in some of the
16 deposition knowledge that I have reviewed, as well,
17 with that.
18     Q.  And what about the phone call you just had
19 me play back for you a second time.  Are you using
20 that?
21     A.  I -- for that, I think the physician,
22 based on the documentation I can see didn't have
23 that same history, and so I wouldn't expect them to
24 make a medical decision based on that history.
25     Q.  But would you agree if the physicians were

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 41

1  given that history, that the standard of care would
2  have required a full neurologic exam on the floor
3  while ▓▓▓▓ was there for observation?
4            MR. DAY:  Object to the form.
5            THE WITNESS:  Sometime during that period,
6  yes.
7            MR. KUCKELMAN:  Why don't we take a short
8  break.
9            MR. YOUNG:  Thanks.
10                 (Recess taken.)
11  BY MR. KUCKELMAN:
12       Q.   Doctor, what does the term standard of
13  care mean?
14       A.   It is the care that a reasonable physician
15  or care provider would give in a similar set of
16  circumstances.
17       Q.   So, if I wrote this down correctly, your
18  definition of standard of care is reasonable care a
19  physician would give in similar circumstances,
20  correct?
21       A.   Correct.
22       Q.   And when we talk about standard of care,
23  that is the minimum care that a patient's entitled
24  to receive, correct?
25            MS. COLE:  Object to form.

Page 42

1            THE WITNESS:  Yes.
2       Q.   When we talk about standard of care, we're
3  not talking about grading a physician of holding
4  them to a standard of an A, are we?
5       A.   Correct.
6       Q.   When we talk about standard of care, we're
7  not even asking to hold the physician to the letter
8  grade of a B, are we?
9            MR. DAY:  Object to form.
10            THE WITNESS:  That is a difficult question
11  to answer.  No, it is sort of what the average,
12  reasonable provider would give.
13       Q.   And it's really a pass/fail kind of a
14  grading, isn't it?
15            MR. DAY:  Object to the form.
16            MR. YOUNG:  Object to the form.
17            THE WITNESS:  Yes.
18       Q.   And you teach, correct?
19       A.   Correct.
20       Q.   And when you talk about standard of care,
21  we're just talking about just getting up over that
22  bare minimum that a patient's entitled to, correct?
23       A.   Yes.
24       Q.   And in this case, D▓▓▓▓ M▓▓▓▓ was
25  certainly entitled, at all times, to expecting these

Page 43

1  physicians to treat him at least at the standard of
2  care, correct?
3            MR. GRIBBLE:  Hang on, object to the form
4  of the question.  Which physicians?
5            Okay.  He's refusing to answer that again, so,
6  go ahead.
7            THE WITNESS:  Yes.
8       Q.   I'm sorry?
9       A.   Yes.
10       Q.   And when you offer standard of care
11  opinions in a legal case where malpractice is
12  alleged, it's important that you have all the
13  information before you render those opinions;
14  correct?
15            MR. DAY:  Objection, asked and answered.
16            MR. YOUNG:  Object to form.
17            THE WITNESS:  Yes.
18       Q.   And, in this case, will you agree that
19  that phone call that you listened to that you asked
20  me to play back a second time, that is critical
21  evidence that you should have had before you
22  rendered your opinions in this case, correct?
23            MR. YOUNG:  Object to the form.
24            MR. DAY:  Object to form.
25            THE WITNESS:  I believe Mrs. Morgan

Page 44

1  testified to that phone call in her deposition, and
2  so I was able to review her comments and memories
3  about that phone call.
4       Q.   So you knew about her phone call before
5  you rendered your opinions in this case?
6       A.   She had mentioned it in her deposition
7  that she had made a phone call.
8       Q.   Did you ever ask for a copy of that audio?
9       A.   I did not.
10       Q.   Well, you agree with me that that's an
11  important piece of evidence to have in a case like
12  this?
13            MR. DAY:  Object to form, that's an
14  improper question.
15            THE WITNESS:  It is one piece of evidence
16  in here that is reasonable to review when rendering
17  an opinion.
18       Q.   Because it stands to reason that if she
19  shared that much information in a very short call
20  without prompting, while driving, that at least that
21  minimal amount of information could have been
22  elicited during a proper history, correct?
23            MR. DAY:  Form.
24            MR. YOUNG:  Object to form.
25            THE WITNESS:  Could have been, yes.

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 45

1   Q.   Well, and when we say "could have been",
2   the standard of care would be that the physician
3   taking the history should be able to obtain at least
4   that minimal amount of information from a witness, a
5   parent, like Mrs. Morgan, correct?
6        MR. DAY:  Object to form.
7        THE WITNESS:  Standard of care would
8   indicate that the physicians involved should have
9   taken a history, asked clarifying questions, and
10  gotten the history that they felt like they needed
11  and that the family would provide.  There's nothing
12  that says a family will give an identical history
13  with different history takers each time.
14       Q.   In this case, if we assume that
15  Mrs. Morgan gave at least the same history at the
16  hospital that she gave to a nurse on the telephone
17  while driving, the standard of care would have
18  required neurological testing, correct?
19       MR. DAY:  Object to form.
20       THE WITNESS:  If you assume that she gave
21  that exact same history to the care providers at the
22  hospital, it should have prompted a neurological
23  assessment sometime during his evaluation.
24       Q.   Did Dr. Borick ever do a neurological
25  exam?

Page 46

1   A.   I don't believe she did.
2   Q.   Did Dr. White ever do a neurological exam?
3   A.   Not a full neurologic exam, no.
4   Q.   Did Dr. Hartpence ever do a full
5   neurologic exam?
6   A.   Not a full neurologic exam.
7   Q.   If they failed to give the full
8   neurological exam, and assuming that she gave at
9   least the history she gave on the telephone, that
10  they would have deviated from the standard of care?
11       MR. DAY:  Object to form.
12       THE WITNESS:  D██████ needed a full
13  neurological exam sometime during his observation,
14  there is nothing that required that to be done
15  initially and immediately at admission.
16       Q.   Right.  It could have been done anytime
17  between admission and the stroke, couldn't it?
18       MR. YOUNG:  Object to form.
19       MR. DAY:  Object to form.
20       Q.   In fact, a full neurological exam should
21  have occurred sometime between admission and his
22  code at 10:00, correct?
23       MR. DAY:  Object to form.
24       THE WITNESS:  Ideally, it would have.  But
25  it did not deviate from standard of care for it not

Page 47

1   to have been done first thing that morning.
2        Q.   But we can agree that standard of care
3   would dictate that there should have been a full
4   neurologic exam sometime between admission and prior
5   to the code, correct?
6        A.   Sometime --
7        MR. DAY:  Object --
8        THE WITNESS:  -- during his admission, he
9   should have had a full neurologic exam.
10       Q.   And that's standard of care, correct?
11       A.   Correct.
12       Q.   And it's a deviation from the standard of
13  care to have failed to do a full neurologic exam at
14  some point between admission and his code at 10:00,
15  correct?
16       MR. YOUNG:  Object to form.
17       MR. DAY:  You keep restating what she
18  says.
19       THE WITNESS:  No, I don't agree that
20  standard of care said it has to be done in those
21  four hours.
22       Q.   When does standard of care dictate that it
23  has to be done?
24       A.   I don't think that standard of care would
25  dictate that, necessarily.

Page 48

1        Q.   So it didn't ever have to be done?
2        A.   It should have been done at some point
3   during his admission, but there's nothing that would
4   say it should have been done at four hours or eight
5   hours or 24 hours.
6        Q.   Can we agree that had a full neurologic
7   exam been conducted, that it could have prevented
8   D██████ from suffering the squall that he now suffers
9   as a result of that code and that stroke?
10       MR. YOUNG:  Object to the form and
11  foundation.
12       MR. DENNING:  Form and foundation.
13       THE WITNESS:  If a full neurologic exam
14  had been done that earlier in that morning, and he
15  had findings consistent with increased intracranial
16  pressure on those exams, it potentially could have
17  prompted an earlier CT scan and intervention
18  earlier.
19       Q.   In D██████ case, what symptoms would you
20  have needed to see in order to -- for you to have
21  ordered a CT scan, had you been there?
22       A.   Sure.
23       MR. DAY:  Object to form.
24       THE WITNESS:  So I think -- I think a lot
25  would have depended on your neurologic exam, was he

Deposition of Stephanie DeLeon MD                     Morgan V. Wesley Medical Center

Page 49

1  a child who was unarouseable, was he a child that
2  showed focal neurologic signs, meaning weakness, in
3  one part of his body, was he a child that seemed
4  like he was able to wake up and appropriately
5  interact.
6       Q.   You mention the nonarouseable again.  I
7  take it that would be an important finding that
8  would lead you to order a CT scan?
9       A.   I think we established that earlier that
10 yes, if you truly believe a patient is unarouseable,
11 that should prompt some more interventions.
12      Q.   And when you say prompt intervention, that
13 would have been a CT scan, correct?
14      A.   That could have been one of them.
15 Unarouseable does not necessitate an immediate CT
16 scan.
17      Q.   Would a CT scan be indicated if you have
18 an otherwise healthy five-year-old boy who's
19 nonarouseable, history of nausea, history of
20 disorientation, really bad headache at church, has
21 been complaining about headaches, vomiting multiple
22 times, and his mother is concerned that he has
23 something more serious than strep, would those
24 factors all lead you to order a CT?
25           MR. YOUNG:  Object to form.

