## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| D.M., a minor, by and through his next friend and Natural guardian, KELLI MORGAN, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 18-2158-KHV |
| | ) |
| WESLEY MEDICAL CENTER LLC d/b/a WESLEY MEDICAL CENTER – WOODLAWN; WESLEY-WOODLAWN CAMPUS; BRIDGET GROVER, PA-C; DR. GREGORY FAIMON; LISA JUDD, RN; VIA CHRISTI HEALTH SYSTEMS d/b/a VIA CHRISTI - ST. FRANCIS; JENNIFER CHAMBERS-DANEY, ARNP; DR. BALA BHASKAR REDDY BHIMAVARAPU; CEP AMERICA-KS LLC; DR. CONNOR HARTPENCE; DR. STEFANIE WHITE; DR. JAMIE BORICK; AND AARON KENT, RN, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## PRETRIAL ORDER

A pretrial conference was conducted in this case on May 1, 2020, by U.S. Magistrate Judge Kenneth G. Gale.  The Plaintiff appears by and through his attorneys of record Daniel B. Giroux of Dugan & Giroux Law, Inc., Wichita, Kansas, and Stephen J. Torline and Michael J. Kuckelman, of Kuckelman Torline Kirkland, Overland Park, Kansas. Defendants Bridget Grover, PA-C, and Gregory Faimon, M.D., appear by and through their counsel of record, Tracy A. Cole of Gilliland Green, LLC, Hutchinson, Kansas. Defendant Bala Bhaskar Reddy Bhimavarapu, M.D., appears by and through his counsel of record, Don D. Gribble, II of Hite, Fanning & Honeyman, LLP, Wichita, Kansas. Defendants

{00586411}

DEFENDANT'S EXHIBIT
A
PENGAD-Bayonne, N.J.

Jamie Borick, M.D., Connor Hartpence, M.D., and Stefanie White, M.D., appear by and through their counsel of record, Steven C. Day and Christopher S. Cole of Woodard, Hernandez, Roth & Day, LLC, Wichita, Kansas. Defendant Jennifer Chambers-Daney, APRN, appears by and through her counsel of record, Gregory S. Young and Brian L. White of Hinkle Law Firm LLC, Wichita, Kansas. Defendant CEP America-Kansas, LLC (hereinafter "CEP"), appears by and through its attorney, Dustin J. Denning of Clark, Mize & Linville, Chartered, Salina, Kansas.[1]

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

## 1.    PRELIMINARY MATTERS.

On March 6, 2019, Defendants filed a motion and memorandum in support to designate Wichita, Kansas, as the location of trial. On July 1, 2019, the Court's order noted that, "[t]he trial date for this case is set for January 11, 2021. Until this case is close to the trial date, the Court cannot make an informed decision as to the place of trial." Location of the trial continues to be a matter for the Court to consider and decide, and the parties intend to file motions on this topic.

---

[1] Defendants Wesley Medical Center LLC, Lisa Judd, Via Christi Health Systems and Aaron Kent do not appear in person or by counsel because a settlement has been reached. This settlement must be approved by the Court. In the event the Court does not approve the settlement this conference will reconvene and an Amended Pretrial Order will be entered.

     **a.**     **Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is invoked under 28 U.S.C. § 1332 and is not disputed.

     **b.**     **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

     **c.**     **Venue.**  Venue in the District of Kansas is not disputed.  The proper place of trial is disputed.

     **d.**     **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law: Kansas statutes and case law.

**2.**     **STIPULATIONS.**

     **a.**     The following facts are stipulated:

          i.     At all relevant times, Defendant Jennifer Chambers-Daney, APRN, was a Kansas licensed and practicing advanced practice registered nurse who was employed by Defendant CEP.

     **b.**     The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

          i.     The following documents constitute business records within the scope of Fed. R. Evid. 803(6) and may be introduced in evidence during trial without the need for a records custodian to establish foundation. This stipulation does not prevent an objection as to relevancy, materiality, or other substantive objections to

3

any portion of the records and is merely designed to eliminate the testimony of a records custodian.

    1.    Medical records, radiology imaging and reports, record updates for the care and treatment of D.M., from the following providers:

|  |  |
|---|---|
| a. | 01 Wesley Medical Center |
| b. | 02a Via Christi St. Francis |
| c. | 02b Via Christi St. Francis |
| d. | 02c Via Christi St. Francis |
| e. | 02d Via Christi St. Francis |
| f. | 03 Abay Neuroscience |
| g. | 04 Children's Mercy Hospitals & Clinics (bill) |
| h. | 05 Children's Mercy Hospitals & Clinics |
| i. | 05a Children's Mercy Hospitals & Clinics |
| j. | 05b Children's Mercy Hospitals & Clinics |
| k. | 05c Children's Mercy Hospitals & Clinics |
| l. | 05d Children's Mercy Hospitals & Clinics |
| m. | 05e Children's Mercy Hospitals & Clinics |
| n. | 05f Children's Mercy Hospitals & Clinics |
| o. | 05g Children's Mercy Hospitals & Clinics |
| p. | 05h Children's Mercy Hospitals & Clinics |
| q. | 05i Children's Mercy Hospitals & Clinics |
| r. | 06 Hutchinson Clinic PA |
| s. | 07a Heartspring |
| t. | 07b Heartspring |
| u. | 07c Heartspring |
| v. | 07d Heartspring |
| w. | 08 Panda Pediatrics |
| x. | 09 Lawrence Memorial Hospital |
| y. | 10 Solace Pediatric Home Healthcare |
| z. | 11 Kids First Pediatrics of Georgia |
| aa. | 12a Children's Hospital Colorado |
| bb. | 12b Children's Hospital Colorado |
| cc. | 12c Children's Hospital Colorado |
| dd. | 12d Children's Hospital Colorado |
| ee. | 12e Children's Hospital Colorado |
| ff. | 12f Children's Hospital Colorado |
| gg. | 12f Children's Hospital Colorado, Update |

hh.    12g Children's Hospital Colorado
ii.    13 Walgreen Company
jj.    14 University of Kansas Medical Center
kk.    15 Children's Eye Physicians
ll.    15 Children's Eye Physicians, Update
mm.    16 Spark Home Health
nn.    17 Children's Dentistry
oo.    18 Boulder Medical Center – Broadway
pp.    18 Boulder Medical Center (bill)
qq.    19a Edgepark Medical Supplies (2)
rr.    19b Edgepark Medical Supplies
ss.    20 Prosthetic & Orthotic Group
tt.    21 CVS Pharmacy
uu.    22a Estrella Home Health Care, Inc.
vv.    22b Estrella Home Health Care, Inc.
ww.    22c Estrella Home Health Care, Inc.
xx.    22d Estrella Home Health Care, Inc.
yy.    23 Apria Billing
zz.    24 Saint Luke's Regional Lab
aaa.   25 Boulder Valley Vision Therapy, PC
bbb.   26 Front Range Eye Associates
ccc.   27 Apria Healthcare
ddd.   Solace Pediatric Home Healthcare, Update
eee.   A Rise Above Home Care
fff.   Linkia
ggg.   Kid Spot Physical Therapy
hhh.   Children's Hospital Colorado Occupational Therapy
       Broomfield
iii.   WMC Records, Produced October 2017 to KM
jjj.   WMC Records, Produced November 2017 to KM
kkk.   WMC Records, Produced March 2017 to KM
lll.   VCHSF Records, Produced April 2017 to KM
mmm. VCHSF Records, Produced August 2017 to D&G
nnn.   Radiology Reports Produced to KM
ooo.   Nutrition Letter by Diana Hieb MSN, APRN, CMH
ppp.   Diagnosis Sheet by Matthew Mayer, MD, Children's
       Hospital Colorado, dated 03/27/19
qqq.   Letter by Molly Hemenway, DNP, dated 05/31/18

Plaintiff will continue to supplement his medical records from
his treating physicians and the parties will stipulate to their

foundation unless good cause exists.

