Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY, KANSAS DIVISION

D.M., a minor, by and through   )
his next friend and natural     )
guardian, KELLI MORGAN,         )
                                )
          Plaintiff,            )
                                )
                                )
     vs.                        ) Case No. 2:18-CV-02158
                                )
                                )
WESLEY MEDICAL CENTER LLC d/b/a )
WESLEY MEDICAL CENTER-WOODLAWN; )
WESLEY WOODLAWN CAMPUS; BRIDGET )
GROVER, PA-C; DR. GREGORY       )
FAIMON; LISA JUDD, RN; VIA      )
CHRISTI HOSPITALS WICHITA,      )
INC.; JENNIFER CHAMBERS-DANEY,  )
ARNP; DR. BALA BHASKAR REDDY    )
BHIMAVARAPU; CEP AMERICA-KS     )
LLC; DR. CONNOR HARTPENCE; DR.  )
STEFANIE WHITE; DR. JAMIE       )
BORICK; and AARON KENT, RN,     )
                                )
          Defendants.           )
                                )

D E P O S I T I O N

   The videotape deposition of JENNIFER CHAMBERS DANEY,

ARNP taken on behalf of the Plaintiff pursuant to the

Federal Rules of Civil Procedure before:

      RICK J. FLORES, CSR
      KELLEY REPORTING ASSOCIATES, LTD.
      515 South Main, Suite 108
      Wichita, Kansas  67202

a Certified Shorthand Reporter of Kansas, at 1617 North

Waterfront Parkway, Suite 400, Wichita, Sedgwick County,

Kansas, on the 3rd day of January, 2019, at 10:08 a.m.

**EXHIBIT C**

### Page 66

1. alert and oriented?
2. MR. YOUNG: Object to form; it's
3. incomplete in isolating one item. Go ahead.
4. A. There's so many things that it could have --
5. I mean, that could have been different about
6. that situation.
7. Q. What things could have been different about
8. that situation?
9. MR. YOUNG: Other than many
10. things? Just do your best.
11. A. There's just -- I mean, the patient did not
12. present in a way that I felt needed an
13. emergency physician at that time. He was
14. sitting up in the chair. He was following
15. command. He was breathing on his own. His
16. vital signs were within normal limits. At
17. that time, there was nothing to see to
18. suggest. He wasn't vomiting during the
19. assessment.
20. Q. When did he last vomit?
21. A. I don't know. I don't know.
22. Q. All right. Let's try it one other way.
23. I understand that you didn't find
24. anything that morning in your opinion that
25. justified bringing an emergency room doctor

### Page 67

1. in. What I'm trying to ask you is the
2. opposite of that.
3. What would you have needed to find in
4. terms of alert and oriented that would have
5. warranted bringing a doctor, a physician in
6. at that point in time?
7. MR. YOUNG: Object to the form of
8. the question in isolating one out of a
9. thousand issues, but go ahead and try to
10. answer it, and you can give the same answer
11. if you want.
12. A. Again, to try to say of all the things that
13. you want me to say that he could have
14. presented with is huge. I mean, I don't know
15. how to answer that any differently than I
16. already have.
17. Q. So I take it that it's not possible for you
18. to answer or tell the jury what you would
19. have had to have found in terms of alert and
20. oriented that would have caused you to bring
21. a physician in?
22. MR. YOUNG: Object;
23. argumentative, asked and answered. We've
24. gone over this issue ten times and she's
25. given your answer. She's given you the

### Page 68

1. answer.
2. MR. KUCKELMAN: No, I haven't
3. received the answer.
4. MR. YOUNG: Yes, you had received
5. the answer.
6. MR. KUCKELMAN: No, she has
7. evaded answering the question.
8. MR. YOUNG: No, you just rephrase
9. it the way you want to rephrase it and ignore
10. other factors. She has answered your
11. question and you -- go ahead. Ask another
12. question.
13. MR. KUCKELMAN: There was a
14. question pending.
15. MR. YOUNG: Read the question
16. back, please, Rick.
17. (The requested portion of the record
18. was read by the reporter, as follows:
19. Question: "So I take it that it's not
20. possible for you to answer or tell the jury
21. what you would have had to have found in
22. terms of alert and oriented that would have
23. caused you to bring a physician in?")
24. MR. YOUNG: Same objections. And
25. your question is for -- to only talk about

