# James Mathews, MD
♦♦♦

Phone: ▮▮▮▮  ♦  Fax: ▮▮▮▮  ♦  Email: ▮▮▮▮

July 23, 2019

Dear Mr. Giroux,

Thanks for allowing to review this case. Pursuant to your request, I have reviewed the following records, documents and depositions in formulating my opinions regarding the care and treatment provided to ▮▮▮▮ at both emergency room visits in March of 2017: Wesley Medical Center-Woodlawn Records for March 5, 2017; Via Christi St. Francis emergency care records and hospitalization records starting March 6th; Depositions of Dr. Gregory Faimon; PA Bridget Grover, Nurse Lisa Judd, Nurse Stacy Harding, Nurse Practitioner Jennifer Daney Chambers, Nurse Summer Whillock, Nurse Kent, Kelli Morgan and Jennifer Knight. In addition, I have reviewed various policies from Wesley Medical Center and Via Christi St. Francis, audit trail records and depositions regarding the audit trail. Based on these materials, I have formulated opinions to a reasonable degree of medical certainty regarding the standard of care regarding the care provided to ▮▮▮▮ while at both emergency rooms and EMTALA violations. I reserve the right to modify these opinions upon receipt of additional information. Before addressing my opinions, let me discuss my qualifications.

I am a board-certified emergency medicine physician licensed to practice medicine in the State of Illinois. Prior to March 2017, I spent a majority of my professional time providing direct care to patients in the emergency room. Currently, I provide emergency medicine services as a staff physician at Northwestern Memorial Hospital in Chicago, Illinois. I am Professor Emeritus of Emergency Medicine in the Department of Emergency Medicine at Northwestern University Feinberg School of Medicine. I also have lectured and published numerous publications in the field of emergency medicine during my career. Over the years, I have worked with numerous mid-level practitioners and am familiar with the standard of care as applied to both physician assistants, nurse practitioners and respective supervising physicians. Furthermore, I have considerable clinical experience in the care and treatment of pediatric patients who present to the emergency room with complaints similar to ▮▮▮▮'s.

According to the Wesley Medical Center Woodlawn (Wesley) records, ▮▮▮▮ first presented to the emergency room 18:19 with complaints of headache and nausea. During

**EXHIBIT E**

triage assessment, it was noted that he had "current symptoms" of new onset headache, nausea 2 days in duration, dizziness and "unbalance" for 2 days duration. ▊'s weight was recorded as 18.6 kg. It was also noted that his "throat was red other day", that he was afebrile, and his father had a history of migraines. He had no surgical history and his vital signs were as follows: 97.2 t, 98% O2 Sats, 85 HR and RR of 18. No blood pressures were taken at any point during this emergency room admission and no discharge vital signs were taken. Upon completion of triage, ▊ was taken to an exam room at approximately 18:28. He was triage as a priority level "4" or "semi-urgent" according to records and deposition testimony of the providers.

The nurse notes that ▊ was nauseated on Friday and Saturday but that it went away upon eating. On Sunday morning (date of ER visit, 3/5/2017), he woke up and ate so that he would not get nauseated. His mother, Kelli, denied emesis and further noted he was afebrile, had no ear complaints, no cough, no cold symptoms and his throat "might be red." Mother further stated that "today at church he wasn't able to staple something because they wouldn't let him, and he got a headache. She also states he is dizzy. No other complaints." According to the depositions of Kelli Morgan and Jennifer White, ▊ had a significant new onset headache that began while ▊ and his family were attending church services. Jennifer Knight described a sudden severe headache that made ▊ cry out in pain causing concern for both her and the other children.

According to the nursing notes, ▊ did not have fever in the past seven days; no sore throat in the past seven days; no fatigue in the past seven days; no body aches in the past seven days, and; no congestion in the past seven days. At approximately 18:32, ▊ was examined by PA Bridget Grover. According to her record, ▊'s chief complaint was "headache, sore throat" which contradicts the nurse's earlier finding of no sore throat over the past seven days. Bridget Grover further reports "fever" in the review of systems which further contradicts the nurse notes. According to the PA's note, ▊ presented "complaining of headache along with a sore throat over the past 24 hours. Had one bout of vomiting today … He has increased fatigue today…" The Focused Review of Systems note "fever, irritability", "sore throat" but denies "dizziness" which are in contradiction to the nurse's notes. It is unclear why there are so many discrepancies between the nurse charting and PA charting, but the deposition testimony of key witnesses provides an explanation which in my opinion played a critical role in substandard care provided to ▊ while at Wesley.

