## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **D.M., a minor by and through his next friend and natural guardian, KELLI MORGAN,** | ) ) ) | |
| **Plaintiff,** | ) ) | **CIVIL ACTION** |
| **v.** | ) ) | **No. 18-2158-KHV** |
| **WESLEY MEDICAL CENTER, LLC d/b/a WESLEY MEDICAL CENTER-WOODLAWN, et al.,** | ) ) ) ) | |
| **Defendants.** | ) ) ) | |

_____

## MEMORANDUM AND ORDER

On September 11, 2018, D.M., a minor by and through his next friend, Kelli Morgan, filed an amended complaint against Wesley Medical Center, LLC d/b/a Wesley Medical Center-Woodlawn, Wesley-Woodlawn Campus, Lisa Judd, RN, Via Christi Hospitals Wichita, Inc. d/b/a Via Christi-St. Francis, Aaron Kent, RN, Bridget Grover, PA-C, Dr. Gregory Faimon, Jennifer Chambers-Daney, ARNP, Dr. Bala Bhaskar Reddy Bhimavarapu, CEP America-KS LLC, Dr. Connor Hartpence, Dr. Stefanie White and Dr. Jamie Borick, alleging that defendants' medical malpractice caused him paralysis, neurological damage and other permanent injuries.  First Amended Complaint (Doc. #121); see Pretrial Order (Doc. #435) filed May 4, 2020.  This matter is before the Court on the Motion For Summary Judgment By Connor Hartpence, M.D. (Doc. #430) filed April 23, 2020.  For reasons stated below, the Court overrules Dr. Hartpence's motion.

**Factual Background**

The following facts are uncontroverted or, where controverted, viewed in the light most favorable to plaintiff.

On March 5, 2017 at 6:19 P.M., Kelli and Kevin Morgan brought plaintiff, their five-year-old son, to the Wesley Medical Center emergency room because of headaches, a sore throat, vomiting, fatigue and abdominal pain.  Wesley Medical Center diagnosed plaintiff with strep throat and at 7:03 P.M., discharged him.

In March of 2017, Dr. Hartpence ("defendant") was a first-year family practice resident on the pediatric floor of Via Christi-St. Francis Medical Center.  As a first-year resident, defendant was part of a team that included a senior resident, Dr. White, and an attending physician, Dr. Bala.  Defendant's responsibilities included accepting admissions from the emergency department.  The residency program maintained a practice whereby the attending physician called the senior resident to report that a patient needed admission.  The senior resident then called the first-year resident and briefly described the case.  At that point, the first-year resident conducted the patient's history and physical examination.  After completing the exam, the first-year resident created an assessment and plan, and spoke with the senior resident.  The senior resident conducted her own evaluation of the patient, and the two residents discussed the case.  The first-year resident then contacted the attending physician.

At 2:31 A.M. on March 6, 2017—approximately seven and a half hours after leaving Wesley Medical Center—Kelli and Kevin Morgan took plaintiff to Via Christi.  Via Christi's documentation listed plaintiff's symptoms as follows: "nausea and vomiting, was just diagnosed with strep tonight at [W]esley, mom concerned unable to keep meds down to treat it."  Emergency

Documentation (Doc. #431-3) at 1.  The emergency room provider listed the "Impression" as headache, vomiting and strep throat.  Id. at 5.

As the junior resident on the pediatrics floor, defendant went to the emergency room to begin plaintiff's admission process.  When he entered, plaintiff was asleep.  Although plaintiff would occasionally arouse and moved his extremities in response to touch, defendant does not remember that plaintiff ever fully woke up while he was in the room.  Defendant was aware that hours earlier, plaintiff had been to Wesley Medical Center, and received a diagnosis of strep throat. Kelli Morgan specifically informed defendant that she had taken plaintiff to Wesley Medical Center because plaintiff was experiencing "really severe" headaches, nausea and vomiting.  Kelli Morgan Deposition (Doc. #436-5) at 45–46.  She also told defendant that since their visit to Wesley Medical Center, she had noticed that plaintiff was "rolling his eyes into the back of his head and [was] really weak and lethargic," and that as they approached the Via Christi emergency room, plaintiff's symptoms had gotten worse.  Id.  She noticed that his eyes would not shut—they "were like half shut while he was asleep," and they appeared to be "protruding."  Id.  When he examined plaintiff, defendant did not know whether Wesley Medical Center had performed a full neurologic examination of plaintiff, other than a Glasgow Coma Scale.[1]  Defendant specifically testified that "[o]ther than a general assessment of the child, I don't know that a full neurological exam was done."  Hartpence Deposition (Doc. #436-2) at 13.

