**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| D.M., a minor by and through his next friend and natural guardian, KELLI MORGAN, ) ) ) | |
| Plaintiff, ) ) | CIVIL ACTION |
| v. ) ) | No. 18-2158-KHV |
| WESLEY MEDICAL CENTER, LLC d/b/a WESLEY MEDICAL CENTER-WOODLAWN, et al., ) ) ) ) ) | |
| Defendants. ) ) | |

**MEMORANDUM AND ORDER**

On September 11, 2018, D.M., a minor by and through his next friend, Kelli Morgan, filed an amended complaint against Wesley Medical Center, LLC d/b/a Wesley Medical Center-Woodlawn, Wesley-Woodlawn Campus, Lisa Judd, RN, Via Christi Hospitals Wichita, Inc. d/b/a Via Christi-St. Francis, Aaron Kent, RN, Bridget Grover, PA-C, Dr. Gregory Faimon, Jennifer Chambers-Daney, ARNP, Dr. Bala Bhaskar Reddy Bhimavarapu, CEP America-KS LLC, Dr. Connor Hartpence, Dr. Stefanie White and Dr. Jamie Borick, alleging that defendants' medical malpractice caused him paralysis, neurological damage and other permanent injuries. First Amended Complaint (Doc. #121); see Pretrial Order (Doc. #435) filed May 4, 2020. This matter is before the Court on Defendants' Joint Motion To Exclude The Causation Testimony And Opinions Of Plaintiff's Expert, Roger E. Huckfeldt, M.D. (Doc. #433) filed May 1, 2020. For reasons stated below, the Court overrules defendants' motion.

**Factual And Procedural Background**

Plaintiff alleges that around March 3, 2017, he began suffering dizziness, nausea, headache, vomiting and lethargy. See Pretrial Order (Doc. #435) at 8–12. On March 6, 2017, after defendants had examined him multiple times, plaintiff suffered a catastrophic stroke[1] which caused various injuries, including right-side paralysis, significant neurological deficits, permanently-impaired eye movement, permanent difficulty swallowing, slowed speech, permanent truncal ataxia,[2] digestive/bowel impediment, pulmonary deficiencies, orthotic deficiencies and walking impairments. Id. at 47. A CT scan later revealed a brainstem tumor and significant obstructive hydrocephalus,[3] and pathology testing confirmed that plaintiff had a treatable form of medulloblastoma.[4] Id. at 8–12. Generally, plaintiff claims that defendants' negligent failure to timely diagnose the tumor caused his stroke, which in turn caused his injuries. See id. at 24–28.

Plaintiff designated Dr. Roger E. Huckfeldt as an expert witness. Until 2008, when a medical condition prevented him from performing surgeries, Dr. Huckfeldt worked in trauma management, burn management, surgical critical care, general critical care, emergency general surgery, emergency vascular surgery and management of neurosurgery patients. Since 2015,

---

[1] As best the Court can ascertain, plaintiff suffered strokes in different parts of his brain. The issue before the Court only relates to the pontine stroke.

[2] The parties do not define several medical terms. As best the Court can ascertain, truncal ataxia is a cognitive condition that affects muscle control and coordination. See Ataxia, MAYO CLINIC (last accessed August 6, 2020), https://www.mayoclinic.org/diseases-conditions/ataxia/symptoms-causes/syc-20355652.

[3] Hydrocephalus is a buildup of fluid in the brain. See Hydrocephalus, MAYO CLINIC (last accessed August 6, 2020), https://www.mayoclinic.org/diseases-conditions/hydrocephalus/symptoms-causes/syc-20373604.

[4] Medulloblastoma is a malignant brain tumor that occurs most often in children. See Medulloblastoma, MAYO CLINIC (last accessed August 6, 2020), https://www.mayoclinic.org/diseases-conditions/medulloblastoma/cdc-20363524.

Dr. Huckfeldt has been a Certified Life Care Planner with special expertise in neuro-trauma intensive care, trauma and pediatric long-term rehabilitation. In this role, he has prepared approximately 500 life care plans, and he regularly assesses and treats stroke patients, including children. Except for plaintiff, Dr. Huckfeldt has never completed a life care plan that involved medulloblastoma. Dr. Huckfeldt is not a pediatric neurosurgeon, a pediatric neurologist or an oncologist, and he is not an expert on medulloblastoma. He also lacks expertise on the typical sequela for children who undergo medulloblastoma removal, chemotherapy and radiation, and he did not conduct research on this issue for this case. Dr. Huckfeldt does not know whether ataxia is a common side effect of medulloblastoma treatment, but knows that it is associated with injuries to the pons region of the brain.

Dr. Huckfeldt intends to testify about the life care plan which he prepared for plaintiff. See Life Care Plan (Doc. #434-2). The life care plan notes the following impairments associated with plaintiff's ischemic pontine stroke[5]: visual, right-sided hemiplegia,[6] swallowing dysfunction, speech dysfunction, left-sided ataxia and unknown cognitive effects. Id. at 5. Dr. Huckfeldt also intends to testify that plaintiff's pontine stroke caused these impairments. See Life Care Plan (Doc. #434-2) at 6 ("As a result of deficits resulting from an ischemic pontine stroke that occurred on March 6, 2017, [plaintiff] will require prolonged health care and related services."); id. at 13 (plaintiff "continues to have very significant deficits from the ischemic stroke and will continue to require care and assistance for the remainder of his life"); see also Huckfeldt Deposition

---

[5] Ischemic stroke occurs when a blood clot blocks or narrows an artery leading to the brain. See Ischemic Stroke, MAYO CLINIC (last accessed August 6, 2020), https://www.mayoclinic.org/diseases-conditions/stroke/multimedia/img-20116029.

[6] Hemiplegia is the severe or complete loss of strength on one side of the body. See Hemiplegia, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION (last accessed August 6, 2020), https://www.ncbi.nlm.nih.gov/medgen/852561.

(Doc. #434-4) at 19–20 (impairments "all caused by or the result of an ischemic pontine stroke"); id. at 37–38 (stroke, not tumor, caused all impairments in report); id. at 50–51 (same). To arrive at these conclusions, Dr. Huckfeldt relied on the approximate timing of the stroke, his experience evaluating and treating individuals who suffered hemorrhagic and ischemic strokes and his own evaluation of plaintiff. See id. at 52; see also Life Care Plan (Doc. #434-2) at 9. Dr. Huckfeldt also reviewed medical records from Wesley Medical Center, Via Christi, Children's Mercy Kansas City and Children's Hospital Colorado, and he relied on findings by plaintiff's treating physicians, who concluded that plaintiff's stroke resulted in various impairments. See Life Care Plan (Doc. #434-2) at 4; see also Levy Report (Doc. #437-3); Mayer Report (Doc. #437-4); Bernard Report (Doc. #473-5); LePichon Report (Doc. #473-7). When defense counsel specifically asked Dr. Huckfeldt how he concluded that the stroke—and not the radiation, chemotherapy and surgery from the tumor—caused plaintiff's impairments, he testified that plaintiff's impairments "were identified immediately postoperative. So that's long before radiation or chemotherapy." Huckfeldt Deposition (Doc. #434-4) at 53. Accordingly, "[i]f you look at his time of problems and you look at his findings . . . and you compare that with my findings on his examination and with what his treating doctors have said—those all line up." Id. Dr. Huckfeldt concluded that plaintiff's symptoms "match what I would expect from people I've taken care of with brainstem strokes." Id.

## Legal Standards

Rule 702, Fed. R. Evid., "imposes on a district court a gatekeeper obligation to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Schulenberg v. BNSF Ry. Co., 911 F.3d 1276, 1282 (10th Cir. 2018) (citations omitted). The Rule

specifically provides that a witness who is qualified as an expert by knowledge, skill, experience, training or education can testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. To determine whether a proposed witness satisfies this standard, the Court applies a two-step approach. Schulenberg, 911 F.3d at 1282. The Court first determines whether the expert's knowledge, skill, experience, training or education qualifies him to render an opinion. Id. (citations omitted). If the expert is qualified, the Court determines whether "the expert's opinion is reliable by assessing the underlying reasoning and methodology," as set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Id. at 1283 (citations omitted); see Bill Barrett Corp. v. YMC Royalty Co., LP, 918 F.3d 760, 770 (10th Cir. 2019). While the Court must "adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper," how the Court conducts this analysis is within its discretion. Bill Barrett Corp., 918 F.3d at 770 (citations omitted); see Schulenberg, 911 F.3d at 1282. The Court resolves all doubts in favor of admissibility. Am. Family Mut. Ins. Co. v. Techtronic Indus. N. Am., Inc., No. 12-2609-KHV, 2014 WL 2196416, at *1 (D. Kan. May 27, 2014).

### Analysis

Defendants assert that pursuant to Rule 702, Fed. R. Evid., the Court should exclude Dr. Huckfeldt's testimony that plaintiff's pontine stroke caused his impairments.[7] Specifically,

---

[7] Defendants do not seek to exclude Dr. Huckfeldt's entire testimony, but limit their challenge to the narrow issue of causation. See Defendants' Joint Memorandum In Support Of Their Motion To Exclude The Causation Testimony And Opinions Of Plaintiff's Expert, Roger E. Huckfeldt, M.D. (Doc. #434) at 3 n.1

defendants argue that Dr. Huckfeldt is not qualified to offer these opinions, and even if he was, his methodology is unreliable.

## I.     Qualification

Defendants assert that Dr. Huckfeldt is not qualified to testify that plaintiff's pontine stroke caused his various physical and mental impairments. As explained above, to assess whether expert testimony satisfies Rule 702, the Court first determines whether the expert's knowledge, skill, experience, training or education qualifies him to render an opinion. Schulenberg, 911 F.3d at 1282. To satisfy this standard, the expert must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004) (citations omitted). Accordingly, the "dispositive question" is whether the issue on which the expert seeks to testify is "within the reasonable confines" of his subject area. Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 (10th Cir. 2001) (citations omitted). This does not necessarily require specialization in the particular subject area, which is an issue of weight rather than admissibility. Id. Merely possessing a medical degree, however, "is not sufficient to permit a physician to testify concerning any medical-related issue." Id.

As noted, defendants assert that Dr. Huckfeldt is not qualified to testify that plaintiff's pontine stroke caused his various physical and mental impairments. They argue that Dr. Huckfeldt is not a pediatric neurosurgeon or a pediatric neurologist. Likewise, he is not an oncologist or an expert on medulloblastoma, and he did not complete any research on medulloblastoma for this case. Defendants stress that Dr. Huckfeldt is not an expert on sequela for children who undergo medulloblastoma resections, chemotherapy and radiation, and he did not conduct research on these

issues. Moreover, he has never completed a life care plan that involved medulloblastoma and, even if he had, defendants argue that producing life care plans—which involves addressing an injured patient's needs—is far different from opining on what caused those injuries. To this extent, while Dr. Huckfeldt's education, training and experience may qualify him to evaluate plaintiff's impairments and to create a life care plan to address them, defendants argue that this experience does not qualify him to take the next step and pinpoint the cause of those impairments.

The Court disagrees. Dr. Huckfeldt has experience managing neurosurgery patients, and he is currently a Certified Life Care Planner with special expertise in neuro-trauma intensive care, trauma and pediatric long-term rehabilitation. In this role, he has prepared approximately 500 life care plans, and he regularly assesses and treats stroke patients, including children. Accordingly, Dr. Huckfeldt has particularly relevant experience with the physical and mental impairments associated with strokes. Because it is "within the reasonable confines" of his subject area, Dr. Huckfeldt can testify whether plaintiff's stroke caused his injuries. Id. In effect, defendants argue that to do so, not only must Dr. Huckfeldt have expertise in assessing and treating strokes, he must also have expertise on medulloblastoma and related actions, such as neuro-surgery, chemotherapy and radiation. See Defendants' Joint Memorandum In Support Of Their Motion To Exclude The Causation Testimony And Opinions Of Plaintiff's Expert, Roger E. Huckfeldt, M.D. (Doc. #434) at 13 (Dr. Huckfeldt lacks experience with malignant brain tumors, surgical removal process, brain radiation and chemotherapy or impairments that these can cause). Under defendants' proposed standard, the Court should exclude an expert witness unless he is an expert on the cause to which he will testify *and* an expert on all other potential causes, even if those other causes involve entirely different fields of medical study. Defendants offer no authority for this unworkable standard, which would in all likelihood disqualify all medical causation experts. See

Kechi Twp. v. Freightliner, LLC, No. 10-1051-MLB, 2012 WL 33653, at *1 (D. Kan. Jan. 6, 2012), aff'd, 592 F. App'x 657 (10th Cir. 2014) (exclusion of expert testimony is exception, not rule).  While Dr. Huckfeldt's lack of expertise on other potential causes may present ample fodder for cross-examination, that is a question of weight—not admissibility.

**II.     Methodology**

Defendants next argue that the Court should exclude Dr. Huckfeldt's testimony because his opinions are unreliable.  As the Court explained above, if the expert is sufficiently qualified, the Court next determines whether "the expert's opinion is reliable by assessing the underlying reasoning and methodology," as set forth in Daubert, 509 U.S. 579.  Schulenberg, 911 F.3d at 1283 (citations omitted).  Under this second step, the Court assesses whether "the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at 592–93.  To do so, the Court consults the following non-exhaustive list of factors: whether the theory or technique has (1) been or can be tested, (2) been peer-reviewed, (3) a known or potential error rate, (4) standards controlling the technique's operation, and (5) been generally accepted by the scientific community.  Etherton v. Owners Ins. Co., 829 F.3d 1209, 1217 (10th Cir. 2016).

The Tenth Circuit has recognized that a causation expert can satisfy this standard by using a differential diagnosis analysis.  Id. at 1221.  Differential diagnosis "refers to the process by which a physician rules in all scientifically plausible causes of the plaintiff's injury," and then "rules out the least plausible causes of injury until the most likely cause remains."  Id. (citations omitted). To properly apply this methodology, experts must provide objective reasons for eliminating alternative causes, such as the timing of plaintiff's injuries or the opinions of other experts.  Id.; see Goebel v. Denver & Rio Grande W. R. Co., 346 F.3d 987, 999 (10th Cir. 2003) (temporal

relationship one factor to support causation, but insufficient by itself); see also Kechi Twp., 2012 WL 33653, at *2 (appropriate to consult other expert's work to eliminate other causes); Chisholm v. Champion Ent., Inc., No. 02-0208-J, 2003 WL 25685508, at *5 (D. Wyo. June 30, 2003) (to perform differential diagnosis, expert consulted reports from other physicians).  This does not mean, however, that experts "must be able to categorically exclude each and every possible alternative cause—to require otherwise would mean that few experts would ever be able to testify." Etherton, 829 F.3d at 1221 (citations omitted).

Here, defendants assert that Dr. Huckfeldt's causation opinions are not the product of reliable principles and methods.  They argue that his report and deposition leave unclear how exactly he reached his conclusion that plaintiff's stroke caused his impairments.  To the extent that Dr. Huckfeldt used a differential diagnosis analysis, defendants assert that he did not explain this process and that, in any event, his alleged differential diagnosis was faulty.  In particular, defendants argue that Dr. Huckfeldt could not perform a proper differential diagnosis because "he had no ability to exclude critical medical issues related to [p]laintiff's cancerous brain tumor and treatment."  Defendants' Joint Reply Memorandum In Support Of Their Motion To Exclude The Causation Testimony And Opinions Of Plaintiff's Expert, Roger E. Huckfeldt, M.D. (Doc. #434) at 5.

The Court again disagrees.  While Dr. Huckfeldt's report certainly could have been more explicit about his differential diagnosis process, the record contains sufficient evidence to show that for purposes of Rule 702, Fed. R. Evid., he properly applied this methodology.  Based on his knowledge and experience in caring for stroke patients, his physical examination of plaintiff and review of plaintiff's medical records from Wesley Medical Center, Via Christi, Children's Mercy Kansas City and Children's Hospital Colorado, Dr. Huckfeldt found that plaintiff's pontine stroke

resulted in the following impairments: visual, right-sided hemiplegia, swallowing dysfunction, speech dysfunction, left-sided ataxia and unknown cognitive effects.  See Life Care Plan (Doc. #434-2) at 5; id. at 6 ("As a result of deficits resulting from an ischemic pontine stroke that occurred on March 6, 2017, [plaintiff] will require prolonged health care and related services."); id. at 13 (plaintiff "continues to have very significant deficits from the ischemic stroke and will continue to require care and assistance for the remainder of his life"); see also Huckfeldt Deposition (Doc. #434-4) at 19–20 (impairments "all caused by or the result of an ischemic pontine stroke"); id. at 37–38 (stroke, and not tumor, caused all impairments in report); id. at 50–51 (same). Therefore, Dr. Huckfeldt properly "ruled in" plaintiff's stroke as the cause of his injuries.  See Etherton, 829 F.3d at 1217.

To rule out other potential causes for plaintiff's impairments, such as treatment related to the tumor, Dr. Huckfeldt primarily relied on two sets of evidence: reports from plaintiff's treating physicians and the timing of his injuries.  As to the first, Dr. Huckfeldt consulted the findings of plaintiff's treating physicians, who also concluded that plaintiff's stroke resulted in various impairments.  See Life Care Plan (Doc. #434-2) at 4; see also Levy Report (Doc. #437-3); Mayer Report (Doc. #437-4); Bernard Report (Doc. #473-5); LePichon Report (Doc. #473-7).  Similar to the argument which the Court rejected above, defendants essentially argue that rather than consult other experts, Dr. Huckfeldt must rely on his own expertise to rule out the other potential causes, and because he lacks experience with medulloblastoma, chemotherapy and radiation, he is not qualified to do so.  As the Court previously explained, this is an unworkable standard, and particularly within the medical field, it would effectively bar most causation experts from using a differential diagnosis.  Aside from its far-reaching consequences, such a standard would also prohibit experts from consulting particularly germane evidence: if several other experts agree that

"x" was the cause of certain injuries, surely those opinions are relevant evidence in eliminating potential causes "y" and "z." See Kechi Twp., 2012 WL 33653, at *2 (appropriate to consult other expert's work to eliminate other causes). This is especially true when the other experts actually go one step further and expressly conclude that "y" and "z" are *not* the causes. See LePichon Report (Doc. #473-7) at 15 (certain impairments "best explained by the pontine stroke, but clinically not consistent with a potential effect from the medulloblastoma"). Dr. Huckfeldt properly consulted the opinions of other experts to eliminate potential causes for plaintiff's injuries.

Dr. Huckfeldt also relied on the timing of plaintiff's injuries to eliminate several potential causes. See Goebel, 346 F.3d at 999 (expert can use temporal relationship to show causation). When defense counsel specifically asked Dr. Huckfeldt how he concluded that the stroke—and not the radiation, chemotherapy and surgery from the tumor—caused plaintiff's impairments, he testified that plaintiff's impairments "were identified immediately postoperative. So that's long before radiation or chemotherapy." Huckfeldt Deposition (Doc. #434-4) at 53. Accordingly, "[i]f you look at his time of problems and you look at his findings . . . and you compare that with my findings on his examination and with what his treating doctors have said—those all line up." Id. Dr. Huckfeldt concluded that plaintiff's symptoms "match what I would expect from people I've taken care of with brainstem strokes." Id. Defendants take issue with the fact that this analysis omits the possibility that the tumor itself (or its surgical removal) caused plaintiff's impairments. Defendants are free to cross-examine Dr. Huckfeldt about this issue, but that is a question of weight for the jury. Combined with his consultation of other expert reports, the record contains sufficient evidence that for purposes of admissibility, Dr. Huckfeldt adequately provided objective reasons

for eliminating alternative causes and therefore utilized a reliable methodology in reaching his opinions.  See Etherton, 829 F.3d at 1217.  Thus, the Court overrules defendants' motion.

**IT IS THEREFORE ORDERED** that Defendants' Joint Motion To Exclude The Causation Testimony And Opinions Of Plaintiff's Expert, Roger E. Huckfeldt, M.D. (Doc. #433) filed May 1, 2020 is **OVERRULED**.

Dated this 7th day of August, 2020 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
