# IN THE UNITED STATES DISTRICT
# COURT FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| D.M., a minor by and through his next friend and natural guardian, KELLI MORGAN, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | No. 18-2158-KHV |
| WESLEY MEDICAL CENTER, LLC d/b/a WESLEY MEDICAL CENTER-WOODLAWN, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

On September 11, 2018, D.M., a minor by and through his next friend, Kelli Morgan, filed an amended complaint against Wesley Medical Center, LLC d/b/a Wesley Medical Center-Woodlawn ("Wesley Medical Center"), Wesley-Woodlawn Campus, Lisa Judd, RN, Via Christi Hospitals Wichita, Inc. d/b/a Via Christi-St. Francis ("Via Christi"), Aaron Kent, RN, Bridget Grover, PA-C, Dr. Gregory Faimon, Jennifer Chambers-Daney, ARNP, Dr. Bala Bhaskar Reddy Bhimavarapu, CEP America-KS LLC, Dr. Connor Hartpence, Dr. Stefanie White and Dr. Jamie Borick, alleging that defendants' medical malpractice caused him paralysis, neurological damage and other permanent injuries. First Amended Complaint (Doc. #121); see Pretrial Order (Doc. #435) filed May 4, 2020. This matter is before the Court on the Motion for Partial Summary Judgment as to Plaintiff's Punitive Damage Claims by Connor Hartpence, M.D., Stefanie White, M.D., and Jamie Borick, M.D. (Doc. #446) filed May 15, 2020. For reasons stated below, the Court overrules defendant's motion.

**Legal Standards**

Pursuant to Rule 56(a), Fed. R. Civ. P., a party may move for summary judgment by "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of the party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010). Once the moving party does so, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which he carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). To carry his burden, the nonmoving party may not rest on his pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.

Liberty Lobby, 477 U.S. at 250–51.   In response to a motion for summary judgment, parties cannot rely on ignorance of facts, speculation or suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.   Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 503 (9th Cir. 1993).   The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."   Liberty Lobby, 477 U.S. at 251–52.

### Factual And Procedural Background

The following facts are uncontroverted, deemed admitted or, where controverted, viewed in the light most favorable to plaintiff, the non-movant.

On March 5, 2017 at 6:19 p.m., Kelli and Kevin Morgan brought plaintiff, their five-year-old son D.M., to the Wesley Medical Center emergency room because of intense headaches, nausea, dizziness, unbalance, vomiting, fatigue and abdominal pain.   At 7:06 p.m., Wesley Medical Center personnel diagnosed plaintiff with strep throat and discharged him.

After returning home, plaintiff's symptoms continued to worsen.   On March 6, 2017 at 2:22 a.m., Kelli took plaintiff to the Via Christi emergency room.   Kelli told Via Christi emergency personnel that D.M. had experienced a sudden onset of headaches, nausea, vomiting, lethargy, weakness, unbalance, dizziness, slurred speech and photophobia.   Deposition of Kelli Morgan (Doc. #468-2) at 293–94. The emergency room provider, Jennifer Chambers-Daney, did not chart this history.   Via Christi Chart (Doc. #468-3) at 6.   She did not perform a neurological examination, and her impression was strep throat.   Id.

At 5:18 a.m., Dr. Bala Bhaskar Reddy Bhimavarapu admitted D.M. to the hospital for observation.   In addition to others, three family practice resident physicians, Dr. Connor

Hartpence, Dr. Stefanie White and Dr. Jamie Borick, attended plaintiff.  Dr. Hartpence, a first-year resident, went to the emergency room to begin D.M.'s admission process.  Kelli told Dr. Hartpence D.M.'s "full history."  Deposition of Kelli Morgan (Doc. #468-2) at 180.  She informed Dr. Hartpence about D.M.'s prior visit to Wesley and his worsening symptoms, including the intense headaches, vomiting, weakness, lethargy and protruding eyes.  Id.  During this discussion, D.M. was asleep, and Kelli testified that Dr. Hartpence did not approach D.M.'s bed or perform any sort of examination.[1]  Id. at 181.  Dr. Hartpence did not perform a full physical exam and deferred the neurological examination because D.M. was sleeping.  Via Christi Chart (Doc. #468-3) at 16.  Dr. Hartpence reported this information to his supervising doctor, Dr. Bala.  They agreed that the neurological exam should be deferred and that they should let D.M. sleep, but they did not discuss when to wake him.  Deposition of Dr. Bala (Doc. #468-7) at 35.

At 6:15 a.m., Dr. Stefanie White, a senior resident, saw D.M. and obtained the following information from D.M.'s mom: "Per mom, [D.M.] was nauseated, dizzy and had a headache at home which is what prompted the hospital visit. He vomited every 30 minutes . . . He is very sleepy this morning and mom is worried about how sleepy he is . . ." Via Christi Chart (Doc. #468-3) at 18.  Dr. White recalls performing a brief exam of D.M. focused on his established diagnosis of strep throat.  Deposition of Dr. White (Doc. #447-5) at 30.  Dr. White's medical chart does not document that she took a complete history or conducted a physical examination.  Via Christi Chart (Doc. #468-3) at 18.  Likewise, the chart does not indicate that she did a neurological examination or established a differential diagnosis.  Id.  Kelli further testified that no female doctor, including

---

[1]        Dr. Hartpence testified that he performed a five-minute examination while D.M. was asleep and D.M. moved his extremities or wiggled in response to touch.  Deposition of Dr. Hartpence (Doc. #447-1) at 35–36.

Dr. White, performed any kind of examination on D.M.[2]  Deposition of Kelli Morgan (Doc. #468-2) at 346.

At 6:58 a.m., third year medical student Samuel DuMontier saw D.M. and noted that he was "Non arousable."  Student Note (Doc. #447-7) at 291.  DuMontier also testified that D.M. "wouldn't get up and participate in my physical exam."  Deposition of DuMontier (Doc. #468-8) at 29.  When Dr. Hartpence left in the early morning, Dr. Borick, another first-year resident, assumed care and treatment of D.M. and was expected to review and sign DuMontier's note.  Dr. Borick received DuMoniter's note and copied and pasted it into D.M.'s medical chart with little review.  Deposition of Dr. Borick (Doc. #468-6) at 51.  The "Non arousable" note indicates that intervention should have been taken, but no medical personnel performed a neurological examination.  Via Christi Chart (Doc. #468-3) at 132.  Dr. Borick claimed to see D.M. for five minutes between 7:30 a.m. and 8:30 a.m., but Kelli testified that no female doctor, including Dr. Borick, ever examined D.M.  Deposition of Kelli Morgan (Doc. #468-2) at 346.

At 10:00 a.m. on March 6, 2017—approximately eight hours after he arrived at Via Christi—Via Christi called a code blue for plaintiff.  Subsequent examination showed a mass in his brain.  As a result, plaintiff suffered a catastrophic stroke which caused paralysis, neurological damage and other permanent injuries.

According to plaintiff's expert, Robert Dabrow, M.D., residents are required to do a complete history and head-to-toe physical.  Deposition of Dr. Dabrow (Doc. #468-4) at 88, 91.  Dr. Dabrow further stated that based on plaintiff's symptoms, defendants should have performed a CT scan and established a broad-based differential diagnosis including elevated intracranial

---

[2]    Based on Kelli Morgan's deposition testimony, both Dr. White and Dr. Borick are female.

pressures.  Id. at 64–65.

On September 11, 2018, plaintiff filed an amended complaint.  See First Amended Complaint (Doc. #121).  Plaintiff claims that defendants were negligent by failing to do one or more of the following:

> (1) consider a differential diagnosis that involved an intracranial process involving increased intracranial pressure;
> (2) rule out a neurological problem as being the cause of D.M.'s complaints and presentation;
> (3) conduct a more complete and adequate neurological examination of D.M.;
> (4) perform a proper physical examination;
> (5) take a proper history of D.M.'s complaints and symptoms;
> (6) obtain a proper history regarding D.M.'s headache;
> (7) order immediate head imaging to rule out elevated intracranial pressure;
> (8) order head imaging;
> (9) order a head CT stat;
> (10) perform and document a proper differential diagnosis;
> (11) properly diagnose;
> (12) diagnose elevated intracranial pressures;
> (13) consider an intracranial process;
> (14) obtain a neurological consultation;
> (15) follow up on abnormal labs;
> (16) obtain vital signs;
> (17) follow up on abnormal vital signs;
> (18) review the complete medical chart including the nursing notes and triage sheet; and
> (19) respond to D.M. being unarousable.

Pretrial Order (Doc. #435) at 24–27.  Plaintiff seeks punitive damages from defendants.  Id. at 28.

## Analysis

Drs. Hartpence, White and Borick assert that they are entitled to summary judgment on plaintiff's claim for punitive damages.

Under Kansas law, plaintiff may recover punitive damages to punish the wrongdoer for a "malicious, vindictive or willful and wanton invasion" of plaintiff's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs.  Foster v. USIC Locating Servs., LLC, No. 16-2174-CM, 2018 WL 3575649, at *4 (D. Kan. July 25, 2018)

(citations omitted).  To recover punitive damages, plaintiff must show by clear and convincing evidence that defendant's conduct was willful, malicious or wanton.[3]  Id.; D.M. by & through Morgan v. Wesley Med. Ctr. LLC, No. 18-2158-KHV, 2019 WL 2448574, at *7 (D. Kan. June 12, 2019).  Wantonness refers to the "mental attitude of the wrongdoer rather than a particular act of negligence."  P.S. ex rel. Nelson v. The Farm, Inc., 658 F. Supp. 2d 1281, 1303 (D. Kan. 2009) (citing Reeves v. Carlson, 266 Kan. 310, 314, 969 P.2d 252, 256 (1998)).  For their acts to be wanton, defendants must "realize the imminence of danger and recklessly disregard and be indifferent to the consequences" of their act.  Id. The first prong—realizing imminent danger—does not necessarily mean that defendants knew that plaintiff's particular injury was imminent.  See Holt v. Wesley Med. Ctr., LLC., No. 00-1318-JAR, 2004 WL 1636574, at *8 (D. Kan. July 19, 2004).  The Court instead asks whether based on defendants' knowledge of existing conditions, they were aware that their action or inaction "would likely or probably result" in the injury or other known risk or complication.   Id.; see Reeves, 266 Kan. at 315, 969 P.2d at 256–57 (based on defendant's knowledge of existing conditions, he was aware that conduct would likely or probably cause injury).  Plaintiff can circumstantially prove defendants' knowledge of imminent dangers. Holt, 2004 WL 1636574, at *8.

As to the second prong—reckless disregard and indifference—Kansas law does not require plaintiff to establish "a formal and direct intention to injure any particular person. It is sufficient if [ ] defendant evinced that degree of indifference to the rights of others which may justly be characterized as reckless."  P.S. ex rel. Nelson, 658 F. Supp. 2d at 1303 (citing Reeves, 266 Kan. at 315, 969 P.2d at 256–57).   Recklessness is more than mere negligence and requires conduct

---

[3]     As best the Court can ascertain, plaintiff does not claim that defendants willfully or maliciously injured him.

which shows "disregard of or indifference to consequences, under circumstances involving danger to life or safety of others."   Id.

The Court typically reserves the question of wantonness for the jury—only when reasonable persons "could not reach differing conclusions from the same evidence may the issue [of wantonness] be decided as a question of law."   Danaher v. Wild Oats Markets, Inc., 779 F. Supp. 2d 1198, 1213 (D. Kan. 2011) (citations omitted).

Here, defendants assert that plaintiff cannot recover punitive damages because (1) plaintiff has failed to plead grounds for recovery of punitive damages and (2) assuming plaintiff relies upon a claim of wanton conduct, no reasonable jury could find that defendants' actions were wanton.

Defendants first argue that the amended complaint does not allege that defendants' conduct was willful, wanton, fraudulent or malicious.  The pretrial order, however, supersedes all pleadings and controls the subsequent course of this case.  Fed. R. Civ. P. 16(d); D. Kan. Rule 16.2(b).  In the Pretrial Order (Doc. #435), plaintiff identifies specific conduct that he claims was wanton. See Pretrial Order (Doc. #435) at 24–27 (failing to conduct complete and adequate neurological examination of D.M., failing to perform proper physical examination and failing to consider differential diagnosis that involved intracranial process involving increased intracranial pressure). The Court therefore rejects defendants' argument that plaintiff has not alleged conduct that would warrant punitive damages.

Defendants do not seek summary judgment on plaintiff's claims of negligence, but they argue that plaintiff has not presented sufficient evidence for a reasonable jury to find wanton conduct.  At most, defendant argues, the evidence shows that they did not realize that plaintiff's symptoms indicated anything other than strep throat.  In other words, as best the Court can ascertain, defendants focus their challenge on the first prong, arguing that they did not realize

imminent danger.[4]   In support, defendants point to plaintiff's Via Christi emergency room admission notes that record his positive strep test and frequent vomiting in response to taking antibiotics.  Via Christi Chart (Doc. #468-3) at 6.  Defendants claim that nothing in plaintiff's medical chart or his history or physical examination caused them to question the diagnosis of strep throat.

The record creates a genuine issue of material fact whether defendants' actions constitute wanton conduct.   According to plaintiff's expert Dr. Dabrow, the standard of care required residents to do a complete history and head-to-toe physical examination.  Deposition of Dr. Dabrow (Doc. #468-4) at 88, 91.  If a patient reports symptoms of headaches, dizziness and nausea, residents need to establish a broad-based differential including checking for elevated intracranial pressures and performing a CT scan.  Id. at 64–65.  Plaintiff's mother testified that she repeatedly informed defendants of plaintiff's headaches, nausea, vomiting, lethargy, weakness, unbalance, dizziness, slurred speech and protruding eyes.  Defendants recorded and reviewed these symptoms in plaintiff's medical chart.  Despite being aware of these facts, defendants did not perform a complete physical examination or establish a differential diagnosis. Instead, they chose to defer plaintiff's neurological examination.

As to Dr. Hartpence, when the evidence is viewed in the light most favorable to plaintiff, Dr. Hartpence was aware of serious symptoms that should have prompted further examination of plaintiff. He documented that plaintiff "complained of headache, dizziness, and worsening nausea and several episodes of emesis." Via Christi Chart (Doc. #468-3) at 15.  Yet he did not complete

---

[4]        Even if defendants challenge the second prong, the Court finds that the record creates a genuine issue of material fact whether defendants were reckless and indifferent to the consequences of their inaction.

a full physical examination and deferred the neurological examination until it was too late because plaintiff was sleeping.  Id. at 16.  According to Kelli, Dr. Hartpence did not approach D.M.'s bed or perform any sort of examination.[5]  Deposition of Kelli Morgan (Doc. #468-2) at 181.  This is sufficient evidence for a reasonable jury to find that Dr. Hartpence's conduct was wanton.

As to Dr. White, she also was aware of symptoms that indicated a more serious illness than strep throat.  She documented that plaintiff was "nauseated, dizzy and had a headache which is what prompted the hospital visit."  Via Christi Chart at 18.  Yet she did not record a neurological exam or establish a differential diagnosis.  Id.  Dr. White also did not perform a physical examination of D.M. at any time.  Deposition of Kelli Morgan (Doc. #468-2) at 346.  This is sufficient evidence for a reasonable jury to find that Dr. White's conduct was wanton.

As to Dr. Borick, she allowed a medical student to monitor plaintiff's condition without more intervention and approved the medical student's note describing plaintiff as "Non arousable." Deposition of Dr. Borick (Doc. #468-6) at 51.   "Non arousable" indicates a state of unconsciousness and should have prompted immediate intervention.  Yet Dr. Borick did not examine plaintiff, record a neurological exam or establish a differential diagnosis.  Deposition of Kelli Morgan (Doc. #468-2) at 346.  This is sufficient evidence for a reasonable jury to find that her conduct was wanton.

Based on defendants' knowledge of these existing conditions, a jury could find that they were aware that their action or inaction "would likely or probably result" in the injury or other known risk or complication.  Holt, 2004 WL 1636574, at *8.  Accordingly, a reasonable jury could find that defendants realized imminent danger and were reckless and indifferent to the

---

[5]     At most, according to Dr. Hartpence's own testimony, he performed a five-minute examination while plaintiff was sleeping.

consequences of their inaction.  As to punitive damages, defendants are not entitled to summary judgment.

**IT IS THEREFORE ORDERED** that the <u>Motion for Partial Summary Judgment as to Plaintiff's Punitive Damage Claims by Connor Hartpence, M.D., Stefanie White, M.D., and Jamie Borick, M.D.</u> (Doc. #446) filed May 15, 2020 is **OVERRULED**.

Dated this 1st day of September, 2020 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge