**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| D.M., a minor by and through his next friend and natural guardian, KELLI MORGAN,　　　　　　　Plaintiff,<br><br>v.<br><br>WESLEY MEDICAL CENTER, LLC d/b/a WESLEY MEDICAL CENTER-WOODLAWN, et al.,<br><br>　　　　　　　Defendants. | CIVIL ACTION<br><br>No. 18-2158-KHV |

**MEMORANDUM AND ORDER**

On September 11, 2018, D.M., a minor by and through his next friend, Kelli Morgan, filed an amended complaint against Wesley Medical Center, LLC d/b/a Wesley Medical Center-Woodlawn ("Wesley Medical Center"), Wesley-Woodlawn Campus, Lisa Judd, RN, Via Christi Hospitals Wichita, Inc. d/b/a Via Christi-St. Francis ("Via Christi"), Aaron Kent, RN, Bridget Grover, PA-C, Dr. Gregory Faimon, Jennifer Chambers-Daney, ARNP ("Chambers-Daney"), Dr. Bala Bhaskar Reddy Bhimavarapu, CEP America-KS LLC ("CEP"), Dr. Connor Hartpence, Dr. Stefanie White and Dr. Jamie Borick, alleging that defendants' medical malpractice caused him paralysis, neurological damage and other permanent injuries. First Amended Complaint (Doc. #121); see Pretrial Order (Doc. #435) filed May 4, 2020. This matter is before the Court on the Motion For Partial Summary Judgment As To Plaintiff's Punitive Damage Claims By Jennifer Chambers-Daney, APRN (Doc. #444) and the Motion For Partial Summary Judgment As To Plaintiff's Punitive Damage Claims By CEP America-KS LLC (Doc. #448), both filed May 15, 2020. For reasons stated below, the Court overrules the motion of Chambers-Daney and sustains the motion of CEP.

**Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of the party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party does so, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which he carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry his burden, the nonmoving party may not rest on his pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby, 477 U.S. at 250–51.  The heart of the inquiry is "whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

## Factual And Procedural Background

The following facts are uncontroverted, deemed admitted or, where controverted, viewed in the light most favorable to plaintiff, the non-movant.

On March 5, 2017 at 6:19 p.m., Kelli and Kevin Morgan brought plaintiff, their five-year-old son D.M., to the Wesley Medical Center emergency room because of intense headaches, nausea, dizziness, unbalance, vomiting, fatigue and abdominal pain. At 7:06 p.m., Wesley Medical Center personnel diagnosed plaintiff with strep throat and discharged him.

After returning home, plaintiff's symptoms continued to worsen. On March 6, 2017 at 2:22 a.m., Kelli took plaintiff to the Via Christi emergency room. At Via Christi, Nurse Practitioner Jennifer Chambers-Daney saw plaintiff. CEP employed Chambers-Daney, who was the only employee of CEP involved in plaintiff's treatment. Kelli told Chambers-Daney about plaintiff's prior visit to Wesley Medical Center, his strep diagnosis and his worsening symptoms, including vomiting, pain when turning his head, lethargy and his eyes rolling into the back of his head "almost like he was going unconscious." Deposition of Kelli Morgan (Doc. #445-2) at 174–75. Kelli also told Chambers-Daney that she was concerned D.M. was progressing into meningitis, but Chambers-Daney "didn't really give a response." Id. at 175.

Chambers-Daney took Kelli and plaintiff to an examination room. Once in the room, Chambers-Daney pointed to D.M.'s eyes and said that he looked like he was awake. Id. at 176. Kelli responded that D.M. was not awake and that "his eyes aren't closing when he is going to sleep." Id.

Chambers-Daney then prepared D.M.'s chart stating as follows:

> The patient presents with sore throat and PT HAS HAD A SORE THROAT FOR UNKNOWN TIME. SISTER JUST HAD TONSILS OUT AND THE MOM WORRIES THAT HE [ ] WAS TOO AFRAID TO TELL THEM THAT HE MAY NEED HIS OUT TOO. SEEN AT WESLEY THIS EVE 6PM DX STREP. PT SENT HOME AND THEN MOM STATES HE HAS BEEN VOMITING EVERY HOUR AND NOT ABLE TO KEEP DOWN PAIN MEDS. The onset was unknown. The course/duration of symptoms is constant. Location: Pharynx throat. The character of symptoms is pain and redness. The relieving factor is none. Prior episodes: none. Associated symptoms: vomiting.

Emergency Documentation (Doc. #445-1) at 020006 (emphasis in original). The chart noted that Chambers-Daney did not perform a neurological examination. According to Kelli, Chambers-Daney never touched or examined plaintiff. Deposition of Kelli Morgan (Doc. #445-2) at 338. The chart also did not include D.M.'s history of headache, nausea, intractable vomiting, lethargy, unbalance, dizziness, slurred speech, photophobia and D.M.'s previous admission to Wesley Medical Center. Id. at 174–75. Chambers-Daney did not ask questions about the headache and on that topic testified, "I could have, but based upon his presentation, I didn't see the need for it at that time." Deposition of Chambers-Daney (Doc. #460-20) at 77. Chambers-Daney never asked Kelli for more information about what happened at Wesley Medical Center because she "didn't see a reason to ask for more than what [Kelli] told me." Id. at 136.

Chambers-Daney then left plaintiff's room and ordered lab work, IV fluids and Zofran for plaintiff's vomiting. Plaintiff and Chambers-Daney did not interact after this point. At 5:02 a.m., Chambers-Daney consulted the supervising doctor, Dr. Bala Bhaskar Reddy Bhimavarapu, who admitted plaintiff for observation.

At 10:00 a.m. on March 6, 2017—approximately eight hours after he arrived at Via Christi—Via Christi personnel called a code blue for plaintiff. Subsequent examination showed a mass in his brain. As a result, plaintiff suffered a catastrophic stroke which caused paralysis,

neurological damage and other permanent injuries.  Pretrial Order (Doc. #435) at 47.

According to plaintiff's experts, Chambers-Daney did not meet the standard of care because she failed to obtain plaintiff's relevant patient history so a medical decision could be made.  Based on plaintiff's symptoms, Chambers-Daney should have called Wesley Medical Center to learn more about D.M.'s presentation, completed a neurological examination and ordered CT imaging.  Deposition of James Mathews, M.D. (Doc. #460-4) at 174; Deposition of Charles Murphy, M.D.  (Doc. #460-5) at 79, 135–36.  Beyond Via Christi's standard of care regarding patient care and emergency room treatments, CEP did not have any additional policies or procedures regarding treatment.  Deposition of Dr. Chang (Doc. #460-12) at 9, 31.

Between April of 2014 and June of 2016, at least eight months before she treated plaintiff, Chambers-Daney posted cartoons and memes to her personal Facebook page.  See Facebook Posts (Doc. #460-10).  The first post was a Bitstrips cartoon depicting two nurses commiserating about the frustration of filling out patient charts.[1]  The other posts were memes that Chambers-Daney reposted from satirical sites.  One meme depicted comedian Ken Jeong, who is a licensed physician, joking that the only patient satisfaction question that matters is "DID YOU DIE?"  Another meme depicted a man surrounded by aggressive reporters and microphones with the caption, "When you try to give a quick medication and your patient's family questions everything you do."  The last meme featured an anthropomorphized iguana complaining about other medical providers making excuses for not completing their patient care duties.

---

[1] The Bitstrips is captioned as follows:
Narrator: "[The nurses] did it! They completed [the patient's] charts! Yeah!"
Nurse 1: "That [t]ook forever!"
Nurse 2: "I know…[did the patient] chart anything!??"

CEP has a Social Media Policy that directs employees to be "respectful and professional" on social media and to not post anything "obscene, defamatory, profane, libelous, threatening, harassing or abusive." Deposition of Dr. Chang (Doc. #460-12) at 54–55. Chambers-Daney testified that she was unaware of CEP policies or procedures that she was obligated to follow. Deposition of Chambers-Daney (Doc. #460-20) at 134. CEP took no disciplinary action against Chambers-Daney for her Facebook posts. When CEP learned that D.M.'s representatives were going to reveal her Facebook posts to the media, CEP representative Dr. Howard Chang told her to "shut down" her Facebook profile. Id. at 114. CEP continues to employ Chambers-Daney.

On September 11, 2018, plaintiff filed an amended complaint. Plaintiff claims that defendants were negligent by failing to do one or more of the following:

> (1) consider a differential diagnosis that involved an intracranial process involving increased intracranial pressure;
> (2) rule out a neurological problem as being the cause of D.M.'s complaints and presentation;
> (3) conduct a more complete and adequate neurological examination of D.M.;
> (4) perform a proper physical examination;
> (5) take a proper history of D.M.'s complaints and symptoms;
> (6) obtain a proper history regarding D.M.'s headache;
> (7) order immediate head imaging to rule out elevated intracranial pressure;
> (8) order head imaging;
> (9) order a head CT stat;
> (10) perform and document a proper differential diagnosis;
> (11) properly diagnose;
> (12) diagnose elevated intracranial pressures;
> (13) consider an intracranial process;
> (14) obtain a neurological consultation;
> (15) follow up on abnormal labs;
> (16) obtain vital signs;
> (17) follow up on abnormal vital signs;
> (18) review the complete medical chart including the nursing notes and triage sheet;
> (19) properly evaluate and document a complete neurological exam in a child who presented to the emergency department and is described as "ill appearing," "SLEEPY";
> (20) properly evaluate and document a complete neurological exam in a child who presented to the emergency department with the symptoms of vomiting and

      headache; and
(21) obtain emergent neuro-imaging.

Pretrial Order (Doc. #435) at 24–27.  Plaintiff claims that based on Chambers-Daney's conduct, CEP is liable for punitive damages under the doctrine of respondeat superior.  Id. at 28.

## **Analysis**

Defendants assert that they are entitled to summary judgment on plaintiff's claim for punitive damages.

Under Kansas law, plaintiff may recover punitive damages to punish the wrongdoer for a "malicious, vindictive or willful and wanton invasion" of plaintiff's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs.  Foster v. USIC Locating Servs., LLC, No. 16-2174-CM, 2018 WL 3575649, at *4 (D. Kan. July 25, 2018) (citations omitted).  To recover punitive damages, plaintiff must show by clear and convincing evidence that defendant's conduct was willful, malicious or wanton.[2] Id.; D.M. by & through Morgan v. Wesley Med. Ctr. LLC, No. 18-2158-KHV, 2019 WL 2448574, at *7 (D. Kan. June 12, 2019).  Wantonness refers to the "mental attitude of the wrongdoer rather than a particular act of negligence."  P.S. ex rel. Nelson v. The Farm, Inc., 658 F. Supp. 2d 1281, 1303 (D. Kan. 2009) (citing Reeves v. Carlson, 266 Kan. 310, 314, 969 P.2d 252, 256 (1998)).  For their acts to be wanton, defendants must "realize the imminence of danger and recklessly disregard and be indifferent to the consequences" of their act.  Id.  The first prong—realizing imminent danger—does not necessarily mean that defendants knew that plaintiff's particular injury was imminent.  See Holt v. Wesley Med. Ctr., LLC., No. 00-1318-JAR, 2004 WL 1636574, at *8 (D. Kan. July 19, 2004).  The Court instead asks whether based on defendants' knowledge of

---

[2] As best the Court can ascertain, plaintiff does not claim that defendants willfully or maliciously injured him.

existing conditions, they were aware that their action or inaction "would likely or probably result" in the injury or other known risk or complication. Id.; see Reeves, 266 Kan. at 315, 969 P.2d at 256–57 (based on knowledge of existing conditions, defendant was aware conduct likely or probably would cause injury). Plaintiff can circumstantially prove defendants' knowledge of imminent dangers. Holt, 2004 WL 1636574, at *8.

As to the second prong—reckless disregard and indifference—Kansas law does not require plaintiff to establish "a formal and direct intention to injure any particular person. It is sufficient if [ ] defendant evinced that degree of indifference to the rights of others which may justly be characterized as reckless." P.S. ex rel. Nelson, 658 F. Supp. 2d at 1303 (citing Reeves, 266 Kan. at 315, 969 P.2d at 256–57). Recklessness is more than mere negligence and requires conduct which shows "disregard of or indifference to consequences, under circumstances involving danger to life or safety of others." Id.

The Court typically reserves the question of wantonness for the jury—only when reasonable persons "could not reach differing conclusions from the same evidence may the issue [of wantonness] be decided as a question of law." Danaher v. Wild Oats Mkts., Inc., 779 F. Supp. 2d 1198, 1213 (D. Kan. 2011) (citations omitted).

Here, Chambers-Daney and CEP assert that plaintiff cannot recover punitive damages because (1) plaintiff has failed to plead grounds for recovery of punitive damages; (2) assuming plaintiff relies upon a claim of wanton conduct, no reasonable jury could find that Chambers-Daney's actions were wanton; and (3) CEP, as an employer, did not authorize or ratify Chambers-Daney's treatment of plaintiff, endorse similar treatment beforehand or place her in a managerial position. Each defendant will be considered in turn.

**I.      Jennifer Chambers-Daney, APRN**

Chambers-Daney first argues that the amended complaint and pretrial order do not allege that her conduct was willful, wanton, fraudulent or malicious.  The pretrial order supersedes all pleadings and controls the subsequent course of this case.  Fed. R. Civ. P. 16(d); D. Kan. Rule 16.2(b).  In the Pretrial Order (Doc. #435), plaintiff identifies specific conduct that he claims was wanton.  See Pretrial Order (Doc. #435) at 24–27 (failing to perform proper physical examination, failing to properly evaluate and document complete neurological exam in child who presented to emergency department with symptoms of vomiting and headache and failing to obtain emergent neuro-imaging).  The Court therefore rejects Chambers-Daney's argument that plaintiff has not alleged conduct that could warrant punitive damages.

Chambers-Daney does not seek summary judgment on plaintiff's claims of negligence, but she argues that plaintiff has not presented sufficient evidence for a reasonable jury to find wanton conduct.  Chambers-Daney focuses her challenge on the first prong, arguing that she did not realize imminent danger.[3]  Chambers-Daney argues that at most, the evidence shows that she did not realize that plaintiff's symptoms indicated anything other than strep throat.   In support, Chambers-Daney points to Via Christi emergency room admission notes documenting plaintiff's sore throat and frequent vomiting in response to taking antibiotics.  Emergency Documentation (Doc. #445-1) at 020006.  Chambers-Daney argues that she did not know and could not have known that neurological injury to plaintiff was imminent.

The record creates a genuine issue of material fact whether Chambers-Daney's actions constitute wanton conduct.  According to plaintiff's experts, when plaintiff reported symptoms

---

[3]     Even if Chambers-Daney challenged the second prong, the Court finds that the record creates a genuine issue of material fact whether she was reckless and indifferent to the consequences of her inaction.

of headaches, dizziness and vomiting, Chambers-Daney should have performed a complete neurological workup and ordered a CT scan. Deposition of Dr. Charles Murphy (Doc. #460-5) at 79, 135–36; Deposition of Dr. James Mathews (Doc. #460-4) at 174. Plaintiff's mother told Chambers-Daney about D.M.'s worsening neurological symptoms, including severe headaches, dizziness, vomiting, unbalance and protruding eyes. Deposition of Kelli Morgan (Doc. #445-2) at 174–75. Chambers-Daney witnessed that D.M.'s eyes would not close when he slept. Id. at 175. Despite being aware of these facts, Chambers-Daney did not chart D.M.'s neurological symptoms. Emergency Documentation (Doc. #445-1) at 020006. She did not complete a physical exam or a neurological exam. Deposition of Kelli Morgan (Doc. #445-2) at 338. She did not ask important follow-up questions about D.M.'s headache or his prior emergency room visit at Wesley Medical Center. Deposition of Daney (Doc. #460-20) at 77, 136. Chambers-Daney argues that before the code blue, none of D.M.'s other providers suspected a stroke, but this argument is tautological. The other providers testified that they did not suspect a stroke because Chambers-Daney's admission notes were deficient. See, e.g., Deposition of Dr. White (Doc. #447-5) at 30.

On this record, a reasonable factfinder could conclude that given Chambers-Daney's knowledge of existing conditions, she understood that her action or inaction "would likely or probably result" in plaintiff's injury or other risk or complications. Holt, 2004 WL 1636574, at *8. Accordingly, a reasonable jury could find that Chambers-Daney realized imminent danger

and was reckless and indifferent to the consequences of her inaction.[4] As to punitive damages, Chambers-Daney is not entitled to summary judgment.

## II.     CEP America-Kansas, LLC

CEP seeks summary judgment on plaintiff's claim for punitive damages. See K.S.A. 60-3702(c)–(d).

Employers can be liable for punitive damages arising from the acts of an employee only in certain limited situations. Exemplary or punitive damages shall not be assessed against a "principal or employer for the acts of an agent or employee unless *the questioned conduct* was *authorized* or *ratified* by a person expressly empowered to do so on behalf of the principal or employer." K.S.A. 60-3702(d)(1) (emphasis added).

The "questioned conduct" in the context of K.S.A. 60-3701 must be causally connected to the resulting harm, and the employer must authorize or ratify this conduct. Smith v. Printup, 254 Kan. 315, 342, 866 P.2d 985, 1003–04 (1993). Authorization is generally accomplished before or during the employee's questioned conduct and may be based on an express grant of authority or on a course of conduct implying authority. Lindsey v. Miami Cty. Nat'l Bank, 267 Kan. 685, 692, 984 P.2d 719, 724 (1999). In addition, placing an employee in certain positions of authority, such as a managerial agent of some kind, can suffice. See, e.g., Holt, 2004 WL 1636574, at *11. Ratification may be accomplished before, during or after the employees' questioned conduct. See Lindsey, 267 Kan. at 692, 984 P.2d at 724; Smith, 254 Kan. at 342,

---

[4]     Plaintiff also argues that Chambers-Daney's prior Facebook posts containing jokes about patient care evidence a wanton attitude. Facebook Posts (Doc. #460-10). The Court need not address this issue or the admissibility of the Facebook posts because plaintiff has presented other evidence that creates a genuine issue of material fact whether Chambers-Daney's actions were wanton.

866 P.2d at 1003–04; Werdann v. Mel Hambelton Ford, Inc., 32 Kan. App. 2d 118, 131, 79 P.3d 1081, 1091 (2003). It may be based on an express ratification or on a course of conduct indicating the approval, sanctioning or confirmation of the questioned conduct. Smith, 254 Kan. at 342, 866 P.2d at 1003–04.

CEP argues that plaintiff has not presented evidence that as Chambers-Daney's employer, it authorized or ratified the "questioned conduct"—her treatment of plaintiff.[5] K.S.A. 60-3702(d)(1). CEP also argues that plaintiff did not present evidence showing that Chambers-Daney was acting in a managerial capacity.

Plaintiff argues that CEP authorized or ratified Chambers-Daney's treatment of plaintiff because it did not have policies or procedures regarding patient care and emergency room treatment that Chambers-Daney was required to follow. Deposition of Dr. Chang (Doc. #460-12) at 9, 31. Plaintiff argues that the *absence* of a CEP-specific prohibition on "wanton" medical treatment implies that CEP authorized or ratified all of Chambers-Daney's conduct. Authorization and ratification in this context, however, require affirmative action. Smith, 254 Kan. at 340–42, 866 P.2d at 1002–04. Plaintiff did not present evidence that CEP approved, sanctioned or confirmed the treatment that Chambers-Daney administered. Id. at 342. Plaintiff did not present evidence that Chambers-Daney was in a managerial role or that CEP knew or should have known that Chambers-Daney would engage in misconduct. Plaintiff also did not present evidence of CEP policies, procedures or managerial behavior that a jury reasonably could infer implicitly authorized or ratified the questioned conduct. Lowe v. Surpas Res. Corp., 253

---

[5] CEP also argues that plaintiff failed to present sufficient evidence for a reasonable jury to find by clear and convincing evidence that Chambers-Daney's actions were willful, wanton, fraudulent or malicious. As explained above, a reasonable jury could find that Chambers-Daney's conduct was wanton. Accordingly, CEP is not entitled to summary judgment on this alternative basis.

F. Supp. 2d 1209, 1256 (D. Kan. 2003) (citing Smith, 254 Kan. at 340, 866 P.2d at 1002–03).

Plaintiff argues that CEP authorized or ratified Chambers-Daney's treatment of him because CEP did not discipline her for objectionable Facebook posts.  Plaintiff does not allege that the Facebook posts themselves were tortious or caused plaintiff harm.  Under Kansas law, to impose punitive damages on CEP, a jury must find that CEP authorized or ratified the "questioned conduct," i.e. the tortious act itself.  K.S.A. 60-3701; Smith, 254 Kan. at 342, 866 P.2d at 1003–04.  Punitive damage awards are premised upon an underlying tortious act, not an egregious mindset alone.  Smith, 254 Kan. at 315, 866 P.2d at 988–89.  Plaintiff's cause of action is based on the questioned conduct of Chambers-Daney's treatment.  Chambers-Daney's Facebook posts, posted months before interacting with plaintiff, were unrelated to his treatment and could not be the basis for his cause of action or the cause of his disability.   Accordingly, plaintiff has not presented sufficient evidence for a reasonable jury to award punitive damages against CEP.  As to punitive damages, CEP is entitled to summary judgment.

**IT IS THEREFORE ORDERED** that the Motion For Partial Summary Judgment As To Plaintiff's Punitive Damage Claims By Jennifer Chambers-Daney, APRN (Doc. #444) filed May 15, 2020 is **OVERRULED**.

**IT IS FURTHER ORDERED** that the Motion For Partial Summary Judgment As To Plaintiff's Punitive Damage Claims By CEP America-KS LLC (Doc. #448) filed May 15, 2020 is **SUSTAINED**.

Dated this 14th day of September, 2020 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge