**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| D.M., a minor by and through his next friend and natural guardian, KELLI MORGAN, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | No. 18-2158-KHV |
| WESLEY MEDICAL CENTER, LLC d/b/a WESLEY MEDICAL CENTER-WOODLAWN, et al., | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER**

On September 11, 2018, D.M., a minor by and through his next friend, Kelli Morgan, filed an amended complaint against Wesley Medical Center, LLC d/b/a Wesley Medical Center-Woodlawn ("Wesley Medical Center"), Wesley-Woodlawn Campus, Lisa Judd, RN, Via Christi Hospitals Wichita, Inc. d/b/a Via Christi-St. Francis ("Via Christi"), Aaron Kent, RN, Bridget Grover, PA-C, Dr. Gregory Faimon, Jennifer Chambers-Daney, ARNP, Dr. Bala Bhaskar Reddy Bhimavarapu, CEP America-KS LLC, Dr. Connor Hartpence, Dr. Stefanie White and Dr. Jamie Borick, alleging that defendants' medical malpractice caused him paralysis, neurological damage and other permanent injuries. First Amended Complaint (Doc. #121); see Pretrial Order (Doc. #435) filed May 4, 2020. This matter is before the Court on the Motion For Partial Summary Judgment As To Plaintiff's Punitive Damage Claims By Defendant Bridget Grover, PA-C (Doc. #442) and the Motion For Summary Judgment For Defendant Dr. Gregory Faimon (Doc. #440), both filed May 15, 2020. For reasons stated below, the Court overrules both motions.

**Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of the party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party does so, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which he carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry his burden, the nonmoving party may not rest on his pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby, 477 U.S. at 250–51.  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251–52.

**Factual And Procedural Background**

The following facts are uncontroverted, deemed admitted or, where controverted, viewed in the light most favorable to plaintiff, the non-movant.

On March 5, 2017 at 6:19 p.m., Kelli and Kevin Morgan brought plaintiff, their five-year-old son D.M., to the Wesley Medical Center emergency room because of intense headaches, nausea, dizziness, unbalance, vomiting, fatigue and abdominal pain.  At triage, Nurse Lisa Judd examined plaintiff and recorded that Kelli told her about his sudden onset of nausea, headaches and dizziness and that "she thinks his throat might be red."  Wesley Medical Center Chart (Doc. #443-1) at 5. Nurse Judd noted that plaintiff currently did not have a cough, fever or sore throat.  Id.  Based on the inputted symptoms, the Wesley Medical emergency department's differential diagnosis software flagged "subarachnoid hemorrhage" as a potential diagnosis.[1]  See Deposition Of Bridget Grover (Doc. #462-2) at 61.  Nurse Judd admitted plaintiff to the emergency room to be examined by Bridget Grover, a physician assistant supervised by Dr. Gregory Faimon.

In the exam room, Kelli told Grover that plaintiff had a severe headache, nausea, unbalance, slurred speech, lethargy, light sensitivity and his eyes were rolling into the back of his head. Deposition Of Kelli Morgan (Doc. #462-4) at 88–89.  Grover examined plaintiff with a stethoscope and looked in his ears and at his throat, but she did not ask plaintiff any questions.  Id. at 90–93. Grover knew that the emergency department computer had flagged "subarachnoid hemorrhage" as a potential diagnosis.  See Deposition Of Bridget Grover (Doc. #462-2) at 62.  To rule out a deadly headache, Grover claimed to perform a neurological exam, including a Romberg exam that would

---

[1] Subarachnoid hemorrhage is a life-threatening type of stroke caused by bleeding into the space surrounding the brain.

have required plaintiff to stand.  Kelli testified, however, that she held plaintiff in her arms during Grover's entire exam.  Deposition Of Kelli Morgan (Doc. #462-4) at 90, 280; Deposition Of Bridget Grover (Doc. #462-2) at 27–28.  When Grover informed Kelli that she suspected plaintiff had strep throat, Kelli started questioning why he "would be having all these symptoms with simply having strep throat."  Deposition Of Kelli Morgan (Doc. #462-4) at 276–77.  Grover became "dismissive," "wouldn't specifically address [Kelli's] concerns about it" and then walked out of the examination room while Kelli was trying to ask questions.  Id. at 278–79.

Upon completion of plaintiff's examination, Grover ordered one test—a strep test.  A nurse performed the swab test on plaintiff, and plaintiff had two profuse vomiting episodes that required a custodian to help clean up while waiting for the results.  Id. at 95.  Plaintiff's strep test came back positive.  Grover then charted that plaintiff's chief complaints were headache and sore throat and that plaintiff reported fever, sore throat and irritability.  Wesley Medical Center Chart (Doc. #443-1) at 8–9.  She also marked that plaintiff denied nausea, vomiting and dizziness.  Id.  At 7:06 p.m., Grover discharged plaintiff with a diagnosis of strep throat and a prescription for antibiotics.  Id. at 11–12.

At 10:15 p.m., supervising physician Dr. Faimon reviewed plaintiff's chart and approved Grover's treatment with a note stating as follows: "I have reviewed [Grover's] note and plan of care. I was available for consultation as needed at all times during the patients' visit in the emergency department. I agree with the clinical impression, plan and disposition."  Id. at 13.

After returning home, plaintiff's symptoms continued to worsen.  On March 6, 2017 at 2:22 a.m., Kelli took plaintiff to the Via Christi emergency room, where he was admitted for observation.  At 10:00 a.m., approximately eight hours after he arrived at Via Christi, Via Christi

personnel called a code blue for plaintiff. Subsequent examination showed a mass in his brain. As a result, plaintiff suffered a catastrophic stroke which caused paralysis, neurological damage and other permanent injuries. Pretrial Order (Doc. #435) at 47. On March 9, 2017, four days after Grover and Dr. Faimon discharged plaintiff from Wesley Medical, Dr. Faimon called plaintiff's father to express that he understood the family was not satisfied with its experience at Wesley Medical and that there had been a misdiagnosis. Deposition Of Dr. Gregory Faimon (Doc. #461-3) at 7–15. Dr. Faimon also asked if there was anything he could do to "take back to make that better to fix that." Id.

According to plaintiff's experts, Grover did not meet the standard of care because plaintiff's presenting symptoms of headache, dizziness, imbalance, nausea and vomiting are signs of an acute neurological emergency and Grover failed to consider a differential diagnosis that involved intracranial process. See, e.g., Deposition Of Dr. Jean-Baptiste LePichon (Doc. #462-9) at 52. As Grover's supervising physician, Dr. Faimon took responsibility for plaintiff's care and failed to properly supervise Grover by reviewing all records, documents and information available when approving Grover's medical decision-making. Deposition Of Dr. Charles Murphy (Doc. #461-4) at 139–41.

On September 11, 2018, plaintiff filed an amended complaint. See First Amended Complaint (Doc. #121). Plaintiff claims that defendants were negligent by failing to do one or more of the following:

(1) consider a differential diagnosis that involved an intracranial process involving increased intracranial pressure;
(2) rule out a neurological problem as being the cause of D.M.'s complaints and presentation;
(3) conduct a more complete and adequate neurological examination of D.M.;
(4) perform a proper physical examination;

(5) take a proper history of D.M.'s complaints and symptoms;
(6) obtain a proper history regarding D.M.'s headache;
(7) order immediate head imaging to rule out elevated intracranial pressure;
(8) order head imaging;
(9) order a head CT stat;
(10) perform and document a proper differential diagnosis;
(11) properly diagnose;
(12) diagnose elevated intracranial pressures;
(13) consider an intracranial process;
(14) obtain a neurological consultation;
(15) follow up on abnormal labs;
(16) obtain vital signs;
(17) follow up on abnormal vital signs;
(18) review the complete medical chart including the nursing notes and triage sheet;
(19) properly supervise Bridget Grover;
(20) perform a complete review of D.M.'s medical chart;
(21) not personally examining D.M.;
(22) consider a differential diagnosis that involved an intracranial process involving increased intracranial pressure;
(23) review the entire medical record including nursing notes;
(24) review the entire medical record including the triage notes
(25) properly observe D.M. for a longer period of time to insure fluid toleration;
(26) observe D.M.'s gait and recording the same; and
(27) obtain a blood pressure.

Pretrial Order (Doc. #435) at 24–26.  Plaintiff seeks damages for medical malpractice and punitive damages from Grover and Dr. Faimon.  Id.

## Analysis

Grover asserts that she is entitled to summary judgment on plaintiff's claim for punitive damages.  Dr. Faimon asserts that he is entitled to summary judgment on plaintiff's claims of medical malpractice.  The Court will consider each defendant in turn.

**I.    Bridget Grover, PA-C**

Grover asserts that she is entitled to summary judgment on plaintiff's claim for punitive damages.

Under Kansas law, plaintiff may recover punitive damages to punish the wrongdoer for a

"malicious, vindictive or willful and wanton invasion" of plaintiff's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs. Foster v. USIC Locating Servs., LLC, No. 16-2174-CM, 2018 WL 3575649, at *4 (D. Kan. July 25, 2018) (citations omitted). To recover punitive damages, plaintiff must show by clear and convincing evidence that defendant's conduct was willful, malicious or wanton.[2] Id.; D.M. by & through Morgan v. Wesley Med. Ctr. LLC, No. 18-2158-KHV, 2019 WL 2448574, at *7 (D. Kan. June 12, 2019). Wantonness refers to the "mental attitude of the wrongdoer rather than a particular act of negligence." P.S. ex rel. Nelson v. The Farm, Inc., 658 F. Supp. 2d 1281, 1303 (D. Kan. 2009) (citing Reeves v. Carlson, 266 Kan. 310, 314, 969 P.2d 252, 256 (1998)). For their acts to be wanton, defendants must "realize the imminence of danger and recklessly disregard and be indifferent to the consequences" of their act. Id. The first prong—realizing imminent danger—does not necessarily mean that defendants knew that plaintiff's particular injury was imminent. See Holt v. Wesley Med. Ctr., LLC., No. 00-1318-JAR, 2004 WL 1636574, at *8 (D. Kan. July 19, 2004). The Court instead asks whether based on defendants' knowledge of existing conditions, they were aware that their action or inaction "would likely or probably result" in the injury or other known risk or complication. Id.; see Reeves, 266 Kan. at 315, 969 P.2d at 256–57 (based on knowledge of existing conditions, defendant was aware conduct likely or probably would cause injury). Plaintiff can circumstantially

---

[2]   As best the Court can ascertain, plaintiff does not claim that Grover maliciously injured him but asserts that Grover acted willfully by dishonestly omitting symptoms from plaintiff's chart that she knew suggested serious illness and lying about performing certain tests. Amended Complaint (Doc. #121) at 35–37. Plaintiff points to evidence of a previous finding from the Kansas Board of Healing Arts—unrelated to plaintiff's treatment—which found Grover guilty of fraud or misrepresentation for lying about completing continuing education hours. Deposition Of Bridget Grover (Doc. #462-2) at 55–56. Because plaintiff has presented other evidence that create a genuine issue of material fact whether Grover's actions warrant punitive damages, the Court need not address the admissibility of that finding.

prove defendants' knowledge of imminent dangers.  Holt, 2004 WL 1636574, at *8.

As to the second prong—reckless disregard and indifference—Kansas law does not require plaintiff to establish "a formal and direct intention to injure any particular person.  It is sufficient if [ ] defendant evinced that degree of indifference to the rights of others which may justly be characterized as reckless."  P.S. ex rel. Nelson, 658 F. Supp. 2d at 1303 (citing Reeves, 266 Kan. at 315, 969 P.2d at 256–57).  Recklessness is more than mere negligence and requires conduct which shows "disregard of or indifference to consequences, under circumstances involving danger to life or safety of others."  Id.

The Court typically reserves the question of wantonness for the jury; only when reasonable persons "could not reach differing conclusions from the same evidence may the issue [of wantonness] be decided as a question of law."  Danaher v. Wild Oats Mkts., Inc., 779 F. Supp. 2d 1198, 1213 (D. Kan. 2011) (citations omitted).

Here, Grover asserts that plaintiff cannot recover punitive damages because (1) plaintiff has failed to plead grounds for recovery of punitive damages and (2) assuming that plaintiff relies upon a claim of wanton conduct, no reasonable jury could find that Grover's actions were wanton.

Grover first argues that the amended complaint does not allege that her conduct was willful, wanton, fraudulent or malicious.  The pretrial order supersedes all pleadings and controls the subsequent course of this case.  Fed. R. Civ. P. 16(d); D. Kan. Rule 16.2(b).  In the pretrial order, plaintiff identifies specific conduct that he claims was wanton.  See Pretrial Order (Doc. #435) at 24–26 (failing to take a proper history of plaintiff's complaints and symptoms, failing to consider a differential diagnosis that involved an intracranial process involving increased intracranial pressure and failing to obtain emergent neuro-imaging).  The Court therefore rejects

Grover's argument that plaintiff has not alleged conduct that could warrant punitive damages.

Grover does not seek summary judgment on plaintiff's claims of negligence, but she argues that plaintiff has not presented sufficient evidence for a reasonable jury to find wanton conduct. Grover argues that at most, the evidence shows that she did not realize that plaintiff's symptoms indicated anything other than strep throat and she treated him accordingly. In other words, as best the Court can ascertain, Grover focuses her challenge on the first prong, arguing that she did not realize imminent danger.[3] In support, Grover asserts that no one suspected plaintiff had a brain tumor until March 6, 2017, when a CT scan was performed at Via Christi. Grover claims that nothing in plaintiff's history or physical examination caused her to question whether his symptoms indicated a more serious or harmful illness.

The record creates a genuine issue of material fact whether Grover's actions constitute wanton conduct. According to plaintiff's expert, a sudden and severe headache, dizziness and unbalance are "neurological symptoms that should trigger a great deal of concern, especially in a five-year-old." Deposition Of Dr. Jean-Baptiste LePichon (Doc. #462-9) at 52. Kelli testified that she told Grover about plaintiff's severe headache, nausea, unbalance, slurred speech, lethargy, light sensitivity and his eyes rolling into the back of his head. Deposition Of Kelli Morgan (Doc. #462-4) at 88–89. Grover charted only a portion of these symptoms and instead charted symptoms that Kelli and plaintiff had not reported, like a fever. Wesley Medical Center Chart (Doc. #443-1) at 8–9. Grover was aware of plaintiff's acute headache and dizziness and that based on his inputted symptoms, the emergency department computer system had flagged "subarachnoid hemorrhage" as a potential

---

[3] Even if Grover challenges the second prong, the Court finds that the record creates a genuine issue of material fact whether she was reckless and indifferent to the consequences of her inaction.

diagnosis.  See Deposition Of Bridget Grover (Doc. #462-2) at 81–82.  Despite being aware of these facts and acknowledging that these symptoms could indicate a much more serious illness than strep throat, she did not ask plaintiff about his headache or order any tests like a CT scan to rule out more serious neurological illnesses.  Id. at 91–92.  Grover argues that before the code blue, none of plaintiff's other providers—including those who saw plaintiff at Via Christi—suspected a stroke, but other providers testified that they did not suspect a stroke because, in part, they were relying on Grover's examination and diagnosis of strep throat.[4]  See, e.g., Deposition Of Dr. Stefanie White (Doc. #447-5) at 30.

Based on Grover's knowledge of these existing conditions, a jury could find that she was aware that her action or inaction "would likely or probably result" in the injury or other known risk or complication.  Holt, 2004 WL 1636574, at *8.  Accordingly, a reasonable jury could find that Grover realized imminent danger and was reckless and indifferent to the consequences of her inaction.  As to punitive damages, Grover is not entitled to summary judgment.

**II.    Dr. Gregory Faimon, Supervising Physician**

Dr. Faimon asserts that he is entitled to summary judgment on plaintiff's claims of medical malpractice.

To recover a claim for medical malpractice, plaintiff is required to meet the same elements of proof as any negligence action: (1) the existence of a duty, (2) breach of that duty, (3) injury and (4) causal connection between the duty breached and the injury suffered.  Seeber v. Ebeling, 36 Kan.

---

[4] Plaintiff contends that Grover's reposting of an emergency physician's Facebook post about the frustration of overbooked emergency rooms in 2013 evidences a wanton attitude.  Grover's Facebook Post (Doc. #462-11).  The Court need not address this issue or the admissibility of the Facebook post because plaintiff has presented other evidence that creates a genuine issue of material fact whether Grover's actions were wanton.

App. 2d 501, 507, 141 P.3d 1180, 1184–85 (2006). The first element concerns whether a physician owes a legal duty to a patient under a particular circumstance, which is a question of law. Irvin v. Smith, 272 Kan. 112, 122, 31 P.3d 934, 942 (2001). A duty arises and liability may be imposed only for negligence occurring during the physician–patient relationship, and the existence of a physician–patient relationship is generally a question of fact for the jury. Irvin, 272 Kan. at 119–22, 31 P.3d at 940–42; Seeber, 36 Kan. App. at 507, 141 P.3d at 1184–85.

In the present case, this first element of legal duty must be viewed in the context of the supervising doctor–physician assistant relationship.[5] In Kansas, physician assistants practice in a dependent role with a supervising physician and perform medical services only through delegated authority or written agreement from their supervising physician. K.S.A. § 65-28a08. Kansas permits physician assistants to practice only within the statutory authority granted to them and their supervising physician in the Physician Assistant Licensure Act. K.S.A. § 65-28a et. seq. The Act defines a licensed physician assistant as a person "who provides patient services under the direction and supervision of a supervising physician." K.S.A. § 65-28a02(4). The Act defines "direction and supervision" as "guidance, direction and coordination of activities of a physician assistant by such physician assistant's supervising physician, whether written or verbal." K.S.A. § 65-28a02(2). The supervising physician does not have to be physically present during the physician assistant's performance but must have "*accepted responsibility* for the medical services rendered and actions of

---

[5] Dr. Faimon argues that the Kansas Health Care Provider Insurance Availability Act, K.S.A. § 40-3401 et seq., originally enacted in 1976, bars vicarious liability as well as responsibility by one health care provider for injury or death arising out of the rendering or failure to render professional services by another "health care provider," including physician assistants. However, the Physician Assistant Licensure Act, amended in 2016, imposes a statutory duty on supervising physicians to adequately supervise physician assistants in their treatment of patients. K.S.A. § 65-28a et. seq.

the physician assistant while performing under [his] direction and supervision." K.S.A. § 65-28a02(5) (emphasis added).

Dr. Faimon argues that he is entitled to summary judgment because absent a physician–patient relationship, he did not owe plaintiff a duty. Dr. Faimon notes that he only approved plaintiff's chart that Grover prepared, which did not create a physician–patient relationship. Under Kansas law, however, Dr. Faimon had a duty in his role as Grover's supervising physician. K.S.A. § 65-28a02(5) (doctor has duty to supervise physician assistant and "accept responsibility for the medical services rendered"). Grover's medical treatment of plaintiff was completely dependent on Dr. Faimon's supervision and authorization. Because Dr. Faimon had a statutory duty to adequately supervise Grover and approve her treatment of plaintiff, the Court overrules Dr. Faimon's motion for summary judgment on plaintiff's claim of medical malpractice.

**IT IS THEREFORE ORDERED** that the Motion For Partial Summary Judgment As To Plaintiff's Punitive Damage Claims By Defendant Bridget Grover, PA-C (Doc. #442) and the Motion For Summary Judgment For Defendant Dr. Gregory Faimon (Doc. #440), both filed May 15, 2020 are **OVERRULED**.

Dated this 22nd day of September, 2020 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge