## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

D.M. a minor, by and through his next friend  )
and natural guardian, Kelli Morgan,          )
                                             )
                        Plaintiff,           )  Case No. 2018-CV-2158-KHV-KGG
                                             )
v.                                           )
                                             )
Bridget Grover, PA-C; Dr. Gregory Faimon;    )
and Dr. Bala Bhaskar Reddy Bhimavarapu,      )
                                             )
                        Defendants.          )
                                             )

## PLAINTIFF D.M.'S
## FINAL WITNESS AND EXHIBIT DISCLOSURES
## PURSUANT TO RULE 26(a)(3)(A)

Plaintiff D.M., by and through his attorneys, hereby makes this final witness and exhibit disclosure pursuant to Federal Rule of Civil Procedure 26(a)(3)(A). These disclosures are based on information available to D.M. at the time of disclosure. These disclosures are made subject to, and without waiving, D.M.'s attorney-client and/or work-product privileges.

**i.**    **Witnesses to be called by Plaintiff at trial.**

1.    **Kelli Morgan, 11948 Ridge Parkway, Apt. 104, Broomfield, CO  80021**
Ms. Morgan will be called live to testify via Zoom.  She is the mother of D.M. and is expected to testify consistent with her first knowledge of events at issue and her deposition testimony.  Her testimony will include, but is not limited to, the following: Kelli Morgan will testify to what life was like for the Morgan family, in particular D.M., prior to D.M.'s stroke and the events leading up to the emergency room admissions on March 5 and 6, 2017.  She will further testify to D.M.'s condition in the days leading up to the emergency room presentations as well as his incident while at church and the ride from church to the emergency room.  She will discuss her first-hand interaction with health care providers at both Wesley Medical Center and Via Christi-St. Francis as well as D.M.'s presentation and condition while there including his significant headache, nausea, vomiting, dizziness, lack of balance among other signs and symptoms.  She will testify to events

and D.M.'s condition between emergency room visits. During both emergency room admissions and admission to the hospital and subsequent hospitalizations and treatment, Kelly was with D.M. a majority of the time and will testify as to all her interactions with defendants but also other providers. Kelli will testify about calls, text messages, searches she engaged in during and between the time of D.M's emergency room presentations. Kelli will testify about D.M.'s cancer and stroke treatment and rehabilitation and D.M.'s course of care and treatment after the diagnoses. Kelly will provide detail about how both the Morgan family, in particular D.M.'s, lives have changed since his stroke. She will testify about his rehabilitation, therapy, education as well as D.M.'s current physical and cognitive abilities compared to before the stroke as well as the impact D.M.'s condition has had on relationships with her spouse, family and friends.

2.   **Kevin Morgan, 11948 Ridge Parkway, Apt. 104, Broomfield, CO 80021**
Mr. Morgan will be called live to testify via Zoom. He is the father of D.M. and is expected to testify consistent with her first knowledge of events at issue and her deposition testimony. His testimony will include, but is not limited to, the following: Kevin Morgan will testify to what life was like for the Morgan family, in particular D.M., prior D.M.'s stroke and the events leading up to the emergency room admissions on March 5 and 6, 2017. He will further testify to D.M.'s condition in the days leading up to the emergency room presentations as well as his incident while at church and the ride from church to the emergency room. He will discuss his interactions with health care providers at both Wesley Medical Center and Via Christi-St. Francis as well as D.M.'s presentation and condition while there. He will testify to D.M.'s presentation and condition while there including his significant headache, nausea, vomiting, dizziness, lack of balance among other signs and symptoms. During both emergency room admissions and admission to the hospital and subsequent hospitalizations and treatment, Kevin was either present or kept apprised of events by Kelly Morgan. He will testify as to all his interactions with defendants but also other providers. He will testify to calls, text messages, searches he engaged in during and between the time of D.M's emergency room presentations. Kevin will testify to phone conversations and messages he left with Wesley Medical Center and phone call correspondence with Dr. Gregory Faimon. Kevin will testify about D.M.'s cancer and stroke treatment and rehabilitation and D.M.'s course of care and treatment after the diagnoses. Kevin will provide detail about how both the Morgan family, in particular D.M.'s, lives have changed since his stroke. He will testify about his rehabilitation, therapy, education as well as D.M.'s current physical and cognitive abilities compared to before the stroke as well as the impact D.M.'s condition has had on relationships with her spouse, family and friends.

3. **D.M., 11948 Ridge Parkway, Apt. 104, Broomfield, CO 80021**

D.M. is a nine-year old and is the Plaintiff in this case. D.M. will testify live about the nature and extent of his injuries, his new life and the things he misses about his old life as best as he can. He will testify about activities of daily livings as well as activities he likes to do on a day to day basis.

4. **Bridget Grover, PA-C, 3021 E. 101st St. North, Valley Center, KS 67147**

Ms. Grover is a physician assistant employed with CarePoint and was working at Wesley Medical Center-Woodlawn on March 5, 2017 when D.M. presented to the emergency room. She will testify in person via Zoom. Ms. Grover was deposed in this case and we anticipate she will testify consistent with that deposition. Ms. Grover provided care to D.M. in the emergency room and will provide testimony as to her care and treatment of D.M. while at the emergency room as well as her interaction with D.M., Kelli Morgan and other staff members in the emergency room. She will testify that she does not review nurse notes and that she made late entries in the medical chart hours after D.M.'s discharge. She will testify that she did not record a differential diagnosis, consult with an emergency room, or consider other diagnoses inconsistent with the diagnosis of strep throat. She will testify as to inconsistencies in her notes versus nursing notes and triage form notes that were made contemporaneous with D.M.'s care and treatment. She will testify about the limited time she spent with D.M. and failure to do a complete neurological examination including asking D.M. to stand, walk and do simple tasks. She will testify she does not recall a lot of her interaction/details regarding Kelly Morgan and D.M. as well as care and treatment provided to D.M. She will testify about her failure to ask follow-up questions about headache, dizziness, unbalance, nausea and vomiting and virtually ask any questions about his complaints or even make an inquiry regarding the church incident. She will also testify to reviewing D.M.'s chart weeks after his discharge.

5. **Dr. Gregory Faimon, MD, 3800 E. 93rd St. North, Valley Center, KS 67147**

Dr. Faimon will be called live to testify. He is a physician and was Bridget Grover's supervising physician when D.M. presented to Wesley Medical Center-Woodlawn on February 5, 2021. He was deposed and we anticipate that he will testify consistent with his deposition transcript. He will also testify as to the various roles he plays at Wesley Medical Center-Woodlawn. He will testify that he was responsible for D.M.'s care and treatment and that he was the attending physician. He will testify as to Grover's charting, his review of her charting for one minute, and also testify that he never reviewed the nursing notes, nor does he require his physician assistants to review nursing notes when delivering care. He will testify that after

reviewing Grover's charting that he agreed with her impression, plan, and disposition without relying on nursing notes. He did not form a differential diagnosis, nor did he discuss D.M.'s care with Grover. He will testify that he did not call D.M.'s parents after his review of his chart. However, he will discuss conversations and emails he had with Tripp Owings of the hospital regarding complaints made by Kevin Morgan. He will testify to a phone conversation he had with Kevin Morgan and not knowing about D.M.'s case despite having reviewed D.M.'s chart. He will testify to reviewing D.M.'s chart for a lengthy period of time weeks after his discharge. Dr. Faimon will also testify to D.M.'s presenting symptoms, differences in charting between nurses and Grover and provide testimony relating to his duties to D.M. and supervisory role of Ms. Grover.

6.   **Lisa Judd, RN, 226 S. Holyoke, Wichita, KS 67218**
Ms. Judd will appear by written/video deposition or live testimony. Ms. Judd was the triage nurse at Wesley Medical Center-Woodlawn at the time D.M. presented. She will testify to her nursing care and treatment of D.M. and her interactions with D.M. and his mother Kelli Morgan. She will testify to D.M. complaints of headache, nausea, dizziness, unbalance, lack of fever and lack of sore throat. She will testify about D.M.'s time in the emergency room, the interactions between PA Grover and D.M. and D.M.'s mother as well as the episode of vomiting surrounding the rapid strep test. Nurse Judd will testify to her to her history and examination of D.M.

7.   **Jennifer Chambers-Daney, ARNP, 8114 E. Boston St., Wichita, KS 67207**
Ms. Chambers-Daney will appear by written and video deposition and is expected to testify about the care and treatment of D.M. while he was in the emergency room at Via Christi- St. Francis. Daney is expected to testify consistent with her deposition testimony. She will testify to his presenting complaints, her workup as well as her history and physical examination. She will testify to her interaction with D.M. and Kelli Morgan. She will discuss her assessment of D.M. and her concerns to have him admitted. She will also testify to the fact she consulted Dr. Bala about accepting D.M. and being the attending physician.

8.   **Dr. Bala Rhaskar Reddy Bhimavarapu, MD., 9911 E. 21st St. N., Apt. 1102, Wichita, KS 67206**
Dr. Bhimavarapu will be called live to testify. He is a licensed healthcare provider, a Pediatric Hospitalist, and was the treating and admitting physician of D.M. and is expected to testify consistent with his deposition testimony. He will testify that he accepted D.M.'s as a patient and responsibility of his care and treatment. Dr. Bala was the pediatric hospitalist on call and when consulted by Daney accepted D.M.'s care which led D.M. to be seen by a first-year family practice resident, Dr. Conor Hartpence, who was still in training. Dr. Bala supervised Hartpence as well as the other residents involved in D.M.'s care. Rather than come to the hospital to do his own

history and physical examination, he relied upon the inexperienced residents he supervised. He never examined D.M. or spoke to his parents. Furthermore, despite Hartpence revealing history of headache, nausea, intractable vomiting, and dizziness, Bala did nothing to follow up on D.M.'s history of symptoms, his previous emergency room department admission or the days leading up the admission. He failed to inquire further about D.M.'s symptoms and ultimately established a plan and impression to let D.M. sleep it off and defer a neurological examination which would have prevented the stroke. This was the order to the residents and D.M. was allowed to sleep although his intracranial pressures continued to build. Dr. Bala only spent minutes with Dr. Hartpence on the phone about D.M. Dr. Bala will testify to his experience as a pediatric clinician and how it differs from a family practice resident. He will discuss how he has more training specifically tailored to the care and treatment of pediatric patients like D.M. He will testify that he never developed a differential diagnosis or considered other diagnoses as the caused of D.M.'s problems. He had access to D.M.'s medical chart anytime and could have physically examined D.M. anytime. He accessed D.M.'s chart at approximately 9:25 am on March 6, 2017 but still did not round on him. He was involved in the code blue that was called shortly after 10:00 a.m. and will discuss the code and the aftermath of D.M. code, surgery and stroke diagnosis. He will testify as to conversations he had with other providers regarding D.M.'s care and treatment. Dr. Bala will testify that while at Via Christi, he was the only pediatric physician, out of training, who provided care and treatment to D.M. up to the time of the code blue.

9. **Dr. Connor Hartpence, MD, 233 N. Edgemoor St., Wichita, KS  67208**
Dr. Hartpence will be called live to testify. He is a licensed healthcare provider and was a treating physician of D.M. and is expected to testify consistent with his notes contained within the medical records and his deposition testimony. At the time of D.M.'s presentation, Dr. Hartpence was a first-year family practice resident with very limited experience treating pediatric patients. He will testify that his experience is far less than Dr. Bala and he was looking to Dr. Bala for supervision, guidance and approval of his care and treatment of D.M. Dr. Hartpence performed a history and physical examination of D.M. while D.M. was asleep, discussed D.M.'s condition with Kelli Morgan and ultimately contacted Dr. Bala about his findings which included headache, nausea, vomiting, dizziness and other symptoms suggestive of a different diagnosis. Hartpence will testify that Dr. Bala approved the plan, that Bala did not establish a differential diagnosis or consider other diagnoses, that Hartpence was not asked to do any follow up regarding D.M.'s symptoms or prior emergency room visit and was instructed to defer the neurological examination and let D.M. sleep if off and round on him later.

10. **Dr. Raymond Grundmeyer, MD, 3223 N Webb Rd., Suite 1, Wichita, KS 67226**
Dr. Grundmeyer will appear by written deposition. He is a licensed

healthcare provider and was a treating physician of D.M. and is expected to testify consistent with his notes contained within the medical records and his deposition testimony.  Dr. Grundmeyer is D.M.'s treating neurosurgeon who removed the intracranial mass from D.M. on February 6, 2017.  Dr. Grundmeyer performed his own assessment of D.M. as well as history.  In this history, he noted that D.M. had multiple emergency room admissions.  That D.M. had a history intractable emesis along with headache, dizziness and worsening nausea.  He will testify as to his interactions with D.M.'s other health care providers and Kelli Morgan.  He will discuss his conversations with Dr. Stephanopolous who consulted him as well as his review of the chart and CT scan.  He will testify about the resection surgeon he performed, level of elevated intracranial pressure resulting from the obstructive hydrocephalus as well as the size and nature of the tumor itself.  He will discuss how D.M.'s symptoms of headache, dizziness, worsening nausea and emesis were consistent with elevated intracranial pressures. He will discuss how his surgery was a success and there were no complications or surprises as a result of the surgery.  He will testify that he believes the strokes D.M. sustained occurred prior to the resection and was not related to the surgery and will also testify to the likely cause of the strokes.

11. **Dr. Dimitrios Stephanopoulos, MD, 929 N. St. Francis, Wichita, KS  67214**

Dr. Stephanopoulos will appear by written and video deposition.  He is a licensed healthcare provider and was a treating physician of D.M. and is expected to testify consistent with his notes contained within the medical records and his deposition testimony.  His testimony will include, but is not necessarily limited to, the following:   Dr. Stephanopoulos is a pediatric critical care physician at Via Christi.  He was paged at about 10:00 a.m. on March 6, 2017in order to respond to the Rapid Response called for D.M.  The Rapid Response was then converted to a Code Blue.   When Dr. Stephanopoulus arrived, he found D.M. unresponsive.  He observed posturing and hyperextension of D.M.'s arms and legs which is a sign of increased intracranial pressure.  Increased intracranial pressure can be related to a number of disease entities, including hydrocephalus.   Dr. Stephanopoulos ordered a CT scan which confirmed a tumor at which time he called the neurosurgeon, Dr. Grundmeyer. Dr. Stephanopolus also identifies some of the signs and symptoms of increased intracranial pressure, including headache, nausea, vomiting and abnormal breathing.   Dr. Stephanopoulos has no opinions as to standard of care or the cause of D.M.'s stroke or when the stroke occurred.

12. **Thomas Dock Owings, IV, 2610 N. Woodlawn Blvd., Wichita, KS 67220.**
Mr. Owings will appear via Zoom or by written and video deposition. He is employed with Wesley Medical Center and is expected to testify consistent with his deposition testimony. His testimony will include, but is not necessarily limited to, the following: Mr. Owings is the CEO of Wesley Woodlawn. He received a phone message from Kevin Morgan complaining that D.M. had been misdiagnosed when he presented to the Wesley Woodlawn emergency room. On March 24, 2017, Mr. Owings emailed Defendant Faimon and requested Faimon contact Mr. Morgan regarding Kevin Morgan's complaint of misdiagnosis. Mr. Owings and Defendant Faimon had several subsequent communications regarding Mr. Morgan's complaint of misdiagnosis.

13. **Stacie Harding, RN, 2610 N. Woodlawn Blvd., Wichita, KS  67220**
Ms. Harding will appear by written and video deposition. She was employed with Wesley Medical Center and is expected to testify consistent with her deposition testimony. Ms. Harding's testimony will include, but is not necessarily limited to, the following: Ms. Harding is a registered nurse at Wesley Woodlawn. On March 5, 2017, Ms. Harding took D.M. to a room in the emergency department and took a history from Kelli Morgan that D.M. had a headache, was nauseaus, dizzy and unbalanced. Mr. Harding will testify consistent with the medical records that she prepared.

14. **Christy Martin, 929 N. St. Francis, Wichita, KS  67214.**
Ms. Martin will appear by written and video deposition. She is a designated corporate witness for Ascension Via Christi St. Francis and will testify regarding her knowledge of electronic audit trail and consistent with her deposition testimony. Ms. Martin's testimony will include, but is not limited to, the following: Ms. Martin is a clinical information specialist at Via Chisti Hospital. Ms. Martin is a corporate representative for Via Christi. Ms. Harding describes the audit trail used by Via Christi

15. **Nelda Appell, 550 N. Hillside, Wichita, KS  67214.**
Ms. Appell will appear via Zoom or by written and video deposition. She is a designated corporate witness for Wesley Medical Center and will testify consistent with her deposition testimony. Her testimony will include, but is not necessarily limited to, the following: Ms. Apell is the manager of EHR (electronic health record) support at Wesley Medical Center. She will identify and explain the Wesley audit trail which shows when anyone should enter the Wesley medical record system and views, creates or modifies a patient's medical record. Ms. Apell will confirm the timing when Defendant Grover accessed D.M.'s medical record on March 5, 2017. Specifically, Defendant Grover accessed D.M.'s medical record at approximately 6:24 p.m. on March 5, 2017. Grover then made several additional modifications to the record before dismissing D.M. at approximately 7:05 p.m. Defendant Grover subsequently completed

D.M.'s history and physical at 9:58 p.m. on March 5, 2017.  Defendant Faimon accessed D.M.'s medical record at 10:15 p.m. on March 5, 2017. According to the audit trail, Defendant Faimon spent less than one minute reviewing D.M.'s medical chart before signing the record at 10:15 p.m. Defendants Grover and Faimon subsequently reviewed D.M.'s chart on March 26, 2017.

16.    **Mary Masterman, MD, 1206 W. 44th St. South, Wichita, KS  67217**.
Dr. Masterman will appear by written and video deposition.  She is a licensed healthcare provider and was a treating physician of D.M. and is expected to testify consistent with her notes contained within the medical records and her deposition testimony. Dr. Masterman's testimony will include, but is not necessarily limited to, the following:  In 2017, Dr. Masterman was a resident physician at Via Christi.  She prepared D.M.'s discharge summary to Children's Mercy Hospital on or around March 15, 2017.  Dr. Masterman will describe the process to prepare a discharge summary, including review of the admission diagnoses, procedures, history of illness, a summary of the problems that the patient encountered while hospitalized and medications.  Dr. Masterman noted in D.M.'s discharge summary: "CVA left pons, corpus callosum, per Dr. El-Nabbout, thought to have occurred prior to the surgery."

17.    **Madonna Androes, 323 E. 16th, Hutchinson, KS  67501.**
Ms. Androes will be called live to testify via Zoom.  She is the Grandmother of D.M. and is expected to testify consistent with her firsthand knowledge of events at issue and her deposition testimony.  Her testimony will include, but is not limited to, the following: Ms. Androes will testify about her interactions with D.M. both before and after his stroke as well as her observations of the effects that the stroke has had on D.M.  Ms. Androes will also testify about her conversations with Kelli Morgan on March 5, 2017 wherein Kelli was upset and told Ms. Androes that she should come to Wichita to take care of the Morgans' foster children because the Morgans and D.M. were on their way to the emergency room because D.M. had been screaming and holding his head in the church nursery.  She will further testify about subsequent phone calls with Kelli that evening before Ms. Androes arrived at the Morgan home.  Ms. Androes will also testify about her observation of D.M. that evening at the Morgan home before she returned home to go to work.

18.    **Jenna Knight, 6713 E. 11th St. N., Wichita, KS  67206.**
Jenna Knight will appear via Zoom or by written deposition to testify.  She attended the same Church as D.M. and was his Youth Group Teacher.  Her testimony will include, but is not limited to, the following:  Ms. Knight was  with D.M. when he experienced a severe headache and had to leave youth group to go to hospital.  Specifically, Ms. Knight remembers D.M. crying and holding his head during an arts and craft project at the Church's Sunday school.  D.M. wouldn't answer Ms. Knight.  D.M. then calmed down for a period of time but D.M. then began "screaming crying" and holding his head and Ms. Knight asked what was wrong.  Ms. Knight recalls D.M. was hunched over and rocking while holding his

head which was very scary to see.  Ms. Knight was "really worried" about D.M. at which time Kelli Morgan came to get D.M.  Ms. Knight also described D.M. as very silly and very happy prior to the stroke.

19. **Melissa Mackey.  4447 N. St. James Place, Bel Aire, Kansas 67226**
Ms. Mackey will be called live to testify.  She attended the same Church as D.M.  Her testimony will include, but is not limited to, the following: Ms. Mackey was at Church with the Morgans on March 5, 2017.  After the service, Ms. Mackey spoke to Betsey Michael who told her that D.M. had been crying and screaming because of a headache and that the Morgans were taking D.M. to the emergency room.

20. **Betsey Michael, 4206 N. Dellrose Cir., Wichita, KS  67220.**
Ms. Michael will be called live to testify.  She attended the same Church as D.M. Her testimony will include, but is not limited to, the following: Ms. Michael was with Kelli Morgan on March 3, 2017 wherein Ms. Morgan told Ms. Michael that something "seemed off" with D.M. and that he seemed "off-balance" and something just wasn't right while the Morgans were having dinner at the Michaels' home.  That night, she saw D.M. at the top of the stairs throw his hands out as if to catch his balance and thinking that D.M. may have had an ear infection. Kelli Morgan told Ms. Michael that if D.M. wasn't better by Monday, Kelli would take D.M. to the doctor.  Ms. Michael also observed D.M. before the stroke and described him as lively, happy, goofy kid who was always laughing, always smiling, very intelligent, reading before what was typical for his age and using big words.  He was also obedient and a great kid. Ms. Michaels was also at Church with the Morgans when D.M. experienced a severe headache that caused him to have to leave Church. Ms. Michael was with Kelli in the Church nursery on March 5, 2017 when she heard a really loud scream come from the Church's Sunday School room.  Ms. Michael observed Kelli jump up and run upstairs to grab D.M. and carried him downstairs.  D.M. was holding his head with both hands and crying.  The Morgans quickly gathered up their foster children and their belongings and headed to the emergency room.

21. **Margot Burns, MD, 1221 S. Clarkson St., Suite 222, Denver CO  80210.**
Dr. Burns will be called live to testify.  She is a vocational rehabilitation counselor and expert witness on behalf of the Plaintiff.  She is expected to testify consistent with her findings and opinions listed in her report and deposition testimony both of which are incorporated by reference.  She will testify regarding her education, training and experience as set forth in detail in her CV which is incorporated by reference.  Dr. Burns will testify regarding her review of D.M.'s case outlining records and documents reviewed by her in developing her opinions and report.  Ms. Burns met with D.M. and his parents and will testify regarding the information she learned from the meeting.  She has information regarding D.M.'s physical and intellectual condition which have both been adversely affected.  She will testify regarding the significant sequalae of the stroke and the impact on D.M.'s future employability and the financial impact on D.M.'s future employment and future earnings.  She will testify regarding D.M.'s

compromised motor system and how it will impact D.M.'s employability in the future and compare to the type of employment D.M. would have been suited for but for the stroke. She will also outline the resources and reference materials that impacted her opinions and lead to her conclusions as set forth in her report. Dr. Burns will testify regarding D.M.'s earning capacity and the criteria used to evaluate D.M. and leading to her conclusion that D.M. has a severe disability and the impact the severe disability will have on his ability to pursue education and eventually employment. She will testify regarding the impact D.M.'s disability will have on his future earnings. She will offer opinions regarding D.M.'s expected education but for the stroke and the impact his anticipated education but for the stroke would have on his earnings. She will testify regarding that but for D.M.'s stroke he would have fully participated in the labor force but now has lost access to 90% of the jobs in the labor market due to his impairment. Dr. Burns will testify regarding how she arrived at his lost earnings and that D.M.'s lost earnings will range between $1.4 million and $3.6 million.

22.   **Robert Dabrow, MD, 6307 Coopers Green Ct., Orlando, FL 32819.** Dr. Dabrow will be called live to testify. He is a licensed medical doctor and expert witness on behalf of the Plaintiff. He is expected to testify consistent with his findings and opinions listed in his report and deposition testimony which is incorporated by reference. Dr. Dabrow will testify regarding the applicable standards of care. He will testify regarding his education and training all of which is set forth in detail in his curriculum vitae and is incorporated by reference. He will testify regarding his work on D.M.'s case and the material he used in arriving at his opinions in this case. He will testify that Dr. Bala, Dr. Faimon and PA Grover deviated from the standard of care. He will testify regarding the failure of Dr. Bala, Dr. Faimon and PA Grover to consider an alternative diagnosis to strep to account for the symptoms D.M. was exhibiting. He will testify regarding the failure of the defendants to engage in further testing of D.M. and to recognize the seriousness of D.M. presenting symptoms. He will explain that D.M.'s diagnosis could have been made at the initial encounter and anytime thereafter until D.M. suffered the stroke that caused him permanent and significant disability. Dr. Bala as the attending physician should have engaged in further testing and evaluation of D.M. Dr. Bala failed in his responsibility to D.M. to formulate a careful differential diagnosis. Dr. Bala should have recognized the residents did not have an appropriate work up or differential diagnosis and directed them to engage in further testing and to prepare an appropriate differential diagnosis and he should have performed a neurological evaluation of D.M. himself or via the residents. Dr. Dabrow will testify that Dr. Bala, the attending physician, was a pediatric hospitalist and was the most experienced pediatric provider and he had at least two opportunities to obtain transfer of care information. Dr. Bala, Dr. Faimon and PA Grover failed to obtain a comprehensive history. Dr. Dabrow will

testify that Dr. Bala, Dr. Faimon and PA Grover provided inadequate and substandard medical care in making a diagnosis of strep and failure to properly develop a differential to account for D.M.'s headache, vomiting, abnormal vital signs, and abnormal neurological exam. Defendants failed to take into account that 5% to 15% of school age children carry the group A streptococcal germ and are not actually infected.  D.M. had many signs and symptoms of increased intracranial pressure.  The defendants made an incorrect diagnosis of strep based upon inadequate and incomplete history taking, inadequate physical exam and diagnosis, and failure to develop a differential diagnosis that would account for his symptoms.  Dr. Faimon was negligent in his review of the chart when he failed to follow up in challenging the strep diagnosis due to lack of clinical findings in the chart, the unusual triage, history and chief complaint.   Dr. Bala failed to demonstrate basic competency requirements of the American Board of Pediatrics for Infectious Disease which would include basis knowledge and understanding of Group A streptococcal infections.   He failed to demonstrate basic understanding and lacked competence under Neurology and Neurologic Disorders which list signs and symptoms of neurologic dysfunction including headache, altered level of consciousness and increased intracranial pressure.  Dr. Bala should have seen D.M. early the morning of admission but failed to see D.M. until D.M. coded.  Dr. Faimon, PA Grover and Dr. Bala each failed to properly evaluate D.M. and to develop an appropriate differential diagnosis and due to their failures, D.M. eventually suffered a stroke.

23.    **Paul Grabb, MD, 2401 Gillham Rd., POB 1st Fl., Kansas City, MO 64108**.  Dr. Grabb will be called live to testify.  He is a licensed medical doctor and expert witness on behalf of the Plaintiff.  He is expected to testify consistent with his findings and opinions listed in his report and deposition testimony and they are incorporated by reference.  He will testify regarding his training, education and experience as fully set forth in his CV which is incorporated by reference.  Dr. Grabb will also testify from his personal experience of treating D.M at Children's Mercy Hospital after D.M. was belatedly transferred to Children's Mercy Hospital.  Dr. Grabb will testify regarding his experience and his knowledge and his employment as Chief of the Section of Neurosurgery at Children's Mercy Hospital.  Dr. Grabb will testify regarding D.M.'s medical history and treatment while under the care of the defendants as well as while under the care of the experts they transferred D.M to at Children's Mercy.  Dr. Grabb will testify about multiple deviations from standard of care in and will testify regarding the fact no imaging was ordered and there was a failure to perform a neurological examination of D.M.  D.M. was seen by a medical student at 6:58 a.m. and the medical student reported that D.M. was "non arousable." No physician saw D.M. after 6:58 a.m. until D.M. coded at approximately 10:00 a.m.  At approximately 10:00 am a nurse found D.M. unresponsive and a code was called.  D.M. was found hypotonic, pupils were reactive but

downbeat nystagmus.  In Dr. Grabb's opinion, it was ocular bobbing rather than nystagmus and ocular bobbing is caused by pontine infarction.  D.M. exhibited decorticate posturing.  A CT scan was belatedly ordered.  Urgent surgical intervention was necessary.  Post-surgery it was determined D.M. had a WNT-type Medulloblastoma which has a high survival rate, up to 90% five-year survival rate.  Dr. Grabb will testify regarding the time of the stroke.  He will also testify that D.M.'s brain responded quickly to the reduction of pressures which indicates an acute process rather than a prolonged exposure to elevated intracranial pressures.

24. **Roger Huckfeldt, MD, 1848 S. Country Hill Lane, Springfield, MO 65809**.  Dr. Huckfeldt will be called live to testify.  He is a licensed medical doctor and expert witness on behalf of the Plaintiff.  He is expected to testify consistent with his findings and opinions listed in his report and deposition testimony both of which are incorporated by reference.  Dr. Huckfeldt will testify regarding his education, training and experience all of which is set forth in detail in his CV which is incorporated by reference.  Dr. Huckfeldt will testify regarding the process and actions necessary to develop a life care plan.  He will testify regarding the information, records, documents and interviews he relied upon to develop a life care plan for D.M.  As set forth in great detail in Dr. Huckfeldt's written life care plan which is incorporated by reference here, he will testify about all of the future needs of D.M. and the cost associated with providing for the future needs of D.M.  Dr. Huckfeldt will testify regarding causation issues.  Dr. Huckfeldt will testify regarding material her reviewed, D.M.'s diagnoses, the medical timeline of D.M.'s medical care and treatment, the surgical procedures and medical procedures D.M. underwent, the therapeutic evaluation and modalities, diagnostic studies and lab work, medical equipment needed by D.M. the orthosis / prothesis D.M. will need, D.M.'s mobility and future medications.  Dr. Huckfeldt will also testify regarding D.M.'s home and living arrangements as well as modifications he believes are necessary.  Dr. Huckfeldt will also testify regarding D.M.'s educational and vocational opportunities or lack thereof.  Dr. Huckfeldt will also be asked to testify regarding recreational opportunities and adjustments to accommodate D.M.'s condition.  Dr. Huckfeldt will testify regarding the cost of providing for D.M.'s future needs and will provide the jury an itemization of all the added costs that are necessary to permit D.M. to live and work around his disabilities caused by defendants negligence.  In Dr. Huckfeldt's most recent life care plan he outlines in specific details the costs that D.M. will incur and the life care plan is incorporated by reference and was provided to defendants previously.  Dr. Huckfeldt will testify and explain to the jury regarding the aggregate cost of providing for D.M. going forward will total $28,710,713.

25. **Jean-Baptiste Le Pichon, MD, 8520 E. 73rd Ter, Kansas City, MO 64133**.
Dr. Le Pichon will be called live to testify. He is a licensed medical doctor
and expert witness on behalf of the Plaintiff. Dr. Le Pichon also was one of
D.M.'s treating physicians at Children's Mercy Hospital after D.M. was
belatedly transferred to Children's Mercy Hospital. Dr. Le Pichon is
expected to testify consistent with his findings and opinions listed in his
report and deposition testimony both of which are incorporated by reference.
Dr. Le Pichon is board certified in neurology with special qualifications in
child neurology. He will testify regarding his education, training,
experience and qualifications which are set forth in full detail in his CV
which is incorporated by reference. Dr. Le Pichon will testify regarding all
of D.M.'s records he has reviewed as well as his personal experience and
knowledge as one of D.M.'s treating physicians after D.M. was belatedly
transferred to Children's Mercy Hospital. He will testify regarding the
chronology of events which are set forth in full detail in his report which is
incorporated by reference. Dr. Le Pichon will testify that the defendants
missed multiple opportunities to provide D.M. with an opportunity to be
accurately diagnosed because the defendants failed to take into account
symptoms that clearly would have directed them to the conclusion
something far more serious than strep was affecting D.M. It is clear that
D.M. was suffering the effects of increased intracranial pressure but Dr.
Faimon and PA Grover did not react to the very clear clues something other
than strep was affecting D.M. PA Grover and Dr. Faimon failed to get an
adequate history and obtained only a very superficial history. Dr. Faimon
failed to examine D.M. and performed only a superficial review of the chart
which was limited by the superficial history and exam by PA Grover.
Likewise, Dr. Bala also missed the opportunity to make a proper diagnosis
or to at a minimum recognize there was more going on with D.M. than strep.
Again, the presentation was a classic presentation of increasing intracranial
pressure and was not a classical presentation of pharyngitis. Dr. Bala was
the physician in charge at the second presentation and Dr. Bala failed to
recognize the characteristic signs of increased intracranial pressure. Failing
to recognize the signs of increasing intracranial pressure and obtain
imagining (at minimum CT scan of head). Dr. Bala's failures are a deviation
from the standard of care as are PA Grover and Dr. Faimon's failures. The
failures of these defendants to act upon the classic signs of increased
intracranial pressure lead to D.M. suffering a catastrophic event leading to a
code blue caused by a pontine ischemic stroke. The stroke was a direct
consequence of the uncheck increased intracranial pressure. But for the
deviations from the standard of care by Dr. Faimon, PA Grover and Dr. Bala,
a proper history would have been obtained and symptoms of increased
intracranial pressure would have been recognized and a CT scan would have
discovered the mass and allowed for surgical decompression and prevented
the pontine ischemic stroke all together. Dr. Le Pichon will testify that PA
Grover, Dr. Faimon and Dr. Bala each deviated from the standard of care by

not recognizing the signs and symptoms of increased intracranial pressure, ordering appropriate tests (CT scan at minimum) and ruled out causes of increased intracranial pressure.

26. **Jean Mulcahy-Levy, MD, 12800 E. 19th Ave., Aurora, CO  80045**.  Dr. Mulcahy-Levy will be called live to testify.  She is a licensed medical doctor and expert witness on behalf of the Plaintiff.  She is expected to testify consistent with her findings and opinions listed in her report and deposition testimony both of which are incorporated by reference.  Dr. Levy will testify regarding her extensive education, training and experience which is set forth in great detail in her CV which is incorporated by reference.  Dr. Levy will testify regarding her review of records in this case which is detailed fully in her report which is incorporated by reference.  Dr. Levy will testify regarding her treatment of D.M. and her experience as D.M.'s primary neuro-oncologist.  She will testify regarding D.M.'s permanent tissue damage and loss of tissue related to the pontine stroke that will result in prolonged neurological deficits for the remainder of D.M.'s life.  Dr. Levy will also testify regarding D.M.'s prognosis and that the WNT-activated subtype of medulloblastoma has a very good prognosis with a 5-year disease free survival over 90% (with some people quoting near 100% survival).  Dr. Levy will testify regarding future plan and treatment for D.M. and the plan to closely follow D.M. with MRI's for monitoring as well as provide extensive PT, OT and speech therapy services D.M. will need to help with his underlying neurologic deficits to provide D.M. the best quality of life possible.  All of Dr. Levy's opinions are presented in detail in her report as well as her deposition and both are incorporated by reference.

27. **James Mathews, MD, 2020 Lincoln Park West, Apt. 10G, Chicago, IL 60614**.  Dr. Mathews will be called live to testify.  He is a licensed medical doctor and expert witness on behalf of the Plaintiff.  He is expected to testify consistent with his findings and opinions listed in his report and deposition testimony which is incorporated herein by reference.  Dr. Matthews will testify regarding his extensive education, training and experience which is set forth in great detail in his CV which is incorporated by reference.  Dr. Matthews will testify in detail regarding his experience in the emergency room as a board-certified emergency room physician.  Dr. Matthews will testify regarding his review of records and materials he used in formulating his opinions in D.M.'s case all of which is set forth in great detail in his report which is incorporated by reference.  He will testify regarding PA Grover's charting shortfalls and the failure to have a proper differential.  Likewise, Dr. Faimon also failed to properly consider a differential and failed to take steps to cause a proper history and physical to be utilized.  More ominous diagnoses were not considered by PA Grover or Dr. Faimon.  Given the constellation of symptoms D.M. presented with further testing was required along with observation and neurological consultation.  Dr. Faimon and PA Grover downplayed the importance of

headache, dizziness and unbalance.   They ignored the presenting symptoms.  D.M. did not receive a proper medical screening.  Dr. Faimon and PA Grover deviated from the standard of care in failing to provide D.M. a proper screening.  If PA Grover and Dr. Faimon had provide care that met the standard of care, a diagnosis would have been made and with proper care and treatment the stroke would not have occurred.

28.     **Charles Murphy, MD, 285 Columbus Ave., Apt. 408, Boston, MA 02116**.  Dr. Murphy will be called live to testify.  He is a licensed medical doctor and expert witness on behalf of the Plaintiff.  He is expected to testify consistent with his findings and opinions listed in his report and deposition testimony both of which are incorporated by reference.  Dr. Murphy will testify regarding his extensive education, training and experience as is set forth in full detail in his CV and which is incorporated by reference.  Dr. Murphy will testify regarding his expertise in pediatric emergency medicine.  He will testify in detail about the materials he reviewed in this case and all such material is disclosed in his report as well as in his deposition.  Dr. Murphy will present his summary of the care and treatment of D.M.  Dr. Murphy will testify that Dr. Faimon and PA Grover deviated from the standard of care in their failure to order emergent neuro-imaging and failure to full evaluate the possibility of life threatening intra-cranial process in light of his presenting symptoms.  They deviated from the standard of care in their failure to document the gait of D.M. in light of the reported unbalanced gait.  The failed to document D.M.'s blood pressure.  They failed to review the medical record adequately and failed to accurately document in the chart symptoms and observations.  He will testify that D.M.'s presenting symptoms were a "red flag."  The failure to adequately respond to D.M.'s symptoms was a deviation from the standard of care by PA Grover and also, Dr. Faimon.  Additionally, physician assistants provide clinical care under the authority of an attending physician who is responsible for the care provided and in this case, that was Dr. Faimon.  He electronically signed off on the chart at 22:15 on 03/05/2017 which is prior to D.M.'s code and he should have taken steps to follow up.  It was a deviation from the standard of care to fail to order a CT scan of D.M.'s head under the circumstances.

29.     **John Ward, PhD, 8340 Mission Rd., Suite 235, Prairie Village, KS 66206.**  Dr. Ward will be called live to testify.  He is an economist and expert witness on behalf of the Plaintiff.  He is expected to testify consistent with his findings and opinions listed in his report and deposition testimony.  Dr. Ward will testify regarding his education, training and experience which is extensive and set forth in substantial detail in his CV which is incorporated by reference.  Dr. Ward will testify regarding the information and documents he reviewed which are all set forth in his report and incorporated by reference.  Dr. Ward will testify regarding the nature of his report, the summary of the information provided, the categories of

economic analysis, D.M.'s lost earning capacity, D.M.'s future medical costs, the future earning capacity growth and discount rates and he will testify regarding his summary of the economic analysis of D.M.'s damages. Each of these categories is set forth in detail in Dr. Ward's written report which is incorporated by reference.

30.     All witnesses necessary for impeachment and rebuttal.

**ii. Description of documents and other tangible things that are in D.M.'s possession, custody, or control and that D.M. may use to support his claims.**

1.  Medical records and radiology imaging and reports for the care and treatment of D.M. from the following providers:

|     |     |     |
| --- | --- | --- |
| a. | 01 | Wesley Medical Center |
| b. | 02a | Via Christi St. Francis |
| c. | 02b | Via Christi St. Francis |
| d. | 02c | Via Christi St. Francis |
| e. | 02d | Via Christi St. Francis |
| f. | 03 | Abay Neuroscience |
| g. | 04 | Via Christi Clinic |
| h. | 05a | Children's Mercy Hospitals & Clinics |
| i. | 05b | Children's Mercy Hospitals & Clinics |
| j. | 05c | Children's Mercy Hospitals & Clinics |
| k. | 05d | Children's Mercy Hospitals & Clinics |
| l. | 05e | Children's Mercy Hospitals & Clinics |
| m. | 05f | Children's Mercy Hospitals & Clinics |
| n. | 05g | Children's Mercy Hospitals & Clinics |
| o. | 05h | Children's Mercy Hospitals & Clinics |
| p. | 05i | Children's Mercy Hospitals & Clinics |
| q. | 06 | Hutchinson Clinic PA |
| r. | 07a | Heartspring |
| s. | 07b | Heartspring |
| t. | 07c | Heartspring |
| u. | 07d | Heartspring |
| v. | 08 | Panda Pediatrics |
| w. | 09 | Lawrence Memorial Hospital |
| x. | 10a | Solace Pediatric Home Healthcare |
| y. | 10b | Solace Pediatric Home Healthcare |
| z. | 11 | Kids First Pediatrics of Georgia |
| aa. | 12a | Children's Hospital Colorado |
| bb. | 12b | Children's Hospital Colorado |
| cc. | 12c | Children's Hospital Colorado |
| dd. | 12d | Children's Hospital Colorado |
| ee. | 12e | Children's Hospital Colorado |

ff.    12f    Children's Hospital Colorado
gg.    12f    Children's Hospital Colorado
hh.    12g    Children's Hospital Colorado
ii.    12h    Children's Hospital Colorado
jj.    13    Walgreen Company
kk.    14    University of Kansas Medical Center
ll.    15    Children's Eye Physicians
mm.   16    Spark Home Health
nn.    17    Children's Dentistry
oo.    18    Boulder Medical Center – Broadway
pp.    19    Edgepark Medical Supplies
qq.    20    Prosthetic & Orthotic Group
rr.    21    CVS Pharmacy
ss.    22a    Estrella Home Health Care, Inc.
tt.    22b    Estrella Home Health Care, Inc.
uu.    22c    Estrella Home Health Care, Inc.
vv.    22d    Estrella Home Health Care, Inc.
ww.    22e    Estrella Home Health Care, Inc.
xx.    23    Apria Healthcare
yy.    24    Saint Luke's Regional Lab
zz.    25    Boulder Valley Vision Therapy, PC
aaa.    26    Front Range Eye Associates
bbb.    27    Kidspot Pediatric Therapies
ccc.    28a    Children's Hospital Colorado Special Care Clinics
ddd.    28a    Children's Hospital Colorado Special Care Clinics
eee.    28b    Children's Hospital Colorado Special Care Clinics
fff.    28c    Children's Hospital Colorado Special Care Clinics
ggg.    28d    Children's Hospital Colorado Special Care Clinics
hhh.    28e    Children's Hospital Colorado Special Care Clinics
iii.    29    Hanger, Inc.
jjj.    30    Numotion
kkk.    31    Accredo
lll.    40    A Physicians Home Care
mmm.    41    A Rise Above Home Care
nnn.    Radiology Reports Produced to KM
ooo.    Nutrition Letter by Diana Hieb MSN, APRN, CMH
ppp.    Diagnosis Sheet by Matthew Mayer, MD, Children's Hospital Colorado, dated 03/27/19
qqq.    Letter by Molly Hemenway, DNP, dated 05/31/18

2. Medical bills and itemizations for the care and treatment of D.M., including, but not limited to:

    a.   Apria Healthcare

    b.  Boulder Medical Center
    c.  Boulder Valley Vision Therapy
    d.  Care Centrix
    e.  Children's Eye Physicians
    f.  Children's Hospital Colorado
    g.  Children's Mercy Hospital
    h.  Children's Mercy Hospital Professional
    i.  Colorado University Medicine Physicians
    j.  Edgepark Medical Supplies
    k.  Hanger Clinic
    l.  Heartspring
    m.  Numotion/United Seating & Mobility
    n.  Nutritional Medicinals
    o.  Solace Pediatric Home Healthcare
    p.  Spark Home Health
    q.  Orthotic Prosthetic Solutions
    r.  Prosthetic & Orthotic Group
    s.  A Rise Above Home Care
    t.  Estrella Home Health
    u.  Linkia
    v.  Kidspot Pediatric Therapy
    w.  Walgreen Co.
    x.  CVS Pharmacy
    y.  Front Range Eye Associates
    z.  A Physicians Home Care
    aa. A Rise Above

3. Medical record audit trails from Via Christi-St. Francis Ascension and Wesley Medical Center.

4. Educational records of D.M.

5. The social media and other online postings of Defendant Grover referenced in Plaintiff's operative Complaint.

6. Photographs and videos of D.M before and after his stroke, including:

    a.  Photos – 152
    b.  Videos – 47

7. Cellular Records, Screen Shots of Texts, and Google searches of Kevin and Kelli Morgan from March 5- 6, 2017, including:

    a.  Texts – Arrival to ER, Check-In
    b.  Texts – Waiting (3 Total)
    c.  Kelli – Call Log 02 24 17 to 03 23 17

d.  Kevin – Call Log 02 24 17 to 03 23 17
e.  I-Phone – Call Log 02 25 17 to 03 20 17
f.  Google Search – Activity Logs 03 05 17
g.  Google Search – Activity Logs 03 06 17
h.  Texts – Monica Lawrence
i.  Texts – Kevin/Kelli Morgan

8.  Verizon Wireless Billing Logs:
    a.  02-24-17 to 03-23-17
    b.  03 24 17 to 04 23 17

9.  Sprint Cellular Records:
    a.  Bala Bhaskar Reddy Bhimavarapu, M.D.

10.  Home Footage Videos of D.M., 10 Total

11.  Files from Kansas Board of Healing Arts:
    b.  Bala Bhaskar Reddy Bhimavarapu, M.D.
    c.  Gregory Faimon, M.D.
    d.  Bridget Grover, PA-C, including the "Final Order" for Docket No. 09-HA00193 filed July 15, 2009 and the "Journal Entry of Satisfaction of Requirements of Final Order" for the same docket number filed June 29, 2009.

12.  Recorded Phone Calls:
    a.  Kevin Morgan/Dr. Gregory Faimon
    b.  Kevin Morgan/Thomas Dock Owings
    c.  Kelli Morgan/CMH personnel (two separate phone calls)

13.  Out-of-Pocket Expenses and Receipts paid by Morgan Family and produced December 26, 2019 and September 4, 2020.

14.  Deposition Transcripts, Exhibits and Videos of the following:

    a.  Madonna Androes
    b.  Nelda Appell
    c.  William Banner, MD
    d.  Bala Bhimaverapu, MD
    e.  Margot Burns, MD
    f.  Jennifer Chambers-Daney, ARNP
    g.  Timothy Chilcote, MD
    h.  Robert Dabrow, MD
    i.  Gregory Faimon, MD
    j.  Paul Arthur Grabb, MD
    k.  Bridget Grover, PA
    l.  Raymond Grundmeyer, MD

m.  Emily Hablutzel
n.  Connor Hartpence, MD
o.  Stacy Harding
p.  Roger Huckfeldt, MD
q.  Lisa Judd, RN
r.  Jenna Knight
s.  Jean Baptiste Le Pichon, MD
t.  Jean Mulcahy-Levy, MD
u.  Mary Masterman, MD
v.  Melissa Mackey
w.  Christy Martin
x.  James Mathews, MD
y.  Betsy Michael
z.  Kelli Morgan
aa.  Kevin Morgan
bb.  Charles Murphy, MD
cc.  Thomas "Tripp" Dock Owings
dd.  Dimitrios Stephanopoulos, MD
ee.  John Ward, PhD

15.  All Disclosures, Interrogatory, Request for Production, and Request for Admission responses and production used and exchanged thereto. Specifically, Interrogatory, Request for Production and Request for Admission Responses by Defendants Grover, Faimon and Bala.

16.  All Expert Reports, C.V.s and Documentation offered by Plaintiff and/or Defendants including medical literature.

17.  Any and all material obtained through discovery in this matter.

18.  Demonstrative evidence for trial purposes.

19.  Anatomical models, charts, diagrams, drawings, photographs and/or illustrations.

20.  Impeachment, foundation and/or rebuttal evidence.

Respectfully submitted,

DUGAN & GIROUX LAW, INC.


/s/: *Daniel B. Giroux*
Daniel B. Giroux          KS # 19375
3636 N. Ridge Rd., Suite 100
Wichita, Kansas 67205
Phone 316-721-5500
Fax 316-722-7510
dan@dgwichitalaw.com

and


KUCKELMAN TORLINE KIRKLAND


/s/ *Stephen J. Torline*
Stephen Torline           KS #18292
Michael J. Kuckelman      KS #14587
Benjamin T. Friesen       KS#26655
Jennifer Salva            KS#82844
Michael G. Crabb          KS#24395
10740 Nall, Suite 250
Overland Park, Kansas 66211
Direct dial: 913-948-8615
Fax: 913-948-8611
storline@ktk-law.com
mkuckelman@ktk-law.com
bfriesen@ktk-law.com
jsalva@ktk-law.com


*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on 6th day of February, 2020 a true and correct copy of the above and foregoing ***Plaintiff D.M.'s Final Witness & Exhibit Pursuant to Rule 26(a)(3)(A)*** was filed via CM/ECF which will cause a copy to be issued to:

> Tracy Cole
> Cameron Bernard
> Goodell Stratton Edmonds & Palmer LLP
> 515 S Kansas Avenue
> Topeka, KS  66603
> *tcole@gseplaw.com*
> *cbernard@gseplaw.com*
> *Attorney for Defendants Bridget Grover and Gregory Faimon*
>
> Don Gribble
> Randy Troutt
> Mackenzie Baxter
> Hite Fanning & Honeyman LLP
> 100 N. Broadway, Suite 950
> Wichita, KS 67202-7803
> gribble@hitefanning.com
> baxter@hitefanning.com
> troutt@hitefanning.com
> *Attorney for Defendant Bala Bhimavarapu*

/s/ Daniel B. Giroux
Attorney