Page 50

1           MR. DAY:  Object to form, assumes facts
2  not in evidence, an incomplete hypothetical.
3           THE WITNESS:  Okay.  Some of those history
4  items would be concerning, and would prompt me to
5  consider a CT scan.  I wouldn't say it would be a
6  slam dunk I would absolutely order a CT in that
7  case.
8       Q.   Which of those factors would lead you
9  towards the CT scan?
10      A.   In a child who was unarouseable and had a
11 history of early morning vomiting and who had
12 neurologic findings, that would have been a
13 reasonable plan to order a CT scan.
14      Q.   Okay.  I think we can agree in this case,
15 you wouldn't have the requisite neurologic findings
16 because they failed to do a neurological assessment;
17 correct?
18      A.   In this case, there was no neurological
19 exam done.
20      Q.   I'm sorry, say that again.
21      A.   In this case, there was no full
22 neurological exam done.
23      Q.   Right, they failed to do a neurological
24 exam, correct?
25      A.   There was not one completed.

Page 51

1       Q.   Now, earlier you said, in your practice,
2  that you order CT scans probably ten times more
3  often than you find actual increased intracranial
4  pressure, correct?
5       A.   Correct.  And that's a rough estimate, but
6  yes.
7       Q.   So, based on your practice here, you, by a
8  factor of tenfold, order more CT scans than find
9  increased intracranial pressure; am I stating that
10 accurately?
11      A.   That's a reasonable statement, yes.
12      Q.   You said something about risks associated
13 with CT scan?
14      A.   Uh-huh.
15      Q.   What are the risks of a CT scan?
16      A.   So, the biggest risk that we know in
17 published literature is an increased risk of cancer
18 in patients who have repeated CT scans.
19      Q.   Do you know, had D█████ ever had even one
20 CT scan in his lifetime?          .
21      A.   I do not know that.
22      Q.   What are the risks of not doing a CT scan?
23           MR. YOUNG:  Object to form.
24           THE WITNESS:  That would depend on the
25 case scenario.  Are you asking specific to this

Page 52

1  case?
2       Q.   Yes.
3       A.   So the consequence of not having an early
4  CT scan in this patient is that the increased ICP
5  and the medulloblastoma were not known until later
6  in the patient's hospitalization.
7       Q.   In fact, they weren't known until after he
8  coded, correct?
9       A.   Correct.
10      Q.   And they could have been known prior to
11 this code, had a CT scan been ordered, correct?
12      A.   That is correct.
13      Q.   Now, you indicated that in your practice,
14 that the admitting physician is, in lay terms,
15 that's where you said he would be the boss, correct?
16      A.   Uh-huh.  Yes.
17      Q.   In this case, do you know who the boss was
18 in that regard?
19      A.   For this case, I believe it was Dr. Bala.
20      Q.   So Dr. Bala had overall responsibility for
21 the three residents, I take it?
22      A.   Yes.
23      Q.   And is that typical in a teaching
24 hospital?
25      A.   For there to be an attending physician

Deposition of Stephanie DeLeon MD

Morgan V. Wesley Medical Center

Page 53

1 assigned to a team?
2     Q.    Yes.
3     A.    Yes.
4     Q.    What is a resident?
5     A.    A resident is a physician who has
6 completed medical school, so, has an M.D. or D.O.
7 behind their name, but is receiving more specific
8 training in a certain area while they -- before they
9 become fully Board Certified.
10     Q.    Is a resident an actual medical doctor?
11     A.    Yes.
12     Q.    And are they held to the same standard of
13 care as any other physician?
14     A.    They are held to a similar standard of
15 care, there is expected to be supervision while
16 you're in residency, however.
17     Q.    And what's the purpose of that supervision
18 of residents?
19     A.    To have a more experienced provider
20 looking over a case and providing education.
21     Q.    And is that supervisor, is that, to use
22 the old Missouri phrase, where the buck stops?
23     A.    Yes.
24     Q.    So the residents in this case, they were
25 all answering to a supervising physician; is that

Page 54

1 right?
2     A.    Assuming that this program is similar to
3 other programs that I'm familiar with, yes, that
4 would be the classic setup for it.
5     Q.    And then that supervising physician would
6 have overall responsibility for the care and
7 treatment that the residents were providing to
8 ▆▆▆▆▆ correct?
9     A.    Correct.
10     Q.    In your report, your written report, you
11 mention that Sam DuMontier, the third year medical
12 student, might not have understood the distinction
13 between unarouseable and sleepy, correct?
14     A.    Correct.
15     Q.    But you do say that Dr. Borick, however,
16 would have understood the gravity of that
17 examination finding, correct?
18     A.    Typically, by the time residents are a few
19 months into their first year, they do.
20     Q.    Well, in fact, you would expect any
21 physician to know the difference between
22 unarouseable and sleepy, correct?
23     A.    Yes.
24     Q.    And in this case, you would agree that Dr.
25 Borick should have known the difference between

Page 55

1 nonarouseable and sleepy, correct?
2     A.    Yes, I believe she should have.
3     Q.    Not understanding the distinction between
4 nonarouseable and sleepy is not something that you
5 would accept in a physician knowledge base, correct?
6     A.    I'm not saying it couldn't happen, it
7 would certainly be an opportunity for education that
8 would need to happen, if so, but I would expect
9 someone at Dr. Borick's level of training to know
10 the difference.
11     Q.    And not only to know the difference, but
12 to appreciate, as you put it, the gravity of the
13 distinction between nonarouseable and sleepy,
14 correct?
15     A.    Correct.
16     Q.    But you're aware in this case, that she,
17 Dr. Borick, did in fact put nonarouseable in her
18 note after seeing that Dr. DuMontier had put that in
19 his note, correct?
20     A.    I --
21     MR. DAY:  Wait, wait, wait, I'm going to
22 object to the form, I'm also going to object that
23 you covered this multiple times.
24     THE WITNESS:  I believe Dr. Borick,
25 essentially, has just copied the medical student's

Page 56

1 note, which has "unarouseable" in it.
2     Q.    What do you mean copied the note?
3     A.    It looks like an identical note that's in
4 there, from it, and I believe, based on her
5 deposition, she said she essentially just copied
6 that note to have something in the chart.
7     Q.    Is that fairly standard in a hospital that
8 a physician will just copy a medical student's note
9 into their records?
10     A.    It does happen.  It should not happen.
11     Q.    When they copy the note, should they read
12 it and make certain that they agree with what's
13 written before they put in their own note?
14     A.    Yes.
15     Q.    So in this case, when Dr. Hartpence copied
16 DuMontier's note, she had an obligation to read that
17 note before she copied it, correct?
18     MR. GRIBBLE:  You misspoke.
19     THE WITNESS:  It was Dr. Borick that did
20 that.
21     Q.    Sorry.
22     A.    But yes, she should have reviewed and
23 edited the note as needed, before signing it.
24     Q.    I'm sorry, just for the record, I need to
25 fix that because I misspoke.  When Dr. Borick copied

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 57

1  DuMontier's note, she had an obligation to read it
2  before she copied it, correct?
3      A.   Yes, she should have done that.
4      Q.   And furthermore, Dr. Borick had an
5  obligation that if there was anything incorrect in
6  DuMontier's note, she had an obligation to edit it
7  and fix it, correct?
8          MR. DAY:  Object to the form.
9          THE WITNESS:  Yes.  That is typically what
10 we train residents to do, is to edit if you don't
11 agree with anything in the note.
12     Q.   Do you know whether Dr. Borick ever
13 actually even saw D█████ M█████ on the floor?
14     A.   Based on her deposition, she said that she
15 did.
16     Q.   Could you tell by the medical records
17 whether she ever went and assessed D█████ M█████
18 prior to his code?
19     A.   I don't know that based on the medical
20 record I could definitively say that.
21     Q.   And prior to the code, the only assessment
22 she had was this copy and paste from DuMontier's
23 note, correct?
24     A.   Correct.  I believe that's her only
25 documentation in there from that morning.

Page 58

1      Q.   Is that within the standard of care in
2  your facility?
3          MR. DAY:  Object to the form.
4          THE WITNESS:  We certainly have residents
5  that put in their own notes and addendum medical
6  student notes in there.  There is no requirement
7  about that must be done by a certain time period,
8  however, and it is not uncommon for residents to be
9  finishing notes in the afternoons.
10     Q.   Is it within the standard of care for a
11 resident to simply copy and paste the note of a
12 medical student without actually seeing the patient
13 themselves?
14         MR. DAY:  Object to the form, foundation.
15         THE WITNESS:  To just -- you mean to just
16 sign a note without actually seeing the patient?
17     Q.   Right.
18     A.   No, that would not be standard of care.
19     Q.   In this case, if Dr. Borick didn't
20 actually go see D█████ prior to the code, but just
21 simply copied and pasted, posted -- I'm sorry, copy
22 and pasted DuMontier's note, that would be a
23 deviation from standard of care, as well, wouldn't
24 it?
25         MR. DAY:  Object to the form, foundation.

Page 59

1          THE WITNESS:  If she did not see the
2  patient and signed a note as if she did, yes, that
3  would not be standard of care.
4      Q.   You state in your report, "In fact,
5  nowhere in the documentation do I find reports of
6  concerning neurologic symptoms that cannot be
7  readily explained by an acute infectious illness."
8  What does that mean?
9      A.   So, it means based on the documentation
10 that is provided, the symptoms that are recorded are
11 consistent with an infection with strep throat.
12     Q.   And that statement is limited by only
13 looking at the documents, correct?
14     A.   That is looking at the documentation, yes.
15     Q.   So, for example, that statement wouldn't
16 be -- would not be true if you took into account the
17 telephone call that Mrs. Morgan made to Children's
18 Mercy Hospital, correct?
19         MR. DAY:  Object to form.
20         THE WITNESS:  If the physicians were given
21 some of that additional information, then yes, that
22 would -- that could change my opinion on that.
23     Q.   Right.  If Mrs. Morgan said to the
24 physicians, Dr. Borick, Dr. Hartpence, Dr. White,
25 the same information she said to Children's Mercy on

Page 60

1  the telephone, then your sentence in your report
2  where you say that you didn't find reports of
3  concerning neurologic symptoms that cannot be
4  readily explained by an acute infectious illness,
5  that would no longer be an accurate statement, would
6  it?
7          MR. DAY:  Object to the form.
8          THE WITNESS:  I would need to clarify and
9  ask more questions about Mrs. Morgan about what she
10 said in some of that to be able to fully evaluate
11 that statement.
12     Q.   Because I take it you agree that what
13 Mrs. Morgan shared on the telephone in just a couple
14 of minutes while driving to the emergency room,
15 there's a lot more information there than it appears
16 in the medical charts, correct?
17         MR. DAY:  Object to form.
18         THE WITNESS:  Her reports in that
19 conversation would prompt other questions from me.
20 So, yes, there is a discrepancy between those.
21     Q.   Well, I take it for your opinion to hold
22 true, that there was not a deviation from standard
23 of care from Dr. Hartpence, Dr. White and Dr.
24 Borick, you've had to assume that their recitation
25 of the facts is accurate, that is that Mrs. Morgan

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 61

1  didn't share all of these other symptoms, and to
2  ignore Mrs. Morgan's statement that she did share
3  those symptoms, correct?
4          MR. YOUNG:  Object to form.
5          THE WITNESS:  Yes.
6      Q.   And I take it, in your opinion, that if
7  Mrs. Morgan did in fact share those concerns as
8  stated in this short telephone call while driving to
9  the emergency room, if she shared that information
10  with Dr. Hartpence, Dr. White and Dr. Borick, they
11  would have deviated from the standard of care in
12  this case, correct?
13          MR. DAY:  Object to form, foundation.
14          THE WITNESS:  If she had shared all of
15  those comments and the information that she shared
16  that she shared in her deposition, that should have
17  prompted more testing and more questioning, but
18  again, there's nothing that said it would need to be
19  done first thing in the morning when he was admitted
20  to the hospital, initially.
21      Q.   It would be better to do it as soon as
22  possible, wouldn't it, when you have this many
23  concerning symptoms being recited, it would be
24  important to do the testing as soon as possible,
25  wouldn't it?

Page 62

1          MR. DAY:  Object to form.
2          THE WITNESS:  As soon as as is reasonable,
3  yes.  Yes.
4      Q.   How long does it take to do a neurological
5  exam?
6      A.   Probably three to four, five minutes,
7  perhaps.
8      Q.   So, a neurological exam would take three,
9  four, maybe five minutes during the time period
10  between D██████ being admitted to the hospital and
11  the time that he coded, correct?
12      A.   Correct.
13      Q.   It would have only taken three, four, five
14  minutes to have completed this necessary
15  neurological exam during those hours, correct?
16          MR. DAY:  Object to form.
17          MR. YOUNG:  Object to the form.
18          THE WITNESS:  It would have taken three to
19  five minutes to complete the exam.
20      Q.   Approximately how many cases have you
21  given deposition testimony in?
22      A.   This is my first one.
23      Q.   Today is your first deposition?
24      A.   Correct.
25      Q.   Okay.  Have you testified at trial

Page 63

1  previously?
2      A.   No.
3      Q.   Do you know the term handover?
4      A.   Yes.
5      Q.   What is a handover?
6      A.   A handover is a verbal exchange of
7  information and a transferred responsibility in the
8  care for a patient.
9      Q.   And what is the significance of a
10  handover?
11      A.   It is essentially passing the
12  responsibility of care for a patient from one person
13  to the next, one team to the next, one area of the
14  hospital to another.
15      Q.   When the handover occurs, does that change
16  who is, as you describe, the boss, the admitting
17  physician?
18      A.   In this case, no.  I believe Dr. Bala was
19  the admitting physician during the time period that
20  we're talking about.
21      Q.   So in the present case, in D█████ M██████s
22  case, Dr. Bala would have continued to be the boss
23  for the entire hospitalization for the period
24  between admission and code, correct?
25      A.   Correct.

Page 64

1      Q.   And during that time period, even if there
2  was a handover between the residents, Dr. Bala would
3  have continued to be the boss between admission and
4  code, correct?
5      A.   As I understand it, yes.  There are
6  attending-to-attending handovers that occur as well,
7  but I don't believe that happened during this time
8  period that we're talking about.
9      Q.   Do you have any criticisms of the handover
10  that occurred in this case, in D█████ M██████'s case,
11  between admission and his code?
12      A.   Based on the records that I was given to
13  review, no.  There's not a lot of information about
14  the handover in them, however.
15      Q.   What do you mean there's not a lot of
16  information about the handover?
17      A.   Well, there -- there's not a lot to review
18  on that.  So, to ask me to give a full opinion about
19  something I wasn't there to witness, is difficult.
20      Q.   I think you've written about handover,
21  haven't you?
22      A.   Uh-huh.
23      Q.   I'm sorry, is that a yes or no?
24      A.   Yes, that's a yes.
25      Q.   And you've written about the risks of a

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 65

1  handover, correct?
2      A.    Correct.
3      Q.    And it's important that the handover be
4  done correctly, correct?
5      A.    Correct.
6      Q.    In this case, in D████ M████'s case, can
7  you describe for us what should have happened during
8  the handover?
9      A.    So, what classically should happen in what
10 we would call a good handover, is a sort of verbal
11 description about what the child presented with,
12 what the current assessment is, and what the plan is
13 for the day that should happen.
14     Q.    In this case, do you have any information
15 about what verbal description was given?
16     A.    Not that I can recall offhand.  It may be
17 in the depositions and I just don't remember.
18     Q.    Do you know what assessment was provided
19 at the time of the handover?
20     A.    I do know, based on Dr. Borick's
21 testimony, that she understood this to be a patient
22 that had strep throat and they were observing to see
23 if he would tolerate antibiotics that morning.
24     Q.    Do you know if, at handover, Dr. Borick
25 was given the information similar to what you heard

Page 66

1  in the telephone conversation between mother and
2  Children's Mercy Hospital while mother was driving
3  to the emergency room?
4      A.    If she was, I am not aware of that.
5      Q.    Is a good handover important to the safety
6  of the patient?
7            MR. YOUNG:  Object to form.
8            THE WITNESS:  Yes.
9      Q.    Is a good handover important to the
10 continuity of care of a patient?
11     A.    By definition, when you're handing a
12 patient over, you're losing continuity of care, so
13 the information passed becomes more important.
14     Q.    Does it risk the patient's health if it's
15 not a good handover?
16           MR. DAY:  Object to form.
17           THE WITNESS:  There is potential for
18 information to be lost.
19     Q.    If it's not a good handover, is there also
20 a risk that the patient can fall through the cracks?
21           MR. DAY:  Same object -- object to the
22 form.
23           THE WITNESS:  Fall through the cracks is a
24 very loose term, depends on what you mean by that.
25 Is a patient going to get lost?  No.  Could

Page 67

1  information be not given to the next providers?
2  Yes.
3      Q.    And if it's not a good handover, is there
4  a risk to the patient that the patient won't receive
5  the assessments that the patient needs?
6      A.    That is a risk, yes.
7      Q.    For example, if there's not a good
8  handover, is the patient at risk of not having a
9  full neurological exam that the patient might be in
10 need of?
11     A.    If that was not handed over, yes, that
12 would be a potential loss.  I do believe Dr. Borick
13 testified that she knew this patient did need a
14 neurologic exam, though.
15     Q.    Okay.  So Dr. Borick was aware of the need
16 for this three to five minute neurological
17 examination that you've described?
18     A.    I believe that was her testimony.
19     Q.    And you believe she would have known about
20 that at the time of the handover?
21     A.    Yes.
22     Q.    Okay.  Do you agree that a poor handover
23 can lead to an inaccurate assessment of a patient?
24     A.    It can contribute to an inaccurate
25 assessment of a patient.

Page 68

1      Q.    Do you agree that a poorly conducted
2  handover can threaten the patient with a delay in
3  diagnosis?
4      A.    It can contribute to a delay in diagnosis.
5      Q.    Do you agree that a poorly conducted
6  handover can lead to a delay in appropriate
7  treatment?
8      A.    Again, it can contribute to that, yes.
9      Q.    Do you agree that a poorly conducted
10 handover could lead to medical errors?
11     A.    Yes.
12     Q.    In fact, do you agree that poorly
13 conducted handovers can be a factor in malpractice
14 claims?
15           MR. DAY:  Object to form.
16           THE WITNESS:  I have no knowledge of how
17 much that would contribute.
18     Q.    Do you degree that the proper teaching of
19 handover is on the supervising physician, the
20 supervising physician of residents?
21           MR. DAY:  Object to form.
22           THE WITNESS:  It is part of the duties of
23 a supervising physician in a residency program to
24 teach their residents how to appropriately hand over
25 a patient.

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 69

1    Q.   So, in this case, the boss or the
2  admitting physician would have responsibility for
3  ensuring a proper handover of D█████ M█████,
4  correct?
5    A.   I don't know how their residency program
6  necessarily was set up.  Most programs do not have
7  every handover supervised by a faculty member with
8  it.  So he should have been part of that process as
9  a faculty member with it, but I can't speak to what
10 his exact expectations were that morning.
11   Q.   Okay.  In our Deposition Notice you were
12 asked to bring certain items with you during to your
13 deposition today.
14   A.   Uh-huh.
15   Q.   Did you bring anything with you today?
16   A.   I did, yes.
17   Q.   Can we start with what you brought with
18 you?
19   A.   Sure.
20   Q.   What's the first item?
21   A.   I was asked to bring the records that I
22 reviewed, so I brought the files that were supplied
23 to me for that.  And then my case review, I was
24 asked to bring my CV, so I have that.
25   And then a billing statement with essentially

Page 70

1  the record of the hours I spent reviewing the case,
2  and then any literature that I had used to review in
3  preparing for this.
4    Q.   I see your CV on top, let's start with
5  that, please.
6    A.   Sure.
7         (Plaintiff's Exhibit 1 marked.)
8    Q.   I have marked your CV as Exhibit 1; is
9  that correct?
10   A.   Correct.
11   Q.   And I take it Exhibit 1, your CV, this is
12 the most up-to-date and current CV that you have
13 available, correct?
14   A.   Yes.
15   Q.   I'm confused on the pagination, it says at
16 the bottom, page 1 of 51, and it looks like there's
17 actually about 18 pages.
18   A.   There are not 51 pages there.  Our CVs are
19 pulled from our University system.  As a section
20 chief, I have access to all of my faculty members'
21 CVs as well, and I am new to that system, so when I
22 tried to pull my CV from it yesterday, it pulled all
23 of my faculty members, and so I deleted out
24 everyone's pages except for mine.
25   I'm sure I could find a way to just run my CV

Page 71

1  and not delete the other pages.
2    Q.   That's okay, I just want to make sure that
3  I have a whole CV.
4    A.   Yes, you have -- those are all of my pages
5  there.
6    Q.   So the numbers at the bottom kind of
7  mislead us, you don't have a 51-page CV?
8    A.   I don't have a 51-page CV.
9    Q.   So Exhibit 1, you are comfortable that's
10 complete and accurate and current as of today,
11 correct?
12   A.   Yes.
13   Q.   I see you have a billing statement?
14   A.   Yes.
15   Q.   If you'll hand that to me, please.
16   A.   (Witness complies.)
17        (Plaintiff's Exhibit 2 marked.)
18   Q.   I've marked your billing statement as
19 Exhibit 2; is that correct?
20   A.   Correct.
21   Q.   And is this a total, I mean, a complete
22 and accurate billing summary as of -- I would assume
23 as of yesterday?
24   A.   As of yesterday, yes.
25   Q.   I don't see the deposition on there, so it

Page 72

1  doesn't include today, correct?
2    A.   Correct.
3    Q.   Would this be up-to-date as of this
4  morning before we started the deposition?  Because I
5  don't see any deposition preparation time.
6    A.   No, it would be, actually, today's
7  Wednesday, up to date as of Sunday.
8    Q.   I take it you did some work on this case
9  on Monday and Tuesday?
10   A.   Yes, I spent some time reviewing the
11 records that I hadn't reviewed in a few months.
12   Q.   All right.  Anything else you did in
13 preparation for your deposition today other than
14 review the records?
15   A.   I had previously pulled some literature in
16 the fall when I was working on this, and I pulled
17 that out and reviewed that as well.
18   Q.   It looks like to me when I look at your
19 billing you charge $500 an hour; is that correct?
20   A.   Correct.
21   Q.   Now, is that paid to you or is that paid
22 to the university or the hospital?
23   A.   It is paid to me, and then run through the
24 university.
25   Q.   So in giving testimony in this case, are

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 73

1  you doing it on your own personal behalf, or are you
2  doing it as OU, who is your employer?
3      A.  I am employed by the University of
4  Oklahoma Health Sciences Center.  My testimony is
5  not on behalf of OU, though, it is my own.
6      Q.  This is, as we call it, moonlighting or
7  off-the-clock type stuff you do, correct?
8      A.  Yes.
9      Q.  This is not an official part of your job
10 for OU, is it?
11     A.  Correct.
12     Q.  All right.  And then you have some
13 literature, I take it?
14     A.  Yes.  There are a couple of different
15 articles here on strep pharyngitis, one on
16 medulloblastoma, they're here.  So --
17         (Plaintiff's Exhibit 3 marked.)
18     Q.  All right.  I'm handing you what's been
19 marked as Deposition Exhibit 3.  What is it?
20     A.  It is an article on Group A Strep
21 Pharyngitis in children and adolescents.
22     Q.  What was the significance of that
23 literature, Exhibit 3, in regard to your opinions
24 today?
25     A.  Honestly, it's part of my research was

Page 74

1  looking up the exact incidences of Group A Strep
2  Pharyngitis.
3      Q.  Does that in any way impact your opinions
4  in this case?
5      A.  No.
6      Q.  We know that the code was not the result
7  of the strep throat, correct?
8      A.  Correct.
9      Q.  Do you know, did ████ even have strep
10 throat?
11     A.  I know that he had a positive strep test.
12     Q.  Does that mean that he had strep?
13     A.  It means he had strep in his oropharynx,
14 it does not mean he had what we classically think of
15 as strep throat, because a certain percent of
16 children are carriers for that strep bacteria.
17     Q.  As you sit here today, you can't even say
18 definitively that D████ even had strep that night,
19 can you?
20         MR. YOUNG:  Object to the form.
21         THE WITNESS:  Correct.  I cannot.  I can
22 tell you he had a positive test.
23     Q.  But we do know with certainty that he had
24 increased intracranial pressure during his
25 hospitalization, correct?

Page 75

1          MR. DAY:  Object to form.
2          THE WITNESS:  Yes.
3          (Plaintiff's Exhibit 4 marked.)
4      Q.  I'll next hand you what's marked as
5  Exhibit 4; can you describe that for us?
6      A.  Those were the Practice Guidelines for
7  Diagnosis and Management of Strep.
8      Q.  What significance does that article have
9  with your opinions today?
10     A.  Again, it's very similar literature to the
11 first one where I was reviewing the incidence of it.
12         (Plaintiff's Exhibit 5 marked.)
13     Q.  Next, let me hand you what's been marked
14 as Plaintiff's Exhibit Number 5.  Can you identify
15 that for us, please?
16     A.  Yes, it is a brief article on
17 medulloblastoma.
18     Q.  What significance, if any, did that
19 article have on your opinions in this case?
20     A.  Again, I was unfamiliar with the incidence
21 of medulloblastoma, and so I was doing some research
22 on that.  While I have diagnosed increased
23 intracranial pressure during my time on faculty,
24 it's been a long time since I have seen an actual
25 medulloblastoma diagnosis.

Page 76

1      Q.  And that's because there are multiple
2  causes of increased intracranial pressure, correct?
3      A.  There are several, yes.
4      Q.  How dangerous is increased intracranial
5  pressure?
6          MR. YOUNG:  Object to form.
7          THE WITNESS:  Increased intracranial
8  pressure is a continuum.  At its milder end, it is
9  not overly dangerous; as it progresses, it becomes
10 quite dangerous.
11     Q.  Well, what's more dangerous, increased
12 intracranial pressure, or the risk of cancer from a
13 CT scan?
14         MR. YOUNG:  Object to the form.
15         MR. DENNING:  Object to form.
16         MS. COLE:  Object to form.
17         THE WITNESS:  That is a difficult question
18 to answer.
19     Q.  Why is that a difficult question to
20 answer?
21     A.  Well, certainly, one, I can't tell you the
22 incidence, necessarily, of what cancer with a CT
23 scan is, I know that it's a factor that we consider
24 when looking at them.  An acute presentation of
25 increased intracranial pressure is concerning with

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 77

1 that.  But I think anytime a physician is seeing a
2 patient, you're trying to weigh those risks and
3 benefits based on the history that you have
4 provided.
5       Q.   Do you even know what the risk of cancer
6 is with a CT scan?
7       A.   I can't give you the percentage.
8       Q.   I take it that the risk is low enough that
9 you feel comfortable ordering, what did you say,
10 over 300 of those per year?
11       A.   I order it if I think --
12            MR. DAY:  Object to form.
13            THE WITNESS:  I order it if I think a
14 patient history indicates the need for it, yes.
15            (Plaintiff's Exhibit 6 marked.)
16       Q.   I'd like to hand you what's been marked as
17 Exhibit Number 6.  Can you identify that for us,
18 please?
19       A.   This is a paper looking at a Guideline to
20 assist healthcare professionals in -- when to do
21 imaging if there's a brain tumor that's suspected,
22 or increased intracranial pressure is suspected.
23       Q.   Is imaging indicated when there's
24 indication that there might be increased
25 intracranial pressure?

Page 78

1       A.   If there are history and exam findings
2 that are consistent with that and concerning for
3 that, yes.
4       Q.   And when you say exam findings, are you
5 talking about the neurological exam?
6       A.   Yes.
7       Q.   And that, again, that would be that three
8 to five minute neurological exam that you described
9 earlier, correct?
10       A.   Correct.
11       Q.   And then you have notebooks with you?
12       A.   Yes.
13       Q.   What -- can I see the notebooks, please?
14       A.   Sure.
15       Q.   Okay.  The first notebook, I take it the
16 highlighting in the notebook, that would be yours?
17       A.   Correct.
18       Q.   What is a failed outpatient?
19       A.   It is a prescribed plan of care to be done
20 for a patient when they are not admitted to the
21 hospital, that is not successful.  So, in this case,
22 it would be planning to give oral antibiotics at
23 home, but a patient not keeping them down and
24 needing to come back in.
25       Q.   I notice in the chart, page VC-132 and

Page 79

1 VC-133, you have highlighted and circled certain
2 things on that page, and it appears to be the record
3 from Dr. Corey; is that correct?
4       A.   Yes.
5       Q.   And is this the record you were describing
6 earlier where Dr. Borick stated that D▪▪▪▪ was
7 nonarouseable?
8       A.   Yes, it is.
9       Q.   And, I'm sorry, you have it in front of
10 you.  Did she say nonarouseable or unarouseable?
11       A.   She says nonarouseable.
12       Q.   And what time did she sign this note?
13       A.   This note is signed at 11:26 a.m.
14       Q.   Are you aware she signed this note then
15 approximately an hour and a half after D▪▪▪▪ coded?
16       A.   Yes, I believe that's consistent with the
17 timeline I'm familiar with.
18       Q.   So even after D▪▪▪▪ coded, she had an
19 opportunity to make changes to this note, I take it?
20            MR. DAY:  Object to the form.
21            THE WITNESS:  Yes.  She did have an
22 addendum up here with events of the morning.
23       Q.   But even after reflection of the code and
24 having an hour and a half after the code when she
25 signed this, she still signed it with the term

Page 80

1 nonarouseable in the description, correct?
2       A.   Yes, that's what the medical record
3 reflects.
4       Q.   In her assessment, correct?
5       A.   Yes.
6       Q.   I noticed that where it says "General:
7 Nonarouseable", you highlighted and circled it.  Why
8 did you highlight and circle it?
9       A.   It was probably a point that I wanted to
10 make sure I saw when I was looking through the
11 record.
12       Q.   I take it because that's a very
13 significant point when you're reviewing this chart,
14 correct?
15       A.   Yes.
16       Q.   I see that you circled the 11:26 when she
17 electronically signed it, why did you circle the
18 time of her signing it?
19       A.   Some of that was me trying to put a
20 timeline together in documentation of when things
21 happened.
22       Q.   Did you put together some form of a
23 chronology?
24       A.   Not on paper anywhere outside of what I
25 have in my report.

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 81

1    Q.   All right.  So, in your first notebook, it
2  looks like you have the Wesley Medical Center
3  records and you have some part of the Via Christi
4  records, correct?
5    A.   Correct.
6    Q.   And how did you decide which Via Christi
7  records you were going to have?
8    A.   I reviewed what was provided to me.
9    Q.   Is any of the writing on these medical
10 records, or highlighting, is any of that someone
11 other than your own?
12   A.   No, I believe it's all mine.
13   Q.   All right.  In regard to depositions in
14 notebook one, you received the following
15 depositions:  Dr. Hartpence, Dr. White, Dr. Borick,
16 Kelli Morgan, Kevin Morgan, Madonna Androes, Eve
17 Robinson, Lisa Judd, Bridget Grover, Dr. Faimon,
18 Nurse Erin Kent and Jennifer Chambers-Daney.  Did
19 you read all of those depositions?
20   A.   I did initially in the fall when I was
21 reviewing some of them, I read more in depth than
22 others, but I did skim through, I believe, all of
23 them.
24   Q.   If my math is any good, I came up with
25 that you spent about 12 and a half hours on this

Page 82

1  case prior to this weekend, correct?
2    A.   I think that's consistent, it was around
3  12 hours.
4    Q.   So I take it there's no way you could have
5  read all of these transcripts within that twelve and
6  a half hours, could you?
7    A.   As I said, some of them I read more
8  in-depth than others.
9    Q.   I noticed you highlighted in Dr. Borick's
10 deposition some of her testimony regarding her copy
11 and paste of this medical student's note; is that
12 correct?
13   A.   Yes.
14   Q.   Was Dr. Borick being overwhelmed that
15 morning with her workload?
16       MR. DAY:  Object to form, foundation.
17       THE WITNESS:  I don't think I could answer
18 that question.  I know what happened in this case,
19 but I don't have any knowledge of what her other
20 workload looked like.
21   Q.   Well, you know, you highlighted that she
22 mentioned that she had a million orders to put in,
23 she had consults to make.  Were you highlighting
24 that because there was some concern about her
25 workload?

Page 83

1    A.   I was highlighting that probably as a
2  report about her morning, I don't know that I
3  necessarily was concerned about her workload at the
4  time.
5    Q.   Because I just -- skimming through her
6  deposition at page 52, I noticed that you had
7  highlighted her testimony about having millions of
8  orders to put in and consults to make.  Were you at
9  all concerned that she was just too busy to spend
10 the three to five minutes to do the full
11 neurological exam that you described earlier today?
12       MR. YOUNG:  Object to form.
13       THE WITNESS:  If I remember correctly, her
14 comment about that was actually after D████ had
15 coded, in which case there were a lot of phone calls
16 and calls and consults to make.  And at that point,
17 documentation does sort of take a back seat to
18 taking care of the patient in an emergent situation
19 like that.
20       (Plaintiff's Exhibit 7 marked.)
21   Q.   Doctor, I'm going to mark this first
22 notebook as Plaintiff's Exhibit 7; is that correct?
23   A.   Correct.
24   Q.   May I see your second notebook?
25   A.   Yes.  There you go.

Page 84

1    Q.   Now, Doctor, I'm going to mark your second
2  notebook as Exhibit Number 8; is that correct?
3    A.   That's correct.
4        (Plaintiff's Exhibit 8 marked.)
5    Q.   And would the two notebooks, Exhibit 7 and
6  8, would that be everything that you've reviewed in
7  this case, other than the literature that you've
8  provided, as well, that's been marked?
9    A.   That is correct.  Again, I heard the phone
10 call today, but prior to today, yes.
11   Q.   All right.  In Plaintiff's Exhibit 7, it
12 appears you have the depositions of Summer Whitlock,
13 Christine Robinson, Angela Walker, Nurse Zogleman,
14 Dr. Bala, Dr. Stephanopoulos, Dr. Nabbout, Betsy
15 Michael, Rodney Michael, Melissa Mackey, Joshua
16 Mackey, Nurse Helm, Nurse Redborne, Dr. Grundmeyer,
17 Dr. DuMontier, Jennifer Knight, Monica Lawrence,
18 Nurse Stacy Harding.  You have plaintiff expert
19 witness reports, you have depositions of Dr. Dabrow,
20 Dr. Grabb, Dr. LePichon, Dr. Leavey, Dr. Matthews,
21 Dr. Murphy and Nurse Polly Zimmerman.
22       Would that be then all -- the full scope of all
23 of the depositions that you have?
24   A.   Correct.
25       MS. COLE:  I think you may have you called

1 it Exhibit 7 and it's Exhibit 8.

2          THE WITNESS:  I was going to say, that was

3 Exhibit 8.

4     Q.    Okay.  Yes.  But between Exhibit 7 and 8,

5 that's a full accounting of everything that you've

6 reviewed, correct?

7     A.    Correct.

8     Q.    Have you asked for anything else for your

9 review?

10     A.    I have not.

11     Q.    Okay.  Why don't we take a short break and

12 I'm going to go through my notes and I think we're

13 about done.

14     A.    Okay, sounds good.

15               (Recess taken.)

16          MR. KUCKELMAN:  Doctor, I don't have any

17 further questions, thank you for your time today, I

18 appreciate it.

19          THE WITNESS:  Thank you.

20          MR. GRIBBLE:  Steve, do you want to go

21 first, or do you want us to go?

22          MR. DAY:  I'll go last.

23               CROSS EXAMINATION

24 BY MR. GRIBBLE:

25     Q.    Doctor, my name is Don Gribble, I

1 represent Dr. Bala, I have just a few questions for

2 you.

3          Do you want your opinions to be clear?

4     A.    Yes.

5     Q.    Do you want your communication to be

6 accurate in this case?

7     A.    Yes.

8     Q.    Do you want your opinions taken in the

9 proper context?

10     A.    Yes.

11     Q.    You wrote a seven and a quarter page

12 report, correct?

13     A.    I did.

14     Q.    And in there, you confined your opinions

15 relative to the standard of care of whether it was

16 met or not met, to the residents, Drs. Hartpence,

17 White and Borick, correct?

18     A.    That is correct.

19     Q.    And you were retained by counsel for those

20 same residents, true?

21     A.    Correct.

22     Q.    Now, during some questioning by

23 Plaintiff's Counsel, I asked, personally, for some

24 clarification; do you recall that?

25     A.    Yes.

1     Q.    And that request was refused each time,

2 wasn't it?

3     A.    Yes.

4     Q.    There are several physicians that are

5 defendants in this case, right?

6     A.    Correct.

7     Q.    So when someone says "the physicians", you

8 don't know if you're talking about one, two, four or

9 however many, correct?

10     A.    Correct.

11     Q.    Because that request was refused, I'm

12 going to have to go another direction and ask you --

13 let's go at this kind of in a backdoor fashion.

14          Am I correct that you did not intend to express

15 any opinion relative to adherence or deviation from

16 the standard of care relative to Dr. Bala?

17          MR. GRIBBLE:  Object to the form.

18          MR. GRIBBLE:  What's wrong with that?

19          MR. KUCKELMAN:  What's that?

20          MR. GRIBBLE:  You heard me.  What's wrong

21 with the question?

22          MR. KUCKELMAN:  I just objected to the

23 form of the question.

24          MR. GRIBBLE:  I know want to know --

25          MR. KUCKELMAN:  That's all I have to do.

1          MR. GRIBBLE:  -- if there's a problem.

2 You won't answer that, either.

3          MR. KUCKELMAN:  No, I'm just following the

4 rules.

5          MR. GRIBBLE:  Again, Counsel is refusing

6 to allow me to cure something that he believes is

7 inappropriate.

8 BY MR. GRIBBLE:

9     Q.    But be that as it may, in any sense, have

10 you intended to comment on adherence to or deviation

11 from the standard of care relative to Dr. Bala?

12     A.    No.

13     Q.    Now, you did answer some questions about

14 doing a neuro exam?

15     A.    Yes.

16     Q.    And at times, frankly, the way I heard

17 your testimony was, doing a neuro exam up to the

18 time of the code, and then sometimes you talked

19 about doing a neuro exam at least sometime during

20 the day when D_____ was admitted for observation.

21 Do you understand what I'm getting at?

22     A.    Yes.

23     Q.    Relative to any opinions you had about

24 doing a neuro exam, a full neuro exam, that's what

25 you were really referring to, correct?

Page 89

1    A.   Correct.

2    Q.   Because a partial neuro exam had been done

3 just by the interaction with D█████ by many

4 different providers, correct?

5    A.   Correct.

6    Q.   So with regard to any opinion you had

7 directed at anyone about doing a full neuro exam

8 before the code, that's based upon, number one,

9 D█████ truly being nonarouseable, and number two,

10 that Kelli Morgan was communicating to the residents

11 the things that she says she was communicating.  Am

12 I correct?

13    A.   That is correct.

14    MR. GRIBBLE:  Thank you, Doctor, that's

15 all the questions I have.

16    MS. COLE:  I don't have any questions for

17 you, thank you.

18              CROSS EXAMINATION

19 BY MR. YOUNG:

20    Q.   Dr. DeLeon, my name is Greg Young, I

21 represent Jennifer Chambers-Daney, and I just have a

22 couple of questions for you.

23        You were asked a lot of questions today, and

24 you were actually played the audio tape several

25 times of two telephone calls that Mrs. Morgan made

Page 90

1 to Children's Mercy Hospital in Kansas City.  Do you

2 remember that?

3    A.   Correct, yes.

4    Q.   And you were questioned about the fact

5 that you had not previously listened to those calls;

6 do you remember that?

7    A.   I do.

8    Q.   And did you feel like you were being

9 questioned implying that you should have done that

10 if you wanted to have been thorough?

11    A.   That is my perception of that, yes.

12    Q.   Were you aware that none of the

13 plaintiff's liability experts listened to those

14 calls?

15    A.   I was not aware.

16    Q.   Do you feel like you had sufficient

17 information without listening to those calls to

18 offer your opinions in this case?

19    A.   I do.

20        MR. GRIBBLE:  That's all the questions I

21 have.

22        MR. DENNING:  I have no questions.

23              CROSS EXAMINATION

24 BY MR. DAY:

25    Q.   Doctor, you were asked many, many

Page 91

1 questions involving the term nonarouseable or

2 unarouseable, correct?

3    A.   Correct.

4    Q.   Now, you have made note of the fact that

5 the -- when Dr. Borick pasted the medical student's

6 note in, that occurred after the code, correct?

7    A.   Correct.

8    Q.   And after the code, what was the situation

9 in terms of what all needed to be done, just in

10 general terms?

11    A.   Sure.  There are phone calls to be made,

12 transfers to arrange, orders to put in,

13 communication to be had with a family, it is -- it

14 is a hectic and busy time when an event like that

15 happens.

16    Q.   And your understanding was that Dr. Borick

17 was going to continue for a period of time as the

18 resident involved with the case?

19    A.   Yes.

20    Q.   And that would involve her making calls,

21 her doing charting, and there would need to be quite

22 a bit of charting done, correct?

23    A.   Correct.

24    Q.   Now, at that point, according to Dr.

25 Borick's deposition testimony, in order to get

Page 92

1 something on the chart reflecting later so that she

2 could work on what was actually happening then, she

3 copied and pasted in the student's note; that's your

4 understanding of her testimony?

5    A.   That is my understanding, yes.

6    Q.   And in speaking to Mr. Kuckelman, you were

7 asked a number of questions as to whether that is

8 appropriate and whether that is consistent with the

9 standard of care charting in that fashion, correct?

10    A.   Yes.

11    Q.   Now, this was after the stroke had

12 occurred, this was after D█████ emergency

13 situation had arisen, and there was an awareness

14 that something neurological was going on, and at

15 that point, how she charted from the morning before

16 that occurred would have no impact on the occurrence

17 of the injury, would it?

18    A.   Correct.

19    Q.   And to the extent that Dr. Borick

20 indicated she pasted the medical student's note in

21 order to get something on the chart, she continued

22 to do charting, though not technically proper, would

23 you consider that be a very understandable thing for

24 a first year resident to do under those

25 circumstances?

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 93

1    A.    I think it definitely is an understandable
2 occurrence and have seen it happen.
3    Q.    And, in fact, vested in with your
4 statement that once you're in that kind of
5 situation, patient care takes priority?
6    A.    Correct.
7    Q.    All right.  Now, in terms of the use of
8 the term nonarouseable, you are aware of the
9 deposition testimony of the medical student,
10 correct?
11    A.    Yes.
12    Q.    And the deposition testimony, of course,
13 of Dr. Borick --
14    A.    Yes.
15    Q.    -- on that subject?
16    A.    Yes.
17    Q.    All right.  And, basically, the medical
18 student testified that as of this point in his
19 education, he basically was not aware of the
20 difference in meaning, from a medical standpoint, of
21 non or unarouseable, as opposed to simply being
22 tired or whatever other term you want to use?
23    A.    Yes, that's consistent with his testimony.
24    Q.    Is that surprising to you that a medical
25 student, that would be the case?

Page 94

1         MR. KUCKELMAN:  Object to form.
2         THE WITNESS:  Not at all.
3    Q.    Now, the medical student then describes in
4 his deposition how, in fact, D███████ had acted when
5 he had been in the room; do you recall that?
6    A.    Yes.
7    Q.    And that basically he would, you know,
8 when touched, would respond by kind of pushing the
9 examiner away; and you recall that?
10         MR. KUCKELMAN:  Object to the form.
11         THE WITNESS:  Yes, I believe he used the
12 word non-participatory is how he would describe it
13 now days.
14    Q.    Right.  And that, basically, is completely
15 consistent with what other people reported in terms
16 of seeing D██████, you know, after the vomiting was
17 controlled and he was sleeping?
18    A.    Correct.
19    Q.    Okay.  And that certainly would not
20 constitute unarouseable or nonarouseable?
21    A.    Correct.
22    Q.    It would be a -- now, there's a lot of
23 discussion about full neurological exam, and I just
24 want to make sure we're clear, because counsel used
25 different timeframes in terms of expressing his

Page 95

1 questions.
2    Is -- do I correctly interpret your testimony
3 to be that there was no requirement that a complete
4 neurological exam be done during the times that Dr.
5 Hartpence and Dr. Borick, and were involved with
6 this patient before the code occurred, but at some
7 point during the observation period, part of the
8 plan needed to be to do that complete neurological
9 exam?
10    A.    Yes.
11    Q.    Okay.  Now, Doctor, let's say that Dr.
12 Hartpence or Dr. Borick had decided that in the
13 middle of the night, that a five-year-old boy, who
14 had finally been able to get to sleep, after getting
15 very little sleep, and after having been sick and
16 vomiting, and made the decision, you know what, I
17 think I will wake this child up and go ahead and do
18 a neurological exam; how would that work out?
19    A.    You are likely not going to get a very
20 good neurological exam, because the patient is
21 likely to not be fully cooperative.
22    Q.    And again, that's not just something that
23 may have occurred, that's exactly what you would
24 expect with a five-year-old under these
25 circumstances, correct?

Page 96

1         MR. KUCKELMAN:  Object to form.
2         THE WITNESS:  That could commonly occur.
3    Q.    Now, you -- in reviewing the depositions,
4 you recall that there's testimony, for example, by
5 Dr. Hartpence that, you know, given the fact that
6 based upon what he was told, and based upon what he
7 knew, it appears he saw -- that nothing could go
8 against the established diagnosis of strep throat,
9 and that he was not thinking that there was some
10 neurological troubles going on, that under the
11 circumstances, you know, he felt it best to allow
12 the child to sleep, and that he thought it would be,
13 basically, an unnecessary cruelty to try to wake the
14 patient up under those circumstances; do you recall
15 that testimony?
16         MR. KUCKELMAN:  Object to the form.
17         THE WITNESS:  Yes, I believe that's
18 consistent with what he said.
19    Q.    And in fact, is that how many physicians
20 would handle that situation?
21    A.    Yes.
22    Q.    And so, number one, you know, it's not
23 going to be good for the child or for mom under
24 those circumstances to try to wake up and obtain
25 some sort of a state of alertness in a child such as

Page 97

1  this, correct?

2       A.   It -- even -- it would potentially be very

3  difficult to get a good exam and a fully awake and

4  alert child in a situation like this.

5       Q.   In a situation like this, deferring the

6  complete neurological exam until after the child has

7  had some sleep in the morning at a time when the

8  providers did not have reason to believe that there

9  was a neurological issue going on, in their opinion,

10 would it be common or uncommon under those

11 circumstances to defer a portion of exams such as

12 this?

13      A.   It would be common to allow a child to

14 sleep for a little while and go back and do a more

15 full neurologic exam, given that scenario.

16      Q.   Doctor, you said a number of times in your

17 testimony that the -- give me just a second here.

18 Doctor, let me withdraw what I was starting to say

19 and go a different direction.

20      Do you recall that there was testimony, I think

21 it may have been by Dr. Borick, that at least in

22 general describes the fact that she was given

23 handover by Dr. White, and that then she was given a

24 description of generally what had occurred and of

25 the plan was given to her, correct?

Page 98

1       A.   Yes.  I don't -- I don't recall if it was

2  Dr. Hartpence or Dr. White who did the handover, but

3  I do recall her stating she received handover.

4       Q.   And among other things, do you recall, and

5  I'll tell you it is in the deposition testimony that

6  she was aware of the plan being to let D██████ sleep,

7  and then, you know, when he was awake in the

8  morning, to go ahead and do any additional exams

9  that were needed to complete the record, and to see

10 if he could keep his oral antibiotics down; is that

11 basically consistent with your understanding of what

12 occurred?

13           MR. KUCKELMAN:  Object to form.

14           THE WITNESS:  Yes.  I do recall that.

15      Q.   And under those circumstances, assuming

16 that Dr. Borick's testimony that she went into the

17 room and told mom that she was not going to wake

18 D█████ up at that point, and just sort of push on

19 him enough to be sure she could get some reaction,

20 and then really not do anything else at that point,

21 planning to do a complete exam later, was that

22 consistent with the plan as was presented her?

23      A.   Yes.

24           MR. KUCKELMAN:  Object to the form.

25      Q.   And would that be consistent with the

Page 99

1  standard of care?

2           MR. KUCKELMAN:  Object to the form.

3           THE WITNESS:  Yes.

4       Q.   All right, Doctor.  Just by way of

5  general, you understand that this deposition was

6  primarily Plaintiff Counsel's opportunity to ask you

7  the questions that he wanted to ask phrased in the

8  way he chose to phrase them; you understand that's

9  how it works?

10      A.   Yes.

11      Q.   And based upon what we've discussed, you

12 also understand that your opportunity to discuss

13 your whole report and to explain in your own wording

14 the basis for your opinion, that the standard of

15 care was met across the board by these three

16 residents, that you'll have that opportunity at the

17 time of trial.  Do you understand that?

18      A.   Yes.

19      Q.   And I told you we would largely be

20 deferring our questioning until that time?

21      A.   Yes.

22           MR. DAY:  That's all I have, thank you.

23                 REDIRECT EXAMINATION

24 BY MR. KUCKELMAN:

25      Q.   Doctor, I have just a few.  You said that

Page 100

1  it could occur, that you might not get a good

2  neurological exam because this patient was tired, it

3  was late at night.  But if you try and you get a

4  good neurological exam, it's just as likely you

5  could get a good neurological exam, right?

6       A.   It's possible --

7           MR. YOUNG:  Object to form.

8           THE WITNESS:  It's possible that you

9  could.

10      Q.   But because they didn't bother to do this

11 three to five minute neurological exam, we'll never

12 know what the findings would have been, will we?

13           MR. YOUNG:  Object to form.

14           MR. DAY:  Object to form, argumentative.

15           THE WITNESS:  That is true, we will not

16 know what it would have shown.

17      Q.   Now, Mr. Day asked you about this being

18 hectic and busy after the code.  Had they taken

19 three to five minutes to do a full neurological

20 exam, we may have completely avoided that code

21 altogether, correct?

22           MR. DAY:  Object as argumentative.

23           THE WITNESS:  It is possible.

24      Q.   What is the difference between

25 non-participatory and nonarouseable?

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 101

1  A.  I think for clarification, you would
2  probably have to ask Dr. DuMontier that.  I can give
3  my opinion on what I would interpret those words to
4  mean with it.
5     Nonarouseable, as we said before, would be
6  nonresponsive to words or stimuli or any sort of
7  exam that you might do.  Non-participatory, I would
8  sort of take more as non-cooperative with the exam,
9  pushing away, not wanting to be listened to with a
10  stethoscope, rolling away, things of that nature.
11  Q.  If a patient is nonarouseable, they're not
12  going to be able to participate, correct?
13  A.  True.
14  Q.  So nonarouseable, would, by definition,
15  include non-participatory, because if you're
16  nonarouseable, you couldn't participate in whatever
17  activity it was they were asking you to participate,
18  correct?
19     MR. DAY:  Object.
20     THE WITNESS:  That would be correct.
21  Non-participatory does not indicate
22  nonarouseability, though.
23  Q.  You were asked if there was anything that
24  went against the diagnosis of strep.  Let me ask you
25  a bit about that.  Dr. Faimon said something about

Page 102

1  that you have to take into account, he had some
2  German word, gestalt?
3  A.  Okay.
4  Q.  Have you heard of that word before, a
5  gestalt?
6  A.  Yes.
7  Q.  Do you know what that means?
8  A.  It's sort of your gut feeling about a
9  situation.
10  Q.  Does it mean, in the medical realm, it's a
11  German word that means you have to look at the whole
12  picture, you can't just look at one item in
13  isolation?
14  A.  Correct.
15  Q.  So when -- to determine the standard of
16  care in D█████'s case, it would be important for a
17  physician to take into account all facts that were
18  known or could have been known, correct?
19  A.  Yes.
20  Q.  So the fact that he was sleepy, that,
21  alone, isn't an item, you have to look at the fact
22  that he had nausea and vomiting, he was disoriented,
23  he had a really bad headache, his mom was concerned
24  this was more serious than strep, he had been to the
25  E.R. before and was back because he wasn't better.

Page 103

1     You'd have to look at the fact that he had been
2  throwing up every hour since he left.  You have to
3  look at all of those things in determining what to
4  do in his care, correct?
5     MR. DENNING:  Object to the form.
6     THE WITNESS:  It would be important to
7  have a wide picture, yes.
8  Q.  Right.  Because otherwise, a physician
9  could be misled into thinking this is a childhood
10  case of strep, when, in fact, you have a child that
11  has increasing intracranial pressure, which is a
12  very serious situation, correct?
13     MR. YOUNG:  Object to form.
14     THE WITNESS:  The symptoms for those
15  overlap a lot with each other, as I stated
16  previously, so that's not necessarily where gestalt
17  comes into play, necessarily.
18  Q.  Gestalt comes into play that the standard
19  of care would require the physician to look at the
20  big picture, the whole picture, when making
21  determinations of what to do in the care and
22  treatment of a patient, correct?
23  A.  Say that sentence again.
24  Q.  Sure.  In this case, if you look at the
25  gestalt, a physician attempting to meet the standard

Page 104

1  of care would have to look at the whole picture, all
2  of the symptoms that were known or could have been
3  known with a proper history, you'd have to look at
4  all of those things in determining what steps to
5  take next, correct?
6     MR. YOUNG:  Object to form.
7     MS. COLE:  Object to form, foundation.
8     THE WITNESS:  Correct.
9  Q.  A physician who falls in the trap of just
10  assuming it's strep, without ruling out more serious
11  illnesses, deviates from the standard of care,
12  correct?
13     MR. YOUNG:  Object to form.
14     MR. DAY:  Form.
15     MR. DENNING:  Object to form.
16     THE WITNESS:  A physician who falls into a
17  trap of thinking something is strep by ignoring
18  other symptoms that are there, could be deviating
19  from the standard of care.
20  Q.  Now, you were asked whether you had
21  addressed anything to do with Dr. Bala.  I want to
22  go back and visit that.  When you were talking about
23  the admitting physician being the boss, being the
24  fully trained, ultimately responsible, the team
25  leader, that was, in fact, talking about Dr. Bala,

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 105

1 correct?
2       A.    In his role in a typical teaching
3 institution, yes.
4       Q.    And when you describe the duties of the
5 admitting physician, the boss, as you put it, you
6 were talking about Dr. Bala in that role, correct?
7       A.    As a description of the role, yes.
8             MR. KUCKELMAN:  No further questions.
9 Thank you, Doctor.
10            MR. GRIBBLE:  Nothing else.
11            MR. YOUNG:  I don't have anything.
12            MR. DENNING:  I don't have anything.
13            MR. DAY:  Anyone else?
14                 RECROSS EXAMINATION
15 BY MR. DAY:
16      Q.    Doctor, Counsel said, asked you a question
17 and basically he said something about that, I guess
18 (inaudible)
19      A.    Are we done?  Should I -- is he talking to
20 me?
21            REPORTER:  I'm sorry, we can't hear you,
22 you'll have to repeat the question.
23      Q.    Doctor, do you recall that in the few
24 questions that Plaintiff's Counsel just asked you,
25 if one of them he was talking about the fact that

Page 106

1 the neurological exam was deferred, and used the
2 language that they didn't quote, bother, close
3 quote, to do the exam before that time.  Do you
4 recall him using that language?
5       A.    Yes.
6       Q.    Doctor, was it your interpretation of the
7 situation from reading the depositions, reviewing
8 the chart, that the decision to defer the exam was
9 based upon the physicians just not wanting to bother
10 to do it at that time?
11      A.    No.
12      Q.    Now, Counsel has also repeatedly talked
13 about mom being concerned.  Do you recall from her
14 deposition that actually what she was primarily
15 concerned about following the conversation with her
16 mother, was that D███████ might be developing
17 meningitis?
18      A.    Yes, I do remember reading that.
19      Q.    And frankly, Doctor, having a little boy
20 or girl who has strep, who is vomiting, who has a
21 headache, that can be kind of scary for a parent,
22 can't it?
23            MR. KUCKELMAN:  Object to form.
24            THE WITNESS:  Sure.
25      Q.    And, in fact, worrying about could this be

Page 107

1 meningitis is something that almost every parent has
2 done at one point or another, correct?
3             MR. KUCKELMAN:  Object to form.
4             THE WITNESS:  I'm sure it's possible that
5 a lot of families have wondered about that, I don't
6 know about every family.
7       Q.    Right.  So I mean, the fact that mom, in a
8 situation like this, may have been worried that
9 there could be something more serious happening
10 would not be unusual, would it?
11      A.    Correct.
12            MR. KUCKELMAN:  Object to form.
13            THE WITNESS:  Correct.
14      Q.    And from your standpoint as a physician,
15 that fact, by itself, doesn't really provide you any
16 information of diagnostic value, does it?
17      A.    I take it into account when talking to a
18 family, but, no, it does not.
19            MR. DAY:  Okay.  Okay.  That's all I have,
20 thank you.
21            FURTHER DIRECT EXAMINATION
22 BY MR. KUCKELMAN:
23      Q.    Doctor, based on the answers to those
24 questions of Mr. Day that he just asked you, let's
25 just shortcut.  This mother was not overreacting,

Page 108

1 was she?
2             MR. YOUNG:  Object to form.
3             MR. GRIBBLE:  Object to form.
4             THE WITNESS:  No, I think ultimately once
5 the diagnosis was known, she was appropriately
6 concerned about her son.
7       Q.    Her level of concern in this case was
8 absolutely appropriate for what she was observing in
9 her son, correct?
10            MR. YOUNG:  Object to form.
11            MR. DAY:  Object to form.
12            THE WITNESS:  He had a critical illness,
13 and so I think her level of concern was reasonable
14 and understandable.
15      Q.    When Mr. Day was asking you about whether
16 it be relevant that this mother was worried about
17 her son, let me ask you, when you're taking the
18 history of a five year old and wanting to know what
19 his baseline is, what better historian is there,
20 typically, than a parent that is around the
21 five-year-old all the time?
22            MR. YOUNG:  Object to form.
23            THE WITNESS:  Typically, for baseline
24 activity, we ask whoever is with them commonly,
25 which is often a parent, perhaps a grandparent, a

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

Page 109

1  guardian.  But no, absolutely, a parent would be
2  able to provide that information.
3      Q.   Right.  And Kelli Morgan's observation of
4  changes in her son would be critical information for
5  these physicians to take into account, correct?
6           MR. DAY:  Object to form.
7           THE WITNESS:  If it was reported, yes.
8           MR. KUCKELMAN:  No further questions.
9           MR. DAY:  I have nothing further.
10          REPORTER:  Read and sign?
11          MR. KUCKELMAN:  Do you want to explain to
12  your witness?
13          MR. DAY:  Yeah, Doctor will read and sign.
14  I would ask that the court reporter send the
15  transcript directly to her, and Doctor, feel free to
16  give me a call, I can explain this in more detail.
17  But basically, you will be sent a copy of the
18  deposition and have an opportunity to review it and
19  see if there are any corrections that need to be
20  made.
21          MR. KUCKELMAN:  Does anybody object to the
22  Doctor withdrawing Exhibits 7 and 8?  Those are her
23  two big notebooks, or do people want actual copies
24  of those?
25          MR. GRIBBLE:  No, no objection.

Page 110

1           MR. YOUNG:  No, I don't object to that.
2           MR. KUCKELMAN:  Steve, she had two big
3  notebooks, Exhibits 7 and 8, which are all the
4  things you sent to her, depositions, records, et
5  cetera.  They're marked.  I am proposing that the
6  doctor be allowed to withdraw Exhibits 7 and 8 and
7  put them in safekeeping in the event of a trial, but
8  not to have the court reporter take Exhibits 7 and 8
9  but just shown on the record they're withdrawn by
10  the Doctor to keep in safekeeping.  Is that all
11  right with you, Steve?
12          MR. DAY:  I have no objection to allowing
13  her to withdraw those exhibits.
14          (Deposition concluded at 1:24 p.m.)

Page 111

ERRATA SHEET

WITNESS: STEPHANIE DeLEON, M.D.

DATE: FEBRUARY 26, 2020

REPORTER:  Brenda Schmitz, CSR, RPR

NO CORRECTIONS ARE NECESSARY _____

PAGE  LINE  CORRECTION            REASON

Page 112

JURAT

I, STEPHANIE DeLEON, M.D., do hereby state
under oath that I have read the above and foregoing
transcript in its entirety, and that the same is a
full, true, and correct transcription of my
testimony so given at said time and place, except
for the corrections noted.

STEPHANIE DeLEON, M.D.

SUBSCRIBED AND SWORN TO BEFORE ME, the
undersigned Notary Public in and for the State of
_____ on this, the _____ day of
_____, 2020.

Notary Public

My Commission Expires: _____

REPORTED BY:  BRENDA SCHMITZ, CSR, RPR

Deposition of Stephanie DeLeon MD                    Morgan V. Wesley Medical Center

```
                                          Page 113
 1                      CERTIFICATE
 2  STATE OF OKLAHOMA    )
                         )  SS:
 3  OKLAHOMA COUNTY      )
 4         I, Brenda Schmitz, Certified Shorthand Reporter
 5  within and for the State of Oklahoma, do hereby
 6  certify that the above-named STEPHANIE DeLEON, M.D.
 7  was by me first duly sworn to testify to the truth,
 8  the whole truth, and nothing but the truth in the
 9  case aforesaid; that the above and foregoing
10  deposition was by me taken in shorthand and
11  thereafter transcribed; that the same is true and
12  correct; and that it was taken on FEBRUARY 26, 2020,
13  at the time of 10:53 a.m. in the City of Oklahoma
14  City, County of Oklahoma, State of Oklahoma under
15  the stipulations hereinbefore set out, and that I am
16  not attorney for or relative of any of said parties
17  or otherwise interested in the event of said action.
18         IN WITNESS WHEREOF, I have hereunto set my hand
19  and official seal this 3rd day of March, 2020.
20
21         BRENDA SCHMITZ, CSR, RPR
           Oklahoma Certified Shorthand Reporter
22         Certificate No. 00823
           Expires: December 31, 2020
23
24
25
```

National Court Reporters, Inc.                    Page: 29 (113 - 113)