2.   Medical bills, itemizations, paid amounts, and updates for the care and treatment of D.M., including, but not limited to:

a.   Apria Healthcare
b.   Boulder Medical Center
c.   Boulder Valley Vision Therapy
d.   Care Centrix
e.   Children's Eye Physicians
f.   Children's Hospital Colorado
g.   Children's Mercy Hospital
h.   Children's Mercy Hospital Professional
i.   Colorado University Medicine Physicians
j.   Edgepark Medical Supplies
k.   Hanger Clinic
l.   Heartspring
m.   Numotion/United Seating & Mobility
n.   Nutritional Medicinals
o.   Solace Pediatric Home Healthcare
p.   Spark Home Health
q.   Orthotic Prosthetic Solutions
r.   Prosthetic & Orthotic Group
s.   A Rise Above Home Care
t.   Estrella Home Health
u.   Linkia
v.   Kid Spot Physical Therapy

Plaintiff will continue to supplement his medical records from his treating physicians and the parties will stipulate to their foundation unless good cause exists.

c.   The following records can be offered without foundation witnesses:

1.   Insurance documentation related to care and treatment of D.M., including:

a.   Lien – Aetna, including Itemized Summary of Claims Paid

       b.     Lien – Cigna, including Itemized Summary of Claims Paid

       c.     Lien – Medicaid, Including Itemized Summary of Claims Paid

2.     D.M.'s school records

3.     Verizon Wireless Billing Logs:

       a.     02-24-17 to 03-23-17
       b.     03-24-17 to 04-23-17

4.     Sprint Cellular Records:

       a.     Bala Bhaskar Reddy Bhimavarapu, M.D.

5.     Recorded Phone Call:

       a.     Kelli Morgan/CMH personnel (two separate phone calls)

## 3.    FACTUAL CONTENTIONS.

Plaintiff, through his natural guardian and next friend, filed his federal court Complaint on April 9, 2018, alleging medical malpractice against Defendants resulting from the medical care he received on March 5 and 6, 2017. Plaintiff alleges that on March 6, 2017, he suffered a medically preventable stroke that left him with right-side paralysis, neurological damage and other physical injuries that permanently changed his and his parents' lives. Defendants deny Plaintiff's allegations

### a.    Contentions of Plaintiff.

Prior to March 5, 2017, D.M. was a healthy, active five-year old who loved being a big brother to his two young foster sisters whom his parents had taken in and raised. D.M.

and his parents, Kevin and Kelli Morgan, lived in Haysville, Kansas where D.M. enjoyed kindergarten, riding his bicycle, rock climbing and helping his parents garden.   On March 6, 2017, D.M. suffered a catastrophic stroke that left him with right-side paralysis, neurological damage and other physical injuries that have permanently changed his life.   D.M.'s stroke occurred after D.M. presented emergently and was seen by the Defendants with complaints of sudden and severe headache, dizziness, nausea, unbalance, vomiting, lethargy, weakness and reduced consciousness.   After D.M. suffered the stroke, a CT scan was ordered which revealed a brainstem tumor and significant obstructive hydrocephalus.   Emergent surgery was successfully performed to remove the tumor but as a result of D.M.'s elevated intracranial pressure caused by the obstructive hydrocephalus, D.M. suffered a major brainstem stroke to the left/medial pons region of his brain.   Subsequent pathology testing later confirmed that D.M. had a very treatable form of medulloblastoma and he completed his treatment and has a high probability of long-term survival.   Unfortunately, the injuries D.M. sustained as a result of the stroke are permanent and catastrophic.

On March 3-5, 2017, five-year old D.M. began suffering symptoms of dizziness, nausea, headache, unbalance, vomiting and lethargy.   While at church on the evening of March 5, 2017, D.M. suffered a headache so severe that he began to scream uncontrollably. The Morgans picked up D.M. and they immediately drove to the Wesley Medical Center-Woodlawn Emergency Room.   During the drive, D.M.'s headache subsided but his condition remained emergent.

The Morgans arrived at the Wesley emergency room entrance and Kelli carried D.M. into the emergency room at approximately 6:20 p.m. because he was too weak to walk by himself.  Kelli reported to the front desk that D.M. presented to the emergency room because of a sudden headache and nausea.  Kelli then described D.M.'s current conditions: a sudden severe headache, nausea for two days, dizziness and unbalance.  A portion of Kelli's report is memorialized in the Wesley triage sheet.

After triage, Defendant Grover then saw D.M. for less than 10 minutes and diagnosed him with strep throat.  Grover never reviewed the triage report where Kelli reported D.M. suffering from a sudden and severe headache, nausea, dizziness and unbalance or any of the nurse charting or nursing notes when assessing D.M.  Grover failed to list a differential diagnosis and she did not chart her treatment of D.M. for over 3.5 hours and her chart contains numerous mistakes and errors.

While at the Wesley Woodlawn emergency room, D.M. began to vomit.  He vomited multiple times in the emergency room but Grover discharged D.M. with a diagnosis of strep throat and a prescription for antibiotics at 7:19 p.m.

Defendant Faimon supervised Grover's treatment of D.M.  However, Faimon never saw D.M.  Instead, Faimon subsequently reviewed the chart and approved Grover's treatment at approximately 10:30 p.m. that night.  In doing so, Faimon spent less than one minute reviewing the chart before signing off and he never reviewed the nursing notes or the triage report where it was confirmed that D.M. presented with sudden and severe headache, nausea, dizziness and unbalance.

9

After his discharge, the Morgans brought D.M. home and watched as his condition continued to worsen. He became more lethargic and continued to vomit. They were concerned that D.M. suffered from meningitis or similar acute neurological emergency and they began performing internet searches for meningitis and complications of strep throat.

On March 6, at approximately 1:45 a.m., Kelli tried to call D.M.'s primary care physician to seek more help. Her phone call was automatically transferred to an operator at Children's Mercy Hospital in Kansas City. In the call, Kelli described D.M.'s worsening condition. She reported to the Children's Mercy operator that D.M. had been at the emergency room around 6 p.m., that he had suffered nausea for the past several days, that he suffered disorientation, that he had a "really bad" headache at church, that he had vomited multiple times and that she was concerned that D.M. suffered from something more serious than strep throat.

Thereafter, a Children's Mercy nurse called Kelli back at approximately 2:05 a.m. In the meantime, the Morgans decided D.M.'s condition was worsening so Kelli drove D.M. back to the emergency room. This time, they went to Via Christi St.-Francis. In the second call, Kelli again reported that D.M. had been to the emergency room earlier that evening, that she was concerned D.M. suffered from a more serious complication than strep throat, that D.M. had suffered from a "severe" headache, that he had been nauseous for several days and that he had vomited multiple times that night. Kelli also reported that she was driving to the Via Christi St. Francis emergency room. The Children's Mercy nurse agreed that Kelli should take D.M. back for further treatment.

10

Kelli and D.M. arrived at the Via Christi St. Francis emergency room at approximately 2:15 a.m.  Kelli again carried D.M. into the emergency room where they waited for D.M. to be seen.

Throughout the morning of March 6, Kevin and Kelli remained in contact via text messages.  In their contemporaneous messages, Kelli confirms that D.M. was asleep by 2:26 a.m.  Kelli later noted that D.M. was "very sleepy" and that he "couldn't stand for weight."  At 4:43 a.m., Kelli texted: "Haven't even see a dr.  At least he's getting fluids.  Idk [I don't know] why we haven't seen anyone."

At 4:48 a.m., D.M. was seen by Defendant Daney, who was an employee of Defendant CEP.  Because the emergency room was busy that night, Defendant Daney actually saw D.M. in a janitor's closet converted into an exam room.  Defendant Daney labeled D.M. as a "FAILED OUTPATIENT."  Defendant Daney's written history of D.M. focuses solely on his previous emergency room visit and the diagnosis of strep throat but lacks any detail as to the presentation of complaints of sudden severe headache, nausea, unbalance, dizziness and vomiting. Defendant Daney admitted D.M. for observation at 5:04 a.m. after consulting by phone with Defendant Dr. Bala Bhimavarapu ("Bala"), the admitting physician.

After his admission, D.M. was seen by three family practice resident physicians (Defendants Connor Hartpence, Stephanie White and Jamie Borick) and a medical student (Samuel Dumontier).  Defendant Hartpence, a first-year resident, saw D.M. shortly after he was admitted at 5:18 a.m. and he obtained the following signs and symptoms of D.M.'s

11

acute neurological emergency: "On Sunday, pt [patient] complained of headache, dizziness, and worsening nausea and several episodes of emesis..." Defendant Hartpence reported this information to Defendant Bala. Defendant Bala agreed that D.M.'s neurological exam should be deferred and that D.M. should be discharged later that day.

Thereafter, Defendant White (third year resident) saw D.M. at 6:15 a.m. and she also obtained the following information from Kelli: "Per mom, he was nauseated, dizzy and had a headache at home which is what prompted the hospital visit. He vomited every 30 minutes . . . He is very sleepy this morning and mom is worried about how sleepy he is . . ." D.M.'s neurological exam was again deferred.

At 6:57 a.m., third year medical student Dumontier noted that D.M. was "Non arousable." This information was allegedly reviewed by Defendant Borick at 8:37 a.m. Defendant Borick did not perform a neurological exam. Defendant Borick later cut and pasted Dumontier's medical history which contained his observation that D.M. was "Non-arousable" into her own history for D.M.

At 8:31 a.m., Kevin texted Kelli: "How is he?" Kelli responded: "He's still asleep." Sometime before 10:00 a.m. on March 6, D.M. suffered a major stroke to the left pons region of his brain caused by sustained increased intracranial pressure. At approximately 10:00 a.m., D.M. stopped breathing and a code blue was called. Dr. Bala did not see D.M. until after he coded.

Other health care providers responded to the code blue and successfully resuscitated D.M. He then received a C.T. scan which confirmed D.M. suffered from increased

12

intracranial pressure and it identified the brain tumor.   Thereafter, a neurosurgeon successfully removed D.M.'s tumor and relieved the elevated intracranial pressure but the damage was already done.  D.M. successfully completed treatment for the tumor and he is cancer-free and has a very good long-term prognosis for survival.  Unfortunately, D.M. continues to suffer from the catastrophic injuries caused by the stroke.

**b.      Contentions of Defendants Grover and Faimon**

On March 5, 2017, D.M. presented to Wesley Woodlawn with his Mother.  DM was seen by Wesley Woodlawn Nurses Harding and Judd who noted in handwriting on a paper intake form a history of headache, nausea, dizziness, unbalance, throat red the other day, no fever, no vomiting.   D.M.'s mother reported the headache began prior to arrival when he was not allowed to staple something at church, it was not described as "sudden and severe" to anyone at Wesley.  No history of vomiting, lethargy, weakness, inability to stand or walk normally, mental changes or reduced consciousness was given or observed.  No one noted DM to be ill appearing; he was noted to be awake, alert and oriented.

Neither Nurse identified any alarming signs or symptoms and triaged DM to be seen in Ready Care by PA Grover.  Nurse Judd performed a nursing assessment, including a GSC of 15, which indicates normal neurologic function. Nurse Judd and PA Grover were both experienced with working in the emergency department and worked together often. It was their practice to verbally communicate about patients they were seeing and Nurse Judd would communicate any concerning history or symptoms to PA Grover.  The intake form includes handwriting by three people, including Nurses Harding and Judd.

The paper intake form was not part of the electronic health record and while it may have been with the nurse in the room or at the nurse's station it was not provided to the physician or PA.   Typically, information gathered by the nurses was communicated verbally and when the nurse completed her charting in the computer that would be accessible for others to review.

DM was seen by Bridget Grover, PA, who obtained a history, went through a review of systems, formulated a differential diagnosis, performed an assessment, including a neurologic assessment, issued orders, obtained lab results and ultimately made a diagnosis of strep.  PA Grover provided a prescription for antibiotics and discharge instructions.  PA Grover was not contacted for any additional care after DM was discharged.

Discharge instructions were provided that advised return if DM's condition worsened and these instructions were reviewed with DM's mother.  After DM was home and the prescribed antibiotics were administered he began to vomit.  According to his parents' account, DM vomited repeatedly when at home, was difficult to wake, and was not able to answer questions as they expected; they were concerned and decided to seek additional medical care.  They did not return to Wesley Woodlawn instead they sought care at Via Christi.  As a consequence, Wesley providers did not have an opportunity to assess any change in condition.

After DM had departed, Dr. Faimon, in the normal course as required by Wesley policy, reviewed PA Grover's charting.  He found PA Grover's charting to be in order and complete and acknowledged his review by adding his signature.

14

At Via Christi, in the morning hours of March 6, 2017, DM was seen by multiple providers, including experienced emergency department nurses and nurses on the floor, APRN Daney, three Residents, and a medical student.  Report of some of the interactions, observations and assessments of DM were provided to Dr. Bala in formulating a plan for DM's care and treatment.  None of the Via Christi providers heard, saw or found anything that caused them to question the diagnosis of strep throat.

Unfortunately, DM had a rare condition that developed in an unusual way; the course, timing and presentation were unusual for medulloblastoma.  Upon D.M.'s initial presentation to Wesley Woodlawn he had symptoms consistent with strep and tested positive for strep.  It was reasonable to make that diagnosis, treat for that condition and discharge with instructions to return if his condition worsened.

The specific facts and evidence to support the above contentions and denials is found within the medical records, the deposition testimony, the experts' reports and deposition testimony, documents disclosed through discovery, medical literature, the anticipated testimony and evidence to be presented at trial and applicable Kansas law.

**c.** **Contentions of Defendant Chambers-Daney**

Plaintiff (5 years old) presented to the Via Christi – St. Francis emergency department in the early morning hours of March 6, 2017 (approximately 2:30 a.m.).  The chief complaint provided by his mother, Kelli Morgan, was nausea, vomiting, diagnosed with strep throat earlier in the night and unable to keep antibiotics down.  This was provided to Via Christi nursing staff involved in the triage assessment.  Plaintiff had been evaluated

15

8 hours earlier at Wesley Woodlawn ER and diagnosed with strep throat and discharged with antibiotics. At Via Christi, Mrs. Morgan also reported that Plaintiff had a sore throat for an unknown time, and that his sister had just had her tonsils out, so Mrs. Morgan was worried Plaintiff was too afraid to say something.  Mrs. Morgan reported Plaintiff had been vomiting every hour, although Plaintiff did not vomit while in the emergency department.

Mrs. Chambers-Daney, an advanced practice registered nurse, assessed Plaintiff in triage room one.  Plaintiff was sitting up in the chair, followed all commands and was responsive to Mrs. Chambers-Daney in an appropriate way.  As a part of the exam, Mrs. Chambers-Daney viewed Plaintiff's throat and noted erythema (redness). Plaintiff was tired but his neurologic status was within normal limits.

After obtaining a history and examination, as well as standard lab tests, Mrs. Chambers-Daney ordered Zofran and fluid resuscitation. Plaintiff improved after fluids and Zofran were administered. Mrs. Chambers-Daney ordered his admission to the hospital and consulted the pediatric hospitalist. The pediatric hospitalist directed resident physicians come to the ER to evaluate Plaintiff in the emergency department and prepare the admission orders/plan.  Plaintiff was then admitted at approximately 5:00 a.m.  Mrs. Chambers-Daney was responsible for the Plaintiff's care for approximately two hours and completed the process to have admitted to the hospital to the pediatric service.

At approximately 10:00 a.m., while admitted in the pediatric unit, Plaintiff became unresponsive and a code blue was called.  Plaintiff was resuscitated and subsequently diagnosed with a Grade 4 WNT medulloblastoma tumor near his pons and brainstem.

Plaintiff's tumor required emergent surgical resection, chemotherapy and radiation. Plaintiff was also subsequently diagnosed with a stroke. Plaintiff's tumor was not metastatic, although there is still a chance it will reappear. Plaintiff has sequela from the tumor and the necessary treatment.

### d.    Contentions of Defendant CEP

This medical negligence case involves a five-year-old, D.M., who presented to the Emergency Department at Via Christi hospital at around 2:30 a.m. the morning of March 6, 2017. His chief complaint was recorded as "Nausea and vomiting, was just diagnosed with strep tonight at Wesley, mom concerned unable to keep meds down to treat it." The triage nurse, Aaron Kent, assessed Plaintiff to be alert, oriented, but sleepy. Vital signs at 2:31 a.m. were pulse 91, blood pressure 124/69, respiratory rate 20, O2 at 97%, and Faces Pain Scale of "0". Vital signs at 4:01 a.m. were pulse 67, respiratory rate 16, and O2 at 97%. APRN Daney received a history from D.M.'s mother, Kelli Morgan, that Plaintiff had a sore throat for an unknown length of time, that his sister had her tonsils taken out recently, and Mrs. Morgan was worried that D.M. was too afraid to admit having a sore throat because he may need his tonsils removed too. Mrs. Morgan also advised APRN Daney that D.M. had been to Wesley the night before where he got diagnosed with strep throat, but since discharge he had been vomiting every hour and unable to keep his medications down. There was nothing in the history or physical examination by anyone to suggest neurological involvement including headache, clutching the back of head screaming, dizziness, off-balance, difficulty standing or walking, protruding eyeballs, or

17

slurring of words. To the contrary, D.M. was described as alert, in no acute distress, but ill appearing. His Glasgow Coma Scale in the ED at 4:29 a.m. was scored at 15. Neurologically, he was described as "sleepy." In the ED, D.M. received intravenous fluids and medication to treat his nausea and vomiting. APRN Daney contacted a pediatrician, Dr. Bala, for admission to an observation unit, and Dr. Bala agreed to accept the admission. Her differential diagnoses at that time included viral pharyngitis, streptococcal pharyngitis, viral syndrome and/or upper respiratory infection, and she handed off care to Dr. Bala and the resident physicians shortly after 5:00 a.m.  Defendant Chambers-Daney had no further contact with D.M. that morning.

At around 10:00 a.m. that morning, D.M. was discovered to be in distress, leading to a code blue call and radiological testing, which revealed a large brain tumor that was eventually diagnosed as medulloblastoma, a rare brain tumor.

Dr. Raymond Grundmeyer performed surgical resection of the tumor starting around 2:30 p.m. the afternoon of March 6. An MRI performed on March 7 revealed that D.M. had also suffered strokes in the left pontine and the corpus callosum. D.M. then underwent a course of chemotherapy, radiation, and rehabilitation.

Plaintiff seeks a sole theory of recovery against CEP – vicarious liability.  As for Plaintiff's vicarious liability claim against CEP for the actions of Defendant Chambers-Daney in treating D.M., CEP denies that Chambers-Daney was negligent in the care and treatment of D.M.  Chambers-Daney obtained nearly the same history that was obtained by the triage nurse, Aaron Kent.  The care that Chambers-Daney provided was appropriate

and consistent with the standard of care in the circumstances of D.M.'s presenting complaints, the history presented by his mother, and the physical examination performed. Indeed, Plaintiff's own experts have admitted that the decision by Chambers-Daney to admit D.M. to the floor more likely than not saved D.M.'s life.  In accordance with the standard of care for an emergency room mid-level, Chambers-Daney conducted a prompt evaluation of D.M., she stabilized his presenting condition, and then determined an appropriate disposition, which was admission to the floor.  D.M. was seen by multiple medical providers at two different hospitals, none of whom have indicated that they suspected a brain tumor or increased intracranial pressure, or that the circumstances should have led them to such a concern. D.M.'s history and examinations gave no one any reason to suspect a brain tumor.

On the issue of medical causation, Plaintiff has developed no evidence, beyond mere speculation, that D.M.'s outcome would have been any different if earlier CT imaging and/or medical interventions had occurred.  Plaintiff also asserts that all or nearly all of his current physical and cognitive limitations are directly traceable to the left pontine stroke that he suffered.  However, the evidence will demonstrate that most of D.M.'s deficits are directly attributable to the brain tumor, its resection, and the chemotherapy and radiation. In other words, D.M. would have been in nearly the same condition if an earlier diagnosis had been made.  To this day, MRI imaging of the brain reveals cerebellar volume loss from the tumor and its resection, which can and does have a profound impact on D.M.'s current condition.

D.M.'s brain tumor was a subtype that is prone to bleeding, and a significant, sudden bleed developed at or around the time of D.M.'s code event through no one's fault. D.M.'s left pontine stroke, more likely than not, occurred at or around the time of surgery to remove the tumor when the pressure in the brain was relieved that caused an upward herniation, or a "vasospasm" type event where the distorted brain tissue and blood vessels from the tumor and pressure were decompressed, resulting in the infarct. This event likely would have occurred even if surgery had been performed earlier.

**e.      Contentions of Defendants Hartpence, White and Borick**

Connor Hartpence, M.D., Stefanie White, M.D., and Jamie Borick, M.D. were all resident physicians in the University of Kansas family practice residency program in Wichita, Kansas.   While each of these defendants is a separate person, entitled to be separately judged, they will be discussed together so as to avoid unnecessarily extending the length of this pretrial order.

At the time in question, Dr. Hartpence and Dr. Borick were first-year residents (interns), whereas Dr. White was a senior resident.  Their involvement in this case occurred during the second hospital visit at issue, which occurred at Via Christi St. Francis Medical Center.  The first visit occurred when D.M., the minor plaintiff, presented to the Wesley Medical Center emergency room with his parents at 18:19 p.m. on March 5, 2017. The provider's clinical impression at Wesley was "strep throat." and D.M. was discharged to home at 19:03 p.m.

Approximately seven hours after being discharged home from the Wesley

emergency department, the Morgans took D.M. to the emergency department at Via Christi St. Francis Medical Center.  They arrived at 2:22 a.m. on March 6, 2017. The nature of the presenting complaint had changed since the Wesley visit.  The chief complaint at Via Christi was "nausea & vomiting, was just diagnosed with strep tonight at Wesley, mom concerned unable to keep meds down to treat it."  They came to Via Christi with a primary concern being to make sure D.M. received the medication he needed to fight the strep throat.  This is a very common presentation in emergency medicine.  A child has a diagnosis, such as strep throat, but due to vomiting is unable to keep medication down. The parents become understandably concerned the illness is not being effectively treated and go to the emergency room. The emergency department will then provide medication for the nausea and vomiting, give rehydration if appropriate and admit the child for observation.  At that point, the child, if no longer vomiting and able to sleep, is allowed to sleep through the night and is assessed in the morning.  If, as is true in most circumstances, the child is then able to keep oral medication down, he or she can be discharged home.

In short, at the time Dr. Hartpence, Dr. White and Dr. Borick entered the picture, the child had been diagnosed with strep throat at two different emergency departments and was being admitted largely to assure medication management and hydration.

On March 6, 2017, Dr. Hartpence was working on the pediatric floor at Via Christi. One of his responsibilities was to accept admissions to the floor from the emergency department.  The practice within the residency program was for the faculty member, acting as attending physician, to call the senior resident to report that a patient needed to be

admitted.   The senior resident would then call the intern/first-year resident and briefly describe the case.   At that point, it became the role of the junior resident/intern to do the history and physical examination.   Upon completion of the exam, he would formulate an assessment and plan and speak with the senior resident.   The senior resident would then conduct his or her own evaluation of the patient and the two residents would discuss the case.   At that point, it would become the junior resident's role to call the attending physician where they would discuss the assessment and plan of care, as well as other matters.

Pursuant to normal protocol, Dr. Hartpence, as a first-year family practice resident, conducted the history and physical of D.M. His findings were entirely consistent with the diagnosis of strep throat.  By this time, D.M.'s vomiting had been controlled by medication. Part of the routine H&P involves a brief neurological examination.   By the time Dr. Hartpence saw D.M., he was asleep and remained asleep during the exam.   He would respond to stimulus from the exam, but never fully awakened. Sleepiness was expected since he had gone many hours through the night without sleep.   Dr. Hartpence elected to defer the neurological exam to the floor, rather than wake D.M.  Waking a sleeping child merely to complete the chart on something unrelated to the working diagnosis was not medically necessary. In any case, a neurological exam on a sleepy child, awakened from deep sleep, would have been very difficult to complete and would likely have led to unsatisfactory results.

Shortly after Dr. Hartpence's examination, Dr. White, the senior resident, briefly saw D.M.  This was done pursuant to normal residency protocols for the senior resident to

sign off on new admissions.  It was not Dr. White's job to do a complete history and physical duplicative of that conducted by Dr. Hartpence.  Nothing about the child's presentation struck Dr. White as inconsistent with the diagnosis of strep throat and she agreed with the plan.  Pursuant to normal practices, she would then have conferred with Dr. Hartpence.  The plan was to let D.M. sleep, then complete the remaining parts of the exam in the morning and administer oral antibiotics.  Assuming D.M. was able to keep the oral antibiotics down he would likely be discharged later in the day.  Also pursuant to residency procedures, Dr. Hartpence then called the attending physician, Dr. Bala, and gave him a complete rundown on the case.  Dr. Bala agreed with and approved the plan.  D.M. was then admitted for "observation," which means the patient is not expected to stay as long as 24 hours.

Later that morning, Dr. Borick came on duty.  She was given report by Dr. White and was told of the diagnosis of strep throat and of the plan to allow the child to sleep and then see whether he could keep down his oral antibiotics after he awoke.  Dr. Borick did briefly enter D.M.'s room and found him asleep.  She advised Mrs. Morgan that she wouldn't wake him up and that they would assess things in the morning when he was awake.  She did conduct a very limited physical examination before leaving the room.  She saw nothing concerning.

D.M. was later diagnosed with an extremely rare brain tumor.

### f.      Contentions of Defendant Bala Bhaskar Reddy Bhimavarapu

Dr. Bala Bhaskar Reddy Bhimavarapu [Dr. Bala], at home at the time, was contacted

23

by Ms. Chambers-Daney from the Via Christi ED and placed a call back to her at 4:59 a.m. They discussed D.M. and together facilitated his admission to the hospital. Their collective action saved D.M.'s life. Dr. Bala contacted Dr. White at 5:02 a.m. to activate the residency service to see D.M. In turn, Dr. Hartpence saw D.M., conducted a History & Physical and at 6:26 a.m. he and Dr. Bala discussed D.M.'s presentation and care plan. Within minutes of Dr. Bala's arrival to the hospital and before he had reviewed all of D.M.'s records or been able to see him, D.M. coded at a few minutes before 10 a.m.

**4.     LEGAL CLAIMS AND DEFENSES.**

**a.     Legal Claims of Plaintiff.**

**Plaintiff asserts that he is entitled to recover upon the following theories:**

It is anticipated that Counts II and III of Plaintiff's First Amended Complaint will be dismissed by the Court following a hearing on Plaintiff's motion to approve a settlement with Defendants Wesley Medical Center, Lisa Judd, R.N., Via Christi Hospitals Wichita, Inc. and Aaron Kent, R.N.

Plaintiff will proceed to trial with respect to Count I and his allegations that Defendants Grover, Faimon, Daney, Hartpence, White, Borick and Bhimavarapu were negligent and deviated from the appropriate standard of care in their treatment of D.M. in the following respects on March 5-6, 2017:

1.     Failing to consider a differential diagnosis that involved an intracranial process involving increased intracranial pressure;

2. Failing to rule out a neurological problem as being the cause of D.M.'s complaints and presentation;

3. Failing to conduct a more complete and adequate neurological examination of D.M.;

4. Failing to perform a proper physical examination;

5. Failing to take a proper history of D.M.'s complaints and symptoms;

6. Failing to obtain a proper history regarding D.M.'s headache;

7. Failing to order immediate head imaging to rule out elevated intracranial pressure;

8. Failing to order head imaging;

9. Failing to order a head CT stat;

10. Failing to perform and document a proper differential diagnosis;

11. Failing to properly diagnose;

12. Failing to diagnose elevated intracranial pressures;

13. Failing to consider an intracranial process;

14. Failing to obtain a neurological consultation;

15. Failing to follow up on abnormal labs;

16. Failing to obtain vital signs;

17. Failing to follow up on abnormal vital signs;

18. Failing to review the complete medical chart including the nursing notes and triage sheet.

In addition to the aforementioned, Dr. Faimon also deviated from the standard of care and was negligent in the following respects:

1.      Failing to properly supervise Bridget Grover;

2.      Failing to perform a complete review of D.M.'s medical chart;

3.      Failing to not personally examining D.M.;

4.      Failing to consider a differential diagnosis that involved an intracranial process involving increased intracranial pressure.

In addition to the aforementioned, Dr. Faimon and Bridget Grover deviated from the standard of care and were negligent in the following respects:

1.      Failing to review the entire medical record including nursing notes;

2.      Failing to review the entire medical record including the triage notes

3.      Failing to properly observe D.M. for a longer period of time to insure fluid toleration;

4.      Failing to observe D.M.'s gait and recording the same;

5.      Failing to obtain a blood pressure.

In addition to the aforementioned, Nurse Practitioner Daney deviated from the standard of care and was negligent in the following respects:

1.      Failing to properly evaluate and document a complete neurological exam in a child who presented to the emergency department and is described as "ill appearing," "SLEEPY;"

2.      Failing to properly evaluate and document a complete neurological exam in a child who presented to the emergency department with the symptoms of vomiting and headache;

3.  Failing to obtain emergent neuro-imaging.

In addition to the aforementioned, Dr. Bala deviated from the standard of care and was negligent in the following respects:

1.      Failing to consider the complexity of D.M.'s condition;

2.      Failing to obtain a comprehensive history of D.M.'s symptoms from Daney;

3.      Failing to obtain a comprehensive history of D.M.'s symptoms and his physical and neurological condition from Residents Hartpence, White & Borick;

4.      Failing to personally examine D.M;

5.      Failing to ask additional questions regarding D.M.'s symptoms and condition including his headache, dizziness, nausea and vomiting;

6.      Failing to ask questions about D.M.'s prior Wesley Medical Center-Woodlawn admission and his complaints leading to that admission.

In addition to the aforementioned, Dr. Borick deviated from the standard of care and was negligent in the following respects:

1.      Failing to respond to D.M. being unarousable.

Defendant CEP is liable under the doctrine of respondeat superior because Defendant Daney was an agent/employee of CEP and was acting within the course and scope of her employment.[2]

Plaintiff will also proceed to trial with respect to Count IV and Plaintiff's claims for punitive damages against Defendants to punish and deter similar conduct.

Defendants object to Plaintiff's contentions as they are duplicative and repetitive. Defendants ask the Court for relief from the repetitive nature of plaintiff's Legal Claims/contentions against individual and all defendants (repeated, though not materially different, claims about history taking, head imaging, differential diagnoses, reviewing records and performing a full neuro exam). If not resolved at the time of Pretrial, Defendants wish to preserve their objections to the duplicative and repetitive contentions. Additionally, Defendants object to any claims that were not properly disclosed during discovery or are unsupported by expert disclosures/opinions. This objection is overruled.

**b.**      **Defenses of Defendants.**

General objections of Plaintiff to all Defendants' contentions regarding comparative fault. Plaintiff objects that if any defendant is comparing fault with any other

---

[2] Plaintiff proposes to add the sentence "The aforementioned deviations from the standard of care are more fully laid out in Plaintiff's expert reports and deposition testimony." Defendant Bala objects to this sentence. To state the claims "are more fully laid out" in the expert reports and deposition testimony demonstrates this sentence is duplicative of the claims already enumerated. Additionally, it is catch-all and vague in nature, therefore inconsistent with the specificity required of a Pretrial Order. The other defendants concur. This objection is sustained as improperly incorporating contentions from an external document.

party, they must specifically include those allegations in the Pretrial Order. (Pursuant to the Local Rules, "If applicable, identify all persons or entities whose fault is to be compared for purposes of K.S.A. 60-258a …. Also, list the specific grounds of comparative fault which is claimed.")  Defendants assert that the comparative fault allegations are adequately described and that each defendant has advised plaintiff throughout discovery that plaintiff's contentions of fault against any defendants dismissed, and claims against same abandoned, would be asserted by incorporation. This objection is overruled.  Defendants may assert comparative fault against any party or former party based on the claims made against that party by the plaintiff in this Pretrial Order.

> **i.      Defendants Bridget Grover, PA-C and Gregory Faimon, M.D. assert the following defenses:**

1.      Defendants Grover and Faimon deny all claims of negligence asserted against them generally and specifically by Plaintiff, and specifically deny any departure from the applicable community standards of medical care with respect to the care and treatment provided to DM,

2.      Defendants Grover and Faimon deny they departed from the standard of care in considering, formulating, or documenting a differential diagnosis. They deny any departure from the standard of care in taking the history, in performing the work-up, and in forming a diagnosis.

3.      Dr. Faimon denies any breach from the standard of care in his supervision of PA Grover or in his review of her care.

29

4.    Defendants Grover and Faimon deny any care provided or not provided by either of them caused or contributed to cause the injuries and damages claimed by Plaintiff.

5.    Defendant Faimon denies any physician-patient relationship was established with DM as he was never consulted about the patient or asked to see the patient and he did not provide any care and treatment for the patient. He acted reasonably in his supervision of PA Grover and he denies his subsequent review of PA Grover's charting was negligent or caused harm to DM.

6.    Defendants Grover and Faimon deny Plaintiff's alleged injuries and damages are a result of any breach in the standard of care and further deny they are of the nature and to the extent alleged.  Defendants did not cause the cancer; surgical removal of the brain tumor and subsequent chemotherapy and radiation would have been necessary in any event.  Plaintiff's failure to recover fully is due to the cancer and the necessary treatment for the cancer, including the complications and risks of surgical intervention, chemotherapy and radiation treatment.

7.    Plaintiff has insufficient evidence to satisfy the burden to prove D.M.'s outcome would have been different if earlier CT imaging and/or medical interventions had occurred.

8.    Plaintiff cannot establish that the care and treatment at Wesley

Woodlawn was the proximate cause of the claimed injures and damages.

9.      There is no conduct, act or omission by PA Grover that supports any claim for punitive damages.

10.     If Plaintiff was injured as a result of negligence, which claims are denied, then any resulting damages and injuries were due to the negligence of others over whom Defendants Grover and Faimon had no right or duty to control.  K.S.A. 60-258a applies to this matter and comparative negligence of others, as separately alleged by Plaintiff must be compared if such negligence exists.   In the event Plaintiff changes position in the case by settling with any other named or formerly named Defendant or, if any other Defendant is otherwise dismissed, Defendants Grover and Faimon reserve the right to incorporate Plaintiff's allegations of fault and utilize Plaintiff's evidence (including expert testimony) in support thereof against any such Defendant, pursuant to case law and Fed. R. Civ. P. 8(d) which allows for pleading in the alternative and/or hypothetical.

11.     Defendants Grover and Faimon further contend that Plaintiff has not been injured or damaged to the extent alleged.  The damages available to Plaintiff are limited to the appropriate statutory caps found under Kansas law. Grover and Faimon state that the damage cap as provided in K.S.A. 60-19a02 applies.  Grover and Faimon specifically assert that K.S.A. 60-19a02 is constitutional and enforceable in this case. Pursuant to the opinion of the

concurring justice in *Hilburn v. Enerpipe*, 442 P. 3d 509 (June 14, 2019), the portions of K.S.A. 60-19a02 found unconstitutional should be severed, while leaving the substantive cap in place. Grover and Faimon allege severance is possible and proper, and for this reason, the cap remains constitutional and enforceable. Grover and Faimon further assert the *Hilburn* decision should not apply retroactively to causes of action which had accrued prior to the date of the decision due to the public's reliance on K.S.A. 60-19a02.

12.     Defendants Grover and Faimon are healthcare providers and as such neither can be vicariously liable for the acts of any other healthcare provider (K.S.A. 40-3403(h); and the statutory limits on damages apply.

13.     Defendants Grover and Faimon adopt and incorporate by reference the contentions and defenses presented by any other Defendant insofar as those contentions and defenses are consistent with the interests of Defendants Grover and Faimon.

**ii.     Defendant Jennifer Chambers-Daney, APRN, asserts the following defenses:**

1.     Mrs. Chambers-Daney denies all allegations of negligence and denies all claims of liability. Mrs. Chambers-Daney met the standard of care in all respects in the treatment provided to Plaintiff. Her care was reasonable, prudent and within the applicable standard of care for a nurse practitioner providing care in a Wichita, Kansas emergency department, or similar

32

communities, under the same or similar circumstances, in March, 2017. The standard of care did not require a repeat rapid strep test and did not require Mrs. Chambers-Daney to order additional diagnostic testing, including emergent brain imaging, in the emergency department. Her recommendations and decision to admit Plaintiff met the standard of care.

2.     Mrs. Chambers-Daney denies that Plaintiff's claimed injuries and damages were the result of any act of negligence or fault on her part, and she denies any causal connection between the alleged acts of negligence and the injuries and damages claimed. Mrs. Chambers-Daney did not cause Plaintiff's brain tumor or stroke. Mrs. Chambers-Daney did not cause Plaintiff to suffer any damages. Plaintiff had a severe, high risk condition prior to presentation to the ER on March 7, 2017, which would have required surgical resection, extensive chemotherapy and radiation therapy treatment, all associated with various risks, morbidities and potential mortality. To the contrary, her recommendation for admission likely saved Plaintiff's life.

3.     Mrs. Chambers-Daney denies Plaintiff's claimed injuries and damages are of the nature or of the extent alleged. Plaintiff's claimed damages are greatly exaggerated, do not consider present value, and do not take into consideration Plaintiff's pre-existing tumor and related complications.

4.      Moreover, Plaintiff's current claimed injuries and damages were the result of a pre-existing brain tumor and recognized complications arising from the same, for which Mrs. Chambers-Daney is not legally responsible. To the extent D.M. faces ongoing cognitive and physical impairments, these are caused by the effects of his tumor, its resection and the life-saving treatment Plaintiff received.  Additionally, earlier surgery would not have reduced the risk of Plaintiff's stroke and it is highly unlikely resection of the tumor would have occurred prior to the sudden, rapid, and unpredictable change in Plaintiff's tumor, even if the tumor was discovered in the emergency department.

5.      Mrs. Chambers-Daney does not believe any health care provider departed from the standard of care or that there was negligence on the part of any health care provider in this matter.  Plaintiff's expert witnesses disagree and allege otherwise.  As such, Mrs. Chambers-Daney reserves the right to compare her fault, if any, with the remaining party Defendants based upon the allegations and opinions of Plaintiff's expert witnesses.

6.      If Plaintiff dismisses any other parties, Mrs. Chambers-Daney reserves the right to adopt Plaintiff's contentions of fault and evidence in support of the same, including experts against any such Co-defendant.  Mrs. Chambers-Daney reserves the right to adopt Plaintiff's contentions against

Co-defendants in the alternative or in the hypothetical in the event of the dismissal or settlement with Co-defendants.

7.      Mrs. Chambers-Daney asserts that this case is controlled by various limitations upon damages as provided by Kansas law, including the limitation upon the recovery of non-economic damages.  Mrs. Chambers-Daney states that the damage cap as provided in K.S.A. 60-19a02 applies. Mrs. Chambers-Daney specifically asserts that K.S.A. 0-19a02 is constitutional and enforceable in this case. Pursuant to the opinion of the concurring justice in *Hilburn v. Enerpipe*, the portions of K.S.A. 60-19a02 found unconstitutional should be severed, while leaving the substantive cap in place.  Mrs. Chambers-Daney alleges severance is possible and proper, and for this reason, the cap remains constitutional and enforceable.  Mrs. Chambers-Daney further asserts the *Hilburn* decision should not apply retroactively to causes of action which had accrued prior to the date of the decision due to the public's reliance on K.S.A. 60-19a02

8.      To the extent Plaintiff claims medical expenses in this case, Mrs. Chambers-Daney is entitled to any applicable credit, set-off, allowance, adjustment, accommodation for medical expenses that were credited, written off, otherwise extinguished, or not chargeable to Plaintiff pursuant to any law, contract, code or regulation.

9.      Mrs. Chambers-Daney asserts that Plaintiff has failed, as a matter of law, to present necessary expert testimony to support a claim that Mrs. Chambers-Daney alleged negligence caused injury to Plaintiff.  Moreover, Plaintiff has failed to establish a claim of punitive damages.

10.     There is no conduct, act or omission by Mrs. Chambers-Daney that supports a claim for punitive damages.  Plaintiff has failed to provide any evidence of grossly negligent, willful or wanton conduct by any defendant, let alone Mrs. Chambers-Daney who timely saw DM, provided treatment that improved his condition and then immediately admitted him to a tertiary medical center for evaluation by pediatric specialists.

11.     Mrs. Chambers-Daney adopts and incorporates the allegations and contentions of Co-defendants unless these are specifically inconsistent with the above contentions.

**iii.     Defendant CEP asserts the following defenses:**

1.      In addition to all defenses set forth above in CEP's contentions and Chambers-Daney's contentions and defenses, CEP states that at all times material hereto, its employee, Chambers-Daney, provided medical care, decisions, treatment, and judgment to Plaintiff that was within the standards of care and was appropriate and consistent with the skill and learning ordinarily possessed by similarly situated nurse practitioners in similar

36

communities; and that nothing she did or failed to do caused or contributed to cause any of Plaintiff's alleged injuries and damages.

2.      CEP asserts that Plaintiff did not meet his burden of proof in providing expert testimony which adequately supports a prima facie case related to all the acts alleged that are claimed to be below the standards of care, or that they contributed to the alleged damages being claimed by the Plaintiff.

3.      CEP denies that Plaintiff's claimed injuries and damages were the result of any act of negligence or fault on Chambers-Daney's part, and it denies any causal connection between the alleged acts of negligence and the injuries and damages claimed.   Chambers-Daney did not cause Plaintiff's brain tumor or stroke.   Chambers-Daney did not cause Plaintiff to suffer any damages.  Plaintiff had a severe, high risk condition prior to presentation to the ER on March 6, 2017, which would have required surgical resection, extensive chemotherapy and radiation therapy treatment, all associated with various risks, morbidities and potential mortality.    To the contrary, Chambers-Daney's recommendation for admission likely saved Plaintiff's life.

4.      CEP denies Plaintiff's claimed injuries and damages are of the nature or of the extent alleged.  Plaintiff's claimed damages are greatly exaggerated, do not consider present value, and do not take into consideration Plaintiff's pre-existing tumor and related complications.

5.      Moreover, Plaintiff's current claimed injuries and damages were the result of a pre-existing brain tumor and recognized complications arising from the same, for which Chambers-Daney, and thus CEP, is not legally responsible.   To the extent D.M. faces ongoing cognitive and physical impairments, these are caused by the effects of his tumor, its resection and the life-saving treatment Plaintiff received.   Additionally, earlier surgery would not have reduced the risk of Plaintiff's stroke and it is highly unlikely resection of the tumor would have occurred prior to the sudden, rapid, and unpredictable change in Plaintiff's tumor, even if the tumor was discovered in the emergency department

6.      To the extent that Plaintiff claims medical expenses in this case, CEP asserts that it is entitled to any applicable credit, set-off, allowance, adjustment, and/or accommodation for medical expenses that were credited, written off, extinguished otherwise, or not chargeable to Plaintiff pursuant to any law, contract, code, statute or regulation.

7.      CEP further contends that Plaintiff has not been injured or damaged to the extent alleged.   The damages available to Plaintiff are limited to the appropriate statutory caps found under Kansas law.   CEP states that the damage cap as provided in K.S.A. 60-19a02 applies. CEP specifically asserts that K.S.A. 60-19a02 is constitutional and enforceable in this case. Pursuant to the opinion of the concurring justice in *Hilburn v. Enerpipe*, 442 P. 3d 509

Case 2:18-cv-02158-KHV   Document 435   Filed 05/04/20   Page 39 of 52

(June 14, 2019), the portions of K.S.A. 60-19a02 found unconstitutional should be severed, while leaving the substantive cap in place. CEP alleges severance is possible and proper, and for this reason, the cap remains constitutional and enforceable. CEP further asserts the *Hilburn* decision should not apply retroactively to causes of action which had accrued prior to the date of the decision due to the public's reliance on K.S.A. 60-19a02.

8.     Plaintiff has not suffered damages in the nature and to the extent alleged, and specifically, but without limitation, the Affordable Care Act limits the cost of medical care that Plaintiff allegedly required and will require into the future, and thus should be considered when calculating Plaintiff's alleged entitlement to damages for medical expenses.

9.     If Plaintiff received any injury or damages as alleged in the First Amended Complaint, which CEP specifically denies, CEP denies that Plaintiff can recover for any damages which were caused by preexisting conditions and other contributing factors which were not caused by the actions of this Defendant.

10.     CEP further contends that Plaintiff's injuries and damages are the result of superseding or intervening causes or were caused or contributed by the acts or omissions of others over whom this Defendant had no control.

11.     The principles of comparative fault shall apply to any and all claims of negligence made herein, and therefore the causal fault of others, including parties and non-parties, must be compared.

12.     In the event Plaintiff settles with any other named or formerly named Defendant or, if any other Defendant is otherwise dismissed or not a party at the time the jury begins deliberations, CEP hereby adopts and incorporates Plaintiff's allegations as to those defendants, and asserts comparative negligence based upon those allegations. CEP also asserts that K.S.A. § 40-3403(h) eliminates any "vicarious liability or responsibility" for the actions of other qualified health care providers.

13.     CEP specifically alleges that Plaintiff's claim for punitive damages against it must be dismissed.  There is no evidence that anyone from CEP expressly empowered to do so on behalf of CEP authorized or ratified the acts of Chambers-Daney.  See K.S.A. 60-3701.  Further, there is no conduct, act or omission by Chambers-Daney that supports a claim for punitive damages against her.  Plaintiff has failed to provide any evidence of grossly negligent, willful or wanton conduct by any defendant, let alone Chambers-Daney who timely saw D.M., provided treatment that improved his condition and then immediately admitted him to a tertiary medical center for evaluation by pediatric specialists.

14.     CEP adopts and incorporates the defenses of the co-defendants, consistent with its defenses herein.

### iv.     Defendants Jamie Borick, M.D., Connor Hartpence, M.D., and Stefanie White, M.D. assert the following defenses:

1.      Dr. Hartpence, Dr. White and Dr. Borick contend that all care provided by them to D.M. was reasonable, appropriate and consistent with the applicable standard of care.  They deny all allegations of negligence and fault asserted against them by Plaintiff.  Defendants deny that any alleged action or inaction on any of their parts was the proximate cause of the Plaintiff's alleged injuries or damages.  Specifically, under all of the circumstances existing, Dr. Hartpence, Dr. White and Dr. Borick acted reasonably in accepting the diagnosis of strep throat, which had been reached by two separate emergency departments and was supported by a positive swab test.  All medical decisions, including the decision to defer a neurological test, were reasonable in light of all of the circumstances existing.

2.      Dr. Hartpence, Dr. White and Dr. Borick contend that the medical care at issue in this case involves application of professional judgment and that the professional judgment doctrine is fully applicable, barring Plaintiff's cause of action, both as a matter of fact and as a matter of law.  This is also a medical situation in which more than one medical approach might have

been followed, and Plaintiff's purported cause of action is barred, both as a matter of fact and a matter of law, under the "two schools of thought" doctrine.

3.      Dr. Hartpence, Dr. White and Dr. Borick contend that Plaintiff's cause of action fails due to a lack of proximate cause.   Specifically, Plaintiff's evidence does not establish that had any of the defendants performed any additional testing it would have changed the outcome of the case.   More specifically, there is no evidence to support a conclusion that the type of brief neurological exam which might be performed on a child with strep throat would have resulted in findings leading to a different outcome.   Further, the evidence does not establish that any different actions which might have been taken by these defendants would have resulted in intervention occurring in time to change the outcome, even assuming the outcome could be changed.

4.      Dr. Hartpence, Dr. White and Dr. Borick allege that Plaintiff's expert testimony is insufficient to establish either the element of breach of duty or the element of causation under the facts of this case.

5.      Dr. Hartpence, Dr. White and Dr. Borick generally deny the nature and extent of Plaintiff's claimed damages.

6.      The principles of comparative fault apply to any and all allegations made by Plaintiff against any party and, therefore, the causal fault of other parties must be compared herein.

7.      In the event Plaintiff settles with any remaining co-defendants, or the co-defendants are otherwise not a party at the time the jury begins deliberations, Dr. Hartpence, Dr. White and Dr. Borick hereby adopt and incorporate Plaintiff's allegations as to those co-defendants and assert comparative negligence such that the negligence of all such actors must be compared herein.  The negligence of persons and corporate entities who have previously been dismissed from the case, for reasons of settlement or otherwise, must also be compared herein, based upon the expert disclosure statements and deposition testimony of Plaintiff's expert witnesses.

8.      Dr. Hartpence, Dr. White and Dr. Borick contend that this case is subject to all limitations upon recovery of damages recognized under Kansas law, including the cap on noneconomic damages in K.S.A. 60-19a02. Defendants specifically assert that K.S.A. 60-19a02 is constitutional and enforceable in this case.   Defendants note that the case of *Hilburn v. Enerpipe, Ltd.* was a non-medical malpractice lawsuit decided by a fractured court with no one opinion gaining a majority of votes.  As such, it is to be narrowly construed.  The controlling rationale is found in the concurring opinion.

9.      The Kansas Supreme Court has not, to this point, been asked to consider severing the portions of the statute found unconstitutional pursuant to the opinion of the concurring justice while leaving the substantive cap in

43

place.  Defendants allege that severance is possible and proper, and for this reason the cap remains constitutional and enforceable.

10.     The application of the cap on damages in K.S.A. 60-19a02 to medical malpractice cases is controlled by *Miller v. Johnson,* 295 Kan. 636, 289 P.3d 1098 (2012).  *Miller* was not expressly overruled by *Hilburn*.  Unique circumstances apply in medical malpractice cases, calling for separate consideration, which involves unique public policy considerations that have been the subject of a substantial statutory scheme.  Defendants assert that the cap on damages in K.S.A. 60-19a02 remains constitutional and enforceable in this medical malpractice case.

11.     In the alternative, if *Hilburn* is held applicable to medical malpractice cases, these Defendants assert that the decision should not apply retroactively to causes of action which had accrued prior to the date of the decision due to the medical community's reliance on K.S.A. 60-19a02, as upheld in *Miller*, and therefore *Hilburn* should not be applicable to this case.

12.     To the extent that Plaintiff has claimed medical expenses in this case, Defendants are entitled to any applicable credit, setoff, allowance, adjustment, accumulation for medical expenses that were credited, written off, otherwise extinguished or not chargeable to Plaintiff pursuant to any law, contract, code or regulation.  Further, evidence of medical bills and related charges, including future damages, should be limited to amounts actually

paid or to be paid, as opposed to any greater amount billed or to be billed but later written off or to be written off or otherwise not collected.

13.     Dr. Hartpence, Dr. White and Dr. Borick allege that the Affordable Care Act limits the costs of medical care that Plaintiff allegedly required and will require into the future, and thus should be considered when calculating Plaintiff's alleged entitlement to damages for medical expenses.

14.     If Plaintiff received any injury or damages as alleged by Plaintiff, which is denied, Defendants deny that Plaintiff can recover for any damages which were caused by preexisting conditions and other contributing factors that were not caused by the actions of these Defendants.

15.     Dr. Hartpence, Dr. White and Dr. Borick adopt and incorporate the defenses of the co-defendants, insofar as they are consistent with the defenses raised herein.

16.     Dr. Hartpence, Dr. White and Dr. Borick allege that Plaintiff's evidence does not support a claim for punitive damages.   There is no evidence before the Court to suggest willful or wanton conduct on the part of these Defendants.   Plaintiff's claim for punitive damages must be dismissed for this reason.   Defendants also allege and incorporate herein all of the arguments and authorities contained in their previous motion to dismiss the claim for punitive damages based upon failure to follow the requirements of Kansas law.   It is specifically alleged that the requirement of

45

Kansas law that Plaintiff obtain permission of Court, based upon affidavits, prior to asserting a punitive damage case constitutes a substantive right and Plaintiff's failure to follow these requirements precludes any claim for punitive damages.

**v.     Defendant Bala Bhaskar Reddy Bhimavarapu, M.D. asserts the following defenses:**

1.     Dr. Bala acted within the standard of an ordinary pediatric hospitalist concerning his limited involvement with D.M.;

2.     Dr. Bala's involvement with D.M. did not cause D.M.'s injuries/damages but, in fact, saved his life;

3.     KSA 60-258a is applicable.

4.     KSA 40-3403(h) bars any claim of Dr. Bala having vicarious liability or other responsibility of other health care providers;

5.     Should plaintiff dismiss any defendant and abandon claims asserted against same, Dr. Bala would incorporate plaintiff's claims of fault and evidence in support thereof as to any such defendant;

6.     D.M.'s injuries/damages are not of the nature or extent alleged;

7.     D.M.'s non-economic damages are subject to the applicable statutory cap.

8.     D.M.'s recoverable medical expenses, both past and future, should be limited to amounts paid or to be paid/payable.

9.      Dr. Bala adopts and incorporates the defenses of the co-defendants, consistent with its defenses herein.

**5.      DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

A.      D.M., currently 7 years old, has right sided paralysis, significant neurological deficits, permanent impaired eye movement, permanent difficulty swallowing and slowed speech, permanent truncal ataxia, swallow impediment, digestive/bowel impediment, pulmonary deficiencies, orthotic deficiencies, difficulty speaking and is unable to walk independently.

B.      D.M. has endured and will permanently continue to endure pain, suffering, disabilities, disfigurement and mental anguish.

C.      D.M. has lost future earning capacity, when reduced to present value, in the range of $1,424,348 to $3,199,325, depending upon the level of education that he would have completed.

D.      D.M.'s past economic damages to date total $436,932.10.

E.      D.M.'s future medical and medical-related expenses total $13,296,456.

F.      D.M.'s past non-economic damages to date total $5,000,000 to $10,000.000.

G.      D.M.'s future non-economic damages total $45,000,000 to $60,000,000.

H.      D.M. calculates punitive damages at $5,000,000 to punish and deter similar conduct.

I.   K.S.A. 60-19a02 does not apply to Plaintiff's claims because *Hilburn v. Enerpipe,* 443 P.3d 509 (Kan. 2019) was held to be unconstitutional by the Kansas Supreme Court.

**6.   AMENDMENTS TO PLEADINGS.**

Assuming the Court approves the pending Motion for Settlement and Dismissal with Defendants Wesley Medical Center, Lisa Judd, Via Christi Health Systems d/b/a Via Christi-St. Francis and Aaron Kent, Plaintiff will seek leave to amend the pleadings to remove reference to these settling Defendants in his pleadings and from the caption of this Pretrial Order.

**7.   DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by April 15, 2020.  By agreement of the parties and due to Plaintiff designating a rebuttal expert witness, the postponement of the deposition of Dr. Jennifer Finley due to a family member's medical emergency, and the need to depose D.M. closer to the time of trial, these depositions will be taken by the parties after the Court-ordered deadline for the completion of all discovery.  Dr. Paul Grabb's deposition will be taken on June 11, 2020. Dr. Jennifer Finley's deposition will be taken on June 5, 2020.  The parties will work together to find a mutually agreeable date to depose D.M. (1 hour in length) closer to the time of trial.  The parties reserve the right to depose any records custodian necessary to establish of documents that have been produced and to which the parties will not stipulate. Lastly, the Plaintiff continues to receive ongoing care so past medical and other expenses

are subject to supplementation as well as supplementation of the Dr. Roger Huckfeldt's life care plan. The parties agree that additional discovery will not interfere with briefing on dispositive motions. However, the parties request an extension of *Daubert* motions deadline to **June 15, 2020.**

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline for completion of discovery if all parties are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery. The parties reserve the right to take evidentiary depositions of witnesses and experts who cannot appear in person at the time of trial.

**8.     MOTIONS.**

    **a.     Pending Motions.**

        **i.     By Plaintiff**

        **ii.     By Defendants**

            (a)     Dr. Hartpence's Motion for Summary Judgment filed on April 23, 2020.

    **b.     Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

**Plaintiff**

49

(i)    Plaintiff intends to file various motions in limine and motions regarding the inadmissibility of certain expert testimony of the Defendants.

(ii)   Plaintiff also intends to file a motion to venue the case in Kansas City for trial.

**Defendants**

i.    Defendants will renew their Motion to Change Location of Trial to Wichita, Kansas.

ii.   Defendants will file Motions for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages.

iii.   Defendants will file *Daubert* motions.

iv.   One or more Defendants may file additional motions for summary judgment, in whole or in part.

v.    Motions in limine.

The dispositive-motion deadline, as established in the Court's Minute Entry order filed on March 23, 2020, is **May 15, 2020**.

The parties should follow the summary-judgment guidelines available on the court's website: http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf.

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

**c.**     **Motions Regarding Expert Testimony.**  All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than **June 15, 2020**.

**9.     TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **<u>January 11, 2021, at 9:00 a.m.</u>, in Kansas City, Kansas.**  This case will be tried by jury.  Trial is expected to take approximately four (4) to six (6) weeks. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

Defendants' Proposal: The parties shall provide opposing counsel with a good faith estimate of what witnesses will be called to testify on which dates seven (7) days prior to the start of trial.  This list shall be reasonably updated as changes occur.  A final and complete list of witnesses a party intends to call the next day of trial shall be provided to opposing counsel no later than the afternoon break of the preceding day of trial.  Plaintiff

51

proposes that the parties shall provide opposing counsel with a good faith estimate of what witnesses will be called to testify one (1) day prior to those witnesses being called to testify.

IT IS SO ORDERED.

Dated May 4, 2020.

s/ KENNETH G. GALE
Kenneth G. Gale
U.S. Magistrate Judge