### Page 69

1. alert and oriented.
2. MR. KUCKELMAN: Yes. Exactly.
3. A. If the patient hadn't have been able to hold
4. up his head, to open his mouth, to follow
5. command, to sit up in that chair, was limp, I
6. mean, any of those things and many others
7. would have caused me to get a doctor involved
8. sooner.
9. BY MR. KUCKELMAN:
10. Q. Why did you recommend admission of         ?
11. A. When the mom came in and told me that he
12. wasn't keeping his medications down, my first
13. thought was to get some labs, to give him
14. some fluids and Zofran, and bring him in for
15. the night to give him some more fluids, maybe
16. some IV antibiotics, 'cause he wasn't keeping
17. it down at home.
18. Q. So the purpose of your recommending admission
19. was to do labs, Zofran, fluids and IV
20. ant biotics?
21. MR. YOUNG: Object to form. Go
22. ahead.
23. A. Can you say your question one more time.
24. Q. Sure. So the reason you recommended
25. admission was to do labs, the Zofran, the

Page 70

1 fluids and the IV antibiotics?
2 A. Well, I did lab in the ER and gave some
3 fluids and some Zofran, and I just
4 recommended that he stay the night for some
5 more fluids, maybe some IV antibiotics, see
6 if we can get him feeling better.
7 Q. And did you recommend that he be admitted for
8 observation?
9 A. I did.
10 Q. What did you mean by observation?
11 A. Just to keep him in the hospital to where he
12 has an IV where we can give fluids if he
13 starts vomiting again, you know, maybe change
14 up the nausea medicine, further evaluation if
15 needed.
16 Q. Did you expect [redacted] to be observed in the
17 hospital after he was admitted?
18 A. I -- yes.
19 Q. Sorry?
20 A. Yes.
21 Q. And what would observation entail?
22 MR. YOUNG: Object to form.
23 MR. WOODING: Object to form;
24 foundation.
25 A. I admit the patient to the floor, and from

Page 71

1 there, the residents and the attending and
2 the nurses make -- do -- take over from
3 there. I'm not involved in that part.
4 Q. So your recommendation for admission for
5 observation was to get him into the hospital,
6 and then you expected others to take over and
7 decided what would be entailed by
8 observation?
9 A. Yes, sir.
10 Q. Did you have any -- at the time you
11 recommended he be admitted for observation,
12 did you have in mind any sort of specific
13 observation you wanted?
14 MR. DAY: Object to form.
15 MR. WOODING: Join.
16 MR. DAY: Foundation.
17 MR. YOUNG: Same objection.
18 A. No. I called the resident and asked that he
19 come in for fluids.
20 BY MR. KUCKELMAN:
21 Q. You called and asked the resident -- I'm
22 sorry. I didn't catch the rest of that.
23 A. To be admitted for fluids, you know, for
24 fluid resuscitation and some nausea medicine.
25 Q. So you knew that [redacted] had nausea?

Page 72

1 A. Yes, that's why he came in was nausea and
2 vomiting.
3 Q. And headache?
4 MR. YOUNG: Object to form;
5 mischaracterization.
6 MR. WOODING: Asked and answered,
7 too.
8 A. What I remember is that he had some strep
9 throat, nausea and vomiting. That's what I
10 remember.
11 Q. So you weren't aware that he had a headache?
12 MR. YOUNG: Object to form;
13 assumes facts not in evidence. Go ahead.
14 A. I don't know if that's -- is it in my chart?
15 MR. YOUNG: No.
16 A. Yeah, then I don't remember that part. I
17 don't remember charting a headache.
18 MR. GRIBBLE: What was the
19 statement? I didn't hear you.
20 MR. YOUNG: I don't recall
21 charting a headache. It is? Which page?
22 MR. GRIBBLE: Six. I don't know
23 if she charted it.
24 MR. KUCKELMAN: What's that?
25 MR. GRIBBLE: At the top,

Page 73

1 associated diagnoses.
2 MR. KUCKELMAN: Yeah, it's under
3 the impression and plan.
4 MR. YOUNG: Well, yeah, she
5 hadn't been asked about that.
6 BY MR. KUCKELMAN:
7 Q. If we go to Page 10, do you see your
8 impression and plan there?
9 MR. YOUNG: Object to form;
10 assumes facts not in evidence.
11 A. I'm on Page 10 of the impression and plan.
12 Q. What did you have as your impression and
13 plan?
14 MR. YOUNG: Object to form.
15 A. Give me just a moment here. Okay. So, well,
16 it's in the chart under impression and plan:
17 Headache, vomiting, strep throat.
18 Q. So you did know or you were aware he had a
19 headache; correct?
20 MR. YOUNG: Object to form. Go
21 ahead.
22 A. It's in here. I don't remember talking about
23 that with mom.
24 Q. This is your charting, though; correct?
25 A. This is my chart.

Page 82

1  severity?  I mean, he may have had a
2  headache, but he had vomiting and strep --
3  and painful red throat, I mean --
4  Q.  I take it from your answer that the headache
5  could have been consistent with strep.
6      Is that what your point is?
7  A.  Very much so.
8  Q.  And what I'm asking you is would you have
9  asked any followup questions with regard to
10  severity in order to rule it in or out as
11  being associated with strep as opposed to
12  some other pathology?
13  A.  When I remember seeing him, I wasn't thinking
14  of some other pathology in regard to a
15  headache.
16  Q.  Well, is that because in this case you fell
17  in a trap of just assuming that it was strep
18  because he had been diagnosed previously with
19  strep?
20      MR. YOUNG:  Object to form;
21  argumentative, asked and answered.  Go ahead.
22  A.  Mom said he had strep, but he also had this
23  vomiting that -- so he wasn't able to keep
24  his meds down.  So I was thinking about that
25  plus his -- like check his labs, make sure he

Page 83

1  wasn't too dehydrated, make sure his kidney
2  function was okay.  I was thinking about
3  multiple other things.
4  Q.  So you were thinking of dehydration as --
5  secondary to the vomiting; correct?
6  A.  I was thinking about that.
7  Q.  And you were thinking about strep and what
8  else did you say you were thinking about?
9      MR. YOUNG:  Kidney function.
10  BY MR. KUCKELMAN:
11  Q.  You said kidney function?
12  A.  Yes.
13  Q.  Anything else?
14  A.  That he wasn't keeping his medications down,
15  so if he needed antibiotics for strep, then
16  he wasn't going to get better without that.
17  That's what I remember thinking about.
18  Q.  Now in regard to the headache, if you had
19  asked about the severity, do you sometimes
20  use a scale of 0 to 10 or how do you ask
21  about severity of headache?
22      MR. YOUNG:  Object to form.
23  BY MR. KUCKELMAN:
24  Q.  If you were to ask -- if you were to have
25  asked?

Page 84

1  A.  Well, you ask people what their pain is on a
2  scale of 0 to 10.
3  Q.  And why -- why is that important?
4  A.  It's part of the vital signs, patient's pain.
5  Q.  If you had asked on a scale of 0 to 10 and
6      's mother had described that she had to
7  take him out of church because he was
8  screaming so loud due to a headache, would
9  that have made a difference?
10      MR. YOUNG:  Object to form;
11  foundation.  Go ahead.
12  A.  That information was not given to me that I
13  recall, and if she had said that, I'd imagine
14  I would have -- I would have gone and gotten
15  a doctor involved.
16  Q.  All right.  So had you been aware that the --
17      VIDEOGRAPHER:  Can we take a
18  short break?
19      MR. KUCKELMAN:  Yeah.  Sure.
20      VIDEOGRAPHER:  Off the record
21  11:59.
22      (A recess was taken from 11:59 a.m. to
23  1:01 p.m.)
24      VIDEOGRAPHER:  Back on the record
25  at 1:01 p.m.

Page 85

1  BY MR. KUCKELMAN:
2  Q.  Do you know Dr. Hartpence?
3  A.  Yes.
4  Q.  Did you -- were you aware that he also
5  examined      the same morning that you
6  did?
7  A.  I remember two residents came down.  I think
8  it was Hartpence and White.
9  Q.  Okay.  If we look at your record starting on
10  Page 6, I think, we established that if you
11  see the service date and time, does that mean
12  the date and time that you saw      ?
13      MR. YOUNG:  Which time are you
14  referencing?  'Cause there's different times
15  on here.
16      MR. KUCKELMAN:  I was asking
17  about the service date/time.
18      MR. YOUNG:  Okay.  I gotcha'.
19  A.  Was that -- I'm sorry.  What was the question
20  again?
21  BY MR. KUCKELMAN:
22  Q.  Is the service date/time, does that mean the
23  day and the time that you had your encounter
24  with      ?
25  A.  It would have been the day, but I don't know

Page 86

    1        about like that was the exact time I
    2        encountered him.  I saw him in triage and
    3        then in the room and so I'm not for sure.
    4   Q.   Do you know what that refers to when it says
    5        March 6, 2017, 4:48 central standard time?
    6   A.   I don't know if that's when I started my
    7        chart or when I saw -- I mean, I don't know
    8        so -- the date would be for sure, but the
    9        time exactly I --
   10   Q.   Well, do you know what time you saw ▮?
   11   A.   I don't remember.  I mean, I remember it was
   12        in the middle of the night.
   13   Q.   If you go to Page 15, and if you look towards
   14        the back, I think, you'll see this is signed
   15        by Dr. Hartpence.  It's his charting.
   16   A.   Okay.
   17   Q.   Is that correct?  Page 18, I think, you'll
   18        see signature?
   19   A.   I see that's who it's signed by, yeah.
   20   Q.   All right.  If we go to the start of
   21        Dr. Hartpence' record, which is on Page 15,
   22        do you see the service date and time for him?
   23   A.   I see it.
   24   Q.   And the two of you, if these times are
   25        correct, saw ▮ within 30 minutes of each

Page 87

    1        other; correct?
    2             MR. YOUNG:  Object.  She didn't
    3        say that's when she saw the patient so you're
    4        assuming facts not into evidence.
    5   A.   I wouldn't say it was within 30 minutes.  I
    6        remember seeing the patient in triage and
    7        then he went to the room.  We did some lab
    8        work.  I mean, I don't believe it would have
    9        been 30 minutes, but I don't know for sure.
   10   Q.   Well, if we look at the times on these two
   11        charts, if you look at yours, yours is timed
   12        at 4:48; correct?
   13   A.   We --
   14   Q.   On Page 6.
   15             MR. YOUNG:  Object; asked and
   16        answered.
   17   A.   Page 6 service date and time 3-6-17, 0448,
   18        yes.
   19   Q.   4:48; correct?
   20   A.   0448.
   21   Q.   And then if you look at Page 15, if that time
   22        is accurate for Dr. Hartpence, it would be at
   23        5:18 central standard time; correct?
   24   A.   That's what's noted here.
   25   Q.   And if these two times have any correlation

Page 88

    1        to when you each saw the patient, you would
    2        have seen him within 30 minutes of each
    3        other; correct?
    4             MR. YOUNG:  Object to form;
    5        assumes facts not into evidence, asked and
    6        answered.  Go ahead.
    7   A.   I just said that.  I don't believe it was 30
    8        minutes.  I don't know what that time means
    9        on there.
   10   Q.   Well, how far apart do you think that you and
   11        Dr. Hartpence saw ▮?
   12             MR. YOUNG:  Object.  She's
   13        already said multiples times she saw the
   14        patient, so which time are you asking?
   15   A.   I don't know how to answer you.  I don't know
   16        what this time means.  I saw him sometime in
   17        the night, I remember that.  I don't believe
   18        it was 30 minutes.  I'm sure it was a little
   19        longer than that.
   20   Q.   If you go to Dr. Hartpence' note, do you see
   21        his history of present -- present illness?
   22   A.   I see that.
   23   Q.   If you go down, oh, it'd be about the third
   24        line up, it starts with the "on Sunday," do
   25        you see that?

Page 89

    1   A.   On --
    2   Q.   History of present illness.  Go from -- start
    3        at the bottom of this history of present
    4        illness, go up to the fourth line from the
    5        bottom, and he starts the sentence with "on
    6        Sunday"?
    7   A.   Starts with on Sunday.  "On Sunday, patient
    8        complained of", yes, I see this.
    9   Q.   Do you see he charted headache?
   10   A.   I see that was charted.
   11   Q.   And he charted dizziness?
   12   A.   I see that was charted.
   13   Q.   And worsening nausea; correct?
   14   A.   I see that is charted.
   15   Q.   And several episodes of emesis, as well;
   16        correct?
   17   A.   Correct.
   18   Q.   And I think we covered headache.  That you
   19        weren't -- as far as sitting here now, you
   20        don't know of the headache; correct?
   21             MR. YOUNG:  Object; asked and
   22        answered.
   23   A.   I don't remember her telling me anything
   24        about a headache.
   25   Q.   How about the dizziness, were you aware

## Page 150

1  time you took care of him?
2  A. No.
3  Q. Under -- on Page 8, under differential
4     diagnosis, and you were asked questions about
5     this, those, I guess, five different
6     categories, those are things you selected or
7     typed in; correct?
8  A. That's correct.
9  Q. And I'm not going to go through all of it,
10    but you were asked various -- well, let me
11    back up.
12       Did you see ▓▓▓ more than one time
13    while he was in the emergency room that day?
14 A. Yes.
15 Q. How many times?
16 A. At least two, probably three.
17 Q. And to your understanding, did he see nurses
18    while he was there?
19 A. Yes, sir.
20 Q. I think we know from testimony and the
21    records that he saw Aaron Kent in triage?
22 A. Aaron in triage.
23 Q. And then he saw Willow --
24 A. Summer, Summer Whillock.
25 Q. Summer Whillock after that; correct?

## Page 151

1  A. Yes.
2  Q. In your experience, if the nurse sees a
3     change or sees anything concerning about the
4     patient, do they come talk to you?
5  A. Yes.
6  Q. So there would have been multiple
7     interactions with ▓▓▓ and his mother from
8     different people; correct?
9  A. Yes.
10 Q. And these other people create their own
11    charting for when they're -- when they see
12    the patient; right?
13 A. That's right.
14 Q. All right. You weren't asked any questions
15    about that, but we -- it would be in the
16    chart somewhere; right?
17 A. Yes, sir.
18 Q. All right. Then when you go through your
19    assessment of the patient, you do a review of
20    systems of all systems; correct?
21 A. Yes.
22 Q. Overall?
23 A. Yes.
24 Q. Then you do an exam based on what all you
25    found, and there's a section within there;

## Page 152

1  correct?
2  A. Yes, sir.
3  Q. You made several orders in the emergency
4     room. Tell us what the orders were.
5  A. I ordered lab work, CBC, CMP, and I ordered
6     normal saline and some Zofran.
7  Q. And then the records will show what the lab
8     results were; correct?
9  A. That's correct.
10 Q. Now they also show when the labs were ordered
11    and when the fluids and Zofran was ordered.
12       Does that help you estimate at all
13    when you would have seen the patient?
14 A. Yes.
15 Q. And tell us about that.
16 A. I would have gone and seen the patient and
17    then came back and sat down and immediately
18    placed the orders before I started a chart.
19 Q. I'll ask you to assume that in Mrs. Morgan's
20    deposition, she testified that after ▓▓▓
21    received fluids in the emergency room, he
22    seemed to improve; okay?
23 A. Okay.
24 Q. Just ask you to assume that's true.
25       Is there anything in your recollection

## Page 153

1  or your charting that indicated that he
2  didn't improve while he was in the emergency
3  room?
4  A. No. I remember when I went back to see the
5     mom to tell her that they were admitted that
6     the child was sleeping and not vomiting.
7        MR. YOUNG: That's all I have.
8     Thank you.
9        REDIRECT EXAMINATION
10 BY MR. KUCKELMAN:
11 Q. I have just a few followup questions, please.
12    If you could go to Exhibit 30, Page 31,
13    please. Let me know when you're there.
14 A. I'm there.
15 Q. Mr. Gribble asked you some questions. I want
16    to go through -- just use Page 31 as an
17    example.
18       Let's start with this first one, he
19    asked you about wearing casual clothing off
20    duty.
21       Do you equate wearing casual clothing
22    off duty with saying things such as "the only
23    patient satisfaction question that matters,
24    did you die?"
25       Do you equate those two?