In the depositions of Bridget Grover and Dr. Faimon, both testified they did not review the nursing notes because the notes are typically not available. With regard to the handwritten triage form, both Grover and Faimon testified they did not have access to this form, but Nelda Appell testified the triage form was available. Dr. Faimon further testified that he does not require his PA to review nursing notes. Although Faimon testified that Nurse Judd is an excellent nurse, he failed to review her notes which provided important information regarding ▊'s presentation and history. Based on the records provided and deposition testimony, it appears the nursing notes were made contemporaneous with the care provided but Grover's charting was not completed until much later after discharge. In the deposition of Nelda Appell,

PA Grover did not complete her charting until 21:54 that evening even though ▮▮▮▮▮ was discharged at 19:06. In an emergency room setting, it is critical to have as much information as possible in order to formulate a differential and arrive at a proper diagnosis. The triage of a patient is a very important aspect of any patient's care and treatment and assists with a proper medical screening of a patient who may have a life-threatening condition requiring stabilization and diagnosis. Emergency room nursing notes play a vital role in an ED provider's decision making as they provide important history and clinical information about the patient's presentation and history of symptoms. If indeed PA Grover and Dr. Faimon did not have access to nursing notes and triage forms or just failed to review the complete record, it would impact the quality of care delivered to the patient. If the nursing notes were not available for review, then Wesley is responsible for providing an inadequate and substandard medical record system. If PA Grover and Dr. Faimon had access to the nursing notes but just failed to review, that would be a deviation from the standard of case. Regardless, there was a breakdown in communication, among other issues discussed in this report, that led to the premature discharge of the patient and misdiagnosis.

According to the Wesley record, ▮▮▮▮▮ was diagnosed with strep pharyngitis, which is a common childhood illness, but ▮▮▮▮▮'s presentation suggested other more ominous diagnoses that were not considered by either Grover or Faimon. In a typical strep case involving a child, you can expect to sore throat, fever, headache and nausea. However, ▮▮▮▮▮ presented with a constellation of signs and symptoms that mandated further testing, observation and neurological consultation. In a child who presents with acute onset headache, nausea, dizziness and unbalance with no fever, an intra-cranial process must be considered. In ▮▮▮▮▮'s care, he was examined, a rapid strep test was performed, and a diagnosis was made in 47 minutes (18:19 to 19:06) and then he was discharged. In review of the medical record, there was no follow-up by either Grover or Faimon about the headache, dizziness and unbalance. Furthermore, there was no concern by either Grover or Faimon whether ▮▮▮▮▮ could tolerate fluids despite history of nausea and vomiting while in the emergency room.

Both Faimon and Grover downplayed the importance of the headache, dizziness and unbalance in their deposition testimony. Both ignored the constellation of symptoms as noted in the chart by nurses. Faimon testified that dizziness and unbalance are vague symptoms. Grover testified that dizziness and unbalance were not present when she examined the child, so it did not play a role in her evaluation. Yet, Grover testified that "fever" played a role in her evaluation, but fever was never recorded during this visit or any subsequent visit. Grover was the only provider at both emergency room visits that notes fever.

Based on the medical records and deposition testimony, ▮▮▮▮▮ was an ill child when he presented to the Wesley emergency room. Any pediatric patient who presents with acute onset headache, dizziness, unbalance, nausea and subsequent vomiting, requires a full set of vital signs, including a blood pressure, at both admission and discharge. Later records revealed that ▮▮▮▮▮ consistently had elevated systolic readings which, along with his symptoms, would suggest an intra-cranial pathology including elevated pressures, tumor, hemorrhage, stroke, etc. There is no documentation by Grover about ▮▮▮▮▮'s neurological status as it relates to his dizziness and

unbalance. Grover testified she didn't recall whether she had him stand, walk or observe his gait and there is no documentation to suggest she had him perform these basic tasks. Kelli Morgan testified that she held ▓▓▓ during the entire examination by Grover. Furthermore, there is no documentation that Grover considered any other diagnoses or established a differential. There is no documentation by Grover that would indicate she asked additional questions about ▓▓▓'s presenting symptoms of headache, unbalance and dizziness. Consequently, this led to a substandard history, review of systems and physical examination by Grover.

It is my opinion to a reasonable degree of medical certainty that ▓▓▓ did not receive a proper medical screening under EMTALA for the aforementioned reasons. The standard of care required Faimon and Grover to review the nursing notes and press Kelli Morgan or ▓▓▓ for more information regarding the headache, nausea, vomiting, dizziness and unbalance. The standard of care required that a blood pressure to be taken considering ▓▓▓'s presentation. While I agree a blood pressure reading is not always taken, in this clinical presentation it was mandated. Grover and Faimon deviated from the standard of care for discharging ▓▓▓ without determining whether he could tolerate fluids. Grover and Faimon also deviated from the standard of care for not ordering neurologic imaging and a neurological consultation. Both providers took substandard approaches in providing care to ▓▓▓ by ignoring critical information charted by the triage team and Nurse Judd. It is clear ▓▓▓ should have been triage at a higher acuity level and he should have been seen in person by Dr. Faimon. Lastly, Dr. Faimon deviated from the standard of care for improperly supervising PA Grover and for not doing a complete review of ▓▓▓'s chart before signing off at 22:15. Based on the audit trail and the testimony of Nelda Appell, he accessed the records for about a minute to review ▓▓▓'s chart.

For the aforementioned reasons, I believe that Dr. Faimon and PA Grover deviated from the standard of care for the following reasons: Failing to perform a proper medical screening for purposes of EMTALA; failing to performed a proper history and physical examination; failing to consider a differential diagnoses that considered intra-cranial process such as elevated pressures, hemorrhage, stroke, etc.; failing to review the nursing documentation including the triage form; failing to order neurologic imaging (i.e. CT Scan); failing to obtain a neurological consultation, and; failing to observe ▓▓▓ for a longer period of time to insure he could tolerate fluids. To a reasonable degree of medical certainty, this would have led to the diagnosis of the tumor as well as the elevated intra-cranial pressures.

▓▓▓ next presented to the emergency room Via Christi Hospital St Francis at approximately 02:22 on March 6, 2017 according to the registration documentation. Several minutes later, ▓▓▓ was triaged by Nurse Kent with a chief complaint of "nausea and vomiting, was just diagnosed with strep tonight at Wesley, mom concerned unable to keep meds down to treat it." Upon triage his vitals were: 97.7 t, 124/69 b/p, 93 p and 20 rr. His O2 sats were 97% and his pain was 0 using FACES pain scale. He was alert and oriented but sleepy according to Nurse Kent. It appears that ▓▓▓ is triaged again at 04:30 by Nurse Whillock. At that time, no additional history is gathered by Nurse Whillock. At approximately 04:48, ▓▓▓ is seen by Jennifer Chambers Daney APRN.

NP Daney obtains a history of present illness revealing that patient had "sore throat" for unknown time and that his sister had her tonsils removed and mom was worried ▇ was afraid to tell her because he might need his tonsils removed as well. Furthermore, NP Daney notes that "SEEN AT WESLEY THIS EVE 6 PM DX STREP. PT SENT HOME AND THEN MOM STATES HE HAS BEEN VOMITING EVERY HOUR AND NOT ABLE TO KEEP DOWN PAIN MEDS. The onset was unknown. The course/duration is constant. Review of symptoms revealed no fever, no rash, sore throat, no shortness of breath, no chest pain and vomiting. Physical exam reveals 67 p, 16 rr and 124/69 bp- consistent with the development of Cushing Triad. In physical assessment, NP Daney notes alert, no acute distress and ill appearing with no other significant findings. However, ▇ is noted to be "SLEEPY" under the neurological assessment. No neurological examination is noted by any provider within the Via Christi ED admission. A differential is established of "viral pharyngitis, streptococcal pharyngitis, viral syndrome, upper respiratory infection and FAILED OUT PATIENT." Labs revealed 93% neutrophils and wbc of 21.6. IV is placed and fluid bolus and ondansetron are ordered, and acetaminophen is orally administered. According to ▇'s record, the impression diagnoses is "headache, vomiting, strep throat." There is no follow up by the ED noted and the patient is admitted to the hospital around 05:00 for observation.

While at the Via Christi ED, no history is obtained about ▇'s prior ED visit to Wesley or follow-up on complaints of headache noted by NP Daney. Nurse Kent testified it was the floor nurse's (Nurse Whillock) responsibility to gather a more thorough history but Nurse Whillock testified it was Nurse Kent's responsibility. Nurse Whillock actually testified that is was not relevant. Regardless, the standard of care required all providers (nurses and NP Daney) to gather the relevant history so that relevant medical decision making can occur as to the cause of the patient's complaints. The providers all failed in that respect. Nurse Kent, Nurse Whillock and NP Daney should have learned more about the prior ED admission and more about the patient's complaints. In light of the history gathered by resident Dr. Hartpence's, there is no reason why any of the providers could not have gathered the same, if not, more information had questions been asked.

By the time ▇ presented to the Via Christi ED, he arguably had a mental altered status as documented by the ED providers, his previous ED admission and vital signs. He was sleepy and "ill appearing" according to NP Daney. Contrary to deposition testimony, I don't think you could argue that ▇ was just sleepy because he had not slept. Frankly, that fact should never prevent the ED provider from doing a neurological examination. In ▇'s presentation and workup at Via Christi, all signs were pointing to a more emergent life-threatening diagnoses such as an intra-cranial process like elevated pressures, mass, hemorrhage, etc. ▇'s presentation was clearly not consistent with strep pharyngitis and his symptoms required NP Daney to consider alternative etiologies.

For the aforementioned reasons, it is my opinion to a reasonable degree of medical certainty that NP Daney deviated from the standard of care for the following reasons: failing to obtain a complete history and learning more from the prior ED admission and the patient's complaints; failing to obtain emergent neurologic imaging such as a CT scan to rule other intra

cranial processes; failing to obtain a neurologic consultation; failing to perform an adequate and standard physical examination including a neurological examination.

For the reasons stated herein, I believe that had the ED providers provided the requisite level of care, a diagnosis would have been made and with proper care and treatment the stroke would not have occurred.

Thanks for the opportunity to review this case and please contact me with any question or concerns.

*[signature]*, MD

James Mathews, MD