Defendant estimates that he spent 15 to 20 minutes taking plaintiff's history and another five minutes conducting an examination.  He recorded that plaintiff had two emergency room admissions, a headache, vomiting, nausea, dizziness and decreased appetite.  Defendant believed that plaintiff appeared well-hydrated, and "just looked like a kiddo that was exhausted after being

---

[1]         The parties do not explain what a Glasgow Coma Scale is.

awake all night." Id. at 12. Given the circumstances, defendant did not establish or communicate a differential diagnosis, and he deferred doing the neurological portion of the physical exam. In that regard, he reasoned as follows: "we, ideally, for completeness sake would have wanted to do, at least, a general overview neurologic exam. And since he was sleeping, I didn't—I thought it would be cruel to wake up a sleeping kid who had been awake at night—to wake him up just for the sake of completeness." Id. at 23.

After defendant finished his examination and spoke with the senior resident, he called Dr. Bala, which marked the end of defendant's involvement with plaintiff. According to defendant, "the plan was to – a PO challenge in the morning, and if he did well with it and tolerated antibiotics, then he could likely go home later that day." Id. at 26.

At 10:00 A.M. on March 6, 2017—approximately eight hours after he arrived at Via Christi—Via Christi called a code blue for plaintiff. Subsequent examination showed a mass in his brain. Plaintiff alleges that he suffered a catastrophic stroke which caused paralysis, neurological damage and other permanent injuries.

Plaintiff and defendant each designated an expert to testify to whether defendant violated the applicable standard of care. Plaintiff's expert, Dr. Robert Dabrow, stated in his report that "it is my opinion to a reasonable degree of medical certainty" that defendant "deviated from the standard of care."[2] Dabrow Report (Doc. #436-6) at 4; see id. at 8 (discussing defendant's particular failures); see also id. at 11 (opinions are "held to a reasonable degree of medical

---

[2]    Defendant suggests that the Court cannot consider the opinions in Dr. Dabrow's report because his deposition testimony "did not constitute an endorsement of those opinions, or provide the foundation necessary for their admission." See Memorandum Reply In Support Of Motion For Summary Judgment By Connor Hartpence, M.D. (Doc. #456) at 6. Defendant does not elaborate on the basis for this objection. In any event, defendant's premise is incorrect. See Dabrow Deposition (Doc. #436-1) at 8 (besides one unrelated error, Dr. Dabrow testifies to report's accuracy); id. at 41 (report reflects Dr. Dabrow's opinions).

certainty").  In his deposition, Dr. Dabrow testified that when a resident sees a patient, he is "required to do a complete history and physical," and that "[r]arely and occasionally people are going to defer [the full exam] for their own unique reasons."  Dabrow Deposition (Doc. #436-1) at 25.  When defense counsel asked whether deferring portions of the exam that do not appear pertinent is "appropriate," Dr. Dabrow stated that when a patient is admitted during the night, "the intern, the resident—it's the duty between one or both of them to get a complete history, and to do a complete physical exam from head to toe, regardless of the complaint.  That's why the child's in the hospital.  It's not a babysitting service."  Id.  According to Dr. Dabrow, defendant would have satisfied "what was expected of him as a first-year resident" if he "did a complete history and a complete exam," and "thought about a differential diagnosis and presented all that information to the attending."  Id. at 32.  As to the standard of care in particular, given the circumstances in this case, a resident could defer part of the exam "if the diagnosis was certain, if a complete history had been obtained and an appropriate differential had been thought about, and if the patient had been at least examined in a limited way for the pertinent findings."  Id. at 25.  Dr. Dabrow stated that if a first-year resident like defendant had accepted the prior strep throat diagnosis, deferring the neurological exam would be "reasonable."  Id. at 32.  Dr. Dabrow also testified that "it is possible that [defendant] was within the standard of care," and that he could not "offer an opinion, to a reasonable degree of medical probability, that [defendant] violated the standard of care."  Id.

Defendant's expert, Dr. Stephanie DeLeon, testified that given the all circumstances, and particularly the information which Kelli Morgan relayed to defendant, plaintiff "needed a full neurological exam sometime during his observation," and "as soon as reasonable."  DeLeon Deposition (Doc. #436-4) at 12, 16.  According to Dr. DeLeon, such an exam would have taken three to five minutes, and if findings were "consistent with increased intracranial pressure," "it

potentially could have prompted an earlier CT scan and intervention earlier." Id. at 16. Dr. DeLeon stated that although the exam would have "ideally" occurred prior to 10:00 A.M. (the time of plaintiff's code blue), "there is nothing that required that to be done initially and immediately at admission." Id. at 12.  In particular, "it did not deviate from the standard of care for it not to have been done first thing that morning." Id.  Instead, "it should have been done at some point during the admission, but there's nothing that would say it should have been done at four hours or eight hours or 24 hours." Id.

## Legal Standards

Pursuant to Rule 56(a), Fed. R. Civ. P., a party may move for summary judgment by "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of the party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party does so, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which he carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,

912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  To carry his burden, the nonmoving party may not rest on his pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51.  In response to a motion for summary judgment, parties cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 503 (9th Cir. 1993).   The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52.

### Analysis

Plaintiff claims that defendant was negligent by failing to do the following:

(1) consider a differential diagnosis that involved an intracranial process involving increased intracranial pressure;
(2) rule out a neurological problem as being the cause of plaintiff's complaints and presentation;
(3) conduct a more complete and adequate neurological examination of plaintiff;
(4) perform a proper physical examination;
(5) take a proper history of plaintiff's complaints and symptoms
(6) obtain a proper history regarding plaintiff's headache;
(7) order immediate head imaging to rule out elevated intracranial pressure;
(8) order head imaging;
(9) order a head CT stat;
(10) perform and document a proper differential diagnosis;
(11) properly diagnose;
(12) diagnose elevated intracranial pressures;

(13) consider an intracranial process;
(14) obtain a neurological consultation;
(15) follow up on abnormal labs;
(16) obtain vital signs;
(17) follow up on abnormal vital signs;
(18) review the complete medical chart including the nursing notes and triage sheet.

Pretrial Order (Doc. #435) at 24–25.  Defendant asserts that he is entitled to judgment as a matter of law because the record does not show that he violated his standard of care.

To prevail in a medical malpractice action under Kansas law, plaintiff must prove that (1) defendant owed him a duty, (2) defendant breached his duty, (3) plaintiff was injured and (4) a causal connection exists between the breach and plaintiff's injury.  Lindsey v. Bowlin, No. 07-3067-EFM, 2011 WL 723040, at *2 (D. Kan. Feb. 23, 2011).  A physician has a duty "to use reasonable and ordinary care and diligence in the diagnosis and treatment" of his patients, to use his best judgment and to exercise "that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations under like circumstances."  Estate of Cox ex rel. Reemer v. Davis, No. 03-2507-GTV, 2004 WL 2066882, at *2 (D. Kan. Sept. 14, 2004).  In medical malpractice cases, the Court generally requires expert testimony to establish the standard of care and to prove causation.[3]  Lindsey, 2011 WL 723040, at *2.  Expert witnesses must confine their opinions to matters "which are certain or probable and not testify as to mere possibilities."  Howard v. TMW Enters., Inc., 32 F. Supp. 2d 1244, 1252 (D. Kan. 1998) (citations omitted).  Although Kansas law does not require the expert to use any particular "magic words," the opinion must reflect "reasonable medical probabilities."  Id.

---

[3]      Under the narrow "common knowledge" exception, expert testimony is not required where "the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience."  Lindsey, 2011 WL 723040, at *2.  Here, plaintiff does not assert that the common knowledge exception applies to his claims against defendant.  Id. (common knowledge exception is "narrow and rarely applied").

(citations omitted); see Greig v. Botros, No. 08-1181-EFM-KGG, 2012 WL 718914, at *3 (D. Kan. Mar. 5, 2012), aff'd, 525 F. App'x 781 (10th Cir. 2013) (expert must testify to standard of care "with certainty and probability"); Nunez v. Wilson, 211 Kan. 443, 448, 507 P.2d 329, 334 (1973) (expressions such as "probably," "more likely than not" and "others of similar import" proper qualifications for medical expert's opinion testimony if, taken as whole, testimony reflects honest expression of professional opinion as to reasonable medical probabilities); see also Sharples v. Roberts, 249 Kan. 286, 297, 816 P.2d 390, 398 (1991) (evidence insufficient where expert could not come to "firm conclusion" or say with any degree of probability or certainty that violation of standard of care caused injury).

Here, defendant asserts that he is entitled to judgment as a matter of law because expert testimony does not establish that with reasonable medical probability, defendant violated his standard of care by deferring a neurological examination.[4]  Defendant points out that plaintiff's expert, Dr. Dabrow, stated that he could not "offer an opinion, to a reasonable degree of medical probability, that [defendant] violated the standard of care," and that "it is possible that [defendant] was within the standard of care."  Dabrow Deposition (Doc. #436-1) at 32.  On the other hand, defendant's expert, Dr. DeLeon, explicitly testified that defendant did not violate his standard of care.  See DeLeon Deposition (Doc. #436-4) at 12 ("it did not deviate from the standard of care for [neurological exam] not to have been done first thing that morning"); id. (neurological exam

---

[4]      As the Court noted above, plaintiff claims that defendant was negligent by failing to take 18 different actions.  See Pretrial Order (Doc. #435) at 24–25.  On summary judgment, the parties exclusively focus on defendant's decision to defer a neurological examination.  See Memorandum Reply In Support Of Motion For Summary Judgment By Connor Hartpence, M.D. (Doc. #456) at 13 ("issue presented is whether the decision to defer the neurological part of the history and physical was, as Plaintiff contends, a violation of the standard of care").  As a result, even if the Court were to sustain defendant's motion, other claims against him would remain in the case.

"should have been done at some point during the admission, but there's nothing that would say it should have been done at four hours or eight hours or 24 hours").

To rebut this evidence, plaintiff highlights testimony from Dr. Dabrow which, according to plaintiff, either directly or indirectly establishes that defendant violated the standard of care. See Dabrow Report (Doc. #436-6) at 4 ("it is my opinion to a reasonable degree of medical certainty" that defendant "deviated from the standard of care"); id. at 8 (discussing defendant's particular failures); id. at 11 (opinions "held to a reasonable degree of medical certainty"); see also Dabrow Deposition (Doc. #436-1) at 25 (when resident sees patient, he is "required to do a complete history and physical," and "[r]arely and occasionally people are going to defer [the full exam] for their own unique reasons"); id. (when patient admitted during night, "the intern, the resident—it's the duty between one or both of them to get a complete history, and to do a complete physical exam from head to toe, regardless of the complaint"); id. at 32 (defendant would have satisfied "what was expected of him as a first-year resident" if he "did a complete history and a complete exam," and "thought about a differential diagnosis and presented all that information to the attending"); id. at 25 (resident could defer part of exam "if the diagnosis was certain, if a complete history had been obtained and an appropriate differential had been thought about, and if the patient had been at least examined in a limited way for the pertinent findings").

Viewed in the light most favorable to plaintiff, the record evidence creates a genuine issue of material fact whether defendant violated his standard of care by deferring the neurological exam. As the Court explained above, medical malpractice cases require expert testimony to establish the standard of care, and experts must confine their opinions to matters "which are certain or probable and not testify as to mere possibilities." Lindsey, 2011 WL 723040, at *2; Howard, 32 F. Supp. 2d at 1252 (citations omitted).  In other words, for plaintiff to succeed on a medical malpractice

claim, expert testimony must establish that with reasonable medical probability, defendant violated his standard of care.  Howard, 32 F. Supp. 2d at 1252 (citations omitted).  Here, contrary to defendant's assertion, the record contains such testimony.  Dr. Dabrow stated in his report that with a reasonable degree of medical certainty, defendant deviated from his standard of care, and Dr. Dabrow discussed specific failures which led to that conclusion.  See Dabrow Report (Doc. #436-6) at 4 ("it is my opinion to a reasonable degree of medical certainty" that defendant "deviated from the standard of care"); id. at 8 (discussing defendant's particular failures); id. at 11 (opinions are "held to a reasonable degree of medical certainty").  While defendant rightfully points out that Dr. Dabrow testified that he could not "offer an opinion, to a reasonable degree of medical probability, that [defendant] violated the standard of care," see Dabrow Deposition (Doc. #436-1) at 32, this apparent contradiction is an issue of weight for the jury, not one for the Court to decide on summary judgment.  Combined with Dr. Dabrow's other testimony regarding particular deficiencies in defendant's treatment of plaintiff, this evidence creates a genuine issue of material fact whether defendant violated his standard of care.  Accordingly, defendant is not entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that the Motion For Summary Judgment By Connor Hartpence, M.D. (Doc. #430) filed April 23, 2020 is **OVERRULED**.

Dated this 23nd day of July, 2020 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge